_____

No. 14-5152
_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SAFARI CLUB INTERNATIONAL and NATIONAL RIFLE ASSOCIATION
OF AMERICA, Plaintiffs-Appellants,

v.

SALLY M. R. JEWELL, in her official capacity as
United States Secretary of the Interior, *et al.*,
Defendants-Appellees

_____

On Appeal from the United States District Court for the District of Columbia
(No. 14-00670-ABJ)

_____

## BRIEF OF PLAINTIFFS-APPELLANTS SAFARI CLUB
## INTERNATIONAL AND NATIONAL RIFLE ASSOCIATION OF
## AMERICA

Anna M. Seidman
Douglas S. Burdin
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
Tel:  202-543-8733
Fax:  202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
*Counsel for Safari Club International*

Christopher A. Conte
National Rifle Association of
America/ILA
11250 Waples Mill Rd., 5N
Fairfax, Virginia 22030
Tel:  703-267-1166
Fax:  703-267-1164
cconte@nrahq.org
*Counsel for National Rifle
Association of America*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The following information is provided pursuant to the Court's order of June 25, 2014, and D.C. Circuit Rule 28(a)(1).

## A. Parties

Appellants:

Safari Club International;

National Rifle Association of America.

Appellees

Sally M. R. Jewell, in her official capacity as Secretary of the U.S. Department of the Interior;

Daniel Ashe, in his official capacity as Director of the U.S. Fish and Wildlife Service;

The United States Department of the Interior; and

The United States Fish and Wildlife Service.

## B. Rulings Under Review

Appellants seek review of the Memorandum Opinion and Order entered on 06/06/2014 (Dkt. No. 24) in Case No. 14-00670 by Judge Amy Berman Jackson of the U.S. District Court for the District of Columbia, denying Plaintiffs/Appellants Safari Club International and National Rifle Association of America's motion for a preliminary injunction. *Safari Club International et al. v. Jewell et al.,* 2014 WL

2535948 (June 6, 2014). The Memorandum Opinion and Order are part of the

Appendix filed on July 18, 2014.

### C. Related Cases

The case under review has never previously been before this Court. Counsel for

Plaintiffs/Appellants Safari Club International and National Rifle Association of

America are aware of no cases challenging the issues addressed in this litigation

pending in this or any other court.

**CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF/APPELLANT
SAFARI CLUB INTERNATIONAL**

In accordance with Federal R. App. P. 26.1 and D.C. Circuit Rule 26.1, counsel of record for Safari Club International certifies that Safari Club International is a 501(c)(4) corporation and, to the best of my knowledge and belief, Safari Club International has no parent companies, subsidiaries or affiliates that have any outstanding securities in the hands of the public. These representations are made in order that judges of this court may determine the need for recusal.

**CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF/APPELLANT
NATIONAL RIFLE ASSOCIATION OF AMERICA**

In accordance with Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, counsel of record for the National Rifle Association of America ("NRA") certifies that the NRA is a not-for-profit membership association incorporated in New York, the NRA is not publicly traded and has no parent corporation, and there is no publicly held corporation that owns 10 percent or more of its stock. These representations are made in order that judges of this court may determine the need for recusal.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF/APPELLANT SAFARI CLUB INTERNATIONAL ............................................................. iv

CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF/APPELLANT NATIONAL RIFLE ASSOCIATION OF AMERICA ................................. iv

TABLE OF AUTHORITIES ................................................................. vii

GLOSSARY OF TERMS ..................................................................... ix

I.   INTRODUCTION ........................................................................1

II.  JURISDICTIONAL STATEMENT ..................................................2

III. STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................2

IV. STATEMENT OF THE CASE ........................................................3

    A.    The Regulatory History and Current Legal Status of African Elephants in Zimbabwe and Tanzania ...................................3

    B.    The African Elephant Importation Bans ..............................6

        1.    Zimbabwe ....................................................................6

        2.    Tanzania ....................................................................10

    C.    Irreparable Harm to SCI/NRA's Members Caused by the Importation Bans .........................................................12

        1.    Harms From the Zimbabwe Importation Ban ...........12

            a.    Loss/Diminishment of Recreational Opportunity ..........13

            b.    Loss to Elephant Conservation .......................14

                i.    Encouragement of community tolerance for elephants ...............................................16

                ii.    Anti-poaching strategies ......................19

                iii.    Habitat improvement resources ...........23

            c.    Economic Losses .........................................24

  2. Harms From the Tanzania Importation Ban .............................26

    a. Loss/Diminishment of Recreational Opportunity ..........27

    b. Loss to Conservation Efforts ..........................................28

    c. Economic Losses ..............................................................31

  3. Loss to SCI/NRA .......................................................................31

 D. Procedural History of the Case..........................................................32

V. SUMMARY OF ARGUMENT .........................................................................34

VI. ARGUMENT ....................................................................................................36

 A. Standard of Review ...........................................................................36

 B. A Likelihood of Irreparable Harm Must Be Established for
  Preliminary Injunctive Relief ............................................................37

 C. The Loss of the Ability to Import Sport-Hunted Elephants Is
  Sufficiently Certain and Great to Qualify as Irreparable ...................38

 D. SCI/NRA's Harms Are Not Self-Inflicted .........................................42

 E. SCI/NRA's Economic Losses Qualify as Irreparable Harm...............45

 F. SCI/NRA's Conservation Harms Are Not Hypothetical ...................48

VII. CONCLUSION.............................................................................................50

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION .....53

CERTIFICATE OF SERVICE ...............................................................................54

ADDENDUM .........................................................................................................55

# TABLE OF AUTHORITIES

**Cases**

Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127 (9th Cir. 2011)..............40

Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356 (D.C. Cir. 1999)....................37

Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288 (D.C. Cir. 2009)................37

District 50, United Mine Workers of America v. International Union,
    United Mine Workers of America, 412 F.2d 165 (D.C. Cir. 1969) ....................37

Gordon v. Holder, 632 F.3d 722 (D.C. Cir. 2011)....................................................36

Kalbfleisch v. Columbia Cmty. Sch. Unit 4, 396 Ill. App. 3d 1105,
    920 N.E.2d 651 (Ill. App. 2009) ..................................................................... 44-45

Myland Pharm., Inc. v. Shalala, 81 F. Supp. 2d 30 (D.D.C. 2000)........................47

Natural Res. Def. Council, Inc. v. U.S. Food and Drug Admin.,
    710 F.3d 71 (2nd Cir. 2013) ................................................................................43

Safari Club International v. Jewell, Case No. 14-670, (D.D.C.),
    June 6, 2014 Memorandum Opinion and Order ............................ 2, 38, 41, 42, 49

Schalk v. Teledyne Inc., 751 F. Supp. 1261 (W.D. Mich. 1990)
    aff'd. 948 F.2d 1290 (6th Cir. 1991) ....................................................................39

Sherley v. Sebelius, 644 F.3d 388 (D.C.Cir. Apr. 29, 2011)....................................38

St. Pierre v. Dyer, 208 F.3d 394 (2d Cir. 2000)........................................................43

Stuller, Inc. v. Steak and Shake Enters., 695 F.3d 676 (7th Cir. 2012)...................44

Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921
    (D.C. Cir. 1958) ....................................................................................................47

*Winter v. Natural Res. Def. Council, 555 U.S. 7 (2008)........................................37

Wis. Gas. Co. v. F.E.R.C., 758 F.2d 669 (D.C. Cir. 1985) ............................... 38, 47

**Statutes**

5 U.S.C. §§ 701-706.....................................................................................................2

5 U.S.C. § 702 ..............................................................................................................2

5 U.S.C. § 706 ..............................................................................................................2

16 U.S.C. §1533 ...........................................................................................................3

28 U.S.C. § 1292(a)(1)......................................................................2

28 U.S.C. § 1331...............................................................................2

28 U.S.C. § 2201...............................................................................2

28 U.S.C. § 2202...............................................................................2

**Treatises**

CITES text, Article III ....................................................................5

CITES text, Article IV ....................................................................5

Res. Conf. 2.11 (Annex 1) .............................................................4

Res. Conf. 2.11 (rev. 1) .................................................................4

**Regulations**

43 Fed. Reg. 20499 (May 12, 1978).............................................3

50 C.F.R. § 17.40(e)........................................................................3

*57 Fed. Reg. 35473 (Aug. 10, 1992) .......................................3, 4

79 Fed. Reg. 26986 (May 12, 2014) ...........................................15

*Authorities Principally Relied On

# GLOSSARY OF TERMS

App.                        Appendix

CAMPFIRE                    Communal Area Management
                            Programme for Indigenous
                            Resources

CITES                       Convention on International
                            Trade of Endangered Species of
                            Fauna and Flora

Decl.                       Declaration

Dkt.                        Docket

ESA                         Endangered Species Act

Mem. Op.                    Memorandum Opinion and Order

Non-detriment Finding       A finding made, according to
                            CITES provisions, that the import
                            of a specimen will be for
                            purposes which are not
                            detrimental to the survival of the
                            species involved.

SCI/NRA                     Safari Club International and the
                            National Rifle Association of
                            America

Service                     United States Fish and Wildlife
                            Service

ZimParks                    Zimbabwe Parks and Wildlife
                            Management Authority

# I.    INTRODUCTION

Safari Club International and the National Rifle Association of America ("SCI/NRA") appeal a ruling of the U.S. District Court for the District of Columbia that denied their motion for a preliminary injunction against two importation bans imposed by Secretary of the Interior, Sally Jewell *et al*. ("Federal Appellees").  The court below denied the motion based on the determination that the bans against the importation of legally sport-hunted elephants from Zimbabwe and Tanzania (importation bans) did not cause SCI/NRA and their members irreparable harm.  The Court below erroneously: (1) afforded insufficient significance to the recreational harm caused by the loss of the opportunity to import successfully hunted elephants; (2) concluded that SCI/NRA members self-inflicted their own recreational, conservation and economic harms by choosing to cancel their hunts; (3) applied an incorrect legal standard for assessing the impact of the economic harms caused by the importation bans; and (4) regarded the conservation losses caused by the importation bans as speculative.  SCI/NRA request that this Court reverse the District Court's ruling on irreparable harm and remand the matter to the court below to evaluate the remaining elements necessary for SCI/NRA's entitlement to preliminary injunctive relief.

## II.    JURISDICTIONAL STATEMENT

This is an appeal from the District Court's June 6, 2014, Memorandum Opinion and Order ("Mem. Op.") denying SCI/NRA's motion for a preliminary injunction to enjoin Federal Appellees from banning the importation of sport-hunted elephants from Zimbabwe and Tanzania. Appendix ("App.") at 45. SCI/NRA filed a timely Notice of Appeal on June 17, 2014. App. at 56.

The District Court had jurisdiction over this action under the Administrative Procedure Act, 5 U.S.C. §§ 702, 706 (judicial review of final agency action and inaction) and 28 U.S.C. § 1331 (federal question jurisdiction) and has the authority to grant declaratory and injunctive relief under 28 U.S.C. § 2201, 28 U.S.C. § 2202, and 5 U.S.C. §§ 701-706.

This Court has jurisdiction, pursuant to 28 U.S.C. § 1292(a)(1), to consider the appeal of an interlocutory order denying preliminary injunctive relief.[1]

## III.    STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the District Court erred 1) in determining that SCI/NRA failed to demonstrate irreparable harm and 2) in denying SCI/NRA's motion for a preliminary injunction on that basis.

---

[1] Pertinent statutes and regulations are in the Addendum.

## IV.  STATEMENT OF THE CASE

### A.  The Regulatory History and Current Legal Status of African Elephants in Zimbabwe and Tanzania

 African elephants (loxodonta Africana) are found throughout much of Africa, but the majority live in southern and eastern Africa, including Zimbabwe and Tanzania.  The wildlife management authorities of Zimbabwe and Tanzania allow the hunting of elephants in their countries.  The regulation of imports of those legally hunted elephants into the United States rests with the U.S. Fish and Wildlife Service ("Service").  The criteria for importation depend upon the listing status of the elephants under the Convention on International Trade of Endangered Species of Fauna and Flora ("CITES") and the Endangered Species Act ("ESA"), 16 U.S.C. §1533.  Elephants in Zimbabwe are listed on CITES Appendix II and elephants in Tanzania are listed on CITES Appendix I.  The Service has designated all African elephants as threatened under the ESA.  43 Fed. Reg. 20499 (May 12, 1978).

In 1978, the Service promulgated a regulation that provides criteria for the importation of legally hunted African elephants into the United States.  50 C.F.R. § 17.40(e) ("special rule").  In 1992, the Service amended the special rule to include a provision that allowed the importation of sport-hunted elephants as long as CITES requirements were fulfilled and the elephant was appropriately marked.  57 Fed. Reg. 35473, 35485 (Aug. 10, 1992).  At the time of the 1992 amendment to

the special rule, CITES required that for Appendix I species, including elephants, the importing country needed to make a determination that the sport-hunting of the animal would not be detrimental to the survival of the species. The Service's special rule matched that CITES enhancement of survival requirement. *Id.*[2]

> CITES requirements included a determination that the killing of elephants for sport-hunting enhances the survival of the species by providing financial support programs for elephant conservation. This requirement is retained in the final revised special rule for the import of sport-hunted trophies from threatened populations that are on CITES appendix I.

57 Fed. Reg. at 35485; Res. Conf. 2.11 (Annex 1)**Error! Bookmark not defined.**, App. at 257.

When CITES later deleted the enhancement of survival finding requirement, the Service did not follow suit. In 1994, the parties to CITES amended Res. Conf. 2.11 (rev. 1) and removed the enhancement of survival requirement from the resolution. App. at 258. From that point forward, CITES no longer imposed enhancement of survival requirements for the importation of species on either Appendix I or II and, consequently, CITES still does not require enhancement findings for the importation of African elephants from Zimbabwe or Tanzania.

---

[2] The Federal Register notice accompanying the special rule noted that sport-hunting "provide[s] important revenues for elephant conservation to range states." 57 Fed. Reg. at 35485.

Without explanation of any kind, the Service failed to make a parallel change to the special rule's enhancement of survival finding requirement for the importation of elephants.  The Service retained the enhancement of survival finding criteria for both Appendix I and II species, yet never gave the public an opportunity to comment on its decision to diverge from the CITES model and to thereby increase the U.S. requirements for elephant importation.  From the time it established that heightened obligation, until the date that it imposed a ban on elephant importation, the Service never wavered from its position that the hunting and importation of elephants from Zimbabwe and from Tanzania enhanced the survival of the species.

CITES and the Service impose an additional requirement for the importation of Tanzania's elephants because they are listed on CITES Appendix I.  They both required a country, allowing the importation of an Appendix I species, to make a finding that the "import will be for purposes which are not detrimental to the survival of the species involved." ("Non-detriment Finding").  CITES text, Article III.[3]

---

[3] For Appendix I and II listed species, CITES (and the Service) requires that the exporting country make a finding that the "export will not be detrimental to the survival of the species."  The importing country is not required to make any finding for an Appendix II listed species, such as Zimbabwe's elephants.  CITES text, Article IV.

In addition, over this same period, the Service consistently determined that the importation of elephants from Tanzania was not detrimental to the survival of the species. All this changed on April 4, 2014.

**B.    The African Elephant Importation Bans**

**1.    Zimbabwe**

On April 4, 2014, the Service announced, in a press release posted on the Service's website, an immediate suspension of the importation of sport-hunted African elephants taken in Tanzania and Zimbabwe during 2014. App. at 58. The Service gave no prior notice of this decision to the public or to the two countries directly affected by the bans.[4]

The press release and a Question and Answer page that the Service posted on its website (App. at 60) explained that the agency had based the importation ban for Zimbabwe on "limited" data and "anecdotal" evidence. App. at 58, 60. An April 4, 2014 document entitled "Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014" ("Zimbabwe Enhancement Finding") made by the Service's Management Authority (Branch of Permits) admitted that the Service had not made any type of formal request for

---

[4] On April 18, 2014, the Service announced a modification to the Zimbabwe elephant importation ban. In a letter to SCI, Service Chief, Division of Management Authority, Robert Gabel explained that the Service had removed the portion of the ban that prohibited the importation of elephants taken during the period between January 1, 2014 and April 4, 2014. App. at 62.

information from the Zimbabwe Parks and Wildlife Management Authority ("ZimParks") since March 21, 2007. App. at 64. The Service waited until after imposing the importation ban on April 4, 2014 to request from ZimParks the most current information on African elephants. App. at 69 and 70. ZimParks responded promptly on April 17, 2014, with a 32-page report referencing multiple attachments, including aerial surveys, management plans, statutes and regulations ("ZimParks Response"). App. at 73.

The Service based their Zimbabwe Enhancement Finding almost exclusively on a 2013 Report prepared by the International Union for Conservation of Nature ("International Union") entitled "Zimbabwe 2012 ('2013 Africa analysis')" ("International Union Report"). App. at 107-08. The International Union Report lacked current information concerning Zimbabwe's elephant population status and recent anti-poaching efforts.[5]

---

[5] For example, the International Union Report relied on a population estimate of 527 elephants for the Save Valley Conservancy based on a 2003 aerial survey (International Union Report, App. at 108) despite the fact that "[t]he Save Valley Conservancy has been conducting annual surveys since 2002" (ZimParks Response at 8, App. at 82) and that a recent population estimate of 1,538 based on a 2013 aerial survey showed a population three times the 2003 estimate reported in the International Union Report. *Id.* Similarly, the International Union Report relied on 2001 data and a population estimate of 53 elephants for the Bubye (also referred to as Bubi) Valley Conservancy instead of a 2013 aerial survey that showed an elephant population of 540. International Union Report, App. at 107; ZimParks Response at 8, App. at 82. The International Union Report also relied on data from 2009 for its population estimate for Gonarezhou National Park (International Union Report, App. at 107) and failed to consider or report data from a 2013 aerial

Neither the Service's press release nor the Zimbabwe Enhancement Finding noted the prominent role that Zimbabwe's sport-hunting businesses play in the battle against elephant poaching. The Zimbabwe Enhancement Finding did not address how the presence of hunters, outfitters and their staff in the field provides a deterrent to poachers or how the infusion of revenue generated by the hunting and other activities of U.S. hunters encourages local communities to guard against poaching. The Zimbabwe Enhancement Finding also failed to analyze the impact an elephant importation ban would have on elephant conservation in Zimbabwe, and offered no discussion of the detriment of removing a major source of conservation funding for the country's elephants or depriving the country of hunters whose very presence deters and discourages poaching.

The documents that the Service published at or around the time that the agency implemented the importation bans revealed that the Service imposed the importation bans with the express intent of reducing the number of U.S. hunters going to Zimbabwe (and Tanzania) to hunt elephants. Not only did the Service expect that the importation bans would discourage U.S. hunters from following through with planned elephants hunts, but the agency actually *recommended* that U.S. hunters cancel their hunts. The Question and Answer page that the Service

survey that demonstrated a population increase and an estimate of 10,151 elephants. ZimParks Response at 8, App. at 82.

posted on its website offered the following hypothetical question from a U.S. hunter and the Service's response:

> **I have already purchased a hunt in Tanzania or Zimbabwe. How do I get my money back?**
>
> We encourage you to contact your hunting outfitter to discuss options. While you can still participate in a hunt in 2014, you currently are not able to import the trophy. In addition, given the current conservation concerns for elephants in Tanzania and Zimbabwe, *we strongly advise that you reconsider taking part in an elephant hunt in either of these countries at this time.*

App. at 61 (emphasis added).

Although the Service was aware that it could not directly regulate the number of elephants hunted in Zimbabwe (and Tanzania), the Service nevertheless intended that the importation bans would reduce the number of elephants taken by hunters. In the press release used to announce the importation bans, the Service expressly stated that the intended purpose of the importation bans was to reduce the take of elephants "additional to" elephants killed by poachers:

> Sport hunting, as part of a sound management program, can provide benefits to conservation. Yet, given the current situation in Tanzania, and given the uncertainty with regard to elephants in Zimbabwe, the Service is not assured that the benefits of sport hunting will be realized in those countries. Further, the Service is concerned that *additional killing of elephants* in Tanzania, even if legal, is not sustainable at this time, and the same may be true for Zimbabwe.

App. at 58 (emphasis added).

Although the April 4, 2014 importation ban decision bore every appearance of finality, the Service subsequently recharacterized the importation ban for Zimbabwe as "temporary" and "interim." In a Federal Register Notice published on May 12, 2014, the Service explained that agency personnel were now reviewing the information necessary to make a decision about elephant importation from Zimbabwe:

> The Service has requested the information necessary to make a final decision from the Government of Zimbabwe. After the Service has an opportunity to review new information and obtain additional information, if necessary, we will make a final decision. If the Service finds that sport hunting of African elephants in Zimbabwe enhances the survival of the species, the suspension will be lifted. If, after reviewing the new information, the Service finds that sport hunting of African elephants in Zimbabwe does not enhance the survival of the species, the suspension will continue until the Service receives new information in the future that would allow it to make a positive enhancement finding. Either way, the final finding will be published in the Federal Register and made available on the Service's Web page.

App. at 370. In the declaration of Service Chief, Branch of Permits, Timothy Van Norman, submitted by Federal Appellees to the District Court in this litigation, Mr. Van Norman stated that he would make a "final" determination about the importation ban for Zimbabwe by mid-July 2014. App. at 287.

## 2. Tanzania

The Service imposed the importation ban for Tanzania based on: (1) a February 21, 2014 determination from the Service's Scientific Authority that it could not make a finding that the hunting of elephants in Tanzania would not be

detrimental to the survival of the species (("2014 Tanzania Non-detriment Finding"), App. at 109), and (2) a March 27, 2014 determination from the Service's Management Authority (Branch of Permits) that the importation of sport-hunted trophies from Tanzania is not likely to enhance the survival of the species ("2014 Tanzania Enhancement Finding"),  App. at 123.  The Service did not make the 2014 Tanzania Enhancement Finding, 2014 Tanzania Non-detriment Finding and import ban decision available to the public for review and comment and did not publish those documents in the Federal Register.

The 2014Tanzania Non-detriment Finding focused on the take of elephants generally, both for legal and illegal purposes instead of on the question of whether the *importation* of sport-hunted elephants for the personal use of the hunters would be for *purposes* that are detrimental to the survival of the species. App. at 109-122. The 2014Tanzania Non-detriment Finding did not examine the role that sport hunting plays in decreasing and discouraging poaching in Tanzania.  It also did not address how the presence of hunters, outfitters and their staff in the field provides a deterrent to poachers or how the infusion of revenue generated by the hunting and other activities of U.S. hunters encourages local communities to guard against poaching.  The 2014 Tanzania Non-detriment Finding omitted this analysis and merely addressed sport hunting as an "additional" source of take.  App. at 119.

The 2014 Tanzania Non-detriment Finding also failed to analyze the impact an importation ban would have on elephant conservation in Tanzania.

Just as with the importation ban for Zimbabwe, the Service imposed the ban for Tanzania with the express intent of prompting U.S. hunters to cancel their elephant hunts and to reduce the number of elephants that U.S. hunters would take in Tanzania. App. at 58, 61.

### C. Irreparable Harm to SCI/NRA's Members Caused by the Importation Bans

#### 1. Harms From the Zimbabwe Importation Ban

The elephant importation ban applicable to Zimbabwe has harmed many hunter/conservationist members of SCI/NRA.[6] Although the ban does not prohibit SCI/NRA members from hunting elephants in Zimbabwe, it does prevent them from bringing home their legally and successfully hunted elephants. Currently, several SCI/NRA members have elephant hunts scheduled in Zimbabwe for future

---

[6] *See generally* Declarations of Jerry Edgar Beardmore, Jr., App. at 140; Anthony John Didado, App. at 144; Atlas Lawrence Cheek III, App. at 147; James Stephen Rawson, App. at 152; Jason Garic Ingersoll, App. at 155; John Holdridge, App. at 157; John W. Berry, App. at 159; Michael Hugh Grieb, App. at 165; Michael J. Condon, App. at 168; Michael Barry Nice, App. at 172; Patrick Joseph Cooley, App. at 175; Paul K. Monsen, App. at 178; Richard David Netzley Jr., App. at 180; Richard Raymond Capozza, App. at 182; Robert Loren Bridges, App. at 188; Ronald Wilson Taylor, App. at 191; Scott Michael Dinger, App. at 194; Thomas Little Whaley Jr., App. at 197; Troy James Perry, App. at 200; Wayne Scott McCall, App. at 202; Martin Gregory Vick, App. at 204; Craig M. McDonnold, App. at 207; Grant F. Dennison, App. at 209; and David J. Adams, App. at 254.

dates in 2014 that they could still experience as originally planned if SCI/NRA succeeds in obtaining a preliminary injunction.[7]

### a.    Loss/Diminishment of Recreational Opportunity

Virtually every hunter who travels to Africa to hunt an elephant plans to bring home his or her successfully hunted elephant as a symbol and memory of that experience.  The ability to bring home the elephant from a successful hunt is a crucial component of that experience for many SCI/NRA members.  Without that ability, the recreational value of the hunt diminishes greatly.  Rawson Decl., App. at 143, ¶17; Perry Decl., App. at 201, ¶9; McCall Decl., App. at 203, ¶7.

> Hunting elephant and importing a sport-hunted elephant trophy has been a dream of mine for years.  I believe it is the classic African safari experience.  To be able to participate in one of the greatest hunting experiences that has been the subject of so much history and literature has been a lifelong aspiration.  I never imagined that I would not be able to have the elephant trophy as a permanent reminder of that experience.  Without the trophy, my experience will be diminished.

Dinger Decl., App. at 195, ¶10; *see also* Cooley Decl., App. at 177, ¶19; Nice Decl., App. at 173, ¶¶10-11; Condon Decl., App. at 170, ¶20.  The loss of the

---

[7] Rawson Decl. (September 2014), App. at 153, ¶15;  Ingersoll Decl. (September 2014), App. at 156, ¶8; Condon Decl. (September 2014), App. 169, ¶12; Nice Decl. (September 2014), App. at 173, ¶10; Cooley Decl. (September-October 2014), App. at 177, ¶18; Bridges Decl. (September 2014), App. at 189, ¶10; Perry Decl. (October 2014), App. at 201; ¶9; McCall Decl. (later in 2014), App. at 203, ¶7; Adams Decl. (November 2014), App. at 255; ¶13.

ability to possess, display and enjoy the elephant that he or she has successfully

hunted is exactly the type of harm that cannot be remedied at law and can only be

prevented through injunctive relief.

Just as the Service intended when imposing the ban, some SCI/NRA members decided that the importation ban deprived them of too much of the value of their hunting experience. At the time that SCI/NRA moved for preliminary injunctive relief, some SCI/NRA members had already cancelled their planned elephant hunts:

> I cancelled the elephant hunt when I learned that I would be unable to import the elephant that I hunted. Being able to bring the elephant home has great significance to me. The loss of that ability removes an important value to my hunt.

Capozza Decl., App. at 183, ¶10; *see also* Holdridge Decl. App. at 157, ¶6.

Other SCI/NRA members decided to go forward with their hunts despite acknowledging that the inability to bring home their successfully hunted elephants significantly diminishes the experience of the hunt.

> I will still hunt elephant and just not bring home the trophy. Although I will be deprived of an important aspect of my experience, I will be doing my best to support the protection of the elephant population in Zimbabwe . . . .

Netzley Decl., App. 181, ¶10; *see also* Beardmore Decl., App. at 143, ¶24.

### b. Loss to Elephant Conservation

By purposefully discouraging the investment of hunter generated revenue in

conservation programs, anti-poaching efforts, habitat management and community development, the importation bans pose a severe threat to African elephant conservation.  The loss of hunter dollars deprives Zimbabwe's wildlife management authority and the hunting businesses in the field of the resources they use to conserve elephants.

> Even if the ban is only temporary, the harm that it will do to the elephant population may be long-term, if not permanent.  The inability to import successfully hunted elephants will diminish the value of the hunt to most hunters and will discourage many from booking hunts at all.  The economic impact of the trophy fees is vital to the survival of the elephant.

Berry Decl., App. 160, ¶11; *see also* Condon Decl., App. at 170, ¶21.  Even the Service, in the documents it used to explain the decision to impose the importation bans, acknowledged the role that U.S. hunting revenues play in Zimbabwe elephant conservation.  In their 2014 Zimbabwe Enhancement Finding, the Service explained that revenue generated through sport-hunting continues to be the ***only*** source of funding for ZimParks.

> However, only revenues generated through sport-hunting conducted on state and private lands are used to finance ZimParks and to our knowledge, no other government funding is provided.

App. at 67; *see also* 79 Fed. Reg. 26986, 26987 (May 12, 2014).  Despite acknowledging this reality, the Service never explained how ZimParks would be able to continue to manage and conserve the country's elephants if deprived of a main source of revenue.

### i.  Encouragement of community tolerance for elephants

Hunting brings revenue into the communities located within Zimbabwe's elephant range.  Elephant conservation depends upon the involvement of these local communities.  Hunting businesses invest sport-hunting revenues from U.S. elephant hunters into projects designed to increase local social tolerance for elephants.  These investments encourage local communities to co-exist with the species, in spite of the damage that elephants cause to local farms and crops and the danger that the elephants pose to the residents themselves.

> The fact that the locals get some benefits from elephant hunting helps alleviate the problems and ensures that the human-elephant conflicts don't become so many that the people try to destroy the elephants in the area.  My company spends a lot of time, effort and resources chasing elephants out of the fields from February to May when crops are growing in the fields.

Pole Decl., App. at 213, ¶8; *see also* De Vries Decl., App. at 235, ¶9; Oosterhuis Decl., App. at 216, ¶10; Carter Decl., App. at 219, ¶14; Barth Decl., App. at 223, ¶9; Duckworth Decl., App.at 232, ¶13.

Several Safari Club members in Zimbabwe operate CAMPFIRE (Communal Area Management Programme for Indigenous Resources) Areas.  In CAMPFIRE operations, the local communities are encouraged to live in harmony with elephants because those communities derive direct benefits in the form of payments and meat donated from the hunts.  Pieters Decl., App. at 226, ¶12; De

Vries Decl., App. at 236, ¶13 (70% of hunting revenues from CAMPFIRE areas go to communities as direct payments or social benefits).

> CAMPFIRE is a program that combines local communities in Zimbabwe and hunters for the benefit and conservation of wildlife in the area, including elephants. Through the program, local communities are encouraged to conserve and manage wildlife species so that hunters may sustainably harvest the animals. In return, the communities receive economic benefits from sport hunting.

Declaration of Charles Jonga, Director of CAMPFIRE, App. at 261, ¶2. U.S. residents represent the vast majority of the hunters who hunt in CAMPFIRE areas. In 2014, 106 of the 167 hunts in CAMPFIRE areas were booked by U.S. hunters. App. at 263, ¶11.

The greater the elephants' value to the local communities, the more likely the communities will tolerate the elephants' destructive behaviors and will participate in the conservation of the species. In addition to investing in community infrastructure, hunting operations employ members of the local communities as trackers and guides. These employees bring money into their communities, which further increases the value of the elephants to those communities. Oosterhuis Decl., App. at 216, ¶8.

Many SCI/NRA members have personally participated in hunts that have increased local tolerance for the damage and expense that elephants cause to local villages and agricultural efforts:

> During my [2003 elephant] hunt, after being told of damage done to a maize field by a herd of elephants, villagers took me to the field, where we picked up the track of the herd. After tracking for some time, I successfully hunted a bull elephant. We then went to the nearest village and told the locals that we successfully took an elephant. Men were sent to take the meat from the elephant, which then went to the villagers. I kept the hide and tusks. It was a win-win for all. The village was benefitted by the fresh meat and sorely needed source of protein; an elephant that caused damage to the agricultural field was removed from the population, and I was able to participate in a successful and sustainable hunt of an African elephant.

Cheek Decl., App. at 148, ¶12. The contribution of the meat from successfully hunted elephants to the local communities is one more way in which U.S. hunters contribute to the social tolerance of elephants in Zimbabwe.

> I personally witnessed how elephant hunting benefits local communities, combats poaching and increases local tolerance for the species. Due to the arrangement in the Omay Concession, the locals received the trophy fee and all the meat from the elephants taken. As a result, they tolerated the presence of elephants in their fields. Martin Pieters, the outfitter employed a dedicated anti-poaching team and charged hunters a specific daily rate to support this effort. Most hunters, like myself, contributed funds above and beyond Martin's daily charge to ensure this effort remained staffed and effective. I watched my elephant be reduced to a wet spot on the ground as locals descended on the animal and made use of all the available meat.

Beardmore Decl., App. at 141, ¶11. Without the revenues brought by U.S. hunters, hunting operators are deprived of the funds they use to invest in communities and local residents. This brings down the value of the elephants and erodes local tolerance for the elephants' destructive behaviors.

### ii.     Anti-poaching strategies

Anti-poaching efforts support elephant conservation.  Many SCI/NRA members contribute to and participate in anti-poaching activities as part of their hunts.  Grieb Decl., App. at 166, ¶9.

> Well-armed safari operators and their clients are huge deterrents to poachers.  I have personally engaged fleeing poachers on several occasions and have been involved in the capture and delivery of poachers to local authorities.  The game officers told me that without the help of hunters, their jobs would be impossible.

Cooley Decl., App. at 176, ¶15.

> In 19 safaris since 1995, I have seen the benefits of sport hunting and the impact it has on poaching.  I have arrested poachers (of plains game) and burned their camps.  I have removed their snares and traps in Tanzania and found plains game dead as a result of poachers.  I have seen anti-poaching operations funded and conducted by professional hunters and outfitters in Zimbabwe.

Nice Decl., App. at 172, ¶7.

> All hunting safaris on government land in Zimbabwe are accompanied by an armed game scout.  The presence of these safaris is, in my opinion, the only thing that deters poachers from Zambia crossing the Zambesi River.  A poacher had been killed by a game scout accompanying a safari not long before my safari in 2007.  My professional hunter told me in 2007 that my monetary tip to the game scout represented two months' salary for him and that without safaris and the associated tips they bring, the game scouts sometimes are not paid for months.  Without this monetary benefit, these scouts have little incentive to protect the game.  In addition, the game meat from animals shot on the safari not only feeds the hunter and safari crew but the game scouts and their families.

Netzley Decl., App. at 180, ¶7; *see also* Condon Decl., App. at 169, ¶13.

The professional hunting businesses that provide elephant hunts in Zimbabwe also provide much of the country's anti-poaching resources. Safari operators, outfitters and professional hunters pay significant sums for the patrols that accompany hunting parties, who search for and apprehend poachers. Mokore Safaris, for example, reports that it alone spends about $75,000 per year on anti-poaching efforts. Duckworth Decl., App. at 233, ¶14. Professional hunter Hermanus De Vries reports that the company with which he works spent $100,000 alone in an effort to catch a band of poachers in Hwange National Park. De Vries Decl., App. at 235, ¶11.

SCI/NRA members that are safari operators also confirm that the presence of hunters decreases poaching and the absence of hunters in the field encourages poachers. "Poaching activity only really happens when hunts are not in progress, because the hunters and their Professional Hunters and others with the hunt make it impossible for the poachers to operate without notice." Cooke Decl., App. at 229, ¶14; *see also* Carter Decl., App. at 219, ¶16. SCI/NRA members who conduct hunting businesses in Zimbabwe have themselves become part of the anti-poaching effort.

> [W]e have been actively combating the poaching since we started hunting [in the Sengwa Research Area] in 2013. We assist the Parks Department there.

Duckworth Decl., App. at 232, ¶9.  In fact, SCI/NRA members that guide and

provide hunts near Hwange National Park in Zimbabwe were instrumental in

discovering and apprehending the poachers responsible for a notorious mass

poisoning of elephants in that Park.  SCI member and Professional Hunter

Abraham De Vries explained that the hunting operation with which he works in

Zimbabwe has 25 permanent scouts that patrol on a daily basis.  It was these

patrols that discovered the source of the poaching and were able to limit the

damage done to the elephant herd.  De Vries Decl., App. at 234, ¶10.

Although the press release and a Question and Answer webpage that the

Service posted on its website both referenced the highly publicized elephant

poisoning in Hwange National Park as a factor in the agency's decision to impose

the Zimbabwe importation ban (App. at 58, 60), neither of those documents made

mention of the sport-hunting business in Zimbabwe that discovered the crime and

that helped finance the effort that resulted in the capture of the poachers involved

in that incident.  The safari operators in Zimbabwe and ZimParks tell a more

complete and accurate story:

> The company that I work with uncovered this horrific incident.
> Within 24 hours of seeing the first tracks of the poachers, we had
> arrested the poachers and the buyers.  The company that I work with
> funded the entire operation to catch them.  We paid for the vehicles,
> fuel, food, camping gear, etc.  We hired the helicopter to do aerial
> reconnaissance, for transport to remote areas, and to get the exact
> number of elephants poached.  It cost us around $100,000 for the
> operation.  Without the U.S. hunters that pay a premium to hunt

> elephants, we would not have had enough money to fund this
> operation.  We also would not have been in the area to uncover the
> incident.  Hunters and hunting operators are the first line of defense in
> the fight against poaching.  Without hunters and hunting operators in
> the field, poachers will get a free pass to slaughter elephants at will.

De Vries Decl., App. at 234, ¶11, *see also* Barth Decl., App. at 223, ¶10; ZimParks

Response at 13, App. at 87.  The funds generated by U.S. hunters for elephant

hunting made possible the discovery and apprehension of the perpetrators of this

horrific crime.  The same is true of anti-poaching efforts throughout elephant range

in Zimbabwe.  Nevertheless, despite acknowledging that "an ongoing poaching

crisis" poses risks to elephant conservation (App. at 60), the Service used the

importation bans to intentionally discourage U.S. hunters from hunting elephants

in Zimbabwe.  In doing so, the Service directly deprived hunting businesses of the

U.S. hunter generated revenues that they use to combat that poaching.

> It is difficult enough for us, the Professional Hunters and Safari
> Operators, who care about the elephants, to impose some measures of
> control on poaching and elephant conservation, when we have the
> help of income from U.S. elephant hunters.  Without that income, it
> will be almost impossible to keep the poachers from taking
> Zimbabwe's elephants.

Cooke Decl., App. at 230, ¶21.  By implementing the importation ban, the Service

set in motion a loss of revenues that has and will continue to deprive hunting

operators of the resources they need to conserve elephants.  There is nothing

conjectural about the fact that cancelled hunts means less money for anti-poaching

patrols.  The loss of those anti-poaching strategies causes harm to elephant

conservation that is both great and certain.

### iii.        Habitat improvement resources

Elephant conservation also involves habitat improvement. That too is

facilitated and funded by professional hunting operations, and supported by funds

collected from U.S. hunters.  Several SCI/NRA member Safari operators in

Zimbabwe provide funds for water pumping developments to create reliable water

sources for elephants and other wildlife. Cooke Decl., App. at 228, ¶5; Barth Decl.,

App. at 223, ¶9; Pieters Decl., App. at 226, ¶16.  By creating a situation that

purposely encouraged U.S. hunters to cancel their Zimbabwe elephant hunts, the

Service has significantly reduced the funds available for these habitat conservation

projects.

Elephant conservation in Zimbabwe depends on U.S. hunters.  The Service's

intentional effort to encourage U.S. hunters to cancel their elephants hunts is

depriving Zimbabwe's and Tanzania's wildlife management authorities and

countries' hunting business of the funds they use to finance anti-poaching efforts,

invest in habitat management, contribute to community projects, hire local

employees and encourage local social tolerance for elephants.  A loss of these

essential conservation tools translates to increased poaching, insufficient habitat,

and communities that consider elephants as nuisance animals.  These logical and

imminent outcomes of the sport-hunted elephant importation ban are directly attributable to the Service's actions and have and will continue to irreparably harm the elephant conservation concerns of SCI/NRA members. These harms will only increase if the importation ban is not immediately enjoined.

### c. Economic Losses

Faced with the importation ban, SCI/NRA members have been forced to make choices about their planned elephant hunts. As indicated above, some are moving forward with hunts for which they have already paid some portion of the many thousands of dollars required and will have experiences greatly diminished from what they planned, hoped and paid for. Others are choosing to cancel, despite financial losses from non-refundable fees, rather than face disappointment and/or frustration with a hunt that is less than what they planned for. Whether or not SCI/NRA members cancel their hunts, the importation ban for Zimbabwe is causing these individuals some form of economic harm.

At the time that the Service announced and implemented the bans, many SCI/NRA members had already placed deposits and made other expenditures towards their hunts, including for airline tickets, firearms, ammunition, training and video equipment.[8] Many planned to take family members with them on their

---

[8] Rawson Decl., App. at 153, ¶16; Ingersoll Decl., App. at 156, ¶8; Condon Decl., App. at 170, ¶¶17-18; Cooley Decl., App. at 177, ¶18; Adams Decl., App. at 255, ¶13.

hunts.[9]  Some had saved for this particular hunt for several years and are concerned that they will never again have the funds to arrange such a trip.  Dennison Decl., App. at 210, ¶9.

Upon contacting their booking agents, professional hunters and outfitters, many SCI/NRA members were told that they if they wished to cancel their bookings, they would be unable to obtain refunds of all or a portion of their hunts. Monsen Decl., App. at 179, ¶¶9-10; Adams Decl., App. at 255, ¶13.

For some SCI/NRA members, cancellation was not an option.  These members were already in Zimbabwe hunting elephants on the date that the Service announced and abruptly implemented the elephant importation ban.  For example, Michael Grieb started his hunt in Zimbabwe just prior to April 4, 2014.  Grieb Decl., App. at 165-67.  When he started his hunt it was legal to import a sport-hunted African elephant from Zimbabwe and the Service had given no indication that it was planning to ban imports.  He took his African elephant on April 7, 2014, unaware of the Service's new rule making it impossible for him to import it into the U.S.  Upon returning from the field on April 8, he discovered that the law had completely changed and that he had been deprived of the ability to import his trophy without notice or an opportunity to comment in opposition to this decision. *Id*. at 167, ¶7; *see also* Whaley Decl., App. at 198, ¶¶10, 16-17 (commenced hunt

---

[9] Condon Decl., App. at 169, ¶12; Nice Decl., App. at 173, ¶10; Adams Decl., App. at 255, ¶13.

on April 1 and finished on April 24, spending approximately $100,000 but now

unable to import trophy). These individuals purchased hunts for which they will

never receive full value due to the present inability to import the elephants they

successfully hunted.

SCI/NRA members who are in the business of providing and booking

elephant hunts in Zimbabwe are also suffering financial harms.[10] Safari operators,

booking agents, outfitters and professional hunters are dealing with multiple

cancellations in a hunting season that is already well underway. *E.g.,* Barth Decl.,

App. at 223, ¶13 (three cancelled hunts by April 22, 2014); Cooke Decl., App. at

229, ¶17 (five cancelled hunts by April 24th 2014); Carter Decl., App. at 220 ¶19.

Some fear that the ban could put them entirely out of business. Barth Decl., App.

at 223, ¶13.

### 2. Harms From the Tanzania Importation Ban

The elephant importation ban for Tanzania's elephants has caused or will

cause irreparable harm to hunter/conservationist members of SCI/NRA who

---

[10] *See generally* Declarations of Alistair Pole (Zambezi Hunters), App. at 212;
Frederick Oosterhuis (Hunting Legends International Pty Ltd.), App. at 215; Ivan
Murray Carter, App. at 218; John C. Barth, App. at 222; Martin Pieters, App. at
225; Richard Stuart Cooke, App. at 228; Gary Michiel Duckworth (Mokore
Safaris), App. at 231; and Hermanus Abraham De Vries, App. at 234.

booked elephant hunts for 2014 in Tanzania.[11]  They too have already paid deposits and bought plane tickets.  Tarpley Decl., App.at 238, ¶6; Petty Decl., App.at 241-42, ¶¶12, 15; Johnson Decl., App. at 244, ¶11; Sakuta Decl.,  App. at 247, ¶6.  In some cases, their significant investments in their hunts cannot be recovered.  *See, e.g.,* Sakuta Decl., App. at 247, ¶8. Rhyne Decl., App. at 186, ¶11.  Regardless of whether they cancel their hunts or go forward with their planned hunts, they each have and will suffer a harm.  Those that cancel suffer financial losses as well as the deprivation of a long anticipated and highly valued hunt.  Those that go on their hunts experience a hunt that is greatly diminished from the one for which they planned, anticipated, and paid.

### a.    Loss/Diminishment of Recreational Opportunity

Like their counterparts with plans to hunt elephants in Zimbabwe, SCI/NRA members with hunts planned for Tanzania consider the ability to import their sport-hunted elephants to be of great significance.  Tarpley Decl., App. at 238, ¶7; Petty Decl., App. at 242, ¶16; Johnson Decl., App. at 244, ¶12.  For some, their elephant hunt is an experience of a lifetime.  Sakuta Decl., App. at 247, ¶7.  Others may never have the chance to make this hunt again.  Petty Decl., App. at 241, ¶14.  The

---

[11] *See generally* Declarations of Robert Joseph Johnson, App. at 243; Robert Allen Sakuta, App. at 246; Walter Allen Tarpley, App. at 238; Scott Petty Jr., App. at 240; and Robert Bruce Rhyne, App. at 186.

loss of the ability to import the elephant from their successful hunts constitutes a great and irreparable harm.

### b. Loss to Conservation Efforts

By purposely discouraging U.S. hunters from elephant hunting in Tanzania, the Service has undermined elephant conservation and has deprived Tanzania and those who operate hunting businesses in Tanzania of the resources used to conserve the African elephant. Hunting revenues from U.S. hunters finance, in significant part, anti-poaching efforts in Tanzania. Petty Decl., App. at 241, ¶13. The mere presence of hunters in the field in Tanzania also deters poachers. Hunting parties often participate in anti-poaching efforts.

> First, if hunters find poaching camps, the camps are destroyed. Second, professional hunters and trackers employed by the hunters always talk to the local communities about poaching and where it might be happening. Third, everyone in hunting groups look out for non-hunting activities in the areas in which they hunt. Fourth, government game scouts, paid for by the hunter, accompany all hunts.

Johnson Decl., App. at 244, ¶9; *see also* McDonnold Decl., App. at 207, ¶6 (SCI member and his hunting group apprehended six poachers for the Tanzania authorities).

U.S. hunting revenues also contribute to elephant conservation by providing resources for local communities. Meat from elephant hunts are donated to the communities. Tarpley Decl., App. at 239, ¶9. Other resources include funding for

schools and wells.  *Id.*  These resources encourage local communities to tolerate the elephant despite its destructive tendencies.

The hunting businesses that operate in Tanzania involve themselves heavily in elephant conservation and rely on hunter fees to finance these projects.   For example, the Robin Hurt Wildlife Foundation is engaged in anti-poaching efforts and works with the Tanzanian government's anti-poaching efforts.  Hurt Decl., App. at 248, ¶5.  The Foundation participates in a community benefits program that encourages local social tolerance for the elephant:

> Because these communities are beneficiaries of revenue generated by hunted animals, they have a vested interest in those animals, and are pro-wildlife conservation for all species in respective areas.  Without benefit schemes such as ours, communities are not usually tolerant of direct wildlife clashes that cause crop and livestock damage.  Hunting and the revenue hunting brings contribute to help pacify those feelings.

Hurt Decl., App. at 249, ¶9; *see also* Angelides Decl., App. at 252, ¶¶8-9.  The importation bans have seriously jeopardized their efforts.

> The hunting business is a huge employer and provider to the local economies.  For this reason, Tanzania can justify keeping wilderness as wilderness and therefore a home for all wildlife.  By depriving U.S. hunters of an important element of the elephant's value, the U.S. government has all but taken the hunter out of the field.  By removing the hunter and the money he brings into Tanzania, the U.S. government respectively reduces our financial ability to patrol and manage these areas.

Hurt Decl., App. at 249, ¶11.

Federal Appellees are well aware of the significant role that U.S. hunters play in Tanzanian elephant conservation. In the 2014 Tanzania Enhancement Finding, the Service acknowledged:

> U.S. hunters are the primary recipients of licenses in Tanzania. It is the belief of these hunters, as well as the [Division of Management Authority], that the funds generated from these licenses are being used for conservation purposes.

2014 Tanzania Enhancement Finding at 8-9, App. at 130-31. Even though the Service decided they could not issue a positive enhancement finding in 2014 for Tanzania, due to concerns over what percentage of the proceeds from U.S. hunting was being dedicated to conservation, the Service nevertheless acknowledged that *some* portion of the money generated by U.S. hunters continues to fund elephant conservation. *Id.* In their 2013 Non-detriment Finding for Tanzania, the Service offered greater detail about the role that U.S. sport-hunting revenue plays in Tanzania's elephant conservation:

> According to the Ministry of Natural Resources and Tourism *(in litt.,* 2008), 25% of the revenue accrued from the sport hunting of elephants goes to the conservation and protection of African elephants and other wildlife species through the Tanzania Wildlife Protection Fund, and 25% of the game fees received from hunters is given to the local communities in the areas where the sport hunting took place. More than 90% of the revenue of the Tanzania Wildlife Protection Fund is generated from fees associated with sport-hunting activities. Law enforcement for wildlife and wildlife products, including ivory, is primarily undertaken by a special antipoaching unit, which is largely subsidized by the Tanzania Wildlife Protection Fund (CoP16 Prop, 11).

2013 Tanzania Non-detriment Finding at 4, App. at 344. By purposefully depriving Tanzania and Tanzanian hunting operations of the revenues generated from U.S. hunters, the Service removed an acknowledged and major source of the funds available for elephant conservation. By doing so, the Service has directly, greatly and certainly harmed elephant conservation in Tanzania. The Service's actions have irreparably harmed SCI/NRA's interests in conserving Tanzania's elephants.

### c.      Economic Losses

Regardless of whether they choose to cancel their hunts or to go forward despite the inability to enjoy the full hunting experience, U.S. hunters have and will continue to sustain economic losses as a result of the Tanzania elephant importation ban. Those who cancel will lose deposits and other nonrefundable fees and charges. Those who hunt will participate in a hunt that is worth less than the one for which they planned and expected to enjoy.

### 3.      Loss to SCI/NRA

SCI and NRA, as organizations, have suffered irreparable harms as a result of the two elephant importation bans. SCI/NRA collectively represent millions of hunters worldwide and have missions that involve the protection of the rights of the hunter and the conservation of wildlife. Declaration of Rew Goodenow, App. at 137, ¶¶4-5. SCI/NRA support "sustainable use" conservation – an approach that

recognizes that the utilization of wildlife often produces benefits and provides incentives for conservation. *Id.,* ¶7; Amended Complaint, App. at 16, ¶19. African elephant hunting in Zimbabwe and Tanzania are prime examples of that sustainable use model. By imposing the importation bans, the Service has purposely discouraged U.S. hunters from visiting Zimbabwe and Tanzania for elephant hunting and has consequently deprived the hunting community and the countries of Zimbabwe and Tanzania of resources that are essential to the two countries' conservation efforts. As a result, SCI/NRA are harmed and will continue to be harmed by the inevitable increased poaching, loss of habitat, and social intolerance that is actively undermining elephant conservation. *Id*., Goodenow Decl., App. at 138, ¶15.

### D. Procedural History of the Case

SCI filed a Complaint in the U.S. District Court for the District of Columbia on April 21, 2014. Dkt. 1. On April 30, 2014, SCI filed a motion for a preliminary injunction, asking that the importation bans be enjoined for the duration of the litigation. Dkt. 4, App. at 43. SCI requested a hearing on the motion. Dkt. 4, Ex. 3. During a telephone conference with the parties on May 2, 2014, the District Court set a briefing schedule and directed the parties to address only the issues of irreparable harm and subject matter jurisdiction in their briefing on the preliminary injunction motion. Minute Order, May 2, 2014. Federal Appellees filed their

Memorandum in Opposition to the Motion for a Preliminary Injunction on May 13, 2014. Dkt. 10.[12]

On May 15, 2014, SCI filed a motion for leave to file supplemental declarations. Dkt. 12. Federal Appellees responded on May 20, 2014 with an unopposed request to file a surreply. Dkt. 18. In Minute Orders on May 21, 2014, the District Court granted both the motion for leave to file supplemental declarations and the motion to file a surreply. Federal Appellees filed their surreply on May 21, 2014. Dkt. 19.

On May 16, 2014, SCI filed an Amended Complaint that joined the National Rifle Association of America ("NRA") as a plaintiff. Dkt. 13. On that same date, SCI/NRA filed a Reply to Federal Appellees' Opposition to the Motion for a Preliminary Injunction. Dkt. 14.

On June 6, 2014, the District Court issued a Memorandum Opinion and Order denying SCI/NRA's motion for a preliminary injunction. Dkt. 24, App. at 45. The District Court determined that SCI/NRA had not demonstrated sufficient

---

[12] On the same date, Federal Appellees filed a Motion to Dismiss for lack of jurisdiction. Dkt. 11. On May 27, 2014, SCI/NRA filed their Memorandum in Opposition to Federal Appellees' Motion to Dismiss. Dkt. 22. Federal Appellees filed their Reply on June 5, 2014. Dkt. 23. In the Memorandum Opinion issued on June 6, 2014 that denied SCI/NRA's preliminary injunction motion, the District Court explained that it was taking Federal Appellees' motion to dismiss under advisement.

irreparable harm to support preliminary injunctive relief. The District Court did not hold a hearing before issuing the ruling.

SCI/NRA noticed the appeal of the District Court's ruling on June 17, 2014. Dkt. 29, App. at 56. On June 27, 2014, counsel for SCI contacted the Clerk's office, in accordance with D.C. Circuit Rule 47.2 and informed the Court that SCI/NRA sought expedited review of this appeal. On June 30, 2014, SCI/NRA further complied with Rule 47.2 by sending the Court a letter providing written notice of the intent to seek expedited review. On July 7, 2014, SCI/NRA filed an unopposed motion for expedited review and supplemented that motion on July 9, 2014, with a proposed briefing schedule. On July 11, 2014, the Clerk of this Court issued an Order establishing an expedited briefing schedule for this appeal.

## V.    SUMMARY OF ARGUMENT

The District Court erroneously determined that SCI/NRA failed to demonstrate the requisite irreparable harm necessary for preliminary injunctive relief. Contrary to the District Court's ruling, the elephant importation bans are imposing irreparable recreational, conservation and economic injuries on SCI/NRA members who planned elephant hunts in Zimbabwe or Tanzania for 2014. The importation bans are also harming SCI/NRA members who operate professional hunting business in Zimbabwe and Tanzania.

The loss of the ability to import successfully hunted elephants is significantly "great" to satisfy the irreparable harm criteria. Although SCI/NRA members continue to be able to hunt elephants in these countries, the loss of their ability to bring home their successfully hunted elephants significantly changes the nature of the hunt and decreases the recreational value of the experience. A diminishment in the ability to enjoy an activity qualifies as irreparable harm.

The Service imposed the importation bans with the express purpose of encouraging U.S. hunters to cancel their elephant hunts in the two countries. Some SCI/NRA members did cancel their hunts just as the Service intended and others are now facing the decision of whether to abandon their upcoming plans. Whether SCI/NRA members choose to cancel their hunts or proceed with hunts that do not include the opportunity to import their legally and successfully hunted elephants, their choices result from a chain of events set in motion by the Service's conduct. Neither the choices nor the resulting recreational, conservation and economic losses qualify as self-inflicted because these very consequences were the intended outcome of the Service's importation bans.

SCI/NRA member hunters, both who choose to cancel their hunts and those who choose to go forward with their hunts, are sustaining economic losses from the importation bans. SCI/NRA members who operate hunting businesses in Zimbabwe and Tanzania are also sustaining losses as a result of the cancellations

by U.S. hunters.  These monetary losses will never be recovered from the federal government in this or any other litigation.  Together with the recreational and/or conservation harms also sustained by SCI/NRA members, these financial losses constitute irreparable harm.

The loss to elephant conservation as a result of the bans is neither self-inflicted nor speculative. The Service has repeatedly acknowledged the role that U.S. hunting plays in elephant conservation.  The Service purposely discouraged U.S. hunters from carrying out these hunts and thereby deprived the two countries and hunting businesses operating in Zimbabwe and Tanzania of hunter generated revenues.  The loss of revenues generated by U.S. hunters for elephant conservation inevitably and irreparably harms SCI/NRA's interests in conserving those elephants.

## VI.    ARGUMENT

### A.    Standard of Review

An appellate court reviews a district court's ruling on a preliminary injunctive motion for abuse of discretion, but conducts de novo review of the lower court's rulings on legal issues. *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011) (Court remanded, rejecting district court's denial of preliminary injunction motion due to delay in filing).  Whether the plaintiff/appellant has demonstrated the irreparable harm needed for preliminary injunctive relief qualifies as a legal

question requiring de novo review. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009) (Court affirmed denial of preliminary injunction due to plaintiff's failure to satisfy both merits and irreparable harm requirements). This Court must independently review SCI/NRA's evidence and arguments to determine whether SCI/NRA have sustained irreparable harm sufficient for preliminary injunctive relief.

> **B.   A Likelihood of Irreparable Harm Must Be Established for Preliminary Injunctive Relief**

A plaintiff seeking preliminary injunctive relief must demonstrate that (1) it is likely to succeed on the merits of its claim; (2) it is likely to suffer irreparable harm in the absence of the requested preliminary relief; (3) that the balance of equities tips in its favor; and (4) that the injunctive relief sought is in the public interest. *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 20 (2008).  "The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." *District 50*, *United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969).[13]

---

[13] Prior to the U.S. Supreme Court's ruling in *Winter*, courts assessed a movant's ability to establish the four requisites for preliminary injunctive relief on a "sliding scale," where an unusually strong demonstration of one of the four factors potentially lessened the showing needed for another factor. *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (citing *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 361 (D.C. Cir. 1999)).  In *Winter*, the Supreme Court indicated that the movant must show that, without the requested relief, his irreparable injury is likely, rather than a possibility.  555 U.S. at 20-21.

The Court below restricted the briefing of SCI/NRA's preliminary injunction motion to the question of whether SCI/NRA could demonstrate irreparable harm. Courts in this circuit have characterized the type of injury needed for a showing of irreparable harm as "certain and great" and "actual and not theoretical." *Wis. Gas. Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (preliminary injunctive relief denied for recoverable economic injuries). SCI/NRA members' recreational, conservation and economic harms sustained from their inability to import their legally hunted elephants from Zimbabwe and Tanzania are sufficiently "certain and great" to justify a reversal of the ruling of the court below.

### C. The Loss of the Ability to Import Sport-Hunted Elephants Is Sufficiently Certain and Great to Qualify as Irreparable

SCI/NRA members' inability to import their legally hunted elephants from Zimbabwe and Tanzania significantly diminishes their enjoyment of their elephant hunting experiences. In spite of this, the Court below erroneously determined that the "inability to import elephant trophies does not result in a 'certain and great' harm to the recreational interests alleged" by SCI/NRA. Mem. Op. at 7, App. at

---

As a result of the *Winter* ruling, the circuit courts have been left to determine whether the sliding scale is still a viable means of evaluating a movant's entitlement to preliminary injunctive relief. As of yet, this Circuit has declined to make that decision. *Sherley v. Sebelius,* 644 F.3d 388, 393 (D.C. Cir. 2011).

50. [14]  The District Court's assessment relied on the fact that, because the importation bans do not prohibit hunters from hunting elephants in Zimbabwe and Tanzania, hunters "may still engage in the core recreational activity of hunting." *Id*.

The District Court *did* acknowledge that SCI/NRA members are suffering some harm in that the "'full enjoyment of the hunt' may be diminished." *Id*.  In reaching its conclusion, the lower Court ostensibly determined that as long as the injured party can carry out some element of the injured activity, no irreparable harm should be found.

In making this decision, the District Court ignored case law that recognizes that the diminishment (as opposed to complete deprivation) of recreational

---

[14] The present inability to import a successfully hunted elephant is undeniably certain.  The fact that the Service has stated that there is a *possibility* that it could reverse the ban for Zimbabwe in the future (App. at 370) is no different than the circumstances involved with the potential fate of any federal regulation or policy. The fact that an agency may someday change its mind about the need for a rule or regulation does not alter the impact that the regulation currently imposes on the regulated public.  The possibility that the Service may someday reverse the ban does not help SCI/NRA members who currently face the imminent decision of whether to cancel or continue their hunts.  If anything, the Service's conjecture only makes SCI/NRA members' decision-making more difficult and uncertain. Emotional turmoil caused when a defendant creates uncertainty can itself qualify as irreparable harm.  *Schalk v. Teledyne Inc.*, 751 F. Supp. 1261, 1268 (W.D. Mich. 1990) *aff'd*. 948 F.2d 1290 (6th Cir. 1991) (insurance plan caused irreparable harm in the form of uncertainty and worry to individuals on a fixed income as to whether they would have sufficient funds in their budgets for medical expenses).

enjoyment qualifies as irreparable harm. The Ninth Circuit has rejected the argument that plaintiffs seeking an injunction against forest management in a portion of a forest could never demonstrate irreparable harm due to the fact that other parts of the forests remained open for them to "view, experience, and utilize." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

The mere fact that SCI/NRA members can still hunt elephants in Zimbabwe and Tanzania does not substitute for the loss of the full hunting experience SCI/NRA members planned for, anticipated and paid for. As documented in SCI/NRA member declarations, the loss of the ability to bring home their successfully hunted elephant has great significance to these hunters. Rawson Decl., App. at 143, ¶17; Perry Decl., App. at 201, ¶9; McCall Decl., App. at 203, ¶7. [15]

Others faced with a comparable loss to their ability to fully enjoy the fruits of an activity would certainly consider their harms to be of great significance. Take, for example, a photographer who pays to travel to photograph a special event, purchases photographic equipment to capture just the right exposure, and

---

[15] The fact that, in spite of the loss of this opportunity, some SCI/NRA members have decided for varied reasons to proceed with their hunts in no way diminishes the detrimental impact of their inability to import their elephants. For example, Jerry Edgar Beardmore Jr.'s decision to keep a commitment to take his son elephant hunting for his 15th birthday should not be used to undermine the significance of the loss Beardmore and other SCI/NRA members are experiencing. "I consider a man's word one of his most important attributes, and I will not compromise mine." Beardmore Decl., App. at 143, ¶24.

then successfully takes the perfect shot. He would certainly consider himself to be irreparably harmed if he was prohibited from keeping the photograph that was the product of that effort. The mere ability to take the photograph itself, although potentially enjoyable, is not a reasonable substitute. A bride-to-be who shops[16] for, locates, tries on, selects and pays for the very dress she wants for her wedding would consider herself to be irreparably harmed if she was told she was prohibited from keeping the dress she had selected for that special day. She would not consider the experience of merely *finding* the perfect dress alone a sufficient replacement for having the dress to wear for her walk down the aisle, dance with her groom and celebration with friends and family. In both these cases, as well as in the case of a hunter who successfully pursues an elephant, the individual seeking the experience in its entirety is irreparably harmed if owning and enjoying the sought after item is not at least part of the end result of that experience.[17]

---

[16] This example recognizes that many women find the experience of shopping for their wedding gown an enjoyable experience.

[17] The District Court suggested that a hunter must successfully shoot an elephant in order to garner a trophy for importing. Mem. Op. at 7, App. at 50. The past successes of several of the SCI/NRA declarants demonstrate the likelihood of their future successes. E.g., Rawson Dec., App. at 152, ¶8; Didado Decl., App. at 145, ¶6; Cheek Decl., App. at 148, ¶12; Grieb Decl., App. at 166, ¶7. Moreover, as the District Court admitted, SCI/NRA's declarations show evidence of at least two members who have already successfully hunted and are now being prohibited from importing their elephants.

Even the Service itself impliedly acknowledged the significance and/or "greatness" of the prohibition that it imposed against the importation of successfully hunted elephants from Zimbabwe and Tanzania. The Service relied on that significance to discourage many U.S. hunters from following through with their elephant hunts scheduled for the two countries. The Service admitted that the elephant importation bans would reduce the number of U.S. hunters and thereby decrease the "additional killing" of elephants by means other than poaching. App. at 58.

As an undeniably great and certain consequence of the importation bans -- the deprivation of the ability to bring home a successfully taken elephant -- qualifies as SCI/NRA's irreparable harm. Regardless of whether SCI/NRA members can still hunt elephants in Zimbabwe and Tanzania, the inability to enjoy the hunt fully, and as originally planned, satisfies the irreparable harm standard.

**D.     SCI/NRA's Harms Are Not Self-Inflicted**

The Court below erroneously characterized SCI/NRA's harms as self-inflicted, attributing their decisions to cancel their hunts to "their own volition." Mem. Op. at 7, App. at 50. Contrary to the District Court's view, the decision to cancel, and all the consequences flowing from hunters' cancellations were set in motion by the Service and were not independently chosen by SCI/NRA members.

The Service implemented the importation bans with the express intention of discouraging U.S. hunters from following through with their planned elephant hunts. App. at 58. The Service "strongly advised" hunters to "reconsider" going on their hunts (App. at 61) and admitted that it imposed the bans to reduce the amount of "additional killing" of elephants over the illegal take by poachers. *Id.* That SCI/NRA members are cancelling their hunts is exactly the consequence the Service intended. Harms resulting from those cancellations, including loss of hunter revenue for elephant conservation, anti-poaching patrols, habitat improvement and community projects, as well as the economic harms to SCI/NRA members, are all the direct result of the Service's purposeful conduct.

To be self-inflicted, an injury must be caused exclusively by the independent and voluntary acts of the injured party. If the defendant contributed to or had something to do with the injured party's volition, the harm does not qualify as self-imposed. When considering the definition of a "self-inflicted" injury in the context of a standing inquiry, the Second Circuit determined that "[a]n injury is self-inflicted so as to defeat the causation necessary to establish standing, however, 'only if ... the injury is so ***completely*** due to the plaintiff's own fault as to break the causal chain.'" *Natural Res. Def. Council, Inc. v. U.S. Food and Drug Admin.*, 710 F.3d 71, 85 (2nd Cir. 2013)(emphasis added) *quoting St. Pierre v. Dyer,* 208 F.3d 394, 402 (2d Cir. 2000) (court found plaintiffs' harm from triclosan exposure not

attributable to the plaintiffs' own failure to bring triclosan-free soap for use at work because the availability of soap containing the chemical was the consequence of the FDA's failure to regulate).  Hunt cancellations are not "completely" due to SCI/NRA members' "faults" because the Service intended SCI/NRA members to cancel their hunts and because it was the Service that set in motion the chain of events that persuaded SCI/NRA members to consider cancellations.

A choice between evils, such as the one currently being faced by SCI/NRA members, results in irreparable harm.  A party suffers irreparable harm when a defendant's action forces the party to sustain one kind of harm by making a decision to avoid another harm. *Stuller, Inc. v. Steak and Shake Enters.*, 695 F.3d 676, 679 (7th Cir. 2012) (court found that restaurant franchisee did not self-inflict harm caused by rejecting franchisor's new policy, even though the decision resulted in loss of franchise).  SCI/NRA's members are now being required to choose between multiple undesirable options (cancellation of hunt vs. proceed with hunt without importation ability) – each of which is attributable to the Service's decision to ban elephant importation – and none of which are self-inflicted.

The Service cannot encourage hunters to cancel their hunts and then escape injunctive relief by alleging that the hunters independently decided to cancel those hunts.  A party cannot purposely create the situation that causes the harm and then claim that the opposing's party reaction is self-inflicted.  *Kalbfleisch v. Columbia*

*Cmty. Sch. Unit 4*, 396 Ill. App. 3d 1105, 1116, 920 N.E.2d 651, 661 (Ill. App. Ct. 2009) (court rejected school's argument that autistic child's decision not to attend school without service dog was self-inflicted because school had prohibited child from bringing service dog to school).

The hunt cancellations and all of the consequences attributable to those cancellations were set in motion by the Service and its importation bans. SCI/NRA's members' inability to enjoy their elephant hunts, the economic injuries arising from the hunt cancellations and the conservation losses due to the lack of funds available for elephant conservation, anti-poaching patrols, habitat conservation and investments in local communities, are all direct and logical consequences of the Service's decision to ban elephant importation. None of these were self-inflicted injuries and all of them qualify as irreparable harms.

### E. SCI/NRA's Economic Losses Qualify as Irreparable Harm

SCI/NRA members, both hunters and safari operators, have asserted economic harms resulting from the elephant importation bans. Some SCI/NRA hunter members have lost thousands of dollars in cancelled hunts, non-refundable deposits and fees. Others suffer from a significant loss in the value of the elephant hunts they originally booked. Still others who have already taken elephants that can no longer be imported into the U.S. are paying fees to store their elephants indefinitely. Grieb Decl., App. at 167. SCI/NRA professional hunting operator

members have lost significant sums due to multiple hunt cancellations.[18]  All of these financial harms qualify as irreparable because (1) SCI/NRA members' economic losses will not be recovered in future legal action against the federal government, and (2) SCI/NRA do not rely solely on economic injury as the basis for their claim of irreparable harm.

Courts in this Circuit have refused to qualify harm as irreparable when it has been attributable exclusively to economic injury.  These rulings have been based on the assumption that, because economic harms are generally recoverable in the course of the litigation, a denial of preliminary injunctive relief merely postpones recovery rather than rejects it permanently.

> It is also well settled that economic loss does not, in and of itself, constitute irreparable harm. As this court has noted:

> > The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

---

[18] The fact that the professional hunters are attempting to resell cancelled hunts to non-U.S. residents in order to reduce the financial impact of the importation bans does not mean that their financial losses are speculative.  *E.g.* Pole Decl., App. at 213, ¶13; Cooke Decl., App. at 229, ¶¶18-19.  Instead, it means that their ability to recoup some of their losses by selling their hunts late in the season, at reduced prices, is speculative.  The fact that they might not lose the entire price of every cancelled hunt does not erase the documented evidence that they are being forced to deal with multiple hunt cancellations and the financial losses and uncertainties caused by the elephant importation bans.

*Wis. Gas. Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) *quoting Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). This analysis does not apply to SCI/NRA's request. In challenging the importation bans, SCI/NRA have sued for declaratory and injunctive relief and have not requested financial recompense from the federal government for the economic losses inflicted by their actions. Because the economic losses that SCI/NRA have sustained are not "recoverable monetary losses," they should not be disqualified from consideration as irreparable.

Although some courts in this Circuit have qualified economic harm as irreparable only where the asserted economic loss "threatens the very existence of the movant's business" (*Wis. Gas.*, 758 F.2d at 674), or where the financial loss is "serious in terms of its effect" (*Myland Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000)), these ruling also do not apply here. These criteria apply only where the plaintiffs assert nothing other than economic harm in support of their request for preliminary injunctive relief. In contrast, SCI/NRA assert their members' economic losses in conjunction with their recreational and conservation injuries caused by the importation bans. Consequently, their financial losses, whether or not they threaten the very livelihoods of SCI/NRA members, qualify as components of the irreparable harm that the Service purposely inflicted on SCI/NRA and their members.

### F.    SCI/NRA's Conservation Harms Are Not Hypothetical

Just as the Service expected and intended, the importation bans are causing many U.S. hunters to cancel hunts scheduled in Tanzania and Zimbabwe for 2014. The reduction in U.S. hunters spending their money in the two countries is depriving and will continue to deprive the governments of Zimbabwe and Tanzania, and the hunting businesses that operate in those countries, of the funds they rely on to conserve elephants.

U.S. hunters unquestionably play a major role in the hunting that takes place in these countries.  As explained by Charles Jonga, the Director of the CAMPFIRE Program, U.S. hunters booked 106 of the 167 hunts on CAMPFIRE areas for 2014. Jonga Decl., App. 263, ¶11.

SCI/NRA provided numerous declarations from U.S. hunters who have personally witnessed and participated in elephant conservation in the two countries, as well as statements from professional hunters and outfitters who invest U.S. hunter fees in anti-poaching patrols, habitat improvement, and projects designed to encourage local communities to participate in elephant conservation. SCI/NRA's declarations demonstrate that it was a professional sport-hunting business that uncovered the notorious elephant poisoning that the Service highlighted in the documents it published announcing the importation bans, and it was that same sport-hunting operation that provided the funding for the capture of

the poachers responsible for that incident. De Vries Decl., App. at 234. By reducing the presence of U.S. elephant hunters in Zimbabwe and Tanzania, the Service has removed a proven and valued elephant conservation tool. There is nothing hypothetical about the consequences of the absence of that tool.

The Service's own statements and publications reveal even stronger connections between hunters, hunter revenues and elephant conservation. The Service acknowledges that hunter dollars often represent the main, and in some cases the *only* financial source for elephant conservation efforts being carried out in Zimbabwe and Tanzania. 2014 Zimbabwe Enhancement Finding, App. at 63; *see also* 79 Fed. Reg. 26986, 26987 (May 12, 2014); 2014 Tanzania Enhancement Finding, App. at 131-32; 2013 Tanzania Non-detriment Finding, App. at 344. Despite this concrete evidence, the court below chose to characterize the conservation harms to the two countries' elephants as "speculative." Mem. Op. at 8, App. at 51. As no proffered evidence contradict SCI/NRA's presentation of the facts and as the Service acknowledges these facts, the court erred in deeming this injury speculative. Without U.S. hunters and the revenues they contribute to elephant conservation, elephant conservation efforts will suffer, as will the interests of SCI members who support those conservation efforts.

Even if SCI/NRA's declarations cannot quote the exact number of hunters who will cancel their hunts or the exact amount of money that will not be invested

by U.S. hunters in Tanzania and Zimbabwe during 2014, this Court has ample evidence to determine that U.S. hunters *are* cancelling their hunts and that the loss of *any* U.S. hunter results in less revenue being invested in elephant conservation in the two countries.  Consequently, the harms to SCI/NRA's conservation interests are certain and therefore irreparable.

## VII.  CONCLUSION

SCI/NRA and their members are suffering irreparable recreational, conservation and economic harms resulting from the elephant importation bans. The Service imposed the bans with the express intent of encouraging U.S. hunters to cancel their 2014 elephant hunts in Zimbabwe and Tanzania.  The bans leave SCI/NRA members with limited choices – to cancel their hunts or proceed with hunts that are missing a significant element of the hunting experience.  Those who select cancellation are reacting just as the Service intended and expected.  As they are following through with a chain of events set in motion by the Service, their resultant harms are anything but self-inflicted.

The consequent loss of hunter revenues being invested in the two countries are depriving the two countries' wildlife management authorities and professional hunters of the funding they use for elephant conservation.  As these revenues represent the major, if not the sole source of much of the elephant conservation

efforts, any deprivation of these funds undermines elephant conservation and harms SCI/NRA members.

The economic losses suffered by SCI/NRA member hunters and professional hunters are not recoverable from the federal government and do not constitute the sole source of SCI/NRA's harm. These financial losses therefore qualify as part of the irreparable harm suffered by SCI/NRA members.

SCI/NRA seek a reversal of the District Court's determination that SCI/NRA have failed to show a likelihood of irreparable harm and its ruling denying SCI/NRA's motion for a preliminary injunction. SCI/NRA further request that this Court remand this matter and direct the District Court to expeditiously (1) order the completion of briefing on the remaining three criteria necessary for the grant of a preliminary injunction and (2) rule on SCI/NRA's motion for a preliminary injunction.

Dated: July 18, 2014

Respectfully submitted,

/s/Anna M. Seidman
Anna M. Seidman
Douglas Burdin
501 2nd Street NE
Washington, D.C.
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org

*Counsel for Plaintiff/Appellant*
*Safari Club International*

Christopher A. Conte
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org

*Counsel for Plaintiff/Appellant*
*National Rifle Association of America*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[X] this brief contains 12,414 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ] this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font, or

[ ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated: July 18, 2014                    Respectfully submitted,

                                        /s/Anna M. Seidman

                                        *Counsel for Plaintiff/Appellant*
                                        *Safari Club International*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 18th day of July 2014, a true and correct copy of the Brief of Appellants Safari Club International and National Rifle Association of America was electronically filed through the CM/ECF system, which caused all parties to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

/s/ Anna M. Seidman
Anna M. Seidman

*Counsel for Plaintiff/Appellant*
*Safari Club International*

**ADDENDUM**

**TABLE OF CONTENTS**

5 U.S.C. § 701 ....................................................................... ADD 1

5 U.S.C. § 702 ....................................................................... ADD 2

5 U.S.C. § 703 ....................................................................... ADD 2

5 U.S.C. § 704 ....................................................................... ADD 2

5 U.S.C. § 705 ....................................................................... ADD 2

5 U.S.C. § 706 ....................................................................... ADD 3

16 U.S.C. § 1533 ..................................................................... ADD 4

28 U.S.C. § 1292 ................................................................... ADD 11

28 U.S.C. § 1331 ................................................................... ADD 14

28 U.S.C. § 2201 ................................................................... ADD 15

28 U.S.C. § 2202 ................................................................... ADD 16

50 C.F.R. § 17.40 .................................................................. ADD 17

CITES, Article III ................................................................. ADD 32

CITES, Article IV ................................................................. ADD 35



in a court of the United States to review a rule. In any such action, the Chief Counsel is authorized to present his or her views with respect to compliance with this chapter, the adequacy of the rulemaking record with respect to small entities and the effect of the rule on small entities.

(c) A court of the United States shall grant the application of the Chief Counsel for Advocacy of the Small Business Administration to appear in any such action for the purposes described in subsection (b).

(Added Pub. L. 96–354, §3(a), Sept. 19, 1980, 94 Stat. 1170; amended Pub. L. 104–121, title II, §243(b), Mar. 29, 1996, 110 Stat. 866.)

AMENDMENTS

1996—Subsec. (a). Pub. L. 104–121, §243(b)(1), which directed substitution of "the Committees on the Judiciary and Small Business of the Senate and House of Representatives" for "the committees on the Judiciary of the Senate and the House of Representatives, the Select Committee on Small Business of the Senate, and the Committee on Small Business of the House of Representatives", was executed by making the substitution for "the Committees on the Judiciary of the Senate and House of Representatives, the Select Committee on Small Business of the Senate, and the Committee on Small Business of the House of Representatives" to reflect the probable intent of Congress.

Subsec. (b). Pub. L. 104–121, §243(b)(2), substituted "his or her views with respect to compliance with this chapter, the adequacy of the rulemaking record with respect to small entities and the" for "his views with respect to the".

CHANGE OF NAME

Committee on Small Business of Senate changed to Committee on Small Business and Entrepreneurship of Senate. See Senate Resolution No. 123, One Hundred Seventh Congress, June 29, 2001.

EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–121 effective on expiration of 90 days after Mar. 29, 1996, but inapplicable to interpretative rules for which a notice of proposed rulemaking was published prior to Mar. 29, 1996, see section 245 of Pub. L. 104–121, set out as a note under section 601 of this title.

## CHAPTER 7—JUDICIAL REVIEW

Sec.
701.    Application; definitions.
702.    Right of review.
703.    Form and venue of proceeding.
704.    Actions reviewable.
705.    Relief pending review.
706.    Scope of review.

SHORT TITLE

The provisions of sections 551 to 559 of this title and this chapter were originally enacted by act June 11, 1946, ch. 423, 60 Stat. 237, popularly known as the "Administrative Procedure Act". That Act was repealed as part of the general revision of this title by Pub. L. 89–554 and its provisions incorporated into sections 551 to 559 of this title and this chapter.

## § 701. Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix; and

(2) "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 103–272, §5(a), July 5, 1994, 108 Stat. 1373; Pub. L. 111–350, §5(a)(3), Jan. 4, 2011, 124 Stat. 3841.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (a) ............. | 5 U.S.C. 1009 (introductory clause). | June 11, 1946, ch. 324, §10 (introductory clause), 60 Stat. 243. |

In subsection (a), the words "This chapter applies, according to the provisions thereof," are added to avoid the necessity of repeating the introductory clause of former section 1009 in sections 702–706.

Subsection (b) is added on authority of section 2 of the Act of June 11, 1946, ch. 324, 60 Stat. 237, as amended, which is carried into section 551 of this title.

In subsection (b)(1)(G), the words "or naval" are omitted as included in "military".

In subsection (b)(1)(H), the words "functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947" are omitted as executed. Reference to the "Selective Training and Service Act of 1940" is omitted as that Act expired on Mar. 31, 1947. Reference to the "Sugar Control Extension Act of 1947" is omitted as that Act expired on Mar. 31, 1948. References to the "Housing and Rent Act of 1947, as amended" and the "Veterans' Emergency Housing Act of 1946" have been consolidated as they are repealed. The reference to former section 1641(b)(2) of title 50, appendix, is retained notwithstanding its repeal by §111(a)(1) of the Act of Sept. 21, 1961, Pub. L. 87–256, 75 Stat. 538, since §111(c) of the Act provides that a reference in other Acts to a provision of law repealed by §111(a) shall be considered to be a reference to the appropriate provisions of Pub. L. 87–256.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

REFERENCES IN TEXT

Sections 1891–1902 of title 50, appendix, referred to in subsec. (b)(1)(H), were omitted from the Code as executed.

AMENDMENTS

2011—Subsec. (b)(1)(H). Pub. L. 111–350 struck out "chapter 2 of title 41;" after "title 12;".

1994—Subsec. (b)(1)(H). Pub. L. 103–272 substituted "subchapter II of chapter 471 of title 49; or sections" for "or sections 1622,".

## § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, § 10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

## § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, § 10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, § 10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to this report.



## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.  Congressional review.
802.  Congressional disapproval procedure.
803.  Special rule on statutory, regulatory, and judicial deadlines.
804.  Definitions.
805.  Judicial review.
806.  Applicability; severability.
807.  Exemption for monetary policy.
808.  Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)2. The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by oper-



throughout all or a significant portion of its range.

(21) The term "United States", when used in a geographical context, includes all States.

(Pub. L. 93–205, § 3, Dec. 28, 1973, 87 Stat. 885; Pub. L. 94–359, § 5, July 12, 1976, 90 Stat. 913; Pub. L. 95–632, § 2, Nov. 10, 1978, 92 Stat. 3751; Pub. L. 96–159, § 2, Dec. 28, 1979, 93 Stat. 1225; Pub. L. 97–304, § 4(b), Oct. 13, 1982, 96 Stat. 1420; Pub. L. 100–478, title I, § 1001, Oct. 7, 1988, 102 Stat. 2306.)

REFERENCES IN TEXT

Reorganization Plan Numbered 4 of 1970, referred to in par. (15), is Reorg. Plan No. 4 of 1970, eff. Oct. 3, 1970, 35 F.R. 15627, 84 Stat. 2090, which is set out in the Appendix to Title 5, Government Organization and Employees.

AMENDMENTS

1988—Par. (13). Pub. L. 100–478, § 1001(a), amended par. (13) generally. Prior to amendment, par. (13) read as follows: "The term 'person' means an individual, corporation, partnership, trust, association, or any other private entity, or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State or political subdivision thereof, or of any foreign government."

Par. (15). Pub. L. 100–478, § 1001(b), inserted "also" before "means the Secretary of Agriculture".

1982—Par. (11). Pub. L. 97–304 struck out par. (11) which defined "irresolvable conflict" as, with respect to any action authorized, funded, or carried out by a Federal agency, a set of circumstances under which, after consultation as required in section 1536(a) of this title, completion of such action would violate section 1536(a)(2) of this title.

1979—Par. (11). Pub. L. 96–159 substituted "action would violate section 1536(a)(2) of this title" for "action would (A) jeopardize the continued existence of an endangered or threatened species, or (B) result in the adverse modification or destruction of a critical habitat".

1978—Pars. (1) to (4). Pub. L. 95–632, § 2(1), (7), added par. (1) and redesignated former pars. (1) to (3) as (2) to (4), respectively. Former par. (4) redesignated (6).

Par. (5). Pub. L. 95–632, § 2(2), (7), added par. (5). Former par. (5) redesignated (8).

Par. (6). Pub. L. 95–632, § 2(7), redesignated former par. (4) as (6). Former par. (6) redesignated (9).

Par. (7). Pub. L. 95–632, § 2(3), (7), added par. (7). Former par. (7) redesignated (10).

Pars. (8) to (10). Pub. L. 95–632, § 2(7), redesignated former pars. (5) to (7) as (8) to (10), respectively. Former pars. (8) to (10) redesignated (13) to (15), respectively.

Pars. (11), (12). Pub. L. 95–632, § 2(4), (7), added pars. (11) and (12). Former pars. (11) and (12) redesignated (16) and (17), respectively.

Pars. (13) to (15). Pub. L. 95–632, § 2(7), redesignated former pars. (8) to (10) as (13) to (15), respectively. Former pars. (13) to (15) redesignated as (18) to (20), respectively.

Par. (16). Pub. L. 95–632, § 2(5), (7), redesignated former par. (11) as (16) and substituted "and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature" for "and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature". Former par. (16) redesignated (21).

Par. (17). Pub. L. 95–632, § 2(7), redesignated former par. (12) as (17).

Par. (18). Pub. L. 95–632, § 2(6), (7), redesignated former par. (13) as (18) and substituted "fish, plant, or wildlife" for "fish or wildlife".

Pars. (19) to (21). Pub. L. 95–632, § 2(7), redesignated pars. (14) to (16) as (19) to (21), respectively.

1976—Par. (1). Pub. L. 94–359 inserted ": *Provided, however,* That it does not include exhibition of commodities by museums or similar cultural or historical organizations." after "facilitating such buying and selling".

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

§ 1533. Determination of endangered species and threatened species

(a) Generally

(1) The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

(2) With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970—

(A) in any case in which the Secretary of Commerce determines that such species should—

(i) be listed as an endangered species or a threatened species, or

(ii) be changed in status from a threatened species to an endangered species,

he shall so inform the Secretary of the Interior, who shall list such species in accordance with this section;

(B) in any case in which the Secretary of Commerce determines that such species should—

(i) be removed from any list published pursuant to subsection (c) of this section, or

(ii) be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

(C) the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

(3)(A) The Secretary, by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable—

(i) shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

(ii) may, from time-to-time thereafter as appropriate, revise such designation.

ADD 4

(B)(i) The Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 670a of this title, if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

(ii) Nothing in this paragraph affects the requirement to consult under section 1536(a)(2) of this title with respect to an agency action (as that term is defined in that section).

(iii) Nothing in this paragraph affects the obligation of the Department of Defense to comply with section 1538 of this title, including the prohibition preventing extinction and taking of endangered species and threatened species.

**(b) Basis for determinations**

(1)(A) The Secretary shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas.

(B) In carrying out this section, the Secretary shall give consideration to species which have been—

(i) designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

(ii) identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

(2) The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) of this section on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

(3)(A) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c) of this section, the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present

such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

(B) Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

(i) The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

(ii) The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

(iii) The petitioned action is warranted, but that—

(I) the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

(II) expeditious progress is being made to add qualified species to either of the lists published under subsection (c) of this section and to remove from such lists species for which the protections of this chapter are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

(C)(i) A petition with respect to which a finding is made under subparagraph (B)(iii) shall be treated as a petition that is resubmitted to the Secretary under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

(ii) Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review.

(iii) The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall make prompt use of the authority under paragraph 7[1] to prevent a significant risk to the well being of any such species.

(D)(i) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be warranted. The Secretary shall promptly publish such finding in the Federal Register.

(ii) Within 12 months after receiving a petition that is found under clause (i) to present substan-

---

[1] So in original. Probably should be paragraph "(7)".

tial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.

(4) Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of title 5 (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this chapter.

(5) With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3) of this section, the Secretary shall—

(A) not less than 90 days before the effective date of the regulation—

(i) publish a general notice and the complete text of the proposed regulation in the Federal Register, and

(ii) give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency in each State in which the species is believed to occur, and to each county, and to each county, or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon;

(B) insofar as practical, and in cooperation with the Secretary of State, give notice of the proposed regulation to each foreign nation in which the species is believed to occur or whose citizens harvest the species on the high seas, and invite the comment of such nation thereon;

(C) give notice of the proposed regulation to such professional scientific organizations as he deems appropriate;

(D) publish a summary of the proposed regulation in a newspaper of general circulation in each area of the United States in which the species is believed to occur; and

(E) promptly hold one public hearing on the proposed regulation if any person files a request for such a hearing within 45 days after the date of publication of general notice.

(6)(A) Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register—

(i) if a determination as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either—

(I) a final regulation to implement such determination,

(II) a final regulation to implement such revision or a finding that such revision should not be made,

(III) notice that such one-year period is being extended under subparagraph (B)(i), or

(IV) notice that the proposed regulation is being withdrawn under subparagraph (B)(ii), together with the finding on which such withdrawal is based; or

(ii) subject to subparagraph (C), if a designation of critical habitat is involved, either—

(I) a final regulation to implement such designation, or

(II) notice that such one-year period is being extended under such subparagraph.

(B)(i) If the Secretary finds with respect to a proposed regulation referred to in subparagraph (A)(i) that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned, the Secretary may extend the one-year period specified in subparagraph (A) for not more than six months for purposes of soliciting additional data.

(ii) If a proposed regulation referred to in subparagraph (A)(i) is not promulgated as a final regulation within such one-year period (or longer period if extension under clause (i) applies) because the Secretary finds that there is not sufficient evidence to justify the action proposed by the regulation, the Secretary shall immediately withdraw the regulation. The finding on which a withdrawal is based shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this clause unless he determines that sufficient new information is available to warrant such proposal.

(iii) If the one-year period specified in subparagraph (A) is extended under clause (i) with respect to a proposed regulation, then before the close of such extended period the Secretary shall publish in the Federal Register either a final regulation to implement the determination or revision concerned, a finding that the revision should not be made, or a notice of withdrawal of the regulation under clause (ii), together with the finding on which the withdrawal is based.

(C) A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened, unless the Secretary deems that—

(i) it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or

(ii) critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

(7) Neither paragraph (4), (5), or (6) of this subsection nor section 553 of title 5 shall apply to any regulation issued by the Secretary in regard to any emergency posing a significant risk to the well-being of any species of fish or wildlife or plants, but only if—

(A) at the time of publication of the regulation in the Federal Register the Secretary publishes therein detailed reasons why such regulation is necessary; and

(B) in the case such regulation applies to resident species of fish or wildlife, or plants, the Secretary gives actual notice of such regulation to the State agency in each State in which such species is believed to occur.

Such regulation shall, at the discretion of the Secretary, take effect immediately upon the

publication of the regulation in the Federal Register. Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation, he shall withdraw it.

(8) The publication in the Federal Register of any proposed or final regulation which is necessary or appropriate to carry out the purposes of this chapter shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation; and if such regulation designates or revises critical habitat, such summary shall, to the maximum extent practicable, also include a brief description and evaluation of those activities (whether public or private) which, in the opinion of the Secretary, if undertaken may adversely modify such habitat, or may be affected by such designation.

**(c) Lists**

(1) The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b) of this section.

(2) The Secretary shall—

(A) conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

(B) determine on the basis of such review whether any such species should—

(i) be removed from such list;

(ii) be changed in status from an endangered species to a threatened species; or

(iii) be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b) of this section.

**(d) Protective regulations**

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case

of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

**(e) Similarity of appearance cases**

The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to this section if he finds that—

(A) such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

(B) the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

(C) such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

**(f) Recovery plans**

(1) The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable—

(A) give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

(B) incorporate in each plan—

(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

(iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

(2) The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act.

(3) The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Rep-

resentatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the status of all species for which such plans have been developed.

(4) The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.

(5) Each Federal agency shall, prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period under paragraph (4).

**(g) Monitoring**

(1) The Secretary shall implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which, in accordance with the provisions of this section, have been removed from either of the lists published under subsection (c) of this section.

(2) The Secretary shall make prompt use of the authority under paragraph 7[2] of subsection (b) of this section to prevent a significant risk to the well being of any such recovered species.

**(h) Agency guidelines; publication in Federal Register; scope; proposals and amendments; notice and opportunity for comments**

The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to—

(1) procedures for recording the receipt and the disposition of petitions submitted under subsection (b)(3) of this section;

(2) criteria for making the findings required under such subsection with respect to petitions;

(3) a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section; and

(4) a system for developing and implementing, on a priority basis, recovery plans under subsection (f) of this section.

The Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection.

**(i) Submission to State agency of justification for regulations inconsistent with State agency's comments or petition**

If, in the case of any regulation proposed by the Secretary under the authority of this section, a State agency to which notice thereof was given in accordance with subsection (b)(5)(A)(ii) of this section files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation which is in conflict with such comments, or if the Secretary

fails to adopt a regulation pursuant to an action petitioned by a State agency under subsection (b)(3) of this section, the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition.

(Pub. L. 93–205, § 4, Dec. 28, 1973, 87 Stat. 886; Pub. L. 94–359, § 1, July 12, 1976, 90 Stat. 911; Pub. L. 95–632, §§ 11, 13, Nov. 10, 1978, 92 Stat. 3764, 3766; Pub. L. 96–159, § 3, Dec. 28, 1979, 93 Stat. 1225; Pub. L. 97–304, § 2(a), Oct. 13, 1982, 96 Stat. 1411; Pub. L. 100–478, title I, §§ 1002–1004, Oct. 7, 1988, 102 Stat. 2306, 2307; Pub. L. 108–136, div. A, title III, § 318, Nov. 24, 2003, 117 Stat. 1433.)

REFERENCES IN TEXT

Reorganization Plan Numbered 4 of 1970, referred to in subsec. (a)(2), is Reorg. Plan No. 4 of 1970, eff. Oct. 3, 1970, 35 F.R. 15627, 84 Stat. 2090, which is set out in the Appendix to Title 5, Government Organization and Employees.

The Federal Advisory Committee Act, referred to in subsec. (f)(2), is Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770, as amended, which is set out in the Appendix to Title 5.

AMENDMENTS

2003—Subsec. (a)(3). Pub. L. 108–136, § 318(a), designated existing provisions as subpar. (A), redesignated former subpars. (A) and (B) as cls. (i) and (ii), respectively, and added subpar. (B).

Subsec. (b)(2). Pub. L. 108–136, § 318(b), inserted "the impact on national security," after "the economic impact,".

1988—Subsec. (b)(3)(C)(iii). Pub. L. 100–478, § 1002(a), added subcl. (iii).

Subsec. (e). Pub. L. 100–478, § 1002(b), substituted "regulation of commerce or taking," for "regulation," in introductory provisions.

Subsec. (f). Pub. L. 100–478, § 1003, amended subsec. (f) generally. Prior to amendment, subsec. (f) read as follows: "The Secretary shall develop and implement plans (hereinafter in this subsection referred to as 'recovery plans') for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans (1) shall, to the maximum extent practicable, give priority to those endangered species or threatened species most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other developmental projects or other forms of economic activity, and (2) may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act."

Subsecs. (g) to (i). Pub. L. 100–478, § 1004, added subsec. (g) and redesignated former subsecs. (g) and (h) as (h) and (i), respectively.

1982—Subsec. (a)(1). Pub. L. 97–304, § 2(a)(1)(A), (D), inserted "promulgated in accordance with subsection (b) of this section" after "shall by regulation" in introductory provisions preceding subpar. (A), and struck out provision following subpar. (E), which directed the Secretary, at the time regulations were proposed, to specify any habitat of a species considered to be a critical habitat but that such specification of critical habitats not apply to species listed prior to Nov. 10, 1978.

Subsec. (a)(1)(A). Pub. L. 97–304, § 2(a)(1)(A), redesignated subpar. (1) as (A).

Subsec. (a)(1)(B). Pub. L. 97–304, § 2(a)(1)(A), (C), redesignated subpar. (2) as (B) and substituted "recreational," for "sporting,".

Subsec. (a)(1)(C) to (E). Pub. L. 97–304, § 2(a)(1)(A), redesignated subpars. (3), (4), and (5) as (C), (D), and (E), respectively.

---

[2] So in original. Probably should be paragraph "(7)".

Subsec. (a)(3). Pub. L. 97–304, §2(a)(1)(E), added par. (3).

Subsec. (b). Pub. L. 97–304, §2(a)(2), completely revised subsec. (b) by, among other changes, requiring the Secretary to base determinations regarding the listing or delisting of species "solely" on the basis of the best scientific and commercial data available, streamlining the listing process by reducing the time periods for rulemaking, consolidating public meetings and hearing requirements, and establishing virtually identical procedures for the listing and delisting of species and for the designation of critical habitat, and altering the evidentiary standard which petitioners must satisfy to warrant a status review of the species proposed for listing or delisting.

Subsec. (c)(1). Pub. L. 97–304, §2(a)(3)(A), struck out ", and from time to time he may by regulation revise," after "Federal Register" and inserted provision directing the Secretary to revise from time to time each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b) of this section.

Subsec. (c)(2). Pub. L. 97–304, §2(a)(3)(B), (C), redesignated par. (4) as (2). Former par. (2), directing the Secretary, within 90 days of the receipt of the petition of an interested person under section 553(e) of title 5, to conduct and publish in the Federal Register a review of the status of any listed or unlisted species proposed to be removed from or added to either of the lists published pursuant to paragraph (1) of this subsection, but only if he made and published a finding that such person had presented substantial evidence which in his judgment warranted such a review, was struck out.

Subsec. (c)(3). Pub. L. 97–304, §2(a)(3)(B), struck out par. (3) which had provided that any list in effect on Dec. 27, 1973, of species of fish or wildlife determined by the Secretary of the Interior, pursuant to the Endangered Species Conservation Act of 1969, to be threatened with extinction be republished to conform to the classification for endangered species or threatened species, as the case might be, provided for in this chapter, but until such republication, any such species so listed was to be deemed an endangered species within the meaning of this chapter, and that the republication of any species pursuant to this paragraph did not require public hearing or comment under section 553 of title 5.

Subsec. (c)(4). Pub. L. 97–304, §2(a)(3)(C), redesignated par. (4) as (2).

Subsec. (d). Pub. L. 97–304, §2(a)(4)(A), substituted "section 1535(c) of this title" for "section 1535(a) of this title".

Subsec. (f). Pub. L. 97–304, §2(a)(4)(B), (C), (D), redesignated subsec. (g) as (f) and substituted "recovery plans (1) shall, to the maximum extent practicable, give priority to those endangered species or threatened species most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other developmental projects or other forms of economic activity, and (2)" for "recovery plans,". Former subsec. (f), relating to the promulgation of regulations, was struck out.

Subsec. (g). Pub. L. 97–304, §2(a)(4)(C), (E), redesignated subsec. (h) as (g), substituted reference to subsection (b)(3) of this section for reference to subsection (c)(2) of this section in par. (1), substituted "under subsection (a)(1) of this section" for "for listing" in par. (3), and substituted "subsection (f) of this section" for "subsection (g) of this section" in par. (4). Former subsec. (g) redesignated (f).

Subsec. (h). Pub. L. 97–304, §2(a)(4)(C), (F), added subsec. (h) and redesignated former subsec. (h) as (g).

1979—Subsec. (b)(1). Pub. L. 96–159, §3(1), required the Secretary's determinations to be preceded with a review of the status of the species.

Subsec. (f)(2)(B)(i). Pub. L. 96–159, §3(2), required publication of summary of text rather than of the complete full text of proposed regulation specifying any critical habitat and inclusion of a map of the proposed critical habitat.

Subsec. (f)(2)(B)(iv)(II). Pub. L. 96–159, §3(3), substituted "if requested within 15 days after the date on which the public meeting is conducted," for "if requested,".

Subsec. (f)(2)(C). Pub. L. 96–159, §3(4), (5), inserted in introductory text ", subsection (b)(4) of this section,"; and in cl. (ii), included reference to significant risk to wellbeing of any species of plants, inserted in item (II) reference to regulation applicable to resident species of plants, extended the statutory period to a "240-day period" from a "120-day period", and provided for withdrawal of an emergency regulation without substantial evidence to warrant it, respectively.

Subsec. (h). Pub. L. 96–159, §3(6), added subsec. (h).

1978—Subsec. (a)(1). Pub. L. 95–632, §11(1), inserted provision requiring the Secretary, at the time a regulation is proposed, to specify by regulation any habitat of the species involved which is considered a critical habitat providing the species was listed subsequent to Nov. 10, 1978.

Subsec. (b)(4). Pub. L. 95–632, §11(7), added par. (4).

Subsec. (c)(1). Pub. L. 95–632, §11(2), struck out "and shall" after "if any" and inserted ", and specify any critical habitat within such range" after "endangered or threatened".

Subsec. (c)(2). Pub. L. 95–632, §11(6), substituted "within 90 days of the receipt of" for "upon" and "conduct and publish in the Federal Register a review of the status of" for "conduct a review of" and inserted a provision requiring that the review and findings be made and published prior to initiation of any procedures under subsec. (b)(1) of this section.

Subsec. (c)(4). Pub. L. 95–632, §11(3), added par. (4).

Subsec. (f)(2)(A). Pub. L. 95–632, §11(4)(A), substituted "Except as provided in subparagraph (B), in" for "In".

Subsec. (f)(2)(B), (C). Pub. L. 95–632, §11(4)(B), (C), added subpar. (B), redesignated former subpar. (B) as (C), and as so redesignated, substituted "Neither subparagraph (A) or (B)" for "Neither subparagraph (A)".

Subsec. (f)(3). Pub. L. 95–632, §13, substituted "a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulations" for "a statement by the Secretary of the facts on which such regulation is based and the relationship of such facts to such regulation".

Subsec. (f)(4), (5). Pub. L. 95–632, §11(4)(D), added pars. (4) and (5).

Subsec. (g). Pub. L. 95–632, §11(5), added subsec. (g).

1976—Subsec. (f)(2)(B)(ii). Pub. L. 94–359 substituted "subsection (b)(1)(A)" for "subsection (b)(A), (B), and (C)".

EFFECTIVE DATE OF 1982 AMENDMENT

Section 2(b) of Pub. L. 97–304 provided that:

"(1) Any petition filed under section 4(c)(2) of the Endangered Species Act of 1973 [subsec. (c)(2) of this section] (as in effect on the day before the date of the enactment of this Act [Oct. 13, 1982]) and any regulation proposed under section 4(f) of such Act of 1973 [subsec. (f) of this section] (as in effect on such day) that is pending on such date of enactment [Oct. 13, 1982] shall be treated as having been filed or proposed on such date of enactment under section 4(b) of such Act of 1973 [subsec. (b) of this section] (as amended by subsection (a)); and the procedural requirements specified in such section 4(b) [subsec. (b) of this section] (as so amended) regarding such petition or proposed regulation shall be deemed to be complied with to the extent that like requirements under such section 4 [this section] (as in effect before the date of the enactment of this Act) were complied with before such date of enactment.

"(2) Any regulation proposed after, or pending on, the date of the enactment of this Act [Oct. 13, 1982] to designate critical habitat for a species that was determined before such date of enactment to be endangered or threatened shall be subject to the procedures set forth in section 4 of such Act of 1973 [this section] (as amended by subsection (a)) for regulations proposing revisions to critical habitat instead of those for regulations proposing the designation of critical habitat.

"(3) Any list of endangered species or threatened species (as in effect under section 4(c) of such Act of 1973 [subsec. (c) of this section] on the day before the date of the enactment of this Act [Oct. 13, 1982]) shall remain in effect unless and until determinations regarding species and designations and revisions of critical habitats that require changes to such list are made in accordance with subsection (b)(5) of such Act of 1973 [subsec. (b)(5) of this section] (as added by subsection (a)).

"(4) Section 4(a)(3)(A) of such Act of 1973 [subsec. (a)(3)(A) of this section] (as added by subsection (a)) shall not apply with respect to any species which was listed as an endangered species or a threatened species before November 10, 1978.''

ABOLITION OF HOUSE COMMITTEE ON MERCHANT MARINE AND FISHERIES

Committee on Merchant Marine and Fisheries of House of Representatives abolished and its jurisdiction transferred by House Resolution No. 6, One Hundred Fourth Congress, Jan. 4, 1995. Committee on Merchant Marine and Fisheries of House of Representatives treated as referring to Committee on Resources of House of Representatives in case of provisions relating to fisheries, wildlife, international fishing agreements, marine affairs (including coastal zone management) except for measures relating to oil and other pollution of navigable waters, or oceanography by section 1(b)(3) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress. Committee on Resources of House of Representatives changed to Committee on Natural Resources of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007.

## § 1534. Land acquisition

### (a) Implementation of conservation program; authorization of Secretary and Secretary of Agriculture

The Secretary, and the Secretary of Agriculture with respect to the National Forest System, shall establish and implement a program to conserve fish, wildlife, and plants, including those which are listed as endangered species or threatened species pursuant to section 1533 of this title. To carry out such a program, the appropriate Secretary—

(1) shall utilize the land acquisition and other authority under the Fish and Wildlife Act of 1956, as amended [16 U.S.C. 742a et seq.], the Fish and Wildlife Coordination Act, as amended [16 U.S.C. 661 et seq.], and the Migratory Bird Conservation Act [16 U.S.C. 715 et seq.], as appropriate; and

(2) is authorized to acquire by purchase, donation, or otherwise, lands, waters, or interest therein, and such authority shall be in addition to any other land acquisition authority vested in him.

### (b) Availability of funds for acquisition of lands, waters, etc.

Funds made available pursuant to the Land and Water Conservation Fund Act of 1965, as amended [16 U.S.C. 460l–4 et seq.], may be used for the purpose of acquiring lands, waters, or interests therein under subsection (a) of this section.

(Pub. L. 93–205, §5, Dec. 28, 1973, 87 Stat. 889; Pub. L. 95–632, §12, Nov. 10, 1978, 92 Stat. 3766.)

REFERENCES IN TEXT

The Fish and Wildlife Act of 1956, as amended, referred to in subsec. (a)(1), is act Aug. 8, 1956, ch. 1036, 70 Stat. 119, as amended, which is classified generally to sections 742a to 742d and 742e to 742j–2 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 742a of this title and Tables.

The Fish and Wildlife Coordination Act, as amended, referred to in subsec. (a)(1), is act Mar. 10, 1934, ch. 55, 48 Stat. 401, as amended, which is classified generally to sections 661 to 666c of this title. For complete classification of this Act to the Code, see Short Title note set out under section 661 of this title and Tables.

The Migratory Bird Conservation Act, referred to in subsec. (a)(1), is act Feb. 18, 1929, ch. 257, 45 Stat. 1222, as amended, which is classified generally to subchapter III (§715 et seq.) of chapter 7 of this title. For complete classification of this Act to the Code, see section 715 of this title and Tables.

The Land and Water Conservation Fund Act of 1965, as amended, referred to in subsec. (b), is Pub. L. 88–578, Sept. 3, 1964, 78 Stat. 897, as amended, which is classified generally to part 3B (§460l–4 et seq.) of subchapter LXIX of chapter 1 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 460l–4 of this title and Tables.

AMENDMENTS

1978—Subsec. (a). Pub. L. 95–632, among other changes in text preceding par. (1), inserted reference to the Secretary of Agriculture with respect to the National Forest System and substituted the establishment and implementation of a plan to conserve plants for the establishment and implementation of a plan to conserve plants which were concluded in Appendices to the Convention.

## § 1535. Cooperation with States

### (a) Generally

In carrying out the program authorized by this chapter, the Secretary shall cooperate to the maximum extent practicable with the States. Such cooperation shall include consultation with the States concerned before acquiring any land or water, or interest therein, for the purpose of conserving any endangered species or threatened species.

### (b) Management agreements

The Secretary may enter into agreements with any State for the administration and management of any area established for the conservation of endangered species or threatened species. Any revenues derived from the administration of such areas under these agreements shall be subject to the provisions of section 715s of this title.

### (c) Cooperative agreements

(1) In furtherance of the purposes of this chapter, the Secretary is authorized to enter into a cooperative agreement in accordance with this section with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species. Within one hundred and twenty days after the Secretary receives a certified copy of such a proposed State program, he shall make a determination whether such program is in accordance with this chapter. Unless he determines, pursuant to this paragraph, that the State program is not in accordance with this chapter, he shall enter into a cooperative agreement with the State for the purpose of assisting in implementation of the State program. In order for a State program to be deemed an adequate and active program for the conservation



(7) Orders of the Federal Security Administrator under section 371(e) of title 21, in a case of actual controversy as to the validity of any such order, by any person adversely affected thereby;

(8) Orders of the Federal Power Commission under chapter 15B of title 15;

(9) Final orders of the National Labor Relations Board;

(10) Cease and desist orders under section 193 of title 7;

(11) Orders of the Securities and Exchange Commission;

(12) Orders to cease and desist from violating section 1599 of title 7;

(13) Wage orders of the Administrator of the Wage and Hour Division of the Department of Labor under section 208 of title 29;

(14) Orders under sections 81r and 1641 of title 19, U.S.C., 1940 ed., Customs Duties.

The courts of appeals also have jurisdiction to enforce:

(1) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(2) Final orders of the National Labor Relations Board;

(3) Orders to cease and desist from violating section 1599 of title 7.

The Court of Appeals for the District of Columbia also has jurisdiction to review orders of the Post Office Department under section 576 of title 39 relating to discriminations in sending second-class publications by freight; Maritime Commission orders denying transfer to foreign registry of vessels under subsidy contract; sugar allotment orders; decisions of the Federal Communications Commission granting or refusing applications for construction permits for radio stations, or for radio station licenses, or for renewal or modification of radio station licenses, or suspending any radio operator's license.

Changes were made in phraseology.

AMENDMENTS

1982—Pub. L. 97–164, § 124, inserted "(other than the United States Court of Appeals for the Federal Circuit)" after "The court of appeals" and inserted provision that the jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

1958—Pub. L. 85–508 struck out provisions which gave courts of appeals jurisdiction of appeals from District Court for Territory of Alaska. See section 81A of this title which establishes a United States District Court for the State of Alaska.

1951—Act Oct. 31, 1951, inserted reference to District Court of Guam.

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

EFFECTIVE DATE OF 1958 AMENDMENT

Amendment by Pub. L. 85–508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c.16 as required by sections 1 and 8(c) of Pub. L. 85–508, see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.

TERMINATION OF UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE CANAL ZONE

For termination of the United States District Court for the District of the Canal Zone at end of the "transition period", being the 30-month period beginning Oct.

1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 2101 and 2201 to 2203 of Pub. L. 96–70, title II, Sept. 27, 1979, 93 Stat. 493, formerly classified to sections 3831 and 3841 to 3843, respectively, of Title 22, Foreign Relations and Intercourse.

§ 1292. Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

(c) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

(1) of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

(2) of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

(d)(1) When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of

opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(2) When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(3) Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

(4)(A) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order or order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Court of Federal Claims under section 1631 of this title.

(B) When a motion to transfer an action to the Court of Federal Claims is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the Court of Federal Claims pursuant to the motion shall be carried out.

(e) The Supreme Court may prescribe rules, in accordance with section 2072 of this title, to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for under subsection (a), (b), (c), or (d).

(June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, §49, 65 Stat. 726; Pub. L. 85–508, §12(e), July 7, 1958, 72 Stat. 348; Pub. L. 85–919, Sept. 2, 1958, 72 Stat. 1770; Pub. L. 97–164, §125, Apr. 2, 1982, 96 Stat. 36; Pub. L. 98–620, title IV, §412, Nov. 8, 1984, 98 Stat. 3362; Pub. L. 100–702, title V, §501, Nov. 19, 1988, 102 Stat. 4652; Pub. L. 102–572, title I, §101, title IX, §§902(b), 906(c), Oct. 29, 1992, 106 Stat. 4506, 4516, 4518.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§225(b), 227, 227a, and section 61 of title 7 of the Canal Zone Code (Mar. 3, 1911, ch. 231, §§128, 129, 36 Stat. 1133, 1134; Feb. 13, 1925, ch. 229, §1, 43 Stat. 937; Feb. 28, 1927, ch. 228, 44 Stat. 1261; Apr. 3, 1926, ch. 102, 44 Stat. 233; May 20, 1926, ch. 347, §13(a), 44 Stat. 587; Apr. 11, 1928, ch. 354, §1, 45 Stat. 422; May 17, 1932, ch. 190, 47 Stat. 158).

Section consolidates sections 225(b), 227 and part of 227a of title 28, U.S.C., 1940 ed., with necessary changes in phraseology to effect the consolidation.

The second paragraph of section 225(b) of title 28, U.S.C., 1940 ed., relating to review of decisions of the district courts, under section 9 of the Railway Labor Act (section 159 of title 45), was omitted as covered by section 1291 of this title.

Words in section 227 of title 28, U.S.C., 1940 ed., "or decree," after "interlocutory order," were deleted, in view of Rule 65 of the Federal Rules of Civil Procedure, using only the word "order."

Provisions of sections 227 and 227a of title 28, U.S.C., 1940 ed., relating to stay of proceedings pending appeal were omitted as superseded by Federal Rules of Civil Procedure, Rule 73.

Provisions of section 227 of title 28, U.S.C., 1940 ed., requiring an additional bond by the district court as a condition of appeal were omitted in view of Federal Rules of Civil Procedure, Rule 73.

Words in section 227 of title 28, U.S.C., 1940 ed., "and sections 346 and 347 of this title shall apply to such cases in the circuit courts of appeals as to other cases therein," at the end of the first sentence of section 227 of title 28, U.S.C., 1940 ed., were deleted as fully covered by section 1254 of this title, applicable to any case in a court of appeals. Other procedural provisions of said section 227 were omitted as covered by section 2101 et seq. of this title.

In subsection (4), which is based on section 227a of title 28, U.S.C., 1940 ed., words "civil actions" were substituted for "suits in equity" and word "judgments" was substituted for "decree," in view of Rules 2 and 54 of the Federal Rules of Civil Procedure.

The provision of sections 227 and 227a of title 28, U.S.C., 1940 ed., that appeal must be taken within thirty days after entry of order, decree or judgment is incorporated in section 2107 of this title.

The provisions of section 227a of title 28, U.S.C., 1940 ed., relating to stay of proceedings pending appeal, were omitted as superseded by Rule 73 of the Federal Rules of Civil Procedure.

The district courts for the districts of Hawaii and Puerto Rico are embraced in the term "district courts of the United States." (See definitive section 451 of this title.) Consequently the specific reference in section 225 of title 28, U.S.C., 1940 ed., to "the United States district courts for Hawaii" was omitted.

The District Court for the District of Puerto Rico is not enumerated in section 225(b) of title 28, U.S.C., 1940 ed., nevertheless subsection (2) of the revised section does not except such court. Thus in conformity with the last sentence of section 864, title 48, U.S.C., 1940 ed. For distribution of said section 864, see Distribution Table.

Section 61 of title 7 of the Canal Zone Code is also incorporated in sections 1291 and 1294 of this title.

AMENDMENTS

1992—Subsec. (d)(2). Pub. L. 102–572, §§902(b)(1), 906(c), substituted "When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims" for "When any judge of the United States Claims Court".

Subsec. (d)(3). Pub. L. 102–572, §902(b)(2), substituted "Court of Federal Claims" for "Claims Court" in two places.

Subsec. (d)(4). Pub. L. 102–572, §902(b), substituted "United States Court of Federal Claims" for "United States Claims Court" in subpar. (A) and "Court of Fed-

eral Claims'' for ''Claims Court'' in two places in subpar. (B).

Subsec. (e). Pub. L. 102–572, § 101, added subsec. (e).

1988—Subsec. (d)(4). Pub. L. 100–702 added par. (4).

1984—Subsec. (b). Pub. L. 98–620, § 412(a), inserted ''which would have jurisdiction of an appeal of such action'' after ''The Court of Appeals''.

Subsec. (c)(1). Pub. L. 98–620, § 412(b), inserted ''or (b)'' after ''(a)''.

1982—Subsec. (a). Pub. L. 97–164, § 125(a)(1), substituted ''Except as provided in subsections (c) and (d) of this section, the courts'' for ''The courts'' in introductory provisions.

Subsec. (a)(4). Pub. L. 97–164, § 125(a)(2), (3), struck out par. (4) which related to judgments in civil actions for patent infringement which were final except for accounting.

Subsecs. (c), (d). Pub. L. 97–164, § 125(b), added subsecs. (c) and (d).

1958—Pub. L. 85–919 designated existing provisions as subsec. (a) and added subsec. (b).

Par. (1). Pub. L. 85–508 struck out reference to District Court for Territory of Alaska. See section 81A of this title which established a United States District Court for the State of Alaska.

1951—Par. (1). Act Oct. 31, 1951, inserted reference to District Court of Guam.

EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by section 101 of Pub. L. 102–572 effective Jan. 1, 1993, see section 1101(a) of Pub. L. 102–572, set out as a note under section 905 of Title 2, The Congress.

Amendment by sections 902(b) and 906(c) of Pub. L. 102–572 effective Oct. 29, 1992, see section 911 of Pub. L. 102–572, set out as a note under section 171 of this title.

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–702, title V, § 502, Nov. 19, 1988, 102 Stat. 4652, provided that: ''The amendment made by section 501 [amending this section] shall apply to any action commenced in the district court on or after the date of enactment of this title [Nov. 19, 1988].''

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

EFFECTIVE DATE OF 1958 AMENDMENT

Amendment by Pub. L. 85–508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c16, as required by sections 1 and 8(c) of Pub. L. 85–508, see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.

TERMINATION OF UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE CANAL ZONE

For termination of the United States District Court for the District of the Canal Zone at end of the ''transition period'', being the 30-month period beginning Oct. 1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 3831 and 3841 to 3843 of Title 22, Foreign Relations and Intercourse.

### [§ 1293. Repealed. Pub. L. 87–189, § 3, Aug. 30, 1961, 75 Stat. 417]

Section, acts June 25, 1948, ch. 646, 62 Stat. 929; Mar. 18, 1959, Pub. L. 86–3, § 14(b), 73 Stat. 10, provided for appeal from supreme court of Puerto Rico to court of appeals for first circuit. See section 1258 of this title.

A subsequent section 1293, added Pub. L. 95–598, title II, § 236(a), Nov. 6, 1978, 92 Stat. 2667, which related to bankruptcy appeals, did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

### § 1294. Circuits in which decisions reviewable

Except as provided in sections 1292(c), 1292(d), and 1295 of this title, appeals from reviewable decisions of the district and territorial courts shall be taken to the courts of appeals as follows:

(1) From a district court of the United States to the court of appeals for the circuit embracing the district;

(2) From the United States District Court for the District of the Canal Zone, to the Court of Appeals for the Fifth Circuit;

(3) From the District Court of the Virgin Islands, to the Court of Appeals for the Third Circuit;

(4) From the District Court of Guam, to the Court of Appeals for the Ninth Circuit.

(June 25, 1948, ch. 646, 62 Stat. 930; Oct. 31, 1951, ch. 655, § 50(a), 65 Stat. 727; Pub. L. 85–508, § 12(g), July 7, 1958, 72 Stat. 348; Pub. L. 86–3, § 14(c), Mar. 18, 1959, 73 Stat. 10; Pub. L. 87–189, § 5, Aug. 30, 1961, 75 Stat. 417; Pub. L. 95–598, title II, § 237, Nov. 6, 1978, 92 Stat. 2667; Pub. L. 97–164, title I, § 126, Apr. 2, 1982, 96 Stat. 37.)

HISTORICAL AND REVISION NOTES

Based on section 1141(b)(1)(2)(3) of title 26, U.S.C., 1940 ed., Internal Revenue Code, title 28, U.S.C., 1940 ed., § 225(d) and sections 645, 864, 865, 1356, and 1392 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and section 61 of title 7 of the Canal Zone Code (Apr. 12, 1900, ch. 191, § 35, 31 Stat. 85; Mar. 3, 1911, ch. 231, § 128, 36 Stat. 1133; Aug. 24, 1912, ch. 390, § 9, 37 Stat. 566; Mar. 2, 1917, ch. 145, §§ 42, 43, 39 Stat. 966; Mar. 3, 1917, ch. 171, § 2, 39 Stat. 1132; Sept. 21, 1922, ch. 370, § 3, 42 Stat. 1006; Feb. 13, 1925, ch. 229, §§ 1, 13, 43 Stat. 936, 942; Feb. 26, 1926, ch. 27, § 1002, 44 Stat. 110; Jan. 31, 1928, ch. 14, § 1, 45 Stat. 54; May 17, 1932, ch. 190, 47 Stat. 158; Feb. 16, 1933, ch. 91, § 3, 47 Stat. 817; May 10, 1934, ch. 277, § 519, 48 Stat. 760; Feb. 10, 1939, ch. 2, § 1141(b)(1)(2)(3), 53 Stat. 164).

Section consolidates the venue provisions of sections 645, 864, 1356, and 1392 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions with sections 1141(b)(1)(2)(3) to title 26, U.S.C., 1940 ed., Internal Revenue and sections 225(d) and 865 of said title 48. Other provisions of said section 864, not incorporated in this section and sections 41 and 119 of this title, were retained in title 48. Other provisions of said section 1356 are incorporated in section 1291 of this title. Other provisions of said section 1392 were also retained in title 48.

Paragraph (3) of section 1141(b) of title 26, U.S.C., 1940 ed., was omitted as executed. It made such subdivision applicable to all decisions of the Board of Tax Appeals (Tax Court) rendered on and after May 10, 1934.

Provisions of section 225(d) of title 28, U.S.C., 1940 ed., for review of the decisions of the United States Court for China were omitted. (See reviser's note under section 411 of this title.)

Subsection (b) rephrases and rearranges the relevant provisions of section 1141(b)(1)(2)(3) of title 26, U.S.C., 1940 ed.

Specific reference to the United States district courts for the districts of Hawaii, Puerto Rico and District of Columbia was omitted as unnecessary, these courts being embraced in the definition of ''a district court of the United States'' contained in section 451 of this title.

Administrative orders, referred to in reviser's note under section 1291 of this title, are reviewable and enforceable in the following circuits:

ORDERS REVIEWABLE

(1) Alcoholic permit orders—in the District of Columbia or in the circuit where the applicant or permittee resides or has his principal place of business;



1962—Pub. L. 87–748, §1(b), Oct. 5, 1962, 76 Stat. 744, added item 1361.

1958—Pub. L. 85–554, §4, July 25, 1958, 72 Stat. 415, inserted "costs" in items 1331 and 1332.

1953—Act Aug. 15, 1953, ch. 505, §3, 67 Stat. 589, added item 1360.

## § 1330. Actions against foreign states

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

(Added Pub. L. 94–583, §2(a), Oct. 21, 1976, 90 Stat. 2891.)

### EFFECTIVE DATE

Section effective 90 days after Oct. 21, 1976, see section 8 of Pub. L. 94–583, set out as a note under section 1602 of this title.

## § 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

(June 25, 1948, ch. 646, 62 Stat. 930; Pub. L. 85–554, §1, July 25, 1958, 72 Stat. 415; Pub. L. 94–574, §2, Oct. 21, 1976, 90 Stat. 2721; Pub. L. 96–486, §2(a), Dec. 1, 1980, 94 Stat. 2369.)

### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §41(1) (Mar. 3, 1911, ch. 231, §24, par. 1, 36 Stat. 1091; May 14, 1934, ch. 283, §1, 48 Stat. 775; Aug. 21, 1937, ch. 726, §1, 50 Stat. 738; Apr. 20, 1940, ch. 117, 54 Stat. 143).

Jurisdiction of federal questions arising under other sections of this chapter is not dependent upon the amount in controversy. (See annotations under former section 41 of title 28, U.S.C.A., and 35 C.J.S., p. 833 et seq., §§30–43. See also, reviser's note under section 1332 of this title.)

Words "wherein the matter in controversy exceeds the sum and value of $3,000, exclusive of interest and costs," were added to conform to rulings of the Supreme Court. See construction of provision relating to jurisdictional amount requirement in cases involving a Federal question in *United States v. Sayward*, 16 S.Ct. 371, 160 U.S. 493, 40 L.Ed. 508; *Fishback v. Western Union Tel. Co.*, 16 S.Ct. 506, 161 U.S. 96, 40 L.Ed. 630; and *Halt v. Indiana Manufacturing Co.*, 1900, 20 S.Ct. 272, 176 U.S. 68, 44 L.Ed. 374.

Words "all civil actions" were substituted for "all suits of a civil nature, at common law or in equity" to conform with Rule 2 of the Federal Rules of Civil Procedure.

Words "or treaties" were substituted for "or treaties made, or which shall be made under their authority," for purposes of brevity.

The remaining provisions of section 41(1) of title 28, U.S.C., 1940 ed., are incorporated in sections 1332, 1341, 1342, 1345, 1354, and 1359 of this title.

Changes were made in arrangement and phraseology.

### AMENDMENTS

1980—Pub. L. 96–486 struck out "; amount in controversy; costs" in section catchline, struck out minimum amount in controversy requirement of $10,000 for original jurisdiction in federal question cases which necessitated striking the exception to such required minimum amount that authorized original jurisdiction in actions brought against the United States, any agency thereof, or any officer or employee thereof in an official capacity, struck out provision authorizing the district court except where express provision therefore was made in a federal statute to deny costs to a plaintiff and in fact impose such costs upon such plaintiff where plaintiff was adjudged to be entitled to recover less than the required amount in controversy, computed without regard to set-off or counterclaim and exclusive of interests and costs, and struck out existing subsection designations.

1976—Subsec. (a). Pub. L. 94–574 struck out $10,000 jurisdictional amount where action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

1958—Pub. L. 85–554 included costs in section catchline, designated existing provisions as subsec. (a), substituted "$10,000" for "$3,000", and added subsec. (b).

### EFFECTIVE DATE OF 1980 AMENDMENT; APPLICABILITY

Pub. L. 96–486, §4, Dec. 1, 1980, 94 Stat. 2370, provided: "This Act [amending this section and section 2072 of Title 15, Commerce and Trade, and enacting provisions set out as a note under section 1 of this title] shall apply to any civil action pending on the date of enactment of this Act [Dec. 1, 1980]."

### EFFECTIVE DATE OF 1958 AMENDMENT

Pub. L. 85–554, §3, July 25, 1958, 72 Stat. 415, provided that: "This Act [amending this section and sections 1332 and 1345 of this title] shall apply only in the case of actions commenced after the date of the enactment of this Act [July 25, 1958]."

## § 1332. Diversity of citizenship; amount in controversy; costs

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court


1960—Pub. L. 86–682, §10, Sept. 2, 1960, 74 Stat. 708, added item for chapter 173.

## CHAPTER 151—DECLARATORY JUDGMENTS

Sec.
2201.     Creation of remedy.
2202.     Further relief.

### § 2201. Creation of remedy

(a) In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

(b) For limitations on actions brought with respect to drug patents see section 505 or 512 of the Federal Food, Drug, and Cosmetic Act, or section 351 of the Public Health Service Act.

(June 25, 1948, ch. 646, 62 Stat. 964; May 24, 1949, ch. 139, §111, 63 Stat. 105; Aug. 28, 1954, ch. 1033, 68 Stat. 890; Pub. L. 85–508, §12(p), July 7, 1958, 72 Stat. 349; Pub. L. 94–455, title XIII, §1306(b)(8), Oct. 4, 1976, 90 Stat. 1719; Pub. L. 95–598, title II, §249, Nov. 6, 1978, 92 Stat. 2672; Pub. L. 98–417, title I, §106, Sept. 24, 1984, 98 Stat. 1597; Pub. L. 100–449, title IV, §402(c), Sept. 28, 1988, 102 Stat. 1884; Pub. L. 100–670, title I, §107(b), Nov. 16, 1988, 102 Stat. 3984; Pub. L. 103–182, title IV, §414(b), Dec. 8, 1993, 107 Stat. 2147; Pub. L. 111–148, title VII, §7002(c)(2), Mar. 23, 2010, 124 Stat. 816.)

AMENDMENT OF SECTION

*For termination of amendment by section 501(c) of Pub. L. 100–449, see Effective and Termination Dates of 1988 Amendment note below.*

HISTORICAL AND REVISION NOTES
1948 ACT

Based on title 28, U.S.C., 1940 ed., §400 (Mar. 3, 1911, ch. 231, §274d, as added June 14, 1934, ch. 512, 48 Stat. 955; Aug. 30, 1935, ch. 829, §405, 49 Stat. 1027).

This section is based on the first paragraph of section 400 of title 28, U.S.C., 1940 ed. Other provisions of such section are incorporated in section 2202 of this title.

While this section does not exclude declaratory judgments with respect to State taxes, such suits will not ordinarily be entertained in the courts of the United States where State law makes provision for payment under protest and recovery back or otherwise affords adequate remedy in the State courts. See *Great Lakes Dredge & Dock Co.* v. *Huffman*, La. 1943, 63 S.Ct. 1070, 319 U.S. 293, 87 L.Ed. 1407. See also *Spector Motor Service* v. *McLaughlin*, Conn. 1944, 65 S.Ct. 152, 323 U.S. 101, 89 L.Ed. 101. See also section 1341 of this title forbidding district courts to restrain enforcements of State taxes where State courts afford plain, speedy, and efficient remedy.

Changes were made in phraseology.

1949 ACT

Section corrects a typographical error in section 2201 of title 28, U.S.C.

REFERENCES IN TEXT

Section 7428 of the Internal Revenue Code of 1986, referred to in subsec. (a), is classified to section 7428 of Title 26, Internal Revenue Code.

Section 516A(f)(10) of the Tariff Act of 1930, referred to in subsec. (a), is classified to section 1516a(f)(10) of Title 19, Customs Duties.

Sections 505 and 512 of the Federal Food, Drug, and Cosmetic Act, referred to in subsec. (b), are classified to sections 355 and 360b, respectively, of Title 21, Food and Drugs.

Section 351 of the Public Health Service Act, referred to in subsec. (b), is classified to section 262 of Title 42, The Public Health and Welfare.

AMENDMENTS

2010—Subsec. (b). Pub. L. 111–148 inserted '', or section 351 of the Public Health Service Act'' before period.

1993—Subsec. (a). Pub. L. 103–182 substituted ''merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930),'' for ''Canadian merchandise,''.

1988—Subsec. (a). Pub. L. 100–449 temporarily substituted ''1986,'' for ''1954 or'' and inserted ''or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of Canadian merchandise, as determined by the administering authority,'' after ''title 11,''. See Effective and Termination Dates of 1988 Amendment note below.

Subsec. (b). Pub. L. 100–670 inserted ''or 512'' after ''505''.

1984—Pub. L. 98–417 designated existing provisions as subsec. (a) and added subsec. (b).

1978—Pub. L. 95–598 inserted reference to proceedings under section 505 or 1146 of title 11.

1976—Pub. L. 94–455 substituted ''taxes other than actions brought under section 7428 of the Internal Revenue Code of 1954'' for ''taxes''.

1958—Pub. L. 85–508 struck out provisions which related to District Court for Territory of Alaska. See section 81A of this title which establishes a United States District Court for the State of Alaska.

1954—Act Aug. 28, 1954, extended provisions to Alaska.

1949—Act May 24, 1949, corrected spelling of ''or'' in second sentence.

EFFECTIVE DATE OF 1993 AMENDMENT

Amendment by Pub. L. 103–182 effective on the date the North American Free Trade Agreement enters into force with respect to the United States [Jan. 1, 1994], but not applicable to any final determination described in section 1516a(a)(1)(B) or (2)(B)(i), (ii), or (iii) of Title 19, Customs Duties, notice of which is published in the Federal Register before such date, or to a determination described in section 1516a(a)(2)(B)(vi) of Title 19, notice of which is received by the Government of Canada or Mexico before such date, or to any binational panel review under the United States-Canada Free-Trade Agreement, or to any extraordinary challenge arising out of any such review that was commenced before such date, see section 416 of Pub. L. 103–182, set out as an Effective Date note under section 3431 of Title 19.

EFFECTIVE AND TERMINATION DATES OF 1988 AMENDMENT

Amendment by Pub. L. 100–449 effective on date United States-Canada Free-Trade Agreement enters into force (Jan. 1, 1989), and to cease to have effect on date agreement ceases to be in force, see section 501(a), (c) of Pub. L. 100–449, set out in a note under section 2112 of Title 19, Customs Duties.

EFFECTIVE DATE OF 1978 AMENDMENT

Amendment by Pub. L. 95–598 effective Oct. 1, 1979, see section 402(c) of Pub. L. 95–598, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–455 applicable with respect to pleadings filed with the United States Tax Court, the District Court of the United States for the District of Columbia, or the United States Court of Claims more than 6 months after Oct. 4, 1976, but only with respect to determinations (or requests for determinations) made after Jan. 1, 1976, see section 1306(c) of Pub. L. 94–455, set out as an Effective Date note under section 7428 of Title 26, Internal Revenue Code.

EFFECTIVE DATE OF 1958 AMENDMENT

Amendment by Pub. L. 85–508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c16, as required by sections 1 and 8(c) of Pub. L. 85–508, see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.

EFFECT OF TERMINATION OF NAFTA COUNTRY STATUS

For provisions relating to effect of termination of NAFTA country status on sections 401 to 416 of Pub. L. 103–182, see section 3451 of Title 19, Customs Duties.

AMOUNT IN CONTROVERSY

Jurisdictional amount in diversity of citizenship cases, see section 1332 of this title.

## § 2202. Further relief

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

(June 25, 1948, ch. 646, 62 Stat. 964.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 400 (Mar. 3, 1911, ch. 231, § 274d, as added June 14, 1934, ch. 512, 48 Stat. 955; Aug. 30, 1935, ch. 829, § 405, 49 Stat. 1027).

This section is based on the second paragraph of section 400 of title 28, U.S.C., 1940 ed. Other provisions of such section are incorporated in section 2201 of this title.

Provision in said section 400 that the court shall require adverse parties whose rights are adjudicated to show cause why further relief should not be granted forthwith, were omitted as unnecessary and covered by the revised section.

Provisions relating to submission of interrogatories to a jury were omitted as covered by rule 49 of the Federal Rules of Civil Procedure.

Changes were made in phraseology.

## CHAPTER 153—HABEAS CORPUS

Sec.
2241.　Power to grant writ.
2242.　Application.
2243.　Issuance of writ; return; hearing; decision.
2244.　Finality of determination.
2245.　Certificate of trial judge admissible in evidence.
2246.　Evidence; depositions; affidavits.
2247.　Documentary evidence.
2248.　Return or answer; conclusiveness.
2249.　Certified copies of indictment, plea and judgment; duty of respondent.
2250.　Indigent petitioner entitled to documents without cost.
2251.　Stay of State court proceedings.
2252.　Notice.
2253.　Appeal.
2254.　State custody; remedies in Federal courts.
2255.　Federal custody; remedies on motion attacking sentence.
[2256.　Omitted.]

SENATE REVISION AMENDMENT

Chapter catchline was changed by Senate amendment. See 80th Congress Senate Report No. 1559.

AMENDMENTS

1978—Pub. L. 95–598, title II, § 250(b), Nov. 6, 1978, 92 Stat. 2672, directed the addition of item 2256 "Habeas corpus from bankruptcy courts", which amendment did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

1966—Pub. L. 89–711, § 3, Nov. 2, 1966, 80 Stat. 1106, substituted "Federal courts" for "State Courts" in item 2254.

## § 2241. Power to grant writ

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had.

(b) The Supreme Court, any justice thereof, and any circuit judge may decline to entertain an application for a writ of habeas corpus and may transfer the application for hearing and determination to the district court having jurisdiction to entertain it.

(c) The writ of habeas corpus shall not extend to a prisoner unless—

(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States; or

(4) He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

(5) It is necessary to bring him into court to testify or for trial.

(d) Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application. The district court for the district wherein such an application is filed in the exercise of its discretion and in furtherance of justice may transfer the application to the other district court for hearing and determination.

(e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of

those benefits that would be achieved if it is assumed that the conservation measures would also be implemented on other necessary properties, would preclude or remove any need to list the species covered by the Agreement.

[50 FR 39689, Sept. 30, 1985, as amended at 63 FR 8871, Feb. 23, 1998; 63 FR 52635, Oct. 1, 1998; 64 FR 32714, June 17, 1999; 64 FR 52676, Sept. 30, 1999; 69 FR 24093, May 3, 2004; 69 FR 29670, May 25, 2004; 69 FR 71731, Dec. 10, 2004]

**§ 17.40  Special rules—mammals.**

(a) [Reserved]

(b) Grizzly bear (*Ursus arctos horribilis*)—(1) *Prohibitions.* The following prohibitions apply to the grizzly bear:

(i) *Taking.* (A) Except as provided in paragraphs (b)(1)(i)(B) through (F) of this section, no person shall take any grizzly bear in the 48 conterminous states of the United States.

(B) Grizzly bears may be taken in self-defense or in defense of others, but such taking shall be reported, within 5 days of occurrence, to the Assistant Regional Director, Division of Law Enforcement, U.S. Fish and Wildlife Service, P.O. Box 25486, Denver Federal Center, Denver, Colorado 80225 (303/236–7540 or FTS 776–7540), if occurring in Montana or Wyoming, or to the Assistant Regional Director, Division of Law Enforcement, U.S. Fish and Wildlife Service, Lloyd 500 Building, Suite 1490, 500 Northeast Multnomah Street, Portland, Oregon 97232 (503/231–6125 or FTS 429–6125), if occurring in Idaho or Washington, and to appropriate State and Indian Reservation Tribal authorities. Grizzly bears or their parts taken in self-defense or in defense of others shall not be possessed, delivered, carried, transported, shipped, exported, received, or sold, except by Federal, State, or Tribal authorities.

(C) *Removal of nuisance bears.* A grizzly bear consituting a demonstrable but non immediate threat to human safety or committing significant depredations to lawfully present livestock, crops, or beehives may be taken, but only if:

(1) It has not been reasonably possible to eliminate such threat or depredation by live-capturing and releasing unharmed in a remote area the grizzly bear involved; and

(2) The taking is done in a humane manner by authorized Federal, State, or Tribal authorities, and in accordance with current interagency guidelines covering the taking of such nuisance bears; and

(3) The taking is reported within 5 days of occurrence to the appropriate Assistant Regional Director, Division of Law Enforcement, U.S. Fish and Wildlife Service, as indicated in paragraph (b)(1)(i)(B) of this section, and to appropriate State and Tribal authorities.

(D) *Federal, State, or Tribal scientific or research activities.* Federal, State, or Tribal authorities may take grizzly bears for scientific or research purposes, but only if such taking does not result in death or permanent injury to the bears involved. Such taking must be reported within 5 days of occurrence to the appropriate Assistant Regional Director, Division of Law Enforcement, U.S. Fish and Wildlife Service, as indicated in paragraph (b)(1)(i)(B) of this section, and to appropriate State and Tribal authorities.

(E) [Reserved]

(F) *National Parks.* The regulations of the National Park Service shall govern all taking of grizzly bears in National Parks.

(ii) *Unlawfully taken grizzly bears.* (A) Except as provided in paragraphs (b)(1)(ii)(B) and (iv) of this section, no person shall possess, deliver, carry, transport, ship, export, receive, or sell any unlawfully taken grizzly bear. Any unlawful taking of a grizzly bear shall be reported within 5 days of occurrence to the appropriate Assistant Regional Director, Division of Law Enforcement, U.S. Fish and Wildlife Service, as indicated in paragraph (b)(1)(i)(B) of this section, and to appropriate State and Tribal authorities.

(B) Authorized Federal, State, or Tribal employees, when acting in the course of their official duties, may, for scientific or research purposes, possess, deliver, carry, transport, ship, export, or receive unlawfully taken grizzly bears.

(iii) *Import or export.* Except as provided in paragraphs (b)(1)(iii) (A) and (B) and (iv) of this section, no person shall import any grizzly bear into the United States.

114

(A) *Federal, State, or Tribal scientific or research activities.* Federal, State, or Tribal authorities may import grizzly bears into the United States for scientific or research purposes.

(B) *Public zoological institution.* Public zoological institutions (see 50 CFR 10.12) may import grizzly bears into the United States.

(iv) *Commercial transactions.* (A) Except as provided in paragraph (b)(1)(iv)(B) of this section, no person shall, in the course of commercial activity, deliver, receive, carry, transport, or ship in interstate or foreign commerce any grizzly bear.

(B) A public zoological institution (see 50 CFR 10.12) dealing with other public zoological institutions may sell grizzly bears or offer them for sale in interstate or foreign commerce, and may, in the course of commercial activity, deliver, receive, carry, transport, or ship grizzly bears in interstate or foreign commerce.

(v) *Other violations.* No person shall attempt to commit, cause to be committed, or solicit another to commit any act prohibited by paragraph (b)(1) of this section.

(2) *Definitions.* As used in paragraph (b) of this section:

*Grizzly bear* means any member of the species *Ursus arctos horribilis* of the 48 conterminous States of the United States, including any part, offspring, dead body, part of a dead body, or product of such species.

*Grizzly bear accompanied by young* means any grizzly bear having offspring, including one or more cubs, yearlings, or 2-year-olds, in its immediate vicinity.

*Identified* means permanently marked or documented so as to be identifiable by law enforcement officials at a subsequent date.

*State, Federal or Tribal authority* means an employee of State, Federal, or Indian Tribal government who, as part of his/her official duties, normally handles grizzly bears.

*Young grizzly bear* means a cub, yearling, or 2-year-old grizzly bear.



(c) *Primates.* (1) Except as noted in paragraphs (c)(2) and (c)(3) of this section, all provisions of §17.31 shall apply to the lesser slow loris, *Nycticebus pygmaeus*; Philippine tarsier, *Tarsius syrichta*; white-footed tamarin, *Saguinus leucopus*; black howler monkey, *Alouatta pigra*; stump-tailed macaque, *Macaca arctoides*; gelada baboon, *Theropithecus gelada*; Formosan rock macaque, *Macaca cyclopis*; Japanese macaque, *Macaca fuscata*; Toque macaque, *Macaca sinica*; long-tailed langur, *Presbytis potenziani*; purple-faced langur, *Presbytis senex*; Tonkin snub-nosed langur, *Pygathrix (Rhinopithecus) avunculus*; and, in captivity only, chimpanzee, *Pan troglodytes.*

(2) The prohibitions referred to above do not apply to any live member of such species held in captivity in the United States on the effective date of the final rulemaking, or to the progeny of such animals, or to the progeny of animals legally imported into the United States after the effective date of the final rulemaking, *Provided,* That the person wishing to engage in any activity which would otherwise be prohibited must be able to show satisfactory documentary or other evidence as to the captive status of the particular member of the species on the effective date of this rulemaking or that the

115

particular member of the species was born in captivity in the United States after the effective date of this rulemaking. Identification of the particular member to a record in the International Species Inventory System (ISIS), or to a Federal, State or local government permit, shall be deemed to be satisfactory evidence. Records in the form of studbooks or inventories, kept in the normal course of business, shall be acceptable as evidence, provided that a notarized statement is inserted in such record to the effect that:

(i) The records were kept in the normal course of business prior to November 18, 1976, and accurately identify (by use of markers, tags, or other acceptable marking devices) individual animals; or

(ii) That the individual animal identified by the records was born in captivity on _____ (Date).

The notarized statement in paragraph (c)(2)(i) of this section, shall be acceptable only if the notarization is dated on or before January 3, 1977. The notarized statement in paragraph (c)(2)(ii), of this section, shall be acceptable only if the notarization is dated within 15 days of the date of birth of the animal.

(3) The provisions of §§ 17.21, 17.22, and 17.23 shall apply to any individual chimpanzee (*Pan troglodytes*) within the historic range of the species, regardless of whether in the wild or captivity, and also shall apply to any individual chimpanzee not within this range, but which has originated within this range after the effective date of these regulations, and also shall apply to the progeny of any such chimpanzee, other than to the progeny of animals legally imported into the United States after the effective date of these regulations. For the purposes of this paragraph, the historic range of the chimpanzee shall consist of the following countries: Angola, Benin, Burkina Faso, Burundi, Cameroon, Central African Republic, Congo, Cote d'Ivoire, Equatorial Guinea, Gabon, Gambia, Ghana, Guinea, Guinea-Bissau, Liberia, Mali, Nigeria, Rwanda, Senegal, Sierra Leone, Sudan, Tanzania, Togo, Uganda, and Zaire.

(d) Gray wolf (*Canis lupus*) in Minnesota.

(1) *Zones.* For purposes of these regulations, the State of Minnesota is divided into the following five zones:

(i) *Zone 1—4,488 square miles.* Beginning at the point of intersection of United States and Canadian boundaries in Section 22, Township 71 North, Range 22 West, in Rainy Lake, then proceeding along the west side of Sections 22, 27, and 34 in said Township and Sections 3, 10, 15, 22, 27 and 34 in Township 70 North, Range 22 West and Sections 3 and 10 in Township 69 North, Range 22 West; then east along the south boundaries of Sections 10, 11, and 12 in said Township; then south along the Koochiching and St. Louis counties line to Highway 53; thence southeasterly along State Highway 53 to the junction with County Route 765; thence easterly along County Route 765 to the junction with Kabetogama Lake in Ash River Bay; thence along the south boundary of Section 33 in Township 69 North, Range 19 West, to the junction with the Moose River; thence southeasterly along the Moose River to Moose Lake; thence along the western shore of Moose Lake to the river between Moose Lake and Long Lake; thence along the said river to Long Lake; thence along the east shore of Long Lake to the drainage on the southeast side of Long Lake in NE\1/4\, Section 18, Township 67 North, Range 18 West; thence along the said drainage southeasterly and subsequently northeasterly to Marion Lake, the drainage being in Sections 17 and 18, Township 67 North, Range 18 West; thence along the west shoreline of Marion Lake proceeding southeasterly to the Moose Creek; thence along Moose Creek to Flap Creek; thence southeasterly along Flap Creek to the Vermilion River; thence southerly along the Vermilion River to Vermilion Lake; thence along the Superior National Forest boundary in a southeasterly direction through Vermilion Lake passing these points: Oak Narrows, Muskrat Channel, South of Pine Island, to Hoodo Point and the junction with County Route 697; thence southeasterly on County Route 697 to the junction with State Highway 169; thence easterly along State Highway 169 to the junction with State Highway 1; thence easterly along State Highway

1 to the junction with the Erie Railroad tracks at Murphy City; thence easterly along the Erie Railroad tracks to the junction with Lake Superior at Taconite Harbor; thence northeasterly along the North Shore of Lake Superior to the Canadian Border; thence westerly along the Canadian Border to the point of beginning in Rainy Lake.

(ii) *Zone 2—1,856 square miles.* Beginning at the intersection of the Erie Mining Co. Railroad and State Highway 1 (Murphy City); thence southeasterly on State Highway 1 to the junction with County Road 4; thence southwesterly on County Road 4 to the State Snowmobile Trail (formerly the Alger-Smith Railroad); thence southwesterly to the intersection of the Old Railroad Grade and Reserve Mining Co. Railroad in Section 33 of Township 56 North, Range 9 West; thence northwesterly along the Railroad to Forest Road 107; thence westerly along Forest Road 107 to Forest Road 203; thence westerly along Forest Road 203 to the junction with County Route 2; thence in a northerly direction on County Route 2 to the junction with Forest Road 122; thence in a westerly direction along Forest Road 122 to the junction with the Duluth, Missable and Iron Range Railroad; thence in a southwesterly direction along the said railroad tracks to the junction with County Route 14; thence in a northwesterly direction along County Route 14 to the junction with County Route 55; thence in a westerly direction along County Route 55 to the junction with County Route 44; thence in a southerly direction along County Route 44 to the junction with County Route 266; thence in a southeasterly direction along County Route 266 and subsequently in a westerly direction to the junction with County Road 44; thence in a northerly direction on County Road 44 to the junction with Township Road 2815; thence westerly along Township Road 2815 to Alden Lake; thence northwesterly across Alden Lake to the inlet of the Cloquet River; thence northerly along the Cloquet River to the junction with Carrol Trail-State Forestry Road; thence west along the Carrol Trail to the junction with County Route 4 and County Route 49; thence west along County Route 49 to the junction with the Duluth, Winnipeg and Pacific Railroad; thence in a northerly direction along said Railroad to the junction with the Whiteface River; thence in a northeasterly direction along the Whiteface River to the Whiteface Reservoir; thence along the western shore of the Whiteface Reservoir to the junction with County Route 340; thence north along County Route 340 to the junction with County Route 16; thence east along County Route 16 to the junction with County Route 346; thence in a northerly direction along County Route 346 to the junction with County Route 569; thence along County Route 569 to the junction with County Route 565; thence in a westerly direction along County Route 565 to the junction with County Route 110; thence in a westerly direction along County Route 110 to the junction with County Route 100; thence in a north and subsequent west direction along County Route 100 to the junction with State Highway 135; thence in a northerly direction along State Highway 135 to the junction with State Highway 169 at Tower; thence in an easterly direction along the southern boundary of Zone 1 to the point of beginning of Zone 2 at the junction of the Erie Railroad Tracks and State Highway 1.

(iii) *Zone 3—3,501 square miles.* Beginning at the junction of State Highway 11 and State Highway 65; thence southeasterly along State Highway 65 to the junction with State Highway 1; thence westerly along State Highway 1 to the junction with State Highway 72; thence north along State Highway 72 to the junction with an un-numbered township road beginning in the northeast corner of Section 25, Township 155 North, Range 31 West; thence westerly along the said road for approximately seven (7) miles to the junction with SFR 95; thence westerly along SFR 95 and continuing west through the southern boundary of Sections 36 through 31, Township 155 North, Range 33 West, through Sections 36 through 31, Township 155 North, Range 34 West, through Sections 36 through 31, Township 155 North, Range 35 West, through Sections 36 and 35, Township 155 North, Range 36 West to the junction with State Highway 89, thence northwesterly along State Highway 89 to the

117

ADD 20

junction with County Route 44; thence northerly along County Route 44 to the junction with County Route 704; thence northerly along County 704 to the junction with SFR 49; thence northerly along SFR 49 to the junction with SFR 57; thence easterly along SFR 57 to the junction with SFR 63; thence south along SFR 63 to the junction with SFR 70; thence easterly along SFR 70 to the junction with County Route 87; thence easterly along County Route 87 to the junction with County Route 1; thence south along County Route 1 to the junction with County Route 16; thence easterly along County Route 16 to the junction with State Highway 72; thence south on State Highway 72 to the junction with a gravel road (un-numbered County District Road) on the north side of Section 31, Township 158 North, Range 30 West; thence east on said District Road to the junction with SFR 62; thence easterly on SFR 62 to the junction with SFR 175; thence south on SFR 175 to the junction with County Route 101; thence easterly on County Route 101 to the junction with County Route 11; thence easterly on County Route 11 to the junction with State Highway 11; thence easterly on State Highway 11 to the junction with State Highway 65, the point of beginning.

(iv) *Zone 4—20,883 square miles.* Excluding Zones 1, 2 and 3, all that part of Minnesota north and east of a line beginning on State Trunk Highway 48 at the eastern boundary of the State; thence westerly along Highway 48 to Interstate Highway 35; thence northerly on I–35 to State Highway 23, thence west one-half mile on Highway 23 to State Trunk Highway 18; thence westerly along Highway 18 to State Trunk Highway 65, thence northerly on Highway 65 to State Trunk Highway 210; thence westerly along Highway 210 to State Trunk Highway 6; thence northerly on State Trunk Highway 6 to Emily; thence westerly along County State Aid Highway (CSAH) 1, Crow Wing County, to CSAH 2, Cass County; thence westerly along CSAH 2 to Pine River; thence northwesterly along State Trunk Highway 371 to Backus; thence westerly along State Trunk Highway 87 to U.S. Highway 71; thence northerly along U.S. 71 to State Trunk Highway 200; thence northwesterly along Highway 200, to County State Aid Highway (CSAH) 2, Clearwater County; thence northerly along CSAH 2 to Shevlin; thence along U.S. Highway 2 to Bagley; thence northerly along State Trunk Highway 92 to Gully; thence northerly along CSAH 2, Polk County, to CSAH 27, Pennington County; thence along CSAH 27 to State Trunk Highway 1; thence easterly on Highway 1 to CSAH 28, Pennington County; thence northerly along CSAH 28 to CSAH 54, Marshall County, thence northerly along CSAH 54 to Grygla; thence west and northerly along Highway 89 to Roseau; thence northerly along State Truck Highway 310 to the Canadian border.

(v) *Zone 5—54,603 square miles.* All that part of Minnesota south and west of the line described as the south and west border of Zone 4.

(vi) Map of regulatory zones follows:



REGULATORY ZONES FOR GRAY WOLF IN MINNESOTA

(ZONES 1, 2, and 3 are CRITICAL HABITAT)

Zone Sizes (square miles)

Zone 1: 4,488
Zone 2: 1,856
Zone 3: 3,501
Zone 4: 20,853
Zone 5: 54,603

(2) *Prohibitions.* The following prohibitions apply to the gray wolf in Minnesota.

(i) *Taking.* Except as provided in this paragraph (d)(2)(i) of this section, no person may take a gray wolf in Minnesota.

(A) Any person may take a gray wolf in Minnesota in defense of his own life or the lives of others.

(B) Any employee or agent of the Service, any other Federal land management agency, or the Minnesota Department of Natural Resources, who is designated by his/her agency for such purposes, may, when acting in the course of his or her official duties, take a gray wolf in Minnesota without a permit if such action is necessary to:

*(1)* Aid a sick, injured or orphaned specimen; or

*(2)* Dispose of a dead specimen; or

*(3)* Salvage a dead specimen that may be useful for scientific study.

*(4)* Designated employees or agents of the Service or the Minnesota Department of Natural Resources may take a

119

gray wolf without a permit in Minnesota, in zones 2, 3, 4, and 5, as delineated in paragraph (d)(l) of this section, in response to depredations by a gray wolf on lawfully present domestic animals: Provided, that such taking must occur within one-half mile of the place where such depredation occurred and must be performed in a humane manner: And provided further, that any young of the year taken on or before August 1 of that year must be released.

(C) Any employee or agent of the Service or the Minnesota Department of Natural Resources, when operating under a Cooperative Agreement with the Service signed in accordance with section 6(c) of the Endangered Species Act of 1973, who is designated by the Service or the Minnesota Department of Natural Resources for such purposes, may, when acting in the course of his or her official duties, take a gray wolf in Minnesota to carry out scientific research or conservation programs.

(ii) *Export and commercial transactions.* Except as may be authorized by a permit issued under § 17.32, no person may sell or offer for sale in interstate commerce, import or export, or in the course of a commercial activity transport, ship, carry, deliver, or receive any Minnesota gray wolf.

(iii) *Unlawfully taken wolves.* No person may possess, sell, deliver, carry, transport, or ship, by any means whatsoever, a gray wolf taken unlawfully in Minnesota, except that an employee or agent of the Service, or any other Federal land management agency, or the Minnesota Department of Natural Resources, who is designated by his/her agency for such purposes, may, when acting in the course of his official duties, possess, deliver, carry, transport, or ship a gray wolf taken unlawfully in Minnesota.

(3) *Permits.* All permits available under § 17.32 (General Permits—Threatened Wildlife) are available with regard to the gray wolf in Minnesota. All the terms and provisions of § 17.32 apply to such permits issued under the authority of this paragraph (d)(3).

(e) African elephant (*Loxodonta africana*)—(1) *Definitions.* For the purposes of this paragraph (e):

(i) *African elephant* shall mean any member of the species *Loxodonta africana,* whether live or dead, and any part or product thereof.

(ii) *Raw ivory* means any African elephant tusk, and any piece thereof, the surface of which, polished or unpolished, is unaltered or minimally carved.

(iii) *Worked ivory* means any African elephant tusk, and any piece thereof, which is not raw ivory.

(iv) *Lip mark area* means that area of a whole African elephant tusk where the tusk emerges from the skull and which is usually denoted by a prominent ring of staining on the tusk in its natural state.

(2) *Prohibitions.* Except as provided in the exceptions in paragraph (e)(3) of this section, it shall be unlawful for any person to:

(i) Import or export any African elephant,

(ii) Possess, sell or offer for sale, receive, deliver, transport ship, or export any African elephant which is illegally imported into the United States,

(iii) Sell or offer for sale any sport-hunted trophy imported into the United States in violation of permit conditions.

(3) *Exceptions.* (i) African elephants, other than sport-hunted trophies and raw and worked ivory, may be imported or exported provided all permit requirements of 50 CFR parts 13 and 23 have been complied with.

(ii) *Ivory.* (A) Raw or worked ivory (other than sport-hunted trophies) may be imported only if:

(*1*) It is a bona fide antique of greater than 100 years of age on the day of import, or

(*2*) It was exported from the United States after being registered with the U.S. Fish and Wildlife Service.

(B) Worked ivory may be exported in accordance with the permit requirements of 50 CFR parts 13 and 23.

(C) Raw ivory may not be exported from the United States for commercial purposes under any circumstances.

(iii) Sport-hunted trophies may be imported into the United States provided:

(A) The trophy originates in a country for which the Service has received

notice of that country's African elephant ivory quota for the year of export;

(B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;

(C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and

(D) The trophy is legibly marked by means of punch-dies, under a marking and registration system established by the country of origin, that includes the following information: Country of origin represented by the two-letter code established by the International Organization for Standardization (see appendix A to chapter I) followed by the registration number assigned to the last two digits of the year of registration and the weight of raw ivory to the nearest kilogram. Any mark must be placed on the lip mark area and indicated by a flash of color which serves as a background for such mark.

(f) *Leopard.* (1) Except as noted in paragraph (f)(2) of this section, all prohibitions of §17.31 of this part and exemptions of §17.32 of this part shall apply to the leopard populations occurring in southern Africa to the south of a line running along the borders of the following countries: Gabon/Rio Muni; Gabon/Cameroon; Congo/Cameroon; Congo/Central African Republic; Zaire/Central African Republic; Zaire/Sudan; Uganda/Sudan; Kenya/Sudan; Kenya/Ethiopia; Kenya/Somalia.

(2) A sport-hunted leopard trophy legally taken after the effective date of this rulemaking, from the area south of the line delineated above, may be imported into the United States without a Threatened Species permit pursuant to §17.32 of this part, provided that the applicable provisions of 50 CFR part 23 have been met.

(g) Utah prairie dog *(Cynomys parvidens).* (1) Except as noted in paragraph (g)(2) of this section, all prohibitions of 50 CFR 17.31 (a) and (b), and exemptions of 50 CFR 17.32 shall apply to the Utah prairie dog.

(2) A Utah prairie dog may be taken on private land throughout its range under a permit issued by the Utah Division of Wildlife Resources, in accordance with the laws of the State of Utah, provided that such taking does not exceed 6,000 animals annually and that such taking is confined to the period from June 1 to December 31. Records on permitted take maintained by the State shall be made available to the U.S. Fish and Wildlife Service on request.

(3) If the Service receives substantive evidence that takings pursuant to paragraph (g)(2) of this section are having an effect that is inconsistent with the conservation of the Utah prairie dog, the Service may immediately prohibit or restrict such taking as appropriate for the conservation of the species.

(h) Mountain lion *(Felis concolor).* (1) Except as allowed in paragraphs (h)(2), (h)(3), and (h)(4) of this section, no person shall take any free-living mountain lion *(Felis concolor)* in Florida.

(2) A mountain lion *(Felis concolor)* may be taken in this area under a valid threatened species permit issued pursuant to 50 CFR 17.52.

(3) A mountain lion *(Felis concolor)* may be taken in Florida by an employee or designated agent of the Service or the Florida Game and Fresh Water Fish Commission for taxonomic identification or other reasons consistent with the conservation of the endangered Florida panther *(Felis concolor coryi).* When it has been established by the Service, in consultation with the State, that an animal in question is not a Florida panther *(Felis concolor coryi)* or an eastern cougar *(Felis concolor couguar),* such animals may be removed from the wild. The disposition of animals so taken shall be at the discretion of the Florida Game and Fresh Water Fish Commission, with the concurrence of the Fish and Wildlife Service.

(4) Take for reasons of human safety is allowed as specified under 50 CFR 17.21(c)(2) and 17.21(c)(3)(iv).

(5) Any take pursuant to paragraph (h)(4) of this section must be reported in writing to the U.S. Fish and Wildlife Service, Division of Law Enforcement, P.O. Box 3247, Arlington, Virginia 22203, within 5 days. The specimen may only be retained, disposed of, or salvaged in accordance with directions from the Service.

ADD 24

(i) Louisiana black bear (*Ursus americanus luteolus*). (1) Except as noted in paragraph (i)(2) of this section, all prohibitions of § 17.31 and exemptions of § 17.32 shall apply to any black bear within the historic range of the Louisiana black bear (Texas, Louisiana and Mississippi).

(2) Subsection 17.40(i)(1) and § 17.31 shall not prohibit effects incidental to normal forest management activities within the historic range of the Louisiana black bear except for activities causing damage to or loss of den trees, den tree sites or candidate den trees. For purposes of this exemption, normal forest management activities are defined as those activities that support a sustained yield of timber products and wildlife habitats, thereby maintaining forestland conditions in occupied habitat. For purposes of this special rule, candidate den trees are considered to be bald cypress and tupelo gum with visible cavities, having a minimum diameter at breast height (DBH) of 36 inches, and occurring in or along rivers, lakes, streams, bayous, sloughs, or other water bodies.

(3) This express exemption for normal forest management activities provided by this special rule is subject to modification or withdrawal if the Service determines that this provision fails to further the conservation of the Louisiana black bear.

(j) Argali (*Ovis ammon*) in Kyrgyzstan, Mongolia, and Tajikistan. (1) Except as noted in paragraph (j)(2) of this section, all prohibitions of § 17.31 of this part and exemptions of § 17.32 of this part shall apply to this species in Kyrgyzstan, Mongolia, and Tajikistan

(NOTE. In all other parts of its range the argali is classified as endangered and covered by § 17.21).

(2) Upon receiving from the governments of Kyrgyzstan, Mongolia, and Tajikistan properly documented and verifiable certification that (i) argali populations in those countries are sufficiently large to sustain sport hunting, (ii) regulating authorities have the capacity to obtain sound data on these populations, (iii) regulating authorities recognize these populations as a valuable resource and have the legal and practical capacity to manage them as

such, (iv) the habitat of these populations is secure, (v) regulating authorities can ensure that the involved trophies have in fact been legally taken from the specified populations, and (vi) funds derived from the involved sport hunting are applied primarily to argali conservation, the Director may, consistent with the purposes of the Act, authorize by publication of a notice in the FEDERAL REGISTER the importation of personal sport-hunted argali trophies, taken legally in Kyrgyzstan, Mongolia, and Tajikistan after the date of such notice, without a Threatened Species permit pursuant to § 17.32 of this part, provided that the applicable provisions of 50 CFR part 23 have been met.

(k) Canada lynx (*Lynx canadensis*). (1) *What lynx does this special rule apply to?* The regulations in this paragraph (k) apply to all wild and captive lynx in the contiguous United States.

(2) *What activities are prohibited for wild lynx?* All prohibitions and provisions of 50 CFR 17.31 and 17.32 apply to wild lynx found in the contiguous United States.

(3) *What is considered a captive lynx?* (i) For purposes of this paragraph (k), captive lynx means lynx, whether alive or dead, and any part or product, if the specimen was in captivity at the time of the listing, born in captivity, or lawfully imported or transported into the contiguous United States.

(ii) Lynx that were either born or held in captivity and then released into the wild are considered wild.

(4) *What activities are allowed for captive lynx?* (i) *Take.* You may take lawfully obtained captive lynx without a permit.

(ii) *Import and export.* You may export captive live lynx, parts or products of captive lynx provided the specimens are tagged with Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) export tags and/or accompanied by a valid CITES export permit. You may import lawfully obtained lynx that originated outside the United States when you follow the requirements of CITES.

(iii) *Interstate commerce.* You may deliver, receive, carry, transport, ship, sell, offer to sell, purchase, or offer to

purchase in interstate commerce captive lynx and captive lynx parts and products in accordance with State or tribal laws and regulations. In addition, lynx pelts that are properly tagged with valid CITES export tags also qualify for this exemption on interstate commerce.

(5) *Are any activities not allowed or restricted for captive lynx?* You must comply with all applicable State and tribal laws and regulations. Violation of State or tribal law will also be a violation of the Act.

(l) Preble's meadow jumping mouse (*Zapus hudsonius preblei*). (1) *What is the definition of take?* To harass, harm, pursue, hunt, shoot, wound, trap, kill, or collect; or attempt to engage in any such conduct. Incidental take is that which occurs when it is incidental to and not the purpose of an otherwise lawful activity. Any take that is not authorized by permit provided through section 7 or section 10 of the Act or that is not covered by the exemptions described below is considered illegal take.

(2) *When is take of Preble's meadow jumping mice allowed?* Take of Preble's meadow jumping mice resulting from the following legally conducted activities, in certain circumstances as described below, is allowed:

(i) *Take under permits.* Any person with a valid permit issued by the Service under § 17.32 may take Preble's meadow jumping mice pursuant to the terms of the permit.

(ii) *Rodent control.* Preble's meadow jumping mice may be taken incidental to rodent control undertaken within 10 feet of or inside any structure. "Rodent control" includes control of mice and rats by trapping, capturing, or otherwise physically capturing or killing, or poisoning by any substance registered with the Environmental Protection Agency as required by the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136) and applied consistent with its labeling. "Structure" includes but is not limited to any building, stable, grain silo, corral, barn, shed, water or sewage treatment equipment or facility, enclosed parking structure, shelter, gazebo, bandshell, or restroom complex.

(iii) *Established, ongoing agricultural activities.* Preble's meadow jumping mice may be taken incidental to agricultural activities, including grazing, plowing, seeding, cultivating, minor drainage, burning, mowing, and harvesting, as long as these activities are established, ongoing activities and do not increase impacts to or further encroach upon the Preble's meadow jumping mouse or its habitat. New agricultural activities or those that expand the footprint or intensity of the activity are not considered to be established, ongoing activities.

(iv) *Maintenance and replacement of existing landscaping.* Preble's meadow jumping mice may be taken incidental to the maintenance and replacement of any landscaping and related structures and improvements, as long as they are currently in place and no increase in impervious surfaces would result from their maintenance and improvement. Construction of new structures or improvements or expansion of the landscaping in a manner that increases impervious surfaces would not be considered maintenance and replacement of existing landscaping.

(v) *Existing uses of water.* Preble's meadow jumping mice may be taken incidentally as a result of existing uses of water associated with the exercise of perfected water rights pursuant to State law and interstate compacts and decrees. (A "perfected water right" is a right that has been put to beneficial use and has been permitted, decreed, or adjudicated pursuant to State law.) Increasing the use or altering the location of use of an existing water right would not be considered an existing use of water.

(vi) *Noxious weed control.* Preble's meadow jumping mice may be taken incidental to noxious weed control that is conducted in accordance with:

(A) Federal law, including Environmental Protection Agency label restrictions;

(B) Applicable State laws for noxious weed control;

(C) Applicable county bulletins;

(D) Herbicide application guidelines as prescribed by herbicide manufacturers; and

(E) Any future revisions to the authorities listed in paragraphs

123

ADD 26

(l)(2)(vi)(A) through (D) of this section that apply to the herbicides proposed for use within the species' range.

(vii) *Ditch maintenance activities.* Preble's meadow jumping mice may be taken incidental to normal and customary ditch maintenance activities only if the activities:

(A) Result in the annual loss of no more than ¼ mile of riparian shrub habitat per linear mile of ditch, including burning of ditches that results in the annual loss of no more than ¼ mile of riparian shrub habitat per linear mile of ditch.

(B) Are performed within the historic footprint of the surface disturbance associated with ditches and related infrastructure, and

(C) Follow the Best Management Practices described in paragraphs (l)(2)(vii)(C)(*1*) through (*3*) of this section.

(*1*) Persons engaged in ditch maintenance activities shall avoid, to the maximum extent practicable, impacts to shrub vegetation. For example, if accessing the ditch for maintenance or repair activities from an area containing no shrubs is possible, then damage to adjacent shrub vegetation shall be avoided.

(*2*) Persons engaged in placement or sidecasting of silt and debris removed during ditch cleaning, vegetation or mulch from mowing or cutting, and other material from ditch maintenance shall, to the maximum extent practicable, avoid shrub habitat and at no time disturb more than ¼ mile of riparian shrub habitat per linear mile of ditch within any calendar year.

(*3*) To the maximum extent practicable, all ditch maintenance activities should be carried out during the Preble's hibernation season, November through April.

(D) All ditch maintenance activities carried out during the Preble's active season, May through October, should be conducted during daylight hours only.

(E) Ditch maintenance activities that would result in permanent or long-term loss of potential habitat that would not be considered normal or customary include replacement of existing infrastructure with components of substantially different materials and design, such as replacement of open ditches with pipeline or concrete-lined ditches, replacement of an existing gravel access road with a permanently paved road, or replacement of an earthen diversion structure with a rip-rap and concrete structure, and construction of new infrastructure or the movement of existing infrastructure to new locations, such as realignment of a ditch, building a new access road, or installation of new diversion works where none previously existed.

(3) *When is take of Preble's not allowed?* (i) Any manner of take not described under paragraph (l)(2) of this section.

(ii) No person may import or export, ship in interstate commerce in the course of commercial activity, or sell or offer for sale in interstate or foreign commerce any Preble's meadow jumping mice.

(iii) No person, except for an authorized person, may possess, sell, deliver, carry, transport, or ship any Preble's meadow jumping mice that have been taken illegally.

(4) *Where does this rule apply?* The take exemptions provided by this rule are applicable within the entire range of the Preble's meadow jumping mouse.

(m) *Vicuña.* This paragraph (m) applies to the threatened vicuña (*Vicugna vicugna*).

(1) *What activities involving vicuña are prohibited by this rule?* (i) *Appendix I populations.* All provisions of § 17.31 (a) and (b) and § 17.32 apply to vicuña and vicuña parts and products originating from populations currently listed in Appendix I of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES).

(ii) *Import, export, and re-export.* Except as provided in paragraph (m)(2) of this section, you must not import, export, or re-export, or present for export or re-export without valid CITES permits vicuña or vicuña parts and products originating from populations listed in Appendix II of CITES.

(iii) *Commercial activity.* Except as provided in paragraph (m)(2) of this section, you must not sell or offer for sale, deliver, receive, carry, transport, or ship in interstate or foreign commerce in the course of a commercial activity vicuña or vicuña parts and

124

products from populations listed in Appendix II of CITES.

(iv) It is unlawful for any person subject to the jurisdiction of the United States to commit, attempt to commit, solicit to commit, or cause to be committed any acts described in paragraphs (m)(1)(ii)-(iii) of this section.

(2) *What activities involving vicuña are allowed by this rule?* You may import, export, or re-export, or place in interstate or foreign commerce, vicuña products, consisting of either raw fiber or items and cloth made, or partially made, from vicuña fiber, without a threatened species permit issued according to §17.32 only when the provisions in parts 13, 14, and 23 of this chapter and the requirements of the applicable subparagraphs of this paragraph (m)(2) have been met:

(i) *Import, export, or re-export.* You may import, export, or re-export into or from the United States vicuña products, consisting of either raw fiber or items and cloth made, or partially made, from vicuña fiber originating in a country authorized under paragraph (m)(4) of this section, provided the following conditions are met:

(A) The vicuña product must comply with all CITES product annotations as given in the CITES Secretariat's official list of the CITES Appendices, and all imports, exports, and re-exports of vicuña products (including raw fiber re-exported from, or products manufactured in, intermediary countries) must be identified as follows:

(*1*) *Cloth, cloth products, and other finished products (including luxury handicrafts and knitted articles not produced in the country of origin):* The reverse side of cloth, cloth products, and other finished products (including luxury handicrafts and knitted articles not produced in the country of origin), and samples of any of these items, must bear the logo adopted by countries signatory to the "Convenio para la Conservación y Manejo de la Vicuña" and the words "VICUÑA—(Country of Origin)," where country of origin is the name of the country where the vicuña fiber in the products originated, either Argentina, Bolivia, Chile, or Peru. The logo and words may be woven into the item, or may be on a label sewn into the item.

(*2*) *Luxury handicrafts and knitted articles produced in the country of origin:* The luxury handicraft or knitted article must bear the logo adopted by countries signatory to the "Convenio para la Conservación y Manejo de la Vicuña" and the words "VICUÑA—Vicuña—(Country of Origin)—ARTESANIA," where country of origin is the name of the country where the vicuña fiber in the products, and the products themselves, originated, either Argentina, Bolivia, Chile, or Peru. The logo and words may be woven into the item, or may be on a label sewn into the item.

(*3*) *Bulk shipments of raw fiber:* The bulk shipment of raw fiber must be sealed with a tamper-proof seal and have the following:

(*i*) An identification tag with a code identifying the country of origin of the vicuña fiber and the CITES export permit number; and

(*ii*) The logo adopted by countries signatory to the "Convenio para la Conservación y Manejo de la Vicuña" and the words "VICUÑA—(Country of Origin)," where country of origin is the name of the original exporting country where the vicuña fiber in the products originated, either Argentina, Bolivia, Chile, or Peru.

(B) The shipment must be accompanied by a CITES permit or certificate that contains the following information:

(*1*) The country of origin, its export permit number, and date of issuance.

(*2*) If re-export, the country of re-export, its certificate number, and date of issuance.

(*3*) If applicable, the country of last re-export, its certificate number, and date of issuance.

(C) At the time of import, for each shipment covered by this exception, the country of origin and each country of re-export involved in the trade of a particular shipment must have designated both a CITES Management Authority and Scientific Authority, and have not been identified by the CITES Conference of the Parties, the CITES Standing Committee, or in a Notification from the CITES Secretariat as a country from which Parties should not accept permits. A listing of all countries that have not designated both a Management Authority and Scientific

125

Authority, or that have been identified as a country from which Parties should not accept permits is available by writing: The Division of Management Authority, ARLSQ Room 700, 4401 N. Fairfax Drive, U.S. Fish and Wildlife Service, Arlington, VA 22203. The list is also on our website *(http://international.fws.gov).*

(ii) *Noncommercial accompanying baggage.* The conditions described in paragraph (m)(2)(i) of this section also apply to noncommercial personal effects in accompanying baggage or household effects from Appendix II populations. Such items are treated the same as Appendix II commercial shipments, and must comply with the same documentary requirements. All other noncommercial personal effects in accompanying baggage or household effects require both a CITES Appendix I permit and a permit as described in § 17.32.

(iii) *Embryos, gametes, blood, other tissue samples, and live animals.* This special rule does not apply to embryos, gametes, blood, or other tissue samples of vicuña, or to live vicuña. Import of such specimens requires an import permit as described in § 17.32 in addition to CITES Appendix I import and export permits, and will be issued only for bona fide scientific research contributing to conservation of the species in the wild.

(3) *When and how will the Service inform the public of additional restrictions in trade of vicuña?* Except in rare cases involving extenuating circumstances that do not adversely affect the conservation of the species, we will issue an information notice that identifies a restriction on trade in specimens of vicuña addressed in this paragraph (m) if any of the following criteria are met:

(i) The country is listed in a Notification to the Parties by the CITES Secretariat as lacking a designated Management or Scientific Authority that issues CITES documents or their equivalent.

(ii) The country is identified in any action adopted by the Conference of the Parties to the Convention, the Convention's Standing Committee, or in a Notification issued by the CITES Secretariat, whereby Parties are asked not to accept shipments of specimens of any CITES-listed species from the country in question.

(iii) The Service's Division of Scientific Authority administratively determines that the conservation or management status of threatened vicuña populations in a range country has changed, such that continued recovery of the vicuña population in that country may be compromised, as a result of one or more of the following factors:

(A) A change in range country laws or regulations that lessens protection for vicuña;

(B) A change in range country management programs that lessens protection for vicuña;

(C) A documented decline in wild vicuña population numbers;

(D) A documented increase in poaching of vicuña;

(E) A documented decline in vicuña habitat quality or quantity; or

(F) Other natural or man-made factors affecting the species' recovery.

(iv) A listing of all countries that have not designated both a Management Authority and Scientific Authority, or that have been identified as a country from which Parties should not accept permits is available by writing: The Division of Management Authority, ARLSQ Room 700, 4401 N. Fairfax Drive, U.S. Fish and Wildlife Service, Arlington, VA 22203. The list is also on our website *(http://international.fws.gov).*

(4) *What must vicuña range countries do in order to be authorized under the special rule to export to the United States?*—(i) *Annual Report.* Range country governments (Argentina, Bolivia, Chile, and Peru) wishing to export specimens of vicuña to the United States will need to provide an annual report containing the most recent information available on the status of the species, following the information guidelines specified below. The first submission of a status report will be required as of July 1, 2003, and every year thereafter on the anniversary of that date. For each range country, the following information should be provided in the annual report:

(A) A description of any revisions to the management program, especially any changes in management approaches or emphasis;

126

(B) New information obtained in the last year on vicuña distribution, population status, or population trends, for the country as a whole or for specific protected areas, and a detailed description of the methodology used to obtain such information;

(C) Results of any research projects concluded in the last year on the biology of vicuña in the wild, particularly its population biology, habitat use, and genetics, and a description of any new research projects undertaken on the biology of vicuña in the wild, particularly its population biology, habitat use, and genetics;

(D) A description of any changes to national and/or provincial laws and programs relating to vicuña conservation, in particular those laws and regulations related to harvest and use of the vicuña, and export of vicuña parts and products;

(E) A description of any changes in the number or size of natural reserves or national parks that provide protected habitat for the vicuña;

(F) A summary of law enforcement activities undertaken in the last year, and a description of any changes in programs to prevent poaching, smuggling, and illegal commercialization of the vicuña;

(G) A description of the current management and harvest (or ''sustainable use'') programs for wild populations of the vicuña, including: any changes in the location and population size of wild populations being managed for sustainable use; any changes in the harvest management practices being used for each population; any changes in current harvest quotas for wild populations, if any; any changes in protocols for translocations undertaken as part of the use program; a summary of the specific financial costs of and revenues generated by the sustainable use program over the last year; and a summary of documented conservation benefits resulting from the sustainable use program over the last year;

(H) A description of current management and harvest (or ''sustainable use'') programs for captive and so-called ''semi-captive'' populations of the vicuña, including: any changes in the number and location of all captive and ''semi-captive'' populations; any changes in the size (ha) of each captive enclosure and the number of vicuña maintained therein; any changes in protocols for translocations undertaken as part of the use program; a summary of the financial costs of and revenues generated by the sustainable use program over the last year; and documented conservation benefits resulting from the sustainable use program over the last year (information on captive and ''semi-captive'' populations must be separate from that provided for wild populations); and

(I) Export data for the last year.

(ii) The Service's Division of Scientific Authority will conduct a review every 2 years, using information in the annual reports, to determine whether range country management programs are effectively achieving conservation benefits for the vicuña. Failure to submit an annual report could result in a restriction on trade in specimens of vicuña as addressed in paragraph (m)(3) of this section. Based on information contained in the annual reports and any other pertinent information it has available, the Service may restrict trade from a range country, as addressed in paragraph (m)(3) of this section, if it determines that the conservation or management status of threatened vicuña populations in a range country has changed, such that continued recovery of the vicuña population in that country may be compromised. Trade restrictions may result from one or more of the following factors:

(A) A change in range country laws or regulations that lessens protection for vicuña;

(B) A change in range country management programs that lessens protection for vicuña;

(C) A documented decline in wild vicuña population numbers;

(D) A documented increase in poaching of vicuña;

(E) A documented decline in vicuña habitat quality or quantity; or

(F) Other natural or man-made factors affecting the species' recovery.

(n)–(o) [Reserved]

(p) Northern sea otter (*Enhydra lutris kenyoni*).

(1) *To what population of sea otter does this special rule apply?* The regulations

127

in paragraph (p) of this section apply to the southwest Alaska distinct population segment (DPS) of the northern sea otter as set forth at § 17.11(h) of this part.

(2) *What provisions apply to this DPS?* Except as noted in paragraph (p)(3) of this section, all prohibitions and provisions of §§ 17.31 and 17.32 of this part apply to the southwest Alaska DPS of the northern sea otter.

(3) *What additional activities are allowed for this DPS?* In addition to the activities authorized under paragraph (p)(2) of this section, you may conduct any activity authorized or exempted under the Marine Mammal Protection Act (16 U.S.C. 1361 *et seq.*) with a part or product of a southwest Alaska DPS northern sea otter, provided that:

(i) The product qualifies as an authentic native article of handicrafts or clothing as defined in § 17.3 of this part; and

(A) It was created by an Indian, Aleut, or Eskimo who is an Alaskan Native, and

(B) It is not being exported or imported for commercial purposes; or

(ii) The part or product is owned by an Indian, Aleut, or Eskimo who is an Alaskan Native and resides in Alaska, or by a Native inhabitant of Russia, Canada, or Greenland, and is part of a cultural exchange; or

(iii) The product is owned by a Native inhabitant of Russia, Canada, or Greenland, and is in conjunction with travel for noncommercial purposes; or

(iv) The part or product has been received or acquired by a person registered as an agent or tannery under § 18.23 of this subchapter.

(4) *What other wildlife regulations may apply?* All applicable provisions of 50 CFR parts 14, 18, and 23 must be met.

(q) Polar bear (*Ursus maritimus*).

(1) Except as noted in paragraphs (q)(2) and (q)(4) of this section, all prohibitions and provisions of §§ 17.31 and 17.32 of this part apply to the polar bear.

(2) None of the prohibitions in § 17.31 of this part apply to any activity that is authorized or exempted under the Marine Mammal Protection Act (MMPA), 16 U.S.C. 1361 et seq., the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), or both, provided that the person carrying out the activity has complied with all terms and conditions that apply to that activity under the provisions of the MMPA and CITES and their implementing regulations.

(3) All applicable provisions of 50 CFR parts 14, 18, and 23 must be met.

(4) None of the prohibitions in § 17.31 of this part apply to any taking of polar bears that is incidental to, but not the purpose of, carrying out an otherwise lawful activity within the United States, except for any incidental taking caused by activities in areas subject to the jurisdiction or sovereign rights of the United States within the current range of the polar bear.

[40 FR 44415, Sept. 26, 1975]

EDITORIAL NOTE: FOR FEDERAL REGISTER citations affecting § 17.40, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at www.fdsys.gov.

## § 17.41   Special rules—birds.

(a) [Reserved]

(b) Coastal California gnatcatcher (*Polioptila californica californica*). (1) Except as noted in paragraphs (b)(2) and (3) of this section, all prohibitions of § 17.31(a) and (b) shall apply to the coastal California gnatcatcher.

(2) Incidental take of the coastal California gnatcatcher will not be considered a violation of section 9 of the Endangered Species Act of 1973, as amended (Act), if it results from activities conducted pursuant to the State of California's Natural Community Conservation Planning Act of 1991 (NCCP), and in accordance with a NCCP plan for the protection of coastal sage scrub habitat, prepared consistent with the State's NCCP Conservation and Process Guidelines, *provided that:*

(i) The NCCP plan has been prepared, approved, and implemented pursuant to California Fish and Game Code sections 2800–2840; and

(ii) The Fish and Wildlife Service (Service) has issued written concurrence that the NCCP plan meets the standards set forth in 50 CFR 17.32(b)(2). The Service shall issue its concurrence pursuant to the provisions of the Memorandum of Understanding (MOU), dated December 4, 1991, between the California Department of Fish and

## Convention on International Trade in Endangered Species of Wild Fauna and Flora

*Signed at Washington, D.C., on 3 March 1973*

*Amended at Bonn, on 22 June 1979*

The Contracting States,

*Recognizing* that wild fauna and flora in their many beautiful and varied forms are an irreplaceable part of the natural systems of the earth which must be protected for this and the generations to come;

*Conscious* of the ever-growing value of wild fauna and flora from aesthetic, scientific, cultural, recreational and economic points of view;

*Recognizing* that peoples and States are and should be the best protectors of their own wild fauna and flora;

*Recognizing*, in addition, that international co-operation is essential for the protection of certain species of wild fauna and flora against over-exploitation through international trade;

*Convinced* of the urgency of taking appropriate measures to this end; *Have agreed* as follows:

. . . .

*Article III*
### Regulation of Trade in Specimens of Species Included in Appendix I

1. All trade in specimens of species included in Appendix I shall be in accordance with the provisions of this Article.

2. The export of any specimen of a species included in Appendix I shall require the prior grant and presentation of an export permit. An export permit shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species;

(b) a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora;

(c) a Management Authority of the State of export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment; and

(d) a Management Authority of the State of export is satisfied that an import permit has been granted for the specimen.

3. The import of any specimen of a species included in Appendix I shall require the prior grant and presentation of an import permit and either an export permit or a re-export certificate. An import permit shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of import has advised that the import will be for purposes which are not detrimental to the survival of the species involved;

(b) a Scientific Authority of the State of import is satisfied that the proposed recipient of a living specimen is suitably equipped to house and care for it; and

(c) a Management Authority of the State of import is satisfied that the specimen is not to be used for primarily commercial purposes.

4. The re-export of any specimen of a species included in Appendix I shall require the prior grant and presentation of a re-export certificate. A re-export certificate shall only be granted when the following conditions have been met:

(a) a Management Authority of the State of re-export is satisfied that the specimen was imported into that State in accordance with the provisions of the present Convention;

(b) a Management Authority of the State of re-export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment; and

(c) a Management Authority of the State of re-export is satisfied that an import permit has been granted for any living specimen.

5. The introduction from the sea of any specimen of a species included in Appendix I shall require the prior grant of a certificate from a Management Authority of the State of introduction. A certificate shall only be granted when the following conditions have been met:

> (a) a Scientific Authority of the State of introduction advises that the introduction will not be detrimental to the survival of the species involved;
> (b) a Management Authority of the State of introduction is satisfied that the proposed recipient of a living specimen is suitably equipped to house and care for it; and
> (c) a Management Authority of the State of introduction is satisfied that the specimen is not to be used for primarily commercial purposes.

## Convention on International Trade in Endangered Species of Wild Fauna and Flora

*Article IV*

**Regulation of Trade in Specimens of Species Included in Appendix II**

1. All trade in specimens of species included in Appendix II shall be in accordance with the provisions of this Article.

2. The export of any specimen of a species included in Appendix II shall require the prior grant and presentation of an export permit. An export permit shall only be granted when the following conditions have been met:

> (a) a Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species;
>
> (b) a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora; and
>
> (c) a Management Authority of the State of export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment.

3. A Scientific Authority in each Party shall monitor both the export permits granted by that State for specimens of species included in Appendix II and the actual exports of such specimens. Whenever a Scientific Authority determines that the export of specimens of any such species should be limited in order to maintain that species throughout its range at a level consistent with its role in the ecosystems in which it occurs and well above the level at which that species might become eligible for inclusion in Appendix I, the Scientific Authority shall advise the appropriate Management Authority of suitable measures to be taken to limit the grant of export permits for specimens of that species.

4. The import of any specimen of a species included in Appendix II shall require the prior presentation of either an export permit or a re-export certificate.

5. The re-export of any specimen of a species included in Appendix II shall require the prior grant and presentation of a re-export certificate. A re-export certificate shall only be granted when the following conditions have been met:

(a) a Management Authority of the State of re-export is satisfied that the specimen was imported into that State in accordance with the provisions of the present Convention; and

(b) a Management Authority of the State of re-export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment.

6. The introduction from the sea of any specimen of a species included in Appendix II shall require the prior grant of a certificate from a Management Authority of the State of introduction. A certificate shall only be granted when the following conditions have been met:

    (a) a Scientific Authority of the State of introduction advises that the introduction will not be detrimental to the survival of the species involved; and

    (b) a Management Authority of the State of introduction is satisfied that any living specimen will be so handled as to minimize the risk of injury, damage to health or cruel treatment.

7. Certificates referred to in paragraph 6 of this Article may be granted on the advice of a Scientific Authority, in consultation with other national scientific authorities or, when appropriate, international scientific authorities, in respect of periods not exceeding one year for total numbers of specimens to be introduced in such periods.