**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

SAFARI CLUB INTERNATIONAL and NATIONAL RIFLE ASSOCIATION
OF AMERICA, Plaintiffs-Appellants,

v.

SALLY M. R. JEWELL, in her official capacity as
United States Secretary of the Interior, *et al.*,
Defendants-Appellees
_____

On Appeal from the United States District Court for the District of Columbia
(No. 14-00670-ABJ)
_____

**APPENDIX VOLUME I**

Anna M. Seidman
Douglas S. Burdin
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
Tel:  202-543-8733
Fax:  202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
*Counsel for Safari Club International*

Christopher A. Conte
National Rifle Association of
America/ILA
11250 Waples Mill Rd., 5N
Fairfax, Virginia 22030
Tel:  703-267-1166
Fax:  703-267-1164
cconte@nrahq.org
*Counsel for National Rifle
Association of America*

# Table of Contents

**VOLUME I**

U.S. District Court Docket Entries ............................................................. 1

Amended Complaint for Declarative and Injunctive Relief ...................................... 9

Motion of Safari Club International for Preliminary Injunction ............................ 43

Memorandum Opinion and Order............................................................. 45

Notice of Appeal ................................................................................ 56

FWS Press Release "Service Suspends Import of Elephant Trophies from Tanzania and Zimbabwe" ................................................................................ 58

Suspension of Import of Elephant Hunting Trophies Taken in Tanzania and Zimbabwe in 2014 – Questions and Answers .......................................... 60

Email from Robert Gabel Allowing the Import of Any Trophy Taken in 2014 Up Until April 4 ................................................................................ 62

Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies in Zimbabwe During 2014 .......................................................... 63

Letter from Edson Chidziya to Timothy Van Norman, April 17, 2014 ................. 69

FWS Questions to Address Endangered Species Act Import Criteria.................... 70

Zimbabwe's Response to Questions Raised By the United States Fish And Wildlife Service to Address the USA Endangered Species Act ........................................... 73

Zimbabwe 2012 ("2013 Africa" Analysis)......................................................... 107

General Advice on Importation of Sport-Hunted Trophies of African Elephants Taken in Tanzania in the Calendar Year 2014 ...................................................... 109

Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies in Tanzania During 2014............................................................................123

Declaration of Rew R. Goodenow ....................................................................137

Declaration of Jerry Edgar Beardmore, Jr ........................................................140

Declaration of Anthony John Didado ...............................................................144

Declaration of Atlas Lawrence Cheek, III ........................................................147

Declaration of Gary L. Bailey..........................................................................150

Declaration of James Stephen Rawson ............................................................152

Declaration of Jason Garic Ingersoll................................................................155

Declaration of John Holdridge..........................................................................157

Declaration of John W. Berry ...........................................................................159

Declaration of Kenneth Eric Buch....................................................................162

Declaration of Michael Hugh Grieb .................................................................165

Declaration of Michael J. Condon ....................................................................168

Declaration of Michael Barry Nice...................................................................172

Declaration of Patrick Joseph Cooley...............................................................175

Declaration of Paul K. Monsen.........................................................................178

Declaration of Richard David Netzley, Jr.........................................................180

Declaration of Richard Raymond Capozza .......................................................182

# VOLUME II

Declaration of Robert Bruce Rhyne ....................................................................186

Declaration of Robert Loren Bridges .................................................................188

Declaration of Robert Wilson Taylor ................................................................191

Declaration of Scott Michael Dinger .................................................................194

Declaration of Thomas Little Whaley Jr .............................................................197

Declaration of Troy James Perry .......................................................................200

Declaration of Wayne Scott McCall ..................................................................202

Declaration of Dr. Martin Gregory Vick ............................................................204

Declaration of Craig M. McDonnold ..................................................................207

Declaration of Grant F. Dennison ......................................................................209

Declaration of Alistair Pole ...............................................................................212

Declaration of Frederick L. Oosterhuis ..............................................................215

Declaration of Ivan Murray Carter ....................................................................218

Declaration of John C. Barth ..............................................................................222

Declaration of Martin Pieters .............................................................................225

Declaration of Richard Stuart Cooke .................................................................228

Declaration of Gary Michiel Duckworth ............................................................231

Declaration of Hermanus Abraham De Vries ......................................................234

Declaration of Walter Allen Tarpley ..................................................................238

Declaration of Scott Petty Jr ............................................................240

Declaration of Robert Joseph Johnson............................................243

Declaration of Robert Allen Sakuta.................................................246

Declaration of Derek Anthony Hurt .................................................248

Declaration of Michael Andrew Angelides ......................................251

Declaration of David J. Adams.........................................................254

Cites Res. Conf. 211 (Annex 1) ........................................................257

Cites Res. Conf. 211 (Rev. 1) ...........................................................258

Declaration of Edson Chidziya ........................................................259

Declaration of Charles Jonga ...........................................................261

Declaration of Anna M. Seidman .....................................................265

    Safari Club International FOIA Request ...................................267

    Information Memorandum for the Director on Suspension of Imports of
    Sport-Hunted African Elephant Trophies Taken in Tanzania And Zimbabwe
    During Calendar Year 2014 .......................................................270

Declaration of Timothy J. Van Norman ...........................................275

Declaration of Rosemarie S. Gnam ..................................................289

    FWS Memorandum on General Advice on Import of Sport-Hunted Trophies
    of African Elephant from Tanzania for the Calendar Year 2008 ...............295

    FWS Memorandum on General Advice on Import of Sport-Hunted Trophies
    of African Elephant from Tanzania for the Calendar Year 2009 ...............299

    FWS Memorandum on General Advice on Import of Sport-Hunted Trophies
    of African Elephant from Tanzania for the Calendar Year 2010 ...............306

FWS Memorandum on General Advice on Importation of Sport-Hunted Trophies  of African Elephant from Tanzania for the Calendar Year 2011 ............................................................................................. 314

FWS Memorandum on General Advice on Importation of Sport-Hunted Trophies  of African Elephant from Tanzania for the Calendar Year 2012 ............................................................................................. 329

FWS Memorandum on General Advice on Importation of Sport-Hunted Trophies and Articles for Personal Use or Display that Were Made from Sport-Hunted Trophies of African Elephants from Tanzania, for the Calendar Year of 2013 ................................................................... 341

FWS Memorandum on General Advice on Importation of Sport-Hunted Trophies  of African Elephants Taken in Tanzania in the Calendar Year 2014 ............................................................................................. 355

Interim Suspension of Imports of Elephant Trophies from Zimababwe, Federal Register Notice, 79 Fed. Reg. 26986 (May 12, 2014) .......................................... 369

Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies in Tanzania Dated May 6, 1997 ............................................................ 372

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:14-cv-00670-ABJ

SAFARI CLUB INTERNATIONAL v. JEWELL et al

Assigned to: Judge Amy Berman Jackson

Case in other court: 14-05152

Cause: 16:1538 Endangered Species Act

Date Filed: 04/21/2014

Jury Demand: None

Nature of Suit: 893 Environmental Matters

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**SAFARI CLUB INTERNATIONAL**     represented by     **Anna Margo Seidman**
SAFARI CLUB INTERNATIONAL
501 Second Street, NE
Washington, DC 20002
(202) 543-8733
Fax: (202) 543-1205
Email: aseidman@safariclub.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas Scott Burdin**
SAFARI CLUB INTERNATIONAL
501 Second Street, NE
Washington, DC 20002
(202) 543-8733
Fax: (202) 543-1205
Email: dburdin@safariclub.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy Evan Clare**
SAFARI CLUB INTERNATIONAL
501 Second Street, NE
Washington, DC 20002
(202) 543-8733
Fax: (202) 543-1205
Email: jclare@safariclub.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATIONAL RIFLE ASSOCIATION**     represented by     **Christopher A. Conte**

**OF AMERICA**

NATIONAL RIFLE ASSOCIATION
11250 Waples Mill Road
Floor 5N
Fairfax, VA 22030
(703) 267-1166
Fax: (703) 267-1164
Email: cconte@nrahq.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**SALLY JEWELL**
*In her official capacity as Secretary of*
*the Department of the Interior*

represented by **Andrea Gelatt**
U.S. DEPARTMENT OF JUSTICE
Land & Natural Resources Division
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-1420
(202) 305-0388
Fax: (202) 305-0275
Email: andrea.gelatt@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meredith L. Flax**
U.S. DEPARTMENT OF JUSTICE
Land & Natural Resources Division
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-1420
(202) 305-0404
Fax: (202) 305-0275
Email: meredith.flax@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF THE**
**INTERIOR**
*An agency of the United States*

represented by **Andrea Gelatt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meredith L. Flax**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DANIEL ASHE**                    represented by **Andrea Gelatt**
*In his official capacity as Director of the*          (See above for address)
*U.S. Fish and Wildlife Service*          *LEAD ATTORNEY*
                    *ATTORNEY TO BE NOTICED*

                    **Meredith L. Flax**
                    (See above for address)
                    *LEAD ATTORNEY*
                    *ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. FISH AND WILDLIFE SERVICE**          represented by **Andrea Gelatt**
*An agency of the United States*          (See above for address)
                    *LEAD ATTORNEY*
                    *ATTORNEY TO BE NOTICED*

                    **Meredith L. Flax**
                    (See above for address)
                    *LEAD ATTORNEY*
                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/21/2014 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0090-3691517) filed by SAFARI CLUB INTERNATIONAL. (Attachments: # 1 Rule 7.1 Corporate Disclosure Form, # 2 Summons (6), # 3 Civil Cover Sheet)(Seidman, Anna) (Entered: 04/21/2014) |
| 04/21/2014 |  | Case Assigned to Judge Amy Berman Jackson. (kb) (Entered: 04/22/2014) |
| 04/22/2014 | 2 | SUMMONS Issued (6) Electronically as to DANIEL ASHE, SALLY JEWELL, U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE, U.S. Attorney and U.S. Attorney General. (Attachments: # 1 Consent Form, # 2 Notice of Consent)(kb) (Entered: 04/22/2014) |
| 04/22/2014 | 3 | Corporate Disclosure Statement by SAFARI CLUB INTERNATIONAL. (Seidman, Anna) (Entered: 04/22/2014) |
| 04/30/2014 | 4 | MOTION for Preliminary Injunction by SAFARI CLUB INTERNATIONAL (Attachments: # 1 Text of Proposed Order, # 2 Memorandum in Support, # 3 Request for Hearing, # 4 Certificate of Service, # 5 Exhibit April 4, 2014 Press Release, # 6 Exhibit Question and Answer Page, # 7 Exhibit Letter from Robert Gabel, # 8 Exhibit |

| | | |
|---|---|---|
| | | Zimbabwe Enhancement Finding, # [9](#) Exhibit Letter from Edson Chidziya, # [10](#) Exhibit FWS Questions to Zimbabwe, # [11](#) Exhibit ZPWMA Response, # [12](#) Exhibit IUCN Report, # [13](#) Exhibit Tanzania NDF, # [14](#) Exhibit Tanzania Enhancement Finding, # [15](#) Exhibit Goodenow Declaration, # [16](#) Exhibit Beardmore Declaration, # [17](#) Exhibit Didado Declaration, # [18](#) Exhibit Cheek Declaration, # [19](#) Exhibit Bailey Declaration, # [20](#) Exhibit Rawson Declaration, # [21](#) Exhibit Ingersoll Declaration, # [22](#) Exhibit Holdridge Declaration, # [23](#) Exhibit Berry Declaration, # [24](#) Exhibit Buch Declaration, # [25](#) Exhibit Grieb Declaration, # [26](#) Exhibit Condon Declaration, # [27](#) Exhibit Nice Declaration, # [28](#) Exhibit Cooley Declaration, # [29](#) Exhibit Monsen Declaration, # [30](#) Exhibit Netzley Declaration, # [31](#) Exhibit Capozza Declaration, # [32](#) Exhibit Rhyne Declaration, # [33](#) Exhibit Bridges Declaration, # [34](#) Exhibit Taylor Declaration, # [35](#) Exhibit Dinger Declaration, # [36](#) Exhibit Whaley Declaration, # [37](#) Exhibit Perry Declaration, # [38](#) Exhibit McCall Declaration, # [39](#) Exhibit Vick Declaration, # [40](#) Exhibit McDonnold Declaration, # [41](#) Exhibit Dennison Declaration, # [42](#) Exhibit Pole Declaration, # [43](#) Exhibit Oosterhuis Declaration, # [44](#) Exhibit Carter Declaration, # [45](#) Exhibit Barth Declaration, # [46](#) Exhibit Pieters Declaration, # [47](#) Exhibit Cooke Declaration, # [48](#) Exhibit Duckworth Declaration, # [49](#) Exhibit De Vries Declaration, # [50](#) Exhibit Tarpley Declaration, # [51](#) Exhibit Petty Declaration, # [52](#) Exhibit Johnson Declaration, # [53](#) Exhibit Sakuta Declaration, # [54](#) Exhibit Hurt Declaration, # [55](#) Exhibit Angelides Declaration, # [56](#) Exhibit Adams Declaration, # [57](#) Exhibit Res. Conf. 2.11 (Annex 1), # [58](#) Exhibit Res Conf. 2.11)(Seidman, Anna) (Entered: 04/30/2014) |
| 05/02/2014 | | Minute Entry for proceedings held before Judge Amy Berman Jackson: Telephone Conference Call in Chambers held on 5/2/14. (NO COURT REPORTER) (jth) (Entered: 05/02/2014) |
| 05/02/2014 | | MINUTE ORDER. As discussed during the teleconference with counsel for the parties held on this date, it is ORDERED that defendants' opposition to plaintiff's motion for preliminary injunction is due by 5/13/14, plaintiff's reply is due by 5/16/14, and a motion hearing is set for 5/28/14 at 10:00 a.m. in Courtroom 3. The parties' briefs, at this juncture, should address only the issues of irreparable harm and subject matter jurisdiction. Signed by Judge Amy Berman Jackson on 5/2/14. (DMK) Modified on 5/2/2014 to reflect that the correct date of the motion hearing is 5/28/2014 (jth). (Entered: 05/02/2014) |
| 05/02/2014 | | Set/Reset Deadlines/Hearings: Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction is due by 5/13/14; Plaintiff's Reply is due by 5/16/14; Hearing on the Motion for Preliminary Injunction is set for 5/28/2014 at 10:00 AM in Courtroom 3 before Judge Amy Berman Jackson. (jth) (Entered: 05/02/2014) |
| 05/02/2014 | [5](#) | NOTICE of Appearance by Meredith L. Flax on behalf of DANIEL ASHE, SALLY JEWELL, U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE (Flax, Meredith) (Entered: 05/02/2014) |
| 05/02/2014 | [6](#) | NOTICE of Appearance by Andrea Gelatt on behalf of All Defendants (Gelatt, Andrea) (Entered: 05/02/2014) |

| 05/12/2014 | 7 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DANIEL ASHE served on 4/25/2014; SALLY JEWELL served on 4/28/2014; U.S. DEPARTMENT OF THE INTERIOR served on 4/25/2014; U.S. FISH AND WILDLIFE SERVICE served on 4/25/2014 (Seidman, Anna) (Entered: 05/12/2014) |
|---|---|---|
| 05/12/2014 | 8 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/28/2014. Answer due for ALL FEDERAL DEFENDANTS by 6/27/2014. (Seidman, Anna) (Entered: 05/12/2014) |
| 05/12/2014 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 04/28/2014. (Seidman, Anna) (Entered: 05/12/2014) |
| 05/13/2014 | 10 | Memorandum in opposition to re 4 MOTION for Preliminary Injunction filed by DANIEL ASHE, SALLY JEWELL, U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE. (Attachments: # 1 Exhibit 1 - Declaration of Timothy Van Norman, # 2 Exhibit 2 - Declaration of Rosemarie Gnam, # 3 Exhibit 3 - Notice of Interim Suspension on Importation of Zimbabwean Elephant Trophies, # 4 Text of Proposed Order)(Flax, Meredith) (Entered: 05/13/2014) |
| 05/13/2014 | 11 | MOTION to Dismiss for Lack of Jurisdiction by DANIEL ASHE, SALLY JEWELL, U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE (Attachments: # 1 Exhibit 1 - Declaration of Timothy Van Norman, # 2 Exhibit 2 - Declaration of Rosemarie Gnam, # 3 Exhibit 3 - Notice of Interim Suspension on Importation of Zimbabwean Elephant Trophies, # 4 Text of Proposed Order)(Flax, Meredith) (Entered: 05/13/2014) |
| 05/15/2014 | 12 | MOTION for Leave to File *Supplemental Declarations* by SAFARI CLUB INTERNATIONAL (Attachments: # 1 Declaration Edson Chidziya, # 2 Declaration Charles Jonga, # 3 Declaration Anna M. Seidman, # 4 Exhibit FOIA Request, # 5 Exhibit Memorandum to Director of the U.S. Fish and Wildlife Service)(Seidman, Anna) (Entered: 05/15/2014) |
| 05/16/2014 | 13 | AMENDED COMPLAINT against All Defendants filed by SAFARI CLUB INTERNATIONAL.(Seidman, Anna) (Entered: 05/16/2014) |
| 05/16/2014 | 14 | REPLY to opposition to motion re 4 MOTION for Preliminary Injunction filed by SAFARI CLUB INTERNATIONAL. (Attachments: # 1 Declaration Edson Chidziya, # 2 Declaration Charles Jonga, # 3 Declaration Anna Seidman, # 4 Exhibit Foia Request, # 5 Exhibit Directors Memo)(Seidman, Anna) (Entered: 05/17/2014) |
| 05/19/2014 | 15 | NOTICE of Appearance by Christopher A. Conte on behalf of NATIONAL RIFLE ASSOCIATION OF AMERICA (Conte, Christopher) (Entered: 05/19/2014) |
| 05/19/2014 | 16 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 04/28/2014., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint |

| | | |
|---|---|---|
| | | Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/28/2014. ( Answer due for ALL FEDERAL DEFENDANTS by 6/27/2014.) (Attachments: # 1 Exhibit Return Receipt Proof of Service Documents)(Seidman, Anna) (Entered: 05/19/2014) |
| 05/20/2014 | 17 | NOTICE of Appearance by Douglas Scott Burdin on behalf of SAFARI CLUB INTERNATIONAL (Burdin, Douglas) (Main Document 17 replaced on 5/21/2014) (jf, ). (Entered: 05/20/2014) |
| 05/20/2014 | 18 | RESPONSE re 12 MOTION for Leave to File *Supplemental Declarations and Federal Defendants' Unopposed Request to File a Surreply* filed by DANIEL ASHE, SALLY JEWELL, U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE. (Attachments: # 1 Proposed surreply, # 2 Text of Proposed Order)(Gelatt, Andrea) (Entered: 05/20/2014) |
| 05/21/2014 | | MINUTE ORDER granting 12 Motion for Leave to File Supplemental Declarations with Preliminary Injunction Reply Brief. The supplemental declarations submitted with plaintiff's reply brief [Dkt. # 14] are treated as filed. Signed by Judge Amy Berman Jackson on 5/21/14. (DMK) (Entered: 05/21/2014) |
| 05/21/2014 | | MINUTE ORDER. In light of defendants' response to plaintiff's motion for leave to file [Dkt. # 18] and unopposed request to file a surreply, it is ORDERED that defendants are granted leave to file a surreply in support of their opposition to plaintiff's motion for preliminary injunction. The Clerk of the Court is directed to enter the surreply [Dkt. # 18-1] on the docket. Signed by Judge Amy Berman Jackson on 5/21/14. (DMK) (Entered: 05/21/2014) |
| 05/21/2014 | 19 | SURREPLY to re 14 REPLY to opposition to motion re 4 MOTION for Preliminary Injunction, filed by DANIEL ASHE, SALLY JEWELL, U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE. (jf, ) (Entered: 05/21/2014) |
| 05/21/2014 | 20 | NOTICE of Appearance by Jeremy Evan Clare on behalf of SAFARI CLUB INTERNATIONAL (Clare, Jeremy) (Entered: 05/21/2014) |
| 05/21/2014 | | MINUTE ORDER that the Hearing on Plaintiff's 4 Motion for Preliminary Injunction presently scheduled for Wednesday, May 28, 2014, at 10:00 AM is cancelled. Signed by Judge Amy Berman Jackson on 05/21/2014. (jth) (Entered: 05/21/2014) |
| 05/23/2014 | 21 | Corporate Disclosure Statement by NATIONAL RIFLE ASSOCIATION OF AMERICA. (Conte, Christopher) (Entered: 05/23/2014) |
| 05/27/2014 | 22 | Memorandum in opposition to re 11 MOTION to Dismiss for Lack of Jurisdiction filed by NATIONAL RIFLE ASSOCIATION OF AMERICA, SAFARI CLUB INTERNATIONAL. (Attachments: # 1 Text of Proposed Order)(Seidman, Anna) (Entered: 05/27/2014) |
| 06/05/2014 | 23 | REPLY to opposition to motion re 11 MOTION to Dismiss for Lack of Jurisdiction filed by DANIEL ASHE, SALLY JEWELL, U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE. (Attachments: # 1 Exhibit 4 - 1997 Tanzania Enhancement Finding)(Flax, Meredith) (Entered: 06/05/2014) |

| 06/06/2014 | 24 | MEMORANDUM OPINION AND ORDER denying 4 motion for preliminary injunction. See Order for details. Signed by Judge Amy Berman Jackson on 6/6/14. (DMK) (Entered: 06/06/2014) |
|---|---|---|
| 06/12/2014 | 25 | MOTION for Relief from LCvR 7(n) by DANIEL ASHE, SALLY JEWELL, U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE (Attachments: # 1 Text of Proposed Order)(Flax, Meredith) (Entered: 06/12/2014) |
| 06/13/2014 | 26 | Unopposed MOTION for Leave to File *Surreply in Opposition to Motion to Cross-Motion to Dismiss* by NATIONAL RIFLE ASSOCIATION OF AMERICA, SAFARI CLUB INTERNATIONAL (Attachments: # 1 Text of Proposed Order, # 2 Surreply)(Seidman, Anna) (Entered: 06/13/2014) |
| 06/16/2014 | | MINUTE ORDER granting in part and denying in part 25 defendants' motion for relief from LCvR 7(n). It is ORDERED that defendants are relieved from complying with LCvR 7(n) pending a ruling on defendants' motion to dismiss but that they are required to begin the process of compiling the administrative record for this case in the meantime. It is further ORDERED that any supplement to defendants' motion to dismiss is due July 3, 2014, plaintiffs' opposition to that supplement is due July 24, 2014, and defendants' reply to the supplement is due August 7, 2014. Signed by Judge Amy Berman Jackson on 6/16/14. (DMK) (Entered: 06/16/2014) |
| 06/16/2014 | | MINUTE ORDER granting 26 plaintiffs' motion for leave to file a surreply in support of their opposition to defendants' motion to dismiss. The Clerk of the Court is directed to enter on the docket the surreply attached to plaintiffs' motion [26-2]. Signed by Judge Amy Berman Jackson on 6/16/14. (DMK) (Entered: 06/16/2014) |
| 06/16/2014 | 27 | SURREPLY to re 11 MOTION to Dismiss for Lack of Jurisdiction filed by NATIONAL RIFLE ASSOCIATION OF AMERICA, SAFARI CLUB INTERNATIONAL. (jf, ) (Entered: 06/16/2014) |
| 06/17/2014 | | Set/Reset Deadlines: Any supplement to defendants' Motion to Dismiss is due by 7/3/2014; Plaintiffs' Opposition to any supplement is due by 7/24/2014; defendants' reply to the supplement is due by 8/7/2014. (jth) (Entered: 06/17/2014) |
| 06/17/2014 | 28 | MOTION for Reconsideration re Order on Motion for Miscellaneous Relief,, *and Cross Motion to Compel Production of the Administrative Record* by NATIONAL RIFLE ASSOCIATION OF AMERICA, SAFARI CLUB INTERNATIONAL (Attachments: # 1 Exhibit Letter from Brian Arroyo, # 2 Text of Proposed Order)(Seidman, Anna). Added Cross MOTION to Compel (jf) (Entered: 06/17/2014) |
| 06/17/2014 | 29 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 24 Memorandum & Opinion by NATIONAL RIFLE ASSOCIATION OF AMERICA, SAFARI CLUB INTERNATIONAL. Filing fee $ 505, receipt number 0090-3751258. Fee Status: Fee Paid. Parties have been notified. (Seidman, Anna) (Entered: 06/17/2014) |
| 06/17/2014 | 30 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court |

| | | |
|---|---|---|
| | | of Appeals. The Court of Appeals fee was paid this date re [29] Notice of Appeal to DC Circuit Court,. (jf, ) (Entered: 06/17/2014) |
| 06/18/2014 | | MINUTE ORDER. It is ORDERED that defendants shall file notice by Friday, June 20, 2014 advising the Court how long it will take to compile the administrative record. Signed by Judge Amy Berman Jackson on 6/18/14. (DMK) (Entered: 06/18/2014) |
| 06/18/2014 | | Set/Reset Deadlines: Defendants' to file notice by 6/20/2014 advising the Court how long it will take to compile the administrative record. (jth) (Entered: 06/18/2014) |
| 06/20/2014 | 31 | NOTICE re MINUTE ORDER filed on 06/18/2014 by DANIEL ASHE, SALLY JEWELL, U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE re Order (Attachments: # 1 Exhibit Decl. of Bryan Arroyo)(Gelatt, Andrea) Modified on 6/23/2014 (jf, ). (Entered: 06/20/2014) |
| 06/20/2014 | 32 | Memorandum in opposition to re [28] MOTION for Reconsideration re Order on Motion for Miscellaneous Relief,, *and Motion to Compel Production of the Administrative Record and incorporated Notice regarding Minute Order of June 18, 2014* filed by DANIEL ASHE, SALLY JEWELL, U.S. DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE. (Attachments: # 1 Exhibit Decl. of Bryan Arroyo)(Gelatt, Andrea) (Entered: 06/20/2014) |
| 06/23/2014 | | MINUTE ORDER. Notwithstanding the Court's view that LCvR 7(n)(1) was amended for the convenience of the Court and addresses cases at the summary judgment stage, it is ORDERED that defendants file a certified list of the contents of the administrative record by August 8, 2014. It is further ORDERED that defendants' supplement to the motion to dismiss is now due by August 8, 2014, plaintiffs' opposition to the supplemental motion to dismiss and the submission of any materials gleaned from the record that support their previously filed responses to the motion to dismiss are due by September 5, 2014, and defendants' reply is due by September 19, 2014. It is further ORDERED that plaintiffs' [28] motion for reconsideration and [28] cross-motion to compel is denied as moot. Signed by Judge Amy Berman Jackson on 6/23/14.(DMK) (Entered: 06/23/2014) |
| 06/24/2014 | | Set/Reset Deadlines: Defendants to file a Certified List of the Contents of the Administrative Record by 8/8/2014. Defendants' Supplement to the Motion to Dismiss is now due by 8/8/2014, Plaintiffs' Opposition and Supplemental Materials gleaned from the Record that Support their previously filed Responses to the Motion to Dismiss are due by 9/5/2014, Defendants' reply is due by 9/19/2014. (jth) (Entered: 06/24/2014) |
| 07/16/2014 | | USCA Case Number 14-5152 for [29] Notice of Appeal to DC Circuit Court, filed by NATIONAL RIFLE ASSOCIATION OF AMERICA, SAFARI CLUB INTERNATIONAL. (erd) (Entered: 07/16/2014) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL ) | |
| 501 2nd Street NE ) | |
| Washington, DC 20002; ) | |
| NATIONAL RIFLE ASSOCIATION OF ) | |
| AMERICA ) | |
| 11250 Waples Mill Rd, 5N ) | |
| Fairfax, VA 22030 ) | |
| ) | |
|   Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Civ. No. 14-cv-00670 (ABJ) |
| SALLY M. R. JEWELL, in her official ) | |
| capacity as Secretary of the U.S. ) | |
| Department of the Interior; ) | |
| U.S. DEPARTMENT OF THE INTERIOR, ) | |
| an agency  of the United States; ) | |
| DANIEL ASHE, in his official capacity as ) | |
| Director of the U.S. Fish and Wildlife Service; and ) | |
| U.S. FISH AND WILDLIFE SERVICE, ) | |
| an agency of the United States ) | |
| 1849 C Street, NW ) | |
| Washington, DC 20240, ) | |
| ) | |
|   Defendants. ) | |

## AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF

### INTRODUCTION

1.   For decades U.S. hunters have been able to hunt African elephants in Zimbabwe and Tanzania and legally import their trophies into the United States.  This hunting and importation supported elephant conservation by increasing the value of African elephants for local communities, discouraging poaching for ivory and/or food and providing financial resources for elephant protection.  On April 4, 2014, without warning or public input, all this

abruptly ended.   The U.S. Fish and Wildlife Service, an agency of the Department of the

Interior, abruptly and immediately suspended the importation of legally sport-hunted African

elephant trophies from Zimbabwe and Tanzania ("trophy importation ban").  With this

Complaint, Plaintiff, Safari Club International and the National Rifle Association of America

("Safari Club"), challenge this April 4, 2014 final action of Defendants Sally M. R. Jewell, in her

official capacity as Secretary of the U.S. Department of the Interior; the U.S. Department of the

Interior; Daniel Ashe, in his official capacity as Director of the U.S. Fish and Wildlife Service;

and the U.S. Fish and Wildlife Service ("Federal Defendants").

      2.      In establishing the trophy importation ban, Federal Defendants acted arbitrarily

and capriciously, violated the law, and abused their discretion by 1) relying on "limited" data and

"anecdotal" evidence and failing to obtain accurate and substantiated information before making

the decision to implement the trophy importation ban; 2) failing to follow the U.S. Fish and

Wildlife Service's ("FWS") own stated procedures for changing its position on whether sport

hunting of elephants in Zimbabwe enhances the survival of the species; 3) imposing and

enforcing a requirement that a finding that enhancing the survival of the African elephant in

Zimbabwe is necessary for the importation of sport-hunted trophies from elephant populations

listed on Convention for International Trade in Endangered Species of Wild Fauna and Flora

("CITES") Appendix II without first providing notice of the requirement and an opportunity for

the public to comment; 4) failing to give the public notice and the opportunity to comment on the

trophy importation ban from Tanzania; 5) imposing and enforcing a requirement that a finding

that enhancing the survival of the African elephant in Tanzania is necessary for the importation

of sport-hunted trophies without first providing notice of the requirement and an opportunity for

the public to comment; and 6) applying an incorrect non-detriment finding analysis for the importation of African elephant trophies from Tanzania.

3.       Federal Defendants' actions violate the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").

4.       Declaratory and injunctive relief is required to remedy the harm the adoption and implementation of the trophy importation ban has caused and will continue to cause.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction over this action under the APA, 5 U.S.C. §§ 702, 706 (judicial review of final agency action and inaction) and 28 U.S.C. § 1331 (federal question jurisdiction).  The Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201, 28 U.S.C. § 2202, and 5 U.S.C. §§ 701-706.

6.       Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) as this action is brought against agencies of the United States and against officers of agencies of the United States in their official capacities.  Decisions and actions challenged here were made, at least in part, in this District; Safari Club maintains an office in this District; and no real property is involved.

7.       Members of Safari Club are hunters, outfitters, professional hunters, booking agents, taxidermists and others who hunt, guide, arrange for hunts and otherwise rely on hunting for their personal, professional and conservation interests in African elephants and who rely on the ability of U.S. hunters to import African elephant sport-hunted trophies from Zimbabwe and Tanzania into the United States to fulfill those interests.

8.       The judicial review provisions of the APA waive the Federal government's sovereign immunity.  5 U.S.C. § 702.

**PARTIES**

9.      Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has

approximately 50,000 members worldwide.  Safari Club's mission is to protect the freedom to

hunt and to promote wildlife conservation worldwide.  Safari Club's purposes include the

following:

- To advocate, preserve and protect the rights of all hunters;
- To promote safe, legal and ethical hunting and related activities;
- To engage in advocacy within the limits imposed by law and regulation, to monitor, support, educate or otherwise take positions on local, national and international legislative, executive, judicial or organizational endeavors that foster and support these purposes and objectives; and
- To inform and educate the public concerning hunting and related activities.

10.      Safari Club works in coordination with the Safari Club International Foundation

("SCIF"), a nonprofit IRC § 501(c)(3) corporation.  SCIF's mission is to fund and manage

worldwide programs dedicated to wildlife conservation, outdoor education and humanitarian

services.  SCIF's purposes include the following:

- To conduct and support scientific and technical studies in the field of wildlife conservation, to assist in the design and development of scientifically sound wildlife programs for the management of wildlife and sustainable use hunting, and to demonstrate the constructive role that hunting and hunters play in the conservation of wildlife and in preserving biodiversity worldwide; and
- To carry out and to support education programs on wildlife conservation, ecology and natural resource management that include a demonstration of the constructive role that hunting and hunters play in natural resource conservation and land management.

11.      Safari Club promotes the principles and practice of sustainable use conservation.

Safari Club and Safari Club members' interests include the sound sustainable use conservation of

African elephants in Zimbabwe and Tanzania.  Safari Club members have an interest in their

ability to hunt those elephants and to import their trophies from successful hunts.  Other Safari Club members have an interest in guiding those hunts and being able to sell to U.S. residents elephant hunts that take place in Zimbabwe and Tanzania.  Still other Safari Club members have an interest in arranging those hunts, performing the taxidermy on sport-hunted trophies from successful African elephant hunts and conducting other types of business related to African elephant hunting in Zimbabwe and Tanzania.  Safari Club members have an interest in the continued ability to participate in the sustainable use conservation of the African elephant, in the long-term survival of the African elephant species, and in preventing poaching from threatening the survival of the species.

12.     Safari Club and members of Safari Club are harmed and aggrieved by the abrupt suspension of the importation of legally sport-hunted African elephant trophies from Zimbabwe and Tanzania.  For many, the opportunity to hunt elephant in Zimbabwe and Tanzania is an event of a lifetime that will never be repeated.  Most Safari Club members who want to participate in an African elephant hunt wish to bring back the trophy from their successful hunt as a prized memento of a treasured experience.  A hunter's inability to import the trophy from his legally sport-hunted African elephant deprives the hunter of an element of the hunting experience to which he or she attributes great value.  A great number will not invest in an expensive elephant hunt if they cannot import the symbol of their successful hunt. Many Safari Club members booked upcoming hunts in these countries years in advance, invested significant funds towards the trip, and are or will be unable to recover the funds already expended if and when they cancel their bookings.

13.     Other Safari Club members are outfitters, professional hunters and booking agents who provide African elephant hunts to U.S. residents.  These Safari Club members have been

and will continue to be harmed and aggrieved by the abrupt suspension of African elephant

trophy importation for 2014.  These Safari Club members have lost clients and bookings due to

the importation ban.  Their livelihoods and ability to remain in business have been drastically

affected due to the reduction in the value of elephant hunts, cancellations by U.S. hunters and the

lack of interest from U.S. hunters to book future hunts.

14.     Still other Safari Club members are taxidermists and other craftsmen who rely on

U.S. hunters for business related to their successfully hunted African elephants.  The loss of U.S.

hunters and the inability of U.S. hunters to import their trophies into the U.S. will significantly

harm these Safari Club members' businesses and livelihoods.

15.     Safari Club and Safari Club members are aggrieved by the harm that the

suspension of trophy importation will cause to African elephant conservation in Zimbabwe and

Tanzania.  Safari Club members support sustainable use conservation generally and the role that

hunting plays in African elephant conservation specifically.  The trophy importation bans will

diminish the number of hunters and potentially the number of outfitting operations present in the

field in elephant range in Zimbabwe and Tanzania, which will consequently erase a major

deterrent to poaching in these areas.  Fewer U.S. hunters means a reduction in the revenue and

elephant meat (contributed by sport-hunters) going to local communities in Zimbabwe and

Tanzania.  This loss of a source of income and food will increase the incentives for poaching

both by those who kill elephants only to sell the ivory and those who kill elephants only to

provide food for their families and communities.

16.     The inability to import trophies combined with the reduction of demand by U.S.

hunters will diminish the value of elephants to all but the poachers.  This loss of value will

reduce the tolerance of local communities for the destructive tendencies of elephants and will

6

**14**

encourage local communities to kill the elephants themselves or facilitate their removal by poachers.  Safari Club members will be harmed by the loss of conservation incentives and the ultimate loss of elephants that will result from the importation ban.

17.    Before the April 4, 2014 implementation of the trophy importation ban, Safari Club members could import African elephant trophies from Zimbabwe and Tanzania.  Now they cannot import any elephant trophy taken after April 4, 2014, regardless of whether the elephant from which that trophy was taken was hunted in accordance with the laws of the countries that have the authority to regulate the hunting of these animals.

18.    Safari Club and its members possess sufficient interests in the subject matter of this litigation to establish standing.  In addition, Safari Club and Safari Club members have suffered concrete injury in fact caused by Federal Defendants' trophy importation ban.  A court ruling declaring illegal and enjoining the ban would redress those injuries.  Safari Club members could once again import their legally sport-hunted African elephant trophies, guide hunts, sell hunts, process elephant trophies and otherwise engage in activities that are dependent on and/or related to the ability to import African elephant trophies from Zimbabwe and Tanzania.  Safari Club and Safari Club members could then continue to participate in activities that help to encourage African elephant conservation in these two countries and to support and finance activities that discourage if not prevent poaching.  Safari Club is an aggrieved party and is entitled to judicial review of the actions and inactions challenged here under the APA and ESA.

19.    The National Rifle Association of America (NRA) is a nonprofit corporation incorporated in New York in 1871, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices and place of business in Fairfax, Virginia.  NRA's Federal Affairs Office is located in Washington, D.C.  Its membership includes approximately 5,000,000 individuals from

the United States and many of the countries around the world.  Among its purposes and objectives are, "[t]o promote hunter safety, and to promote and defend hunting as a shooting sport and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources."  (NRA Bylaws Article II Section 5).

20.     The NRA has a Director of Conservation, Wildlife and Natural Resources working from its headquarters in Fairfax, Virginia.  The Director's primary responsibility is to promote the interests of the hunting community in wildlife management, healthy habitats and sustainable populations to ensure that these wildlife populations continue to be available to be enjoyed by NRA members and to protect and sustain hunters' legacy as the primary supporters of wildlife conservation.

21.     NRA and its members have a strong interest in enhancing the survival of African elephants in Zimbabwe and Tanzania in a manner that promotes proper wildlife management of the species.  NRA members have participated in hunts of African elephants in Zimbabwe and Tanzania and have imported their trophies or attempted to do so but were prevented after encountering Federal Defendants' trophy importation ban just one day after legally harvesting an African elephant.  Others have made substantial investments towards future hunts of African elephants in Zimbabwe and Tanzania which have been placed in jeopardy due to Federal Defendants' trophy importation ban.

22.     Federal Defendants' trophy importation ban has also negatively impacted NRA members participating in ancillary fields directly related to the hunting of African elephants in Zimbabwe.  NRA members involved in the marketing, planning, outfitting and guiding hunts of

African elephants in Zimbabwe have been forced to cancel trips and reevaluate already booked trips, resulting in current and continuous monetary harm.

23.     Federal Defendants' trophy importation ban threatens sustainable use conservation of the African elephant species directly impacting and damaging NRA members' interests.  In addition to the concrete injury in fact the ban has on the livelihood of NRA members, the long-term survival of the African elephant faces major complications associated with a decrease in NRA member assisted conservation efforts which have contributed to anti-poaching efforts and the survival of the species.  Ensuring a viable population of African elephants in Zimbabwe and Tanzania through sustainable use conservation efforts is of paramount importance to NRA and its members.

24.     NRA and its members possess sufficient interests in the subject matter of this litigation to establish standing.  Federal Defendants' trophy importation ban has caused current and continuous injury upon NRA members.  A court ruling declaring illegal and enjoining the ban would redress those injuries.  NRA members could once again import their legally sport-hunted African elephant trophies, guide and sell hunts and otherwise engage in activities that are dependent on and/or related to the ability to import African elephant trophies from Zimbabwe and Tanzania.  These activities are of cardinal importance to the NRA and its members as they allow for direct participation and support of the African elephant populations in Zimbabwe and Tanzania through sustainable use conservation efforts.  NRA is an aggrieved party and is entitled to judicial review of the actions and inactions challenged here under the APA and ESA.

25.

26.     Defendant Sally M. R. Jewell is the Secretary of the Interior and has ultimate responsibility for the administration of the ESA and the decisions made by the parties to CITES within the United States Department of the Interior.  She is sued in her official capacity.

27.     Defendant U.S. Department of the Interior is an agency of the federal government that is authorized to administer and implement the ESA and to administer the decisions made by the parties to CITES.

28.     Defendant Daniel Ashe is the Director of the U.S. Fish and Wildlife Service.  He has responsibility for the administration and implementation of the ESA and the decisions made by the parties to CITES, including with regard to the suspension of African elephant trophy importation from Zimbabwe and Tanzania for 2014.  He is sued in his official capacity.

29.     Defendant U.S. Fish and Wildlife Service is an agency within the Department of the Interior that is authorized to administer and implement the ESA and the decisions made by the parties to CITES.

## FACTUAL BACKGROUND

30.     African elephants (loxodonta Africana) are found throughout much of Africa. The majority of African elephants live in southern and eastern Africa, including Zimbabwe and Tanzania.

31.     Currently, all African elephants are listed as threatened under the ESA.  African elephants in Zimbabwe, Namibia, South Africa and Botswana are listed on Appendix II of CITES.  All other African elephants, including those in Tanzania, are listed on Appendix I of CITES.

32.     In 1977, the FWS was petitioned to list the African elephant as endangered under the ESA.  In 1978, the FWS listed all African elephants as threatened under the ESA.  43 Fed. Reg. 20499 (May 12, 1978).  With the listing, the FWS adopted a special rule that regulates the importation of trophies from legally hunted African elephants.  50 C.F.R. § 17.40(e) ("special rule").

33.     At the seventh CITES Conference of the Parties ("COP") in 1989, the parties to CITES transferred all African elephants from Appendix II to Appendix I.  55 Fed. Reg. 5847 (Feb. 20, 1990).  Pursuant to the CITES Treaty, a country allowing the importation of members of an Appendix I species must make a finding that the "import will be for purposes which are not detrimental to the survival of the species involved." ("Non-detriment finding" or "NDF")  CITES text, Article III.

34.     The FWS received another petition in 1989 to uplist the African elephant from threatened to endangered status, but rejected it.  57 Fed. Reg. 35473 (Aug. 10, 1992).  The FWS amended the special rule to include a provision that allowed the importation of sport-hunted elephant trophies so long as CITES requirements were fulfilled and the trophy was appropriately marked.  57 Fed. Reg. 35473, 35485 (Aug. 10, 1992).  At the time, the parties to CITES required that an enhancement of survival determination be made by the importing country for species listed on Appendix I, including elephants.  The FWS promulgated the special rule to specifically require that same enhancement of survival requirement for the importation of a CITES Appendix I species.  *Id.*

35.     In the Federal Register notice accompanying the special rule, the FWS also recognized that sport-hunting "provide[s] important revenues for elephant conservation to range states."  *Id.*

36.     The FWS's Division of Scientific Authority ("DSA") is the designated CITES "Scientific Authority" for the United States.  Before the FWS issues a permit for the importation of a CITES Appendix I species, the DSA makes a non-detriment finding called an "advice."  The DSA gives the advice to the FWS's Division of Management Authority, which makes the decision whether or not to grant the permit.

37.     At least as early as 1993, the DSA issued general non-detriment advices for African elephants taken from Zimbabwe and South Africa and the FWS allowed the importation of legally taken sport-hunted trophies into the United States.  At least as early as 1993, the DSA issued non-detriment advices for African elephants taken from Tanzania, Namibia and Cameroon and the FWS allowed the importation of legally taken sport-hunted trophies into the United States.  60 Fed. Reg. 12969, 12969-70 (Mar. 9, 1995).

38.     At the tenth COP in 1997, the parties to CITES transferred Zimbabwe's elephants from Appendix I to Appendix II.  The FWS adopted this change in 1998.  63 Fed. Reg. 63210 (Nov. 12, 1998); 62 Fed. Reg. 44627 (Aug. 22, 1997).  Since the parties to CITES determined that, for Appendix II species, the importing country need not make its own NDFs to authorize the importation of sport-hunted trophies of members of the species, the FWS has not made such findings for Zimbabwe's elephants and has not required hunters who import their legally sport-hunted African elephant trophies from Zimbabwe to apply for or obtain an importation permit from the U.S.  CITES text, Article IV.   62 Fed. Reg. 44627, 44633 (Aug. 22, 1997).

39.     In a Federal Register notice published in 1997, the FWS announced that it had made an enhancement finding for African elephants from Zimbabwe.  Further the FWS stated that the enhancement finding for importation of sport-hunted trophies from Zimbabwe would "remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published notice of any change in the Federal Register." *Id.*

40.     As of the filing of this Complaint, the FWS has never published in the Federal Register a notice that the conditions of the special rule are no longer met or a change in the enhancement finding previously in existence for elephants from Zimbabwe.

41.     Until 2014, the FWS allowed the importation of African elephant sport-hunted trophies from Zimbabwe, Namibia, South Africa, Botswana and Tanzania. During the eight year period from 2004 to 2011, 1,186 African elephant sport-hunted trophies were imported into the United States from Zimbabwe. During that same eight year period, 300 African elephant sport-hunted trophies were imported into the United States from Tanzania.

42.     Each year, in accordance with CITES, the range states establish a quota for the number of African elephant sport-hunted trophies that will be allowed to be exported from their country. For 2014, Zimbabwe's quota is 500 elephants and Tanzania's quota is 200 elephants.

43.     On April 4, 2014, the FWS announced, in a press release posted on the FWS website, an immediate suspension of the importation of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during the 2014 calendar year. http://www.fws.gov/news/ShowNews.cfm?ID=2E6FF2A2-E10F-82BC-DAE08807810E3C6B. The FWS gave no prior notice of this decision to the public. The FWS did not publish notice of the suspension in the Federal Register. The FWS did not provide a public comment opportunity.

44.     The press release noted that "[l]egal, well-regulated sport hunting, as part of a sound management program, can benefit the conservation of listed species by providing incentives to local communities to conserve the species and by putting much-needed revenue back into conservation." Neither the press release nor a brief Question and Answer ("Q and A") webpage that the FWS published on the same day analyzed the role that hunting plays in the conservation of Zimbabwe's elephants or described the role that sport hunters and sport hunting plays in discouraging elephant poaching. http://www.fws.gov/international/pdf/questions-and-answers-suspension-of-elephant-sport-hunted-trophies.pdf.

45.     The press release and Q and A webpage explained that the FWS based its decision to suspend importation for African elephant trophies from Zimbabwe on "limited" data and "anecdotal" evidence.  Neither the FWS's press release nor the Q and A page indicated that the FWS had obtained the data or evidence for Zimbabwe's suspension from the Scientific or Management Authorities of Zimbabwe.

46.     On April 18, 2014, the FWS announced a modification of the suspension of legally taken African elephant trophies.  By telephone message and letter to Safari Club, the FWS explained that Federal Defendants had revised the complete suspension of trophy importation for Zimbabwe for 2014 and had removed the retroactive portion of the ban that had banned the importation of trophies from the period between January 1, 2014 and April 4, 2014. "We will allow the import of any trophy taken in 2014 up until April 4.  The hunter will need to be able to demonstrate to our Office of Law Enforcement that the hunt occurred before that date in order to import the trophy."  Letter, dated April 18, 2014, from Robert R. Gabel, Chief, Division of Management Authority, U.S. Fish and Wildlife Service to Nelson Freeman, Deputy Director of Governmental Affairs, Safari Club International.

47.     The April 18, 2014 letter confirmed that the FWS had imposed the ban on April 4, 2014 without obtaining information about the status of elephants or the conservation benefits of sport hunting from the Scientific and Management authorities of the government of Zimbabwe. The letter explained:

> I hope everyone understands as well that we are in contact with the
> Government of Zimbabwe, professional hunters, and others in Zimbabwe,
> and working through our embassy there, to get the most current
> information on African elephants in that country, including population
> status, poaching levels, how hunting programs are currently managed,
> etc.  If the information we are receiving addresses our concerns
> sufficiently and shows that hunting continues to be well managed,
> populations are stable, etc., we may lift the suspension of imports

completely and continue to allow the import of all trophies legally taken in 2014.  We intend to conduct this review as quickly as possible and will get the word out once the review is completed.

*Id.*

48.     The FWS's April 4, 2014 press release indicated that the FWS's decision to ban the importation of elephant trophies in Zimbabwe was based in part on a "widely publicized poisoning last year of 300 elephants in Hwange National Park."  The information upon which the FWS based its trophy importation ban was incorrect.  The number of elephants involved in the Hwange National Park incident was less than half the number reported in the press release.  In addition, the press release did not mention, and apparently Federal Defendants did not take into account, the fact that it was sport-hunting outfitters in Zimbabwe who discovered the poaching and helped finance the effort to capture the poachers.  Without sport-hunting outfitters present in the field, the poachers and the poaching would not have been discovered and stopped.

49.     The trophy importation ban affects only U.S. residents who seek to import their trophies into the U.S.  It has no impact on the export quotas established by Zimbabwe or Tanzania, or on the number of elephants that the governments of the two countries authorize for hunting annually.  Federal Defendants' ban on U.S. importation of African elephant trophies does not control the number of elephants taken in each of those countries each year.

50.     Federal Defendants based their trophy importation ban for Tanzania on a February 21, 2014 determination from the Scientific Authority of the FWS not to issue an NDF for elephant trophy importation from Tanzania and a March 27, 2014 determination from the Management Authority of the FWS that the importation of sport-hunting trophies from Tanzania is not likely to enhance the survival of the species.

15

51.     The February 21, 2014 decision advising the FWS not to issue an NDF for Tanzania discussed sport hunting but was not based on "a consideration of purpose for which the specimen will be used upon import into the United States."  Instead of determining if the importation of sport-hunted trophies for the personal use of the hunters would pose a detriment to the species, the NDF advice document focused on the take of elephants generally, both for legal and illegal purposes.

> We recognize that sport-hunting, as part of a sound management program, can provide benefits to wildlife conservation and that sport-hunting of elephants is not the primary cause of the decline of elephant populations in Tanzania.  However, given the significant decline in the elephant population due to uncontrolled poaching and questionable management and governance, we are concerned that additional killing of elephants, even if legal, is not sustainable and will not support effective elephant population recovery efforts in Tanzania.

*Id.*

52.     The NDF failed to examine the role that sport-hunting has in decreasing and discouraging poaching in Tanzania.  The NDF did not address how the presence of hunters, outfitters and their staff in the field provides a deterrent to poachers or how the introduction of revenue generated by the hunting and other activities of U.S. hunters encourages local communities to guard against poaching.  The NDF completely avoided this analysis and merely analyzed sport hunting as an "additional" source of take.

53.     Because U.S. hunters are no longer permitted to import their legally sport-hunted African elephant trophies, some have cancelled their elephant hunts in Zimbabwe and Tanzania, and many more will cancel their hunts.  Instead of having the desired effect – to reduce "additional" take of elephants, the ban is likely to have the opposite effect.  The absence of hunters in the field will remove a major deterrent to poaching.  Poachers, freed from the risk of being discovered by hunters, outfitters and their staff, will be encouraged to illegally take more

16

24

rather than fewer elephants.  Local residents who have generated income for their families and communities from jobs with hunting operations and other activities associated with the presence of U.S. hunters will no longer have that income.  As a consequence, the elephants that local residents protected for the benefit of the hunters will decline in value to local communities. Poachers who offer money for protection from authorities and for the illegal killing of elephants will take the place of hunters as the source of revenue for local communities.  As a result, more elephants will be poached and fewer elephants will survive.

54.     Sport hunters, with the help of their outfitters and professional hunters, donate much of the meat from the elephants they hunt to the local communities.  Poachers do not.  The loss of U.S. hunters means a loss of important food sources for local residents and increases the likelihood that local residents will themselves kill the elephants to feed their families and communities.

55.     Because the U.S. has no authority to control the number of elephants that can be taken or exported from Zimbabwe and Tanzania, the outfitters and professional hunters who depend on elephant hunts in these countries for their livelihoods will attempt to sell the cancelled hunts to other, non-U.S. hunters who are still able to import trophies into their home countries. While some of the elephant hunts will be resold, the revenue generated from U.S. hunters will not.  Although residents of the United States are not the only hunters who pursue elephants in Zimbabwe and Tanzania, U.S. citizens often pay the highest fees for elephant hunts in Zimbabwe and Tanzania and bring in the most additional revenue to local communities by buying associated goods and services while present for the hunt.  The higher the cost of a hunt, the greater the value the animal has to the local community.  As a result, deterring Americans from hunting elephants in the two countries will lower the value of the elephants.

56.     Because of the abruptness with which the U.S. announced the ban, some outfitters and professional hunting businesses in these two countries will not be able to survive the economic loss.  Many are likely to go out of business, leaving greater areas of the elephant range without people on the ground, who by their very presence, act as a deterrent to poaching.

57.     In some areas of Zimbabwe, elephant populations are too large for the local communities to tolerate.  Because elephants damage crops and interfere with agricultural and other businesses, they are deemed a nuisance rather than a conservation asset.  Sport hunters bring value to the elephant and the revenue generated by sport hunting increases local tolerance for the species.  In addition, sport hunters help reduce overpopulations where they exist.  The loss of the U.S. hunter will eliminate local incentives to tolerate elephant behavior and will encourage those troubled by elephants to kill the elephants themselves.

58.     Sport hunting discourages many reasons and sources for illegal elephant killings. Without U.S. hunters in the field, the African elephant populations in Zimbabwe and Tanzania are likely to suffer and decrease.

## RELEVANT LAW

**A.     The Endangered Species Act ("ESA") and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES")**

59.     The ESA provides the FWS with the authority to classify African elephants, including those from Zimbabwe and Tanzania, as a threatened species.  16 U.S.C. §1533(a)(1).

60.     The ESA does not prohibit the importation of sport-hunted trophies from animals designated as threatened.  16 U.S.C. §1538((a)(1)(A).  Instead, the FWS, acting on behalf of the Secretary of the Interior, promulgates regulations governing the importation of threatened species.  16 U.S.C. §1538(a)(1)(G).

61.     Section 4(d) of the ESA authorizes the FWS to issue regulations pertaining to threatened species under limited circumstances.  "Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Accordingly, the FWS may not issue regulations without specifically determining that they are "necessary and advisable for conservation."

62.     In the African Elephant Conservation Act of 1989 ("AECA"), Congress adopted specific legislation intended to focus on the conservation of the species.  16 U.S.C. § 4201 *et seq.* In the AECA, Congress directed the FWS to impose moratoriums against the importation of ivory from countries that did not meet certain criteria, but prohibited the FWS from issuing moratoriums against the importation of sport-hunted trophies:

> Sport-hunted trophies
>
> Individuals may import sport-hunted elephant trophies that they have legally taken in an ivory producing country that has submitted an ivory quota. The Secretary ***shall not establish any moratorium*** under this section, pursuant to a petition or otherwise, which prohibits the importation into the United States of sport-hunted trophies from elephants that are legally taken by the importer or the importer's principal in an ivory producing country that has submitted an ivory quota.

16 U.S.C. § 4222(e) (emphasis added).

63.     In the AECA, Congress singled out the hunting and importation of African elephant trophies as acts that benefit the survival of the species.  Congress specifically found that "[t]here is no evidence that sport hunting is part of the poaching that contributes to the illegal trade in African elephant ivory, and there is evidence that the proper utilization of well-managed elephant populations provides an important source of funding for African elephant conservation programs."  16 U.S.C. § 4202(9).

19

64.     The FWS does not rely on the AECA for its authority to regulate the importation of African elephant trophies but instead takes that authority from the ESA. 16 U.S.C. § 4241.

65.     The FWS's regulation of the importation of African elephants relies on decisions made by both Congress, through the authority given to the FWS in the ESA, and by CITES, through resolutions and other decisions.  50 C.F.R. § 23.1.

66.     CITES is an international agreement between governments.  During conferences held between the party members to the agreement, the parties agree upon decisions and adopt resolutions designed to prevent international trade in specimens of wild animals and plants from threatening the survival of those species.

67.     The United States, Zimbabwe and Tanzania are all parties to CITES.

68.     The parties to CITES placed African elephants from Zimbabwe on Appendix II and those from Tanzania on Appendix I.

69.     Appendix I includes species that the parties to CITES have determined are threatened with extinction and that are or may be affected by trade of that species.  Appendix II includes species that the parties to CITES have determined are not presently threatened with extinction, but may become so if their trade is not regulated.  Appendix II also includes species that the parties to CITES consider in need of being regulated so that trade in certain other Appendix I or II species may be effectively controlled.  50 C.F.R. § 23.4

70.     The ESA and CITES direct the FWS to treat species classified as "threatened" in different ways, depending on whether the species are listed on CITES Appendix I or II.

71.     Article III of the CITES Treaty and CITES Resolution Conf. 10.3 recommend that, for species that are listed on CITES Appendix I, the importing country must make its own

NDFs.  The FWS has promulgated regulations that require it to make NDFs for the import of Appendix I species.  50 C.F.R. § 23.61.

72.     Articles III and IV of the CITES Treaty and CITES Resolution Conf. 10.3 recommend that exporting countries make findings that the proposed trade of species on both CITES Appendix I and Appendix II will not be detrimental to the survival of the species.

73.      The FWS is required to make different types of NDFs, depending on whether the species in question is being imported or exported.  For NDFs for species being exported from the United States, the FWS examines the potential detriment that could be caused by the "take" of the species from the wild.  In contrast, NDFs for species being imported into the U.S. must examine the potential detriment to the species that could be caused by the purpose for which the animal is being imported into the U.S. The FWS has explained that "[t]he finding for the import of an Appendix-I species is based on a consideration of purpose for which the specimen will be used upon import into the United States."  71 Fed. Reg. 20168, 20195 (Apr. 19, 2006).  An NDF for a sport-hunted trophy must therefore consider whether the personal possession by the hunter who took the animal will itself pose a detriment to the survival of the species.

74.     CITES does not require that the importing country conduct an NDF for species listed on Appendix II.

75.     The ESA states that, for species classified as threatened, that are listed on CITES Appendix II, where the take and exportation of the species comply with all CITES provisions and requirements, a presumption exists that the importation of the species for non-commercial purposes does not violate federal statute or regulation.  16 U.S.C. § 1538(c).

76.     Despite this presumption, the FWS has, by regulation, imposed additional requirements for the importation of sport-hunted elephant trophies, whether they are listed on CITES Appendix I or II ("special rule").  50 C.F.R. § 17.40(e)(3)(iii).

> Sport-hunted trophies may be imported into the United States provided:
>
> (A) The trophy originates in a country for which the Service has received notice of that country's African elephant ivory quota for the year of export;
>
> (B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;
>
> (C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and
>
> (D) The trophy is legibly marked by means of punch-dies, under a marking and registration system established by the country of origin, that includes the following information: Country of origin represented by the two-letter code established by the International Organization for Standardization (see appendix A to chapter I) followed by the registration number assigned to the last two digits of the year of registration and the weight of raw ivory to the nearest kilogram. Any mark must be placed on the lip mark area and indicated by a flash of color which serves as a background for such mark.

77.     The FWS promulgated the special rule on August 10, 1992.  That regulation created the requirement that the take of the elephant to be imported would enhance the survival of the species.  57 Fed. Reg. 35473 (Aug. 10, 1992).  At the time that the FWS promulgated the rule, all African elephants were listed on CITES Appendix I.  In addition, at the time that the FWS promulgated the special rule, the CITES resolution pertaining to the importation of Appendix I species contained a requirement for a determination by the importing country that the take of the animal intended for importation enhanced the survival of the species by financially benefitting elephant conservation.

> CITES requirements included a determination that the killing of elephants for sport-hunting enhances the survival of the species by providing financial support programs for elephant conservation. This requirement is retained in the final

revised special rule for the import of sport-hunted trophies from threatened populations that are on CITES appendix I.

57 Fed. Reg. at 35485; Res. Conf. 2.11. (Annex 1).  The FWS's reason for including the enhancement of survival requirement was the parallel obligation adopted by CITES.

78.     Since the FWS promulgated the special rule, CITES changed the listing status of African elephants from Zimbabwe from Appendix I to Appendix II.  Consequently, CITES would no longer have imposed an enhancement of survival requirement for the species once it was downlisted to Appendix II.  In addition, at the CITES COP 9 in 1994 the parties to CITES amended Res. Conf. 2.11 and removed the enhancement of survival finding requirement entirely from the resolution.  As a result, from that point forward CITES no longer required an enhancement of survival determination for the importation of elephant trophies from either Appendix I or Appendix II species and therefore would not have required the finding for elephants from either Zimbabwe or Tanzania.

79.     The FWS has made no change to its special rule's enhancement of survival finding requirement for the importation of elephants since including those requirements in the rule in 1992, despite the fact that the criteria upon which the FWS based its finding requirement have all disappeared.  The FWS has never explained why the retention of the enhancement requirement is necessary or advisable for the conservation of elephants listed on Appendix I or Appendix II of CITES or offered the public an opportunity to comment on the retention of the enhancement of survival requirement, despite the fact that the FWS's justification for the imposition of this requirement no longer exists.

80.     Since at least as early as 1993 until April 4, 2014, the FWS has consistently made NDFs for the importation of sport-hunted African elephant trophies from Tanzania and has determined that all criteria identified in 50 C.F.R. § 17.40(e)(3)(iii) have been met.

**B.     The Administrative Procedure Act ("APA")**

81.     The APA provides for judicial review of final agency action by persons "aggrieved" by the action.  5 U.S.C. § 702.

82.     It also provides standards applicable when a Federal agency proposes and adopts final rules and regulations.  Those standards include formal notice of the proposed rulemaking and an opportunity to participate in the rulemaking by providing comments through the submission of data, views and/or arguments.  5 U.S.C. § 553; *id.* § 551(4).

83.     The APA authorizes a reviewing court to

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--

>> a.   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

5 U.S.C. § 706.

## CAUSES OF ACTION

### Count I - Violations of the ESA and APA:

### Federal Defendants Illegally Relied on "Limited" and "Anecdotal" Information to Reverse a Longstanding Approach to African Elephant Sport-Hunted Trophy Importation from Zimbabwe

84.     Safari Club/NRA realleges and incorporates by reference all the allegations of paragraphs 1-76 above, as though fully set forth below.

85.     Federal Defendants abruptly suspended the importation of legally sport-hunted African elephant trophies from Zimbabwe after consistently allowing such importations for over two decades.  Federal Defendants made the decision to suspend importation of legally sport-hunted African elephant trophies based on "limited" data and "anecdotal evidence" without first waiting to obtain comprehensive and substantiated data on the issues relevant to the continued

24

importation of those trophies from the Scientific or Management Authorities of Zimbabwe or from others.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

86.     Federal Defendants abruptly suspended the importation of legally hunted African elephant trophies from Zimbabwe without fully analyzing the role that the presence of sport hunters in the field plays in reducing and discouraging the poaching of elephants in Zimbabwe as well as the economic role that U.S. hunters play in providing Zimbabwe with the financial resources to combat poaching.  Federal Defendants did not fully consider the harm to elephant conservation that will result from the absence of U.S. hunters in the field and the loss of revenue from U.S. hunters.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

87.      Federal Defendants failed to consider that, instead of being additional to the illegal take of elephants by poachers, the legal sport hunting by U.S. hunters in fact reduces the number of elephants illegally killed in Zimbabwe.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

88.     Federal Defendants failed to adhere to the purpose for which the FWS included the enhancement of survival requirement in the special rule for African elephant trophy importation – to determine whether the sport hunting "enhances the survival of the species by providing financial support programs for elephant conservation."  57 Fed. Reg. 35473, 35485 (Aug. 10, 1992).  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

89.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1533(d) and 1538(c).

90.     The remedies requested in this Complaint would remedy Safari Club and Safari

Club members' injuries, as outlined in this Complaint.

### Count II – Violations of the ESA and APA:

**Federal Defendants Erroneously and Illegally Failed to Justify and to
Provide Notice and an Opportunity to Comment on the Decision to
Suspend the Importation of African Elephant Trophies from Zimbabwe**

91.     Safari Club/NRA realleges and incorporates by reference all the allegations of

paragraphs 1-83, as though fully set forth below.

92.     Federal Defendants abruptly changed their position on April 4, 2014 on the

legality of the importation of legally sport-hunted African elephant trophies from Zimbabwe

without complying with the process to which they had committed for making such decisions.

Federal Defendants' change of position on the enhancement finding and on the legality of the

importation of sport-hunted African elephant trophies contradicted the FWS's own

announcement on August 22, 1997 that the enhancement finding for Zimbabwe would "remain

in effect until the Service finds, based on new information, that the conditions of the special rule

are no longer met and has published a notice of any change in the Federal Register." 62 Fed.

Reg. 44627 (Aug. 22, 1997).  These actions were arbitrary and capricious, not in accordance with

law, and an abuse of discretion.

93.     Federal Defendants announced their decision to suspend the importation of legally

sport-hunted African elephant trophies on April 4, 2014 with only a press release and a Q and A

webpage published on the FWS's website, and without publishing a Federal Register notice that

the conditions of 50 C.F.R. §17.40(e)(3)(iii) are no longer met.  These actions were arbitrary and

capricious, not in accordance with law, and an abuse of discretion.

94.     Federal Defendants also violated APA rulemaking procedures by abruptly suspending the ability of Safari Club/NRA members to import their African elephant trophies from Zimbabwe, without first giving the public advance notice and the opportunity to comment and without providing data to support the finding that the take and importation of legally sport-hunted African elephant trophies continue to enhance the survival of the species.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

95.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

96.     The remedies requested in this Complaint would remedy Safari Club/NRA and Safari Club/NRA members' injuries, as outlined in this Complaint.

## Count III - Violations of the ESA and APA:

### Federal Defendants Illegally Imposed an Enhancement of Survival Finding Requirement in the Special Rule Pertaining to Trophy Importation from African Elephants on CITES Appendix II

97.     Safari Club/NRA realleges and incorporates herein by reference all the allegations of paragraphs 1-89, as though fully set forth below.

98.     Federal Defendants failed to explain why the enhancement finding requirement included in 50 C.F.R. § 17.40(e)(3)(iii) is necessary and advisable for African elephant conservation.  For species classified as "threatened, the ESA authorizes Federal Defendants to issue such regulations deemed "necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Federal Defendants have not explained why the enhancement finding is "necessary and advisable" for African elephant conservation.  This failure to act was arbitrary and capricious, not in accordance with law, and an abuse of discretion.

27

99.     On August 10, 1992, Federal Defendants instituted the enhancement of survival finding requirement when all African elephants, including Zimbabwe's, were listed on CITES Appendix I and when CITES Res. Conf. 2.11. (Annex 1) required an enhancement finding for the importation of Appendix I species.  Federal Defendants included the enhancement of survival finding requirement in 50 C.F.R. § 17.40(e)(3)(iii) to match that same CITES requirement for Appendix I species.  Despite the fact that in 1994 CITES removed the enhancement of survival finding requirement from its resolution applicable to Appendix I species and in 1997 CITES downlisted African elephants from Zimbabwe to CITES Appendix II, Federal Defendants have never deleted the enhancement of survival finding requirement from § 17.40(e)(3)(iii).  In addition, Federal Defendants have never published a public notice justifying the enhancement of survival requirement for African elephants listed on CITES Appendix II and have never given the public the opportunity to comment on the requirement.  Despite the fact that the status of the species changed and the FWS's original justification for the requirement disappeared, Federal Defendants have never provided proper justification, notice and an opportunity for comment on its decision to modify the basis for imposing an enhancement of survival requirement on an elephant population listed on CITES Appendix II.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

100.    On April 4, 2014, for the first time since imposing the enhancement of survival requirement for the importation of legally sport-hunted African elephants from Zimbabwe, Federal Defendants determined that an enhancement of survival finding could not be made. These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.  These April 4, 2014 actions also caused harm to Safari Club/NRA and their members for the first time since Federal Defendants illegally retained the requirement in the special rule.

28

**36**

101.     This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

102.     The remedies requested in this Complaint would remedy Safari Club/NRA and Safari Club/NRA members' injuries, as outlined in this Complaint.

**Count IV - Violation of the ESA and APA:**

**Federal Defendants Illegally Failed to Provide the Public with Notice and the Opportunity to Comment on the Trophy Importation Ban for Tanzania**

103.     Safari Club/NRA realleges and incorporates herein by reference all the allegations of paragraphs 1-95, as though fully set forth below.

104.     Federal Defendants announced the trophy importation ban for Tanzania in a press release published on the FWS's website and implemented the ban immediately.  Despite the fact that the ban applied to the hunting public generally, and reversed an opportunity available to Safari Club members and others for decades, Federal Defendants failed to publish notice of the ban in the Federal Register and provide the public with an opportunity for comment on a proposed ban.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

105.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

106.     The remedies requested in this Complaint would remedy Safari Club/NRA and Safari Club/NRA members' injuries, as outlined in this Complaint.

**Count V - Violations of the ESA and APA:**

**Federal Defendants Illegally Imposed an Enhancement of Survival
Finding Requirement in the Special Rule Pertaining to Trophy
Importation from African Elephants on CITES Appendix I**

107.     Safari Club/NRA realleges and incorporates herein by reference all the allegations
of paragraphs 1-99, as though fully set forth below.

108.     Federal Defendants failed to explain why the enhancement finding requirement
included in 50 C.F.R. § 17.40(e)(3)(iii) is necessary and advisable for African elephant
conservation.  For species classified as "threatened," the ESA authorizes Federal Defendants to
issue such regulations deemed "necessary and advisable to provide for the conservation of such
species."  16 U.S.C. §1533(d).  Federal Defendants have not explained why the enhancement
finding is "necessary and advisable" for African elephants listed on CITES Appendix I.  This
failure to act was arbitrary and capricious, not in accordance with law, and an abuse of
discretion.

109.     On August 10, 1992, Federal Defendants instituted the enhancement of survival
finding requirement when CITES Res. Conf. 2.11. (Annex 1) required an enhancement finding
for the importation of Appendix I species.  Federal Defendants included the enhancement of
survival finding requirement in 50 C.F.R. § 17.40(e)(3)(iii) as a result of a parallel CITES
requirement.  Despite the fact that in 1994 CITES removed the enhancement of survival finding
requirement from its resolution applicable to Appendix I species, Federal Defendants never
removed the enhancement of survival finding requirement from § 17.40(e)(3)(iii), never
provided a public notice justifying the retention of the requirement for African elephants,
including those from Tanzania, and never gave the public the opportunity to comment on the
requirement when the reason for the requirement no longer existed.  These actions were arbitrary
and capricious, not in accordance with law, and an abuse of discretion.

110.     On April 4, 2014, for the first time since imposing the enhancement of survival requirement for the importation of legally sport-hunted African elephants from Tanzania, Federal Defendants determined that an enhancement of survival finding could not be made.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion. These April 4, 2014 actions also caused harm to Safari Club/NRA and their members for the first time since Federal Defendants illegally retained the requirement in the special rule.

111.     This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

112.     The remedies requested in this Complaint would remedy Safari Club/NRA and Safari Club/NRA members' injuries, as outlined in this Complaint.

### Count VI - Violation of the ESA and APA:

### Federal Defendants Illegally Applied the Incorrect Non-Detriment Standard to the Importation of African Elephant Trophies from Tanzania

113.     Safari Club/NRA realleges and incorporates herein by reference all the allegations of paragraphs 1-105, as though fully set forth below.

114.     Federal Defendants failed to conduct the proper NDF assessment for the importation of an Appendix I species.  When considering the potential detriment posed by U.S. importation of legally sport-hunted trophies from Tanzania, Federal Defendants applied the analysis authorized for exportation, rather than importation.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

115.     Federal Defendants wrongfully assessed the potential detrimental impact of both legal and illegal (poaching) take of elephants in Tanzania rather than focusing their NDF assessment on the purpose for which sport-hunted trophy importations would be intended.  In

31

doing so, Federal Defendants ignored and/or contradicted their own published conclusion that the "finding for the import of an Appendix-I species is based on a consideration of purpose for which the specimen will be used upon import into the United States." 71 Fed. Reg. 20168, 20195 (Apr. 19, 2006). These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

116. On April 4, 2014, Federal Defendants, for the first time since African elephants in Tanzania were listed as a threatened species, determined that it could not make an NDF for the importation of African elephant sport-hunted trophies and caused Safari Club/NRA and its members harm for the first time.

117. These actions by Federal Defendants violate the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

118. The remedies requested in this Complaint would remedy Safari Club/NRA and Safari Club/NRA members' injuries, as outlined in this Complaint.

## PRAYER FOR RELIEF

For the reasons stated above, Safari Club/NRA respectfully requests that the Court grant the following relief:

1. Declare that Federal Defendants violated the ESA and the APA in suspending the importation of African elephant trophies legally hunted in Zimbabwe between April 5, 2014 to December 31, 2014.

2. Declare that Federal Defendants violated the ESA and APA in suspending the importation of legally sport-hunted African elephant trophies from Tanzania for 2014.

3. Declare that Federal Defendants' suspension of the importation of legally sport-hunted African elephant trophies from Zimbabwe was arbitrary and capricious, contrary to law, and an abuse of discretion and therefore the suspension is invalid.

4.    Declare that Federal Defendants' suspension of the importation of legally sport-hunted African elephant trophies from Tanzania was arbitrary and capricious, contrary to law, and an abuse of discretion and therefore the suspension is invalid.

5.    Enjoin the Federal Defendants from continuing and/or enforcing the suspension of the importation of African elephant trophies from Zimbabwe for 2014.

6.    Enjoin the Federal Defendants from continuing and/or enforcing the suspension of the importation of African elephant trophies from Tanzania for 2014.

7.    Award Safari Club/NRA the costs of litigation, including reasonable attorneys' fees.

8.    Award Safari Club/NRA such other relief that is just and proper.

Dated this 21st day of April 2014.


Respectfully submitted,



/s/ Anna M. Seidman

Anna M. Seidman, Esq. (DC Bar No. 417091)
Douglas S. Burdin, Esq. (DC Bar No. 434107)
Jeremy E. Clare, Esq. (DC Bar No. 1015688)
Safari Club International
501 2nd Street, NE
Washington, DC 20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org


*Counsel for Plaintiff,*
*Safari Club International*

33

**41**

Christopher A. Conte (DC Bar No. 43048)
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org

*Counsel for Plaintiff,*
*National Rifle Association of America*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
|     Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
|     Defendants | ) | |
| ———————————————————— | ) | |

**MOTION OF SAFARI CLUB INTERNATIONAL FOR PRELIMINARY INJUNCTION**

Plaintiff Safari Club International moves for a preliminary injunction to restore the status quo that existed before the Federal Defendants, on April 4, 2014, ended the importation into the United States of sport-hunted elephants from Zimbabwe and Tanzania for 2014.  This motion is supported by the accompanying Memorandum of Points and Authorities in Support of Motion of Safari Club for Preliminary Injunction, the over 50 exhibits supporting that Memorandum, and the Complaint filed in this matter.  Counsel for Safari Club contacted attorneys for the Federal Defendants, who indicated that they would oppose this motion.

Dated:  April 30, 2014.

Respectfully submitted,

/s/Anna M. Seidman
Anna M. Seidman
D.C. Bar No. 417091
Douglas Burdin
D.C. Bar No. 434107
501 2nd Street NE
Washington, D.C.
202-543-8733
202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                    )
SAFARI CLUB INTERNATIONAL, et al., )
                                    )
              Plaintiff,            )
                                    )
      v.                            )        Civil Action No. 14-0670 (ABJ)
                                    )
SALLY M. R. JEWELL, in her official )
capacity as Secretary of the U.S.   )
Department of the Interior, et al., )
                                    )
              Defendants.           )
_____)
```

## MEMORANDUM OPINION AND ORDER

Plaintiff Safari Club International brought this lawsuit to challenge two decisions of the United States Fish and Wildlife Service ("FWS") to suspend any importation of sport-hunted African elephant trophies from Zimbabwe and Tanzania in 2014.   Compl. [Dkt. # 1] ¶ 1.[1] Plaintiff alleges that the decisions violate the Endangered Species Act and the Administrative Procedures Act.   *Id.* ¶¶ 77–111.   After filing its complaint, plaintiff filed a motion for a preliminary injunction.   Mot. for Prelim. Inj. [Dkt. # 4] ("Mot."); Mem. of P. & A. in Supp. of

---

[1]     On May 16, 2014, Safari Club filed an amended complaint to add the National Rifle Association as a plaintiff in the case.   Am. Compl. [Dkt. # 13] ¶¶ 19–24.

Mot. for Prelim. Inj. [Dkt. # 4-2] ("Mem.").  The parties have fully briefed the motion,[2] and it is now before the Court.

Safari Club alleges that actions of FWS have irreparably harmed its interests as an organization and the interests of its members.  Because plaintiff has failed to demonstrate the necessary irreparable injury, the Court will deny the motion for a preliminary injunction.[3]

## ANALYSIS

On April 4, 2014, FWS issued a press release announcing "a suspension on imports of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014."  April 4, 2014 Press Release, Ex. A to Mem. [Dkt. # 4-5].[4]  Plaintiff has challenged the agency's action and moved for a preliminary injunction to restore the pre-suspension status quo pending a ruling on the merits of the lawsuit.

To obtain a preliminary injunction, Safari Club must establish that:  1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of preliminary

---

2     Defendants filed an opposition to plaintiff's motion, and pursuant to the schedule established by the Court, simultaneously filed a motion to dismiss for lack of jurisdiction.  *See* Defs.' Opp. to Mot. for Prelim. Inj. and Mem. in Supp. of Cross-Mot. to Dismiss [Dkt. # 10] ("Opp."); Defs.' Mot. to Dismiss [Dkt. # 11].  With leave of Court, plaintiff filed a reply in support of its motion, with supplemental declarations, *see* Pl.'s Reply to Defs.' Opp. to Mot. for Prelim. Inj. [Dkt. # 14] ("Reply"), and defendants filed a surreply in support of their opposition. *See* Defs.' Surreply [Dkt. # 19].

3     The Court recognizes that defendants have raised questions about subject matter jurisdiction in their motion to dismiss.  But the questions are sufficiently close and the lack of irreparable harm sufficiently clear that the Court will proceed to rule on the need for expedition first and take the motion to dismiss under advisement.  The defendants will also have the opportunity to file any other motions under Fed. R. Civ. P. 12(b)(6).

4     FWS later modified the suspension to apply to elephants taken during the 2014 season only after April 4, 2014.  *See* Van Norman Decl., Ex. 1 to Opp. [Dkt. # 10-1] ¶¶ 14–15, 25, 28.

relief; 3) the balance of equities tips in its favor; and 4) an injunction serves the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[5]

Injunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Id.* at 22. Failure to show any irreparable harm is grounds for the court to refuse to issue a preliminary injunction, even if the other three factors entering the calculus point in the plaintiff's favor. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also GEO Specialty Chem., Inc. v. Husisian*, 923 F. Supp. 2d 143, 147 (D.D.C. 2013) ("[A] court may refuse to issue an injunction without considering any other factors when irreparable harm is not demonstrated.").

To show irreparable harm, plaintiff must demonstrate that the harm has occurred in the past and is likely to occur again, or that the harm is certain to occur in the near future. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiff must also show the alleged harm will "directly result" from the action that plaintiff seeks to enjoin. *Id.* The harm "must be both

---

5        A number of circuits, including the D.C. Circuit, have historically evaluated the four factors utilizing what has been referred to as a "sliding scale" approach. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). The Court of Appeals articulated the balancing test as follows: "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak. An injunction may be justified . . . where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). But it is questionable whether this formulation has survived the Supreme Court's 2008 decision in *Winter*. *See Davis*, 571 F.3d at 1295–96 (Kavanaugh, J., and J. Henderson, concurring). In *Winter*, the Supreme Court specifically rejected the Ninth Circuit's reasoning that "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm." *Winter*, 555 U.S. at 21. The Court found that standard to be "too lenient." *Id.* at 22. Thus, setting the bar at a "relatively slight showing," *CityFed Fin. Corp.*, 58 F.3d at 747, is not likely to pass muster either. But it is not necessary to settle the question of the viability of the sliding scale approach to decide this case. Even when the balancing test was the clear governing standard, the D.C. Circuit warned: "[d]espite this flexibility, we require the moving party to demonstrate at least 'some injury' . . . since '[t]he basis of injunctive relief in the federal courts has always been irreparable harm.'" *Id.*

certain and great" and "actual and not theoretical." *Id.* And, it cannot arise from plaintiff's own actions. *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (holding that litigant cannot "be heard to complain about damage inflicted by its own hand"); *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001) (holding that a "preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted") (citations omitted); *see also Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (no irreparable harm when plaintiffs could avoid harm).

Safari Club alleges that the moratorium on the importation of elephant trophies from two countries in Africa has irreparably harmed the recreational, conservationist, and economic interests of its members and of the Safari Club as an organization. But the motion falls well short of the legal standard for preliminary relief. Plaintiff has not shown that members who plan to travel to Africa and hope to shoot an elephant, or that members who have already successfully accomplished that feat, will suffer grave, imminent, and certain harm because while they may hunt elephants, and they may remember, recount, and record any success they achieve, they will not be permitted – at least for now – to bring home a particularly prized souvenir.

Plaintiff asserts: "[b]y depriving U.S. hunters of an important element of the elephant's value, the U.S. government has all but taken the hunter out of the field." Mem. at 27, quoting Hurt Decl., Ex. XX to Mem. [Dkt. # 4-54] ¶ 11. But that statement overstates the impact of the suspensions. The agency's announcement did not prohibit anyone from hunting African elephants in Zimbabwe or Tanzania or anywhere else; it did not bar plaintiff or its members from organizing elephant hunts or earning income by providing services to hunting enthusiasts; and it did not restrict anyone's ability to support the conservation of elephants. These facts and,

indeed, the declarations supplied by plaintiff's own members, defeat plaintiff's claim of irreparable harm.

## I.   Plaintiff Has Not Shown Irreparable Harm to Recreational Interests

Safari Club asserts that its members have suffered irreparable harm to their recreational interests because the opportunity to import elephants from Tanzania and Zimbabwe has been suspended.  In support of this argument, Safari Club provides numerous declarations from its members.

The record includes declarations from two hunters who began elephant hunts before April 4, 2014, shot and killed elephants after that date, but were prevented from importing their trophies, such as the hides and tusks, because of the suspensions.  Grieb Decl., Ex. U to Mem. [Dkt. # 4-25] ¶¶ 11–12; Whaley Decl., Ex. FF to Mem. [Dkt. # 4-36] ¶¶ 10, 15.[6]

Other members report that they decided to hunt other animals after learning they would not be able to bring home the elephant trophies from hunts scheduled for 2014.  *See* Holdridge Decl., Ex. R to Mem. [Dkt. # 4-22] ¶ 6 ("I had a hunt planned for July 2014 in Zimbabwe for elephant, lion and leopard.  I am no longer going to hunt an elephant due to the trophy importation ban. . . . [M]y outfitter has offered to shift the deposit to other hunts instead."); Capozza Decl., Ex. AA to Mem. [Dkt. # 4-31] ¶¶ 19–20 ("I cancelled the elephant hunt when I learned that I would be unable to import the elephant that I hunted. . . . I was able to rebook another hunt with my safari operator for other species during the same time frame . . . .").

Some members are proceeding with elephant hunts despite the suspensions.  *See* Cheek Decl. Ex. N to Mem. [Dkt. # 4-18] ¶ 13 (stating "I am prepared to go forward with the hunt

---

[6]    These members indicate that their elephants are stored in Zimbabwe, Grieb Decl. ¶ 12, Whaley Decl. ¶ 15, suggesting the elephants may be imported at a later date if FWS reverses course.  *See also* Van Norman Decl. ¶¶ 11, 25 (stating that FWS may amend the challenged findings).  This indicates that these members' inability to import now may not be "irreparable."

despite my concern that I will be unable to import the trophy, but I am hopeful that the [FWS] will rescind the bans"); Beardmore Decl., Ex. L to Mem. [Dkt. # 4-16] ¶ 24 ("Although the government has deprived me and my son of our ability to import our elephant from our hunt, I refuse to seek refunds."); Netzley Decl., Ex. Z to Mem. [Dkt. # 4-30] ¶ 10 ("I will still hunt elephant and just not bring home the trophy.").

Finally, numerous other members with hunts planned for later in the year have not yet decided whether to cancel their trips or not.  *See, e.g.*, Didado Decl., Ex. M to Mem. [Dkt. # 4-17] ¶ 13 ("Nothing has been determined or finalized yet, but I am worried that we will need to cancel the trip."); Rawson Decl., Ex. P to Mem. [Dkt. # 4-20] ¶ 17 (stating "I may attempt to cancel"); Ingersoll Decl., Ex. Q to Mem. [Dkt. # 4-21] ¶ 9 ("I have not decided whether I am going to try to cancel this trip."); Buch Decl., Ex. T to Mem. [Dkt. # 4-24] ¶ 17 ("I am not sure what to do at this point."); Condon Decl., Ex. V to Mem. [Dkt. # 4-26] ¶ 20 ("I will likely cancel my hunt."); Nice Decl., Ex. W to Mem. [Dkt. # 4-27] ¶ 11 (stating he "may decide to cancel"); Taylor Decl., Ex. DD to Mem. [Dkt. # 4-34] ¶ 19 ("I am still considering my options with my outfitter."); McDonnold Decl., Ex. JJ to Mem. [Dkt. # 4-40] ¶ 8 ("I do not know if I will continue with my hunt."); Bridges Decl., Ex. CC to Mem. [Dkt. # 4-33] ¶ 11 ("I have not yet decided if I will cancel my 2014 elephant hunt and seek a refund."); Johnson Decl., Ex. VV to Mem. [Dkt. # 4-52] ¶ 12 ("I am considering cancelling my hunt.").

Those who choose to cancel their hunts state they will miss out on the recreational opportunity to hunt elephant, and those who plan to proceed note that if they are successful, they will not be able to bring home the elephants, and therefore they will be deprived of a valuable part of the hunt.  *See* Beardmore Decl. ¶ 16 ("[B]eing able to import the successfully hunted elephant from this amazing experience is a significant element and memory of the hunt.").  In

sum, plaintiff asserts that the import suspensions have "dramatically changed the nature of that hunt," and that hunters have been or will be deprived of "the full enjoyment of the hunt."  Reply at 12.

The Court does not doubt the sincerity of declarants' disappointment and it does not find that the suspensions will have no effect on their overall hunting experience.  But the inability to import elephant trophies does not result in a "certain and great" harm to the recreational interest alleged.  First of all, as plaintiff acknowledges, the FWS suspensions do not prohibit hunters from participating in hunts of African elephants.  *See*, *e.g.*, April 4, 2014 Press Release, Ex. A to Mem.; Mem. at 21 n.7 (explaining that the suspension does not affect the number of elephant hunts in Zimbabwe); Beardmore Decl. ¶ 24 ("[T]he hunt I paid for is still perfectly legal and absolutely necessary.").  Those already on hunts when the suspensions took effect and those who will proceed with their hunts despite the suspensions may still enjoy the recreational benefits of participating in hunts.  *See* Rhyne Decl., Ex. BB to Mem. [Dkt. # 4-32] ¶ 9 (stating that he hunts, in part, for personal enjoyment); Vick Decl., Ex. II to Mem. [Dkt. # 4-39] ¶ 13 (stating he enjoys the intensity of the hunt).  Notwithstanding the "great emotional significance" of an elephant trophy, Reply at 16, hunters may still engage in the core recreational activity of hunting.  So while the "full enjoyment of the hunt" may be diminished, it has not been eliminated.

Second, it is worth noting that a hunter must successfully shoot an elephant in order to garner a trophy worth importing.  So it is not necessarily clear that *any* Safari Club member other than the declarants with elephants already in storage, *see* Grieb Decl. ¶ 12; Whaley Decl. ¶ 15, will be affected by this ban for the rest of 2014.

Moreover, those hunters who chose to rearrange their hunts so that they could hunt other species or who cancelled their trips entirely did so of their own volition.  Thus, any loss of their

recreational interest in participating in hunts did not "directly result" from the FWS suspensions. *Wis. Gas*, 758 F.2d at 674.  Rather, the harm is self-inflicted and, therefore, not the irreparable harm that supports injunctive relief.  *Pennsylvania v. New Jersey*, 426 U.S. at 664.

Finally, since most of the hunter declarants are still considering whether to cancel or change their trips or not, it is uncertain whether any harm will come to their recreational interests at all.  Irreparable harm must be great and certain, not speculative.  *Wis. Gas*, 758 F.2d at 674. For all of these reasons, the Court holds that the FWS suspensions have not caused irreparable harm to plaintiff's recreational interests.

## II.       Plaintiff Has Not Shown Irreparable Harm to Conservation Interests

Safari Club's claim of irreparable harm to its own and its members' conservation interests fails for the same reasons.  Plaintiff and its members state that they support the sustainable use conservation of African elephants though hunting, which contributes to anti-poaching efforts and supports elephant habitat. Mem. at 19–20, 26.  Plaintiff also states that the organized hunts encourage tolerance for elephants within the local communities that derive such benefits as job opportunities and elephant meat from the hunts.  *Id*. at 18–19, 26.  Plaintiff contends that the inability to import irreparably harms these conservation efforts:  fewer elephant hunts will take place; less money will flow to support conservation efforts; and fewer hunters, who deter and sometimes catch poachers, will be in the field to support anti-poaching activities. *Id.* at 21–25, 27–28.

Putting aside the question of whether these generalized policy interests satisfy standing requirements, the fact is that the challenged suspensions do not prohibit U.S. hunters from hunting African elephants in Zimbabwe or Tanzania, so they do not prevent the Safari Club or its members from supporting elephant conservation by participating in or supporting hunts.  Any

decline in funds available for conservation efforts resulting from hunters' cancellations is the result of hunters' decisions and not the result of the suspensions. Accordingly, it is not irreparable harm. *Wis. Gas.*, 758 F.2d at 674; *Pennsylvania*, 426 U.S. at 664. This is true even if, as plaintiff contends, FWS imposed the suspensions recognizing that Zimbabwe and Tanzania might lose a portion of conservation funding and hunt-generated revenue and that U.S. hunters might cancel hunts. *See* Reply at 20–21. Elephant hunts in these two countries are not prohibited, U.S. hunters remain free to participate in those and other hunts, and any decline in elephant conservation efforts arising because of hunters' decisions to cancel their trips is indirect and speculative. For this reason, the Court holds that plaintiff has not demonstrated irreparable harm to its or its members' conservation interests.

### III.    Plaintiff Has Not Shown Irreparable Harm to Economic Interests

Safari Club also asserts that the suspensions will cause irreparable economic harm to its members. Plaintiff notes that hunters who cancel or rearrange their hunts because of the suspensions may lose deposits they have already paid towards hunting expeditions, as well as the money they have already spent purchasing such items as airline tickets, firearms, ammunition, training, and video equipment. Mem. at 15–16, 25. But any economic harm hunters may suffer arises out of their own decisions to cancel or change their plans and, therefore, it is indirect, self-inflicted, and not irreparable harm. *Wis. Gas.*, 758 F.2d at 674; *Pennsylvania*, 426 U.S. at 664.

Safari Club also asserts that outfitters and other businesses that support these hunts will be harmed economically due to the suspensions. *See, e.g.*, Carter Decl., Ex. NN to Mem. [Dkt. # 4-44] ¶ 19 (stating the suspensions have already hurt his business); Barth Decl., Ex. OO to Mem. [Dkt. #4-45] ¶ 13 (same). It is true that "[t]he loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms." *Air Transp. Ass'n of*

*Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).  But the general rule in this Circuit is "that economic harm does not constitute irreparable injury."  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d at 1295; *see also Wis. Gas.*, 758 F.2d at 674 ("It is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm.").  Courts in this Circuit have recognized that economic loss can constitute irreparable injury only in limited circumstances:  where "monetary loss . . . threatens the very existence of the movant's business," *Wis. Gas.*, 758 F.2d at 674, or where the claimed economic loss is unrecoverable.  *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011).  But the "fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm," *id.*, for the harm must also be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff."  *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000).

Plaintiff does not present any evidence that would indicate that the FWS import suspensions threaten the very existence of any business that supports elephant hunts, nor does it contend that any threatened economic losses are serious in terms of their effect on these businesses.  *See* Reply at 18–19.  Given this, the Court finds that the claim of economic harm to hunting-related businesses does not constitute irreparable harm.  *See Wis. Gas.*, 758 F.2d at 674; *Mylan Pharm.*, 81 F. Supp. 2d at 42.

Plaintiff contends that the financial harms arising from the suspensions "were set in motion and expected by" defendants.  Reply at 19.  But this has nothing to do with the legal requirement that the harm be irreparable.  The law requires that the harm must be "must be both certain and great" and "actual and not theoretical."  *Wis. Gas.*, 758 F.2d at 674.  Here, the outfitters state that they *may* suffer economic losses if hunters cancel expeditions.  *See, e.g.*, Pole Decl., Ex. LL to Mem. [Dkt. # 4-42] ¶ 11 ("My company will potentially lose the income

from nine elephant safaris this year due to the trophy importation ban."); Oosterhuis Decl., Ex. MM to Mem. [Dkt. # 4-43] ¶¶ 14–15 (reporting that he has tried to cancel two clients' hunts, is considering refunding his clients' money, and stating that "[a]t this point, I do not know what we will do"); De Vries Decl., Ex. SS to Mem. [Dkt. # 4-49] ¶ 14 (stating that about eighty percent of his hunting clientele is comprised of U.S. hunters and his business would lose approximately $500,000 if they all cancel).[7]   Outfitters also state that cancelled trips may be rebooked by hunters from other countries, so it is not even certain that cancelled trips will result in lost revenues.  *See*, *e.g.*, Pole Decl. ¶ 13 ("We will attempt to sell our elephant hunts to non-U.S. hunters if necessary."); Carter Decl. ¶ 18 ("[O]utfitters can and will attempt to book elephant hunts with hunters from countries other than the U.S."); Cooke Decl., Ex. QQ to Mem. [Dkt. # 4-47] ¶ 18 ("I will have to try to sell these hunts to citizens of other countries. . . . I believe that the European hunting market is weak, but Russia and especially China are strong, so I will try to sell the hunts there."); Duckworth Decl., Ex. RR to Mem. [Dkt. # 4-48] ¶ 15 ("We will obviously attempt to sell the elephant hunts to non-U.S. hunters . . . .").  Because the outfitters do not even know if their clients will cancel or if they will be replaced, their assertions of economic harm are speculative.

The Court appreciates that there may well be some loss of revenue if U.S. hunters with a particular interest in elephants change their plans.  *See* De Vries Decl. ¶ 15 ("We will never generate the same amount of revenue by selling the hunts to non-U.S. hunters, especially so late

7       Some declarants acknowledge that they do not even sell elephant hunts, which suggests any harm caused to their businesses will be minimal. Hurt Decl. ¶ 7 ("I guide 4-5 hunts each year in which the clients may be entitled to hunt for elephant (if they chose to take this option). We have not actively sold elephant hunts in recent times, as a management decision, in order to try to encourage the stewardship of older bull for the future."); Angelides Decl., Ex. YY to Mem. [Dkt. # 4-55] ¶ 13 ("I am not a big elephant outfitter, so the harm to my personal business will be minimal.  However, I am likely not going to pursue obtaining the rights to hunt in a new area for elephants, and my business will not grow.").

in the year.").  But because the import suspensions do not completely prohibit U.S. hunters from hunting African elephants in Zimbabwe or Tanzania, the Court finds that the economic harm arising from cancellations are not the direct result of the FWS import suspensions but rather of the hunters' independent decisions to cancel their hunts.

For all of these reasons, the Court finds that the economic harm alleged by plaintiff does not rise to the level of the irreparable harm needed to support extraordinary injunctive relief.

## CONCLUSION

For the reasons stated above, plaintiff's motion for a preliminary injunction [Dkt. # 4] is DENIED.


AMY BERMAN JACKSON
United States District Judge


DATE:   June 6, 2014

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| and | ) | |
| NATIONAL RIFLE ASSOCIATION OF | ) | |
| AMERICA | ) | |
| | ) | |
|      Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 14-cv-00670 (ABJ) |
| SALLY M. R. JEWELL, in her official | ) | |
| capacity as Secretary of the U.S. | ) | |
| Department of the Interior; | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| an agency of the United States; | ) | |
| DANIEL ASHE, in his official capacity as | ) | |
| Director of the U.S. Fish and Wildlife Service; and | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| an agency of the United States | ) | |
| | ) | |
|      Defendants. | ) | |

<u>**CIVIL NOTICE OF APPEAL**</u>

Notice is given on the 17th day of June, 2014, that Plaintiffs/Appellants, Safari Club

International and National Rifle Association of America[1] hereby appeal to the United States

Court of Appeals for the District of Columbia Circuit from this Court's Memorandum Opinion

and Order, entered June 6, 2014, denying Plaintiffs' Motion for a Preliminary Injunction (Dkt.

24).

Dated this 17th day of June, 2014.

Respectfully submitted,

/s/Anna M. Seidman

---

[1] National Rifle Association of America (NRA) joined the case as a plaintiff after Safari Club
International filed its Motion for Preliminary Injunction.

Anna M. Seidman
D.C. Bar No. 417091
Douglas Burdin
D.C. Bar No. 434107
501 2nd Street NE
Washington, D.C.
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org

*Counsel for Plaintiff/Appellant*
*Safari Club International*

Christopher A. Conte (DC Bar No. 43048)
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org

*Counsel for Plaintiff/Appellant*
*National Rifle Association of America*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of June, 2014, the foregoing document was filed with the Clerk of Court, causing it to be served on Defendants' counsel of record.

/s/Anna M. Seidman
Anna M. Seidman



Conserving the Nature of America External Affairs

Search

Search USFWS



- o **FWS Home**
  o **Newsroom Home**
  o **Offices**

◄ Back

Press Release
Service Suspends Import of Elephant Trophies from Tanzania and Zimbabwe

**April 4, 2014**

**Contacts:**

Gavin Shire
703-346-9123
gavin_shire@fws.gov

---

The U.S. Fish and Wildlife Service today announced a suspension on imports of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014. Questionable management practices, a lack of effective law enforcement and weak governance have resulted in uncontrolled poaching and catastrophic population declines of African elephants in Tanzania. In Zimbabwe, available data, though limited, indicate a significant decline in the elephant population. Anecdotal evidence, such as the widely publicized poisoning last year of 300 elephants in Hwange National Park, suggests that Zimbabwe's elephants are also under siege.

Given the current situation on the ground in both Tanzania and Zimbabwe, the Service is unable to make positive findings required under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) and the Endangered Species Act to allow import of elephant trophies from these countries. Additional killing of elephants in these countries, even if legal, is not sustainable and is not currently supporting conservation efforts that contribute towards the recovery of the species.

The decision to suspend the import of sport-hunted trophies from Tanzania and Zimbabwe applies to

elephants taken in 2014. The Service will reevaluate this suspension for calendar year 2015 or upon receipt of new information that demonstrates an improved situation for elephants in these countries.

Legal, well-regulated sport hunting, as part of a sound management program, can benefit the conservation of listed species by providing incentives to local communities to conserve the species and by putting much-needed revenue back into conservation. At this time, the Service does not have conservation concerns with African elephant sport hunting in Namibia, South Africa, or Botswana; though it should be noted that Botswana is not currently open to sport hunting.

For more information, please visit www.fws.gov/international/permits/by-activity/sport-hunted-trophies.html.

*The mission of the U.S. Fish and Wildlife Service is working with others to conserve, protect, and enhance fish, wildlife, plants, and their habitats for the continuing benefit of the American people. We are both a leader and trusted partner in fish and wildlife conservation, known for our scientific excellence, stewardship of lands and natural resources, dedicated professionals, and commitment to public service. For more information on our work and the people who make it happen, visit www.fws.gov.*

*For more information on our work and the people who make it happen, visit http://www.fws.gov/. Connect with our Facebook page, follow our tweets, watch our YouTube Channel and download photos from our Flickr page.*

U.S. Fish and Wildlife Service Home Page | Department of the Interior | USA.gov |
About the U.S. Fish and Wildlife Service | Accessibility | Privacy | Notices | Disclaimer | FOIA

## Suspension of Import of Elephant Hunting Trophies
## Taken in Tanzania and Zimbabwe in 2014

### Questions & Answers

### UPDATED ON 4/22/14

*On April 4, 2014, the U.S. Fish and Wildlife Service (Service) announced a suspension of imports of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014. Although initially covering the entire year for both countries, the Service has revised the suspension to allow the import of legally taken elephant trophies from Zimbabwe if the importer can demonstrate that it was taken prior to the date of the finding leading to the suspension, which is April 4, 2014. Zimbabwe allows hunting year-round, so some hunters had actually hunted an elephant in that country in 2014 before the Service announced the suspension. Tanzania's hunting season does not begin until July 1st.*

**Why has the Service made this decision?**

Questionable management practices, a lack of effective law enforcement, and weak governance have resulted in uncontrolled poaching and catastrophic population declines in Tanzania. For example, the Selous, Africa's largest protected area, has lost 66 percent of its elephants in the past five years.

In Zimbabwe, available data, though limited, indicate a significant decline in the elephant population, while anecdotal evidence, such as the widely publicized poisoning of 150 to 300 elephants last year in Hwange National Park, suggests that Zimbabwe's elephants are also being impacted by the ongoing poaching crisis. The information readily available to us on the status of Zimbabwe's elephant population, management plans, hunting policies and regulations is limited. However, the information that we have raises significant concerns about the long-term survival of elephants in Zimbabwe.

Sport hunting, as part of a sound management program, can provide benefits to conservation. Yet, given the current situation in Tanzania, and given the uncertainty with regard to elephants in Zimbabwe, the Service is not assured that the benefits of sport hunting will be realized in those countries. Further, the Service is concerned that additional killing of elephants in Tanzania, even if legal, is not sustainable at this time, and the same may be true for Zimbabwe.

**Does the Service plan to shut down all sport-hunting of African elephants?**

No. Legal, well-regulated sport hunting, as part of a sound management program, can benefit the conservation of listed species by providing incentives to local communities to conserve the species and by putting much-needed revenue back into conservation. At this time, the Service does not have conservation concerns with sport hunting of African elephants in Namibia, South Africa, or Botswana, though it should be noted that Botswana is not currently open to sport hunting.

Hunters should choose to hunt in countries that have only strong governance, sound management practices, and healthy elephant populations.

**I hunted an elephant in Tanzania or Zimbabwe *prior* to 2014, but have not yet imported the trophy. Will I be able to do so?**

Yes. The decision to suspend the import of sport-hunted trophies from Tanzania applies only to elephants hunted in calendar year 2014. For Zimbabwe, the decision to suspend the import of trophies applies only to elephants hunted on or after April 4, 2014. If you plan to import an African elephant sport-hunted

trophy from either of these countries, you will need to provide documentation that the elephant was hunted prior to the effective date of this decision (January 1, 2014, for Tanzania; April 4, 2014, for Zimbabwe).

**I have already purchased a hunt in Tanzania or Zimbabwe.  How do I get my money back?**

We encourage you to contact your hunting outfitter to discuss options.  While you can still participate in a hunt in 2014, you currently are not able to import the trophy.  In addition, given the current conservation concerns for elephants in Tanzania and Zimbabwe, we strongly advise that you reconsider taking part in an elephant hunt in either of these countries at this time

**When will the Service reevaluate the suspension on imports of sport-hunted African elephant trophies from Tanzania and Zimbabwe?**

The findings for Tanzania are made on an annual basis.  We will reevaluate the situation in Tanzania for elephant trophies taken in calendar year 2015.  If the Service receives information that indicates a significant improvement for elephants in this country, or that the information on which we based the suspension was incomplete or inaccurate, we could reevaluate the suspension prior to 2015.

For Zimbabwe, we currently do not have sufficient information to make a positive finding under the Endangered Species Act (ESA). We are actively working with the Government of Zimbabwe, as well as a number of non-government agencies, to obtain additional information.  If this information demonstrates that elephant hunting in Zimbabwe during 2014 does meet the criteria under the ESA, we will be able to lift the suspension and allow imports of 2014 trophies.

**An import permit is not required to import an elephant trophy from Zimbabwe into the United States.  What authority does the Service have to restrict imports, and how would the restriction be enforced?**

African elephants from Zimbabwe are included in CITES Appendix II for the purpose of non-commercial trade in hunting trophies, among other things.  As with all CITES Appendix-II specimens, an import permit is not required.  However, the listing of African elephants under the Endangered Species Act (ESA) contains a provision that requires the Service to make a determination that the import of an elephant trophy would enhance the survival of the species.  The Service must make this enhancement finding to be able to allow the import of an African elephant trophy from any country. With the 2014 suspension of imports, the Fish and Wildlife Service Office of Law Enforcement would either refuse entry or seize any elephant trophy from Zimbabwe that was hunted on or after April 4, 2014 at the time of import. By announcing this suspension before trophies are sent to the United States, the Service hopes to avoid having to refuse or seize shipments upon importation.

**Where should I send additional questions?** If you have specific questions regarding the import of sport-hunted trophies, please send an email to managementauthority@fws.gov or call 1-800-358-2104.

For additional information on these decisions, please refer to the following web links:

- Zimbabwe - U.S. Endangered Species Act enhancement finding  posted at http://www.fws.gov/international/pdf/enhancement-finding-2014-elephant-Zimbabwe.PDF
- Tanzania - CITES non-detriment finding posted at http://www.fws.gov/international/pdf/non-detriment-finding-2014-elephant-Tanzania.pdf; U.S. Endangered Species Act enhancement finding posted at http://www.fws.gov/international/pdf/enhancement-finding-2014-elephant-Tanzania.PDF

**From:** "Gabel, Roddy" <<u>roddy_gabel@fws.gov</u>>
**Date:** April 18, 2014 at 11:36:22 AM EDT
**To:** "Freeman, Nelson" <<u>NFreeman@safariclub.org</u>>
**Subject: Zimbabwe trophies**

Hello, Nelson,

I just left a message on your cell phone about this same matter, but want to make sure we reach you.

We have revised our April 4, 2014, finding for Zimbabwe elephant trophies so that now we will allow the import of any trophy taken in 2014 up until April 4.  The hunter will need to be able to demonstrate to our Office of Law Enforcement that the hunt occurred before that date in order to import the trophy.

I hope everyone understands as well that we are in contact with the Government of Zimbabwe, professional hunters, and others in Zimbabwe, and working through our embassy there, to get the most current information on African elephants in that country, including population status, poaching levels, how hunting programs are currently managed, etc.  If the information we are receiving addresses our concerns sufficiently and shows that hunting continues to be well managed, populations are stable, etc., we may lift the suspension of imports completely and continue to allow the import of all trophies legally taken in 2014.  We intend to conduct this review as quickly as possible and will get the word out once the review is completed.

If you have any other questions, please feel free to call me or contact Danielle Kessler (703-358-2644).

Regards,

Roddy

--
Robert R. Gabel
Chief, Division of Management Authority
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, Room 212
Arlington, Virginia  22203, USA
telephone:  +1 703 358 2498
fax:         +1 703 358 2280
<u>http://www.fws.gov/international/</u>

In Reply Refer To:
FWS/AIA/DMA

Memorandum

To:          The File

From:        Chief, Branch of Permits

Subject:     Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in
             Zimbabwe during 2014

[This finding was originally signed on April 4, 2014.  It was revised on April 17, 2014, for
clarification purposes, to make editorial corrections, and to revise the effective date such that the
effective date of the suspension is April 4, 2014.  Hunters who hunted an African elephant in
Zimbabwe in 2014 prior to April 4 may import their elephant trophy if they can provide adequate
documentation to show that the elephant was taken before the effective date of the suspension.]

The African Elephant (<u>Loxodonta</u> <u>africana</u>) is listed as threatened under the U.S. Endangered
Species Act with a special rule [50 CFR 17.40(e)].  The special rule gives the requirements for
the import of sport-hunted trophies, including marking requirements for ivory.  Under paragraph
17.40(e)(3)(iii)(C), in order for the U.S. Fish and Wildlife Service (Service) to authorize the
import of a sport-hunted elephant trophy, the Service must make a finding that the killing of the
animal whose trophy is intended for import would enhance the survival of the species in the wild.
 In evaluating the available data on elephant hunting in Zimbabwe, the Service does not have the
ability at this time to make a finding that the sport-hunting of African elephants and subsequent
imports would meet the enhancement requirements.  Therefore, the Service is ***unable to find*** that
the killing of an elephant in Zimbabwe during the 2014 hunting season for the purpose of
importing into the United States will enhance the survival of the species.

<u>General considerations</u>:

In evaluating whether sport-hunting is contributing to the enhancement of African elephants
within a country, the Service looks at a number of factors.  The Service evaluates whether a
country has a valid national or regional management plan and if the country has the resources and
political will to enact the plan.  Does the plan have clear, achievable objectives?  If there is a
plan, what government entities implement the plan and how often is it reviewed and updated?  Is
there an adaptive management approach within the management plan so that enacting agencies
can quickly respond to changing environmental or social issues?

The Service also evaluates the status of the elephant population and trends over time.
Particularly, we are interested in population numbers, sex and age-class distribution, and
mortality rates (both natural and man-induced).  Are standardized surveys being conducted and,

if so, what are the timing, census methodology, and coverage?  Since elephant populations can move across international borders, what level of cooperation is there between neighboring countries in management and surveying efforts for shared populations?  How is poaching accounted for within survey efforts?

As with any wildlife species, the policies on how the central and regional governments address management efforts, human-elephant conflicts, poaching, and sport-hunting greatly affect the long-term survival of elephant populations.  While recognizing that there may be limited resources available for elephant management, the Service considers what national policies are in place to address human-elephant conflicts and problem elephant control.  Is there a policy on culling surplus animals and removal of nuisance animals?  Is there domestic harvesting of elephants for local consumption or use?  The amount of protected area either set aside for elephants or managed for elephant populations and the level of protection provided is also important in the Service's ability to determine whether imports of trophies could be authorized.

Finally, the Service considers how sport-hunting has been incorporated into national/regional management strategies and the effectiveness of implementing hunting programs.  Are sufficient funds to address management needs generated through the hunting program?  Are the funds dedicated to management efforts or do they go to a general treasury fund?  How are hunting quotas distributed?  If there are concession areas, how are they managed and allocated?

Basis for Finding for Zimbabwe:

Information received from the Zimbabwe Parks & Wildlife Management Authority (ZimParks), previously Department of National Parks & Wild Life Management (DNPWLM), has been very limited since 1997.  Through the CITES Secretariat, we have confirmed that the sport hunting of elephants continues to be authorized for non-commercial purposes.  An Elephant Management Plan was provided to the Service in 1997, but we have not been informed of any change, modification, or adaptive management since that date.  The Service has sent letters to the Zimbabwe wildlife authorities on several occasions, most recently on March 21, 2007, requesting information on the management plan, population status, hunting policies and regulations, and conservation programs. We received a response consisting of three undated and unsigned papers, which seemed to rely on somewhat dated information.  Since 2007, we have received no additional updates.  Service representatives have met in person with Zimbabwe representatives at various times in the past 6 years, usually in the context of annual meetings hunting organizations in the United States.  Little new or additional information has been provided during those meetings.  We have received recent information to indicate that ivory poaching has been taking place in various areas of the country.  Most recently, it has been widely publicized in 2013, that over 300 elephants were poisoned and their ivory removed in Hwange National Park leading to a number of arrests.  There also appears, based on the media and CITES documentation, to have been an increase in human-elephant conflicts due to an increasing human population and settlement or re-settlement into elephant habitat.

***Management Plan:*** As stated, the Division of Management Authority (DMA) requested an update of the Zimbabwe management plan on March 21, 2007.  The information received in response to

64

that letter did not indicate any significant change to the "Elephant Population Status in Zimbabwe" (management plan included) which we received in response to our July 2, 1997 request.

The elephants range is classified into four major sub-regions. They are the Matebeleland north-west, Mid Zambezi Valley, Sebungwe, and South-East Lowveld. There have been concerns that high elephant concentrations have had a great impact on Savanna ecosystems within Zimbabwe. In 1975, Zimbabwe passed the Parks and Wild Life Act that established National Parks to preserve and protect wildlife and plants and to maintain ecological stability. Until 1989, DNPWLM managed elephant densities in protected areas through culling operations. This practice was drastically reduced due to lack of funds and possibly due to negative public opinion. In 1992-1993, Zimbabwe experienced a major elephant die-off in the Lowveld region due to severe drought conditions. A major culling operation was resumed in this area where 350 elephants were culled. In addition, DNPWLM conducted a translocation operation where 1,400 elephants were translocated to private conservancies and about 200 were translocated to South Africa to stock a new Game Park. Despite these efforts to reduce the Lowveld population, 1,500 elephants died due to natural mortality.

Under the Parks and Wild Life Act, as amended on August 1, 1991, elephants are afforded the highest level of legal protection in National Parks where the killing of elephants is undertaken only as a management tool to protect habitat. Other range areas available to the elephant include Safari areas, Communal land, and Private land where sustainable recreational hunting is permitted. The sale and purchase of live animals or trophies in these areas is subject to a permit, and hunting on state land also requires a permit.

On Communal lands, the protection of elephants falls under the Communal Areas Management Programme for Indigenous Resources (CAMPFIRE) program, which encourages reductions in human-elephant conflicts through conservation-based community development. The program was established in 1989 as a means of providing an economic incentive and return to rural communities while encouraging tolerance for the elephant and sustainable use of natural resources. Under this program there are currently 29 Rural District Councils (RDCs) that have been granted Appropriate Authority status under the Parks and Wild Life Act. There are approximately 13 RDC's with exploitable wildlife resources that make up the core of the CAMPFIRE program. Revenue generated through sport hunting is spent according to decisions taken by RDCs and their constituent Communities. ZimParks provides guidelines for the distribution of these funds between administrative costs, cost of wildlife management, and returns to communities in wildlife areas.

The CAMPFIRE program has come under criticism relating to excessive retention of generated funds by district councils which resulted in diminished benefits being realized by the communities it was designed to help. Information supplied by the CAMPFIRE Association to the CITES Panel of Experts in 2013 indicates that this situation may be improving. We have received no recent updates to add to this finding.

***Population Status***: According to the IUCN SSC African Elephant Database report "2013Africa", the elephant population in Zimbabwe in 2007 was 84,416, but as of 2013 that population had been reduced to 47,366, which include only 304 animals counted by aerial or ground counts, 41,840

through sample counts or dung counts and the remainder guesses. However, until very recently, the government continues to provide population estimates exceeding 100,000 elephants. In recent news articles in September of 2013 ZimParks spokesperson Caroline Washaya-Moyo stated that the country's elephant population was 100,000 strong and becoming too large to manage. Similar statements estimating the population at 120,000 were made by the same individual in interviews related to the Hwange poisoning event.

The summary in the IUCN report indicates that, of recent surveys, only about 1% of the country has been covered by aerial or ground surveys for population estimates, while about 50% was covered by sample counts or dung counts. For a substantial portion of the country, there have been no recent surveys and most estimates are based on 2001 figures. Even problem areas such as Hwange National Park do not appear to have been surveyed since 2001. Several areas that were covered in the current surveys (2006 – 2010) indicate that there has been a substantial decline in the population, whether related to habitat degradation or poaching is unknown.

Figures presented at the 16th Meeting of the Conference of the Parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora in Bangkok, Thailand, March 3-14, 2013, indicates that, from 2002 – 2010, the percentage of illegally killed elephants (PIKE) in Zimbabwe was circa 24%, whereas in 2011 that number jumped to 67%. While the numbers for 2012 and 2013 are not yet available, the trend would indicate a higher percentage of illegal killings and a population in decline.

***Regulations and Enforcement:***  Under the Parks and Wild Life Act, Zimbabwe has regulations in place that provide substantial penalties for the unlawful possession of or trading in ivory. The first offense carries a minimum of 5 years and a maximum of 15 years in prison. The second offense carries a minimum prison term of 7 years and a maximum of 15 years. If properly enforced, these penalties should be sufficient to reduce the desire for poaching.

In 1993, "Operation Safeguard Heritage" was launched by the President of Zimbabwe which incorporated large numbers of army personnel along with Air Force support, the Zimbabwe Republic Police (ZRP), and ZimParks in a coordinated anti-poaching effort throughout the country. At the time, and possibly now, the overall anti-poaching manpower densities in protected areas stood at one game scout per 76 sq. km. The Investigations branch of the ZimParks was 9 officers and 7 game scouts based in Harare, Bulawayo, Mutare, Kariba, Hwange, and Beitbridge. The ZRP had a support unit of 112 men which assist anti-poaching programs in the districts of Makuti, Mashumbi Pools, Binga, and Hwange. Elephants located in communal lands come under the protection of the CAMPFIRE program. Currently, it is not clear if these numbers have been increased or held steady.

However, based on the limited information the Service currently has, the ZimParks operational budget allocation from the central government has been severely reduced since its inception. In 1997, the law enforcement expenditure was equivalent to $49.00 spent per sq. km on the elephant range, greatly reducing enforcement capabilities. The status of ZimParks changed in January 1996, when the Government of Zimbabwe approved the establishment of the Parks and Wild Life Conservation Fund, a statutory "Fund" responsible for financing operations directly from wildlife revenues. However, only revenues generated through sport-hunting conducted on state and private

lands are used to finance ZimParks and to our knowledge, no other government funding is provided. The 2013 CITES Panel of Experts raised concerns as to the status of ZimParks relating to its weak financial base, lack of management skills, inadequate and old equipment, and poor infrastructure.  We have no current information as to the funding level of ZimParks or any indication that the financial base, management skills, equipment, or infrastructure have changed.

At the 15th Meeting of the Conference of the Parties to CITES, a report on the Elephant Trade Information System (ETIS) was presented (CoP15 Doc. 44.1 Annex).  In the report, Zimbabwe was specifically identified in regards to management issues and illicit ivory trade.  The report noted the existence of organized criminal activities within Zimbabwe, including reports of the involvement of politicians, military personnel, and Chinese nationals in illicit wildlife trade (Anon. 2009a, 2009b).  The report goes on to state that the law enforcement effort ratio within the countries grouped for the analysis had dropped to 40%, a decline of 4% from the CoP14 analysis. This declined indicates a less than average performance and was attributed to the situation in Zimbabwe.

***Sustainable Use*:** The CITES Secretariat has provided current documentation that Zimbabwe has established a quota of 500 elephants (1000 tusks) for the 2014 hunting season. These quotas are established each year by ZimParks apparently based upon standardized aerial surveys and analysis of biological data collected from hunts in determining the sustainability of offtake.

There are six categories of offtake monitored by ZimParks which include: Cropping (meat supply to rural communities and live animals to breeders), Natural Mortality (found dead of natural causes), Accidents (killed by trains, landmines, or vehicles), Poaching (illegal take), Problem Animals (elephants destroyed to protect human life and property), Management Offtake (offtake due to other management decisions).  Cropping presumably includes sport hunting, though that is not specifically stated in any documents provided.

The principle form of utilization of the elephant in Zimbabwe is sport-hunting. These quotas are set to maximize the sustainable production of high quality trophies without detriment to the population. However, Zimbabwe has not indicated how the quotas are determined and what factors go into these decisions.  Clearly, the government's belief that they have a population of 100,000 elephants may result in the over-estimation of the sustainable offtake.  Under the CAMPFIRE program, rural communities should benefit from revenue generated by sport-hunting. With increased human-elephant conflicts on Communal lands, sport-hunting may be an important tool which gives these communities a stake in sustainable management of the elephant as a natural and economic resource.  However, without current information on how funds are utilized and the basis for hunting off-takes, the Service is unable to confirm this assumption.

***CITES Implementation*:** The Control of Goods (Import and Export) (Wildlife) Regulations of 1982, and the Parks and Wild Life Act of 1975 as amended on August 1, 1990, allow for the implementation of the provisions of CITES in Zimbabwe. All exports of sport-hunted trophies from Zimbabwe should conform with CITES regulations.

***Summary*:** Based on the available survey information publicly available, the elephant population in Zimbabwe has declined from 84,416 elephants in 2007 to 47,366 elephants in 2012.  There

appears to have been virtually no annual elephant population surveys for many years, with the government depending on past surveys and anecdotal information to make decisions. We have no current information to indicate how sport hunting quotas are determined, even though Zimbabwe maintains the highest export quota in Africa. The current poaching problem does not appear to be under control or even acknowledged. Finally, the information available to the Service does not indicate that the current offtake of elephants in Zimbabwe is sustainable.

The most significant aspect of our analysis is the lack of recent data on what is occurring in Zimbabwe. Without current data on population numbers and trends, government efforts to manage elephant populations, address human-elephant conflicts and poaching, and the state of the hunting program within the country, it is not possible for the Service to make a positive finding that sport-hunting is enhancing the survival of the species and that imports of trophies would meet the criteria established under the ESA for African elephants. Therefore, at this time, we are unable to find that the killing of elephants intended for import as sport-hunted trophies from Zimbabwe will serve to enhance the survival of the species. The Service will attempt to reestablish better communications with Zimbabwe and look to partners, NGOs, and other entities in an effort to gather additional information to support a positive finding. Until such information can be obtained the Service is unable to make the positive finding required under the ESA and will not allow the import of sport-hunted elephant trophies taken in Zimbabwe after April 4, 2014. Until substantial new information is provided to the Service, U.S. hunters are on notice that, while no import permit is currently required for the import of sport-hunted trophies, such imports cannot occur at this time.

Anon. (2009a). Ministers in illicit rhino horn trade. Zimbabwe Standard, 11 July 2009.
Anon. (2009b). Mnangagwa police docket disappears. Zimeye, 13 July 2009.

# ZIMBABWE PARKS AND WILDLIFE MANAGEMENT AUTHORITY

Telephone : 263-4-792786-9
          : 707624-9

Fax       : 263-4-708180
          : 793867, 250658

Email     : info@zimparks.co.zw

*All correspondence to be directed to Director General*



**Head office**

Botanical Gardens
Cnr Borrowdale Rd/Sandringham Dr
P.O.Box CY 140
Causeway
Harare

www.zimparks.org

Ref: B/3/15

17 April 2014

Chief Branch of Permits

Division of Management Authority

U.S Fish and Wildlife Services

Washington, D.C 20240

USA

**ATTENTION:** Mr Timothy J. Van Norman

## RE: SUSPENSION OF IMPORT OF SPORT HUNTED AFRICAN ELEPHANT TROPHIES FROM ZIMBABWE

In response to your letter dated 4 April 2014, please find attached the Government of Zimbabwe's response to questions that you raised to address the USA Endangered Species Act Import Criteria of sport hunted African elephants trophies.

Please find enclosed various official papers and books on elephant management in Zimbabwe for your information.

Please feel free to contact us for any additional information and clarification.

E. Chidziya

**DIRECTOR GENERAL**

U.S. Fish and Wildlife Service
Division of Management Authority

## Questions to Address Endangered Species Act Import Criteria

**I. Management Plan** (a comprehensive plan addressing specific management goals or actions)

1. Does Zimbabwe have a current national management plan for African elephants?  If required under your national legislation, has the plan been approved by the appropriate government authorities?  It would be helpful if we could receive a copy of the ratified plan.  If there is no national plan, have regional plans been developed and adopted?  If so, how do these regional plans interact to provide a national management strategy?  Copies of such regional plans would also be helpful.

2. Is your agency the only agency that is responsible for administering the management plan(s)? If not, which other agency or organization within your national or regional governments is responsible?

3. Is the national plan(s) or are regional plans reviewed and updated on a regular basis?  If so, what process do you use to make any revisions?

4. A management plan could be very specific concerning the areas of management it addresses (i.e., hunting activities, human-elephant interactions).  What are the objectives of this plan(s) and is it designed to address specific management issues with measurable goals and outcomes?

5. Does the plan(s) cover specific regions of your country that are subject to hunting or is it inclusive of the whole country?

6. Have you developed a mechanism (i.e., adaptive management approach) for implementing the plan(s) and determining its effectiveness?  Could you describe how implementation of the plan is progressing and if there are management or logistical problems that still need to be addressed?

7. Are there any other management plans or conservation plans that contribute to or interact with the elephant management plan(s) (i.e., regional plans, hunting concession plans)?

## II. Population Status

1. What is the status of elephant populations within Zimbabwe (e.g., population numbers; population trends; sex and age class distribution)?

1

2.  Do you have a standardized process to conduct population censuses?  If so, how often?  What areas are surveyed?  Do they include all hunting areas?  What is the censusing methodology?

3.  What is the current population distribution within Zimbabwe (i.e., widespread, environmentally confined to specific areas, confined to national or regional protected areas)?

4.  It would be beneficial if you could provide population data, including population trend information and demographic data (i.e., age class distribution, sex ratios).

5.  African elephant populations move across international borders.  Such movement can have a significant impact on population numbers throughout the year.  How are transborder populations counted?

6.  Even with protection activities and legal intervention, poaching could still occur.  Do you have any estimates on the number of specimens lost to illegal killing annually?

7.  What impact are human-elephant conflicts having on local or national populations?  Is there a standardized national policy to address such conflicts and problem elephant control?  If so, does this policy include culling of surplus animals and removal of nuisance animals?  Is there domestic harvesting of elephants for local consumption or use?

## III. Conservation and Management

1.  How much national/regional/tribal land(s) have been set aside for wildlife conservation/protection purposes?  Are their national/regional/tribal laws or regulations that specifically protect these lands?

2.  How much habitat is available to elephants and does it receive effective protection?

3.  Please describe potential threats to the species, such as poaching and human-animal conflicts, and how these threats are being addressed.

4.  Is your agency currently conducting any research efforts addressing conservation issues involving elephants?  What about other agencies or departments within your national or regional governments and what are their roles?  Are you aware of any NGO projects currently underway in Zimbabwe that involve elephant conservation or management?  If so, could you describe such projects or provide contact information to the organization carrying out the work?

2

## IV. Hunting Policies/Regulations

1. Since Zimbabwe has an active sport-hunting program, please describe how this program functions.

2. Specifically, do you have an established national/regional hunting quota?  How is this quota determined?

3. There have been antidotal accounts, coming out of several southern African countries, of hunters exchanging smaller, less desirable tusks from their legally hunted trophies for larger tusks from government ivory stores.  What policies/regulations do you have that support or prohibit such activities?

4. What format do you use to manage sport hunting in Zimbabwe (i.e., establishment of national hunting districts under government control, awarding hunting concessions to privately owned operations)?

5. How are hunting areas/concessions allocated to safari outfitters, if at all?  If concessions are awarded, what requirements have been established for the concession holders (i.e., mandatory census activities, assistance to local villages, etc.)?  Are concessions awarded on an annual basis or for longer periods?  If concession areas are centrally controlled by your government (e.g., several outfitters hunt in the same areas and no one outfitter is responsible for overall management), what mechanism is used to monitor and control outfitters activities?

6. How much do hunting licenses cost foreign hunters?  How does your government utilize this revenue?  Does a percentage go directly back to elephant conservation efforts or into more general wildlife management efforts?  If so, what percentage is allocated to each?  Is any of this revenue provided to local communities?  If so, what percentage?

7. How does your government utilize revenue generated by hunting concessions?

8. How does the sport-hunting program provide any other tangible benefits, besides revenue, to local communities (i.e., increase employment, jobs in antipoaching units)?

9. Please provide a complete list of hunting concessions and their geographic areas of operation.

3

# ZIMBABWE PARKS AND WILDLIFE MANAGEMENT AUTHORITY

Telephone : 263-4-792786-9
          : 707624-9

Fax       : 263-4-708180
          : 793867, 250658

Email     : info@zimparks.co.zw

All correspondence to be directed to Director General



**Head office**

Botanical Gardens
Cnr Borrowdale Rd/Sandringham Dr
P.O.Box CY 140
Causeway
Harare

www.zimparks.org

---

Ref: B/3/15

17 April 2014

Chief Branch of Permits

Division of Management Authority

U.S Fish and Wildlife Services

Washington, D.C 20240

USA

**ATTENTION:** Mr Timothy J. Van Norman

## RE: SUSPENSION OF IMPORT OF SPORT HUNTED AFRICAN ELEPHANT TROPHIES FROM ZIMBABWE

In response to your letter dated 4 April 2014, please find attached the Government of Zimbabwe's response to questions that you raised to address the USA Endangered Species Act Import Criteria of sport hunted African elephants trophies.

Please find enclosed various official papers and books on elephant management in Zimbabwe for your information.

Please feel free to contact us for any additional information and clarification.

E. Chidziya

**DIRECTOR GENERAL**

73

# RESPONSE TO QUESTIONS RAISED BY THE UNITED SATES FISH AND WILDLIFE SERVICE TO ADDRESS THE USA ENDANGERED SPECIES ACT



## ZIMBABWE PARKS AND WILDLIFE MANAGEMENT AUTHORITY

**APRIL 2014**

# RESPONSE TO QUESTIONS RAISED BY THE UNITED STATES FISH AND WILDLIFE SERVICE TO ADDRESS THE USA ENDANGERED SPECIES ACT BY THE ZIMBABWE PARKS AND WILDLIFE MANAGEMENT AUTHORITY

## I.    MANAGEMENT PLAN

1. *Does Zimbabwe have a current national management plan for African elephants? If required under your national legislation, has the plan been approved by the appropriate government authority? It would be helpful if we receive a copy of the ratified plan. If there is no national plan, have regional plans been developed and adopted? If so, how do these regional plans interact to provide a national management strategy? Copies of such regional plans would also be helpful.*

Zimbabwe has a national management plan and policy for African elephant – Elephant Management in Zimbabwe and The Policy and Plan for Elephant Management in Zimbabwe. The plan was officially approved by the Minister of Environment and Tourism in 1997. Zimbabwe also implements the following plans, The African Elephant Action Plan, SADC Protocol on Wildlife, Elephant and Rhino Security Plan. In addition to the above, all the protected areas have specific aspects of elephant monitoring programs that are being implemented and reviewed on an annual basis. Information on the status of elephants is derived from surveys which include, aerial, water-hole, road strip, walking transects, visitor observations /sightings and ranger based monitoring. Through the Monitoring of the Illegal Killing of Elephants (MIKE) program in Chewore and Nyaminyami, Zimbabwe has also regularly been monitoring the status of the elephant populations including poaching. The MIKE program is providing valuable information on elephant poaching and has assisted the Authority in taking proactive action in anti-poaching and other law enforcement efforts. These efforts have resulted in successful arrests, recoveries and prosecutions of poachers. Statistics from the MIKE program have enabled the Authority to collaborate with the Zimbabwe Republic Police, other law enforcement agencies, and protected area stakeholders such as the Forestry Commission, conservancies and safari operators. Deterrent sentences of 9 to 16 years have been meted out for elephant poaching. In addition, to the national elephant management

1

plan there are area specific elephant management plans such as in Save Valley, Malilangwe and Bubye Valley Conservancies.

Through the Trans-Frontier Conservation Areas (TFCA) initiative, Zimbabwe is jointly monitoring the status and distribution of the elephants with regional counterparts. The regional plans also strongly interact with the national management plans through shared databases, elephant monitoring platforms such as the MIKE Regional Database and the Elephant Trade Information System (ETIS). Please find attached a copy of Zimbabwe's Elephant Management Plan and The Policy and Plan for Elephant Management in Zimbabwe, Parks and Wildlife Act Chapter 20:14 as amended.

2. *Is your agency the only agency that is responsible for administering the management plans(s)? If not, which other agency or organization within your national or regional Governments is responsible.*

Yes, the Zimbabwe Parks and Wildlife Management Authority is the only legal agency, in terms of the Parks and Wildlife Act Chapter 20:14 as amended that is responsible for administering the management plan. The Authority supervises the implementation of the plan outside protected areas including communal areas, Conservancies, Forestry Commission area and private land.

3. *Is the national plan(s) or are regional plans reviewed and updated on regular basis? If so, what process do you use to make revisions?*

There is adaptive management of the elephant population in Zimbabwe. Aspects of the elephant management plan are reviewed through annual stakeholder consultative national workshops where Government Departments, NGOs, Local Communities, Safari Operators and the private sector participate. Regular reviews are also done in compliance with Resolutions from the relevant Meetings of Conference of Parties of the Convention on International Trade in Endangered Species of wild flora and fauna (CITES) and regional protocols. Zimbabwe is part of the SADC Protocol on Wildlife and Law Enforcement Co-operation, which meets regularly to review the implementation of the protocol. This protocol primarily addresses issues of rhino and elephant management including cross border poaching and joint surveys (Rhino And Elephant Security Group of Southern Africa, 2000).

4. *A management plan could be very specific concerning the areas of management it addresses (i.e., hunting activities, human-elephant interactions). What are the objectives*

*of this plan(s) and is it designed to address specific management issues with measurable goals and outcomes?*

The Elephant Management Plan recognizes that elephants comprise an important component of Zimbabwe's wildlife and cultural heritage and its goal to conserve elephants at levels which promote the goals of biodiversity conservation while ensuring sustainable use and contribution to national development. The document also reviews the past history of elephant management in Zimbabwe and outline future strategies. The primary focus is to maintain biodiversity through the conservation of ecosystems, species and ecological processes. The elephant is only one member of a whole complex of species which must be conserved but there is no doubt that elephants have a huge impact on the environment. With a certain level of impact, they may increase the heterogeneity in the structure and species composition of their habitats but when their impacts are so great as to make the habitat uniform(that is, remove all trees and keep all shrubs' pruned ' to a certain height) then the reverse is probably true. Of course there are different outcomes in different habitats, but the Parks and Wildlife Management Authority of Zimbabwe has decided to take a conservative stand and rather err on the side of caution. Thus it is preferred to keep elephant populations at densities which are likely to maintain or facilitate the regeneration of woodland and other vegetation including ecosystem functions and processes.

Yes, the objectives are designed to address specific management issues with measurable goals, specific management actions and outcomes and expected impacts. The three major objectives of Zimbabwe's Elephant Management plan are:
- Maintaining at least four demographically and genetically viable populations,
- Maintaining numbers and densities below levels which will not compromise biodiversity
- Maintaining or increasing elephant range at or above the 1996 level.

Zimbabwe also has areas with micro management plans which feed into the national elephant management plan as stated in question 1. These are Forestry Commission, Conservancies such as Malilangwe, Save Valley and Bubye Valley.

5. *Does the plan(s) cover specific regions of your country that are subject to hunting or is it inclusive of the whole country?*

The Elephant Management Plan covers the whole country including hunting and non-hunting areas. Please refer to 4 above.

6. *Have you developed a mechanism (i.e, adaptive management approach) for implementing the plan(s) and determining its effectiveness? Could you describe how*

3

*implementation of the plan is progressing and if there are management or logistical problems that need to be addressed?*

By adopting the principle of adaptive management, the Authority believes that, with continued monitoring of large mammal populations and vegetation, it is sensitive to changes in the status of either in order to make the appropriate responses. Zimbabwe has since 1980 been carrying out annual scientific aerial surveys in order to monitor populations of large mammals and especially elephants. The results of previous surveys are presented in the Elephant Management in Zimbabwe documents and enclosed Aerial Survey Reports. A vital part of the elephant management program in Zimbabwe is law enforcement. This activity has become increasingly difficult due to high levels of funding required for human resources and equipment for law enforcement research and monitoring. The Zimbabwe Parks and Wildlife Management Authority strictly enforces CITES regulations, and keeps tight controls on the trade in wildlife and wildlife products, as part of the country's ongoing commitment to elephant conservation. Currently the Authority is in the process of planning a national aerial survey in the dry season of 2014, the results of which will be availed before the end of 2014. The Authority has been unable to conduct national aerial survey due to severe resource constraints. Allocation of quotas in hunting areas is based on a consultative process that involves ZPWMA authorities, hunters, safari operators, local communities, land owners, researchers, and NGOs. The participatory approach ensures that the quotas allocated for each hunting area are sustainable.

7. *Are there any other management plans or conservation plans that contribute to or interact with the elephant management plan(s) (i.e., regional plans, hunting concession plans)?*

The Elephant Management in Zimbabwe document interacts with other policies and plans such the approved Rhino Policy and Management Framework (2011-2016), approved Lion Conservation Strategy and Action Plan, approved Zimbabwe Policy for Wildlife, approved Wildlife Based Land Reform Policy, approved Wildlife Resources Outside the Zimbabwe Parks Estate: A Management Policy Framework, National Conservation Action Plan for Cheetahs and African Wild Dogs in Zimbabwe, Environmental Management Act Chapter 20:27, Forest Act Chapter 19:05 and approved National Environmental Policy and Strategies. All concession plans are guided by Game Management Plans of specific areas and the Parks and Wildlife Act.

At the regional level, Zimbabwe together with other African elephant range States, is implementing the African Elephant Action Plan through CITES. Within Southern African Development Community (SADC), Zimbabwe is implementing the Regional Elephant Management Strategy through the Trans-frontier initiatives such as the Kavango-Zambezi (KAZA), Great Limpopo Trans-frontier Park, Greater Mapungubwe, Zimbabwe, Mozambique,

Zambia Trans-frontier Conservation Area and Mana Lower Zambezi Trans-frontier Conservation Area.

## II.    POPULATION STATUS

*1.  What is the status of elephant populations within Zimbabwe (e.g., population numbers; population trends; sex and age class distribution)?*

The elephant range in Zimbabwe consists of four major sub-regions commonly referred to as North West Matabeleland, Sebungwe, Zambezi Valley and South East Lowveld. This major range stretches across all land tenure categories which include Parks and Wildlife Estate, Indigenous forest areas managed by Forestry Commission, Communal land and privately owned farming areas. The estimated total range is 66 000km$^2$, of which 43, 650 km$^2$ is the Parks and Wildlife Estate. Over 90% of Zimbabwe's elephants are found in the Parks and Wildlife Estate (Figure 1).



**Figure 1:  Major elephant geographical ranges in Zimbabwe**

5

In Zimbabwe, elephants are regularly censured by the Zimbabwe Parks and Wildlife Management Authority in collaboration with the World Wide Fund for Nature and recently with the Frankfurt Zoological Society. The census utilises sample aerial strip and block count techniques. These techniques have been scientifically validated and are used throughout the elephant range in Africa. Elephant population estimates are also derived from surveys which include, water-hole, road strip, walking transects, visitor observation card reports and ranger based monitoring.

Trends in Zimbabwe's elephant population show a steady increase from 46 000 in 1980, 64 000 in 1995, 68 000 in 1998 and 89 000 in 2001. The last national survey of elephants and large herbivores covering all the sub-regions of the elephant range was conducted in 2001. Subsequent aerial surveys have been conducted for selected areas within the elephant range in 2005, 2006, 2009 and 2013. In 2001, the national elephant population was estimated at 88 123 with a 95% confidence interval of ±8%. An estimate of ±1 000 elephants was present in the areas within the minor range giving an estimate of 89 000 elephant in 2001. A steady increase in elephant populations have been observed in all the areas were the surveys have been carried out in the period after 2001.

**North West Matabeleland**

The largest elephant sub-population is found in North West Matabeleland in an area also commonly referred to as the Hwange-Matetsi Complex. This area includes protected areas managed by the Zimbabwe Parks and Wildlife Management Authority, indigenous forestry areas managed by the managed by the Forestry Commission including private and communal lands. The elephant population is contiguous with the Botswana sub-population. The survey results for the period 1980 to 2001 showed a growing population despite a total off-take of 11 956 elephants from population controls in the region between 1980 and 1989 (Booth *et. al*, 1997). In 2001, the elephant population in this sub-region was estimated at 49,310 +/- 12.3% (Dunham and Mackie, 2001). The average elephant population density was 2.9 elephants per km$^2$ in 2001. To date, this area has the highest elephant density than any other protected area in Zimbabwe. After 2001, the area was surveyed in 2006. The 2006 aerial survey however did not cover the entire Hwange Matetsi complex due to survey aircraft problems. The results from the 2006 survey estimated the elephant population at 25 087 elephants. In 2007, the sub-region was also surveyed. There were also technical problems related to the aircraft which delayed the start of the survey and the survey could not be completed due to the onset of the rains that affected elephant movements as well. The results from the 2007 survey estimated the elephant population at 39 765 (Dunham, Chimuti et al, 2007). All the results from the surveys show a growing trend in the elephant population.

Overall carcass ratios from the aerial surveys from 1995 to 2006 were generally low(less than 8%) indicating a low mortality in the population for the period under review. The slight increase in

6
**80**

carcass ratio in 2006 was due to the drought induced mortality in 2005 which significantly affected Hwange National Park population (Dunham, Chimuti et al, 2007).

Hwange National Park does not have perennial natural surface water supplies and depends on artificial supplies over most of the dry season. Water hole counts have been conducted annually in Hwange National Park. This method gives an index of abundance of elephants in the area. Results from the waterhole counts indicate a growing elephant population.

**The Mid-Zambezi Valley**

The Mid-Zambezi region is a significant part of the major elephant range in Zimbabwe. This population occupies largely the Parks and Wildlife Estate between Lake Kariba to Kanyemba and forms a larger part of a larger population that Zimbabwe shares with the Lower Zambezi National Park in Zambia and the Magoe in Mozambique. The area was surveyed in 2001, 2003, 2005, 2006, 2010 and 2011. The survey which covered the entire sub-region was conducted in 2001. Coordinated surveys in this region were undertaken in 2003 and 2005 with the support from the African Wildlife Foundation as through the Zambezi Heartland project. The 2003 aerial survey was not completed due to logistical constraints related to strong winds and only 8% of the survey was completed (Dunham 2003). In 2005, the population estimate was 30 209 +/- 21%, the highest ever for the region indicating that the population was increasing (Chimuti et. al, 2006).

Historically, this sub-population was subjected to high levels of illegal elephant killings (336 animals) during the period 1990-1999 when armed poachers switched from rhino to elephant poaching. The trend in poaching declined in 2000 when most of the notorious poachers were arrested or killed during the armed contacts with parks rangers.

Population reduction exercises were conducted during the period 1980 to 1992 when 5 190 elephants were culled (Booth et. al., 1997). The carcass ratio for the period 1995 to 1999 were also relatively high compared to the period post 1999. Recorded off-takes were low during the period 2000- 2006 with the exception of relatively high levels of drought induced mortalities in 2005 (Chimuti et. al, 2006).

In Mana Pools, annual waterhole counts have been conducted since 1995 in partnership with the Wildlife and Environment Zimbabwe and this methodology gives an index of abundance. The reports indicate a growing elephant population in the Mid to Lower Zambezi.

**Sebungwe**

The Sebungwe, unlike other elephant populations in Zimbabwe, this sub-region is largely closed being isolated by Lake Kariba, human settlement and areas of communal and commercial

agriculture (Fig 1). Within the sub-region, protected areas are relatively small occurring in a mosaic of communal lands. In 2001, the elephant population was estimated at 13 989. The average density in Chizarira National Park in 2001 was 2.4 elephants per km$^2$. The population estimate of 15 024 +/- 14.2% from the 2006 survey is the highest count achieved in the Sebungwe region (Dunham et. al., 2006).

Due to fact that the area surrounded by human settlements, there are high levels of human elephant conflicts reported in the area. Aerial survey reports also reflect a high carcass ratio in the area.

**South East Lowveld**

The South-East Lowveld elephant sub-population is centred on Gonarezhou National Park, Save Valley Conservancy and surrounding communal lands. Gonarezhou National Park has been regularly surveyed and the population trends show a steady increase. The elephant population estimate for Gonarezhou National Park was 6516 in 2007, 9123 in 2009 and currently it is estimated at 10151 (Dunham et al, 2013). The incidence of elephant poaching in Gonarezhou National Park is negligible, the elephant population is increasing.

The Save Valley Conservancy has been conducting annual aerial surveys since 2002. The population estimates for Save Valley Conservancy from the 2013 aerial survey is 1 538 elephants. Malilangwe and Chiredzi River Conservancies hold relatively small elephant populations and are part of the South-East Lowveld sub-population. The Malilangwe and Chiredzi River Conservancies have an estimate of 200 and 70 elephants respectively (South East Lowveld: Aerial Survey Report 2013). In Bubye Valley Conservancy, there is an estimate of 540 elephants and this is a growing population (South East Lowveld; Aerial Survey Report 2013). In Bubye Valley Conservancy there are no recorded cases of elephant poaching as this is a closed system.

The Save Valley Conservancy through funding from the United States Fish and Wildlife Service developed a management programme which includes the removal of approximately 60 elephants annually so as to maintain a population density of 0.3 elephants per km$^2$ with the objective of reducing elephant impacts on woodlands, and inter-specific competition, and also allowing continuous flow of benefits to conservancy members and surrounding communities. This programme is on-going and was last conducted in 2011 in the Save Valley Conservancy.

The data/information is numerous that Zimbabwe would like to invite USFWS to visit and work with ZPWMA official them to fill any gaps that might be apparent in this report. In addition, to the copies that have been submitted for your consideration there are various other data sources on elephant management in Zimbabwe. The visit will also provide an opportunity for field experiences and a better appreciation of elephant and general wildlife management issues and strategies that are being implemented by the Government of Zimbabwe.

2. *Do you have any standardized process to conduct population census? If so, how often? What areas are surveyed? Do they include all hunting areas? What is the censusing methodology?*

Yes, Zimbabwe has a standardized process to conduct elephant population censuses. The primary objective of aerial surveys is to provide precise estimates of the number of elephants in a region. Secondary objectives include determining the spatial distribution of elephants, estimating the number and distribution of elephant carcasses and estimating the numbers and spatial distribution of other herbivores. The methods used are technically robust and are identical to those used in previous surveys for comparability during analysis of results.  Elephants and other large herbivores in all land tenure categories are surveyed from the air in the dry season from August to September. Fixed wing aircraft are used to conduct sample surveys flying transects and in hilly areas, block count techniques are conducted. In order to maintain uniformity and comparability in the surveys over different years, MIKE Standards for aerial surveys are used (Aerial Survey Standards for the MIKE Programme Version 2.0, 2012).

In previous years, aerial census techniques that were used in Zimbabwe were initially developed in East Africa (Jolly 1969; Norton Giffiths, 1978) and were been refined over the years in Southern Africa.  In addition to counting live elephants, elephant carcasses are also counted to gain knowledge of mortality in the population. Carcass ratios (as percentages) are calculated from the counts. A carcass ratio of less than 8% is normal for a population which is stable or growing (Douglass- Hamilton & Hillman, 1981).

The validity of the Zimbabwean census techniques was confirmed by Dr. I Douglas- Hamilton (1995) who conducted independent surveys of Gonarezhou in 1995 and produced a similar estimate to the one obtained by the then Department of National Parks and Wildlife Management (DNPWLM) ELESMAP funded survey. He also confirmed that techniques used in Zimbabwe were satisfactory, and similar to aerial sample counts used throughout Africa (Douglas-Hamilton, 1995). A review by Price Waterhouse 1995 also established the validity of estimates obtained elsewhere in the country over a period of 15 years.

Elephant numbers throughout the four major geographical ranges in all land tenure categories including hunting areas are regularly censused by the Zimbabwe Parks and Wildlife Management Authority (ZPWMA) and Wild Wide Fund (WWF) Southern African Regional Programme Office (SARPO) under a collaborative agreement dating back to 1989. Since 2008, the Authority has collaborated with the Frankfurt Zoological Society in conducting aerial surveys in Gonarezhou National Park. Organisations that have supported the programme include USAID (1989 to 2001), EU through the Elephant Survey and Mapping (ELESMAP) project (1992 to 1995), the African Wildlife Foundation (2003 to 2005), and the US Fish and Wildlife Services (2006) including the Frankfurt Zoological Society in Gonarezhou National Park since 2008.

3.  *What is the current population distribution within Zimbabwe (i.e., widespread, environmentally confined to specific areas, confined to national or regional protected areas)?*

There are four major elephant geographical ranges in Zimbabwe and these are North-West Matebeleland, Mid Zambezi Valley, Sebungwe and South East Lowveld (Figure 1). These ranges cover all different land tenure categories in Zimbabwe which include Parks Estate, privately owned land, communal lands, and the indigenous forest areas managed by the Forestry Commission of Zimbabwe. Table 1 below shows the land categories and their total area in km$^2$ as well as the current population sizes of these areas.

**Table 1: Land categories and area (km$^2$) and total elephant populations in Zimbabwe**

| Sub-region | Land category and area (km$^2$) | | | | Total |
|---|---|---|---|---|---|
| | Parks estate | Communal lands | Forests | Private land | |
| N-W Matebeleland | 19,618 | 3,110 | 2,344 | - | 25,072 |
| Mid-Zambezi Valley | 13,371 | 3,756 | - | - | 17,127 |
| Sebungwe | 5,842 | 9,500 | 270 | - | 15,612 |
| S-E Lowveld | 5,125 | 221 | - | 3,484 | 8,830 |
| Total | 43,956 | 16,587 | 2,614 | 3,484 | 66,641 |
| Percentage of Total | 66 | 25 | 4 | 5 | 100 |

*Source: Dunham and Mackie (2001), Dunham et. al (2006a and b)*

4.  *It would be beneficial if you could provide population data, including population trend information and demographic data (i.e., age class distribution, sex ratios).*

The following Tables show elephant population trends for the four elephant ranges of Zimbabwe from 1980 up to the year 2013. Table 2 and 3 show results from aerial surveys carried by the Zimbabwe Parks and Wildlife Authority. Table 4 shows trends in elephant populations in specific areas that have been surveyed regularly in the period under review.

There is a steady increase in population estimates from 1980 to date in most of the areas in the elephant range.

**Table 2: Elephant population trends per region (1980 to 2001)**

| REGION | 1980 | 1983 | 1989 | 1993 | 1995 | 2001 |
|---|---|---|---|---|---|---|
| North-West Matabeleland | 20 444 | 25 888 | 27 411 | 27 841 | 30 985 | 49 310 |
| Sebungwe | 11 126 | 9 302 | 12 946 | 10 742 | 11 796 | 13 989 |
| Zambezi Valley | 10 152 | 9 907 | 13 029 | 14 361 | 16 842 | 19 297 |
| Gonarezhou | 4 704 | 3 985 | 5 286 | 5 241 | 4 156 | 4 992 |
| **TOTAL** | **46 426** | **49 082** | **58 672** | **58 185** | **63 779** | **88 123** |

**Source: Aerial Survey Reports**

There is an increasing trend in elephant population estimates since 1980 as shown in the Table above. Generally, Zimbabwe's elephant population has increased from less than 4 000 in the early 1900 to over 89 000 in 2001 (Cumming and Jones, 2005). This is an indicator of remarkable conservation success by any standards.

**Table 3:  Current elephant population**

| | GONAREZHOU NATIONAL PARK | | | | |
|---|---|---|---|---|---|
| | 2001 | 2007 | 2009 | 2011 | 2013 |
| Elephant | 4992 | 6516 | 9123 | 11025 | 10151 |

**Source: Aerial survey reports**

As shown in Table 3 the increasing trends in elephant population in Gonarezhou National Park clearly demonstrate good and sustainable management practices which have been able to sustain hunting in adjacent areas such as Malipati Safari area, Chiredzi CAMPFIRE areas namely Chibwedziva, Sengwe, Mahenye and Gonakudzingwa. On average 40 elephant bulls are harvested outside Gonarezhou National Park annually.

11

5. *African elephant populations move across international borders. Such movements can have a significant impact on population numbers throughout the year. How are trans-boundary populations counted?*

Elephant numbers throughout the four major geographical ranges in Zimbabwe are regularly censured by the Zimbabwe Parks and Wildlife Management Authority (ZPWMA) and Wild Wide Fund (WWF) Southern African Regional Programme Office (SARPO) under a collaborative agreement dating back to 1989. Systematic aerial sample techniques are used to conduct these elephant surveys. Organisations that have supported the programme include USAID (1989 to 2001), EU through the Elephant Survey and Mapping (ELESMAP) project (1992 to 1995), the African Wildlife Foundation (2003 to 2005), and the US Fish and Wildlife Service (2006).

The elephant population in North West Matabeleland is contiguous with the Botswana elephant population > 140 000 elephants and is thus part of the largest single population of elephants in Africa. During the ELESMAP project (1992 to 1995) aerial surveys were synchronised in terms of timing and the results show that there was no evidence of any large scale cross boarder movements during the dry season when these surveys were conducted.

Through the Trans-Frontier Conservation Areas (TFCA) initiative, Zimbabwe is jointly monitoring the status and distribution of the elephants with regional counterparts. The Trans-frontier initiatives include such as the Kavango-Zambezi (KAZA), the Great Limpopo Trans-frontier Park, the Greater Mapungubwe, the Zimbabwe-Mozambique –Zambia (ZIMOZA) Trans-frontier Conservation Area and the Mana Lower Zambezi Trans-frontier Conservation Area.

Zimbabwe will be collaborating with regional countries in the preparation for the "Great Elephant Census" in the dry season of 2014 whose results will be available by the end of 2014.

6. *Even with protection activities and legal interventions, poaching could still occur. Do you have estimates on the number of specimens lost to illegal killing annually?*

The following are total estimates of the number of elephants poached in Zimbabwe. The 2013 figure includes the 105 elephants that were poisoned in Hwange National Park.

**Elephant Poaching Statistics: 2009 to 2013**

| Year | 2009 | 2010 | 2011 | 2012 | 2013 |
|------|------|------|------|------|------|
| **Number of elephants poached** | 145 | 77 | 223 | 212 | 293 |

12

It is however important to note that although the trends in poaching have increased in recent years, the impact of poaching on the national elephant population is not significant.

The Government of Zimbabwe reacted swiftly to the unprecedented elephant poisoning incident in Hwange National Park in 2013. A private sector driven fund raising initiative was set up which has to date managed to mobilize 21 vehicles, communication and field equipment for enhanced law enforcement. The ZPWMA has increased manpower level for Hwange and other protected areas through a massive recruitment drive. The police and the judiciary also actively collaborated with the ZPWMA in apprehending all 35 poachers that were involved in the elephant poisoning. Other strategies included awareness campaigns, collaboration with universities and research institutions, enhanced intelligence gathering, vehicular aerial surveillance and patrols including clean up and decontamination of affected areas and other measures.

**Summary of arrests and prosecution of elephant poaching cases for period between 2011 and 2013**

| Item | 2011 | 2012 | 2013 |
|------|------|------|------|
| Accused arrested | 144 | 167 | 134 |
| Poachers killed | 6 | 4 | 1 |
| Accused prosecuted | 144 | 83 | 77 |
| Accused acquitted | 10 | 6 | 3 |
| Zambians arrested | 1 | 4 | 1 |
| Chinese arrested | 0 | 0 | 6 |
| Mozambicans arrested | 2 | 1 | 0 |
| Firearms recovered | 29 | 25 | 16 |
| Ammunition recovered | 195 | 454 | 133 |

In addition to the successful arrests and prosecutions of elephant poachers, the Zimbabwe Parks and Wildlife Management Authority raised awareness among law enforcement agencies, the judiciary and private sector in efforts to build partnerships and prioritize elephant poaching and ivory smuggling. Combined operations within and outside protected areas were enhanced with remarkable success. The Table above reflects achievements of joint law enforcement teams in arresting and prosecuting elephant poachers. The provision of a mandatory imprisonment of not less than nine years crimes as provided for in the General Laws Amendment Act (No.5) of 2010 ensures deterrent sentences for poaching.

7. *What impacts are human-elephant conflicts having on local or national populations? Is there a standardized national policy including culling of surplus animals and removal of nuisance animals? Is there domestic harvesting of elephants for local consumption or use?*

Human / elephant conflict is also on the increase in most of the areas adjacent to the major elephant range. The table below indicates the extent of human elephant conflict in four hot spot districts for the period 2009 to 2011.

**Human elephant cases for 4 Hot Spot Districts from 2009 to 2011**

| District | Number of cases | Human killed | Humans injured |
|----------|-----------------|--------------|----------------|
| Binga | 36 | 8 | 0 |
| Mbire | 6 | 5 | 1 |
| Hwange | 289 | 2 | 1 |
| Tsholotsho | 41 | 0 | 0 |
| Total | 372 | 15 | 2 |

14

It is important to note that not all incidences of human elephant conflicts are reported as CAMPFIRE staff lack the capacity to attend every report.

In addition to the loss and injury to human life communities adjacent to wildlife areas suffer the following;

- Destruction of crops which affects both the quality and quantity of harvests and impacting negatively on food security;
- Destruction of property;
- Depletion of water sources;
- Destruction of water infrastructure;
- Reduced grazing land;
- Restricted access to essential commodities such as firewood;
- Loss of opportunities to carry out other activities due to time spent guarding crops and property.

The Zimbabwe Policy for Wildlife (2000) provides guidelines on how to manage human elephant conflicts. In cases were wildlife including elephants pose a threat to human life they are removed however the impact of this form of problem animal management is very insignificant on the national elephant population (Zimbabwe Policy for Wildlife, 2000).

In addition to problem animal management, other very low elephant off takes are for training of ZPWMA staff and professional hunters on how to handle dangerous game.

Save Valley Conservancy has a separate elephant management plan for its closed elephant population. The elephant population is increasing in this closed system. Culling is done on an annual basis as a management tool to control the elephant population. On average 60 elephants are harvested during this exercise. The last culling was done in 2011. The meat is distributed to the local community.


## III.    CONSERVATION AND MANAGEMENT

1. *How much national/regional/tribal land(s) have been set aside for wildlife conservation/protection purposes? Are there national/regional/tribal laws or regulations that specifically protect these lands?*

The Parks and Wildlife Act Chapter 20:14 as amended legally defines six categories of Protected Areas under the jurisdiction of the ZPWMA. The six categories are National Parks, Safari Areas, Recreational Parks, Botanical Reserves and Gardens and Sanctuaries and in total cover about 13% of the country (5 million hectares). The same Act recognises any land that is being used for wildlife conservation and designates the legal occupant of that land as Appropriate Authority. On

15

communal lands/tribal Appropriate Authority is accorded to the Rural District Council. Appropriate Authority is the legal right to utilize and manage wildlife on the property under community jurisdiction. In addition to the Parks and Wildlife Estate there are other wildlife areas under government agencies such as (Forestry Commission, Cold Storage Commission, Agricultural Rural Development Authority and Ministry of Agriculture) and Communal/tribal land, Conservancies and Private land. Approximately 29% of the total land mass of Zimbabwe is under one form or another of wildlife management as a land use category.

## 2. *How much habitat is available to elephants and does it receive effective protection?*

As alluded to in Question 1, the Parks and Wildlife Act Chapter 20:14 as amended legally defines six categories of Protected Areas under the jurisdiction of the ZPWMA. The six categories are National Parks, Safari Areas, Recreational Parks, Botanical Reserves and Gardens and Sanctuaries and in total cover about 13% of the country (5 million hectares). The same Act recognises any land that is being used for wildlife conservation and designates the legal occupant of that land as Appropriate Authority. On communal lands/tribal Appropriate Authority is accorded to the Rural District Council. Appropriate Authority is the legal right to utilize and manage wildlife on the property under community jurisdiction. In addition to the Parks and Wildlife Estate there are other wildlife areas under government agencies such as (Forestry Commission, Cold Storage Commission, Agricultural Rural Development Authority and Ministry of Agriculture) and Communal/tribal land, Conservancies and Private land. Approximately 29% of the total land mass of Zimbabwe is under one form or another of wildlife management as a land use category.

Refer to Question 3 (Table 1) showing the sizes of the extent of the major elephant range in Zimbabwe. Approximately, 66 641 $km^2$ of the major elephant range is surveyed. The elephant range in Zimbabwe is very large and it is neither restricted, fragmented, nor declining in accordance with the CITES criteria of assessing viability and sustainability of the range of a species. A guideline for a marked historical extent of decline is a percentage decline of 5% to 30% of the baseline while the recent rate of decline in range is a percentage decline of 50% or more in the last 10 years of three years whichever is the longer. This clearly does not apply to the elephant range in Zimbabwe.

Zimbabwe's Elephant Management Plan is clear testimony of the country's intention to effectively protect the country's elephant population but its implementation is constrained by lack of resources just like any other Southern African elephant range State. Most of the elephant range has been funded by elephant hunting.

The Zimbabwe Parks and Wildlife Management Authority does not receive any funds from the Government fiscus hence depends on revenues from sport hunting, assistance from donors.

*3. Please describe potential threats to the species, such as poaching and human-animal conflicts, and how these threats are being addressed.*

The elephant population is under threats which include poaching, human/animal conflict and habitat loss. Habitat loss is exacerbated by the fact that Zimbabwe is not able to cull due to pressure from animal rights groups and inadequate funding. Zimbabwe is also persistent droughts which result in elephant die offs such as the 1992 drought. Habitat loss is more severe in Hwange National Park where there is a need to provide artificial water supplies. Viable elephant populations in the state protected areas and indeed the success of the TFCA conservation initiatives are dependent on the maintenance of suitable habitat in the communal land. As both human and elephant populations are increasing, human/elephant conflict is also on the increase resulting in continuous increase in the number of elephants killed protecting crops of poor rural farmers. The inherent dangers are the emergence of an increasing illegal off-take of elephants.

The centralised command and control approach to law enforcement to protect the elephant is unlikely to work as proved in most parts of Africa. The long-term solution is to ensure greater return of elephants to the community. Conservation of elephants will be achieved as a by-product of the quest for sustainability.

*4. Is your agency currently conducting any research efforts addressing conservation issues involving elephants? What about other agencies or departments within your national or regional governments and what are their roles? Are you aware of any NGO projects currently underway in Zimbabwe that involve elephant conservation or management? If so, could you describe such projects or provide contact information to the organization carrying out the work?*

Yes, the Zimbabwe Parks and Wildlife Management Authority is currently conducting research efforts addressing conservation issues involving elephants. Research efforts have been expended on studies of diet, impacts on vegetation, game water supply and population dynamics. The Zimbabwe Parks and Wildlife Management Authority's publication *ELEPHANT MANAGEMENT IN ZIMBABWE* gives a full history and description of past elephant management and research. There are several NGOs undertaking elephant research in the country. Please find below their contact details.

1.   WWF
     P. O. Box CY 1409
     Causeway

Harare

Tel:    +263 04 252533
+263 04 252534
Fax:    263 04 703902
Email: wwfsarpo@wwfsarpo.org


2.    CIRAD Representative in Zimbabwe
      P. O. Box 1378
      Harare
      Zimbabwe

      Tel:        +263 4 332 487
      Office Cell: +263 775 131 601

      Email:      bourgarel@cirad.fr

3.    Save Valley Conservancy
      Email:      clives@senuko.com

4.    Frankfurt Zoological Society
      Gonarezhou Conservation Project
      Gonarezhou National Park, Chiredzi, Zimbabwe
      hugo@fzs.org

5.    University of Zimbabwe
      Tropical Resource Ecology
      skativu@science.uz.ac.zw

6.    Bindura University of Science Education
      emwenje@buse.ac.zw

7.    Mushandike Wildlife College
      dchitupa@zimparks.co.zw

8.    CAMPFIRE Association
      cjonga@campfirezimbabwe.org

9.    National University of Science and Education


18

mundy@gatorzw.co.uk

10.   Malilangwe Trust
      mark.saunders@malilangwe.org

11.   Bubye Valley Conservancy
      mazunga@mazsaf.com

## IV.   HUNTING POLICIES/ REGULATIONS

*1.   Since Zimbabwe has an active sport hunting program, please describe how this program functions.*

Zimbabwe has an active sport hunting program. The principal and most important form of utilization of elephants in Zimbabwe is safari or trophy hunting. This hunting takes place in Safari areas of the Parks and Wildlife Estate, indigenous Forest Areas managed by the Forestry Commission, the Communal Lands where the Communal Areas Management Programme for Indigenous Resources (CAMPFIRE) occurs and the private game farms and conservancies. (Hunting in Zimbabwe; 2011).

*2.   Specifically, do you have an established national/regional hunting quota? How is this quota determined?*

Yes, Zimbabwe has a national hunting quota. The main policy approach that guides the determination of quotas of all hunting areas is that the quota levels should enable Zimbabwe to be a hunting destination whereby animals of internationally acceptable trophy quality are hunted. Viable and sustainable population areas are offered to high fee paying sportsmen (Please see Quota Setting Manual and tool box).

**FACTORS CONSIDERED FOR SETTING QUOTAS ANNUALLY**

| Factor | Effects on Quota |
|---|---|
| Calculation of the quota | Quota = Population estimate x growth rate<br>Where growth rate >= Offtake rate<br>Quota = the animals to be killed or removed<br>Population = number of animals estimated to      be the current population.<br>Offtake rate = percentage of the population to be removed, based on the estimated growth rate of the population. |
| Recommended Off take for sport hunting quotas | The recommended % Off take was used to determine the quotas that had to be set for free ranging or passively managed animal populations. In most instances there are no known populations or measured population parameters, recommended Off take levels were used instead. |
| CITES limits | This limits the total number of key species that is leopard, cheetah, elephant and crocodile. The CITES quotas that where presented during the Quota Setting Workshops were adjusted to meet the CITES allocation of elephant 500, crocodile 200 and cheetah 50. The success rate for leopard hunts is very low so the CITES export tags will be given on a first come first serve basis. |
| Size of hunting area | The quota allocated had to be related to the size of the hunting area. Smaller hunting areas had to have smaller hunting bags. |
| Shared animal populations | Where animals were non-resident in one area and were migratory, the quota set had to be that of the meta-population, which was then allocated to each individual. |
| Status of animal populations and habitats | Where possible the applicants submitted population estimates or indices of animals on their property. Poaching and encroaching of human into wildlife areas was also taken into account as it affected population viability. |
| Status of management | It was acknowledged that some properties with enclosed populations had populations that are viable and secure as they are actively managed. Among other things the management systems were characterised by:<br>❖ Proper maintenance of secure multiple strands and double game fences such as those surrounding Bubye Conservancy.<br>❖ Routine anti-poaching. |

| | |
|---|---|
| | ❖ Proper road and other infrastructure development and maintenance. <br> ❖ Tick control <br> Proper veld management and habitat manipulation. <br> Generally effectively managed populations and small properties have high animal productivity than those in free ranging or passively managed areas. <br> It was therefore, suggested that the level of offtakes whether management or sport hunting should actually be determined by the status of the management applied. |
| Desirable animal populations | For some species the level of quotas was affected by the viability of the hunted populations. For instance on the lion quota lion females were removed in all hunting areas |

**Figure 1.MULTI STAKEHOLDERS PARTICIPATORY QUOTA SETTING**

Participatory quota setting at concession level
(ecologists, field managers, safari operators, all
Stakeholders and technical specialists)

-local ground counts
-trophy          quality

monitoring

-success rate
-stakeholders

perception

-field monitoring

Make use of INDICES to establish
the population trend

Data, information and knowledge acquired
is analyzed and known by all

STAKEHOLDERS

Submit quota proposal to Quota Setting Workshop
**CO-MANAGEMENT APPROACH**

Scientific Service Unit, after the scrutiny presents
consolidated quota proposals to the Directorate

Quota utilized following approval with or without
Adjustments

22

3. *There have been antidotal accounts, coming out of several southern African countries, of hunters exchanging smaller, less desirable tusks from legally hunted trophies for larger tusks from government ivory stores. What policies/regulations do you have that support or prohibit such activities?*

Zimbabwe strictly enforces its own security controls and checks to prevent any potential exchange of less desirable tusks for larger tusks from Government ivory stores. There has never been any case of ivory from the ivory stores ever being abused by officials. The Zimbabwe Parks and Wildlife Management Authority has both manual and electronic ivory registers at station, regional and national levels where all ivory tusks are registered (Statutory Instrument 362 of 1990). Additionally CITES officials make regular unannounced checks on the Government ivory stores.

If the USFWS accepts Zimbabwe's invitation, the Authority would be happy to walk their representatives through the process. Further to this, Zimbabwe submits annual ivory reports to the CITES Secretariat for which no questions have ever been raised.

4. *What format do you use to manage sport hunting in Zimbabwe (i.e., establishment of national hunting districts under government control, awarding hunting concessions to privately owned operations)?*

Hunting areas in Zimbabwe are established in terms of the Parks and Wildlife Act Chapter 20:14 as amended which designates specific areas as hunting areas which are State Safari areas managed by ZPWMA, Forestry areas managed by Forestry Commission, Communal areas adjacent to national parks and safari areas where CAMPFIRE takes place, private game ranches and conservancies managed by private property owners in terms of the Parks and Wildlife Act Chapter 20:14. ZPWMA regulates and monitors all utilization of wildlife in all land categories in the country.

On private land, hunting rights are allocated by private treaty where landowners negotiate with private hunters on a one on one basis. The ZPWMA has no control over ownership of such land but only concerned with proper of wildlife on all land in Zimbabwe irrespective of ownership.

Hunting concessions within the Parks Estate are awarded to operators through public auctions which are conducted by reputable certified auction houses. On communal lands, Rural District Councils apply for Appropriate Authority Status to manage sport hunting. The Right to hunt in communal land is also allocated through a tender system with proceeds accruing to communities.

5. *How are hunting areas/concessions allocated to safari outfitters, if at all? If concessions are awarded, what requirements have been established for concession holders (i.e., mandatory census activities, assistance to local villages, etc.)? Are concessions awarded on an annual basis or for longer periods? If concession areas are centrally controlled by your government (e.g., several outfitters hunt in the same areas and no one outfitter is responsible for overall management), what mechanism is used to monitor and control outfitters activities?*

The current policy is that the Authority leases out State hunting concessions to pre-qualified Zimbabwean Safari Operators through an auction system for a period of five (5) years which can be renewed for another five (5) years [bringing the maximum to (10) ten years]. The ten year period is provided for in the Parks and Wildlife Act: Chapter 2014 under Section 37. Concessions are therefore not awarded on an annual basis.

As for Rural District Councils (RDCs) they are given Appropriate Authority Status (AAS) in areas surrounding national parks and safari areas under their jurisdiction. The AAS allows the RDCs to sustainably utilize wildlife resources in the areas, including allocation of hunting quotas.

All operators are required to submit returns in terms of utilization of the previous year's quota as well as the Tourism Return Form 2 before issuance of the following year's quota. On communal lands, the distribution of revenue is in terms of allocation for wildlife management, RDC administration, CAMPFIRE Association and benefits to communities (Guidelines for managing communal lands wildlife revenues in accordance with Policy for Wildlife, 1995). Wildlife management funding takes approximately 50% of the allocation for anti-poaching, game water supply, road maintenance and general wildlife management.

All hunts in state concessions are accompanied by a Parks Ranger whose duties are to ensure that the right animals on quota are shot and recorded accordingly. The same Rangers also conduct sighting surveys which give an approximation of the variety and density of wildlife in the areas under focus. As mentioned earlier the Authority does not have the capacity in terms of resources to undertake frequent national surveys. However it is noteworthy that there are some private conservancies who conduct/carry out research in their areas on an annual basis. Annual quotas set will therefore be based on these annual surveys for such concessions. Where surveys are not done on an annual basis quotas are set based on the adaptive management approach as well as use of historical information/data such as the quality of trophies, hunting effort and hunting success rate. A decline in the trophy quality would automatically indicate a need to adjust quotas downwards or even impose a moratorium. As an example in 2005 to 2007 a moratorium was imposed for lion hunting in the Matetsi hunting complex and Gwaai Intensive Conservation Area in response to declining trophy quality for the species.

**Control in concessions where several outfitters hunt the same area**

- A hunting permit specifying area and animals to be hunted is issued;
- Each hunting bag is allocated specific days which are not allowed to overlap and restrict the hunting effort;
- Every hunt is accompanied by a Parks ranger who records all the animals hunted;
- There are penalties for shooting the wrong sex animals (Statutory Instrument 56 of 2012);
- All hunters are required to complete the Tourism Return Form 2, which has to be acquitted with Parks and Wildlife Management Authority and Reserve Bank of Zimbabwe before trophies are exported out of the country;
- A copy of all TR 2 forms is submitted to Parks for recording and analysis.
- In all these hunting areas, ZPWMA remain responsible for all management issues.

6. *How much do hunting license cost foreign hunter? How does your government utilize this revenue? Does a percentage go directly back to elephant conservation efforts or into more general wildlife management efforts? If so, what percentage is allocated to each? Is any of this revenue provided to local communities? If so what percentage?*

In Zimbabwe a foreign hunter buys a bag which may or may not include an elephant. If an elephant is included, the amount paid increases. The amount declines depending on key species in the bag such as leopard and buffalo. A foreign hunter pays to the operator who then pays to the Authority relevant trophy fees where applicable.

A hunting permit is only issued to the hunting operator or a private land holder or to communities with Appropriate Authority Status. The foreign hunter only pays for the daily rates and trophy fees to the particular operator they will be hunting with. Both the daily rates and trophy fees vary with the area being hunted, type of animals in the hunting package and the target market of the operator. The daily rate is paid for services received in camp which include accommodation, food and beverages, professional hunter services etc. The hunter also pays government levies which are 2% Zimbabwe Tourism Authority levy on daily rate and 4% on trophy fees.

For areas where several outfitters hunt the same area, animals are packaged into bags which are auctioned every year and hunters pay the highest bid price at the auction subject to a reserve price.

The Zimbabwe Parks and Wildlife Management Authority, which is the Government's Agency responsible for managing all wildlife in the country ploughs back all the money into managing conservation and protection of the Parks Estate, which includes the range areas for elephants.

Communities are provided for through the Communal Areas Management Programme for Indigenous Resources of Flora and Fauna. Some of the revenue that accrues to Rural District Councils under this program is ploughed back into wildlife conservation activities in CAMPFIRE areas. Proceeds are used directly for elephant conservation, provision of game water supplies, wildlife monitoring and anti-poaching programs on communal land.

7. *How does your government utilize revenue generated by hunting concessions?*

### a.   Revenue generated from the Parks Estate

Hunting concessions under the Zimbabwe Parks and Wildlife Management Authority are allocated to Zimbabwean private operators through an auction system. The total value of Safari hunting in this category is derived from the right to hunt (auction bid price), trophy fees, and hunting lease fees (concession fees). The later is calculated as 30% of the total trophy fees of animals on the allocated quota. Besides leasing out hunting concessions to private safari operators the Authority also fully manages some concessions to raise revenue for conservation, to train Parks staff in hunting operations and to get a full appreciation of the operations of the sport hunting industry.

All this revenue is paid directly to Zimbabwe Parks and Wildlife Management Authority hence contributes wholly to the conservation budget of the Authority.

### Revenue generated from communal lands

As with Parks Estate, the Rural District Councils also lease out hunting concessions under their jurisdiction to private operators and the major revenue in this category is also derived from trophy fees and hunting lease fees (concession fees). The hunting fees are also calculated as 30% of total trophy fees for animals on the quota. It is noteworthy that revenue from elephant hunting contributes approximately 60% of total earnings by Rural District Councils. Safari hunting contributes more than 90% of revenues earned in CAMPFIRE Program.

**Revenue generated from Forestry land**

All hunting revenue in this land category is generated from trophy fees and daily rates paid directly to the Forestry Commission as it conducts its own hunting operations. This revenue contributes wholly to the conservation budget of the Forestry Commission as is the case with hunting revenue generated by the Zimbabwe Parks and Wildlife Management Authority.

**Private land**

As in the above land category, hunting revenue comes from trophy fees and daily rates as the land owners are also the hunting operators. The Authority only receives administration fees for processing quotas, hunting permits, export permits, registration fees and fees paid for assistance offered in surveys. The ZPWMA staff also accompany some hunts for key species are also paid daily fees.

8. *How does the sport-hunting program provide any other tangible benefits, besides revenue, to local communities (i.e., increase employment, jobs in anti-poaching units)?*

**Other Benefits**

- Most of the meat from hunting in communal areas is availed to rural communities where they provide much needed protein.
- Hunting takes place in areas that are not suitable for agriculture and non-hunting tourism due to low rainfall, are far from tourism routes and have no scenic attractions. Without hunting, such areas would be prone to poaching due to absence of human activity. Furthermore hunting brings accessibility to such remote areas in terms of roads, airstrips, and water development etc thus making the areas have economic, environmental and social benefits.
- Meat from the other hunting categories is largely sold as supplementary feed to crocodile farmers and other wildlife breeders in the country.

- **Multiplier Benefits**

Besides direct benefits from safari hunting such as cash and employment, indirect benefits arise from the multiplier effect in downstream activities for example taxidermists, freight

companies, and ivory manufacturers. Hunting concessions employ locals as skinners, cooks, trackers, guides and drivers.

9. *Please provide a complete list of hunting concessions and their geographic areas or operation.*

Figure 2: Geographical Location of Safari Areas in Zimbabwe.



**LIST OF HUNTING CONCESSIONS AND THEIR GEOGRAPHIC AREAS**

| PROVINCE | HUNTING CONCESSIONS |
|---|---|
| Mashonaland West Province | Charara South (Rural District Council) |
| | Charara Safari Area |
| | Chewore North |
| | Chewore Mkwichi (Rural District Council) |
| | Rifa |
| | Makuti |
| | Makuti Pool |
| | Doma Safari Area |
| | Dande Safari Area  (Rural District Council) |
| | Chewore South |
| | Sapi |
| | Nyakasanga |
| | Sibilobilo (Rural District Council) |
| | Rifa Educational Camp |
| Matabeleland North Province | Deka  Pool |
| | Matetsi Safari Area (1,2, 3, 4, 5 ,6) |
| | Deka Tail |
| | Chete Safari Area |
| Midlands Province | Chirisa Safari Area |
| | Sengwa |
| Masvingo Province | Malipati Safari Area (Rural District Council) |
| Matebeleland South Province | Tuli Safari Area |

## CONCLUSION

The Zimbabwe Parks and Wildlife Management Authority (ZPWMA) hopes that this submission provides a comprehensive response to issues raised by USFWS. The ZPWMA would kindly provide answers to any further questions that the USFWS might have or clarifications to issues explained in this submission. We reiterate our invitation for a bilateral engangement and a field tour of Zimbabwe for a better appreciation of Zimbabwe's wildlife management strategies/practices.

Zimbabwe earnestly looks forward to a favourable review of the suspension of the importation of Zimbabwe's sport hunted elephant trophies taken in 2014.

# REFERENCES

1. Chimuti, T. 2005. Aerial Survey of Elephants and Other Large Herbivores in the Mid-Zambezi Valley, Zimbabwe. Zambezi Heartland Transboundary Natural Resources Management Area. Harare.
2. Conservation Strategy and Action Plan for the Lion (*Panthera leo*) in Zimbabwe (2006)
3. Department of National Parks and Wildlife Management Authority 1997. Elephant management in Zimbabwe. Zimbabwe Department of National Parks and Wildlife Management Authority. Harare.158 p.
4. Department of National Parks and Wildlife Management Authority undated. The policy and plan for elephant management in Zimbabwe. Department of National Parks and Wildlife Management Authority. Harare.
5. Dunham, K. M. 2002. Aerial census of elephants and other large herbivores in the North West Matabeleland, Zimbabwe. Zimbabwe Department of National Parks and Wildlife Management Authority. Harare.
6. Dunham, K. M. and Mackie, C. S. 2002. National Summary for Aerial Census Results for Elephant in Zimbabwe. WWF-SARPO Occasional Paper 1. Zimbabwe Department of National Parks and Wild Life Management Authority. Zimbabwe
7. Dunham, K. M., Mackie, C. S., Musemburi, O. C., Zhuwawo, C., Mtare, T. G., Taylor, R. D. and Chimuti, T. 2007. Aerial survey of elephants and other large herbivores in north-west Matabeleland Park, Zimbabwe. Zimbabwe Department of National Parks and Wildlife Management Authority. Harare.
8. Dunham, K. M., van der Westhuizen, E., van der Westthuizen, H. F. and Ndaimani , H. 2013. Aerial survey of elephants and other large herbivores in Gonarezhou National Park (Zimbabwe) and surrounding areas. Frankfurt Zoological Society and Zimbabwe Department of National Parks and Wildlife Management Authority. Harare.
9. Elephant management in Zimbabwe (1995).Zimbabwe Department of National Parks and Wildlife Management Authority. Harare. 124 p.
10. Government of Zimbabwe 1996. Forest Act chapter 19:05 Revised Edition 1996 Zimbabwe Government Printer. Harare.
11. Grobbelaar, C. and Masulani, R. 2003. Review of Offatke Quotas, Trophy Quality and Zimbabwe Department of National Parks and Wildlife Management Authority Dunham, K. M. 2004. Aerial Survey of Elephant and Other Large Herbivores in the Zambezi Heartland (Zimbabwe, Mozambique and Zambia). African Wildlife Foundation. Harare.
12. Hunting in Zimbabwe (2009) Zimbabwe Parks and Wildlife Management Authority
13. Joubert, C. J. and Joubert, L. 2013. Aerial Survey of the Larger Herbivores in Save Valley Conservancy Zimbabwe. Save Valley Conservancy. Chiredzi.
14. Kuvawoga, P.T and Gandiwa E. 2010. Aerial survey of Elephants and other large Herbivores in Chewore Safari Area, Zambezi Valley, Zimbabwe Parks and Wildlife Management Authority and the Monitoring the Illegal Killing of Elephants(MIKE).
15. Mackie, C. S. 2002. Aerial census of elephants and other large herbivores in the Sebungwe region, Zimbabwe. Zimbabwe Department of National Parks and Wildlife Management Authority. Harare.
16. Ministry of Environment Natural Resources Management, (2009) National Environmental Policy and Strategies

17. Murindagomo, F. 2011. Aerial survey status of wildlife populations in Zimbabwe in 2011. Zimbabwe Department of National Parks and Wildlife Management Authority. Harare.
18. Parks and Wildlife Amendment No. 19 (2001)
19. Taylor R.,D. (nd) A Review of Problem Elephant Policies and Management Options in Southern Africa
20. WWF 1997. Quota Setting Manual 1997. WWF, Zimbabwe Trust and Safari Club International. Harare.
21. Zimbabwe Department of National Parks and Wildlife Management Authority 1997. A Management Policy Framework. Department of National Parks and Wildlife Management. Harare.
22. Zimbabwe Government 13/2002. Environmental Management Act (Chapter 20:27) Zimbabwe Government. Harare.
23. Zimbabwe Government 1975 Parks and Wildlife Act 1975- As amended at the 1st August 1990. Act 14 of 1975 Zimbabwe Government Printer. Harare.
24. Zimbabwe Parks and Wildlife Management Authority 2004. Wildlife based land reform policy 2004. Government of Zimbabwe. Harare.
25. Zimbabwe Parks and Wildlife Management Authority 2004. Wildlife-based land reform policy. Zimbabwe Government Printer. Harare.
26. Zimbabwe Parks and Wildlife Management Authority 2005. Population status of the African elephant (*Loxodonta Africana*) in Zimbabwe. Zimbabwe Parks and Wildlife Management Authority. Harare.
27. Zimbabwe Parks and Wildlife Management Authority 2005. Zimbabwe elephant proposal to cities COP 12 Zimbabwe Parks and Wildlife Management Authority. Zimbabwe Parks and Wildlife Management Authority. Harare
28. Zimbabwe Parks and Wildlife Management Authority 2012. National conservation action plan for cheetahs and African wild dogs in Zimbabwe. Zimbabwe Parks and Wildlife Management Authority. Harare.
29. Zimbabwe Parks and Wildlife Management Authority Zimbabwe rhino policy and management framework (2011), Zimbabwe Parks and Wildlife Management, Zimbabwe National Parks and Wildlife Management Authority. Harare
30. Zimbabwe policy for wild life (2000), Parks and Wildlife Conservation Fund, Ministry of Environment and Tourism, Zimbabwe



Log In   Register

The most comprehensive data on elephant
population and range worldwide.

# Zimbabwe, 2012 ("2013 AFRICA" analysis)

All Years for Zimbabwe: **2013** — **2007** — **2002** — **1998** — **1995**

## 2012 Summary Totals for Zimbabwe

| Data Category | Definite | Probable | Possible | Speculative |
|---|---|---|---|---|
| Aerial or Ground Total Counts | 304 | 0 | 0 | 0 |
| Direct Sample Counts and Reliable Dung Counts | 41,840 | 3,775 | 3,775 | 0 |
| Informed Guesses | 0 | 0 | 0 | 0 |
| Other Guesses | 5,222 | 0 | 0 | 45,375 |
| Totals 2012 | 47,366 | 3,775 | 3,775 | 45,375 |
| Totals 2007 | 84,416 | 7,033 | 7,367 | 291 |

## Area of Range Covered by Each Data Category (km²)

| Data Category | Known Range | Possible Range | Total Range |
|---|---|---|---|
| Aerial or Ground Total Counts | 1,283 | 0 | 1,283 |
| Direct Sample Counts and Reliable Dung Counts | 37,710 | 0 | 37,710 |
| Informed Guesses | 175 | 0 | 175 |
| Other Guesses | 36,104 | 0 | 36,104 |
| Unassessed Range | 1,283 | 375 | 1,658 |
| Totals | 76,554 | 375 | 76,930 |

## Zimbabwe: Elephant Estimates

| Input Zone | Cause of Change [1] | Survey Details [2] Type | Reliab. | Year | Number of Elephants Estimate | 95% C.L. | Source | PFS [3] | Area (km²) | Map Location Lon. | Lat. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| + Binga Communal Lands | - | AS | B | 2006 | 431 | 373 | Dunham et al., 2006a | 2 | 2,217 | 27.9E | 17.4S |
| + Bubiana Conservancy | DD | O | E | 2001 | 50 | 50* | Dunham & Mackie, 2002 | 2 | 1,772 | 29.8E | 21.1S |
| + Bubi Valley Conservancy | DD | O | | 2001 | 53 | | Dunham & Mackie, 2002 | 1 | 2,895 | 30.1E | 21.5S |
| + Chete Safari Area | - | AS | B | 2006 | 971 | 310 | Dunham et al., 2006a | 2 | 1,260 | 27.8E | 17.4S |
| + Chewore 1 | RS | AS | B | 2010 | 1,488 | 468 | Kuvawoga & Gandiwa, 2011 | 2 | 840 | 29.9E | 16.0S |
| + Chewore 2 | NP | AS | B | 2010 | 1,360 | 665 | Kuvawoga & Gandiwa, 2011 | 2 | 1,054 | 29.9E | 16.0S |
| + Chewore 3 | RS | AS | B | 2010 | 1,974 | 685 | Kuvawoga & Gandiwa, 2011 | 2 | 897 | 29.9E | 16.0S |
| + Chewore 4 | RS | AS | B | 2010 | 226 | 294 | Kuvawoga & Gandiwa, 2011 | 2 | 610 | 29.9E | 16.0S |
| + Chiredzi River Conservancy | DD | GT | E | 2001 | 28 | | Dunham & Mackie, 2002 | 2 | 895 | 31.6E | 20.8S |
| + Chirisa Safari Area | - | AS | B | 2006 | 4,231 | 1,260 | Dunham et al., 2006a | 2 | 1,529 | 28.3E | 17.9S |
| + Chizarira National Park | - | AS | B | 2006 | 3,071 | 1,117 | Dunham et al., 2006a | 2 | 2,084 | 27.9E | 17.8S |
| + Doma Safari Area | DD | AS | E | 2001 | 336 | 383 | Mackie, 2002a | 2 | 975 | 30.2E | 16.4S |
| + Gonarezhou National Park | RS | AS | B | 2009 | 9,123 | 1,902 | Dunham, et al., 2010 | 1 | 4,950 | 32.0E | 21.5S |
| + Hartley Safari Area | DD | O | E | 2001 | 100 | 20* | Dunham & Mackie, 2002 | 2 | 445 | 29.6E | 17.9S |
| + Home Farm & Greystone Ranches | DD | O | E | 2001 | 3 | 1* | Dunham & Mackie, 2002 | 3 | 60 | 27.9E | 20.8S |
| + Hwange National Park | DD | AS | E | 2001 | 44,492 | 5,770 | Dunham & Mackie, 2002 | 1 | 12,900 | 26.6E | 19.1S |
| + Kariba Communal Areas | - | AS | B | 2006 | 3,715 | 1,033 | Dunham et al., 2006a | 1 | 3,224 | 28.4E | 17.1S |
| + Kavira Forest Land | DD | O | E | 2001 | 100 | | Dunham & Mackie, 2002 | 2 | 287 | 27.0E | 18.1S |
| + Lusulu | DD | AS | E | 2001 | 33 | 63 | Mackie, 2002b | 2 | 543 | 27.8E | 18.0S |
| + Mahenye Ward | DD | AS | E | 2001 | 0 | 0 | Dunham & Mackie, 2002 | 3 | 221 | 32.4E | 21.2S |
| + Malapati Safari Area | RS | AS | D | 2009 | 0 | | Dunham, et al., 2010 | 3 | 175 | 32.0E | 21.5S |
| + Malilangwe Conservancy | DD | AT | E | 2001 | 116 | | Dunham & Mackie, 2002 | 2 | 425 | 31.9E | 21.1S |
| + Mambali Communal Lands | DD | AT | E | 2001 | 10 | | Dunham & Mackie, 2002 | 2 | 327 | 28.4E | 21.5S |
| + Maramani Communal lands | RS | AT | A | 2010 | 0 | | Selier & Page, 2010 | 2 | 361 | 29.3E | 22.1S |
| + Matabeleland Communal Land | DD | AS | E | 2001 | 64 | 79 | Dunham & Mackie, 2002 | 1 | 3,110 | 27.1E | 19.6S |
| + Matetsi Safari Complex | DD | AS | E | 2001 | 4,201 | 1,670 | Dunham & Mackie, 2002 | 1 | 4,399 | 25.7E | 18.2S |
| + Matibi II Communal Lands | | AS | E | 1996 | 0 | | Davies et al., 1996 | 2 | 400 | 31.7E | 21.5S |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| + Matusadona National Park | - | AS | B | 2006 | 1,925 | 443 | Dunham et al., 2006a | 2 | 1,413 | 28.6E | 17.0S |
| + Mavuradonha Wilderness Area | DD | AS | E | 2001 | 13 | 26 | Dunham & Mackie, 2002 | 2 | 617 | 30.9E | 16.5S |
| + Mukwiche Area | DD | AS | E | 2001 | 228 | 296 | Mackie, 2002a | 2 | 337 | 29.9E | 16.4S |
| + Ngamo & Sikumi State Forests | DD | AS | E | 2001 | 553 | 496 | Dunham & Mackie, 2002 | 2 | 2,344 | 27.3E | 18.8S |
| + North Gokwe Communal Lands | - | AS | B | 2006 | 192 | 172 | Dunham et al., 2006a | 1 | 3,082 | 28.5E | 17.5S |
| + Nyalana Wildlife Management Area | DD | O | E | 2001 | 150 | | Dunham & Mackie, 2002 | 2 | 651 | 32.5E | 16.7S |
| + Protea Farm | DD | O | E | 2001 | 7 | | Dunham & Mackie, 2002 | 4 | 14 | 29.6E | 16.5S |
| + Rest of Zambezi valley | NA | AS | B | 2003 | 15,870 | 2,224 | Dunham, 2003 | 1 | 11,636 | 30.0E | 15.9S |
| + Save Valley Conservancy | - | AS | B | 2003 | 527 | 310 | Dunham, 2003 | 1 | 3,047 | 32.1E | 20.4S |
| + Sengwe Communal Land | DT | AS | B | 2009 | 23 | 34 | Dunham, et al., 2010 | 2 | 1,987 | 32.0E | 21.5S |
| + Sentinel & Nottingham | RS | AT | A | 2010 | 304 | | Selier & Page, 2010 | 2 | 760 | 29.3E | 22.1S |
| + Shangani Ranch | DD | O | E | 2001 | 60 | 20* | Dunham & Mackie, 2002 | 2 | 628 | 29.3E | 19.6S |
| + Sijerira Forest Area | - | AS | B | 2006 | 488 | 333 | Dunham et al., 2006a | 3 | 270 | 27.5E | 17.6S |
| + Tuli Circle Safari Area | RS | AT | A | 2010 | 0 | | Selier & Page, 2010 | 2 | 500 | 29.3E | 22.1S |

## Zimbabwe: Summary

Very few new surveys were conducted in Zimbabwe since 2007, covering a small percentage of the overall population. Half of the estimates included in the current update are now older than 10 years, resulting in an overall degradation of the quality of data from Zimbabwe. This lack of systematic and updated monitoring data is of serious concern for possibly the third largest elephant population in Africa. As a result of the data degradation, the DEFINITE category has seen a drop of 41,536, while the SPECULATIVES have increased by 45,084. Only 8 of the estimates in this update were as a result of repeated surveys, increasing the number of DEFINITE elephants by 3,759.

The 2010 aerial sample count of Chewore Safari Area covered part of the previous valley-wide survey (Zambezi Valley 2003 – Dunham 2004a), as well as repeating the survey of Chewore4 (Mackie 2002a). Chewore 4 replaced the 2001 survey of the same area. Although Chewore 2 had previously been surveyed in a 2001 count (Mackie 2002b), that estimate was not included in the 2007 African Elephant Status Report, and so the 2010 count for Chewore 2 was included in the current analysis as a New Population. Chewore Safari Area (Chewore 1 and Chewore 3) replaced those strata from the 2003 Zambezi Valley count (originally included in the 2007 AESR area Zambezi Valley). The remaining strata of the 2003 Zambezi Valley count were retained as a New Analysis, named Rest of Zambezi Valley.

Aerial total counts of the Nottingham and Sentinel area and the Tuli Circle Safari Area in 2010 replaced the 2001 total counts of those areas. The 2009 aerial sample count of the communal land adjacent to Gonarezhou National Park replaced the 2001 guess for the Sengwe Communal Land. The Malapati Safari Area and Gonarezhou National Park were resurveyed in 2009 using the same methodology and coverage as previous surveys of those areas. The River Ranch-Zhove Dam area, surveyed in 2010 with an aerial total count, replaced the previous estimate for the Maramani Communal Land.

Apart from the areas noted above, there were no other new estimates available for the elephant populations in Zimbabwe.

\* Range of informed guess

[1] Key to Causes of Change (only tracked since 2007): DA: Different Area; DD: Data Degraded; DT: Different Technique; NA: New Analysis; NG: New Guess; NP: New population; PL: Population Lost; RS: Repeat Survey (RS` denotes a repeat survey that is not statistically comparable for reasons such as different season); —: No Change

[2] Key to Survey Types: AC: Aerial Count, not specified; AS: Aerial Sample Count; AT: Aerial Total Count; DC: Dung Count; EX: Extrapolation from GIS; GD: Genetic Dung Count; GS: Ground Sample Count; GT: Ground Total Count; IG: Informed Guess; IR: Individual Registration; OG: Other Guess. Survey Type is followed by an indicator of survey quality, ranked from 1 to 3 (best to worst). Survey Reliability is keyed A-E (best to worst) as **outlined in this table**

[3] PFS: Priority for Future Surveys, ranked from 1 to 5 (highest to lowest). Based on the precision of estimates and the proportion of national range accounted for by the site in question, PFS is a measure of the importance and urgency for future population surveys. All areas of unassessed range have a priority of 1. See Introduction for details on how the PFS is derived.

Note that totals for the Definite, Probable, and Possible categories are derived by pooling the variances of individual estimates, as described at **http://www.elephantdatabase.org/reliability** As a result, totals do not necessarily match the simple sum of the entries within a given category.

All materials on this site are Copyright (C) 1995-2014 IUCN - The International Union for the Conservation of Nature. Use is permitted only under the Creative Commons Attribution-NonCommercial-ShareAlike license (http://creativecommons.org/licenses/by-nc-sa/3.0/).

**108**



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
### Washington, D.C. 20240



FEB 2 1 2014

## MEMORANDUM

To:        Chief, Division of Management Authority

From:     Chief, Division of Scientific Authority *Rosemarie Gnam*

Subject:   General Advice on Importation of Sport-hunted Trophies of African Elephants
           taken in Tanzania in the Calendar Year 2014

---

This General Advice represents our CITES finding for permit applications that you might receive
for the import of sport-hunted trophies of African elephants (*Loxodonta africana*) taken in the
United Republic of Tanzania (Tanzania) in calendar year 2014.

Please be advised that, based on the available information, we are **unable** to determine that the
importation of sport-hunted trophies of African elephants taken in Tanzania during calendar year
2014 will be for purposes that are not detrimental to the survival of the species.

If permit applications are received that include new or additional information showing that
elephant management practices by the Government of Tanzania have led to the sustainability of
its elephant population on a nation-wide basis, these applications should be referred to the
Division of Scientific Authority for consideration on a case-by-case basis.

BASIS FOR ADVICE:

Since our analysis for the General Advice issued for calendar year 2013, several sources of
information have become available indicating a significant decline in Tanzania's elephant
population primarily due to poaching for ivory, including:

- *Aerial census of large animals in the Selous-Mikumi ecosystem, population status of
  African elephant* (TAWIRI 2013a);
- *Aerial census of large animals in the Ruaha-Rungwa ecosystem, population status of
  African elephant* (TAWIRI 2013b);
- A written report, *Recognition and tackling of the current elephant poaching crisis in
  Tanzania* (TEPS 2013a) and PowerPoint presentation, *Tackling the elephant poaching
  crisis in Tanzania* (TEPS 2013b), by the Tanzania Elephant Protection Society (TEPS)
  Task Force presented to the Parliamentary Committee of Land, Natural Resources and
  Environment, April, 2013;

- A report to the African Elephant Summit (Botswana, 2013), *Status of African elephant populations and levels of illegal killing and the illegal trade in ivory: A report to the African elephant summit* (CITES Secretariat *et al.* 2013);
- A report to the 16th Meeting of the CITES Conference of the Parties (CoP16 - Bangkok, Thailand, 2013), providing an update on Monitoring the Illegal Killing of Elephants (MIKE) (CoP16 Doc. 53.1), posted 11/30/2012, with an Addendum posted 2/19/2013; and
- A report to CoP16 (Bangkok, Thailand, 2013), providing an update on monitoring of illegal trade in ivory and other elephant specimens (CoP16 Doc. 53.2.2 (Rev. 1)), originally posted 12/12/2012, with a revision of the document posted 2/8/2013.

The new information provided by these sources is discussed below as it relates to our finding for the 2014 calendar year.

Conservation and Management

1. As recently as a few years ago, African elephants were considered to be widely distributed throughout Tanzania.  As of 2009, they covered about 39% of the country's total land surface area (~370,000 square kilometers (km$^2$) (TAWIRI 2010) within six ecosystems, including: Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa, and Moyowosi-Kigosi (CoP15 Doc. 68, Annex 6a).  The Selous-Mikumi ecosystem represented about 40% of the total elephant population in Tanzania (CoP15 Doc. 68, Annex 6a).  At 31,040 square miles, the Selous-Mikumi ecosystem is Africa's largest protected area, and historically held East Africa's largest elephant population, followed by Ruaha-Rungwa (13,384 square miles) (Jones and Nowak 2013).

2. According to the Government of Tanzania, about 50% of the elephant's range in that country is in protected areas (PA) (CoP16 Prop. 11).  This proportion of protected range is relatively high compared to other African elephant range countries (Blanc *et al.* 2007).  These protected areas comprise about 28% of the country's land area, and elephants receive full protection in 19% of Tanzania's total land surface area (CoP16 Prop. 11).  The network of PAs includes national parks (NP), Ngorongoro Conservation Area, game reserves (GR), game controlled areas (GCA), and wildlife management areas (WMA) in village lands.  In the year 2012, Tanzania put into place Wildlife Management Area Regulations (2012), which provided a legal mechanism to promote the establishment of wildlife conservation areas outside of PAs administered by the central government.  These regulations allow local communities to establish wildlife management areas in village lands that offer conservation potential for wildlife.  This legal mechanism has the potential to enable local communities to contribute to wildlife conservation and to benefit from conservation activities on their land (CoP16 Prop. 11).  Concerns have been raised, however, that WMAs have not effectively contributed to conservation (TEPS 2013a).  The legal process developed by the Wildlife Department has been criticized as being complicated, overregulated, and lengthy, resulting in high transaction costs and making

compliance difficult. It is suggested that in order to make the WMA approach successful, it will need to be simplified (Baldus and Hahn 2009).

3. Historically, there have been transboundary elephant populations in the Kilimanjaro-Amboseli, the Serengeti-Mara, and Tsavo-Mkomazi ecosystems along the Tanzania-Kenya border (Blanc *et. al.* 2003), and elephants have moved between the Selous in Tanzania and the Niassa in Mozambique (Mpanduji *et al.* 2002). Tanzania also shares elephant populations with Rwanda – the Burigi Game Reserve in Tanzania and Akagera National Park in Rwanda (TAWIRI 2010). Tanzania cooperates with transboundary countries, especially Kenya and Mozambique, in cross-border law enforcement efforts (CoP16 Prop. 11); however, concern has been raised over the lack of effectiveness of cross-border cooperation in anti-poaching efforts (Baldus and Hahn 2009).

4. According to the Government of Tanzania (Tarimo, Severre, and Mduma, *in litt.* 2011), the following legal instruments govern wildlife conservation in Tanzania:
- Wildlife Policy, 2007, which provides guidelines for the management of African elephants through the development, review, and updating of specific management plans (CoP15 Doc. 68, Annex 6a);
- Wildlife Conservation Act No. 5 of 2009;
- Tanzania National Parks Act CAP. 282 (RE 2002); and
- Ngorongoro Conservation Area Act CAP. 284 (RE 2002).

5. Four different institutions have authority for management of wildlife in Tanzania:
- Tanzania National Parks (TANAPA), a Parastatal organization that manages 15 national parks (total area of $50,872$ km$^2$);
- Ngorongoro Conservation Area Authority (NCAA), a Parastatal organization that manages the Ngorongoro Conservation Area (NCA) (total area of $8,300$ km$^2$);
- Wildlife Division, an institution that manages 28 game reserves with an area of $112,564$ km$^2$, about 38 game controlled areas with an area of about $161,521$ km$^2$, and RAMSAR sites covering $249,856$ km$^2$; and
- District Councils, local government institutions that collaborate with the Wildlife Division on wildlife conservation issues and facilitate the establishment and management of WMAs on village land (Tarimo, Severre, and Mduma, *in litt.* 2011).

6. Tanzania developed its country-level strategy and action plan, the "Tanzania National Elephant Management Plan 2010-2015" in 2010, and the plan was endorsed by the Minister for Natural Resources and Tourism on January 15, 2011. This plan provides updated information on several biological and ecological topics, including: distribution and range, abundance, population trends and demography, elephant corridors, and human-elephant conflicts. It identifies nine different strategic objectives, as well as numerous specific objectives and their associated targets, actions, timelines, actors, and indicators. The strategic objectives include: Human-Elephant Conflict, Elephant Corridors, Law Enforcement, Benefits and Sustainable Utilization, Ivory Stockpile and Management System, Research and Monitoring, Elephant Health

and Welfare, Cross-border Cooperation, and Elephant Information Management (TAWIRI 2010). It is unclear whether or to what extent the National Elephant Management Plan has been implemented to date.

7. The Tanzania National Elephant Management Plan 2010-2015 (TAWIRI 2010) identified that a substantial decrease in funding is an important factor that has influenced the protection of the elephant population in the Selous ecosystem. Prior to 2005, a Revenue Retention Scheme was being implemented in which 100% of the revenue from photographic tourism and 50% from hunting operations was retained for management of the Game Reserve (TAWIRI 2010). By 2003, the revenue had risen to USD 2,800,000, but following national budget reductions in 2004, the amount retained by the Reserve had dropped to about USD 800,000 by 2008 (UNEP 2008, as cited in TAWIRI 2010). The timing of the decrease in funding coincides with increased poaching in the Reserve, suggesting that anti-poaching operations are greatly under-funded (TAWIRI 2010). It has been reported that the Tanzanian Government terminated the Selous Revenue Retention Scheme following the end of the Tanzanian-German Selous Conservation Program in 2003 (Baldus and Hahn 2009).

8. In addition to concerns about the implementation of Strategic Objective 3, Law Enforcement, we are concerned about implementation of Strategic Objective 8, Elephant Utilization, which includes as an action item to, "Set realistic hunting quotas." Since 2007, the annual CITES export quota for Tanzania has been 400 tusks (sport-hunting quota of 200 elephants). During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals (http://www.cites.org/eng/resources/quotas/index.php). Based on the available information, Tanzania's elephant population is now less than 70,000 elephants nation-wide (see paragraph 16), and according to the population trends shown in the Tanzania National Elephant Management Plan 2010-2015 (p. 10), the population has not been this low since the 1990's. According to the graph, the population in 1999 was estimated at about 75,000 elephants (TAWIRI 2010). During this time period, the quota was 100 tusks from 50 individuals, and the population appeared to be showing an increasing population trend. Despite the ongoing population decline and current estimated population figure, Tanzania has not adjusted its national export quota downward in response.

9. In Tanzania, the only consumptive use of African elephants is sport hunting (CoP16 Prop. 11), which is covered by The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Government of the United Republic of Tanzania 2010). These regulations control hunting by concession area, season, minimum trophy sizes (18 kg and 160 cm per tusk), annual quotas, post-hunt reporting, trophy registration, marking, and export requirements (CoP15 Doc. 68 Annex 6a; Part V, Regulation 24.-(5)(b)). According to the Government of Tanzania, sport hunting quota determinations for different areas take into account the density of elephants in those ecosystems (CoP16 Prop. 11).

10. According to Tanzania's proposal submitted (and later withdrawn) to CoP16 (CoP16 Prop. 11), 25% of the revenue accrued from the sport hunting and 100% of the revenue from resident

hunting goes to District Councils to support community development projects and conservation activities. In addition, 65% of the revenue from photographic tourism and 75% of the block fee in WMAs is given back to local communities. More than 90% of the revenue of the Tanzania Wildlife Protection Fund is generated from fees associated with sport-hunting and the sale of trophies. Law enforcement activities for wildlife and wildlife products, including ivory, are largely subsidized by the Tanzania Wildlife Protection Fund (CoP16 Prop. 11).

11. Despite the legal and management tools available to Tanzania for managing its elephant populations, population trends and data collected under the CITES program known as Monitoring the Illegal Killing of Elephants (MIKE) show, as discussed below, that elephant populations throughout Tanzania are declining, primarily due to rampant poaching. This ongoing crisis raises questions about the effectiveness of Tanzania's management and governance to protect elephants, particularly with respect to Strategic Objective 3, Law Enforcement, in the National Elephant Management Plan. In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II (Note: the proposal was rejected), the Panel of Experts questioned the commitment by Tanzania to combat poaching, raising concerns over the financial mechanism by which the Wildlife Division was funded. The Wildlife Division's revenue share is paid directly to the central Treasury, and the Treasury is then supposed to distribute the budgeted monies to the Wildlife Division. The Panel of Experts raised the concern that over a 3-year period (2007-2009), the Wildlife Division had received only 63% (USD 2,634,975 per year) of its approved budget from the central Treasury. The Panel noted that given these funding limitations, the Wildlife Division would not be able to meet its needs and obligations regarding the conservation, management, and protection of African elephants. The Panel of Experts also noted, however, that between 2005 and 2009, the Tanzania Wildlife Protection Fund contributed on average a total of USD 12,894,564 annually to the Wildlife Division. According to the Panel of Experts, these funds, when combined with the Treasury allocations, should have put the Wildlife Division in a "strong position" to meet its enforcement obligations, including containment of threats to elephants in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a). Reported elephant poaching levels in the Selous-Mikumi ecosystem, however, suggest that enforcement was inadequate.

12. Tanzania's high Proportion of Illegally Killed Elephants (PIKE) values indicate high poaching rates, which suggests weak governance in Tanzania (see paragraph 16 for PIKE values). Repeated analyses under the CITES MIKE program have identified that at the national level, governance, as measured by Transparency International's Corruption Perceptions Index (CPI), is the factor most strongly correlated with PIKE. Poaching levels are higher in countries where governance is weaker, and vice versa. It is suggested that poor governance likely facilitates the illegal killing of elephants and movement of illegal ivory by ineffective law enforcement and/or "active aiding and abetting by unscrupulous officials" (CITES Secretariat *et al.* 2013).

13. The MIKE analyses are consistent with information available from the Elephant Trade Information System (ETIS), a global illegal elephant trade tracking system operated by

TRAFFIC on behalf of the CITES Parties. According to an analysis of data from the ETIS presented at CITES CoP16, Tanzania was implicated as a significant player in the illegal ivory trade. In the ETIS analysis presented at CoP15, Tanzania was already identified as a country of concern with respect to large consignments of illicit ivory leaving the African continent. In the intervening three years, the ETIS data show that both Kenya and Tanzania continued to be the primary conduits for large shipments of ivory exported to Asia, together accounting for nearly half of the 34 large-scale ivory seizures by number and 58% of the associated weight of such seizures during the period 2009-2011(CoP16 Doc. 53.2.2 (Rev. 1). A recent TRAFFIC news article, drawing on ETIS data, reports that since 2009 Tanzania has made or been implicated in 18 large-scale ivory seizures (i.e., seizures that involved 500 kg or more in a single shipment). Of these seizures, Tanzania only made five, while the other 13 seizures were made outside of the country. In total, these seizures represented nearly 43 tons of ivory, representing the death of about 4,000 elephants (http://www.traffic.org/home/2014/1/27/tanzania-reshuffled-cabinet-should-address-poaching-urgently.html). Such large-scale transactions of ivory represent higher-level criminal activity, and the ETIS report to CoP16 suggests that governance issues could be responsible for Tanzania's low seizure and reporting rates (CoP16 Doc. 53.2.2 (Rev. 1)).

Population Distribution, Status and Trends

14. New census information was made publicly available in early 2014. The results of back-to back aerial surveys of the Selous-Mikumi and Ruaha-Rungwa ecosystems in October through November of 2013 show significant population declines (TAWIRI 2013a and 2013b) in both of these ecosystems. The Selous-Mikumi survey revealed an estimate of 13,084 (±1,816 SE) elephants, the lowest figure reported in this area since surveys began in 1976 (TAWIRI 2013a). This figure is down from an estimated 38,975 (± 2,644 SE) elephants in 2009 (TAWIRI 2009, *as cited in* TAWIRI 2013a), a decline of about 66%, which is significant ($d$-test = 8.07, $p$>0.05) (TAWIRI 2013a). The Ruaha-Rungwa survey revealed an estimate of 20,090 (±3,282 SE) elephants (TAWIRI 2013b), down from an estimated 31,625 (±2,890 SE) elephants in 2009 (TAWIRI 2010, *as cited in* TAWIRI 2013b), a decline of about 36.5%, which is significant ($d$-test = 2.6, $p$>0.05) (TAWIRI 2013b).

15. The latest update to Tanzania's population information in the African Elephant Database (http://www.elephantdatabase.org/preview_report/2013_africa/Loxodonta_africana/2012/Africa/Eastern_Africa/Tanzania) provides a best estimate for the year 2012, but does not reflect the new survey information discussed above from 2013. According to the 2012 estimate, the "definite" category estimate was 95,351 elephants, in addition to 10,278 "probable," 10,927 "possible," and 900 "speculative" category estimates. The new survey information would reduce the population estimate by about 37,426 individuals. Additional information below suggests that an updated population estimate would be revised downward even further.

16. Other information that indicates elephant populations are declining throughout Tanzania, includes:

a) Demographic surveys of the Katavi-Rukwa and Ugalla populations in 2009-2010 suggested that these populations were in distress. Survey results revealed that in each of these populations, the proportion of the herd less than 5 years of age was below 30% (TAWIRI 2010). These results are indicative of low recruitment and growth rates, suggesting one or more population stressors, such as higher infant mortality or increased stress associated with human-elephant conflict or illegal activity (i.e., poaching) (CoP15 Doc. 68, Annex 6a).

b) Anecdotal reports presented at a stakeholders meeting[1] held in Dar es Salaam (January 2013) to address elephant and other wildlife poaching issues in Tanzania (TEPS 2013a and 2013b) indicate that:
   o the Moyowosi population in northwest Tanzania may have been extirpated;
   o the population in the Ugalla ecosystem in western Tanzania is becoming unviable, with less than 500 elephants left;
   o the Katavi-Rungwa-Ruaha population in central Tanzania has been decimated by poachers;
   o elephants are almost absent from the Matambwe photo-tourism sector of the Selous Game Reserve and from the Kilombero Valley in southern Tanzania;
   o elephants in the southern Selous Game Reserve and Selous-Niassa corridor are being decimated by poachers;
   o Tanzania has lost 50% of its elephant population since 2007; and
   o the national population estimate is <70,000[2] elephants (*versus* 109,000 elephants in 2009 (TAWIRI 2010) and that if this rate of poaching continues, it is estimated that elephants will be extirpated from Tanzania within seven years.

c) Although Tarangire National Park in northeast Tanzania was cited in 2010 as having one of the highest growth rates (6%) ever recorded for an African elephant population (Foley and Faust 2010), it has been reported that since December 2011, there has been ongoing massive organized poaching within the park that has resulted in the illegal killing of at least 30 elephants in the year 2012 alone (Kideghesho *et al.* 2013). Demographic surveys of elephants from the Serengeti ecosystem during 2009-2010 were also indicative of good growth rates; however, the January 24, 2014, seizure of six pieces of elephant tusks in the Tarime District bordering the northern part of Serengeti National Park is an indication that not even the Serengeti ecosystem is free from poachers (http://allafrica.com/stories/201402070291.html).

d) Consistent with the population and anecdotal information available, recent information from the CITES MIKE program also suggests widespread population declines in

---

[1] This meeting was convened by the Tanzanian Elephant Protection Society (TEPS) and was attended by representatives from the Tanzania Ministry of Natural Resources and Tourism (Wildlife Division, Tunduru District Council, Morogoro Region), Tanzania National Parks (NP) (Udzungwa Mountains NP, Ruaha NP, and Mikumi NP), Wildlife Management Areas (WMA), photographic safari operators, hunting safari operators, researchers, NGOs, foreign donors, the press, and other interested individuals (TEPS 2013a).

[2] Note: this estimate was suggested prior to receipt of new information resulting from the 2013 aerial surveys of the Selous-Mikumi and Ruaha-Rungwa ecosystems.

Tanzania due to poaching.  MIKE collects data at representative sites throughout Asia and Africa in order to measure trends in the levels of illegal killing of elephants and identifies factors associated with those trends.  MIKE evaluates relative poaching levels based on the Proportion of Illegally Killed Elephants (PIKE), which is calculated as the number of illegally killed elephants found divided by the total number of elephant carcasses encountered by patrols or through other means, aggregated by year for each site (CITES Secretariat *et al.* 2013).  A PIKE level of 0.5 or higher translates to a level of illegal annual offtake that is likely to be higher than the annual natural birth rate and, therefore, indicates that the elephant population is very likely to be in net decline (CoP16 Doc. 53.1).  Within Tanzania, PIKE values suggest widespread population declines due to poaching.  At the Selous-Mikumi MIKE site, Tanzania's sole World Heritage site, the 2011 PIKE was 0.64 (based on 224 carcasses), a nearly 27% increase over the 2002-2010 average of 0.50.  At the Ruaha- Rungwa MIKE site, the 2011 PIKE was 0.94 (based on 34 carcasses), the highest ever recorded for that site.  The PIKE was 0.86 (based on 29 carcasses) at the Katavi-Rukwa MIKE site (CoP16 Doc. 53.1).

17.  Aside from concerns about population numbers, we are also concerned about the mobility of the African elephant populations in Tanzania.  The Panel of Experts noted, for example, that associated human settlements were increasing in size and number around protected areas and were accompanied by increasing human-elephant conflicts.  These settlements and the associated conflicts were probably the most important factors limiting the elephants' mobility and range.  It was the opinion of the Panel of Experts that -- at the rates of habitat change and land conversion at the time -- the corridors that still remained in Tanzania would be converted to unsuitable habitat in less than 5 years (CoP15 Doc. 68, Annex 6a).

18.  According to Jones *et al.* (2009), Tanzania was working to minimize risks to African elephants, other wildlife, people, and property through improvements in spatial planning involving the identification, maintenance, and restoration of wildlife corridors.  The Tanzania National Elephant Management Plan lays out a strategic objective to restore lost corridors and to increase protection for corridors that are still in use (TAWIRI 2010).  We do not have updated information on the status of the implementation of this strategic objective, but based on the information available we are particularly concerned about the viability of the Selous (Tanzania)-Niassa (Mozambique) corridor.  According to the 2013 survey of the Selous ecosystem only 32 elephants were counted within the Selous portion of the corridor, resulting in an estimate of 1,006 ± 810 (SE) elephants (TAWIRI 2013a).  In addition, poaching in the Niassa Reserve has reached crisis levels, as evidenced by high carcass ratios (18%; population of 12,000 elephants) observed during October 2011 aerial surveys (WCS Mozambique *in litt.* 2014) (see paragraph 24 for an explanation of carcass ratios).

Sustainability of Offtake

19.  In Tanzania, African elephant deaths occur as a result of several factors, including:  1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching.  In order to

evaluate whether offtake from trophy hunting is sustainable, all losses to the African elephant population must be considered.

Legal Offtake

20.  Since 2007, the annual CITES export quota for Tanzania has been 400 tusks (sport-hunting quota of 200 elephants).  During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals.  Tanzania, however, typically has not exported its full quota allotment in sport-hunted trophies or African elephant tusks.  This may be an indication that the quota is set too high.

21.  Although complete records on natural mortality for the entire country or on the killing of problem elephants were not available, the Panel of Experts were able to estimate the level of such offtake by analyzing the data from the ivory store databases of Tanzania.  Based on 21 years of data for that country, an average of 231 elephants died annually from natural mortality, while another 287 individuals died annually from elephant control measures (CoP15 Doc. 68, Annex 6a).  These annual mortality rates continue to be the best estimates available for Tanzania and are cited and used by the Government of Tanzania (TAWIRI 2010).

22.  Based on a sport-hunting quota of 200 African elephants, as well as the estimates cited earlier for natural mortality and problem animal control in Tanzania, the overall legal offtake of African elephants in Tanzania is about 718 elephants annually.  Considering the current population estimate to be 70,000 elephants, which we believe is a significant over-estimate because it did not consider the most recent survey figures, the legal annual offtake would be estimated at about 1% of the population.  This figure is less than the annual population growth rate of 3-5% (CoP15 Doc. 68, Annex 6a) and in itself would be considered sustainable; however, sustainability is measured against total offtake, including illegal offtake, discussed below.

Illegal Offtake

23.  Based on the MIKE report presented to CoP16 (Bangkok, Thailand, 2013), the levels of illegal killing across the African elephants' range are of serious and increasing concern.  There has been an ongoing increase in the levels of illegal killing of elephants in Africa since 2006, with 2011 showing the highest levels of poaching since MIKE records began in 2002.  The increase in poaching between 2010 and 2011 is statistically significant.  As highlighted in paragraph 16, within Tanzania, PIKE values suggest widespread population declines due to illegal offtake.  At the Selous-Mikumi MIKE site, Tanzania's sole World Heritage site, the 2011 PIKE was 0.64 (based on 224 carcasses), a nearly 27% increase over the 2002-2010 average of 0.50.  At the Ruaha- Rungwa MIKE site, the 2011 PIKE was 0.94 (based on 34 carcasses), the highest ever recorded for that site.  The PIKE was 0.86 (based on 29 carcasses) at the Katavi-Rukwa MIKE site (CoP16 Doc. 53.1).  A PIKE level of 0.5 or higher translates to a level of illegal annual offtake that is likely to be higher than the annual natural birth rate, indicating that the elephant populations are very likely to be in net decline (CoP16 Doc. 53.1).  In other words,

the illegal offtake is unsustainable at these sites. Recent information presented at the African Elephant Summit (Botswana, 2013) indicates that in 2012 and the first six months of 2013, the trend in PIKE levels for Eastern Africa stabilized at levels close to those of 2011(CITES Secretariat *et al.* 2013), indicating that unsustainable illegal offtake levels are continuing.

24. Carcass analyses resulting from the 2013 Selous-Mikumi and Ruaha-Rungwa aerial surveys are consistent with MIKE data. Based on the surveys, there were an estimated 6,516 (± 534 SE) elephant carcasses in the Selous-Mikumi, spanning three years. Carcass analyses indicate that more than two thirds (67%) of these elephants were killed 18 to 30 months prior, with much fewer elephants being killed within the last 18 months (<5%). The carcass ratio for the Selous-Mikumi was calculated at 30%, which indicates unnaturally high mortality (TAWIRI 2013a). Natural mortality is represented by a ratio of about 7-8% (Douglas-Hamilton and Burrill 1991, *as cited in* TAWIRI 2013a). In the Ruaha-Rungwa ecosystem, there were an estimated 3,496 (±342 SE) elephant carcasses, spanning over a ten-year period. Carcass analyses indicate that relatively fewer elephants were killed in the last 12 months (<13%). The carcass ratio for the Ruaha-Rungwa was calculated at 14.6%, which indicates unnaturally high mortality (TAWIRI 2013b).

25. It is expected that data showing high levels of poaching would be concurrent with data showing high levels of illegal trade, and this is the case with Tanzania. As noted in paragraph 16, a recent TRAFFIC news article reports that since 2009 Tanzania has made or been implicated in 18 large-scale ivory seizures (i.e., seizures that involved 500 kg or more in a single shipment). Of these seizures, Tanzania only made five of these seizures, while the other 13 seizures were made outside of the country. In total, these seizures represented nearly 43 tons of ivory, representing the death of about 4,000 elephants (http://www.traffic.org/home/2014/1/27/tanzania-reshuffled-cabinet-should-address-poaching-urgently.html). Although information on the origin of ivory from these seizures is not yet available, a significant proportion of the large seizures of ivory made in Asia in 2006 have been traced by forensic DNA work to elephants killed in the Selous-Niassa ecosystem (Wasser *et al.* 2009).

Sustainability of All Offtake

26. In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II (Note: the proposal was rejected), the Panel of Experts noted that illegal hunting can reduce the sustainability of legal offtakes, potentially negatively impacting the population as a whole. The Panel raised concerns that the poaching in the Selous-Mikumi ecosystem, which was happening at that time, could affect the long-term population sustainability. While the Panel concluded that the level of offtake in the Selous-Mikumi ecosystem was not sustainable at the time, the Panel asserted that legal and illegal offtake appeared to be sustainable for other elephant ecosystems where populations were stable or increasing, namely the Tarangire-Manyara, Ruaha-Rungwa, Katavi-Rukwa, Moyowosi-Kigosi and Serengeti (CoP15 Doc. 68, Annex 6a). In recent years our findings have been made under the supposition that the populations mentioned above were stable or increasing, rendering the

overall Tanzania elephant population to be sustainable.  New information, however, indicates that the population decline is no longer restricted to the Selous-Mikumi ecosystem, but is occurring throughout Tanzania.  Estimates are that Tanzania is losing about 30 elephants per day to poaching, a rate far greater than replacement through natural reproduction (TEPS 2013a and 2013b).  This loss rate has recently been cited by TANAPA's Director General, Allan Kijazi (http://allafrica.com/stories/201402041257.html).

Conclusion

27.  Although Tanzania has put into place legal instruments, wildlife management authorities, and a National Elephant Management Plan, the national elephant population has plummeted, primarily due to the ongoing illegal killing of elephants.  Indications are that management resources have not been fully utilized and that governance in Tanzania is weak.  In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II, the Panel of Experts raised concerns about the mechanism Tanzania used for funding the conservation, management, and protection of African elephants; however, after reviewing the actual allocations to the Wildlife Division between 2005 and 2009, the Panel concluded that sufficient funding was available for Tanzania to meet its enforcement obligations during that time period.  The Panel of Experts also raised concern that the levels of offtake in the Selous-Mikumi ecosystem due to poaching was not sustainable at the time and could potentially affect long-term population sustainability.  At the time, the Panel asserted that legal and illegal offtake appeared to be sustainable for other ecosystems where elephant populations were stable or increasing, namely the Tarangire-Manyara, Ruaha-Rungwa, Katavi-Rukwa, Moyowosi-Kigosi and Serengeti.

28.  Our recent non-detriment findings followed the rationale laid out by the Panel of Experts and concluded that the import of sport-hunted trophies from Tanzania would be for purposes that are not detrimental to the survival of the species.  However, now new information indicates that the elephant declines in Tanzania are no longer restricted to the Selous-Mikumi ecosystem, but are occurring throughout the country.  MIKE analyses showing high levels of poaching at sites throughout Tanzania and ETIS data showing rampant, large-scale illegal ivory trade involving Tanzania, point to weak governance.

29.  We recognize that sport-hunting, as part of a sound management program, can provide benefits to wildlife conservation and that sport-hunting of elephants is not the primary cause of the decline of elephant populations in Tanzania.  However, given the significant decline in the elephant population due to uncontrolled poaching and questionable management and governance, we are concerned that additional killing of elephants, even if legal, is not sustainable and will not support effective elephant population recovery efforts in Tanzania.

30.  Therefore, we are **unable** to find that the importation of sport-hunted trophies of African elephants taken in Tanzania during calendar year 2014 will be for purposes that are not detrimental to the survival of the species.

REFERENCES:

Baldus, R.D. and R. Hahn. 2009. The Selous – Niassa Wildlife Corridor in Tanzania: Biodiversity Conservation from the Grassroots. Practical Experiences and Lessons from Integrating Local Communities into Trans-boundary Natural Resources Management. Joint publication of FAO and CIC. Budapest. 48 pp. Available online at: http://www.wildlife-baldus.com/download/transboundary.pdf.

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. African Elephant Status Report 2007: An Update from the African Elephant Database. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

Blanc, J.J., C.R. Thouless., J.A. Hart., H.T. Dublin., I. Douglas-Hamilton., C.G. Craig and R.F.W. Barnes. 2003. African Elephant Status Report-2002: An update from the African Elephant Database. IUCN/SSCAfrican Elephant Specialist Group, Tanzania, 112 -117, IUCN, Gland, Switzerland and Cambridge, UK. Available online at: http://african-elephant.org/aed/aesr2002.html.

CITES Secretariat, IUCN/SSC African Elephant Specialist Group, and TRAFFIC. 2013. Status of African elephant populations and levels of illegal killing and the illegal trade in ivory: A report to the African elephant summit, December 2013. 19pp. Available online at: https://cmsdata.iucn.org/downloads/african_elephant_summit_background_document_20 13_en.pdf.

CoP15 Doc. 68 Annex 6a). 2010.  Report of the Panel regarding the proposal of the United Republic of Tanzania. 19 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/15/doc/E15-68A06a_.pdf.

CoP16 Doc. 53.1. 2012. Monitoring the Illegal Killing of Elephants (MIKE). Sixteenth meeting of the Conference of the Parties, Bangkok (Thailand), 3-14 March 2013, 15 pp. Available online at:  http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-01.pdf.

CoP16 Doc. 53.2.2 (Rev. 1). 2013. ETIS Report of TRAFFIC.  Sixteenth meeting of the Conference of the Parties, Bangkok (Thailand), 3-14 March 2013, 30 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-02-02.pdf.

CoP16 Prop. 11. 2012. Transfer the population of the African elephant, *Loxodonta africana*, of the United Republic of Tanzania from Appendix I to Appendix II (with an annotation) (Note: proposal withdrawn). Available online at: http://www.cites.org/sites/default/files/eng/cop/16/prop/E-CoP16-Prop-11.pdf.

Foley, C.A.H. and L.J. Faust. 2010. Rapid population growth in an elephant *Loxodonta africana* population recovering from poaching in Tarangire National Park, Tanzania. *Oryx* 44(2):205─212.

Government of the United Republic of Tanzania. 2010. The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010). Gazette of the United Republic of Tanzania (No. 27; Vol. 91):1─35.

Jones, T., T. Caro and T.R.B. Davenport (eds.). 2009. Wildlife Corridors in Tanzania. Unpublished Report. Tanzania Wildlife Research Institute (TAWARI), Arusha. Available online at: http://www.tzwildlifecorridors.org/TzWildlifeCorridors.pdf.

Jones, T. and K. Nowak. 2013. Elephant declines vastly underestimated. *A Voice for Elephants*. December 16, 2013. National Geographic Society. Available online at: http://newswatch.nationalgeographic.com/2013/12/16/elephant-declines-a-view-from-the-field/.

Kideghesho, J.R., A.A. Rija, K.A. Mwamende and I.S. Selemani. 2013. Emerging issues and challenges in conservation of biodiversity in the rangelands of Tanzania. *Nature Conservation* 6:1-29.

Mpanduji, D.G., H. Hofer, T.B. Hilderbrandt, F. Goeritz, M.L.East. 2002. Movement of elephants in the Selous-Niassa wildlife corridor, southern Tanzania. *Pachyderm* 33:18-31.

Tarimo, E.E., E.L.M. Severre, and S. Mduma. 2011. *in litt.* Elephant Management Plan and Law Enforcement in Tanzania: A report presented at the meeting between Ministry of Natural Resources and the Department of Interior, Fish and Wildlife Service, Washington, D.C., 17 February 2011. 16 pp.

TAWIRI. 2013a. Aerial census of large animals in the Selous-Mikumi ecosystem, dry season 2013, population status of African elephant. Arusha, Tanzania, 11pp.

TAWIRI. 2013b. Aerial census of large animals in the Ruaha-Rungwa ecosystem, dry season 2013, population status of African elephant. Arusha, Tanzania, 12pp.

TAWIRI. 2010. Tanzania Elephant Management Plan 2010-2015. TAWIRI, Arusha, Tanzania, 95 pp. Available online at: www.tawiri.or.tz/images/Conference/elephant_plan.pdf.

TEPS. 2013a. Recognition and tackling of the current elephant poaching crisis in Tanzania. Report by Tanzania Elephant Protection Society (TEPS) Task Force to the Parliamentary Committee of Land, Natural Resources and Environment. April 2013. Dar es Salaam, Tanzania, 18pp. Available online at:

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2014*

http://www.tanzaniaelephantprotectionsociety.org/images/PDFs/TEPS_Elephant_Crisis_Report_BUNGE1_April_2013.pdf.

TEPS. 2013b. Tackling the elephant poaching crisis in Tanzania. Presentation to the Parliamentary Committee of Land, Natural Resources and Environment. 23rd April 2013. Task Force, Tanzania Elephant Protection Society. Dar es Salaam, Tanzania, 28pp.

Wasser, S.K., B. Clark and C. Laurie. 2009. The Ivory Trail. *Scientific American*, July 2009. Pp. 68-76.

WCS Mozambique. 2014. *in litt.* Niassa Reserve expanded elephant protection program. USFWS WWB-AECF FY14 grant proposal (F13AS00357).




# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer To:
FWS/AIA/DMA

Memorandum

MAR 2 7 2014

To:        The File

From:      Chief, Branch of Permits

Subject:   Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in
           Tanzania during 2014

The African Elephant (<u>Loxodonta africana</u>) is listed as threatened under the U.S. Endangered
Species Act (Act) with a special rule [50 CFR 17.40(e)]. In addition to other items, the special
rule gives the requirements for the import of sport-hunted trophies. Under paragraph
17.40(e)(3)(iii)(C), the U.S. Fish and Wildlife Service (Service) must make a finding that the
sport-hunting of elephants will enhance the survival of the species in the wild.

In a meeting in Washington, D.C. on February 17, 2011 between the Service and the Tanzania
Ministry of Natural Resources and Tourism (MNRT), the Service was provided with a copy of
Tanzania's Elephant Management Plan 2010 – 2015, signed and endorsed by the Minister for
Natural Resources on January 15, 2011 (the last National Elephant Management Plan for
Tanzania had been produced in 2001). The 2010 Elephant Plan identified nine (9) Strategic
Objectives which needed to be address for the effective management of Tanzania's elephant
population. The Plan also identified three major issues impacting Tanzania's ability to manage
its elephants. The first was the growth in Tanzania's human population which had doubled in
size since 1984, putting increased pressure on the country's natural resources and creating
challenges in conserving its elephants, (e.g., increased human-elephant conflicts). The second
was the threat to healthy and sustainable elephant populations from an increasing loss of
connectivity between important wildlife habitat areas in Tanzania. Existing wildlife corridors
where under increased pressure from expansion of agriculture lands, increased human settlement,
and habitat destruction caused by logging and charcoal production. The third issue was the
ability to provide increased protection for Tanzania's elephant population. There had been an
upsurge in elephant poaching occurring across eastern and central African over the past three to
five years, apparently fueled by the increased demand for ivory in Asia. This increase in demand
had also impacted several distinct elephant populations within Tanzania. A 2009 national
elephant census showed an overall decline in Tanzania's elephant population for the first time
since 1989.

Since that time, the Service has received more recent population surveys and biological

information to indicate a continued decline in Tanzania's elephant population. One example is the Selous-Mikumi ecosystem that was once an elephant stronghold representing the second largest elephant population in Africa and approximately 40% of Tanzania's elephant population. An October 2013 population survey of that ecosystem indicated that an 80% population decline has occurred in the last three years, from a population of approximately 40, 000 to 13,000. Of further concern are the numerous reports of questionable government activities relating to how the elephant hunting program is being managed. While the Service recognizes that a well-managed hunting program could provide a conservation benefit to Tanzania's elephant population, there are indications that Tanzania's program is being managed in a manner whereby participation by U.S. hunters may no longer provide a conservation benefit to the species as is required under the Act. In addition, information regarding financial resources and infrastructure indicates that the Tanzania Government may no longer have the ability to effectively manage and protect its elephant population. We have also received information to indicate that ivory poaching has continued to increase in some parts of the country, and that human-elephant conflict has continued to rise with an ever increasing human population and settlement into elephant habitat for agriculture use and livestock grazing. Therefore, the Service is *unable to find* that the taking of sport-hunted elephant trophies in Tanzania will enhance the survival of the species.

Basis for Finding:

***Management Plan***: On March 21, 2007, the Division of Management Authority (DMA) sent a letter to the Wildlife Division, MNRT, requesting updated information relating to their current management program for African elephants. This request was stimulated due to the Service not having any substantive communication with the government of Tanzania regarding their elephant management program and elephant hunting in Tanzania for several years. The DMA request related specifically to the following areas: (1) existence of an elephant management plan; (2) current population status of Tanzania elephants; (3) existing legislation and programs relating to elephant conservation and management; (4) elephant trophy hunting quotas for Tanzania; (5) threats of poaching and human-elephant conflicts; (6) revenue generated by trophy hunting; and (7) operations involving trophy hunting in Tanzania. The Service received an email response to this letter on July 1, 2008. While this communication indicated that Tanzania's original response had been sent to DMA on October 29, 2007, by an acting Director of Wildlife, Mr. F. Lyimo, the Service had no record of this official response having been received.

The 2008 e-mail indicated that Tanzania had an approved Policy and National Management Plan for African Elephant that was developed in 2001. This plan was also reviewed on a regular basis to accommodate new insight and other issues deemed pertinent to the conservation of the African elephant. The identified objectives of this elephant management plan were to increase elephant numbers and restore age and sex structures; promote economic value of elephants through tourist game viewing and sustainable harvest through tourist hunting; control elephant numbers where necessary and appropriate (mitigate human-elephant conflict); and incorporate community-based conservation whereby local communities realize a direct benefit from the sustainable utilization and management of elephants. This plan was intended to be implemented throughout the entire country.

More recently, a February 17, 2011, meeting between the Service and the MNRT occurred in Washington, D.C. to discuss concerns by the Government of Tanzania and the Tanzania Hunting Operators Association (TAHAO) relating to potential changes the Service might implement regarding import permits issued to clients intending to hunt elephants in Tanzania in 2011. These concerns were based primarily on the July 23, 2010, Convention on International Trade in Endangered Species (CITES) non-detriment finding prepared by the Service's Division of Scientific Authority (DSA). In that finding, DSA raised several concerns, the first being the availability of future resources to the Wildlife Division to combat poaching in Tanzania, especially in the Selous-Mikumi ecosystem. The second involved the threats to wildlife corridors within Tanzania which allows for elephant movement throughout Tanzania and transboundary populations. These corridors were under increased pressure due to the rising human population in Tanzania, loss of these corridors due to the expansion of agricultural lands, and human expansion into elephant habitat. During this meeting, the Service received a copy of Tanzania's Elephant Management Plan 2010 - 2015, prepared by the Tanzania Wildlife Research Institute (TAWIRI) with the financial support of the Government of Tanzania. This document was endorsed by the Minister for Natural Resources and Tourism on January 15, 2010. The document identified nine key strategic objectives for a management plan: (1) human-elephant conflict; (2) elephant corridors; (3) law enforcement; (4) benefits/sustainable utilization; (5) management of ivory stockpiles; (6) research and monitoring; (7) elephant health and welfare; (8) cross-border cooperation; and (9) elephant information management.

In the 2011 meeting, Mr. Eramus Tarimo, Director of Wildlife, MNRT, provided a summary of the strategic objectives under the national elephant plan. Mr. Tarimo noted the many challenges to the plan, including: low human resources and financing; the large area covered by Tanzania; the high demand for ivory; an increase in poverty; increased frequency of human-elephant conflicts due to human population growth; political resistance to maintaining wildlife corridors; reversing attitudes people have towards elephants; and providing local communities with a stake in managing, protecting, and conserving elephants as both a natural and economic resource. Mr. Tarimo stated that major reforms were underway to improve the management of wildlife outside National Parks and the Ngorongoro Conservation Area and Game Reserves. He also stated that trophy hunting played a major role in wildlife conservation in Tanzania. Mr. Tarimo went on to state that the Government of Tanzania was in need of United States support to help strengthen their law enforcement capabilities in protected areas and to assist with anti-poaching operations.

Based on this discussion and the document provided to the Service, we have concluded that the "Elephant Management Plan 2010-2015" was a very good starting point for Tanzania, provided that the country strived to overcome the challenges presented by Mr. Tarimo and strived to fully implement the plan throughout Tanzania. However, the presences of a plan, particularly a plan that is not fully implemented, was not sufficient in and of itself to meet the criteria established by the ESA or CITES.

***Population Status***: Tanzania's Protected Area (PA) network for wildlife includes six ecosystems: Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa; and Moyowosi-Kigosi. In 2006, the Tanzania Wildlife Research Institute (TAWIRI 2007, as cited in CoP15 Doc. 68, Annex 6a) estimated the African elephant populations in these six ecosystems

within Tanzania at 139,915 ± 12,338 (SE) animals, based on census surveys covering 227,328 sq.km using both total and sample counts. This estimate was not significantly different from the 111,475 ± 18,728 (95% CL) elephants estimated in 2000-2003. It was noted that the 2006 estimate did not include 2,873 additional elephants from areas that had not been previously surveyed, providing a country-wide "best estimate" of 142,788 ± 12,405 (SE) elephants in 2006 (CoP15 Doc. 68, Annex 6a). According to the IUCN SSC African Elephant Status Report 2007 (Blanc *et al.*, 2007), the 2006 elephant population in Tanzania was categorized as being an estimated 108,816 elephants identified as "definite," 27, 937 "probable," 29,350 "possible", and 900 "speculative". These estimates were based upon aerial or ground counts, direct sample counts, reliable dung counts, and informed guesses. This was a reported increase from the 2002 report, which estimated 92,453 elephants as "definite," an increase of 16,363 elephants. The report attributed this increase largely due to the results of new estimates from methodologically comparable surveys. The report stated that although over 60% of the country's estimated elephant range was covered by good quality counts, over a third of the estimated range still remained unassessed. According to the 2007 IUCN report, an aerial survey of the Ruaha-Rungwa Ecosystem conducted by the Tanzania Wildlife Research Institute (TAWIRI, 2007), found an estimated 35,409 ± 11,507 (95% CL) elephants. An aerial survey of the Selous Ecosystem (TAWIRI, 2007), found an estimated 70,406 ± 24,843 (95% CL) elephants. These areas account for the two largest elephant populations within Tanzania and Tanzania alone accounted for about 80 % of Eastern Africa's regional population.

In 2009, a similar survey was conducted across the same six ecosystems covering 229, 318 sq.km. This census produced a total population estimate of 105,439 ± 6, 080 (SE) African elephants (TAWIRI 2010a, as cited in CoP15 Doc. 68, Anex 6a). A "best estimate", which included an additional 3,583 elephants, provided a country-wide estimate of 109,022 ± 6,135 (SE) elephants in 2009. The results of this survey suggested a significant decline compared to the 2006 estimate of 142,788 elephants and that the decline could be attributed in large part to a downward population trend recorded in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a). According to the 2013 IUCN SSC Provisional African Elephant Status Report (AESR 2013), the 2012 elephant population in Tanzania was categorized as being an estimated 95,351 elephants defined as "definite," 10,278 "probable," 10,927 "possible," and 900 "speculative." These survey numbers were based upon the same methodology used in the 2007 report. There was a clear decrease in population from the 2007 report, which estimated 108,816 elephants as "definite," 13,465 elephants. According to the 2013 IUCN report, the 2009 aerial sample counts of the Ruaha-Rungwa and the Selous-Mikumi Ecosystems (TAWIRI, 2009), replaced the 2006 survey of those systems. The Rauha-Rungwa survey found an estimated 31,625 ± 5,665 (95% CL) elephants and the Selous-Mikumi survey found an estimated 38,997 ± 5,183 95% CL) elephants. Both surveys represented a decline in those populations, with the Selous-Mikumi ecosystem experiencing a significant decline of more than 30,000 elephants. According to TAWIRI, there were methodological issues during the 2006 survey that is believed to have resulted in an overestimate of this population. Taking several factors into account, TAWIRI estimated the actual population in the Selous ecosystem would have been approximately **50,000 elephants in 2006**. This still represents a significant decline (**approximately 11,000 elephants**) most likely resulting from illegal killing taking place in this area.

Two more recent aerial surveys were undertaken by TAWIRI during the 2013 dry season, again looking at the Ruaha-Runga and Selous-Mikumi Ecosystems. The preliminary results of those surveys show a continued decline in those two populations. The census of the Ruaha-Rungwa ecosystem covered 50,889 sq.km. The results of this survey produced a total population estimate of 20,090 ± 3,282 (SE) elephants. This represents a significant decline (over 11,500 elephants) from the 2009 estimates. This estimate was derived from a count of 1,247 live elephants recorded along 119 transects. In addition, a total of 214 elephant carcasses were also recorded during this survey. Using these two figures, the carcass ratio for the Ruaha-Rungwa ecosystem was 14.6%. This carcass ratio is indicative of a population suffering from unnaturally high mortality. A carcass ratio of about 7 to 8% is considered to represent natural mortality (Douglas-Hamilton and Burrill 1991).

The census of the Selous-Mikumi ecosystem covered 87,421 sq.km. The results of this survey produced a total population estimate of 13,084 ± 1,816 (SE) elephants, the lowest numbers ever recorded in this ecosystem. This represented another significant decline (over 25,000 elephants) from the 2009 estimates. This estimate was derived from a count of 712 live elephants recorded along 203 transects. In addition, a total of 314 elephant carcasses were also recorded during this survey. With these figures, the carcass ratio for the Selous-Mikumi ecosystem was calculated at 30%, twice that recorded in Ruaha-Rungwa, indicating an unnaturally high rate of mortality in the two most significant elephant populations within Tanzania. These numbers indicate significant and unsustainable levels of illegal killing taking place within the two largest elephant populations found in Tanzania.

Based on the most recent surveys, it seems apparent that Tanzania has experienced a significant increase in illegal offtake due to poaching and the increased demand for ivory in the Asian market. In response to the current conditions in Tanzania and the urgent need for wildlife protection, the Service, in collaboration with USAID-TZ, awarded $200,310 in U.S. Government funds, matched by $378,443 from other partners, to fund four African Elephant Conservation Fund (AFE) projects that will get underway in 2014. The first project will assess patterns of poaching risk in relation to resource-constrained distribution of Mikumi elephants, for a long-term elephant protection and management strategy in partnership with the Animal Behavior Research Unit in Mikumi National Park. This project will support TANAPA to help improve their ability to protect elephants by assessing elephant distribution and habitat use, threats and poaching activity, and deploying patrol efforts effectively within Mikumi National Park.

The second project will monitor the long-term effects of poaching of elephants in southern Tanzania in partnership with the Udzungwa Elephant Project. This organization, in response to widespread elephant poaching throughout southern Tanzania, is working to protect a key population near Tanzania's elephant strongholds of Selous and Ruaha. Activities will include training staff from TAWIRI, assessing four elephant populations for early warning signs of decline, and training national park staff in monitoring elephant populations and conducting anti-poaching activities.

The third project will support aerial operations and law enforcement activities for the Selous Game Reserve in partnership with the Frankfurt Zoological Society/Grzimek's Help for

Threatened Wildlife, Inc., and the Tanzania Wildlife Division. The Selous, formerly the second most numerous elephant population in Africa, has been heavily impacted by poaching for the past decade with the most recent survey indicating a population of only 13,084 elephants, the lowest levels ever recorded in that area. This project will reinvigorate anti-poaching efforts in the Selous by supporting operating expenses for an aircraft to conduct aerial surveillance, for patrol vehicles, and for basic equipment for rangers throughout the reserve.

The final project will support village game scouts on the Waga Wildlife Management Area, in the Ruaha ecosystem. This will be done in partnership with the Wildlife Conservation Society. In order to improve patrol efficiency, this project will fund village game scout anti-poaching patrols and the pilot phase of a spatially explicit law enforcement monitoring technique, SMART (Spatial Monitoring and Reporting Tool), in the community-owned Waga Wildlife Management Area bordering Ruaha National Park in Tanzania.

The significant decline in the elephant population throughout Tanzania raises grave concerns over the impact of any additional offtake, including sport-hunting, on the country's elephants and its continued survival in the country. These declines must be taken into consideration with any finding made by DMA in regards to trophy imports to ensure that U.S. hunters, while operating under the best intentions, do not adversely contribute to further elephant population declines in Tanzania.

***Regulations and Enforcement***: In Tanzania, wildlife resources are protected under several Acts of Parliament, providing the authority for all aspects of wildlife management, including law enforcement. The Wildlife Conservation Act (WCA) of 2009, which replaced the original WCA of 1974, provides the legal framework for operation of the Wildlife Division under the MNRT, including the appointment of the Director, as well as the establishment of Game Reserves, Game Controlled Areas, Wildlife Management Areas, and other protected areas such as wildlife corridors (not including national parks). The WCA also provides for the establishment of a Wildlife Authority to address the management of wildlife occurring outside the National Parks or the Ngorongoro Conservation Area, with the added responsibility for meeting international obligations involving wildlife conservation. There is also a Wildlife Protection Unit that is granted paramilitary status under the WCA, with the duty of protecting wildlife against unlawful utilization.

In addition, the National Parks Act (CAP 282 RE 2002) establishes the legal authority for the creation and management of national parks, granting powers to the Director General to enable maintenance and security within national parks, as well as the responsibility for the protection of their wildlife resources. The Ngorongoro Conservation Act (CAP 284 RE 2002) provides the legal framework for the existence of the multiple land use in the Ngorongoro Conservation Area and its management Authority under the direction of the Conservator, and also provides the authority for its maintenance and security. The Tanzania Wildlife Institute (TAWIRI, CAP 260 RE.2002), grants powers to the Director General who is responsible for research involving wildlife, and for providing this information to the Wildlife Authorities. The TAWIRI also functions as the CITES Scientific Authority for Tanzania.

The responsibility for managing Tanzania's wildlife falls under four institutions. The first is the Tanzania National Parks (TANAPA). This Parastatal Organization is responsible for managing 15 National Parks with a total area of 50,872 sq.km. In the national parks, only the non-consumptive utilization (tourism game viewing) of wildlife resources is allowed. The second is the Ngorongoro Conservation Area Authority (NCAA). This is also a Parastatal Organization which is responsible for management of only one area, the Ngorongoro Conservation Area covering 8,300 sq.km. It is the only multiple land use wildlife area in Tanzania in which the consumptive utilization of wildlife is not permitted.

The Wildlife Division under the MNRT is responsible for the management of 28 Game Reserves (GRs) with an area of 112,564 sq.km., approximately 38 Game Controlled Areas (GCAs) covering about 161,521 sq.km, and Ramsar sites covering 249,856 sq.km. There are also District Councils, Local Government institutions that work in collaboration with the Wildlife Division. These Councils oversee wildlife conservation issues and facilitate the establishment and management of Wildlife Management Areas (WMAs) on village lands that are outside Protected Areas (PAs). The framework for WMAs was outlined in Tanzania's Wildlife Policy of 1998 (revised in 2007), with legislation established under the Wildlife Management Areas Regulations of 2002, authorizing the formal establishment of WMAs. The goal of this policy is to allow for rural communities and private land holders to manage wildlife on their land for their own benefit and to transferring management responsibilities of settled and unsettled areas outside PAs to rural people and the private sector.

The WMAs are used by communities for conservation and benefit sharing in conjunction with the Wildlife Division. These local communities run the WMAs as a business venture. However, 50% of any hunting revenue generated is retained by the Wildlife Division which also sets quotas and tariffs for any hunting that occurs in the WMAs. The facilitation of these WMAs commenced in 2003, with 12 of 16 original proposals achieving Authorized Association (AA) status. As of June 2010, there were an additional 12 proposals in process. The establishment of these WMAs has resulted in an additional 23,700 sq.km. of Tanzania's land area being added to its conservation network and increased capacity for protected area management through the training of village game scouts and WMA managers. As of June 2010, six out of the ten WMAs with user-rights had entered into business agreements with the private sector worth over $3.3 million, however, it appears that only a small proportion of this money is being been made available to the local communities. Over $1.7 million was allocated to nine WMAs and several districts in which hunting took place between 2005 -2008. However, there appears to be ongoing challenges that need to be addressed. Investment in training and capacity development needs to be increased as there is a shortage of qualified personnel with relevant skills to be able to manage the Community-based Organizations (CBOs) and AAs. The ability of the community to hold the CBO management accountable and ensure transparent decision-making processes is an issue. There is also a pressing need to increase the economic benefits realized by local communities from utilization of wildlife resources. Overall, the WMAs have a low capacity for generating income for socio-economic development, and as such, do not provide an incentive to local communities to support or even tolerate wildlife as a potential source of renewable revenue.

Both the consumptive and non-consumptive utilization of wildlife resources contributes to about

10% of Tanzania's annual Gross National Product. The tourist industry generates approximately 1.3 billion per year with about 80 million annually going to TANAPA, NCAA, and the Wildlife Division to fund their operations. The two parastatal organizations, TANAPA and NCAA retain 100% of their revenue share. As a result, both TANAPA and NCAA are generally self-sustaining and consequently, National Parks and equivalent areas such as Ngorongoro Conservation Area, with an area covering approximately 57,387 sq.km., or 38% of all PAs in Tanzania, are adequately funded.

By contrast, the Wildlife Division's revenue share is paid to the central treasury, and the Treasury is then responsible for distributing the budgeted monies to the Wildlife Division. The Wildlife Division is responsible for the management and protection of Game Reserves with an area covering approximately 109,471 sq.km., (62% of all PAs). The Wildlife Division over a three year period covering 2007-2009, received only 63% ($2,634,975 per year) of its approved budget from the central Treasury. This is equivalent to US$ 24 per sq.km which, when compared to the generally accepted norm of ca. US$ 200 per sq.km required to protect PAs across southern and eastern Africa (Cummings, 2004), is completely inadequate. With regards to the Selous Game Reserve, the equivalent figure is US$ 19 per sq.km based on an annual actual budget of $928,597. Based on this level of funding, it is apparent that the Wildlife Division has not had adequate resources to be able to meet its obligations to conserve, manage, and protecting Tanzania's wildlife resources.

Of further concern is the situation with the elephant population in the Selous-Mikumi ecosystem. Prior to 2005, a Revenue Retention Scheme was in operation in the Selous Game Reserve. This was an agreement between the Government of Tanzania and the German government aid agency, GTZ, whereby a special project status was granted to Selous GR (IUCN-UNESCO, 2007). This allowed for 100% of revenue from photographic tourism, and 50% of revenue from hunting operations to be retained for management of the area. Over the 10 year period from 1994-2004, this retention scheme provided and operational and development budget totaling $ 15.8 million, an average of $1,576,000 annually. However, following National budget reductions in 2004, this amount retained by the Reserve declined dramatically to approximately $800,000 in 2008. This drop in revenue coincides with a period of increased poaching in the Reserve suggesting that anti-poaching operations are severely underfunded.

The hunting of elephants is permitted in Game Reserves, Game Controlled Areas, and Wildlife Management Areas where designated hunting blocks exist. The trophy hunter is required to pay of a license fee that ranges from $7,500 to $25,000, the fee being determined by the tusk size of the animals shot and the type of weapon used. The minimum tusk size of a trophy animal is 15kg for males and females. In 2007, Tanzania notified the CITES Secretariat that it had established and export quota of 200 elephants (400 tusks), an increase of 100 bull elephants a year. However, since that time, the legal off-take has been less than 50% of the established quota.

U.S. hunters are the primary recipients of licenses in Tanzania. It is the belief of these hunters, as well as the DMA, that the funds generated from these licenses are being used for conservation purposes. If, however, only a limited portion of these funds are actually utilized for conservation,

it raises further concerns that U.S hunters are not actually contributing the level of conservation funding they are led to believe, and therefore, are not likely to meet the ESA criteria of showing that imports of their trophies contribute to the enhancement of the species.

***Sustainable Use***: The elephant deaths that occur in Tanzania are a result of several factors, including: 1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching. In considering whether any level of off-take from trophy hunting is sustainable, the level of both legal and illegal take, as well as the rate of natural mortality throughout the country, must be taken into consideration. As previously stated, since 2007, Tanzania has had an established export quota of 200 bull elephants (400 tusks). From 2003-2006, the export quota was set at 100 elephants (200 tusks). During the period from 1997-2002, the quota was set at 50 elephants (100 tusks). Typically, Tanzania has not exported its full quota allotment in sport-hunted trophies or tusks. During the period covering 1997-2009, elephant tusks exported annually amounted to about 40-45 % of the allowed quantities and never exceeded the approved annual quota. In 2010, in conjunction with Tanzania's request to have their elephant populations down-listed to Appendix II, a CITES Panel of Experts was convened to determine whether a down-listing was warranted. At the time, records of natural mortalities covering the entire country were not available and the MNRT Wildlife Division failed to provide data that the Panel requested on the killing of problem elephants. An analysis of the Wildlife Division and TANAPA ivory store databases in 2010 showed the accumulation of 9,705 whole tusks from natural mortality and 12,057 from Problem Animal Control (PAC) in the period from 1989-2009. When averaged over the 21-year period, this was equivalent to 231 elephants dying from natural causes and 287 elephants taken as problem elephants annually. Based on these numbers and the number of trophy animals taken each year, it was estimated that a minimum of 718 elephants were taken annually by legal means. This was equal to 0.7% of the 2009 elephant population estimate of 109,022. Based on what was considered very low carcass detection rates for the country overall, it is likely that the number of natural mortalities was much higher. However, the Panel believed that the level of offtake from legal killings still fell within the expected rate of increase of the elephant population, 3 to 5% annually, which was considered sustainable.

With regards to illegal off-take, official elephant poaching statistics provided to the Panel by the Wildlife Division indicated that 258 reported poaching incidents were documented during 2005-2009, including 82 poaching incidents in 2009. This was the highest reported number of elephants poached in any one year during that time period. The Panel noted, however, that total number of poaching incidents was considered to be greatly underestimated given the low elephant carcass detection rates for the country (CoP15 Doc. 68, Annex 6a). Evidence cited by the Panel showed that poaching had led to elephant population declines in the Selous-Mikumi ecosystem, based in part, on the Proportion of Illegally Killed Elephants (PIKE) values collected at the Selous Mikumi Monitoring Illegal Killing of Elephants (MIKE) site, showing a progressive increase in poaching activities between 2003 and 2009 (CITES Secretariat, 2010). In addition, the joint Wildlife Division/Selous Rhino Project aerial observations and foot patrols recorded more than a threefold increase in encounter rates of recently dead elephant carcasses between 2007 and 2008 (TAWIRI, 2010b). There had also been reports from tourism operators in the northern Selous of increased elephant and other wildlife poaching since 2007/2008, including several incidents close to tourist camps. There were also a significant proportion of the large

131

seizures of ivory made in Asia in 2006 that were traced by forensic DNA work to elephants killed in the Selous-Niassa area (Wasser et al., 2009). The ivory confiscations served to highlight that the Selous-Mikumi ecosystem was a hotspot for elephant poaching. In the Udzungwa National Park, all ivory collected by wildlife enforcement officials was from confiscations. According to wildlife officials, these confiscations consisted of illegally-sourced ivory coming out of nearby Kilombero Game Controlled Area in the Selous-Mikumi ecosystem. In addition, the highest numbers of tusks confiscated by field-based Wildlife Division offices were found to originate from Morogoro and Lindi, both areas which are adjacent to the Selous-Mikumi ecosystem (CoP15 Doc. 68 Annex 6a). Given these factors, the Panel of Experts came to the conclusion that the level of off-take at that time was not sustainable in the Selous-Mikumi ecosystem, an area containing about 40% of Tanzania's total elephant population. However, the Panel did note that the legal and illegal off-take appeared to be sustainable in the five other elephant ecosystem, including Ruaha-Rungwa, where populations were stable or increasing, but there were concerns that the situation in the Selous-Mikumi ecosystem could affect long-term elephant population sustainability.

MIKE collects data at representative sites throughout Asia and Africa to measure trends in the levels of illegal killing of elephants, as well as identifying factors associated with those trends. MIKE evaluates relative poaching levels based on the PIKE, which is calculated as the number of illegally killed elephants found divided by the total number of elephants carcasses encountered by patrols or through other means, aggregated by year for each site (CITES Secretariat et. al. 2013). A PIKE level of 0.5 or higher translates to a level of illegal annual off-take that is likely to be higher than the annual natural birth rate and, therefore, indicates that the elephant population is very likely to be in net decline (CoP16 Doc. 53.1). A more recent analysis of MIKE data indicates that the levels of killing across the African elephants' range are of serious and increasing concern, and populations throughout Tanzania are declining due primarily to rampant poaching. At the Selous-Mikumi MIKE site, the 2011 PIKE level was 0.64 (based on 224 carcasses), a nearly 27% increase over the 2002-2010 average of 0.50. At the Ruaha-Rungwa MIKE site, the 2011 PIKE was 0.94 (based on 34 carcasses), the highest ever recorded for that site. The PIKE was 0.86 (based on 29 carcasses) at the Katavi-Rukwa MIKE site (CoP16 Doc. 53.1). This trend raises concerns as to the effectiveness of Tanzania's management and enforcement capabilities in protecting their elephant populations and the country's wildlife resources in general.

Of additional concern is the distribution of elephants in relation to existing wildlife corridors in Tanzania, and the impact these corridors have on the mobility of these populations. These wildlife corridors are being destroyed by rapid agricultural expansion, unplanned land use, unsustainable resource utilization, and road construction, resulting in increased isolation of protected areas within Tanzania. The Panel of Experts noted that associated human settlements were increasing in size and number around protected areas, the result being increased human-elephant conflicts. These settlements and the associated conflicts were probably the most important factors limiting the elephant's mobility and range. It was the opinion of the Panel at the time, based on the rates of habitat change and land conversion, that those wildlife corridors still remaining in Tanzania would be converted to unsuitable habitat (would disappear) in less than 5 years (CoP15 Doc. 68, Annex 6a). The current National Elephant Management Plan lays

out a strategic objective to restore lost corridors and to increase protection for corridors that are still in use (TAWIRI 2010). The Wildlife Conservation Act (WCA) of 2009, Part IV (b), Section 22. (1-3), provides the legal framework for conserving Tanzania's wildlife corridors. However, it is not clear whether regulations for implementing this section of the Act were ever written, published, or are currently being implemented.

Based on the most current information available, there is particular concern about the viability of the Selous (Tanzania)-Niassa (Mozambique) corridor. The Selous-Niassa ecosystem extends across southern Tanzania and northern Mozambique, and is one of the largest trans-boundary ecosystems in Africa covering ca. 154,000 sq.km of diverse miombo woodland and supporting a rich mammalian and avian fauna (Jones *et al.*, 2009). According to the 2013 survey of the Selous ecosystem, there were only 32 elephants counted within the Selous portion of the corridor, which resulted in an estimate of $1,006 \pm 810$ (SE) elephants (TAWIRI 2013a). Additionally, poaching in the Niassa Reserve has reached crisis levels, as evidenced by high carcass ratios (18%; population of 12,000 elephants) observed during October 2011 aerial surveys (WCS Mozambique *in litt.* 2014).

***Summary***: The most recent national elephant management plan, "Elephant Management Plan for Tanzania 2010-2015", was prepared by TAWIRI with the financial support of the Government of Tanzania. The Plan identified nine strategic objectives to be addressed in order to effectively manage Tanzania's elephant population. The Plan also identified three major issues impacting Tanzania's ability to manage its elephants: (1) the country's increasing human population which is putting pressure on natural resources and presenting challenges to conserving its elephants; (2) the threat to healthy and sustainable elephant populations from an increasing loss of connectivity (wildlife corridors) between important wildlife habitat areas in Tanzania; and (3) the ability to provide increased protection for Tanzania's elephant population. In a meeting between the Service and representatives from Tanzania that took place in Washington, D.C. in 2011, then Director of Wildlife, MNRT, Erasmus Tarimo, acknowledged that there were many challenges to the plan, including: low human resources and financing; the high demand for ivory; increase in the level of poverty; increased human-elephant conflicts related to human population growth; political resistance to maintaining wildlife corridors; and providing local communities with a stake in managing, protecting, and conserving elephant populations in Tanzania. Mr. Tarimo indicated at the time that major reforms were underway to improve the management of wildlife resources outside National Parks and Game Reserves.

However, since that time, the situation involving Tanzania's elephant population has grown increasingly worse based on current information from a number of sources. The most recent aerial surveys undertaken by TAWIRI conducted during the 2013 dry season covered the two most important ecosystems for elephants in Tanzania, the Ruaha-Rungwa and Selous-Mikumi Ecosystems. The resulting data shows a continued and rapid decline in the two largest elephant populations in Tanzania. The census of the Ruaha-Rungwa ecosystem showed a decline of over 11,500 elephants from the 2009 population estimate of 31,625. The census of the Selous-Mikumi ecosystem showed a decline of over 25,000 elephants from the 2009 survey estimate of 38,997. The carcass ratios resulting from the survey data from each area was indicative of populations suffering from unnaturally high mortality, with the Selous-Mikumi ecosystem having

a mortality rate twice that of the Ruaha-Rungwa ecosystem. These ratios indicate significant and unsustainable levels of illegal off-take occurring in these ecosystems.

In 2010, the CITES Panel of Experts, in its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II, raised concerns that the level of offtake due to poaching in the Selous-Mikumi ecosystem was not sustainable and could potentially affect long-term population sustainability throughout Tanzania. However, the Panel also determined that legal and illegal off-take appeared to be sustainable in other ecosystems where elephant populations were found to be stable or increasing, namely the Tarangire-Manyara, Katavi-Rukwa, Moyowosi-Kigosi, Serengeti, and including the Ruaha-Rungwa ecosystem. However, since that time, new information indicates that the elephant declines in Tanzania are no longer restricted to the Selous-Mikumi ecosystem. A more recent analysis of MIKE data indicates that the levels of killing across the elephant's range are serious and on the rise, and that elephant populations throughout Tanzania are declining due primarily to rampant poaching.

Of further concern are recent reports of political corruption at high levels within the government, as well as allegations of Wildlife Division staff within MNRT being in collusion with poachers in the illegal killing of elephants. In October of 2013, under orders from the President of Tanzania, Jakaya Kikwete, a countrywide anti-poaching operation was undertaken to combat the illegal taking of elephants. However, the operation, named "Operation Tokomeza", was suddenly terminated after human rights violations, including homicide and rape, were reported to have been committed during the operation, mainly by army personnel involved in the operation. The victims were semi-nomadic pastoralists who illegally, but quite often, utilize national parks and reserves for grazing their livestock. It was also reported that livestock was confiscated by force, and that unlawful collection of money from both farming communities and pastoralists occurred. On December 20, 2013, four cabinet ministers, including Ambassador Khamis Kagasheki, the Natural Resources and Tourism Minister, were forced to resign over this incident. Mr. Kagasheki assumed the political responsibility for the misdeeds of the army. However, it is not believed he was responsible for what occurred, based partly on his reputation for wanting to combat rampant poaching in Tanzania. There are concerns being voiced of strong political and business forces within Parliament, and elsewhere, possibly involved in local poaching or actively protecting such illegal operations.

There are also questions as to the ability of the Wildlife Division to combat poaching. It was announced in January of this year that MNRT had suspended 21 Wildlife Division staff for allegedly colluding with poachers to kill elephants. The Deputy Minister, Lazaro Nyalandu, MNRT, stated that investigations had shown certain members of the ministry's staff were directly involved in illegal acts in collaboration with wildlife criminals. The suspended staff were comprised of eleven individuals from the Anti-Poaching Unit in Arusha, four from the Rukwa-Lwari Forest Reserve, one from the Anti-Poaching Unit in Bunda, three from Maswa Forest Reserve, one from Selous Forest Reserve, and one from the Lukwika-Lumesule-Msanjesi Forest Reserve. These recent events put into question the county's commitment and ability to conserve and protect its natural resources, including elephants.

It was announced in early January of 2014, that the government planned to establish a new agency, the Tanzania Wildlife Authority (TWA), charged with the security of wildlife within all game and forest reserves in the country. The TWA would be granted full authority to hire, fire, and carry out official functions as opposed to the present framework under the MNRT. This new body would be charged with eliminating poaching and other illegal acts harmful to the country's natural resources and would be given full autonomy to set its own salaries and provide incentives to staff to perform their duties efficiently and effectively. It would operate as a parastatal organization much like TANAPA and NCAA. It was estimated that over 4,000 new staff would be needed to cover the over 20 game reserves and 50 forest reserves country wide. This new organization awaits Parliamentary endorsement sometime this year. As a result, while hopeful that this organization will greatly improve the situation in Tanzania, it is too soon to determine what impact the creation of TWA will have on anti-poaching efforts in Tanzania.

While the Service recognizes that sport-hunting, when conducted as part of a sound management program, can provide an important conservation benefit to elephant populations, current conditions in Tanzania put into doubt whether any level of legal take is sustainable. The CITES Panel of Experts concluded in 2010, that the level of off-take occurring in the Selous-Mikumi ecosystem could not be considered sustainable based on a decreasing population and the high level of poaching taking place within that ecosystem. The panel further noted that the legal and illegal off-take appeared to be sustainable in the other five elephant ecosystems based on stable or increasing elephant populations, but voiced concerns that this situation could affect the long-term elephant population sustainability. Since that time, data has shown that populations throughout Tanzania are in severe decline and that poaching appears to be out of control. Based on these factors, DMA is **unable to find** that the sport-hunting of elephants in Tanzania in 2014, for import as personal trophies is likely to enhance the survival of the species. The Service will continue to monitor elephant population levels in Tanzania, progress made by the Government in implementing its management plan and addressing the strategic objectives identified in that plan, as well as efforts made to deal with rampant poaching and government corruption that is negatively affecting African elephants in Tanzania.

REFERENCES:

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. African Elephant Status Report 2007: An Update from the African Elephant Database. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

CITES Secretariat, IUCN/SSC African Elephant Specialist Group, and TRAFFIC. 2013. Status of African elephant populations and levels of illegal killing and the illegal trade in ivory: A report to the African elephant summit, December 2013. 19pp. Available online at: https://cmsdata.iucn.org/downloads/african_elephant_summit_background_document_2013_en.pdf.

CITES Secretariat (2010). *Monitoring of Illegal hunting in elephant range States*. Document CoP15 Doc. 44.2 presented at the 15ht meeting of the Conference of the Parties to CITES.

CoP15 Doc. 68 Annex 6a). 2010.  Report of the Panel regarding the proposal of the United Republic of Tanzania. 19 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/15/doc/E15-68A06a_.pdf.

CoP16 Doc. 53.1. 2012. Monitoring the Illegal Killing of Elephants (MIKE). Sixteenth meeting of the Conference of the Parties, Bangkok (Thailand), 3-14 March 2013, 15 pp. Available online at:  http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-01.pdf.

Cumming, D.H.M (2004). Performance of Parks in a century of change. In: *Parks in transition: biodiversity, rural development and the bottom line*. Ed. B Child. Earthscan, London.

Douglas-Hamilton, I. and Burrill, A. (1991). Using elephant carcass ratios to determine population trends. *African Wildlife: Research and Management*, pp. 98-105. International Council of Scientific Unions.

IUCN Provisional African Elephant Status Report 2013: An Update from the African Elephant Database.  IUCN/SSC African Elephant Specialist Group.  IUCN, Gland, Switzerland. Available online at: http://www.elephantdatabase.org/preview_report/2013_africa/Loxodonta_africana/2012/.

IUCN-UNESCO (2007). *Report of the reactive monitoring mission: Selous Game Reserve*, United Republic of Tanzania.

Jones, T., T. Caro and T.R.B. Davenport (eds.). 2009. Wildlife Corridors in Tanzania. Unpublished Report. Tanzania Wildlife Research Institute (TAWARI), Arusha. Available online at: http://www.tzwildlifecorridors.org/TzWildlifeCorridors.pdf.

TAWIRI. 2013a. Aerial census of large animals in the Selous-Mikumi ecosystem, dry season 2013, population status of African elephant. Arusha, Tanzania, 11pp.

TAWIRI. 2010. Tanzania Elephant Management Plan 2010-2015. TAWIRI, Arusha, Tanzania, 95 pp. Available online at:  www.tawiri.or.tz/images/Conference/elephant_plan.pdf.

TAWIRI. 2010b. Presentation to CITES Panel of Experts, 25 January, 2010, Dar es Salaam.

Wasser, S.K., B. Clark and C. Laurie. 2009. The Ivory Trail. *Scientific American*, July 2009. Pp. 68-76.

WCS Mozambique. 2014. *in litt*. Niassa Reserve expanded elephant protection program. USFWS WWB-AECF FY14 grant proposal (F13AS00357).

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**DECLARATION OF REW R. GOODENOW**

I, Rew R. Goodenow, being first duly sworn on oath, depose and state as follows:

1. I am Chairman of the Legal Task Force of Safari Club International.

2. I am an attorney and principal in the law firm of Parsons, Behle and Latimer in Reno, Nevada.

3. Safari Club International (Safari Club) is a nonprofit corporation incorporated in the State of Arizona, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices and places of business in Tucson, Arizona and Washington, D.C.

4. Safari Club's membership includes approximately 50,000 individuals from the United States and many other countries around the world

5. Its missions are the conservation of wildlife, protection of the hunter, and education of the public concerning hunting and its use as a conservation tool.  Safari Club carries out its conservation mission through its sister organization, Safari Club International Foundation (SCIF).

6. SCIF'S missions include the conservation of wildlife, education of the public concerning hunting and its use as a conservation tool, and humanitarian services. More specifically, the conservation mission of SCIF is: (a) to support the conservation of the various species and populations of game animals and other wildlife and the habitats on which they depend; and (b) to demonstrate the importance of hunting as a conservation and management tool in the development, funding and operation of wildlife conservation programs.

1

7. "Sustainable use" recognizes that the utilization of wildlife often produces benefits that provide incentives for conservation, that conservation does not require non-use of wildlife and that non-use can actually be counter-productive to conservation efforts. Well-managed hunting is and has been a valuable tool in conservation and protection of many game species and associated habitats, and biodiversity. The concept of sustainable use has been endorsed and adopted as a key principal of conservation by the International Union for the Conservation of Nature and Natural Resources -- the oldest and largest conservation organization in the world -- at its 2nd World Conservation Congress. Sustainable use is also one of the three primary principles of the Convention on Biological Diversity, commonly referred to as the Biodiversity Treaty, one of two major treaties opened for signature at the United Nations Conference on Environment and Development (UNCED) in 1992.

8. Safari Club is an organization that promotes the principle and practice of sustainable use conservation, including the ability of its members to participate in hunting and importation of foreign species in order to 1) increase social tolerance for the species' destructive behavior, 2) discourage and apprehend poachers, 3) contribute meat and other important resources and revenue to local communities, 4) reduce overpopulations in areas where the species has exceeded its carrying capacity, and 5) increase the value of the species.

9. On information and belief, Safari Club members have booked hunts for elephants in Zimbabwe and Tanzania for 2014 and beyond, have taken elephants in the two countries between April 4, 2014 and the date of this declaration and/or are presently engaged in elephant hunts in those countries.

10. On information and belief, Safari Club members include Professional Hunters, Outfitters, Booking Agents, Taxidermists and others whose businesses and livelihoods depend on U.S. hunters, including Safari Club members, to hunt African elephants.

11. On information and belief, Safari Club member Outfitters and Professional Hunters are conducting on-the ground elephant conservation and anti-poaching efforts in Zimbabwe and Tanzania. These efforts are funded, at least in part, by income paid to them by Safari Club members for the opportunity to hunt elephants and import their elephant trophies.

12. The importation ban will prevent Safari Club members from importing their elephants from their successful hunts in Zimbabwe and Tanzania into the U.S. in 2014.

13. Safari Club member hunters who cannot import their trophies, as well as outfitters, professional hunters, booking agents, taxidermists and others, have all been harmed by the importation ban.

14. Safari Club's own conservation interests and efforts are harmed by the loss of revenue that the importation ban will cause as it will result in a decrease in funding for anti-poaching efforts and a decline in the resources that have encouraged local communities to value and protect elephants.

15. Safari Club will suffer when these losses result in elephant overpopulations, damage to habitat and increased poaching.

16. Safari Club seeks to enjoin the U.S. Fish and Wildlife Service from continuing the importation bans and to have the Court declare the bans illegal.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, as provided by 28 U.S.C. § 1746.

Executed this 25th day of April 2014 in Reno, Nevada

By: _____

Rew R. Goodenow

3

139

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| ——————————————————— | ) | |

**DECLARATION OF JERRY EDGAR BEARDMORE, JR.**

I, Jerry Edgar Beardmore, Jr., being first duly sworn on oath, depose and state as follows:

1.  I am a resident of Katy, Texas and am employed as a petroleum engineer.

2.  I have been a member of Safari Club International for the past 3-4 years.

3.  I am also a member of Dallas Safari Club and the National Rifle Association of America.

4.  I have a ranch in the Hill Country of Texas where we (myself and my family) participate in Wildlife Management.  This includes providing supplemental food and water, habitat improvement, predator control and population management through hunting (white-tailed deer, turkey).  Our efforts have yielded significant improvements in buck-doe ratios and the quality of the bucks.

5.  I am 46 years old and have been hunting for 38 of those years.

6.  I grew up on a farm in Ohio.  Our standard routine was to hunt on Saturday mornings (starting with squirrel – first season to open, then rabbit, deer, quail and grouse).  By the time I reached 11 years old, I was hunting on my own after school on weekdays.

7.  I have hunted in the U.S., Canada and Africa.  In the U.S. I have hunted in Ohio, Mississippi, Louisiana, Colorado, New Mexico, Texas, and Alaska for white-tailed and mule deer, caribou, black bear, grizzly bear, elk, moose, axis, blackbuck, feral hogs, scimitar-horned oryx, turkey, quail, dove, grouse, ducks, geese, and sandhill cranes.  In Newfoundland, I hunted moose. In the Republic of South Africa, Zimbabwe and Botswana, I hunted for elephant, lion, Cape buffalo, rhino, caracal, eland, kudu, gemsbok, nyala, waterbuck, zebra, wildebeest, impala, warthog, bushbuck, and steenbok.

Page **1** of **4**

8.  I last hunted in Zimbabwe in 2012 for elephant, Cape buffalo, kudu and waterbuck.

9.  I have successfully hunted elephant twice, in Zimbabwe in 2012 and in Botswana in 2013.  I imported my elephant from Zimbabwe in 2013.

10. During my elephant hunt in the Omay Concession in Zimbabwe, we encountered many elephants.  On many of the days that we were not actively hunting elephants, we also saw cows, calves and both young and mature bulls.

11. I personally witnessed how elephant hunting benefits local communities, combats poaching and increases local tolerance for the species. Due to the arrangement in the Omay Concession, the locals received the trophy fee and all the meat from the elephants taken.  As a result, they tolerated the presence of elephants in their fields.  Martin Pieters, the outfitter, employed a dedicated anti-poaching team and charged hunters a specific daily rate to support this effort.  Most hunters, like myself, contributed funds above and beyond Martin's daily charge to ensure this effort remained staffed and effective.  I watched my elephant be reduced to a wet spot on the ground as locals descended on the animal and made use of all the available meat.

12. As recently as mid - 2010, I had no desire to hunt elephant and I couldn't rationalize in my mind why it was appropriate. I decided to research it, however, and in a very short period of time I became obsessed with the idea. The obsession became a reality in April 2012, and I'm more obsessed by it now than ever before.

13. The conservation imperative played a major role in my change of heart.  Understanding more about elephant biology and behavior also contributed to my interest in the endeavor. Getting a clearer picture of how a proper elephant hunt is conducted and how challenging and physically demanding it can be, however, really appealed to me. Even with the number of books and DVDs I studied, I still underestimated what an elephant is capable of. The Omay in Zimbabwe is rugged country, and there were days where I would see a pile of elephant dung on an 18" wide trail on the side of a cliff (for lack of a better description) and just shake my head in disbelief that anything the size of an elephant could have passed that way. My bull was not big by any standard, but the hunt was incredible. There is nothing that can compare to walking up and placing your hands on the tusks of an elephant, especially one that has come after many long days and miles.

14. Many of my acquaintances couldn't grasp why I, or anyone else, would hunt an elephant. Since it wasn't that long ago that I felt the same way, I explained how I once felt and why my feelings changed. For some, they were fine once they understood the entire elephant would be utilized, especially the meat for the local villagers. Others were swayed by the overpopulation and habitat destruction (even though the current limited CITES quotas are not going to rectify this issue). With some, the funding for anti-poaching efforts and the animal's value that hunting created for the local population resonated. Surprisingly, many had no issue with the killing of an elephant; they just assumed that the animal was some placid, lumbering creature that you drove up to and shot and there was no sport or

challenge. Once these folks better understood the challenges of a proper hunt, the capability and behavior of an elephant, and the difficultly associated with a lethal shot, most developed a very keen interest in the undertaking.

15. Some of my acquaintances, however, could not justify it in their own minds. They would revert back to "let nature take its course, elephants did just fine long before we got involved." For these folks, I simply explained that those days are gone forever. With a human population knocking on 7 billion, we have forever altered the face of the earth and created an environment where the majestic elephant, once free to migrate thousands of miles as food sources were depleted, are confined to areas that can no longer support a population that grows at a reported 3-5% annually. Allowing "nature to take its course" in these relatively small, isolated sanctuaries will have devastating effects on not only the elephant population, but on all wildlife populations. Well managed and regulated hunting has proven to be a very effective conservation tool around the world, but there will always be the crowd that cannot (or will not) see this.

16. Many consider the hunting of the African elephant to be the greatest hunting adventure in the world. I agree. However, being able to import the successfully hunted elephant from this amazing experience is a significant element and memory of the hunt. The loss of the ability to import a portion of the elephant that was successfully taken and fully used, decreases the value of the hunt for many hunters.

17. The African Elephant is the most challenging, awe-inspiring animal on land. As stated above, I didn't fully appreciate the complexity of this animal, the challenge it presents to a hunter, and the situation that exists in the countries where it is hunted (namely over-population and the resulting habitat destruction). Zimbabwe offers what I consider a classic elephant hunt – miles upon miles of tracking in terrain where tracking is truly an art dominated by locals who can see things I simply cannot. It was the most challenging, rewarding hunting experience of my life – and now my son too wants to participate in this grandest of adventures.

18. Regardless of ones beliefs, we have reached a situation where in many cases, an animal's value plays heavily into its ability to survive. In the case of the elephant, the choice is between regulated, managed hunting and the indiscriminate, illegal ivory trade fueled by the growing Asian economies and centuries of tradition and culture. I have witnessed first-hand the positive impact of legal, well-regulated hunting in Zimbabwe. American sportsmen play a critical role in this endeavor, perhaps the biggest role. If this contribution is removed, the alternative will prevail and the effects will be devastating on the animal I respect and admire the most.

19. I signed a contract with Charlton McCallum Safaris (CMS) for a Bull Elephant hunt in the Dande concession of Zimbabwe (for my son Hunter who will turn 15 the day we arrive in Zimbabwe) in September 2012. Our hunt dates were confirmed to be 17 – 30 June, 2014 (Hunter turns 15 on June 16th). I paid a deposit of $6,160 at the time the contract was signed.

20. On 17 March, 2014 I wired another $21,570 to CMS for the final deposit and for our charter flights.  My contract with CMS stipulates no refunds within 6 months of the scheduled date.

21. On the morning of 04 April, I wired $13,000 to Martin Pieters Safaris for a follow-on Hippo hunt on Lake Kariba, and $2,604 to his wife Candy (Nehimba Lodge) for 2 days at Victoria Falls and associated activities following the hippo hunt.  While not "elephant related", I certainly wouldn't be flying to Zimbabwe just to hunt a hippo.  As with CMS, Martin considers this too late in the game to be refunding money for canceled trips.

22. In addition, I have purchased airfare for my son Hunter and myself (secured long ago), enrollment at the Safari Shooting School for Hunter in January this year, an elephant-capable rifle for Hunter, etc.

23. Approximately 4 hours after my last wire transfer to my Zimbabwe outfitters, the U.S. FWS announced the elephant importation ban.  My 14 year old son, who has been practicing, preparing and studying for 2 years for this adventure cannot understand why he will not be able to import the elephant he potentially takes from a hunt that is perfectly legal and absolutely necessary for the conservation of this incredible animal.

24. Although the government has deprived me and my son of our ability to import our elephant from our hunt, I refuse to seek refunds.  I signed a binding contract with CMS, and the recent, irrational decision by U.S. FWS is my cross to bear, not CMS's.  CMS has done nothing wrong, and the hunt I paid for is still perfectly legal and absolutely necessary.  It is my own government that has jeopardized the long-term survival of the African Elephant.  Furthermore, I have a commitment with my son who has been practicing, studying and preparing since 2012.  I consider a man's word one of his most important attributes, and I will not compromise mine.

25. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 23rd day of April, 2014, at Katy, Texas.

_____
Jerry Edgar Beardmore, Jr

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| 501 2nd Street NE | ) | |
| Washington, DC 20002, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 14-cv-00670(ABJ) |
| SALLY M. R. JEWELL, in her official | ) | DECLARATION OF |
| capacity as Secretary of the U.S. | ) | ANTHONY JOHN DIDADO |
| Department of the Interior; | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| an agency  of the United States; | ) | |
| DANIEL ASHE, in his official capacity as | ) | |
| Director of the U.S. Fish and Wildlife Service; and | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| an agency of the United States | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
| Defendants. | ) | |

I, Anthony John Didado, being first duly sworn on oath, depose and state as follows:

1. I am an electrical contractor from Akron, Ohio.

2. I have been a member of Safari Club International for about 7 years and became a life member in 2013.

3. I personally participate in conservation measures for deer management on my farm in Ohio.

4. I have been hunting for 35 years.  I started hunting small game when I was young.

5. In North America, I have hunted deer, bear, and elk.  In Zimbabwe and Mozambique, I have hunted buffalo, elephant, lion, leopard, hippopotamus, and plains game.

1

6. I have been on six safaris in Zimbabwe over the last nine years. I have successfully harvested elephants on two trips.

7. On all of my trips to Zimbabwe, I have witnessed large numbers of elephants. I have also seen anti-poaching patrols confiscate dugout canoes used by poachers. On one hunt, my guide had to put down a bull elephant that was severely wounded by a poacher the night before. I have also seen the remains of a very young bull elephant that was poached along the Zambezi River. Anti-poaching patrol units in Zimbabwe's National Parks have told me that poachers seem less active when outfitters and hunters are out in the concessions.

8. On one trip, the guides told me of an incident where they got into a fire fight with some young poachers a few months before my hunt. They killed one poacher and captured another. After questioning the captured poacher, they discovered a camp of a poaching ring in the area. The leader of the poacher was hiring young male villagers to poach elephants for him. Zimbabwe National Parks supposedly raided the poaching camp and some of the village to put an end to that ring.

9. On a different hunt in Zimbabwe, my family and I were close to the South African border. We witnessed an elite anti-poaching unit for the World Rhino Foundation patrolling the area. They were specifically combatting rhino poaching, but were also looking for signs of elephant, lion, and plains game poaching as well. They told us that two weeks prior to our hunt, they killed a young poacher. They confiscated his cell phone and used it to capture his boss. To their surprise, it was a South African businessman who was hiring young men to bring him poached ivory and rhino horns. Even with these type of military-trained special forces patrolling, poachers are still willing to risk their lives to poach rhinos and elephants.

10. When I first went to Zimbabwe, I had no desire to hunt an elephant. On that trip, I was hunting buffalo. To my surprise, we were constantly encountering elephants. They were everywhere – even walking through our camp at night. The cows with calves were constantly giving us trouble when we tried to track buffalo. Many times we had to run away from them. After my experience with the elephants and seeing how many there were, I decided that I would like to hunt one and help in the sustainable use and conservation of the species.

11. The proceeds from my hunts, including the trophy fees and money spent to obtain vehicles, supplies, and labor to carry out anti-poaching patrols is very important to the survival of elephants and other wildlife affected by poaching. Unfortunately, poachers are not targeting just elephants.

2

12. I have booked a hunt with my daughter, brother, niece, nephew and close family friend to hunt elephant and buffalo from June 9 to June 24, 2014 in the Rifa Concession in Zimbabwe.  We have already prepaid for the hunt in advance.  In total, I believe the group has paid well over $150,000.00.  If we go on the hunt, we will, of course, spend more money when we are in Zimbabwe.

13. We are discussing our options with our outfitter.  Nothing has been determined or finalized yet, but I am worried that we will need to cancel the trip.

14. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 22 day of April, 2014, at ___9/10 PM___ .


Anthony John Didado

3

**146**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL )<br>501 2nd Street NE )<br>Washington, DC 20002, )<br> )<br>     Plaintiff, )<br> )<br>v. )<br> )<br>SALLY M. R. JEWELL, in her official )<br>capacity as Secretary of the U.S. )<br>Department of the Interior; )<br>U.S. DEPARTMENT OF THE INTERIOR, )<br>an agency of the United States; )<br>DANIEL ASHE, in his official capacity as )<br>Director of the U.S. Fish and Wildlife Service; and )<br>U.S. FISH AND WILDLIFE SERVICE, )<br>an agency of the United States )<br>1849 C Street, NW )<br>Washington, DC 20240, )<br> )<br>     Defendants. ) | Civ. No. 14-cv-00670(ABJ)<br>DECLARATION OF<br>ATLAS LAWRENCE CHEEK, III |

I, Atlas Lawrence Cheek, III, being first duly sworn on oath, depose and state as follows:

1. I am from Farmers Branch, Texas.

2. I have been a member of Safari Club International since 1997.

3. I have been a member of the North Texas Chapter of SCI since 1997. I have been on the Board of Directors for the last 14 years, and I have been the 2nd Vice President of the Chapter for the last 8 years.

4. I am also a member of the National Rifle Association of America and Ducks Unlimited.

5. I have been hunting for 61 years. My father introduced me to hunting when I was young. I grew up hunting with all of my friends.

1

6. In the United States, I have hunted for white-tailed deer, pronghorn elk, moose, black bear, Alaskan brown bear, mountain lion, mule deer, bobcat, foxes, coyotes, rabbits, squirrels, woodcock, quail, cranes, marsh hens, pheasant, chukar partridge, Hungarian partridge, grouse, doves, turkey and geese. I have hunted in Mexico for ducks and geese; in Canada for caribou; in South America for doves, ducks, geese and red stag; and in Spain for red stag and fallow deer.

7. I have been on ten safaris in Zimbabwe from 1997 to 2013. During those safaris, I hunted for leopard, lion, Cape buffalo, elephant, hippo, crocodile, hyena, eland, greater kudu, waterbuck, southern bushbuck, Limpopo bushbuck, impala klipspringer, duiker, grysbok, nyala, sable, warthog, zebra, genet, bush pig and wildebeest.

8. In 2013, I hunted in Tanzania for Thomson's gazelle, Grant's gazelle, gerenuk, lesser kudu, wildebeest and zebra.

9. In 2003, I hunted for a bull elephant in Zimbabwe. In 2008, I hunted for a tuskless cow elephant in Zimbabwe. I recently paid a deposit to hunt a tuskless cow elephant in Zimbabwe in July 2014.

10. I saw many elephants in Zimbabwe during both of my previous elephant hunts. The damage to the habitat by elephants was alarming. I saw stripped mopane trees, denuded forests, and large eroded areas caused by a loss of vegetation.

11. I also saw signs of poaching. The cow elephants of the Zambezi Valley were extremely aggressive and would charge unprovoked when least expected. Vehicles and anything on two legs were fair game. I believe poaching and harassment to be the cause of this behavior.

12. I believe that hunting elephants benefits the species and the local people that live in areas with elephants. My 2003 Zimbabwe hunt took place in Dande North, close to the Mozambique border, in a "Communal Area Management Programme for Indigenous Resources" (CAMPFIRE). The CAMPFIRE program allows the residents of communal lands to share in the benefits generated by the wildlife in the area. During my hunt, after being told of damage done to a maize field by a herd of elephants, villagers took me to the field, where we picked up the track of the herd. After tracking for some time, I successfully hunted a bull elephant. We then went to the nearest village and told the locals that we successfully took an elephant. Men were sent to take the meat from the elephant, which then went to the villagers. I kept the hide and tusks. It was a win-win for all. The village was benefited by the fresh meat and sorely needed source of protein; an elephant that caused damage to the agricultural field was removed from the population; and I was able to participate in a successful and sustainable hunt of an African elephant.

2

13. My hunt planned for 2014 is scheduled for late July in the Zambezi Valley in Zimbabwe. I have paid a deposit of $4,000 and expect the total cost for the hunt to range between $25,000.00 and $30,000.00. I am prepared to go forward with the hunt despite my concern that I will be unable to import the trophy, but I am hopeful that the U.S. Fish and Wildlife Service will rescind the bans before it is time for me to import my trophy (if I am successful).

14. I take great pride in knowing that hunting elephants will help with the species' survival. Regulated sport-hunting of elephants amounts to a small number of elephants taken compared to the overall populations in each country. Poaching takes a far greater toll on the elephant populations. Reducing elephant hunting only reduces the anti-poaching efforts that are undertaken by safari operators, staff and hunting clients out in the field. With the reduction in revenue from U.S. hunters, CAMPFIRE and similar programs will fail and the local people will take matters into their own hands. Elephant poaching will increase and the number of elephants will decline. I believe that without proper game management via hunting, the African elephant will be doomed.

15. I have heard that most safari operators are not offering refunds to U.S. hunters that have already paid deposits for elephant hunts in 2014. I do not think it would be financially viable for them to offer refunds. They depend on U.S. hunters coming to hunt elephants. Unfortunately, I think that most U.S. hunters will not go to Zimbabwe or Tanzania to hunt elephants if they are not allowed to import the trophy.

16. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 22 day of April, 2014, at _Farmers Branch, Tx_

Atlas Lawrence Cheek, III

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL   )
             )
   Plaintiff,      )   Civ. No. 14-cv-00670(ABJ)
             )
v.              )
             )
SALLY M. R. JEWELL, et al.   )
             )
   Defendants     )
_____)

## DECLARATION OF GARY L. BAILEY

I, Gary L. Bailey, being first duly sworn on oath, depose and state as follows:

1. I am a resident of Williams, Minnesota.

2. I have been a member of Safari Club International for 15 years.

3. I have been hunting for 57 years. I started hunting with my grandfather when I was young.

4. On my property, we raise white-tailed deer, elk and buffalo. A Wounded Warrior hunt has been held on my property for the past 10 years. I am a paraplegic Vietnam Veteran and actively support the program.

5. I have hunted in Africa six times. The only species that I would like to hunt and have not been able to is elephant.

6. Because I am paraplegic, I cannot go on any hunt that involves walking. I have a special hunt that can accommodate me planned for March1 to March 15, 2015 in Zimababwe. I made these arrangements in May 2013. I have already paid a $10,500.00 deposit for the hunt. A lot of planning has been put into this hunt because I am confined to a wheelchair.

7. I understand that the trophy importation bans imposed by the U.S. Fish and Wildlife Service currently only last until the end of 2014; however, I have no

1

confidence that they will lift the bans in 2015. If they do not, I will lose out on this incredible opportunity.

8. I believe that the elephant populations in Zimbabwe and Tanzania will be harmed by the trophy importation bans. I know that the park in which I will hopefully be hunting, 90 percent of the trophy fees from hunters go toward the benefit of the wildlife in the park. Without those funds, the wildlife, including elephants, will suffer.

9. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 24ᵗʰ day of April, 2014, at  Williams , Minnesota.

Gary L. Bailey

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DECLARATION OF JAMES STEPHEN RAWSON

I, James Stephen Rawson, being first duly sworn on oath, depose and state as follows:

1. I am a physician and a resident of Columbus, Mississippi.

2. I have been a member of Safari Club International for seven years.

3. I am also a member of Dallas Safari Club and the National Rifle Association of America.

4. I have been a study participant for Quality Deer Management (Mississippi) for the last three years.

5. I am 60 years old and have been hunting for 55 years. I started hunting with my grandfather.

6. I have hunted in Wyoming for elk; Argentina for doves, ducks and red stag; Botswana for elephant and plains game, Zimbabwe for lion and hyena; and Mozambique for cape buffalo, leopard and plains game.

7. I last hunted in Zimbabwe in 2013.

8. I successfully hunted elephants in Botswana in 2012 and 2013.

9. While hunting in Zimbabwe in 2013, I saw many elephants as well as evidence of elephant foraging to excess in some places.  We also found one carcass with the ivory missing from a poached elephant.

1

10. Elephants overpopulate some areas of Zimbabwe. Having been to three "elephant areas" in three years, I have seen the effects of overpopulation on the environment. Hunting helps keep the populations in balance with the habitat.

11. Hunting operations in Zimbabwe are the best weapon against poaching. The game managers, scouts, and rangers all do their utmost to fight poachers and they all follow hunting regulations to the letter.

12. When I hunt elephants, I look for the older bulls and am not interested in the younger males. Hunters remove "post mature" elephants that are not significant contributors to elephant propagation. Poachers are not so selective.

13. When an elephant is legally hunted, every part of it is used. The meat from the elephant goes to the local communities. Nothing is wasted and the locals clean the carcasses. Poachers take the ivory and leave the carcasses in the field to waste.

14. Hunting also helps decrease poaching. Due to the fact that hunters will pay well to hunt an elephant, the elephants have value to the local communities and the locals have reason to protect the animals from poachers.

15. I have a hunt planned for September 2014. I like the area that I have selected for my hunt. The number of older bulls is high and I have become friends with many of the locals in that area.

16. My hunt is booked for September 24-October 19, 2014. I have deposited $18,000 towards the hunt, plus around $5,000 in airline tickets. I am entitled to a $10,000 discount for repeat business to apply to my hunt, which I will lose if I cancel the hunt. At this point, I am not sure whether I will receive any refund if I decide to cancel.

17. My ability to import the elephant I successfully hunt is an important part of my hunting experience. If I am unable to import the elephant, the value of the hunt diminishes greatly for me. This is why I may attempt to cancel.

18. Although elephant importation remains open for hunting in other countries, it is likely that the prices for these hunts will escalate due to the increased demand for these hunts. For this reason, rescheduling my hunt for another country is not a viable substitute for my planned Zimbabwe hunt.

19. In addition, rescheduling my trip is not a real option. As a physician, my patient appointments are booked far in advance and it is difficult to make changes to my schedule.

20. Hunting, along with the industry associated with hunting in Africa, are essential for the survival of elephants and big cats.  The herds and prides of these animals are healthier because of sustainable hunting.

21. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 24ᵗʰ day of April, 2014, at    9:30 a.m.                    .


_____ M.D.
James Stephen Rawson, MD

3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DECLARATION OF JASON GARIC INGERSOLL

I, Jason Garic Ingersoll, being first duly sworn on oath, depose and state as follows:

1. I work in sales management in the oil and gas business and live in Houston Texas.

2. I have been a member of Safari Club International for about 15 years.

3. I have been hunting for 38 years.  I started hunting with my father when I was about five years old.

4. I have hunted numerous species in North America.

5. In 1999, I hunted for several species in Zimbabwe, including Elephant, Leopard, Buffalo, and several plains game.  I was not able to harvest an elephant on this trip.  We did, however, see several elephants during the trip and actually came upon a dead elephant that had been poached.

6. During my Zimbabwe trip, I hunted with a game officer who was very interested in game management.  He was very much aware that hunters are instrumental in helping to stop poaching.  The money that U.S. hunters spend hunting elephant is key to continuing the efforts against poaching.  Without hunting I am afraid the poaching will continue out of control until there are no more elephants.  I want to be a part of the effort to ensure elephants stay around for years to come

7. For me, hunting is part of our life.  I have always dreamed of harvesting an elephant.  I have hunted throughout Africa since my early childhood days and love the continent.  I would like to continue to be able to take my three boys to Africa in the years to come. Continuing to use hunting as a means to stop poaching is key to making that happen.

1

8. I booked an upcoming elephant hunt at the February 2014 SCI convention.  The hunting dates are Sept 1–12, 2014 in Zimbabwe.  We booked our hunt with Russ Broom and have sent a deposit to secure our hunt (approximately $15,000).  I have spent countless hours trying to secure and arrange flights as well as other arrangements for this trip

9. I have not decided whether I am going to try to cancel this trip.  I am much less inclined to take and pay for this trip if I am unable to import any trophy.  If I cancel, which is a real possibility, I do not know if I will be able to get a refund of all or part of the money.  I also certainly will be deprived of the opportunity to contribute to elephant conservation in Zimbabwe.

10. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 25 day of April, 2014, at ___9:46 Am_____

_____

Jason Garic Ingersoll

2

**156**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DECLARATION OF JOHN HOLDRIDGE

I, John Holdridge, being first duly sworn on oath, depose and state as follows:

1. I am a businessman in Odessa, Texas.

2. I have been a member of Safari Club International for about 10 years.

3. I am also a member of Dallas Safari Club and the West Texas Safari Club.

4. I have been hunting for 60 years.  I started hunting on my ranch when I was young and have always enjoyed the sport.

5. I have hunted in Africa on six separate occasions.  I have hunted in Botswana and South Africa for elephant, lion, leopard, and buffalo and have darted a rhino.

6. I had a hunt planned for July 2014 in Zimbabwe for elephant, lion and leopard.  I am no longer going to hunt an elephant due to the trophy importation ban.  My ability to import the elephant I successfully hunt is an important and valuable part of my elephant hunt.  Because I already paid a deposit for an elephant hunt, my outfitter has offered to shift the deposit to other hunts instead.  Unfortunately, we had to change our plane tickets.  Other reservations had to be changed or cancelled.  The trophy importation ban has directly cost me money.

7. I believe that the presence of legal hunters in Zimbabwe and Tanzania is a deterrent to poaching in these areas.

1

8. I would not want to hunt the elephant if I did not believe that it would help the survival of the species. Hunting is an important part of sustainable use wildlife management.

9. I believe that the U.S. Fish and Wildlife Service should not be able to ban the importation of sport-hunted elephant trophies from Tanzania and Zimbabwe. It is the responsibility of the governments of Tanzania and Zimbabwe to manage their elephant populations. Sport-hunting provides the livelihoods for many people in both of these countries. The bans will hurt those communities.

10. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _24_ day of April, 2014, at _____ Odessa, Texas

_____
John Holdridge

2

**158**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| 501 2nd Street NE | ) | |
| Washington, DC 20002, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 14-cv-00670(ABJ) |
| SALLY M. R. JEWELL, in her official | ) | DECLARATION OF |
| capacity as Secretary of the U.S. | ) | JOHN W. BERRY |
| Department of the Interior; | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| an agency  of the United States; | ) | |
| DANIEL ASHE, in his official capacity as | ) | |
| Director of the U.S. Fish and Wildlife Service; and | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| an agency of the United States | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
| Defendants. | ) | |

I, John W. Berry, being first duly sworn on oath, depose and state as follows:

1.   I am a resident of Anson, Texas.

2.   I am the President of E C Tool & Supply Co.

3.   I have been a member of Safari Club International since 2011.

4.   I am also a member of the Dallas Safari Club, National Rifle Association of America, and Nosler Magnum Hunt Club.

5.   I am 62 years old and have been hunting for 55 years.  I started hunting with my father and grandfather.

6.   I have hunted both in North America and in Africa.  In North America, I have hunted elk, mule deer, whitetail deer, wild hogs, coyote, black buck, axis deer, squirrels, quail, dove, turkey, and ducks.  In Africa, I hunted plains game, cape buffalo and leopard.

Page **1** of **3**

7. In September of 2013, I booked my first elephant hunt. I am scheduled to hunt in in Zimbabwe beginning in June 2014. The importation ban announced by the government on April 4, 2014 would make it impossible for me to import the trophy from my elephant if I am successful. The ability to retain and import that trophy is a valuable part of my hunt and my memories of the experience. Without that ability, the hunt has significantly diminished in value for me and is no longer worth the investment I have made to complete the hunt.

8. I have already made my down payment and a final payment for the hunt and have purchased nonrefundable airline tickets. At this point, I have invested $30,000 that I will not be able to recover.

9. My outfitter has been in Zimbabwe since the ban and so far I have been unable to discuss the ban with him. The hunt is scheduled for June 16 to June 25, and I do not expect he will be willing to refund the payments since he has been out considerable time and expense in preparation for the hunt.

10. If I am unable to participate in the hunt of my dreams in 2014, I may not have many opportunities to do so in the future. I am approaching 63 years old. Although I am in good health and reasonably fit, I feel I only have a few years left that I will be capable of the physical requirements needed to hunt elephant. Elephant hunting is demanding physically and mentally, and it has been a lifelong dream. I have finally reached a financial position that I am able to go on an elephant hunt, and I don't have many more years that it may be possible.

11. My concern is not only for my economic loss. Even if the ban is only temporary, the harm that it will do to the elephant population may be long-term, if not permanent. The inability to import successfully hunted elephants will diminish the value of the hunt to most hunters and will discourage many from booking hunts at all. The economic impact of the trophy fees is vital to the survival of the elephant.

12. Fewer hunters means fewer legally harvested elephants. Hunters donate the meat from their elephants to local villages. The meat from a harvested elephant provides food for a village for several months.

13. Elephants are destructive animals that are not well tolerated by villages. Without the economic benefit to the local economies that elephant hunting provides, elephants are merely a destructive pest that will be destroyed by human encroachment on their habitat. Without the infusion of funds from U.S. hunters, the locals may simply kill the elephants to be rid of them.

14. I am concerned that by the time the government recognizes its error and removes the ban, the damage done to elephant conservation may make it impossible for anyone, including me, to enjoy the elephants of Zimbabwe again.

15. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _23rd_ day of April, 2014, at _Abilene, TEXAS_ .

John W. Berry

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL ) <br> 501 2nd Street NE ) <br> Washington, DC 20002, ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SALLY M. R. JEWELL, in her official ) <br> capacity as Secretary of the U.S. ) <br> Department of the Interior; ) <br> U.S. DEPARTMENT OF THE INTERIOR, ) <br> an agency of the United States; ) <br> DANIEL ASHE, in his official capacity as ) <br> Director of the U.S. Fish and Wildlife Service; and ) <br> U.S. FISH AND WILDLIFE SERVICE, ) <br> an agency of the United States ) <br> 1849 C Street, NW ) <br> Washington, DC 20240, ) <br> ) <br>     Defendants. ) | Civ. No. 14-cv-00670(ABJ) <br><br> DECLARATION OF <br> KENNETH ERIC BUCH |

I, Kenneth Eric Buch, being first duly sworn on oath, depose and state as follows:

1. I am a resident of Hanover, Pennsylvania.

2. I am the owner of Kebco LLC, a firearms importer.

3. I first became a member of Safari Club International about 20 years ago. I have been a life member for about 4 years.

4. I am also a member of the National Capital SCI Chapter and the Blue Ridge SCI Chapter.

5. I am also a member of Dallas Safari Club and two local sportsmen clubs. I am a past member of Ducks Unlimited, Rocky Mountain Elk Foundation and National Wild Turkey Federation.

1

6. I have been hunting for 47 years.  I started hunting small game with friends when I was young.

7. I have hunted in a dozen states in the United States, as well as Sweden, France, Australia, New Zealand, Zimbabwe, South Africa, Argentina and Canada.

8. I have hunted for various deer, bear, antelope, buffalo, elephant, bison, goats and wild pigs.

9. I hunted in Zimbabwe in 1989 and 2013 for antelope, buffalo and elephant.  I have successfully harvested four elephants.

10. I have seen lots of elephants and signs of elephants in Zimbabwe.  The elephants that I observed were very shy of people and would run at the first sight of us.  I did not seen signs of elephant poaching in the areas I hunted.

11.     When I hunted the elephants, the local people were very happy to receive the meat after a successful harvest.  They came from miles around.  Most of the locals are subsistence farmers and suffer from elephants raiding their crops.  They were all happy that we were hunting elephants.  In addition, some of the trophy fees and other expenses for the hunts went directly back to the community for schools, bore holes, etc.

12.     In my opinion, elephants are the most interesting animal to hunt.  Every other animal pales in comparison.  Elephants are potentially dangerous animals that must be taken at a relatively close range.

13.     Contrary to what many people believe, elephants are over-populated in most of southern Africa.  Many other species are in trouble because elephants are destroying the habitat.  I enjoy hunting elephants to benefit the conservation of the species and all other species that rely on their shared habitat.

14.     My hunting enhances the survival of the species.  I receive the experience of the hunt and the trophy as a symbol of my effort and success.  Locals receive desperately needed protein and jobs during the hunts.  Money goes back to poor communities and subsistence farmers have some relief from the elephants that raid their crops.

15.     The bull elephants that hunters choose to pursue are generally near the end of their natural life.  These are not elephants that are major contributors to the propagation of the species, so taking these members of the population has no impact on the general health and well-being of the elephant herd as a whole.

2

16.     The trophy importation bans will result in fewer U.S. hunters and less funding for anti-poaching efforts in Tanzania and Zimbabwe. In addition, fewer people will be in the field to prevent poachers from taking more elephants. If the elephants have no value to the people living with them, the people are not going to be as tolerant of the destruction that the elephants cause. Ultimately, the bans will cause more elephant deaths, not fewer.

17.     I have made a financial commitment of $7,000 for a 2015 trophy elephant hunt in Zimbabwe. My ability to import the elephant that I successfully hunt in Zimbabwe is a tremendous component of the hunt that I have planned to take. If I am unable to import my elephant, I do not want to invest the time, energy and funds involved in such a hunt. I have little faith that the U.S. Fish and Wildlife Service will lift the importation ban before my scheduled hunt. Even if the Fish and Wildlife Service commits to reconsider the trophy importation ban, based on what they did in 2014, I do not think I can trust that I will be able to import a trophy from my 2015 hunt. I do not think I can convince my outfitter to return the deposit that I have already paid. I am not sure what to do at this point.

18.     I expect that the costs for trophy elephant hunting in South Africa and Namibia will double as a result of the importation bans from Tanzania and Zimbabwe. If they do, hunting in either of those countries will be financially out of reach for me.

19.     I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

    In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _23_ day of April, 2014, at _Hanover, PA_ .

_Kenneth Eric Buch_ (signature)

Kenneth Eric Buch

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL    )
    )
    Plaintiff,    )    Civ. No. 14-cv-00670(ABJ)
    )
v.    )
    )
SALLY M. R. JEWELL, et al.    )
    )
    Defendants    )
    )

## DECLARATION OF MICHAEL HUGH GRIEB

I, Michael Hugh Grieb, being first duly sworn on oath, depose and state as follows:

1. I am a certified surgical first assistant from Charlevoix, Michigan.

2. I have been a member of Safari Club International for 10 years.

3. I am also a member of the National Rifle Association of America, and I have previously been a member of Rocky Mountain Elk Foundation, National Wild Turkey Federation, Grouse Society and Ducks Unlimited.

4. I have been hunting for 49 years. I started hunting with my father when I was young.

5. I have hunted in eight different U.S. states, Canada, South Africa, Tanzania and Zimbabwe.

6. I have hunted in Tanzania twice for Cape buffalo and plains game and twice in Zimbabwe for elephant. I successfully harvested an elephant both times in Zimbabwe.

1

7. One of those elephant hunts in Zimbabwe occurred from March 30 to April 14, 2014. I successfully harvested the elephant on April 7, 2014. I learned of the U.S. Fish and Wildlife Service's decision to ban the importation of sport-hunted elephant trophies from Zimbabwe on April 8, 2014. I had no outside world communication capabilities while on the hunt and in camp. There was no way for me to know of the ban prior to taking the elephant. Needless to say, I was distraught when I heard of the ban. Importing the elephant that I took has great meaning for me and is an important part of my hunting experience. Without it, the hunt loses value for me. For now, my trophy is stored in Zimbabwe with the safari company I used during the hunt. I have not determined the cost of storing it.

8. During the 2014 hunt, I saw many elephants each day. To my knowledge, they were behaving normally with no evidence of stress that I could see. I saw no evidence of elephant poaching.

9. During the 2014 hunt, I witnessed an anti-poaching patrol operated by Zimbabwe Parks personnel. As I understand it, the funding for the Parks Department comes from hunting fees. In addition, hunting parties are an effective anti-poaching tool because poachers avoid the areas where hunters are out in the field. During the hunt, a Parks Department game scout accompanied the hunting party. He was there to scout for signs of poaching.

10. Zimbabwe is a poor country. Without the revenue hunters bring in – mostly U.S. hunters – the local communities will not be able to protect the elephant herds. If hunters can't bring their trophies home as a tangible memory of their experience, they won't go to Zimbabwe to hunt. The trophy fee and many other fees that hunters pay support Zimbabwe's Parks Department and the CAMPFIRE program, which creates jobs. This gives elephants value beyond the black market value of the ivory, and the Zimbabwe government also receives an incentive to protect them. Without the value that hunting gives elephants, they are just a large and dangerous animal that tramples and eats crops. Without that value, elephants will be considered a nuisance.

11. My 2014 hunt was booked in January 2012. After more than 2 years of planning and saving money, I arrived in Zimbabwe on March 30, 2014. I began the hunt on March 31, 2014. As I previously stated, I successfully harvested an elephant on April 7, 2014 and learned about the importation ban on April 8, 2014. The costs for the hunt were approximately $45,000.00.

2

12. I had been keeping track of the U.S. Fish and Wildlife Service's new wildlife trafficking initiatives.  Before the hunt, I assumed that I would be allowed to bring back my trophy because the FWS never mentioned a possible importation ban.  I knew they might limit hunters to two elephant trophies per year, but I never thought they would completely close imports from Zimbabwe and Tanzania.  Now it seems that I am without recourse and will have to pay to store my trophy in Zimbabwe until I figure out what else can be done with the trophy.  I hope that the Fish and Wildlife Service realizes that the importation bans are not what is best for the conservation of elephants and reverses their decision.

13. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _25_ day of April, 2014, at _Charlevoix, Michigan_ .

_Michael H Grieb_

Michael Hugh Grieb

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL )<br>501 2nd Street NE )<br>Washington, DC 20002, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>SALLY M. R. JEWELL, in her official )<br>capacity as Secretary of the U.S. )<br>Department of the Interior; )<br>U.S. DEPARTMENT OF THE INTERIOR, )<br>an agency of the United States; )<br>DANIEL ASHE, in his official capacity as )<br>Director of the U.S. Fish and Wildlife Service; and )<br>U.S. FISH AND WILDLIFE SERVICE, )<br>an agency of the United States )<br>1849 C Street, NW )<br>Washington, DC 20240, )<br>)<br>    Defendants. ) | Civ. No. 14-cv-00670(ABJ)<br>DECLARATION OF<br>MICHAEL J. CONDON |

I, Michael J. Condon, being first duly sworn on oath, depose and state as follows:

1. I am a resident of Virginia Beach, Virginia.

2. I am a Special Agent (Retired) with the Federal Bureau of Investigation. I was commissioned 2/22/71 and retired 4/18/97. I was a Bureau instructor in firearms, defensive tactics, swat, and "flying commercial aircraft while armed". I also was a Bureau Instructor Pilot and assigned to the San Francisco Special Operations Group.

3. I have been a member of Safari Club International since 2005.

4. I am also a member of the National Rifle Association of America, the Fairfax Rod and Gun Club from 2000 to 2010, Camp Allen Shooting Range at Norfolk Naval Station as a member and military arms instructor and Conservation Force.

**168**

5. In 2006 I competed in the National Bullseye Pistol Matches at Camp in Perry, Ohio.

6. From 1999-2005, I was contract small arms instructor for new agents at the FBI Academy in Quantico, Virginia and used that opportunity to explain to students how hunting leads to law enforcement abilities in weapon handling and situational awareness. I continue to teach and requalify local police and U.S. military in small arms proficiencies at local shooting ranges.

7. I have purchased 4-5 SCI memberships for friends who are hunters to help them be part of an organization that strongly advocates for hunters and for sustainable use conservation. I have also purchased memberships for Navy personnel who have an interest in hunting.

8. I am 67 years old and have been a hunter since 1952. I started hunting with my father in Nebraska and we went hunting for pheasants or rabbits and went fishing together almost every weekend.

9. In the United States, I have hunted in Nebraska, South Dakota, Texas, Idaho, Georgia and California. I have also hunted outside of the U.S. in Canada, Tanzania and South Africa.

10. I have hunted pheasants, grouse, quail, rabbits, deer, wild pig, moose, elk, impala, warthog, haartbeast, waterbuck, gemsbuck, blesbuck, kudu, cape eland, cape buffalo, zebra, wildebeest, and nyala.

11. I hunted in Tazania for cape buffalo and plains game.

12. My hunt planned for September in 2014 will be my first elephant hunt. It will also be the first time I will take my wife with me on a hunt in Africa.

13. In all of my past African hunts, the hunting concession owners, Professional Hunters and trackers told me that the presence of hunters in the field prevents poaching. They explained that because armed Game Management personnel are required to accompany each hunter, poachers would be arrested immediately if encountered. The safari operators also report poachers to the wildlife management as soon as they see signs of such activity as they are in the field.

14. I love the outdoors, and the opportunity to experience and pursue wildlife in its own habitat. I enjoy using my own skills to help keep the balance of nature. I am proud to participate in an activity that deters poaching and funds local communities by supporting and protecting animals. Hunting gives value to wildlife and focuses on sustainable use. Hunters do not seek animals to hunt them

to extinction. To the contrary, the goal of the hunter is to make sure that wildlife species remain healthy and in sufficient numbers to survive long into the future.

15. The elephants in many locations in Zimbabwe exceed carrying capacity and are starving. Hunting helps cull those populations to achieve effective wildlife management.

16. Without the presence of hunters and the funds they bring into the countries and in particular to the local communities, poachers will be able to run rampant.

17. I am contracted with Zambezi Hunters, of Harare, Zimbabwe for a 15 day elephant, hippo and crocodile hunt, beginning on September 17, 2014. I purchased this safari in the SCI Convention in 2013, more than a year prior to the USFWS ban.

18. I have also purchased round trip tickets to Harare, Zimbabwe for the hunt.

19. By happenstance, I purchased travel insurance the week before the importation ban was announced. I am concerned that the insurance company will not honor the agreement, on the assumption that I had some prior knowledge of the impending ban when I purchased the agreement.

20. If I cannot import the trophy that demonstrates the success of my elephant hunt, the hunt greatly diminishes in value for me. For that reason, I will likely cancel my hunt. If I do so, I could lose about $15,000 in hunt contracts, airline tickets and preparation for the safari.

21. Unless the importation ban is reversed, I will either suffer a financial loss or will be deprived of a valued element of my hunting experience. African elephants will also lose as the importation ban will defund game management and anti-poaching efforts and will lead to fewer elephants rather than enhanced conservation.

22. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this **24** day of April, 2014, at *Virginia Beach, VA*.

Michael J. Condon

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL, | ) |
| | ) |
| Plaintiff, | ) Civ. No. 14-cv-00670(ABJ) |
| | ) |
| v. | ) |
| | ) |
| SALLY M. R. JEWELL, et al. | ) |
| | ) |
| Defendants | ) |
| | ) |

**DECLARATION OF MICHAEL BARRY NICE**

I, Michael Barry Nice, being first duly sworn on oath, depose and state as follows:

1. I am a retired law enforcement officer (Sheriff's Lieutenant) and live in San Jose California.

2. I have been a member of Safari Club International for about 18 years and have been a life member for most of that time.

3. I have been hunting for 57 years. I started hunting with my father.

4. In North America, I have hunted Rocky Mountain Mule Deer, Kaibab Mule Deer, Wild Pig, Rocky Mountain Elk, Roosevelt Elk, Tule Elk, Canadian Moose, and Black Bear. In the South Pacific, I have hunted Tar, Chamois, Red Deer, and Feral Goat. In Africa, I have hunted approximately 50 species.

5. I hunted the following animals in Tanzania in 2001: Lion, Cape Buffalo, Leopard, and plains game. In Zimbabwe, I hunted the following species in the year indicated: 1997 - Sable, Kudu, and Eland; 1998 - Elephant, 2011 - Elephant, and 2012 - Elephant. I have an elephant hunt booked for September 2014 with a professional guide.

6. I have seen elephants in eight sub-Saharan African countries. From what I observed on my three elephant hunts is that they were plentiful in Zimbabwe.

7. In 19 safaris since 1995, I have seen the benefits of sport hunting and the impact it has on poaching. I have arrested poachers (of plains game) and burned their camps. I have removed their snares and traps in Tanzania and found plains game dead as a result of poachers. I have seen anti-poaching operations funded and conducted by professional hunters and outfitters in Zimbabwe.

1

8. In my opinion, there is no hunting that compares to elephant hunting. It is the largest land mammal on earth, capable of killing a man with ease, beautiful to watch, and dangerous in the extreme. When it comes to hunting tuskless elephants, hunters are removing animals with a recessive gene that makes the animals aggressive. If their population is not controlled, elephants will denude an environment and make it uninhabitable by other species. I understand that each adult elephant drinks about 40 gallons of water and eats about 400 pounds of food per day.

9. In addition, the existence of high-paying U.S. hunters shows the local native populations that there is a value to having elephants on the land. Hunting provides jobs and income that would otherwise not exist. Hunting helps control the populations and discourages poaching by its mere presence. Rampant poaching, which will occur if sport hunting is stopped or reduced, will cause mass slaughter and drive the elephant toward extinction. Private funding and support for anti-poaching operations will disappear or be severely limited, forcing some operations to shut down.

10. My son-in-law and I began planning our 2014 safari in August of 2013. We conducted research and selected our outfitter in December 2013 and signed a contract and made a down payment in early February 2014. The hunt will include one or perhaps two tuskless elephants in Zimbabwe and is scheduled for 21 days in September 2014.

11. We have not taken any action yet with our outfitter. If I cannot import the hide from the elephant I harvest, it will mean I will be unable to have leather items produced by my leather craftsman here in the USA. We will have to reconsider the whole safari and may decide to cancel. This would hopefully mean at least a partial refund from our outfitter, but nothing is certain. It will cause a loss of business to him. Of course the local communities will also suffer if the outfitter is not able to fill our spots or is not able to fill them with others willing and able to spend the money U.S. hunters spend.

12. As a veteran of 19 African safaris in eight countries, including Tanzania and Zimbabwe, I have a better than average understanding of the safari business and the conservation and use of the African Elephant. Having successfully hunted four African Elephants, I have the experience and understanding of the process and what these importation bans mean on the ground.

13. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 2 3 day of April, 2014, at ⟶ San Jose, CA .

Michael Barry Nice

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL            )
                                     )
        Plaintiff,                   )        Civ. No. 14-cv-00670(ABJ)
                                     )
v.                                   )
                                     )
SALLY M. R. JEWELL, et al.           )
                                     )
        Defendants                   )
                                     )

## DECLARATION OF PATRICK JOSEPH COOLEY

I, Patrick Joseph Cooley, being first duly sworn on oath, depose and state as follows:

1. I am a business owner and manager from Yuma, Arizona.

2. I have been a member of Safari Club International and the San Diego SCI Chapter for about 10 years.

3. I am also a member of Desert Wildlife Unlimited, Ducks Unlimited, Rocky Mountain Elk Foundation, Arizona Desert Bighorn Sheep Society, Yuma Valley Rod and Gun Club, Foundation for North American Wild Sheep and Boone & Crockett Club.

4. I used to be a Hunter Safety Instructor for the Arizona Game and Fish Department.  Now I work with the Department to host classes of school children – about 300 children per year – on field trips to teach them the importance of fishing and hunting for conservation and wildlife management.

5. I am a current measurer for the Boone & Crockett Club.  I am also very involved in water development for wildlife in the deserts of California, Arizona, Utah, Mexico and Mongolia.

6. I have been hunting for 39 years.  I started pheasant hunting with my father when I was young.

7. I have hunted many species in the United States, including desert mule deer, rocky mountain mule deer, rocky mountain elk, Tule elk, Coues white-tailed deer, desert bighorn sheep, bison, coyote, alligator, wild boar, javelin, caribou, pronghorn, upland game birds, waterfowl, moose, black bear, wolf, inland grizzly bear, squirrels, rabbits,

1

turkey and rattlesnakes.  I have hunted Coues deer, mule deer and upland game birds in Mexico.

8.  In Africa I have hunted elephant, lion, leopard, hippo, Cape buffalo, crocodile, hyena, kudu, impala, gemsbok, springbok, red hartebeest, wildebeest, black wildebeest, blesbok, klipspringer, duiker, grysbok, civet, serval, baboon, warthog, bush pig, giraffe, eland, bushbuck, sable antelope, zebra, Guiney fowl and black backed jackal.

9.  I hunted four separate times in Zimbabwe between 2004 and 2012.  I hunted elephant, lion, leopard, hippo, Cape buffalo, crocodile, hyena, kudu, impala, wildebeest, klipspringer, duiker, grysbok, civet, serval, genet, baboon, warthog, bush pig, giraffe, eland, impala, bushbuck, sable antelope, zebra, Guiney fowl and black backed jackal.

10. I hunted for tuskless elephant cows on two separate trips.  I was not successful in either hunt.

11. I have witnessed hundreds of elephants on each trip to Zimbabwe.  I saw solitary bulls, small herds of two to six elephants, and large herds over 100 elephants.  All of the elephants I have seen seemed to be well established and very healthy.

12. I have also seen many poachers.  I have found and removed hundreds of snares, including some with various species of animals in them, alive and dead.  I've only seen one elephant with a snare on its back leg and another with a small gun wound on its back leg.

13. The most serious poaching incident I witnessed was when my hunting group and I startled five poachers attempting to kill a black rhino cow and her calf.  We chased them for about a mile but never caught them.  We also witnessed poachers' dogs pursuing different animals.  I harvested a hyena with a fresh snare scar around his neck.  I have also released six animals from snares and have had to kill three others.

14. By far the least amount of poaching activity I witnessed was during my last trip to Zimbabwe in 2012.  It seems to me that the safari operators, their staff and clients, and the game scouts and local authorities are doing a good job of curtailing poaching compared to my earlier trips to the same areas where I hunted before.

15. Well-armed safari operators and their clients are huge deterrents to poachers.  I have personally engaged fleeing poachers on several occasions and have been involved in the capture and delivery of poachers to local authorities.  The game officers told me that without the help of hunters, their jobs would be impossible.

16. I believe the elephant populations in most parts of Zimbabwe are comprised of healthy and sustainable herds.  I believe it is my best opportunity to take an elephant as part of maintaining healthy, balanced populations.  In some places, based on the destruction caused by elephants on their feeding areas, there are too many elephants and more need to be harvested.

17. I believe that hunting elephants enhances the survival of the species. Hunting places value on the elephant to the benefit of locals in Zimbabwe. The locals are motivated to protect, conserve and maintain the elephant herds.

18. I have an elephant hunt in Zimbabwe booked for September 22 to October 9, 2014. I have paid a $10,000.00 deposit. I also purchased a double rifle for my upcoming hunt and spent $16,000.00 for the gun and ammo. I have also contracted a video company to film the hunt and am committed to $4,000 to $5,000 for that. The Safari operator has already given the deposit to government officials for the hunt and has told me that it is unlikely that they will be willing to return it to him.

19. Hunting and taking an elephant has been a goal of mine since before I can remember. Importing the elephant that I hunt as a symbol and memory of my achievement and success is a large part of the enjoyment and value of that hunt. I can't believe that I might not have that opportunity now. The U.S. Fish and Wildlife Service's decision not to allow the importation of the trophy does not make any sense to me. I consider myself a conservationist who does a lot to ensure the future of wildlife. The U.S. Fish and Wildlife Service's decision is devastating to me.

20. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.


In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 25 day of April, 2014, at  YUMA , ARIZONA .

Patrick Joseph Cooley

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## DECLARATION OF PAUL K. MONSEN

I, Paul K. Monsen, being first duly sworn on oath, depose and state as follows:

1. I am an accountant and live in Salt Lake City, Utah.

2. I have been a member of Safari Club International for about three years.

3. I have been hunting for 38 years. I started hunting with my grandfather and uncles.

4. In addition to hunting locally, I have hunted in Africa for big game and other plains game; Alaska for Caribou; and New Zealand for Stag, Tahr, and Chamois.

5. Specific to Zimbabwe and Tanzania, I have hunted Leopard, Kudu, Buffalo, and Sable in 2012. In 2010, I hunted Elephant in South Africa, but did not harvest an Elephant.

6. In my experiences in Africa, I have seen lots of elephants and many young bulls, not much in the way of big bulls.

7. In my trips to Africa, I have seen the benefits of sport hunting and the impact it has on poaching. American hunters spend a lot of money in Africa when they hunt. Part of this money goes to help combat poaching. The import ban has discouraged many U.S. hunters from visiting Zimbabwe and Tanzania to hunt. Now that the U.S. hunters are much less likely to travel to these two countries and by their presence help to discourage poaching, and now that there will be less support and funding for patrolling and anti-poaching efforts, poaching will increase. This obviously will hurt the elephants and other species.

8. My elephant hunt was scheduled to begin on May 20, 2014. The plan was for a two-week hunt for elephant in Zimbabwe, then to travel to South Africa to hunt other animals.

1

8. My elephant hunt was scheduled to begin on May 20, 2014. The plan was for a two-week hunt for elephant in Zimbabwe, then to travel to South Africa to hunt other animals.

9. I have contacted my outfitter in South Africa to discuss the possibility of cancelling the Zimbabwe part of the trip and to try to obtain a tag in South Africa. He is waiting for the refund amount to come back from his contact in Zimbabwe. The Zimbabwe outfitter has already bought the tag from their government and paid for a game scout to go with us for two weeks, as is the law in Zimbabwe. Those fees are not refundable. I am still waiting to be told the amount of my lost funds.

10. My whole trip is on hold at the moment. The air fare also is not refundable. There is no reason to go on the elephant part of my trip (and maybe the whole thing) now if I can't bring the elephant trophy back with me.

11. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this *23* day of April, 2014, at  Salt Lake City, Utah            .

_Paul K. Monsen_
Paul K. Monsen

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
|      Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
|      Defendants | ) | |
| _____ | ) | |

**DECLARATION OF RICHARD DAVID NETZLEY, JR.**

I, Richard David Netzley, Jr., being first duly sworn on oath, depose and state as follows:

1.  I work as a veterinarian and live in Boynton Beach, Florida.

2.  I have been a member of Safari Club International for about 13 years.

3.  I have been hunting for 55 years.  I started rabbit hunting with my father on our family farm in Ohio when I was about five years old.

4.  I have hunted numerous species in Zimbabwe, Nunavut (Canada), Ontario and in eleven U.S. states.

5.  Twice I hunted in Zimbabwe, once in 2001 and once in 2007.   Both times, I hunted plains game and other game animals.  I have never hunted elephant.

6.  On my visits to Zimbabwe, I saw multiple elephants in the areas where government game scouts were present and no evidence of poaching.  On private land where no game scouts were present, I saw evidence of poaching of plains game.  In the dangerous game areas of Chewore North and Chewore South, the elephant herds were relatively plentiful with many bulls.

7.  All hunting safaris on government land in Zimbabwe are accompanied by an armed game scout.  The presence of these safaris is, in my opinion, the only thing that deters poachers from Zambia crossing the Zambesi River.  A poacher had been killed by a game scout accompanying a safari not long before my safari in 2007.  My professional hunter told me in 2007 that my monetary tip to the game scout represented two months' salary for him and that without safaris and the associated tips they bring, the game scouts sometimes are not paid for months.  Without this monetary benefit, these scouts have

1

little incentive to protect the game.  In addition, the game meat from animals shot on the safari not only feeds the hunter and safari crew but the game scouts and their families.

8.  My hunt supplies hard currency to the Zimbabwe Parks and Wildlife Department.  They are the first line of defense against the poaching gangs supplying the demand for illegal ivory.  In addition, my safari helps provide the local population with needed protein as well as incentivizes the game scouts.  They see the value of what they do and the locals see a greater value to the elephants than what they receive by tolerating the presence of poachers. Without hunters, the unpaid game scouts and the locals will not protect the elephants if they see no value in the elephants that destroy their crops in the fields.

9.  I am scheduled for a 14-day hunt in June, 2014 in Zimbabwe. I first placed the deposit for this hunt in February, 2013.  I have already paid $18,200 and that does not include the air fare as well as a potential $15,000 in trophy fees.

10.  Since the elephant is only one of four species sought on this hunt, I am unable to obtain a refund.  I will still hunt elephant and just not bring home the trophy.  Although I will be deprived of an important aspect of my experience, I will be doing my best to support the protection of the elephant population in Zimbabwe for the above mentioned reasons.

11.  I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 23rd day of April, 2014, at _BOYNTON BEACH, FLORIDA_

_Richard David Netzley, Jr._
Richard David Netzley, Jr.

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DECLARATION OF RICHARD RAYMOND CAPOZZA

I, Richard Raymond Capozza, being first duly sworn on oath, depose and state as follows:

1. I am an environmental attorney from Skaneateles, New York.

2. I have been a member of Safari Club International since the early to mid-1990s.

3. I am or have been a member of Dallas Safari Club, Ducks Unlimited, Boone & Crockett Club, American Wildlife Conservation Foundation, Grand Slam/OVIS Club, and the International Council for Game and Wildlife Conservation.

4. I am the Chair of the Honorary Advisory Council of the Roosevelt Wild Life Station. The station was created in 1919 to honor Theodore Roosevelt and his conservation legacy. The station is the only memorial bearing Roosevelt's name that was personally approved by him during his lifetime. The original Honorary Advisory Council included members of the Roosevelt family and leaders of the 20th century North American conservation movement including Gifford Pinchot, George Bird Grinnell and George Shiras III. In 2013, the Honorary Advisory Council was reestablished to help guide and support the station's research and training programs to meet the pressing issues of wildlife conservation and management today. I have also held leadership positions at the state and local level of Ducks Unlimited in New York State, and served as President of the Central New York Wildfowlers Association, a regional waterfowl and wetlands conservation organization founded in 1960. I have donated hundreds of hours of volunteer to wildlife conservation and hunting causes including support for initiatives of Conservation Force. I regularly speak at local schools on wildlife conservation and the benefit of hunting to both wildlife and local communities, particularly poor, rural communities in Africa.

1

5. I am 48 years old and have been hunting for over three decades. I started hunting with my father.

6. I have hunted extensively throughout the United States and Canada including Alaska, Hawaii, Utah, Arizona, Texas, New Mexico, Montana, North Dakota, New York, Maryland, the provinces of Ontario, Saskatchewan, Alberta and the Yukon Territory. I have hunted in Europe -- Spain, Scotland and England and in Africa -- Tanzania and Zimbabwe. I have hunted for Dall sheep, Stone sheep, Rocky Mountain bighorn, elk, mule deer, white-tailed deer, Kodiak brown bear, antelope, mountain lion, free range/pure bred European mouflon and axis deer, Gredos ibex, red stag, Cape buffalo, lion, leopard, elephant and numerous plains game species in Africa. I have hunted wild turkey (Eastern and Rio Grande), ruffed grouse, woodcock, numerous species of waterfowl, pheasant, red grouse, red legged partridge, sand grouse, pigeons and doves.

7. I hunted in Tanzania in October 2005 in the Usangu Game Reserve. I hunted for Cape buffalo, eland, sable antelope, roan antelope, kudu, waterbuck, bushbuck, impala, hyena, crocodile, warthog, bushpig, honey badger, hartebeest and zebra.

8. I hunted in Zimbabwe in September 2008 in the Chewore South Safari Area. I hunted for Cape buffalo, leopard (unsuccessfully), zebra, impala and elephant (chose not to shoot). I also hunted in Zimbabwe in May and June 2012 in the Dande East and Ward 11 Communal Areas. I hunted for lion, leopard, sable antelope, kudu, Cape buffalo, hyena, grysbok, impala and birds.

9. I had an opportunity to harvest an elephant in Zimbabwe in 2008, but I chose not to due to the uncertainty caused by the financial crisis of 2008 which hit while I was on my hunt..

10. I had an elephant hunt booked in Zimbabwe in the Dande Safari Area for August 2014, but I canceled it due to the trophy importation ban imposed by the U.S. Fish and Wildlife Service on April 4, 2014.

11. In both 2008 and 2012, I observed large numbers of elephants both in the Chewore South Safari Area and the Dande East and Ward 11 Communal Areas. In Chewore South, in my opinion, there were too many elephants as there were significant signs of overgrazing and tree damage throughout the concession. However, the herds appeared to be very healthy and we saw numerous cows with calves and had to repeatedly avoid them. I saw no evidence of poaching in 2008.

12. In 2012 in the Dande East and Ward 11 Communal Areas, there were again large numbers of elephants in Dande East and the herds appeared very calm and healthy. I saw one herd estimated at 300 cows, calves and young bulls near the border of Mozambique. I saw elephants every day. I saw no evidence of recent elephant poaching when I was there. I did, however, see evidence of old signs of elephant poaching by Mozambique poachers (old blinds over waterholes, old elephant bones with hatchet marks ,etc.). A successful elephant hunter in Dande East who hunted just prior to me in 2012 removed a

2

homemade cut bullet from his elephant. I removed a similar homemade bullet from my
Cape buffalo. These were the result of homemade muskets that were used by
Mozambique poachers in the area prior to anti-poaching efforts described in paragraph
13. My Cape buffalo also had an old scar around his neck from a snare. These were old
wounds that had healed.

13. I have witnessed firsthand the benefits of hunter-generated revenues that support rural,
community-based conservation and anti-poaching programs in northern Zimbabwe in the
communal area of Dande East. I stayed in the Kurunga Camp which was funded by
CAMPFIRE and USAID. The benefits I observed extended well beyond the elephants.
The large numbers of elephants I observed throughout my hunt were of all ages and in
very good condition. Dande East was considered a depleted area for wildlife in 2009 due
to rampant poaching by locals and poachers from adjacent Mozambique. At that time,
Dande East was only frequented in the early season by crop-raiding elephant bulls from
Mozambique. In 2010, my safari operator, Charlton McCallum Safaris, took over Dande
East and formed the Dande Anti Poaching Unit (DAPU). To date, the DAPU has
removed over 5,000 poaching snares and have arrested over 60 poachers. In just two
short years (2010 to 2012), the wildlife rebounded in unbelievable numbers, including
elephants, African wild dogs, Cape buffalo, herds of sable and roan antelope, lion,
leopard and countless numbers of other wild game and birds – all of which I personally
observed during my hunt.

14. In fact, I was the first hunter ever out of the Kurunga Camp to harvest Cape buffalo, sable
antelope, lion and leopard. This was something that, at the time, was unheard of and
completely unexpected two years prior. The community and the wildlife have responded
positively to DAPU. The consistent and coordinated presence of DAPU in the area,
combined with the material benefits to the community, have led to this resurgence of
wildlife.

15. Without elephant hunting, for which Dande East is a prime area, funding for DAPU
would not be possible. The trophy importation ban places this funding in jeopardy. Not
only will elephants suffer, but all wildlife will. A major source of funding and
conservation incentive to the local communities will be eliminated.

16. To me, it is simple. Without revenue generated by U.S. elephant hunters, consistent and
coordinated anti-poaching efforts will suffer. The very elephants that the U.S. Fish and
Wildlife Service purports to be concerned about will suffer directly, as will other wildlife.
The incentive to protect and conserve elephants and other wildlife will be removed. In
Africa, the adage "if it pays, it stays" applies. By way of example, lions had only
recently returned to the Dande East Communal Area in 2012 after years of absence
following the resurgence of plains game. The lion I harvested was a problem animal that
had take dozens of livestock from local villagers prior to my arrival in camp. The only
reason the locals had not trapped, shot or poisoned the entire pride, which consisted of
nine adults and several cubs, was due to the fact that they knew they would benefit from
my hunt. So, the dramatic gains in wildlife conservation achieved in areas like Dande
East in only two years will go down the drain. Under the CAMPFIRE program, elephant

3

populations doubled from 1990 to 2003 on communal lands during the same time that human populations doubled in the same areas. Those gains will also be lost.

17. It has been a lifelong dream of mine to hunt an African elephant on a fair chase basis in the wilds of Africa. I selected Zimbabwe for several reasons – I know the safari operator, observed firsthand the benefits of their anti-poaching efforts, saw the number of elephants that frequented their concessions, and I am familiar with the benefits that elephant hunting has for local communities, including meat and revenues. Operators like Charlton McCallum Safaris provide 50% of elephant trophy fees to the community. The community share is around $228,000.00. I also understand the need to manage elephant herds to avoid habitat degradation and minimize wildlife-human conflict.

18. Zimbabwe is estimated to have upwards of 100,000 elephants but has a carrying capacity of 50,000. Regulated hunting is the only effective way to manage to the elephants in Africa. In other words, I am putting my money where my mouth is. I wanted to see my fees go directly into conservation and anti-poaching programs that benefit elephants and the local people.

19. I intended to hunt elephant in Zimbabwe in the Dande Safari Area from August 16 to 26, 2014. I made final arrangements for the hunt in January 2014. Since that time, I have paid a deposit on the hunt, booked non-refundable airfare and purchased ammunition totaling several thousand dollars. I cancelled the elephant hunt when I learned that I would be unable to import the elephant that I hunted. Being able to bring the elephant home has great significance to me. The loss of that ability removes an important value to my hunt.

20. I not only cancelled my hunt, but also cancelled gunsmith work to my rifle which was to exceed $2,000. I was able to rebook another hunt with my safari operator for other species during the same time frame, but at a much higher cost than the elephant hunt.

21. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 24th day of April, 2014, at _Syracuse, New York_.

Richard Raymond Capozza

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18th day of July 2014, a true and correct copy of the Appendix for the Safari Club International and National Rifle Association of America's Appeal of the Denial of Motion for a Preliminary Injunction was electronically filed through the CM/ECF system, which caused all parties to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

/s/ Anna M. Seidman
Anna M. Seidman

*Counsel for Appellants,*
*Safari Club International*