_____

No. 14-5152
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

SAFARI CLUB INTERNATIONAL and NATIONAL RIFLE ASSOCIATION
OF AMERICA, Plaintiffs-Appellants,

v.

SALLY M. R. JEWELL, in her official capacity as
United States Secretary of the Interior, *et al.*,
Defendants-Appellees
_____

On Appeal from the United States District Court for the District of Columbia
(No. 14-00670-ABJ)
_____

## APPENDIX VOLUME II

Anna M. Seidman
Douglas S. Burdin
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
Tel:  202-543-8733
Fax:  202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
*Counsel for Safari Club International*

Christopher A. Conte
National Rifle Association of
America/ILA
11250 Waples Mill Rd., 5N
Fairfax, Virginia 22030
Tel:  703-267-1166
Fax:  703-267-1164
cconte@nrahq.org
*Counsel for National Rifle
Association of America*

# Table of Contents

**VOLUME I**

U.S. District Court Docket Entries ............................................................1

Amended Complaint for Declarative and Injunctive Relief ......................................9

Motion of Safari Club International for Preliminary Injunction ...........................43

Memorandum Opinion and Order.............................................................45

Notice of Appeal ..................................................................................56

FWS Press Release "Service Suspends Import of Elephant Trophies from Tanzania and Zimbabwe".......................................................................................58

Suspension of Import of Elephant Hunting Trophies Taken in Tanzania and Zimbabwe in 2014 – Questions and Answers ........................................................60

Email from Robert Gabel Allowing the Import of Any Trophy Taken in 2014 Up Until April 4 ..................................................................................62

Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies in Zimbabwe During 2014 ..........................................................................63

Letter from Edson Chidziya to Timothy Van Norman, April 17, 2014 .................69

FWS Questions to Address Endangered Species Act Import Criteria....................70

Zimbabwe's Response to Questions Raised By the United States Fish And Wildlife Service to Address the USA Endangered Species Act ...........................................73

Zimbabwe 2012 ("2013 Africa" Analysis)........................................................ 107

General Advice on Importation of Sport-Hunted Trophies of African Elephants Taken in Tanzania in the Calendar Year 2014 .....................................................109

Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies in Tanzania During 2014 .......................................................................123

Declaration of Rew R. Goodenow ............................................................137

Declaration of Jerry Edgar Beardmore, Jr .............................................140

Declaration of Anthony John Didado ......................................................144

Declaration of Atlas Lawrence Cheek, III ..............................................147

Declaration of Gary L. Bailey ..................................................................150

Declaration of James Stephen Rawson ....................................................152

Declaration of Jason Garic Ingersoll .......................................................155

Declaration of John Holdridge ................................................................157

Declaration of John W. Berry ..................................................................159

Declaration of Kenneth Eric Buch ..........................................................162

Declaration of Michael Hugh Grieb .......................................................165

Declaration of Michael J. Condon ...........................................................168

Declaration of Michael Barry Nice ..........................................................172

Declaration of Patrick Joseph Cooley .....................................................175

Declaration of Paul K. Monsen ...............................................................178

Declaration of Richard David Netzley, Jr ...............................................180

Declaration of Richard Raymond Capozza .............................................182

# VOLUME II

Declaration of Robert Bruce Rhyne ....................................................................... 186

Declaration of Robert Loren Bridges ................................................................... 188

Declaration of Robert Wilson Taylor .................................................................. 191

Declaration of Scott Michael Dinger ................................................................... 194

Declaration of Thomas Little Whaley Jr ............................................................. 197

Declaration of Troy James Perry ......................................................................... 200

Declaration of Wayne Scott McCall .................................................................... 202

Declaration of Dr. Martin Gregory Vick ............................................................. 204

Declaration of Craig M. McDonnold ................................................................... 207

Declaration of Grant F. Dennison ....................................................................... 209

Declaration of Alistair Pole ................................................................................ 212

Declaration of Frederick L. Oosterhuis .............................................................. 215

Declaration of Ivan Murray Carter ..................................................................... 218

Declaration of John C. Barth ............................................................................... 222

Declaration of Martin Pieters .............................................................................. 225

Declaration of Richard Stuart Cooke .................................................................. 228

Declaration of Gary Michiel Duckworth ............................................................. 231

Declaration of Hermanus Abraham De Vries ...................................................... 234

Declaration of Walter Allen Tarpley ................................................................... 238

Declaration of Scott Petty Jr ................................................................240

Declaration of Robert Joseph Johnson.................................................243

Declaration of Robert Allen Sakuta....................................................246

Declaration of Derek Anthony Hurt ...................................................248

Declaration of Michael Andrew Angelides ........................................251

Declaration of David J. Adams............................................................254

Cites Res. Conf. 211 (Annex 1) ..........................................................257

Cites Res. Conf. 211 (Rev. 1) .............................................................258

Declaration of Edson Chidziya ...........................................................259

Declaration of Charles Jonga...............................................................261

Declaration of Anna M. Seidman ........................................................265

    Safari Club International FOIA Request ....................................267

    Information Memorandum for the Director on Suspension of Imports of
    Sport-Hunted African Elephant Trophies Taken in Tanzania And Zimbabwe
    During Calendar Year 2014 .......................................................270

Declaration of Timothy J. Van Norman ..............................................275

Declaration of Rosemarie S. Gnam .....................................................289

    FWS Memorandum on General Advice on Import of Sport-Hunted Trophies
    of African Elephant from Tanzania for the Calendar Year 2008...............295

    FWS Memorandum on General Advice on Import of Sport-Hunted Trophies
    of African Elephant from Tanzania for the Calendar Year 2009...............299

    FWS Memorandum on General Advice on Import of Sport-Hunted Trophies
    of African Elephant from Tanzania for the Calendar Year 2010...............306

FWS Memorandum on General Advice on Importation of Sport-Hunted Trophies of African Elephant from Tanzania for the Calendar Year 2011 ..................................................................................................314

FWS Memorandum on General Advice on Importation of Sport-Hunted Trophies of African Elephant from Tanzania for the Calendar Year 2012 ..................................................................................................329

FWS Memorandum on General Advice on Importation of Sport-Hunted Trophies and Articles for Personal Use or Display that Were Made from Sport-Hunted Trophies of African Elephants from Tanzania, for the Calendar Year of 2013 ................................................................341

FWS Memorandum on General Advice on Importation of Sport-Hunted Trophies of African Elephants Taken in Tanzania in the Calendar Year 2014 ..................................................................................................355

Interim Suspension of Imports of Elephant Trophies from Zimababwe, Federal Register Notice, 79 Fed. Reg. 26986 (May 12, 2014) ...........................................369

Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies in Tanzania Dated May 6, 1997 ................................................................372

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL ) | |
| ) | |
| Plaintiff, ) | Civ. No. 14-cv-00670(ABJ) |
| ) | |
| v. ) | |
| ) | |
| SALLY M. R. JEWELL, et al. ) | |
| ) | |
| Defendants ) | |
| ) | |

**DECLARATION OF ROBERT BRUCE RHYNE**

I, Robert Bruce Rhyne, being first duly sworn on oath, depose and state as follows:

1. I am a resident of Sharon, South Carolina.

2. I am a member of Safari Club International and a past chapter president of the Carolinas Chapter of SCI.

3. I am 68 years old and have been hunting for 60 years. My father was the one to introduce me to hunting.

4. I have hunted in the U.S., Canada, Africa and Tajikistan.

5. I have previously hunted in Zimbabwe in 2005, 2006, and 2014.

6. I have been on several elephant hunts. In addition to my 2005, 2006 and 2014 in Zimbabwe, I hunted elephant in Botswana in 2009, 2010, 2011 and 2012.

7. During my April 2014 elephant hunt in Zimbabwe, I witnessed lots of elephants and did not see evidence of poaching.

8. My outfitter used poaching patrols.

9. I hunted elephant in Zimbabwe for my personal enjoyment, but also to provide meat to local communities, and to help combat against poaching.

1

10. I know from personal experience that elephant hunting gives value to the elephant and provides revenue to the local economies. If U.S. hunters are discouraged from going to Zimbabwe to hunt elephants, this will remove the funding used to support poaching patrols. Without hunters in the field and the poaching patrols that hunters finance, poaching will become rampant and Zimbabwe will soon resemble Kenya.

11. I have an elephant hunt booked for Tanzania in August of 2014. When I learned that I would be unable to import my elephant trophy, I contacted my outfitter and asked for a refund of the funds I had already invested. My outfitter would not issue a refund.

12. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 24th day of April, 2014, at _Sharon, S.C.  USA_.

Robert Bruce Rhyne

2

187

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| 501 2nd Street NE | ) | |
| Washington, DC 20002, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 14-00670(ABJ) |
| SALLY M. R. JEWELL, in her official | ) | DECLARATION OF |
| capacity as Secretary of the U.S. | ) | ROBERT LOREN BRIDGES |
| Department of the Interior; | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| an agency of the United States; | ) | |
| DANIEL ASHE, in his official capacity as | ) | |
| Director of the U.S. Fish and Wildlife Service; and | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| an agency of the United States | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
| Defendants. | ) | |

I, Dr. Robert Loren Bridges, being first duly sworn on oath, depose and state as follows:

1. I am a physician from Girdwood, Alaska.

2. I have been a member of Safari Club International since 2012.

3. I am also a Life member of the National Rifle Association of America.

4. I have been hunting for 55 years. My father introduced me to hunting when I was young.

5. In the United States, I have hunted for deer, elk, moose, bear, rabbits, dove and duck. I have hunted in Argentina for dove and pigeon.

6. In 2005, I hunted in Zimbabwe for elephant, kudu, impala, wildebeest, zebra, warthog, bush buck, bush pig and Cape buffalo.

1

7. I was not successful on my elephant hunt in Zimbabwe. I was hunting a tuskless female, which requires finding one in the herd that does not have a dependent calf.

8. While hunting elephant and other species in Zimbabwe, I saw many elephants. There were enough elephants around to cause us to be very wary to avoid unnecessary contact with them, especially when hunting other species. They mostly seemed well nourished and in good health. On one occasion, my hunting party was charged by a dominant female elephant. On another occasion, we were almost surrounded by a herd of 75 to 100 elephants. We were fortunate to get away both times. I have been told of at least one instance in which an elephant killed a tracker who was out with a hunting group.

9. I never saw poachers while out hunting, but I did see signs of them. We found snares and remnants of trapped animals. We were able to take apart one trap. Obviously, poachers try to avoid being seen by hunting groups.

10. I am scheduled to go back to Zimbabwe in September 2014 to hunt a bull elephant and potentially a tuskless female. Two years ago, I scheduled the hunt and I have put down 50% of the base fee, which is just under $13,000.00. The total base fee will be around $25,000.00 if I do not cancel the hunt. Adding other fees and costs paid to the locals, I estimate that I will spend about $40,000.00 for the hunt. That is a significant amount of money for the Zimbabwean economy, the professional hunters, camp employees, local merchants and government entities that would benefit from the money.

11. I have not yet decided if I will cancel my 2014 elephant hunt and seek a refund. I hope that the trophy importation bans will be revoked by the time I leave for my hunt in September.

12. I believe that hunting is a very valuable part of game management. Elephant populations in southern Africa are too large for the carrying capacity of the land. Elephants are indiscriminate eaters. They over-browse and tear down whole trees to only eat a few branches and then move on. I have witnessed the kind of destruction elephants can cause to the ecology of their habitat. When hunters remove elephants from the populations they improve the population balances in these locations and help improve the tolerance of local residents for these animals.

13. I believe the U.S. Fish and Wildlife Service's decision to suspend the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania runs counter to sound science and wildlife management. The bans will exacerbate the pressure on the land resources and make it difficult for the elephant herds to remain healthy.

14. I believe that active management of southern African elephant herds is vitally important for the health of current elephants and the conservation of future herds. Hunting is a key component of active management. It makes elephants valuable to the locals and creates a system in which locals consider healthy, large herds of elephants as a valuable resource.

15. The trophy importation bans do nothing to stop poaching. The bans will defund anti-poaching efforts. Armed hunting groups generally present a formidable force against poaching. The trophy importation bans will decrease the number of hunting parties out in the bush that can prevent poaching.

16. When the value of elephants is decreased, locals who suffer crop damage from elephants will lose incentive to help maintain healthy herds of elephants.

17. The trophy importation bans will not address the continuing need to cull the elephant herds. The bans take a source of revenue for the country that can be applied to proper game management and shifts it to a cost requiring other sources of funding, such as taxes or grants.

18. I also believe that the trophy importation bans will be detrimental to the United States politically. They drive the governments of Zimbabwe and Tanzania away from the U.S. and towards our competitors, such as China. The United States should pursue greater political influence in Africa, not less.

19.     I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 22ⁿᵈ day of April, 2014, at _GIRDWOOD, ALASKA_.


_Robert Loren Bridges_
Robert Loren Bridges

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DECLARATION OF RONALD WILSON TAYLOR

I, Ronald Wilson Taylor, being first duly sworn on oath, depose and state as follows:

1. I am a resident of St. Joseph, Missouri.

2. I am an oral and maxillofacial surgeon.

3. I am a member of Safari Club International and have been since 1999 or 2000.

4. I am a member of Dallas Safari Club (8-10 years) and a life member of the Rocky Mountain Elk Foundation (20 years).   I have also been a member of Ducks Unlimited; Quails Unlimited, Pheasants Unlimited, Wild Turkey Federation and Quality Deer Management Association.

5. I helped start our local Rocky Mountain Elk Foundation group.

6. I own three properties that I manage solely for wildlife – deer, turkey, quail, pheasants and ducks, as well as predators and small game.

7. I am 61 years old and have hunted since I was 8-10 years old.  I became a serious big game hunter in 1994.

8. I started hunting with the Boy Scouts and with one of my uncles.  I started with small game and eventually hunted big game as well.

1

8. I started hunting with the Boy Scouts and with one of my uncles. I started with small game and eventually hunted big game as well.

9. In Alaska, I hunted brown bear, dall sheep, moose, caribou and wolf. In Canada, I hunted black bear. In the western United States, I hunted elk, mule deer, mountain lion, and black bear. In other parts of the U.S., I hunted white-tailed deer, turkey, quail, pheasant, duck, and hogs. In Mexico, I hunted duck.

10. In 1999, I hunted in Zimbabwe for plains game and leopard. In 2006, I hunted in Tanzania for buffalo and plains game. In 2008, I hunted in Tanzania for buffalo, leopard, lion, elephant, hippo and plains game.

11. I have only hunted elephant on one previous occasion. I hunted elephant unsuccessfully in Tanzania in 2008.

12. When I was in Zimbabwe in 1999, I saw many elephants, but did not hunt them. In Tanzania in 2006 (Masialand), I saw many elephants and did not hunt them. When I returned to Tanzania in 2008, I hunted in the Selous. I saw a fair amount of evidence of poaching and encountered several dead elephant carcasses. The elephants were generally on high alert and were difficult to approach.

13. During our hunt in Zimbabwe, we encountered anti-poaching patrols on several occasions.

14. A few years ago, my partner successfully hunted an elephant in Zimbabwe. The entire elephant was used to feed a local village. When I hunted other animals in Zimbabwe, my animals were also given to locals for a source of protein. It was obvious that meat donated by hunters played an important part in their lives.

15. While every hunter has different reasons for his or her desire to hunt, most of us pursue big game hunting for the love of the animal, the love of the chase and being out among other wild things. No one I know, who has the passion to hunt, wants to waste the resource and most of us have an interest in helping others. To be able to fulfill a dream and help others as well as the animal we are hunting is a win-win-win scenario for all.

16. There are significant differences between the removal of animals by hunters and the illegal take of animals by poachers. Hunters are usually very particular about the animal taken, and therefore they generally choose mature animals and leave younger, immature animals to grow the herd. Poachers are not very particular.

2

17. With full access to the species, due to the absence of hunters in the field, poaching will go completely unchecked. More elephants will die as a result of the importation ban – rather than less.

18. Hunting generates revenue for elephant conservation. Money generated by sport hunting helps provide resources for local communities and protection from poaching. Hunting increases the chance that more elephants will survive.

19. I have already paid a deposit for a 2014 Zimbabwe elephant hunt. I intend to leave on May 17, 2014. I have been planning this safari since 2008 after an unsuccessful attempt to harvest an elephant in Tanzania. I have $25,000 invested in my upcoming hunt at this time, with approximately $20,000 more reserved for fees and importation costs. I am not sure if I can get refunds for any of these investments. I am hopeful that I can get some of this money back if the importation ban is not reversed or if some other plan cannot be developed. I am still considering my options with my outfitter. None of the current options are desirable.

20. I cannot help but wonder why the U.S. Fish and Wildlife Service could not announce the plan to suspend importation in advance. I would like to know why the FWS penalized people like me who had relied on two decades of a consistent approach to importation from Zimbabwe, instead of announcing a proposed ban for a date in the future to give the countries, the hunters and the businesses dependent on elephant hunting an opportunity to provide the information necessary and/or plan for the change in the law.

21. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this **23** day of April, 2014, at _____*1800 H*_____.

_____
Ronald Wilson Taylor

3

# UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. |
| SALLY JEWELL, in her official | ) | DECLARATION OF SCOTT |
| capacity as Secretary of the U.S. | ) | MICHAEL DINGER |
| Department of the Interior, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DANIEL ASHE, in his official capacity as | ) | |
| Director of the U.S. Fish and Wildlife | ) | |
| Service, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| U.S. Fish and Wildlife Service, an Agency | ) | |
| of the United States, | ) | |
| | ) | |
| Defendants, | ) | |

I, Scott Michael Dinger, being first duly sworn on oath, depose and state as follows:

1. I am an attorney and Chief Operating Officer of ExL Petroleum, LP from Texas.

2. I have been a member of Safari Club International since 2010.

3. I am also a member of the West Texas SCI Chapter and have been a board member of that chapter since 2010.

4. I am also a member of Dallas Safari Club.

5. I have been hunting for about 35 years. I started hunting on my family ranch when I was young.

6. Internationally, I have hunted in Namibia for numerous plains game species; in South Africa for lion and numerous plains game species; and in New Zealand for stag, sika deer, chamois, tahr and fallow deer.

7. I have never hunted in Tanzania or Zimbabwe before, but I will hunt elephant in Zimbabwe in April 2014. It was my hope and my expectation that if I was successful, I would import my trophy back to the United States.

8. I booked my elephant hunt in Zimbabwe two years ago. I will be hunting with Chifuti Safaris from April 18th to 28th. I have already spent upwards of $50,000.00 for the hunt, including trophy fees, day rates, air charters and airfare. The elephant trophy fee alone was $15,000.00. I understand that much of the money I have spent will go to the government of Zimbabwe to assist in elephant conservation programs and anti-poaching efforts. The money will also help the local people that live and farm in elephant habitat.

9. On April 4, 2014, the United States Fish and Wildlife Service imposed an immediate importation ban for all sport-hunted elephant trophies from Zimbabwe and Tanzania for all of 2014.

10. Hunting elephant and importing a sport-hunted elephant trophy has been a dream of mine for years. I believe it is the classic African safari experience. To be able to participate in one of the greatest hunting experiences that has been the subject of so much history and literature has been a lifelong aspiration. I never imagined that I would not be able to have the elephant trophy as a permanent reminder of that experience. Without the trophy, my experience will be diminished.

11. I believe the importation ban imposed by the U.S. Fish and Wildlife Service is not based on evidence and sound reasoning.

12. I believe the ability to import elephant trophies into the United States is absolutely necessary for the survival of the species in Africa. Elephants are viewed by many local residents in Zimbabwe as a nuisance as the elephants destroy crops and lands. The money that hunters, including myself, spend to hunt elephants, along with the meat the hunts provide, is essential for rural Africa and the local populations. If elephants are not valuable to the locals, they will kill off the elephants to eat the meat and to prevent the destruction these animals cause to agricultural efforts.

13. Additionally, the importation bans will limit the number of American hunters and others in the bush and will allow poachers easier access to elephants.

2

14. I have not tried to obtain a refund for my hunt because I believe that sustainable use hunting is the most important part of conservation. If I cancel my hunt now, I will not be doing as much as I can for the future survival of elephants. Even though I will not be able to import my trophy, I will at least have the memories of the hunt, and I will have done my part to promote the survival of the species.

15. Aside from not being able to import a trophy that I have already paid for, I believe the importation bans harm me because they are detrimental to elephant conservation. I know of many others that are cancelling their hunts in Zimbabwe or Tanzania and are choosing to hunt in Namibia or South Africa instead. I believe the bans are doing nothing for the conservation and survival of elephants in Zimbabwe and Tanzania. The bans have made elephants much less valuable. Anti-poaching efforts will be less funded, elephants will become more of a nuisance to their environment, and the local populations will poach many more elephants merely to protect their crops and lands from elephant intrusions.

16. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this __15__ day of April, 2014, at __Midland, Texas__.

_____
Scott Michael Dinger

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DECLARATION OF THOMAS LITTLE WHALEY JR.

I, Thomas Little Whaley, Jr., being first duly sworn on oath, depose and state as follows:

1. I am a resident of Marshall, Texas.

2. I have been a member of Safari Club International for at least ten years.

3. I am also a member of Dallas Safari Club.

4. I take my children and grandchildren hunting on a regular basis and attempt to educate them about hunting and good conservation practices.

5. I am 57 years old. My father and grandfather introduced me to hunting, starting when I was five years old.

6. I have hunted all over the U.S. as well as in South Africa and Zimbabwe.

7. In South Africa, I hunted plains game and in Zimbabwe, I hunted leopard, cape buffalo and plains game.

8. For most of my life, I have been interested in hunting an elephant. It is an indescribable feeling to be out in the wild with them.

9. I am currently in Zimbabwe at the end of my first elephant hunt.

10. I arrived in Zimbabwe on March 31, 2014 and started hunting on April 1st.  My elephant hunt was scheduled for 15 days.  I also booked an additional ten day hunt that followed.  I was successful in shooting an old elephant bull.

11. While hunting, I saw many elephants.  In one day, my party saw over 60 bulls plus many more cows.  We saw many more on other days as well.

12. We also saw evidence that elephants had destroyed farmers' crops.

13. In addition, I saw evidence of two elephants that had been poached at a water hole.  I also saw an elephant that had lost part of its trunk due to a poacher's snare.

14. Hunting is an important weapon against poaching.  By having hunters, game scouts and Professional Hunters in the field, it is harder for poachers to operate freely.

15. We returned from the hunting area to hear of the elephant importation ban.  The skin and tusks from my elephant are currently being stored in Zimbabwe.

16. I booked this 15 day hunt, plus an additional ten day hunt in January 2013.  By the time I finished my hunts on April 24, I spent close to $100,000.  These monies have already been paid and are not refundable despite the fact that I am now unable to bring home a valuable part of my successful experience.

17. My hunt commenced on a date when the importation of my elephant was entirely legal.  By the time, I finished my hunt, the law had changed without advance notice of any kind.  I booked and started my hunt with the reasonable expectation that I could rely on the laws that were in effect when I arranged and paid for my hunt, departed from home and began my hunt. The immediate change in importation laws provides no benefit to elephant conservation and simply and unfairly harms legal hunters like me.

18. If the elephant importation ban discourages U.S. hunters from coming to Zimbabwe, it will completely undermine efforts to combat poaching.  The dollars generated by U.S. hunters will decline greatly and the local areas will not receive the funds necessary to pay for anti-poaching programs.  Without the hunters, Professional Hunters, scouts and others associated with the hunt in the field and without the resources to fight poaching, poachers will have the freedom to kill more elephants.

19. The importation ban will do far more harm than good. It will cause the prices of hunts to fall in both Zimbabwe and Tanzania. U.S. citizens will either cancel or not book hunts for these countries or will pay less for hunts from which they cannot import their elephants. Much needed money generated by hunting that goes to local areas to pay for game conservation activities and personnel will diminish or disappear. Without these funds, game conservation will decline greatly. With fewer "boots on the ground" to combat illegal activities, poaching will rise and a larger number of elephants, plus other game, will be illegally taken and wasted.

20. Both Zimbabwe and Tanzania need all the help we can give them. Hunters and the revenue they bring into these countries and into the local communities, provide that help. The importation ban does nothing but interfere with hunters' invaluable contribution to wildlife conservation in these two countries.

21. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this _24_ day of April, 2014, at ___2:21 Pm___

Thomas Little Whaley, Jr.

3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## DECLARATION OF TROY JAMES PERRY

I, Troy James Perry, being first duly sworn on oath, depose and state as follows:

1. I am self-employed in the construction business and live in Malta, Montana.

2. I have been a member of Safari Club International for over 14 years.

3. I have been hunting for 31 years. I started hunting with my father.

4. In the United States I have hunted Deer, Elk, Antelope, Moose, Mountain Goat, Bear, Mountain Lion, Bobcat, and Yukon Moose. Outside the U.S., I have hunted in Alberta Canada for Bear; British Columbia for Mountain Goat; the Northwest Territories for Polar Bear, Barren Ground Grizzly, Wolf, and Wolverine; Russia (Kamchatca Peninsula) for Snow Sheep and Brown Bear; and New Zealand for Red Deer, Chamois, and Tar.

5. Specific to Africa, I have hunted Lion, Leopard, Buffalo, Crocodile, Hippo, and numerous plains game (6-7 times over the years) in Zimbabwe; Cheetah, Oryx, plains game in Namibia; and plains game and small cats in South Africa.

6. In my experiences in Africa, I have seen numerous elephants on previous hunts to Zimbabwe. I believe the elephants in Zimbabwe are currently over-populated, at least in some areas (I do not have hard numbers to back this, but is based off what I have been told locally and witnessed). As long as hunters are hunting, the populations are being controlled by the operators through science-based quotas so as to not over hunt the elephants.

7. In my trips to Africa, I have seen the benefits of sport hunting and the impact it has on poaching. I have been told numerous times by operators that, if not for the hunters and game scouts in the field, there would be heavy poaching. The money U.S. hunters pay

1

for trophy fees goes in part to help combat poaching. I never myself witnessed poaching of elephant but have witnessed poaching of other game while in the field. If hunting is not occurring in the field, the poaching will go uncontrolled and may affect the elephant numbers drastically.

8. The influx of U.S. hunters also benefits the local economies in numerous ways, including the hiring of locals so that some of the costs of the hunts stay in the communities, delivering all the meat to the local residents, and controlling the elephant numbers so as to reduce the damage to local crops. Without the ability to import any trophy, U.S. hunters are less likely to hunt elephants in these two countries and these benefits will dry up.

9. As I have never hunted elephants before and wanted to experience it, and bring home a trophy of my adventure if I was successful, I planned an elephant hunt in Zimbabwe for October 2014. I made this commitment in February 2014. I wire transferred $15,000.00 to the operator in Zimbabwe to secure the hunt. The ability to import the item that memorializes my success is a significant part of a memorable hunt. I do not want to hunt the elephant if I cannot import the animal I take. I have contacted the safari operator and am currently trying to make some sort of deal to hunt other animals and apply the deposit towards that. This may work to some extent, but appears I am going to lose at least $10,000.00 of the original deposit that went to securing the elephant hunt.

10. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _25_ day of April, 2014, at _Malta, MT, 59538_ .

_Troy J. Perry_
Troy James Perry

2

**201**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL<br>501 2nd Street NE<br>Washington, DC 20002,<br><br>      Plaintiff,<br><br>v.<br><br>SALLY M. R. JEWELL, in her official<br>capacity as Secretary of the U.S.<br>Department of the Interior;<br>U.S. DEPARTMENT OF THE INTERIOR,<br>an agency of the United States;<br>DANIEL ASHE, in his official capacity as<br>Director of the U.S. Fish and Wildlife Service; and<br>U.S. FISH AND WILDLIFE SERVICE,<br>an agency of the United States<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. 14-cv-00670(ABJ)<br>DECLARATION OF<br>WAYNE SCOTT McCALL |

I, Wayne Scott McCall, being first duly sworn on oath, depose and state as follows:

1. I am a general contractor from Jacksonville, Florida.

2. I first became a member of Safari Club International about 12 years ago.

3. I personally participate in conservation measures for deer management on my farm in Georgia.

4. I have been hunting for 51 years. My father first took me hunting when I was very young.

5. I have hunted many different species in the United States. I have also hunted in New Zealand, Argentina, Canada and Africa.

6. I have been on two safaris in Zimbabwe. My first safari was in 2000. My second was in March 2014. During those safaris, I hunted for leopard, elephant, zebra,

1

sable antelope, warthogs, baboon and hyena. I also hunted for elephant in Botswana in 2013.

7. I was not successful on either of my elephant hunts. I have been invited back to Zimbabwe to hunt elephant and leopard later this year. If the U.S. Fish and Wildlife Service continues to enforce an elephant trophy importation ban from Zimbabwe, I do not know if I will be able to take advantage of this great opportunity. Retrieving the trophy from a successful hunt is a valuable part of the hunting experience. The inability to import the trophy from a successful elephant significantly diminishes the value of the hunt.

8. Hunters play a beneficial role in elephant conservation. While hunting in Zimbabwe, the professional hunter I hired told me that poachers were less likely to come into the areas we hunted because they do not want to be caught by hunters.

9. I have seen the damage that elephants can cause in Zimbabwe. Elephants have devastated the woods and vegetation in many areas where they live. By doing so, they destroy the habitat for themselves and for other wildlife. I believe that managing the elephant population so that the vegetation and soil are not destroyed is critically important for many different species in Zimbabwe. If the soil is destroyed, the vegetation will die. This affects all animal life from plains game up to elephants.

10. I do not think that the U.S. Fish and Wildlife Service acted in the best interest of the elephants by imposing the importation bans. It seems that politics have trumped actual species conservation in this instance.

11. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this ___23___ day of April, 2014, at ___Jacksonville , FL_____.

_____
Wayne Scott McCall

# UNITED STATES DISTRICT COURT

SAFARI CLUB INTERNATIONAL,       )
                                 )
     Plaintiff,                    )
                                 )

v.                                   )
                                 )   Civ. No.
SALLY JEWELL, in her official     )   DECLARATION OF DR.
capacity as Secretary of the U.S.   )   MARTIN GREGORY VICK
Department of the Interior,       )
                                 )
and                                 )
                                 )
DANIEL ASHE, in his official capacity as )
Director of the U.S. Fish and Wildlife  )
Service,                            )
                                 )
and                                 )
                                 )
U.S. Fish and Wildlife Service, an Agency )
of the United States,           )
                                 )
     Defendants,                 )

I, Dr. Martin Gregory Vick, being first duly sworn on oath, depose and state as follows:

1. I am a physician and anesthesiologist from Mansfield, South Dakota.

2. I have been a member of Safari Club International for six months.

3. I have also been a member of Pheasants Forever for about 25 years

4. My wife and I live on 70 acres in rural South Dakota, which we manage exclusively for wildlife. On my property, I have restored native prairie grasses and plant corn and sorghum to help sustain pheasant and white-tailed deer through the winter. I also co-own 130 acres of woodland in northern Minnesota, on which I hunt and help manage for white-tailed deer.

5. I have been hunting for about 45 years. My father first took me pheasant hunting when I was 15 years old.

1



6. In North America I have hunted for white-tailed deer, pronghorn antelope, caribou, elk, black bear and multiple species of birds and upland game. In Africa I have hunted for elephant, leopard, Cape buffalo, crocodile, kudu, impala, gemsbok, eland, red hartebeest, black wildebeest, blue wildebeest, bushbuck, bush pig, warthog, and other plains game. I have also hunted brown bear in Russia.

7. I hunted in Zimbabwe in 2005, 2009, 2011 and 2013. I hunted for elephant, leopard, Cape buffalo, hyena, blue wildebeest, bush pig, klipspringer, and grysbuck.

8. In 2009, I successfully hunted two tuskless cow elephants in Zimbabwe, and in 2011, I successfully hunted a trophy bull elephant in Zimbabwe.

9. I will be hunting a trophy bull elephant and a tuskless cow elephant in Zimbabwe in April 2014.

10. During my hunts in Zimbabwe, I have witnessed severe environmental damage caused by overpopulation of elephants in the Zambezi Valley. I have seen the results of human-elephant conflict in communal areas where damage from elephants that eat crops is severe. Sport-hunting revenue from hunters like me offer recompense to subsistence farmers in the area.

11. During my hunts in Zimbabwe, I have also seen evidence of poaching for meat and ivory from elephants. I saw a site where poachers had killed an entire herd of elephants and left everything behind but the ivory.

12. Sport hunting gives elephants more value to the local populations, aside from the ivory and meat. I have witnessed great benefits from ethical safari operators funding and conducting anti-poaching efforts. Poachers have been apprehended and deterred. In areas where the operators have conducted the anti-poaching efforts over a multi-year period, I have noticed a significant increase in game species.

13. I prefer to hunt African elephant in Zimbabwe because I enjoy the intensity of the experience. Approaching wild elephants with the intent to select and harvest an individual is, in my opinion, an extreme sport. I believe that in Zimbabwe it is ecologically sound. I utilize a renewable resource for the benefit of the elephant population and the locals that live in the area.

14. My previous hunts and future hunt will help provide employment to locals that might otherwise be involved in poaching. In addition, the fees that I pay provide

2

funds that will be directly applied to curb poaching and to projects such as boreholes and dams to enhance habitat.

15. On April 4, 2014, the United States Fish and Wildlife Service placed an importation ban for all sport-hunted elephant trophies from Zimbabwe and Tanzania for all of 2014.

16. I will be hunting a trophy bull elephant and a tuskless cow elephant for 18 days, commencing on April 16, 2014.

17. Even though I will not be able to import the trophies, I am still going on my elephant hunt this month. To me, it is not entirely about bringing home the trophies. I enjoy the hunt and value being part of the effort to conserve elephants. However, I do hope that the Fish and Wildlife Service rescinds the importation ban because I would like to bring my trophies home.

18. I am harmed not only because I will not be able to bring home my trophies from this month's hunt, but I also believe that I will be harmed in the future by the loss of a sport-hunting resource. I believe that the elephant population in Zimbabwe will be greatly harmed by the importation ban due to its impact on the elephant's economic value. Without the benefit of sport-hunting revenue for the local populations, the elephants are only valuable as protein (food for local residents) and a source of ivory. There will be less incentive for the local populations to conserve them, less money for anti-poaching efforts, and less management of the resource.

19. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 16 day of April, 2014, at Pedza Pasi Camp, Donilo Safari area Zimbabwe.

Dr. Martin Gregory Vick

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL )<br>)<br>　　　　Plaintiff,　　　　　)<br>)<br>v.　　　　　　　　　　　　)<br>)<br>SALLY M. R. JEWELL, et al.　　)<br>)<br>　　　　Defendants　　　　　)<br>_____ ) | Civ. No. 14-cv-00670(ABJ) |

**DECLARATION OF CRAIG M. MCDONNOLD**

I, Craig M. McDonnold, being first duly sworn on oath, depose and state as follows:

1. I am a petroleum engineer and live in Midland, Texas.

2. I have been a member of Safari Club International for about 7 years.

3. I have been hunting for 50 years.  I started hunting with my father.

4. I have hunted the following species in the indicated area:  Lower-48 United States: White-tail/Mule Deer, Pronghorn, and Elk; Alaska:  Brown bear, Caribou, Moose; Tanzania/Zimbabwe/Cameroon/Ethiopia: Elephant, Cape Buffalo, Lion, Leopard, Mountain Nyala, Bongo, Sable, Roan, Kudu, Hyena, Hippo, Oryx, and Crocodile.

5. Specific to Tanzania and Zimbabwe, I have hunted the following animals: Tanzania (2009, 2011, 2013), Elephant (Selous Game Reserve), Lion, Leopard, Hippopotamus, Crocodile, Cape Buffalo, Hyena, Sable, Kudu, Klipspringer, Dik Dik, Lesser Kudu, and Roan; Zimbabwe (1994), Sable, Kudu, Buffalo, Warthog, Impala, Wildebeest, and Leopard.

6. During my visit to Tanzania in 2011, I found poached elephants in the Selous Game Reserve.  During this trip I saw eight or nine legal bulls in the Selous U1 & U2 block.  We also found poached elephants in the Rungwa Area in 2013.  The Professional Hunter, my son, and I caught two poachers on that trip.  The game scouts caught four more that night.  During that trip, we did not see a legal bull in 21 days in Rungwa.

7. The owners of the game concessions, supported by U.S. hunter dollars, run and support private anti-poaching operations.  These operations tend to be more effective than government game officials and their programs.  The money I will spend on my hunt is

1

much greater than the value of the ivory. Economic benefit to the local population can be a big deterrent to poaching and can generate support among the local population for sound management of elephants.

8. I have plans for a 14-day elephant hunt with Desfountain and Jones, Ltd. in Zimbabwe, for Aug 10-28, 2014. I have committed approximately $75,000. I chose Zimbabwe because it still has a strong elephant population that requires culling in areas. I have emailed my professional hunter about the ban. He had only recently become aware of the ban right and is extremely concerned about losing my hunt as well as hunts by many other Americans hunting with him in 2014. If I am unable to import my elephant trophy (a cherished symbol of my hunt) I do not know if I will continue with my hunt. I have no firm commitment on a refund or not.

9. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _28_ day of April, 2014, at _10:37 Am CST._ .

Craig M. McDonnold

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL                           )
501 2nd Street NE                                    )
Washington, DC 20002,                                )
                                                     )
      Plaintiff,                                 )
                                                     )
v.                                                   )
                                                     )   Civ. No. 14-00670(ABJ)
SALLY M. R. JEWELL, in her official                  )   DECLARATION OF
capacity as Secretary of the U.S.                    )   GRANT F. DENNISON
Department of the Interior;                          )
U.S. DEPARTMENT OF THE INTERIOR,                     )
an agency of the United States;                      )
DANIEL ASHE, in his official capacity as             )
Director of the U.S. Fish and Wildlife Service; and  )
U.S. FISH AND WILDLIFE SERVICE,                      )
an agency of the United States                       )
1849 C Street, NW                                    )
Washington, DC 20240,                                )
                                                     )
      Defendants.                                )

I, Grant F. Dennison, being first duly sworn on oath, depose and state as follows:

1. I am a chemical process operator in Liberty, Texas.

2. I have been a life member of Safari Club International since 2012.

3. I am also a member of Rocky Mountain Elk Foundation, Dallas Safari Club, Grand Slam Club/Ovis, National Rifle Association, and Friends of the Trinity River National Wildlife Refuge.

4. I have been hunting for about 40 years. I started hunting with my father and grandfather when I was young.

5. In the United States I have hunted for white-tailed deer, elk, mule deer, ducks, geese, turkey, and other small game. In South Africa I have hunted for plains game. In Zimbabwe, I have hunted for Cape buffalo and impala.

1

6. While hunting in Zimbabwe in 2011, I observed numerous elephants and came upon them several times in the bush. After talking with my Professional Hunter and others who had previously hunted elephant in Zimbabwe, I decided that it was something that I would like to pursue as well. Especially after seeing the remains of three poached elephants and the remnants of two poachers' camps, I wanted to contribute to the conservation of the species with my own hunt.

7. At the 2012 Safari Club International Convention I booked an elephant hunt in Zimbabwe with Chifuti Safaris for August 2014. I have saved for several years and made monthly payments for the hunt until March 2014.

8. I have yet to try and receive a refund for the hunt because of the trophy importation ban. I am hoping that the U.S. Fish and Wildlife Service will reverse its decision before August. Due to financial obligations, I am unsure if I will be able to pay for another elephant hunt. I believe this will be my only opportunity to successfully hunt an elephant.

9. Sport hunting elephants places value on the species and that impacts the local economies. In addition to the revenue received from hunting fees, locals are employed in jobs related to the hunting operation as trackers, skinners, camp staff, etc. They earn wages that would otherwise not be available to them without the presence of hunters and hunting.

10. Without the value that sport hunters provide, elephants would become intolerable to the locals because their destructive behaviors. Local residents would lose their tolerance of the crop destruction caused by elephants and will resort to poaching the elephants. The trophy importation bans imposed by the U.S. Fish and Wildlife Service will increase illegal poaching of elephants in Zimbabwe and Tanzania and will be extremely detrimental to the species.

11. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _26_ day of April, 2014, at _Liberty, Texas_____.

2

210

Grant F. Dennison

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SAFARI CLUB INTERNATIONAL          )
                                   )
      Plaintiff,          )    Civ. No. 14-cv-00670(ABJ)
                                   )
v.                                 )
                                   )
SALLY M. R. JEWELL, et al.         )
                                   )
      Defendants          )
_____    )

**DECLARATION OF ALISTAIR POLE**

I, Alistair Pole, being first duly sworn on oath, depose and state as follows:

1. I am the owner of Zambezi Hunters in Ballantyne Park, Harare, Zimbabwe.

2. Through Zambezi Hunters I have been a member of Safari Club International since 2003.

3. I have also been a member of Dallas Safari Club since 2003 and the Safari Operators Association of Zimbabwe since 2001.

4. I am currently a committee member for the Safari Operators Association of Zimbabwe, Save Valley Conservancy, and Zimbabwe Wildlife Association. From 2010 to 2012, I was vice president of the Zimbabwe Council for Tourism.

5. I have been an outfitter for 13 years. I have provided elephant hunts since 2004. This year, we have nine elephant hunts in our quota.

6. We have seven elephants on quota in the Mahenye CAMPFIRE area adjacent to the Gonarezhou National Park. An aerial survey of the area conducted last year estimated the elephant population at over 10,000. The population has doubled in the last 10 years.

7. We usually hunt another two elephants in the Save Valley Conservancy. Last year's aerial survey estimated the population at 1,500 elephants in the area. This is an increase from the 553 elephants that were introduced into the area in 1993.

1

The Save Valley Conservancy has an elephant management plan (that was funded by the U.S. Fish and Wildlife Service) with a stated density objective being 0.3 elephants per square kilometer. The current population is well above this target. The management plan advises management through culling or live off take.

8. In the Mahenye CAMPFIRE area the elephants are a problem because they destroy crops and endanger the safety of those that live in the area. The fact that the locals get some benefits from elephant hunting helps alleviate the problem and ensures that the human-elephant conflicts don't become so many that the people try to destroy the elephants in the area. My company spends a lot of time, effort and resources chasing elephants out of the fields from February to May when crops are growing in the fields.

9. I have not personally witnessed elephant poaching in the areas in which I provide hunts. Sport hunting helps protect crops and provides a financial benefit to the community. This helps to deter the people in the Mahenye area from poaching the elephants. If there was no sport hunting, I have little doubt that the community would see no point in maintaining an elephant population in their area.

10. Safari areas form buffers around many of the National Parks in Zimbabwe and harbor a large portion of the national elephant population. The protection and maintenance of the elephant herds in the National Parks is dependent upon the survival of elephants in these more marginal safari areas. In other words, the safari areas are the first line of defense. The management of these areas is almost solely funded by safari operators through the income that they receive via sport hunting. Funds received from sport hunting covers anti-poaching efforts, road maintenance, water supply, fire protection, etc. The elephants in these areas would be exposed to poaching without sport hunting. In turn, the elephants in National Parks would also be threatened.

11. My company will potentially lose the income from nine elephant safaris this year due to the trophy importation ban. The potential income from those hunts is $337,000.00.

12. In the Save Valley Conservancy a wide range of species are hunted, so the loss of elephant hunting will not be catastrophic, but the Conservancy is already stressed financially. On the other hand, the Mahenye area relies on elephant hunting for 100% of its income. A loss of elephant hunts will result in us not being able to meet our obligations to the community in making payments, providing animal control and assisting with community projects.

13. We will attempt to sell our elephant hunts to non-U.S. hunters if necessary. However, we sell 90% of our hunts to U.S. hunters. It will not be easy to replace

2

them. I imagine that we will have to offer severely discounted hunts to get any interest because the market will be flooded with offers from other operators.

14. I believe the decision to ban the importation of elephant trophies from Zimbabwe and Tanzania is short sighted and will have a negative impact on elephant conservation to the extent that the bans will fuel and facilitate an increase in poaching.

15. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this _25_ day of April, 2014, at_____HARARE, ZIMBABWE_____.


_____
Alistair Pole

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| 501 2nd Street NE | ) | |
| Washington, DC 20002, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 14-cv-00670(ABJ) |
| SALLY M. R. JEWELL, in her official | ) | DECLARATION OF |
| capacity as Secretary of the U.S. | ) | FREDERICK L OOSTERHUIS |
| Department of the Interior; | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| an agency  of the United States; | ) | |
| DANIEL ASHE, in his official capacity as | ) | |
| Director of the U.S. Fish and Wildlife Service; and | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| an agency of the United States | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
| Defendants. | ) | |

I, Frederick L Oosterhuis, being first duly sworn on oath, depose and state as follows:

1. I am the Director of Hunting Legends International, Pty Ltd, a company duly registered and based in South Africa.

2. I have been a life member of Safari Club International since 2012.

3. I am also a member of the Professional Hunters' Association of South Africa, Wildlife Ranching South Africa, International Professional Hunters' Association, and the South African Hunters and Game Conservation Association.

4. Hunting Legends International is a specialist African hunting corporation.  We offer world class hunts to our clients.

5. Hunting Legends International also owns one of the top ten rare-game breeding projects in South Africa.  We breed lions, sable antelope, roan antelope, buffalo, black impala, nyala, Livingston eland, and rhinos.

1

6. Many of our clients have hunted in Zimbabwe.  Since 2006, we have had clients with successful elephant hunts in Zimbabwe.  Hunting in Zimbabwe offers our clients a unique experience to hunt elephant in large, wild and untamed areas that give the elephants a fair chance of avoiding the hunter and give hunters a valuable hunting experience.

7. Our clients and professional hunters have witnessed many elephants in the areas where we hunt.  The elephant populations seemed to be healthy and in high numbers.

8. When our clients hunt elephant in Zimbabwe, members of the local communities are employed as trackers and guides for the hunts.  The hunts provide the communities with a direct financial benefit.  Hunters also often tip the community members who assist in the hunts.  On successful hunts, the community members are often able to harvest the elephant meat, providing a valuable source of protein to the community.

9. I believe that the U.S. Fish and Wildlife Service's decision to ban the importation of elephant trophies from Zimbabwe and Tanzania is a big mistake.  Their decision will diminish the value of elephants, causing local communities to suffer financially when they lose the benefits from U.S. sport hunters.  Without this financial resource, I believe the locals will resort to poaching elephants for survival.

10. Local community members will also kill elephants that threaten their crops. The income generated from the presence of U.S. hunters balances against the loss of crops caused by elephant damage.  If the number of hunters and hunter generated revenue declines or disappears, there will be no more financial benefit for local residents when they lose crops to damage caused by elephants.

11. Hunters provide much needed financial support that the parks and anti-poaching organizations in these areas rely on to protect elephants.

12. Hunters from all over the world, but mostly those from the United States, provide a huge source of revenue for the parks, private reserve owners and local communities in Zimbabwe and other areas.  Without U.S. hunters in the field, much of this source of income will be lost.  Many U.S. hunters that would have hunted in Zimbabwe or Tanzania will now hunt elsewhere, causing huge reductions in revenue for areas that desperately need it.  Many efforts to protect elephants and combat poaching will be defunded.

2

13. I have seen how money from hunters positively impacts local communities. I cannot imagine how Zimbabwe and those communities will be able to cope without U.S. hunters providing a valuable source of income and support.

14. Hunting Legends International has two clients that have already booked elephant hunts in Zimbabwe for this year. The total money invested by the two clients already totals about US $122,000.00 and they are expected to spend more money during the hunts. We have tried to cancel the hunts and get refunds for our clients, but all the money has already been utilized to pay for accommodations, government fees, tag fees, etc. The hunts are not refundable at this point.

15. In order to maintain the company's very good reputation, we are considering refunding our clients and taking a severe financial loss to the company. We cannot afford to lose our reputation. At this point, I do not know what we will do.

16. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 22nd day of April, 2014, at Wind Gap, Pennsylvania.

_____
Freddie Oosterhuis

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL<br>501 2nd Street NE<br>Washington, DC 20002, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 14-cv-00670(ABJ) |
| SALLY M. R. JEWELL, in her official<br>capacity as Secretary of the U.S.<br>Department of the Interior;<br>U.S. DEPARTMENT OF THE INTERIOR,<br>an agency of the United States;<br>DANIEL ASHE, in his official capacity as<br>Director of the U.S. Fish and Wildlife Service; and<br>U.S. FISH AND WILDLIFE SERVICE,<br>an agency of the United States<br>1849 C Street, NW<br>Washington, DC 20240, | ) ) ) ) ) ) ) ) ) ) ) ) | DECLARATION OF<br>IVAN MURRAY CARTER |
| Defendants. | ) | |

I, Ivan Murray Carter, being first duly sworn on oath, depose and state as follows:

1.   I am a resident of Freeport Bahamas.

2.   I am a booking agent for Africa, a professional hunter and a television show host.

3.   I am a life member of Safari Club International and have been a member for well over ten years.

4.   I am a life member of the mid-Michigan Chapter of SCI.

5.   I am also a member of Dallas Safari Club (over ten years), the Zimbabwe Professional Hunters and Guides Association (over ten years), the Tanzania Professional Hunters Association (two years), the African Professional Hunters Association (one year), Houston Safari Club (two years) and the International Professional Hunters Association (five years).

Page **1** of **4**

6. I have a television show on the Outdoor Channel that is produced by Safari Classics Productions. Every episode highlights the value of hunting through conservation.

7. I write for African Outfitter Magazine on the role that hunting plays in the conservation of wildlife. I also write for Dallas Safari Club's Gametrails Online – a blog that deals with current wildlife issues and stories.

8. I am 43 years old and have been an outfitter for 23 years.

9. I provide or guide hunts in Zimbabwe, Tanzania, South Africa, eastern Cape Cameroon. northern Mozambique, northern and southeast Namibia and Caprivi. Until recently, I provided or guided hunts in Botswana as well.

10. Each year I guide a maximum of 20 elephant hunts. At a minimum, I guide eight elephant hunts a year.

11. Over the years, I have witnessed the population status and behavior of elephants. For example, in Zimbabwe, the elephant populations are stable and their behavior is generally unchanged. However, there is overpopulation in many areas that has led to the destruction of habitat. Although I have noticed an increased number of carcasses left by poachers, I have not noticed a population decline.

12. In Tanzania, I have witnessed that the elephant behavior has changed and that the elephants are more agitated, nervous and disturbed. I have also seen many carcasses left by poachers.

13. It is worth noting also that in Botswana, where elephant hunting is no longer possible, there is chronic elephant overpopulation which has led to much habitat loss.

14. Generally, local African populations consider elephants a nuisance because elephants interfere with green season crop cultivation. Various programs that invest hunter dollars in local economies changes local attitudes towards elephants. Hunter money helps the communities by employing local residents and in some cases through direct payments to the communities for the rights to hunt. Where elephants become worth protecting as a means of generating hunter revenue, local communities are far more willing to tolerate and protect these animals.

15. I have often witnessed the evidence of poaching and have seen many elephant carcasses with the ivory chopped out. Many, many of these scenes have been deep in hunting areas. Without the presence of hunters, this evidence of poaching would go unnoticed.

16. Guided sport-hunting is an important weapon against poaching. The mere presence of hunters (all of whom are accompanied by rangers/scouts) is a deterrent. In addition, sport-hunter dollars go a long way in financing outfitters' anti-poaching efforts.

17. It is a very, very simple fact that the value placed on an elephant by visiting hunters will enhance the livelihood of the outfitters. In particular, U.S. hunters generate the most revenue

for outfitters and for the wildlife that the outfitters want to protect for their hunting clients. Without the income generated by U.S. hunters, outfitters will have less money to use for their anti-poaching efforts.

18. Even though outfitters can and will attempt to book elephant hunts with hunters from countries other than the U.S., the U.S. economy is such that U.S. hunters are often in a position to pay more for elephant hunts than European and other hunters. So with the U.S. importation ban in effect, the same number of elephants will be available for hunting in Zimbabwe and Tanzania, but the revenue generated that will go towards elephant protection will be less.

19. The importation ban imposed by the U.S. government has already hurt my business. I have lost several hunts that were booked in Zimbabwe and Tanzania for elephant over the next few years. This has greatly impacted my personal income, the income of our company, Safari Classics as a whole, and the income of the outfitters on the ground that we support.

20. Many of the areas in which I guide elephant hunts will suffer from this ban. Many areas were specifically "sold" with elephant as the target species. These areas will severely diminish in financial returns. This may make the areas non-viable for future hunts. A non-viable hunting area sees no financial return and that, in turn, means no anti-poaching efforts, no employment and an area devoid of "legal" presence and wide open to poachers.

21. The importation ban is likely to harm elephant conservation. Taking away the value of an animal takes away its future. This is no different than what we saw with the imposition of restrictions on the scimitar-horned oryx. Once restrictions were imposed, the value dropped and the numbers of these animals dropped as well. We saw reduced numbers because there was no incentive to maintain healthy populations. In Africa, and in many other parts of the world, cash is king and where a resource cannot or does not generate financial return, it has no future. Elephants are just such a resource. Without sport hunters, there are many, many millions of acres across Africa that will soon be devoid of elephant.

22. It is a proven fact that in many parts of Southern Africa, the elephant numbers are grossly above the viable carrying capacity of the environment they live in. In Zimbabwe particularly, many, many thousands of elephants live in conflict with people and indeed in conflict with their environment. Worthy naturalists have cited that several thousand elephants should actually be culled. Removing the ability to import a few hundred elephants will not have a positive impact on elephant conservation in Zimbabwe. Instead, all it will do is diminish the return that these animals can generate and diminish their value in the eyes of the people and the government.

23. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Page **3** of **4**

220

Dated this _24_ day of April, 2014, at _6:15 pm_ _____.



Ivan Murray Carter

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL<br>501 2nd Street NE<br>Washington, DC 20002, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 14-00670(ABJ) |
| SALLY M. R. JEWELL, in her official<br>capacity as Secretary of the U.S.<br>Department of the Interior;<br>U.S. DEPARTMENT OF THE INTERIOR,<br>an agency of the United States;<br>DANIEL ASHE, in his official capacity as<br>Director of the U.S. Fish and Wildlife Service; and<br>U.S. FISH AND WILDLIFE SERVICE,<br>an agency of the United States<br>1849 C Street, NW<br>Washington, DC 20240, | ) ) ) ) ) ) ) ) ) ) ) | DECLARATION OF<br>JOHN C. BARTH |
| Defendants. | ) ) | |

I, John C. Barth, being first duly sworn on oath, depose and state as follows:

1. I am a safari hunting consultant, safari outfitter and booking agent and own Adventure Unlimited, Inc. in Corpus Christi, Texas.

2. I have been a member of Safari Club International for the last 15 years. I have been an exhibitor at Safari Club International's Convention each year for the last 14 years.

3. I am also a member of the South Texas SCI Chapter and was previously a member of the Texas Hill Country SCI Chapter.

4. I am also a member of the International Professional Hunters Association, Coastal Conservation Association, and the National Rifle Association.

5. I have been a professional outfitter for 20 years.

1

6. I have provided hunts in Zimbabwe, Tanzania, Zambia, Botswana, Mozambique, Cameroon, Central African Republic, Benin, South Africa, Namibia and Ethiopia.

7. Elephant hunts are my specialty area of focus. For the past 15 years I have provided between 5 and 25 elephant hunts per year.

8. I primarily provide elephant hunting opportunities in Zimbabwe around the Hwange National Park.

9. The locals that live in that area of Zimbabwe fully support and depend on the legal sport hunting of elephants. In the hunting concessions we hunt in Zimbabwe and used to hunt in Botswana, revenue generated from trophy hunting is the only source of conservation dollars being brought into the region. The revenue pays for simple things like food, shelter and supplies for anti-poaching teams. It pays for diesel fuel to run pumps at water wells where animals drink, and it pays the local communities for the crops lost from elephant damage.

10. I understand that poaching is an issue in Zimbabwe. A professional hunter that I work with in Zimbabwe helped bring down the poaching ring that poisoned elephants in the Hwange National Park. It was this incident that the U.S. Fish and Wildlife Service cited in their press release regarding implementation of the importation bans. It was because of the presence of hunting operations that the poachers were caught and punished.

11. From my experience, areas of Zimbabwe that have legal safari operators as their hunting concession holder are well patrolled by anti-poaching teams. Areas that do not have safari operators are generally overrun with poachers.

12. On April 4, 2014, the United States Fish and Wildlife Service imposed an immediate importation ban for all sport-hunted elephant trophies from Zimbabwe and Tanzania for all of 2014.

13. The importation bans have already hurt my business. Since the U.S. Fish and Wildlife Service announced its decision, 3 clients have cancelled hunts that were previously booked or arranged for later this year. I also have 7 pending safaris for late 2014 and 12 pending safaris for 2015 that could be cancelled due to the bans. I believe the bans will ultimately destroy my business if not revoked.

14. U.S. hunters pay far higher prices on average than foreign hunters do for elephant hunts. Prohibiting the import of elephant trophies and possibly removing that many elephant hunts will have a damaging impact.

15. I believe the bans will be extremely detrimental to elephant conservation in Zimbabwe and Tanzania. I do not think the U.S. Fish and Wildlife Service realizes how many thousands of elephants will die as a result of the bans. If hundreds of U.S. hunters cancel their elephant hunts, many of the anti-poaching teams will not have an operating budget and the employees will not be paid. Many locals will lose their incentive to not poach elephants and other species.

16. I believe the bans will have the exact opposite effect that was intended. Many more elephants will die as a result of the bans.

17. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 22 day of April, 2014, at *Corpus Christi, TX* .

*John Barth*

John Q. Barth

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL        )
                                 )
        Plaintiff,               )        Civ. No. 14-cv-00670(ABJ)
                                 )
v.                               )
                                 )
SALLY M. R. JEWELL, et al.       )
                                 )
        Defendants               )
_____)

## DECLARATION OF MARTIN PIETERS

I, Martin Pieters, being first duly sworn on oath, depose and state as follows:

1. I am a resident of Burnside, Bulawayo, Zimbabwe.

2. I am a Safari Operator and Professional Hunter.

3. I am a life member of Safari Club International and have been so for six years.

4. I am a member of the Zimbabwe Professional Hunters and Guides Association, a past Chairman and a Committee Member (over seven years) of the Safari Operators Association of Zimbabwe (ten years).

5. I am currently involved in constructing a conservancy in the Zambezi Valley known as Mackenzies Conservancy and the Ume River Conservancy. This is a joint venture with NuaninyamiRural District Council and the community.

6. I am 41 years old and have been an outfitter for 21 years.

7. I provide and/or guide hunts primarily in Zimbabwe, but have also operated in Zambia, Botswana and South Africa as an agent.

8. I have provided and/or guided for elephant hunts for 20 years.

9. I provide and/or guide for over 20 elephants hunts each year.

10. I operate in various areas in northwest Zimbabwe. In these areas, I have witnessed the fact that elephant populations are abundant and elephant numbers are increasing.

Page 1 of 3

11. In contrast, in the Zambezi Valley, elephant numbers are decreasing due to heavy poaching.

12. I operate a CAMPFIRE Area (Communal Area Management Programme for Indigenous Resources) where the local community derives direct benefits from hunting via payments and meat. As a result of these benefits, the local residents are willing to co-exist with the elephants.

13. In the last three years, I have witnessed a huge increase in elephant poaching by armed poachers. This is having an impact on the elephant population in the Zambezi Valley. This is not the case in northwest Zimbabwe where the population is on an increase and where there are heavy armed anti-poaching patrols.

14. Guided sport hunting has a huge impact on poaching. The fact that hunters, together with professional hunters, trackers and others, drive around the areas in the hunting season is enough to deter most poachers. We are always on the lookout for their tracks and listen for their gun shots.

15. Hunting operations like mine are one of the most effective anti-poaching weapons. We conduct anti-poaching activities with trained scouts and fund these efforts out of our own pockets.

16. There is no question that hunting enhances the survival of elephants in Zimbabwe. Money generated from sport hunting allows us to protect the species. We invest that money in educating local residents, anti-poaching efforts, pumping water and monitoring elephant populations.

17. The U.S. ban on elephant trophy importation will harm elephant conservation by decreasing the number of U.S. hunters. Businesses like mine will attempt to sell cancelled or unsold elephant hunts to non-U.S. hunters, but this will likely be at reduced prices due to the fact that the season is now well underway and that non-U.S. hunters bring less revenue into the country. Our business is bound to be harmed as we lose a major market share and as other countries (and their hunting operations) bargain us down on elephant hunt rates.

18. If the value of an elephant hunt decreases, that means less revenue for anti-poaching and other species protection efforts.

19. Sadly, if the importation ban continues, it will be directly responsible for the demise of the African elephant in Zimbabwe.

20. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Page 2 of 3

Dated this 24 day of April, 2014, at VICTORIA FALLS

Martin Pieters

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DECLARATION OF RICHARD STUART COOKE

I, Richard Stuart Cooke, being first duly sworn on oath, depose and state as follows:

1. I am a resident of Victoria Falls, Zimbabwe.

2. I am a Professional Hunter.

3. I have been a member of Safari Club International for at least ten years.

4. I have been a member of the Zimbabwe Professional Hunters Association since 1996. I am also a member of SOAZ (for over eight years) and a member of Dallas Safari Club (over 14 years).

5. I actively support wildlife conservation. For example, I have been privately funding some small-scale water development projects in the areas that I hunt.

6. I am 45 years old and have been a Professional Hunter for 19 years.

7. I have guided hunts in Mozambique for eight years in Lipilichi Wilderness, Niassa Province.

8. I have guided hunts in Zimbabwe for 19 years. I guide about 150 days per year.

9. In Zimbabwe I guide on Forestry lands- Ngamo/Sikumi, Amandundamela, Fuller, Kazuma, Pandamasuie; Private lands – Lemlo/Bubye Valley, Rosslyn

1

Safaris/Lawsten; National Parks lands – Matetsi, Chirisa, Chete,Makuti, Chewore, Dande, Deka, Gengwa RSCH; and Communal lands:  Omay north and south.

10. Almost all of my guiding is for elephant and lion hunts.  I assist hunters in taking from six to 24 elephant bulls per year.

11. My guiding in elephant range gives me an excellent opportunity to view and assess the status of the elephant populations in my areas.  In the Forestry Concessions, the condition of the herds and the elephants themselves is very good.  There are many big bulls.  In Matetsi, the status of the population is also very good.  In the Zambezi Valley, there is an overpopulation of elephants.

12. The local residents who live in elephant ranges live in fear of the elephants and of the damage the elephants do to crops each year.

13. I have viewed evidence of poaching in my areas.  I have never seen rifle poaching in Forestry lands in my nine years of guiding there. But in 2013 and 2014, I saw seven carcasses of elephants that had been poisoned.

14. Poaching activity only really happens when hunts are not in progress, because the hunters and their Professional Hunters and others with the hunt make it impossible for the poachers to operate without notice.

15. The U.S. market of hunters drives prices of our elephants up.  If the U.S. discourages U.S. hunters from coming to Zimbabwe to hunt elephants, elephants will still be hunted, but at far lower prices.  This means less money going back into the system that finances the anti-poaching efforts.

16. The loss of the revenue from U.S. hunters will not benefit elephant conservation.  It will just mean less money coming into Zimbabwe communities for pumping water and anti-poaching efforts.  More elephants will be poached and elephants will move out of the area due to less pumped water.

17. The importation ban will seriously hurt my business.  For 2014, I will have five elephant hunts on my hands that U.S. hunters will not want.  For 2015, I have already committed to hunts for 11 bulls and had plans to buy more.  The same is true for 2016.

18. I will have to try to sell these hunts to citizens of other countries.  I have sold only to the U.S. market for the past 14 years.  I believe that the European hunting market is weak, but Russia and especially China are strong, so I will try to sell the hunts there.

19. This year, I will sell the elephant hunts for any small profit I can. As my familiarity with Eastern markets grows, I imagine I'll be selling for better profits, but it is unlikely that I will ever be able to sell for the same prices that I have been able to obtain from the U.S. market.

20. Because the United States cannot control the number of elephants hunted or imported to other countries by non-U.S. hunters, all the importation ban succeeds in doing is decreasing the funding available for elephant conservation. The U.S. is effectively stepping out and is holding the door open for Eastern markets to step in.

21. It is difficult enough for us, the Professional Hunters and Safari Operators, who care about the elephants, to impose some measures of control on poaching and elephant conservation, when we have the help of income from U.S. elephant hunters. Without that income, it will be almost impossible to keep the poachers from taking Zimbabwe's elephants.

22. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 26ᵀᴴ day of April, 2014, at _VICTORIA FALLS, ZIMBABWE_

_____
Richard Stuart Cooke

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
|     Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
|     Defendants | ) | |
| _____ | ) | |

**DECLARATION OF GARY MICHIEL DUCKWORTH**

I, Gary Michiel Duckworth, being first duly sworn on oath, depose and state as follows:

1.  I am a professional hunter and safari operator with Mokore Safaris in Borrowdale, Harare, Zimbabwe.

2.  Mokore Safaris is a member of Safari Club International.

3.  The company is also a member of the Safari Operators Association of Zimbabwe, Zimbabwe Pro Hunters and Guides Association, and Mozambique Safari Operators Association.

4.  My family and I have been responsible, both financially and physically, for the restoration of the Mokore, Angus and Umkondo sections of the Save Valley Conservancy. We worked to bring it from denuded cattle land to one of the best game areas left in Africa today. We've also successfully restored the Nhacainga Conservancy (Coutadas 9 and 13) in Manica Province, Mozambique from an area with very little game after their civil war into one of the best game areas in Mozambique.

5.  My family has been in the safari business my entire life. My father, Barrie Duckworth, has been operating since 1979.

6.  We provide hunts in Zimbabwe (Save Valley Conservancy and Sengwa Research Area) and Mozambique (Coutadas 9 and 13). We also sublease in other areas if our quotas are sold old.

1

7.  Currently, we provide 5 bull elephant and 4 tuskless cow elephant hunts each year in Zimbabwe.  We provide 3 bull elephant hunts each year in Mozambique.

8.  The Save Valley elephant population is in excellent health.  In fact, ecologists have advised us to cull 60 elephants per year to maintain numbers they think are manageable.

9.  In the Sengwa Research Area, there is a healthy population of elephants.  Unfortunately, there has been some fairly heavy poaching in the last 4 to 5 years (about 20 animals per year), but we have been actively combating the poaching since we started hunting there in 2013.  We assist the Parks Department there.  In 2013, we had three separate contacts with elephant poachers.  We recovered a set of ivory tusks the first time.  The second time, we recovered a rifle and set of tusks.  In the third instance, we recovered two rifles, killed one poacher, wounded and arrested one, and arrested another.  This all took place over the second half of last year, once we were established in the area.

10. I have witnessed other poaching incidents as well.  Poachers normally kill the elephants late in the evening.  They chop out the ivory and then are gone by the time we find the carcass the next morning.  Some of the poachers are amateurs, but many have made a profession out of it and have become quite good at it.

11. We spend large amounts of time, money and effort protecting the elephants in our areas.  We do so because they are a valuable resource for sport hunters.  If they were worth nothing financially, very few people would be willing to spend money to protect them.

12. Non-hunting organizations provide very little support to any conservation in most hunting blocks.  It is only through sport hunting that enough financial resources are raised to protect these areas.  In some areas, like the Save Valley Conservancy, there has been some assistance from non-hunting organizations, but not nearly enough.  In addition, the organizations typically support only endangered species such as rhinos.  If rhinos did not exist in the Save Valley Conservancy, I do not think non-hunting organizations would provide funding to protect the species there.

13. In both Zimbabwe and Mozambique, we are working with the locals to keep elephants away from their crops.  We try to chase the elephants back to protected areas.  If the elephants crop raid, the locals will not tolerate them as much.  If we did not do this and the elephants destroyed the crops, the locals would destroy them as often as possible for meat and to protect their crops.

14. Most of our clientele for elephant hunts are U.S. hunters.  Without them, we will not be able to market elephant hunts for reasonable prices.  This loss of income will seriously deplete our resources and severely impact our anti-poaching and community work.  Mokore Safaris spends around $75,000 per year on anti-poaching efforts.  Without U.S. hunters, we will lose around $160,000.00 per year in bull elephant hunts alone.

15. We will obviously attempt to sell the elephant hunts to non-U.S. hunters, but at this stage of the season, most will remain unsold.  Even beyond this year, I fear that we will not be able to sell the hunts for very much because the European market will be swamped when the U.S. market is gone.

16. The loss of American hunters will also take away employment from professional hunters, staff, and general laborers, again detrimentally impacting the communities.  The locals, in turn, will want elephants even less.

17. I believe that the trophy importation bans imposed by the U.S. Fish and Wildlife Service will spell the end of elephants in many hunting areas.  No one will spend the huge amounts of money needed to protect the species if they are no longer valuable.  We will try as much as we can to protect the elephants in our areas because we love the wildlife we are so fortunate to live and work with, but financial restraints are very real.

18. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 26 day of April, 2014, at _Mokore Ranch, SVC, Zimbabwe_

_____
Gary Michiel Duckworth

3

233

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

**DECLARATION OF HERMANUS ABRAHAM DE VRIES**

I, Hermanus Abraham De Vries, being first duly sworn on oath, depose and state as follows:

1. I am a resident of Hillside, Bulawayo, Zimbabwe.

2. I am a professional hunter and safari outfitter.  I work with my son Thys De Vries in the business of providing hunts in Zimbabwe.

3. I have been a life member of Safari Club International for about 29 years.

4. I have been an affiliated member of the CAMPFIRE Association of Zimbabwe for 15 years.

5. I have been an outfitter for about 40 years.  As an outfitter, I usually provide around 25 elephant hunts each year.  I personally guide about 3 of them each year. I provide hunts in several areas of Zimbabwe: Tsholotsho South and Lusulu, Binga CAMPFIRE areas and Ngamo/Sekumi, Pandamasui and Kazuma Forest areas.

6. In the Tsholotsho South area, the permanent elephant population is around 2,000. The migratory elephant population is around 8,000.  The permanent population is in good health.  The migratory population from Hwange National Park is in poor health during the dry months (August to November).  The behavior of the populations is calm.

1

7. In the Lusulu area, the permanent elephant population is approximately 100 elephants. The migratory elephant population is around 600. Both populations are in good health and demonstrate calm behavior.

8. In the Pandamasui and Kazuma Forest areas, the permanent elephant population is about 2,000 elephants. The migratory elephant population is about 8,000. Similar to the Tsholotsho South area, the permanent population seems to be in better health than the migratory population. These areas are also on the border of Hwange National Park.

9. In all the areas in which I provide hunts, the local communities have learned the value that the elephants have due to the value of elephants to hunters. For that reason, the communities have taken on a role of ownership and responsibility for the elephant herds. The locals want to conserve the elephants and peacefully co-exist with them. However, with an ever increasing population, there is more human and elephant conflict, especially when elephants destroy maize fields. The locals consider elephants to be a nuisance when they destroy their crops. The value that hunting gives to the elephants helps to balance against the nuisance that these animals cause.

10. I have not witnessed poaching in the CAMPFIRE areas in which I provide hunts, but I have seen poaching in the neighboring Hwange and Chizirira National Parks. The company that I work with actually uncovered the cyanide poison poaching that occurred in Hwange National Park. Our scouts detected the poachers that were poaching with cyanide. We have 25 permanent scouts between our two areas that patrol on a daily basis. They quickly discovered the source of the poaching and limited the damage done to the elephant herd.

11. I find it ironic that the anecdotal evidence on which the U.S. Fish and Wildlife Service relied to implement the importation ban came from our guides. The Fish and Wildlife Service cited the Hwange National Park cyanide poisoning as anecdotal evidence; although, they incorrectly stated that 300 elephants were killed. It was actually only 132. The company that I work with uncovered this horrific incident. Within 24 hours of seeing the first tracks of the poachers, we had arrested the poachers and the buyers. The company that I work with funded the entire operation to catch them. We paid for the vehicles, fuel, food, camping gear, etc. We hired the helicopter to do aerial reconnaissance, for transport to remote areas, and to get the exact number of elephants poached. It cost us around $100,000 for the operation. Without the U.S. hunters that pay a premium to hunt elephants, we would not have had enough money to fund this operation. We also would not have been in the area to uncover the incident. Hunters and hunting operators are the first line of defense in the fight against poaching. Without

2

hunters and hunting operators in the field, poachers will get a free pass to slaughter elephants at will.

12. With the funds that we receive from U.S. hunters, we are able to fund conservation operations, including anti-poaching efforts, wildlife water supply, and local community education and dialogue.  The areas in which we hunt are CAMPFIRE areas, so the local communities receive 70% of the total revenue, either by direct payment or other social benefits that the outfitters give to the local communities.  If U.S. hunters stop hunting in Zimbabwe, we will not have the funds to pay for all of these programs and the locals will receive fewer benefits from elephant hunting.  In addition, the local communities in our areas receive all the meat from the sport-hunted elephants.  That is about 50 tons of much needed protein, something that is very rare in this part of the world.

13. If we do not receive the income that U.S. hunters provide for elephant hunts in our CAMPFIRE areas, we cannot put money into our conservation operations.  We will not be able to pay the local communities or be able to carry out our social responsibilities for the local communities.  We will not be able to build new classrooms and medical clinics.  We will not be able provide transportation for the elderly.  We will not be able to provide anti-poaching operations or help Hwange National Park scout with patrols, logistics, food and fuel.  Without these services and payments, the locals will view elephants as a burden.

14. About 80% of our clientele that hunt elephants are from the United States.  If we lose 80% of our income, it will be about $500,000.00 lost.  We actually had an American hunter on the ground hunting when we received news of the trophy importation ban.  He stopped his safari and returned home.  The immediate cost just from that one safari is significant.  Furthermore, we have invested a lot of money into marketing in the United States.  We will now have to market in other countries and try to sell 80% of our elephant quota all over again.

15. Even if we are able to sell some of the hunts to non-U.S. hunters, it is very unlikely that we will ever make our money back.  The American market for elephant hunting is the biggest in the world.  We will never generate the same amount of revenue by selling the hunts to non-U.S. hunters, especially so late in the year.  The market in Zimbabwe is now flooded with elephant bulls and a quarter of the year has passed, so we cannot sell the hunts for as much money.

16. It is common knowledge that Zimbabwe's elephant population is bursting at the seams, especially in the western area of Zimbabwe.  Eliminating U.S. hunters from the equation will only exacerbate the problem.

17. I submit this declaration in support of Safari Club International's efforts to

3

236

challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 26 day of April, 2014, at 13 Percy Ave, Hillside, Bulawayo, Zimb..

Hermanus Abraham De Vries

4

237

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DECLARATION OF WALTER ALLEN TARPLEY

I, Walter Allen Tarpley, being first duly sworn on oath, depose and state as follows:

1. I am the owner of two construction business and live in Crown Point, Indiana.

2. I have been a life member of Safari Club International for about 8 years.

3. I have been hunting for about 30 years. I started hunting with my father.

4. I have hunted all over the United States, British Columbia and Alberta in Canada, New Zealand, and Africa (South Africa and Tanzania). Among the species I have hunted are deer, elk, moose, bear, wolf, red stag, tar, stone sheep, dall sheep, goat, lion, leopard, and buffalo.

5. About two years ago, I hunted elephant in Tanzania and was successful in harvesting an elephant. I was able to import my trophy into the United States.

6. I have an elephant hunt booked for July 2014 in Tanzania with a professional guide. My hunt is schedule to take place in the Rungwa area and include elephant, lion, buffalo, leopard, and plains game. I have paid over $100,000 for my hunt and $10,000 for my plane ticket. There will also be approximately $50,000 in trophy fees and $50,000-70,000 in taxidermy costs (depending on what I harvest).

7. The elephant trophy (when I am fortunate enough to harvest an elephant) is an important memento of my hunting adventure. If I am unable to import my elephant trophy, I will not participate in the elephant portion of the hunt. I will be out the part of the fees attributable to the elephant hunt. I could have booked a cheaper hunt for the other animals in South Africa.

1

8. When I hunted in Tanzania (twice in the last three years), I saw at least 50-75 elephants per day in the Tundura area of Tanzania.  Tanzania is my prime choice for hunting in Africa because there is good hunting for a range of big game animals and the country is relatively safe.

9. Based on my hunting experiences in Africa, I know that hunting helps support anti-poaching and other conservation efforts.  In addition, the dollars that U.S. hunters bring to the areas, including much that is funneled to the local communities and residents, helps build schools, dig wells and feed people (including through the meat of the animal).  If the animal (whether an elephant or another species) is not valuable to the local community, then the local residents will not support conservation efforts.

10. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 2 4 day of April, 2014, at_____.

Walter Allen Tarpley

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL<br>501 2nd Street NE<br>Washington, DC 20002, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| | ) | Civ. No. 14-cv-00670(ABJ) |
| SALLY M. R. JEWELL, in her official<br>capacity as Secretary of the U.S.<br>Department of the Interior; | ) ) ) | DECLARATION OF<br>SCOTT PETTY JR. |
| U.S. DEPARTMENT OF THE INTERIOR,<br>an agency of the United States;<br>DANIEL ASHE, in his official capacity as<br>Director of the U.S. Fish and Wildlife Service; and<br>U.S. FISH AND WILDLIFE SERVICE,<br>an agency of the United States<br>1849 C Street, NW<br>Washington, DC 20240, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

I, Scott Petty, Jr., being first duly sworn on oath, depose and state as follows:

1. I a resident of San Antonio, Texas.

2. I am a rancher, investor and a retired executive.

3. I am a life member of Safari Club International and have been for many years. I also have family members who are members of SCI.

4. I participate in the Austin Safari Club Chapter and recently joined the Alamo SCI Chapter in San Antonio.

5. I am a member of many hunting and conservation organizations, including the Texas Wildlife Association (over 30 years); Exotic Wildlife Association (over 30 years); United States Animal Health Association (over 30 years); Texas and Southwestern Cattle Raisers Association (50 years); Rocky Mountain Elk Foundation (over 20 years); U.S. Sportsmen's Alliance Foundation; Ducks Unlimited; The Explorer's Club (over 35 years); Society for Range Management; National Rifle Association of America; Atlantic

1

Salmon Federation; National Cattlemen's Beef Association; Independent Cattlemen's Association of Texas, Inc.; Ranching Heritage Association; Coastal Conservation Association; Texas Forestry Association; Deer Associates Program; Texas State Rifle Association; Quality Deer Management Association; National Wild Turkey Federation; Sportsmen Conservationist of Texas; and Caesar Kleberg Wildlife Research.

6. I participate in many activities related to hunting as a tool for wildlife conservation, both personally and through my ranch. We work with the Texas Parks & Wildlife on all of our ranches and hold Managed Lands Deer Permits (MLDP). We also have scimitar-horned oryxs on the ranch and have worked with the United States Fish & Wildlife Services on permits and annual reports on the herd. We have also donated to the conservation efforts for the scimitar-horned oryxs through the Exotic Wildlife Association and Conservation Force.

7. We are strong advocates for the conservation of animals as well as the land. I have served on the Texas and Southwestern Cattle Raisers Association's Animal Health Committee and Natural Resources and Environmental Committee for a number of years. We have held many studies with Texas A & M and Caesar Kleberg on the decrease in population of the white-tailed deer and axis deer in the Hill Country of Texas.

8. I am 77 years old and have been hunting for 71 of those years. I started hunting with my father.

9. I have hunted in North America for white-tailed deer, turkeys, mule deer, elk, and birds.

10. I have hunted in Africa since 1953 and have successfully taken many animals during those hunts.

11. I first hunted in Tanzania in 1953 and returned during the summer of 2013 to hunt elephant, but did not succeed in taking an elephant.

12. I have another elephant hunt booked for Tanzania to begin in September 2014.

13. During my 2013 hunt in Tanzania, I saw many elephants. While there, I watched numerous anti-poaching details that were supported by our Professional Hunter. Much of the money which we paid for our hunt went into anti-poaching efforts in all the areas where our Professional Hunter was operating. Everyone involved in the hunting of elephants was very involved in anti-poaching patrols and all efforts at preventing poaching of elephants.

14. I have been desirous of successfully hunting an elephant since my first time in Tanzania in 1953 and have only lately been able to go back to Tanzania and try for an elephant before I am too old to go on the hunt. The hunt I have planned for 2014 may be the last time that I can make such a trip while still in good health and condition to do so. For this reason, the harm from the trophy importation ban to me is much worse than monetary. For me, it is a lifelong dream that has been shattered.

15. I have booked an elephant hunt with Tanzania Big Game Safaris, Raoul Ramoni owner, for September 8 through October 1 for a 21 day Safari.  I have made financial commitments to our professional hunter for that trip and in addition have already purchased first class airline tickets for my wife and for me to travel to and from Tanzania for that particular time.

16. The inability to import the trophy from my successful hunt significantly diminishes the value of the hunt for me.  If I decide to cancel the hunt for that reason, I do not yet know whether I will be able to obtain refunds for the money I have already invested.

17. Although I do not know what financial harm I will sustain if I cancel my hunt, I do know the financial harm that will be sustained by the elephant anti-poaching patrols if hunters are discouraged from elephant hunting in Tanzania.  Without the revenue brought in by U.S. hunters, the anti-poaching patrols will not be able to do their jobs because of the absence of funding.

18. Poaching poses a risk to elephants.  Hunting does not.  It is through hunting that Tanzania can combat poaching.  The money received within Tanzania by the government and by the Professional Hunting Association as a result of the taking of elephants by legal *means* is being now used and will continued to be used wisely to deter poaching. Actually the numbers of elephants will increase through hunting of elephants.

19. I believe that elephant conservation has been devastated by the U.S. Fish and Wildlife Service.  The government's erroneous decision to ban the importation of legally hunted elephants will reduce the amount of funds available to combat elephant poaching which in turn will result in more poaching and fewer elephants.

20. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this ___23___ day of April, 2014, at _____San Antonio, Texas_____.

_____
Scott Petty Jr.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| —————————————————————— | ) | |

**DECLARATION OF ROBERT JOSPEH JOHNSON**

I, Robert Joseph Johnson, being first duly sworn on oath, depose and state as follows:

1. I am a car dealer in Austin, Texas.

2. I have been a life member of Safari Club International for 16 years.  I have been a member of the Austin SCI Chapter since the mid-1980s.

3. I am also a life member of the Foundation of North American Wild Sheep, Texas Bighorn Society, Grand Slam Club/Ovis, and the Coastal Conservation Association.

4. I have been involved in the reintroduction of desert bighorn sheep in Texas at Beach Mountain Ranch from 1990 to the present.

5. I have been hunting for more than 50 years.  I started hunting white-tailed deer and bird hunting in central Texas while in high school.

6. I have hunted numerous species in the United States, Mexico, Canada, Argentina, Tajikistan, China, Mongolia, South Africa, Mozambique, Botswana, Zambia, Zimbabwe, Tanzania, Central Africa and Ethiopia.

7. I hunted elephant in Ethiopia in 1986, Zimbabwe in 1995, Botswana in 2012 and Tanzania in 2008 and 2013.  I was successful only in Ethiopia.

8. I saw many elephants in Zimbabwe.  Most were not big enough or old enough to harvest. I was close to taking one, but did not have a good opportunity, so I did not take the shot. In Tanzania, I saw many elephants in 2008, but none big enough to hunt.  In 2013, there were drought conditions where I was hunting in Tanzania.  I did not see any elephants or signs of poaching.

1

9. Hunting acts as a deterrent to poaching in several ways. First, if hunters find poaching camps, the camps are destroyed. Second, professional hunters and trackers employed by the hunters always talk to the local communities about poaching and where it might be happening. Third, everyone in hunting groups look out for non-hunting activities in the areas in which they hunt. Fourth, government game scouts, paid for by the hunter, accompany all hunts.

10. Trophy hunting provides a real economic value that cannot be dismissed. Without the value that trophy hunting places on the elephants, anti-poaching efforts will be minimized. Hunting also provides a profitable means to population control.

11. I purchased an elephant hunt in Tanzania at Safari Club's Convention in February 2014. I am scheduled to go hunting in October 2014. I have already spent about $12,000.00 in airfare and committed $42,000.00 for the hunt and $31,000.00 for a trophy fee if successful.

12. The ability to import the elephant that I successfully hunted is of great importance to me. It is a part and a symbol of the entire hunting experience. Without that ability, the hunt loses value to me, and for that reason, I am considering cancelling my hunt.

13. I have not discussed the trophy importation ban with my outfitter yet. Some of the money spent on airfare is non-refundable. My nephew and his mother had also planned to hunt at the same camp. My wife was also going to join me to hunt plains game. All of these hunts are now in limbo and may be cancelled due to the trophy importation ban imposed by the U.S. Fish and Wildlife Service.

14. More important than me losing money is the fact that I will lose the opportunity to hunt an elephant and Tanzania will lose a considerable sum of money for elephant conservation and anti-poaching efforts.

15. The importation ban will decrease the economic value of elephants and reduce the amount of money going toward conservation efforts. I believe that all game populations can be enhanced by hunting and sound management practices. The importation ban is not a sound management practice.

16. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

2

Dated this 25 day of April, 2014, at _____ AUSTIN TEXAS .

_____

Robert Joseph Johnson

3

**245**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

### DECLARATION OF ROBERT ALLEN SAKUTA

I, Robert Allen Sakuta, being first duly sworn on oath, depose and state as follows:

1.  I am a business owner and live in Plymouth, Michigan.

2.  I have been a member of Safari Club International for about two years and have been a life member for about one year.

3.  I have been bird hunting for 30 years and hunting game animals for three years. I was introduced to the hunting of game animals by a friend who has hunted for many years. He educated me on the value of managed hunting as a benefit to conserve and manage the populations of the animals. This enlightenment changed me from a person who was not a game animal hunter to someone who now spends any free time toward ethical, lawful hunting.

4.  In North America, I have hunted in Texas for the last three years for Aoudad, Fallow, Axis, Blackbuck, sheep, wild pigs, and Markhor.  I have hunted in Pennsylvania and Michigan for Whitetail deer; in South Dakota for Prairie Dog; and in Florida for Red Stag, Alligator, and wild pigs.

5.  Although I have not yet hunted in Africa, I know that the taking of a trophy elephant will benefit the elephant population by giving the elephants a high value. Without the trophy fees the elephants are of little value to the locals who consider them a nuisance to crops and the area they share.  The trophy fees are an important source of funds used to hire wildlife officers to prevent poaching.  In addition, the meat is given to the locals for food. The locals are also employed during the hunt.  All this creates local support and incentives for proper and sustainable management of elephants.

1

6. I signed a contract in November of 2013 for a 21-day elephant hunt in Tanzania for November 15 thru Dec 10, 2014 with Stone Safaris. I have to date given them $65,000 toward the $125,000 cost for the hunt, not including trophy or other fees. The trophy fee for the elephant should be approximately $50,000 depending on the size of the ivory. Other costs are air fare for myself and companion ($25,000); cost for the companion in camp ($11,500); and other permits, fees and costs (approximately $50,000). This brings the total cost to about $261,500.

7. Based on my financial situation, this is definitely the trip of a lifetime. Now that our government has taken away my ability to import any elephant trophy, I will be deprived of a very important symbol of this once-in-a-lifetime adventure.

8. I was in contact with the outfitter for the hunt. He told me there is no refund for the elephant hunt as the problem is not in Tanzania but with the U.S. government. He also told me the people in Tanzania are greatly disappointed by the actions of the U.S. Fish and Wildlife Service as it will undermine elephant conservation and harm the businesses and local residents who support that conservation.

9. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 25 day of April, 2014, at _Plymouth MI_ .

Robert Allen Sakuta

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

**DECLARATION OF DEREK ANTHONY HURT**

I, Derek Anthony Hurt, being first duly sworn on oath, depose and state as follows:

1. I am a resident of Arusha, Tanzania.

2. I am a professional hunter and a director of Robin Hurt Limited.

3. Our company is a member of Safari Club International.

4. I am also a member of the African Professional Hunters Association (APHA), the Tanzania Professional Hunters Association (TPHA), and our company is a member of Tanzania Hunting Operators Association (TAHOA) and Tanzania Association of Tour Operators (TATO).

5. Our company, through the Robin Hurt Wildlife Foundation, has a very active community relationship and trophy related benefit scheme.  We are engaged in anti-poaching efforts in conjunction with and with giving support to the Tanzanian government anti-poaching units.

6. I am 47 years old and have been a licensed professional hunter for 25 years.

7. I guide 4-5 hunts each year in which the clients may be entitled to hunt for elephant (if they chose to take this option).
   We have not actively sold elephant hunts in recent times, as a management decision, in order to try to encourage the stewardship of older bull for the future.

1

Unfortunately our efforts were undone by recent poaching, and in most of our areas, the very bulls we were looking after were poached in the wet off-seasons of November to April, when access into the remote areas is difficult.

8. Our business gives us the opportunity to view and assess several of the elephant populations of Tanzania.  In Masailand, elephants are few and seasonal.  In Luganzo and Mlele, elephants are few – there have never been more than 100-200 animals in each area.  In Rungwa South, there are healthy elephant populations of 200-300 animals.

9. The local communities near our areas generally tolerate the elephant populations, due greatly to our community benefits scheme (described above).  Because these communities are beneficiaries of revenue generated by hunted animals, they have a vested interest in those animals, and are pro-wildlife conservation for all species in respective areas.  Without benefit schemes such as ours, communities are not usually tolerant of direct wildlife clashes that cause crop and livestock damage.  Hunting and the revenue hunting brings contribute to help pacify these feelings.

10. We have witnessed elephant poaching in our areas.  Particularly in February 2011, one Professional Hunter with our company, Andre De Kock, was killed by elephant poachers in Maswa.  In 2012, we saw many freshly poached elephants.  I estimate the numbers were around 30 collectively in all of our blocks.  We (us hunters and our own village anti poaching patrols) avoided encounters with armed poaching gangs and called in government Zonal Anti-Poaching to take over.

11. Elephant hunting in Tanzania certainly enhances the survival of the species.  Hunters are the only ones in the remote wilderness areas who can deter poachers.  The hunting business is a huge employer and provider to the local economies.  For this reason, Tanzania can justify keeping wilderness as wilderness and therefore a home for all wildlife.  By depriving U.S. hunters of an important element of the elephant's value, the U.S. government has all but taken the hunter out of the field.  By removing the hunter and the money he brings into Tanzania, the U.S. government respectively reduces our financial ability to patrol and manage these areas.
The hunting off-season has recently been shorted by three months, by the Tanzania Government, now allowing hunting companies to remain in their blocks for 9 months of the year being from July through to March inclusive. This should help with reducing poaching pressure as it is allowing more time for hunters in the field.

12. The U.S. elephant importation ban does not merely affect elephants.  A reduction of potential client (foreign tourist hunters) numbers in the field will have a negative impact on all wildlife.  Fewer clients means less revenue to be used to

2

help curtail poaching, community tolerance and overall area management for all species.

13. Unless it is reversed, I would consider the rash and poorly investigated importation suspension decision by the U.S. Fish and Wildlife Service to be a signature on the death warrant for tens of thousands of elephants. This decision could lead to and contribute to the loss of all wildlife in Tanzania, save for a few animals in safe sections within National Parks and private land. We could lose our wildlife in a short period of five years. If this importation suspension is not overturned, we could see a repeat of what has happened in Kenya with 70% of their wildlife lost since the hunting ban was instituted in 1977.

14. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 24 day of April, 2014, at _Arusha, Tanzania_.

Derek Anthony Hurt

3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## DECLARATION OF MICHAEL ANDREW ANGELIDES

I, Michael Andrew Angelides, being first duly sworn on oath, depose and state as follows:

1. I am a professional hunter and General Manager of Danny McCallum Safaris Ltd/Old Nyika Safaris Ltd/Safari Royal Holdings in Arusha, Tanzania.

2. I have been a member of Safari Club International for 15 years.

3. I have been a member of the International Professional Hunters Association for 17 years, the African Professional Hunters Association for 17 years, and the Tanzania Professional Hunters Association for 18 years.

4. I am currently the Secretary General for the Tanzania Professional Hunters Association and the Executive Officer for the African Professional Hunters Association.

5. I have been an outfitter for 23 years. I provide hunts in several areas of Tanzania: Ikhuishibor Wildlife Management Area, Chunya Lukwatti, Pitti West, Lukwatti Game Reserve, Chunya Msami, and Burko Open Area. I have provided hunts in these areas for 15 years.

6. I usually provide one elephant hunt per year.

7. I recently gained the opportunity to hunt in a Wildlife Management Area with great potential for elephant hunting. The majority of the area would be

1
**251**

specifically used for elephant hunting because the vegetation is too thick to sustain most other species. If the U.S. Fish and Wildlife Service continues to impose a trophy importation ban, I may not take advantage of this opportunity. The area will be left without hunters and outfitters, available for poachers, charcoal burners and farmers to move in. If that happens, the area will likely not be able to sustain wildlife for more than 5 years.

8. The local villagers in the areas where I hunt and other areas have realized that having elephants in the area will benefit them because of the hunting. The terrain in many areas provides no other value aside from hunting.

9. The people in my areas are pastoralists, but their livestock cannot feed on the thick bush the elephant feed on so there is usually no conflict. However, with the increase in human population, the locals will start clearing land and other tribes will move in, and before long the bush will be cleared for farming. The wildlife, including elephants, will have nowhere to go and will come to the farms. This will result in an increase in conflicts and an increase in poaching of elephants and other wildlife species.

10. Poaching in my areas has escalated dramatically over the last four or five years. I discover new elephant carcasses each year, although very few, if any, during the hunting season. Poaching escalates when there is no professional hunting activity in the area – usually during the rainy season from December to July. This is also when the anti-poaching units have limited mobility.

11. When sport hunting is occurring in the area, vehicles patrol the area daily. This movement and the presence of others present a huge deterrent to poachers. Sport hunters are not restricted to roads or the inside of vehicles. Hunters and hunting groups are able to prevent poachers from hiding in the bush where patrols in vehicles cannot see.

12. Trophies from hunts are a valuable part of the experience for many hunters. For many, if they cannot obtain a trophy, they will not hunt the animal. This will have huge negative effects on the businesses and locals that depend on elephant hunting, not to mention the species itself.

13. I am not a big elephant outfitter, so the harm to my personal business will be minimal. However, I am likely not going to pursue obtaining the rights to hunt in a new area for elephants, and my business will not grow.

14. Elephant hunts are often booked years in advance. For many professional hunters, finding a hunter from somewhere other than the United States to fill the spaces left by U.S. hunters that cancelled their hunts will not be possible.

15. Many areas will no longer be hunted if elephant hunting is no longer economically viable. If an area does not bring in income, the outfitters will not stick around to protect it. There will be no one responsible for elephant conservation and anti-poaching efforts in those areas. Without the benefit of hunting in the area for the locals, they will not see the elephant as valuable. The locals will then poach the elephants for meat, ivory and to prevent damage to their farms.

16. When elephants are poached for ivory, the meat is left to rot. Villagers poach elephants because of the money they can receive for the ivory. Businessmen who pay for the ivory are not hunters. They need the villagers to do their dirty work. When a professional hunter leaves an area because he can no longer provide sustainable hunting in the area, the villagers that used to benefit from the hunts will then welcome the corrupt businessmen and poach in order to make a living. The ban on the importation of elephant trophies into the United States will stop the legal and controlled hunting of elephants and allow illegal, uncontrolled elephant killing to take over.

17. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 24 day of April, 2014, at Arusha, Tanzania.

Michael Andrew Angelides

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SALLY M. R. JEWELL, et al. | ) |
| | ) |
| Defendants | ) |
| ——————————————————— | ) |

Civ. No. 14-cv-00670(ABJ)

**DECLARATION OF DAVID J. ADAMS**

I, David J. Adams, being first duly sworn on oath, depose and state as follows:

1. I am an engineer in Bixby, Oklahoma.

2. I have been a member of Safari Club International for about three years.

3. I am also a member of the National Rifle Association of America and Dallas Safari Club. I am a contributor to Conservation force and a Dande Anti-Poaching Unit.

4. I have been hunting for 45 years. I started hunting with my father and uncles when I was eleven years old.

5. In the United States I have hunted white-tailed deer, turkey, rabbit, squirrel, pheasant, grouse, elk, moose, black bear, hogs, nilgai, mule deer and antelope. In South Africa I have hunted nyala, wildebeest, waterbuck, Cape buffalo, lion, springbok, kudu, sable antelope and zebra.

6. In Tanzania I have hunted elephant, leopard, Cape buffalo, crocodile, hippo, waterbuck, warthog, hartebeest and zebra. I hunted for elephant in 2013 and was unsuccessful.

7. I hunted the Selous in Tanzania and only saw a few elephants. I did come across a carcass of an elephant that was poached.

8. Hunters in the field make it harder on poachers to poach elephants. Hunters and professional hunters remove and report any snares or poacher tracks they find. If evidence of poachers or poaching is seen, the game scouts report it and a crew is dispatched to pursue the poachers. I was told that most poaching occurs when the safari

1

operators are not present in the area because poachers are afraid of being caught by the hunting groups.

9.  Safari operators are very diligent in preventing poaching. This is critical to the protection of the elephant herds. Without that protection and anti-poaching surveillance, poachers will have easier access to elephant herds.

10. The African elephant is the ultimate hunting adventure. In order for the species to survive and thrive, funds from hunters are necessary to provide value to the elephants for the communities that live near elephant habitat. Some elephants raid local crops and the farmers will not tolerate them unless they are compensated. Revenue from sport hunting is used to compensate locals for lost crops. Sport-hunted elephants also provide much needed protein to feed local families.

11. Additionally, safari operators provide jobs to local communities. If those jobs are taken away, poaching, in many cases, will become the only way for those people to survive.

12. If sport-hunted elephant trophies cannot be imported into the United States from Zimbabwe, the African elephant will be severely harmed. In many areas, the only things standing between the elephants and the demand for ivory are the safari operators and the sport-hunting funds. I happily donate money to the Dande Anti-Poaching Unit run by CM Safaris in Zimbabwe. They and many others like them across Zimbabwe are actively preventing poaching. Unfortunately, they will not be able to continue their work if the revenue they receive from sport hunting is eliminated. The actions by the U.S. Fish and Wildlife Service are likely going to increase poaching by reducing funding for anti-poaching efforts and by causing locals to turn to poaching.

13. My son and I planned to each hunt an elephant in Zimbabwe from May 20 to June 10, 2014. We booked this hunt in January 2013. We have paid a total of $63,500.00 for the hunt already, which is non-refundable. We've also paid $17,000.00 for non-refundable airfare. We have also scheduled a second hunt for November 1 to November 14, 2014. We booked the hunt in January 2014. We have paid non-refundable deposits totaling $28,500.00 so far for the hunt. The safari operator has already used those funds to secure his hunting area, pay government fees, pay for infrastructure for his camps, and pay his employees.

14. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 24th day of April, 2014, at _Bixby, Oklahoma_.

David J. Adams

3

| Doc. 9.50 Annex 1 |
| --- |

Conf. 2.11

### Trade in Hunting Trophies of Species Listed in Appendix I

CONSIDERING the need of uniform interpretation of the Convention with regard to hunting trophies;

#### THE CONFERENCE OF THE PARTIES TO THE CONVENTION

RECOMMENDS

a) that with the exception of the rare case of exemptions granted under paragraph 3 of Article VII of the Convention, trade in hunting trophies of animals of the species listed in Appendix I be permitted only in accordance with Article III, i.e. accompanied by import and export permits;

b) that the scientific opinions under paragraphs 2 (a) and 3 (a) of Article III of the Convention cover the trade in dead specimens, too;

c) that in order to achieve the envisaged double control (also in the scientific field) by the importing and the exporting country of the trade in Appendix–I specimens, the Scientific Authority have the possibility of comprehensive examination concerning the question of whether the importation is serving a purpose which is not detrimental to the survival of the species. This examination should, if possible, also cover the question of whether the killing of the animals whose trophies are intended for import would enhance the survival of the species; and

d) that the scientific examination by the importing country in accordance with paragraph 3 (a) of Article III of the Convention be carried out independently of the result of the scientific assessment by the exporting country in accordance with paragraph 2 (a) of Article III, and vice versa.

# Conf. 2.11 (Rev.)*

## Trade in hunting trophies of species listed in Appendix I

CONSIDERING the need of uniform interpretation of the Convention with regard to hunting trophies;

THE CONFERENCE OF THE PARTIES TO THE CONVENTION

RECOMMENDS that:

a)  with the exception of the rare case of exemptions granted under paragraph 3 of Article VII of the Convention, trade in hunting trophies of animals of the species listed in Appendix I be permitted only in accordance with Article III, i.e. accompanied by import and export permits;

b)  in order to achieve the envisaged complementary control of trade in Appendix-I species by the importing and exporting countries in the most effective and comprehensive manner, the Scientific Authority of the importing country accept the finding of the Scientific Authority of the exporting country that the exportation of the hunting trophy is not detrimental to the survival of the species, unless there are scientific or management data to indicate otherwise; and

c)  the scientific examination by the importing country in accordance with paragraph 3 (a) of Article III of the Convention be carried out independently of the result of the scientific assessment by the exporting country in accordance with paragraph 2 (a) of Article III, and vice versa.

---

*  *Amended at the ninth meeting of the Conference of the Parties.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL<br>501 2nd Street NE<br>Washington, DC 20002, | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | Civ. No. 14-cv-00670(ABJ) |
| SALLY M. R. JEWELL, in her official<br>capacity as Secretary of the U.S.<br>Department of the Interior;<br>U.S. DEPARTMENT OF THE INTERIOR,<br>an agency of the United States;<br>DANIEL ASHE, in his official capacity as<br>Director of the U.S. Fish and Wildlife Service; and<br>U.S. FISH AND WILDLIFE SERVICE,<br>an agency of the United States<br>1849 C Street, NW<br>Washington, DC 20240, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | DECLARATION OF<br>EDSON CHIDZIYA |
| Defendants. | )<br>) | |

I, Edson Chidziya, do hereby make an oath, depose and state as follows:

1. I am the Director General of Zimbabwe Parks and Wildlife Management Authority.

2. Zimbabwe Parks and Wildlife Management Authority sent a "Response to Questions Raised by the United States Fish and Wildlife Service to Address the USA Endangered Species Act" to the U.S. Fish and Wildlife Service on 17 April 2014. I approved the response and signed a cover letter to the U.S. Fish and Wildlife Service that accompanied the document.

3. To the best of my knowledge, the information contained in the document is true and correct

4. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania

in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing to the best of my knowledge is true and correct.

Dated this 8th day of May, 2014, at ___WASHINGTON, DC___:

_____
Edson Chidziya

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 14-cv-00670(ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DECLARATION OF CHARLES JONGA

I, Charles Jonga, being first duly sworn on oath, depose and state as follows:

1. I am the Director of the Community Areas Management Program for Indigenous Resources (CAMPFIRE).

2. CAMPFIRE is a program that combines local communities in Zimbabwe and hunters for the benefit and conservation of wildlife in the area, including elephants.  Through the program, local communities are encouraged to conserve and manage wildlife species so that hunters may sustainably harvest the animals. In return, the communities receive economic benefits from sport hunting.

3. Since its establishment, the program has made considerable achievements in mitigating widespread antagonism towards wildlife due to crop losses in rural areas, especially from elephants.  The program has created appropriate structures and institutions under which communities generate revenues from the sustainable utilization of wildlife, and legitimately manage and disburse these revenues for their benefit.

4. An average of 90% of CAMPFIRE revenue annually comes from hunting. Elephant trophy hunting contributes more than 70% of CAMPFIRE's annual revenue.  On average $2 million per year in net income directly benefits local communities, and most of this is derived from the lease of sport hunting rights to commercial safari operators in 49 CAMPFIRE hunting concessions.  A lesser proportion of income is generated from sales of hides and ivory, tourism leases on communal land, and other natural resource management activities.

1

5. Forty-five percent of gross hunting revenues in the CAMPFIRE areas goes to CAMPFIRE, while 55% goes to the safari operators. Cumulatively, $89 million went to CAMPFIRE and safari operators from 1989 to 2006. In those years, CAMPFIRE received a total of $40 million.

6. In all CAMPFIRE districts, revenue from hunting is used to support various management activities such as; fire awareness and purchase of fire-fighting equipment; opening of roads and fireguards; training of committees; look and learn tours to other CAMPFIRE districts; purchase of communication equipment; purchase of firearms for Resource Monitors; and rehabilitation of water supply systems to hunting areas. CAMPFIRE thus contributes to job creation, empowerment, and diversification of livelihoods for rural communities. Substantial investments are also made annually by Rural District Councils and safari operators in problem animal control and anti-poaching. CAMPFIRE employs a total of 256 resource monitors and game scouts that conduct anti-poaching efforts.

7. The Rural District Councils (RDCs) are a district level administrative authority for the management of CAMPFIRE. The RDCs are given the authority to manage wildlife for sustainable use by the government. They make administrative decisions in consultation with the communities, such as which safari operators are allowed to operate within the CAMPFIRE areas.

8. According to the CAMPFIRE Revenue Sharing Guidelines, which were incorporated into the Constitution of the CAMPFIRE Association in 2007, at least 55% of revenues should be distributed to producer communities, no more than 26%, and 15% for wildlife management operations, including anti-poaching efforts, and overheads (respectively) go to the RDC level, and 4% goes to the CAMPFIRE Association.

9. Each hunter who hunts in CAMPFIRE areas pays a trophy fee for every animal they take. Those trophy fees directly contribute to CAMPFIRE's income. Trophy fees constitute the largest single portion of CAMPFIRE's income. Safari operators do not receive any benefit from the trophy fees.

10. Without the ability to actually import the trophies, U.S. hunters will not pay the trophy fees. Elephants generate the highest trophy fees by far – even compared to lions, Cape buffalo, etc. The trophy fees are immediately paid to CAMPFIRE and the communities once a hunt is completed. Fifty-five percent of the trophy fees go directly to community bank accounts (and not through the RDCs).

11. The CAMPFIRE program relies heavily on U.S. sport-hunters. Of the 167 hunts booked in CAMPFIRE areas in 2014, 106 were booked by U.S. hunters. If those 106 hunts are cancelled or rescheduled, this will result in an immediate loss of income for the CAMPFIRE program and cripple its wildlife management and anti-poaching operations.

12. The communities are confused by the trophy importation ban. In some instances, they do not know if it is still legal for U.S. hunters to hunt elephants.

13. The loss of the income stream from trophy fees will certainly increase the loss of confidence by communities in wildlife management, and consequently threaten tolerance and survival of the elephant. Community antipathy to wildlife and the reciprocal costs to wildlife is set to increase, especially through retaliatory killing or self-help problem animal control and commercial poaching to feed international syndicates. Communities are disillusioned with the suspension of elephant trophy imports into the US, and are more likely than ever before to succumb to the temptation to open up more land for rain-fed agriculture in areas generally unsuitable for cropping leading to massive land degradation. The disruption of hunting revenue inflows and investment into the protection of wildlife and direct incentives at community level is a sure way to increase elephant poaching and human encroachment into wildlife areas.

14. The government of Zimbabwe and key stakeholders are currently engaged in a process to address CAMPFIRE's challenges and revive the program as a successful vehicle and flagship model for community-based conservation and economic development at district and national levels. The sudden loss of income from elephant hunts does not only scuttle these efforts, but also poses an unprecedented threat to all future conservation efforts of the African elephant in the rural areas of Zimbabwe.

15. In recognition of CAMPFIRE's efforts, Safari Club International Foundation has supported CAMPFIRE with a bull elephant tag donation each year since 2012. This has come in handy as CAMPFIRE operations are presently funded from limited trophy hunting income, with no support from any external funders. The tag donations, in the amount of nearly $100,00 cumulatively, has supported training of community game scouts, annual meetings of district level CAMPFIRE Coordinators, and CAMPFIRE Association's participation at crucial regional and international wildlife conservation for a, such as the Annual African Wildlife Consultative Forum.

16. CAMPFIRE has already received $42,000 from the 2014 tag auction, but under the circumstances, the hunt cannot be delivered. Should the hunt be deferred to next year, this means that there will be no revenue from a 2015 hunt, thereby

severely crippling CAMPFIRE's ability to fulfill is capacity building and knowledge sharing role for many years to come.  The marketability of future hunts is also damaged because U.S. hunters will not be willing to pay the same amount as they previously did due to the uncertainty of U.S. importation regulations.

17. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this _9th_ day of May, 2014, at _WASHINGTON DC_ .

_____
Charles Jonga

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL          )
                                    )
        Plaintiff,                  )      Civ. No. 14-cv-00670(ABJ)
                                    )
v.                                  )
                                    )
SALLY M. R. JEWELL, et al.          )
                                    )
        Defendants                  )
_____   )

**DECLARATION OF ANNA M. SEIDMAN**

I, Anna M. Seidman, being first duly sworn on oath, depose and state as follows:

1. I am the Director of Litigation for Safari Club International ("Safari Club"). I represent Plaintiff Safari Club as lead counsel in this litigation.

2. On April 8, 2014, Safari Club submitted a Freedom of Information Act request ("FOIA request") to the U.S. Fish and Wildlife Service ("FWS") for documents pertaining to current and previous enhancement findings and non-detriment findings for the importation of sport-hunted elephants from Zimbabwe and Tanzania. Ex. 1.

3. On April 24, 2014, the Division of Scientific Authority of the FWS sent Safari Club a partial response to the FOIA request. The response contained eight documents about Tanzania's elephant populations, but it did not contain any documents about Zimbabwe or the FWS's current or previous findings.

4. On April 29, 2014, the Division of Management Authority of the FWS sent Safari Club what it referred to as a "complete" response to the FOIA request in Compact Disk ("CD") form. The CD included in the response contained only a copy of Safari Club's FOIA request. I contacted Brenda Tapia of the FWS by telephone to inquire as to whether this was an error and received a telephone message on May 5, 2014 from Ms. Tapia that the FWS inadvertently failed to copy the full response onto the CD and would send a replacement disk promptly.

1

5. On May 7, 2014, Safari Club received a corrected CD containing the Division of Management Authority's asserted complete response to the FOIA request. The CD contained 751 pages of documents in a single file.

6. Among the documents on the CD was an "Information Memorandum for the Director" dated January 8, 2014 from Bryan Arroyo (prepared by Rosemarie Gnam and Roddy Gabel on January 3, 2014). Ex. 2 ("Memorandum for the Director"). The Memorandum for the Director indicates that the FWS knew as early as January 3, 2014 that Federal Defendants intended to ban the U.S. importation of sport-hunted elephants from Zimbabwe and Tanzania for 2014.

7. The Memorandum for the Director informed FWS Director Daniel Ashe that there was a "need for early engagement with the sport-hunting community to maintain positive relations and create opportunities for cooperative action to affect change," and that "there [were] key hunting conventions upcoming where African elephant hunts costing tens of thousands of dollars, including in Tanzania and Zimbabwe, are booked by hunters, including the Dallas Safari Club Convention (January 9-12, 2014) and the annual Safari club International Convention (February 5-8, 2014)." The memo "recommended[ed] that high-level outreach be considered prior to these meetings," and "that outreach to the sport-hunting community be undertaken before any messages about suspension of elephant trophy imports from Tanzania and Zimbabwe are disseminated broadly." Ex. 2, p. 2.

8. I thoroughly reviewed the documents that Safari Club received in response to its FOIA request. I found no documents indicating any outreach, high level or otherwise, before or after January 8, 2014 to representatives of Zimbabwe or Tanzania or to Safari Club International or to any other hunting organization or representative of the hunting community concerning the 2014 sport-hunted elephant importation ban from Zimbabwe and Tanzania. No document indicated outreach at the Conventions held in early 2014 or any outreach of any kind until April 3, 2014, the day before the ban was announced and implemented.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this _15th_ day of May, 2014, at _Washington, D.C._ .

Anna M. Seidman

2

April 8, 2014

Johnny Hunt
FWS FOIA Officer
Division of Information Resources and Technology Management
4401 N. Fairfax Drive
Suite 380
Arlington, VA 22203
fwhq_foia@fws.gov

**Re:  Freedom of Information Act Request**

Dear Mr. Hunt:

I am writing on behalf of Safari Club International ("SCI") to make a request for documents under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  SCI requests copies of the following:

(1) Any documents, records or data regarding or supporting the enhancement of survival findings made by the U.S. Fish and Wildlife Service ("FWS") for the importation of sport-hunted African elephant Zimbabwe (*see* 62 Fed. Reg. 44627, 44633 (Aug. 1997) and 63 Fed. Reg. 63210, 63214 (Nov. 1998).  The Federal Register notices state that the enhancement finding for Zimbabwe is on file in the Division of Management Authority, which is a part of the FWS.

(2) Any documents, records or data considered by the FWS as evidence regarding or in support of any determinations, subsequent to 1998, that the importation of sport-hunted elephant trophies from Zimbabwe enhances the survival of the species.

(3) Any documents, records or data the FWS considered and/or used regarding its early April 2014 decision to revoke its enhancement finding for Zimbabwe and suspend the importation of sport-hunted elephant trophies from Zimbabwe.

(4) Any documents, records or data regarding the general non-detriment advices made by the FWS for the importation of sport-hunted elephant trophies from Tanzania (60 Fed. Reg. 12969-02 (Mar. 1995)).

(5) Any documents, records or data the FWS considered and/or used regarding its early April 2014 decision to suspend the importation of sport-hunted elephant trophies from Tanzania.

(6) Any documents, records, or data that the FWS considers evidence of the total number of elephants in both Zimbabwe and Tanzania (separately) that contributed to the decision to suspend the importation of sport-hunted trophies from these countries in April 2014.

The term "document" includes, but is not limited to, any report, study, scientific paper, intra-agency memorandum, inter-agency memorandum, correspondence, publicly-filed comments (excluding private personal information protected by law), electronic mail, handwritten or typed

notes, or other written record or paper; whether in written or electronic form; and including charts, maps, and similar papers.

The subject matter of this request relates to determinations and actions most likely made by the Office of International Affairs, but is not limited to that office if other offices or divisions within the FWS or Department of the Interior possess responsive documents.

Safari Club International does not fall into any of the requestor fee categories (it is "other").  I ask that you notify me of any costs exceeding $200.00 for the total amount of the request.  Please provide these records in electronic format and by e-mail whenever possible.

If necessary, we are willing to modify this request in order to receive a quicker response.

If responses to some and not all of the above-listed items can be made available more quickly than others, please provide these items first, instead of delaying a response until all items are ready for disclosure.  Please consult with me about a schedule for delivering reasonable packets of responsive documents.

If you determine that any or all or the information qualifies for an exemption from disclosure, we ask you to note whether, as is normally the case under the Act, the exemption is discretionary, and if so whether you determine that it is necessary in this case for you to exercise your discretion to withhold the information.

If you determine that some but not all of the information is exempt from disclosure and that you intend to withhold it, we ask that you redact it for the time being and make the rest available as requested.  Please provide a signed notification citing the legal authority on which you rely if you determine that any or all of the information is exempt and will not be disclosed.

If it is your position that a document contains non-exempt segments and that those nonexempt segments are so dispersed throughout the documents as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed through the document.  *See Mead Data Central v. Department of the Air Force*, 455 F.2d at 261. Further, we request that you provide us with an index of those documents as required under V*aughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972), with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA" pursuant to *Founding Church of Scientology v. Bell*, 603 F.2d 945, 959 (D.C. Cir. 1979), and "describ[ing] each document or portion thereof withheld, and for each withholding it must discuss the consequences of supplying the sought-after information."  *King v. Department of Justice*, 830 F.2d at 223-24.

If SCI can provide any clarification that will help expedite your attention to my request, please contact me.

Sincerely,

Anna Seidman
Director of Litigation
Safari Club International
501 2nd St. NE
Washington, D.C. 20002
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org

January 8, 2014

## INFORMATION MEMORANDUM FOR THE DIRECTOR

**FROM:**        Bryan Arroyo

**CC:**            Steve Guertin, Deputy Director

**SUBJECT:**   Suspension of imports of sport-hunted African elephant trophies taken in
Tanzania and Zimbabwe during calendar year 2014

## I.        SUMMARY

Based on our review of the best available information, the U.S. Fish and Wildlife Service
(Service) will be unable to make positive findings required under the Convention on
International Trade in Endangered Species (CITES) or the Endangered Species Act (Act) to
allow the import of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe
during calendar year 2014.  The required findings are currently being finalized and will be
completed by late February 2014.

In Tanzania, recent information indicates a significant elephant population decline, primarily due
to poaching for ivory.  In addition, we have growing concerns over the ability of the Government
of Tanzania to successfully manage its elephant hunting program to ensure that it provides a
clear benefit to the survival of elephants within the country.  Given this information, the Division
of Scientific Authority (DSA) will not be able to find that the import of sport-hunted elephant
trophies taken in Tanzania will be for purposes that are not detrimental to the survival of the
species, as required under CITES.  Likewise, the Division of Management Authority (DMA) will
not be able to find that the "the killing of the animal whose trophy is intended for import would
enhance the survival of the species" as required by the Act's special rule for African elephants
contained in 50 CFR 17.40(e).  We recognize that sport hunting, as part of a sound management
program, can provide benefits to conservation and that sport hunting of elephants is not the
primary cause of  the decline of elephant populations in Tanzania.  However, given the significant
decline in the elephant population due to uncontrolled poaching and questionable management
practices, we are concerned that additional killing of elephants, even if legal, is not sustainable
and is not supporting effective management and community programs that enhance the survival
of the species in Tanzania.

For Zimbabwe, credible information about the status of elephants is extremely limited.
However, indications are that Zimbabwe's elephant population is also being affected by the
African elephant poaching crisis.  In addition, there do not appear to be adequate governmental
controls in place in Zimbabwe to ensure that the "killing of the animal whose trophy is intended
for import would enhance the survival of the species" as required by the special rule for
elephants.  Consequently, DMA is unlikely to be able to make such a determination.  While
recognizing the potential benefits that the sport hunting of elephants could provide to elephant
conservation, we have insufficient information to determine how sport hunting is supporting
effective management and community programs that enhance the survival of the species in
Zimbabwe.

1

We are raising this issue at this time due to the need for early engagement with the sport-hunting community to maintain positive relations and create opportunities for cooperative action to affect change. There are key hunting conventions upcoming where African elephant hunts costing tens of thousands of dollars, including in Tanzania and Zimbabwe, are booked by hunters, including the Dallas Safari Club Convention (January 9-12, 2014) and the Annual Safari Club International Convention (February 5-8, 2014). We recommend that high-level outreach be considered prior to these meetings. We recommend that outreach to the sport-hunting community be undertaken before any messages about suspension of elephant trophy imports from Tanzania and Zimbabwe are disseminated broadly.

As we finalize our negative findings, we will identify specific actions that can be taken by Tanzania and Zimbabwe that might allow the Service to reconsider its findings in the future. These actions, in addition to being provided to the Governments of Tanzania and Zimbabwe, could be shared with our Federal Government partners and leaders in the sport-hunting community with the idea that collaboration and partnership will be important to effect positive changes.

## II.   DISCUSSION

Import of African elephant hunting trophies into the United States is subject to FWS regulations implementing CITES and the ESA. The African elephant is listed as threatened (throughout its range) under the ESA and trade in African elephant specimens is regulated by a special rule under Section 4(d) of the Act (50 CFR 17.40(e)). The special rule allows for import of African elephant hunting trophies without an ESA permit, provided they are accompanied by the necessary CITES permits and a determination has been made that "the killing of the animal whose trophy is intended for import would enhance survival of the species." The African elephant population of Tanzania is listed in CITES Appendix I; therefore, elephant hunting trophies from Tanzania must be accompanied by a CITES export permit, issued by the country of origin, and a CITES import permit, issued by FWS. The African elephant population of Zimbabwe is listed in CITES Appendix II; therefore, only the CITES export permit issued by the country of origin is required. [Our regulations (50 CFR 17.8) also provide for the noncommercial import of any other threatened, CITES Appendix-II wildlife without an ESA permit when certain conditions are met.]

*Tanzania:* Tanzania's CITES annual export quota for elephants is 400 tusks (200 elephants). In the past, Tanzania typically has not exported its full quota. To issue a CITES Appendix-I import permit for sport-hunted elephant trophies taken in Tanzania, DSA must make a finding that the import is for purposes that are not detrimental to the survival of the species. In addition, under the special rule for African elephants, DMA must determine that the killing of the animal whose trophy is intended for import would enhance the survival of the species.

The Selous-Mikumi ecosystem was once an elephant stronghold, representing the second largest elephant population in Africa and about 40% of Tanzania's total elephant population. However, an October 2013 population survey conducted in that ecosystem indicates an 80% population decline has occurred in the last 3 years, from ~40,000 to ~13,000. In addition, while updated numbers are not readily available for many other areas in Tanzania, all indications are that those

2

populations have experienced similarly drastic declines. With the precipitous decline of African elephants in the Selous-Mikumi ecosystem, and strong indications of similar declines in other Tanzanian populations, it is no longer possible for us conclude the national elephant population of Tanzania is stable.

According to an analysis of data from the Elephant Trade Information System (ETIS, a global illegal elephant trade tracking system) presented at CITES CoP16, both Zimbabwe and Tanzania are implicated as significant players in the illegal ivory trade. This is particularly true for Tanzania. In the ETIS analysis presented at CoP15, Tanzania was already identified as a country of concern with respect to large consignments of illicit ivory leaving the African continent. In the intervening three years, the ETIS data show that both Kenya and Tanzania continue to be the primary conduits for large shipments of ivory exported to Asia, together accounting for nearly half of the 34 large-scale ivory seizures by number and 58% of the associated weight of such seizures during the period 2009-2011. These two countries have been implicated in 16 of the world's largest ivory shipments, totaling some 35 tonnes of ivory, interdicted at, or successfully moved through, their Indian Ocean seaports of Mombasa, Dar es Salaam, and Zanzibar.

The CITES program known as Monitoring the Illegal Killing of Elephants (MIKE) also reported at CITES CoP16. MIKE monitors sites throughout Asia and Africa, and evaluates relative poaching levels based on the Proportion of Illegally Killed Elephants (PIKE), which is calculated as the number of illegally killed elephants found divided by the total number of elephant carcasses encountered by patrols or through other means, aggregated by year for each site. The data presented at CoP16 suggest an ongoing increase in levels of illegal killing of elephants since 2006, with 2011 displaying the highest levels of poaching since MIKE records began in 2002. This increase between 2010 and 2011 is statistically significant. Prior to 2011, 2010 had the highest levels on record. PIKE levels were above 0.5 in all four subregions in 2011, meaning that more than half of elephants found dead were deemed to have been illegally killed. A PIKE of 0.5 or higher exceeds maximum birth rate and means that the elephant population is very likely to be in net decline.

In Selous, Tanzania's sole World Heritage Site that is also a MIKE site, the 2011 PIKE was .64, a nearly 27% increase over the 2002-2010 average of .50. In Ruaha Rungwa, another MIKE site with a significant elephant population, the 2011 PIKE was .94, the highest ever recorded for that site.

In addition to concerns over the elephant population trend within Tanzania, there have been numerous recent reports of questionable government activities in regard to how the elephant hunting program is being managed, how hunting concessions are awarded and for how long, and how funds generated by the hunting program are used. While it is possible that a well-managed hunting program could provide conservation benefits to the species, there are clear indications that Tanzania's program is not being managed in a manner where the participation of U.S. hunters provides the benefits called for under the ESA. One recent news report reiterates our concerns. On December 20, 2013, *The Citizen*, a Tanzanian news outlet, reported that President Jakaya Kikwete had fired four ministers— the Ministers for Home Affairs, Defense and National Service, Natural Resources and Tourism, and Livestock Development and Fisheries—for failing to effectively manage the infamous *Operesheni Tokomeza Ujangili*, a government anti-poaching campaign that was suspended indefinitely due to claims of civilian abuse, torture, extortion, and

murder. These reports led to further concerns about Tanzania's ability to safeguard their elephant population and implement effective sport-hunting programs such that the elephant populations are enhanced by those programs.

We have made positive findings and issued permits to allow the import of sport-hunted elephant trophies from Tanzania for more than 15 years. Recently, these findings have been based on information in the report of a Panel of Experts convened to evaluate Tanzania's CoP15 (2010) proposal to down list their elephant population from CITES Appendix I to Appendix II; the proposal was rejected. Despite reports of poaching and other wildlife management issues in Tanzania, available information had indicated that legal sport hunting within the declared quotas was not causing a population declines and, because of revenues generated by sport hunting, had the potential to provide conservation benefits to the species. However, given recent population survey numbers, it appears that the illegal offtake is so great that the legal offtake could be contributing to the ongoing population decline and may be detrimental to the survival of the species in Tanzania. Likewise, due to questionable management practices within the hunting program, it is now difficult to find that the killing of the animal whose trophy is intended for import would enhance the survival of the species, as required by the Act.

*Zimbabwe:* Zimbabwe's CITES annual export quota for elephants is 1,000 tusks (500 elephants). Although no U.S. CITES or ESA permits are required for the import of sport-hunted trophies from Zimbabwe, the special rule for African elephants requires that a determination be made that the killing of the animal whose trophy is intended for import would enhance the survival of the species. So, the Service does have the ability to suspend the import of elephant hunting trophies if it is unable to determine that the imports provide a clear benefit to the survival of the species within Zimbabwe.

While some popular reports continue to name Zimbabwe as the African country with the third-largest elephant populations, the current status of elephants in Zimbabwe is unknown. The International Union for Conservation of Nature (IUCN) reports that only a small portion of Zimbabwe's elephant habitat has been surveyed in recent years, resulting in an overall degradation in the quality of data. It is feared that due to government dysfunction and lack of effective protection, Zimbabwe's elephants have experienced severe declines in the past decade.

Further, MIKE data support the hypothesis that elephant populations in Zimbabwe are significantly declining. In Chewore, Zimbabwe's only World Heritage Site that is also a MIKE site; the 2011 PIKE was .67, a 180% increase over its 2002-2010 average of .24. In Nyami Nyami, Zimbabwe's only other MIKE site, the PIKE was .81, much higher than what could be considered a biologically sustainable level of poaching.

Without reliable population estimates, it is unclear how Zimbabwe's hunting offtake is determined to be biologically sustainable. Reports indicate that questionable hunting practices are taking place, including the shooting of female elephants, sport-hunting of crop-raiding animals, and accusations of hunting within protected areas.

Along with unknown population levels, we are concerned about the status of Zimbabwe's once well-managed hunting and community resource conservation programs. Recent information indicates that the newly appointed Minister of the Environment, Water, and Climate recognizes

4

deficiencies within Zimbabwe Parks and Wildlife Management Authority (ZPWMA) and the need to reinvigorate the country's Communal Areas Management Programme for Indigenous Resources (CAMPFIRE).  In addition, there have been reports of government corruption, including politicization of hunting quota distribution and abuse of ration quotas (internal ZPWMA program to provide game meat to government employees), as well as purported direct and indirect participation in wildlife trafficking by Zimbabwean politicians, defense forces, and intelligence officers.  Poaching is believed to be widespread.  Recently, poachers used cyanide to poison over 90 elephants in Hwange National Park.

The U.S. Government has sanctions in place for individuals who are senior officials of the Government of Zimbabwe, have participated in human rights abuses related to political repression, and/or have engaged in activities facilitating public corruption by senior officials of the Government of Zimbabwe.  U.S. sanctions also target entities owned or controlled by the Zimbabwean government or officials of the Zimbabwean government.  Popular articles and unofficial reports indicate that Zimbabwean government officials may be financially linked to sport hunting in Zimbabwe, which raises concern about whether money intended to enhance the survival of elephants is being used for that purpose.  An undated Safari Club International Foundation fact sheet that cites a 2007 report estimates that elephant hunting contributes $12 million annually to the economy in Zimbabwe.  It is unclear how this money is being used, or if it provides any benefits to elephant conservation efforts within Zimbabwe.  The lack of credible data undermines our ability to make positive findings with regard to whether sport hunting enhances the survival of the species.

In the past, we have not used the requirements of the elephant special rule as the basis for suspending imports for an Appendix-II population and have allowed elephant trophies to be imported from Zimbabwe since 1997.  At this time, the other Appendix-II African elephant populations in South Africa, Botswana, and Namibia are stable or increasing.  Because no U.S. permits are required for elephant trophies from Zimbabwe, outreach will be an important factor to ensure that the sport-hunting community is made aware of any prohibitions on imports.

**PREPARED BY:** Rosemarie Gnam, Ph.D., Chief, Division of Scientific Authority, and Roddy Gabel, Chief, Division of Management Authority.

**DATE:** January 3, 2014

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Safari Club International,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 14-cv-00670-ABJ |
| v. ) | |
| ) | |
| **S.M.R. Jewell,** in her official capacity as ) | |
| Secretary of the United States Department of ) | |
| Interior, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

**DECLARATION OF TIMOTHY J. VAN NORMAN**

I, Timothy J. Van Norman, hereby declare as follows:

1.      I am the Chief, Branch of Permits, the Division of Management Authority

(DMA), of the United States Fish and Wildlife Service (FWS).  As Chief, Branch of

Permits, I am responsible to the FWS Director for the issuance of permits and certificates

to import, export, and re-export species that are protected by the Convention on

International Trade in Endangered Species of Wild Fauna and Flora (CITES) and by

various other wildlife conservation laws, including the Endangered Species Act (ESA).

2.      The African elephant *(Loxodonta africana)* is listed under the ESA as a threatened

species (50 CFR § 17.11(h)) with a special rule (50 CFR § 17.40(e)) issued under the

authority of ESA Section 4(d), 16 U.S.C. § 1533(d).  As relevant here, the special rule

1

contains four conditions that must be met before the import of sport-hunted trophies is allowed in the United States. One of the four conditions is that FWS must make a finding that the killing of the animal whose trophy is intended for import would enhance the survival of the species (Enhancement Finding); 50 CFR § 17.40(e)(3)(iii)(C). The Branch of Permits is responsible under the ESA special rule for African elephants, for authorizing the import of sport-hunted elephant trophies by making the Enhancement Findings.

3.      In evaluating whether sport hunting of an elephant from a particular country contributes to the enhancement of African elephants, my office looks at a number of factors. We evaluate whether the country has a current national or regional management plan and if the country has the resources and political will to enact the plan. We review the plans to determine if they have clear, achievable objectives. We look at which government entities implement the plan and how often is it reviewed and updated. We also look at whether the plan incorporates an adaptive management approach so that enacting agencies can quickly respond to changing environmental or social issues.

4.      We also evaluate the status of the elephant population in that country and trends over time. In particular, we are interested in population numbers, sex and age-class distribution, and mortality rates (both natural and human-induced). We look to determine if there are standardized surveys being conducted and, if so, the timing, census methodology, and coverage of those surveys. Since elephant populations can move across international borders, we look to see what level of cooperation there is between neighboring countries in management and surveying efforts for shared populations. We also evaluate how poaching is accounted for within survey efforts.

5.      As with any wildlife species, the policies on how a country's central and regional governments address management efforts, human-elephant conflicts, poaching, and sport hunting greatly affect the long-term survival of elephant populations.  While recognizing that there may be limited resources available for elephant management, we consider what national policies are in place to address human-elephant conflicts and problem elephant control.  We are interested in policies on culling surplus animals and removal of nuisance animals.  We look at what other offtakes may be occurring, such as domestic harvesting of elephants for local consumption or use.  We also look at the amount of protected area that is either set aside for elephants or managed for elephant populations and the level of protection provided.  All of these are relevant to being able to assess whether the additional removal of elephants for sport hunting and associated import of trophies will enhance the survival of the species.

6.      Finally, we consider how sport hunting has been incorporated into the country's national/regional management strategies and the effectiveness of implementing hunting programs.  We look at whether the hunting program generates revenue for use in elephant management efforts or if it goes to a general treasury fund.  We evaluate if sport hunting provides a benefit to local communities through employment, community development projects, or other avenues.  We assess how hunting quotas are established and distributed. We also look to land tenure issues to determine if concession areas, areas managed by regional or national government, are tendered in a manner that would foster long-term sustainability of elephant populations.

7.      African elephants in Tanzania are listed in Appendix I of CITES.  In accordance with Article III of the CITES Treaty, a CITES export permit must be issued by the

3

CITES Management Authority of the exporting country and a CITES import permit must be issued by the CITES Management Authority of the importing country. In order to issue a CITES export permit for a sport-hunted trophy, the Tanzanian CITES Authorities would need to make two findings, in addition to any stricter domestic legislation that might apply to exports: 1) the CITES Scientific Authority must find that the export would not be detrimental to the survival of the species; and 2) the CITES Management Authority must find that the specimen was not obtained in contravention of the laws of the exporting country (i.e., was legally acquired). To issue the corresponding CITES import permit for a trophy to be imported into the United States, the U.S. CITES Scientific Authority, FWS's Division of Scientific Authority (DSA), would need to make a finding that the import was for purposes that are not detrimental to the species. The U.S. CITES Management Authority, my office, would have to make a finding that the import was not for primarily commercial purposes.

8.      In addition, to authorize the import from Tanzania under the ESA, my office would have to make the required Enhancement Finding.

9.      In the case of imports of sport-hunted elephant trophies taken in Tanzania during the 2014 hunting season, DSA advised my office that it was not able to make the required non-detriment finding under CITES (please see the declaration submitted by Dr. Rosemarie Gnam on May 13, 2014, for additional information).

10.     While my office was able to make a finding under CITES that the import of a personally hunted elephant trophy from Tanzania by a U.S. citizen or resident would not be for primarily commercial purposes, I was not able to make a positive Enhancement

4

278

Finding under the ESA.  Please refer to the March 27, 2014, Enhancement Finding for the agency's specific rationale.

11.     The March 27, 2014, Enhancement Finding is valid only for elephants taken in the 2014 Tanzania hunting season, which begins in July.  It does not replace the previous positive enhancement finding, made on May 6, 1997, which is still applicable to any elephant taken in Tanzania before the 2014 hunting season.   While I believe we have made an effort to obtain all relevant information and data before making this finding, it is possible that additional information that was not available to us at the time the finding was made will become available.  If such information does become available, my office would evaluate the data to determine if the March 27, 2014, finding should be amended or replaced.

12.     Regardless of whether the March 27, 2014, finding is amended or replaced based on new information, my office will make a new enhancement finding that would cover the 2015 Tanzania elephant hunting season.

13.     Since Tanzanian elephants are listed as Appendix-I specimens under CITES and therefore require a U.S. import permit to be legally imported into the United States, the FWS has established a permit application process whereby individuals wishing to import a sport-hunted trophy are required to submit an "Import of Sport-hunted Trophies of Southern African Leopard, African Elephant, and Namibian Southern White Rhinceros" application, form 3-200-19, to my office for consideration.  Once received, information about the applicant, the activity that they are requesting to carry out (in this case, import of a trophy), and the species of trophy would be entered into the FWS's Servicewide Permit Information and Tracking System (SPITS), the computer system used by my

office to track and finalize all applications submitted to DMA.  The application would be

assigned to one of my staff for processing, which consists of reviewing the submitted

information and other available information to determine whether the applicant has met

all of the issuance criteria under CITES, that are the responsibility of the U.S.

Management Authority, and the conditions of the special rule under the ESA.

14.      For several species listed under CITES and the ESA, DSA and my office each

may make a single finding that would apply to all applications received within a given

time period for given activities that are otherwise prohibited under the ESA or CITES.

These findings, called either general advices or findings, would be used for any

applications that are received requesting to engage in the given activity.  This is the case

with elephant trophy imports from Tanzania.  These findings would apply to any

application that is received by FWS in which authorization is requested to import a sport-

hunted elephant trophy taken in Tanzania during the 2014 hunting season.  At the time

the March 27, 2014, Enhancement Finding was made for Tanzania, my office had

received three applications from U.S. hunters requesting authorization to import a sport-

hunted elephant trophy from Tanzania that was planned to be hunted in 2014.  On April

21, 2014, a fourth application to import an elephant trophy from Tanzania that was

planned to be hunted in 2014 was received by my office.  It is not unusual for U.S.

hunters to apply well before they travel to Africa to hunt to request the required import

permit from my office.  By applying before traveling, the hunter can, in many cases,

make adjustments to their hunting trip, if desired, based on the FWS determination on

whether a permit can be issued.

15.     None of these applicants provided any additional information or any information

that my office or DSA had not already considered.  Therefore, based on the finding

produced by DSA and the Enhancement Finding made by my office, we denied two of

the applications on April 4, 2014, and one on May 7, 2014.  The fourth application was

denied on May 12, 2014.

16.     CITES import permits are valid for one year.  An import must be completed (i.e.,

cleared by FWS wildlife inspectors at the port of import) before the permit expires.  If a

permit expires before it can be used, the permittee could request that the permit be

reissued for an additional one year.  Reissuance of a permit, however, can only be

authorized if the activity remains the same and the import has not already occurred.

Therefore, a U.S. hunter that successfully hunted an elephant in 2012, but was unable to

import the trophy within a year of receiving the import permit, could request that the

permit be reissued.  However, a U.S. hunter who applied for an import permit in 2012,

but was not successful in hunting an elephant in that year, could not have the 2012 permit

reissued.

17.     Approximately 25% of all trophy import permits issued by my office in the last 4

years were renewed after the permit expired.  Since import permits are valid for one year,

it is clear that at least 25% of U.S. hunters that had received an import permit were

unable to import the trophy within one year of obtaining the import permit.

18.     As identified in the FWS regulations on permitting (50 CFR part 13), when an

application is denied, the applicant is sent a letter identifying why the application was

denied and  notifying the applicant that they have the option to have the decision

reconsidered by the Chief, Division of Management Authority.  The applicant is informed

that the request for reconsideration must be submitted within 45 days of the date of the

FWS's denial letter. Further, the applicant is instructed that if my office misunderstood

or misinterpreted the information that was provided with the application, the applicant

could clarify the information.

19.    Once the Service receives a request for reconsideration, my office would review

any additional or clarifying information. If the original denial involved a negative

finding from DSA, the request for reconsideration would be provided to DSA as well.

Once my office, and DSA if appropriate, has reviewed the request, we would formulate a

recommendation on whether the original denial should be overturned or upheld. This

recommendation, along with all application material, is provided to the Chief of the

Division of Management Authority for consideration. If our recommendation is to

overturn the original denial and/or the Division Chief believes that the original denial

should be overturned, my office would issue the required import permit. If the Division

Chief supports the original denial, a second letter is sent to the applicant informing them

that their request for reconsideration has been denied. The applicant is again given 45

days to appeal the decision to the FWS Director.

20.    Once FWS receives an appeal request for an application that was denied at

reconsideration, my office, along with DSA if appropriate, would formulate a

recommendation that would be provided to the Director for consideration. If the Director

decides to overturn the previous denial decisions, my office would issue the required

permit. If the Director upholds the previous denials, a letter would be sent to the

applicant informing them of the final Agency decision to deny their appeal.

21.     Despite the suspension and permit denials, individual permit applications under both CITES and the ESA to import sport-hunted elephant trophies from Tanzania will be considered on a case by case basis for 2014 and permits will be granted if the applicants can provide evidence that the findings under both laws can be made.

22.     Typically, FWS does not make public announcements on the findings made by the DSA or my office. Applications are processed by DMA on a case-by-case basis as they are received. However, in the case of Tanzania elephant trophies, we decided to make a public announcement of our findings so that U.S. hunters would have the most current information, which could be useful when arranging to travel to Tanzania to hunt. The April 4, 2014, announcement informed hunters that while they could still hunt elephants in Tanzania in 2014, FWS was currently unable to making the findings that would allow it to issue permits to import their trophies. FWS also stated that it would make new findings for 2015 or upon receipt of new information that demonstrates an improved situation for elephants in Tanzania. While it is possible that FWS could revise its 2014 findings, such revision would only occur if an applicant, the Government of Tanzania, a non-government organization, or some other person or entity was able to provide additional information that would demonstrate that the import of an elephant trophy taken in Tanzania in 2014 would meet the issuance criteria under the ESA and CITES.

23.     African elephant in Zimbabwe are listed in Appendix II of CITES. In accordance with Article IV of the CITES Treaty, a CITES export permit must be issued by the CITES Management Authority of the exporting country, but no CITES import permit is required to be issued by the importing country. In order to issue a CITES export permit

for a sport-hunted trophy, the Zimbabwe CITES Authorities would need to make two findings, in addition to any stricter domestic legislation that might apply to exports: 1) the Scientific Authority must find that the export would not be detrimental to the survival of the species; and 2) the Management Authority must find that the specimen was not obtained in contravention of the laws to the exporting country (i.e., was legally acquired).

24.     While no import permit, either under CITES or the ESA, is required, my office must make a finding under the ESA that the killing of the animal whose trophy is intended for import would enhance the survival of the species consistent with the requirements of the special rule.  If my office determines that imports of sport-hunted elephant trophies from Zimbabwe do not meet this criterion, imports cannot occur.

25.     On April 4, 2014, I signed a finding that stated that, at that time, we could not make the required Enhancement Finding under the ESA and that, until additional information was obtained, no elephant trophies taken during the 2014 season could be imported.  On April 17, 2014, the finding was revised to clarify that the finding only applied to elephants taken on or after April 4, 2014.  Any elephant taken before April 4, 2014, could be imported under the previous enhancement finding dated July 2, 1997.  The April 17, 2014, finding is an interim finding that will be valid until a final finding is made by my office.

26.     Under section 9(c)(2) of the ESA, individuals that are importing a threatened species that are also listed in Appendix II of CITES for personal use, and that meet all provisions of CITES, do not need to obtain an ESA import permit.  This provision, however, can be overridden by a special rule established under section 4(d) of the ESA.

27.     While the special rule for African elephant does not require the issuance of a

permit for the import of an elephant trophy from Zimbabwe, it does state that the FWS

must make a finding that the killing of the animal whose trophy is intended for import

would enhance the survival of the species.

28.     Therefore, while the FWS does not issue an ESA import permit for Zimbabwe

elephant trophy imports, we are required to make a positive enhancement finding.  Since

there is no permit application process, as there is with Tanzania elephants, we are unable

to communicate directly with individual hunters to inform them that, while they could

legally hunt a Zimbabwe elephant during the 2014 hunting season, they would be unable

to import the trophy if taken after April 4.  The most appropriate venue to communicate

this information, therefore, would be through a press release and posting on the Service's

web page, and direct notice to organizations representing hunters.

29.     On April 4, 2014, the FWS issued a press release and posted a notice on its web

page announcing the decision of the interim suspension on imports of sport-hunted

elephant trophies from Zimbabwe (the posting was updated after the enhancement

finding was revised on April 17).  The press release and web posting stated that the

suspension would stay in place until the FWS received information that would allow it to

make a final determination.

30.     On April 4, 2014, I sent a letter to the Director General of the Zimbabwe Parks

and Wildlife Management Authority with a number of questions that would assist DMA

to make a final determination on trophy imports.  The letter was e-mailed to the Director

General and a copy was provided to the U.S. State Department for transmission through

the U.S. Embassy in Harare.  While I did not receive a confirmation that the Director

General received the letter, I did receive communication from the U.S. Embassy in Harare on April 11, 2014, that indicates that the Zimbabwe Parks and Wildlife Management Authority was aware of the interim suspension and was working on a response.

31.     On April 14, via an e-mail from the U.S. Embassy in Harare, I received a letter from the Director General acknowledging the receipt of my letter and stating that his agency was working on a response. On April 17, 2014, again through the U.S. Embassy in Harare, I received several documents from the Director General, including a 32-page response to my April 4 questions. I also received a box of reports and other supporting documentation via the Embassy on May 8, 2014. On May 8, 2014, Matt Eckert, a senior staff member of Safari Club International Foundation, delivered a second box of the same supporting material to my office. The Director General accompanied Mr. Eckert. Mr. Eckert asked if we could meet to discuss the suspension and the responses that the Zimbabwe Parks and Wildlife Management Authority had provided me. Although I had not reviewed the supporting documentation sent through the U.S. Embassy at that time, I agreed to meet with the Director General to discuss the April 17 response from Zimbabwe.

32.     This discussion, lasting approximately 1 ½ hours, consisted primarily of the Director General providing a clarification of statements made in the 32-page response, as well as responding to some questions posed by the Director General to me. The Director General appeared particularly interested in discussing more recent survey data on elephant populations, distribution of elephants within Zimbabwe, and the economic impact the interim suspension would have on the public and private sector within

Zimbabwe. The Director General expressed particular concern over the impact the interim suspension would have on local communities that rely on hunting, particularly elephant hunting, for their livelihoods.

33.     I am now reviewing the 32-page response to my April 4 questions, as well as the supporting documentation provided by the Zimbabwe Parks and Wildlife Management Authority. In addition, since the April 4 announcement, I have received a large number of letters and comments, primarily via e-mail, from professional hunter associations in Zimbabwe, individual safari outfitters, and non-government organizations with additional supporting information. It is my intent to review all of this material within the next two weeks in order to make a final determination on whether the April 4 interim suspension should be lifted. There is a possibility that, after reviewing the provided material, I will need to have additional communication with the Director General or his staff to clarify certain information.

34.     On May 12, 2014, a notice was published in the **Federal Register** also announcing the interim suspension (79 FR 26987, May 12, 2014).

35.     Assuming that subsequent communication with the Zimbabwe Parks and Wildlife Management Authority can be conducted in an expedited manner, I intend to complete a final determination by mid-July at the latest. At that time, another announcement will be made, through both public media and the **Federal Register**, announcing the decision.

36.     As stated in the May 12, 2014, **Federal Register** notice, if my office is able to make a positive Enhancement Finding for Zimbabwe for 2014, hunters will be able to import their sport-hunted elephant trophies taken from Zimbabwe after April 4, 2014 at that time.

Pursuant to 28 U.S. C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Arlington, Virginia, on this ___13___ day of May, 2014.

Timothy J. Van Norman
Chief, Branch of Permits
Division of Management Authority
U.S. Fish and Wildlife Service
Department of the Interior

14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Safari Club International,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 14-cv-00670-ABJ |
| **S.M.R. Jewell,** in her official capacity as | ) | |
| Secretary of the United States Department of | ) | |
| Interior, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ROSEMARIE S. GNAM

I, Rosemarie S. Gnam, hereby declare as follows:

      1.     I am the Chief, Division of Scientific Authority (DSA), of the United

States Fish and Wildlife Service (FWS). As DSA Chief, I am responsible to the FWS

Director for making findings related to non-detriment (NDFs) that are required for the

issuance of permits for the import and export of certain species that are protected by the

Convention on International Trade in Endangered Species of Wild Fauna and Flora

(CITES). In particular, I am responsible for making NDFs regarding the import of sport-

hunted trophies of African elephants (*Loxodonta africana*) from Tanzania.

2.     The FWS has been increasingly concerned about the escalation in poaching

activity throughout much of Africa in the past several years. At the Fifteenth Meeting of

the CITES Conference of the Parties (CoP15, Doha, 2010), the CITES Secretariat

provided the first report to a CoP that provided an analysis of data collected under the

CITES program known as Monitoring the Illegal Killing of Elephants (MIKE) since the

adoption of baseline information in 2007 (CoP15 Doc. 44.2 (Rev. 1). Available at the

official CITES website, maintained by the CITES Secretariat on behalf of the Parties, at

[http://www.cites.org/sites/default/files/eng/cop/15/doc/E15-44-02.pdf].)  The report

showed an increase in elephant poaching since 2006.  Also of concern, the report to

CoP15 on an analysis of Elephant Trade Information System (ETIS) data showed a

pronounced upward trend in the illicit ivory trade in 2009, despite the fact that at the time

of the analysis, the 2009 data were incomplete (CoP15 Doc. 44.1 (Rev.1) Annex.

Available at [http://www.cites.org/sites/default/files/common/cop/15/doc/E15-44-

01A.pdf].)  Initial concerns raised by this information received at CoP15 have since been

affirmed.  The CITES Secretariat's MIKE report to CoP16 (Bangkok, 2013) showed an

ongoing increase in levels of illegal killing of elephants since 2006, with 2011 showing

the "highest levels of poaching since MIKE records began in 2002" (CoP16 Doc. 53.1.

Available at [http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-01.pdf].)

The ETIS report provided to CoP16 showed that the illegal trade in ivory has continued to

escalate since CoP15, and the most recent year analyzed (2011) represents the highest

level of illegal trade in the 16-year period analyzed (1996 through 2011) (CoP16 Doc.

53.2.2. Available at [http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-

02-02.pdf].)  The increased poaching and associated illegal trade have raised questions

about the sustainability of African elephant populations.

   3. Specific and detailed MIKE and ETIS information for Tanzania is

available in our NDF for Tanzania for 2014 (see Illegal Offtake Section, paragraphs 23 –

24, pages 9 – 10 and below), which I signed on February 21, 2014.

2

4.     Tanzania currently allows sport hunting of its CITES Appendix-I African elephant population.  DSA has no evidence that any other country with an Appendix I African elephant population currently allows sport hunting.

5.     DSA was able to make positive NDFs with regard to the import of sport-hunted elephant trophies from Tanzania for calendar years 2008 – 2013.  Yet DSA's findings clearly articulate growing concerns over reports of poaching in Tanzania that are increasingly substantiated through time (see attached NDFs for years 2008 – 2013).

6.     During the same time-frame, credible new information about possible effects of poaching on population status was not available to us.

7.     In 2011, I, FWS-International Affairs staff, and Teiko Saito, FWS Assistant Director-International Affairs, met with Tanzania government officials from the Tanzania Ministry of Natural Resources and Tourism, accompanied by John J. Jackson, III, from Conservation Force.  During the meeting, the FWS received documents from the Tanzania authorities that would support DSA in making its 2011 NDF, including Tanzania's draft elephant management plan as well as new legislation.  In addressing FWS' concerns raised in its 2010 NDF about the elephant population in the Selous-Mikumi ecosystem, the Tanzanian authorities clarified that the 2006 census had been an over-estimate due to counting errors, and, therefore, in adjusting for that error, their updated statistical analyses showed that there was not a significant decline in the population between 2006 and 2009.  The Tanzanian authorities said they were hoping to conduct another census in the upcoming dry season in 2011, which would provide updated trend information.

3

8.     In our NDF for 2011, among other things, we noted that we would continue to monitor African elephant population survey results, especially the forthcoming survey information discussed by the Tanzanian authorities in the 2011 meeting.

9.     At the 11th African Wildlife Consultative Forum in Botswana September 16-22, 2012, Patrick Leonard, FWS Deputy Assistant Director-International Affairs, provided a list of FWS concerns about the import of sport-hunted trophies from Tanzania to Tanzania representatives at the meeting.  Among other things, we raised concerns about whether management and regulatory measures had been implemented and the availability of resources available to combat poaching in Tanzania.  We also stated that we were interested in receiving the 2011 Selous survey results.  In our NDFs for both 2012 and 2013, we re-iterated the same concerns and interest in receiving the survey information.

10.     In December 2013 and January 2014, DSA received the results of credible population surveys that demonstrated significantly reduced elephant population numbers in two areas once considered Tanzanian elephant strongholds, the Selous-Mikumi and the Ruaha-Rungwa.  The new surveys showed that since 2009 the Selous-Mikumi and the Ruaha-Rungwa elephant populations were reduced by 66% and 36.5%, respectively.  Such declines were found to be statistically significant.  The new survey information on these two elephant populations alone suggested a decline by about 37,426 elephants.  Demographic surveys and anecdotal reports from the field also suggested elephant population declines throughout Tanzania (see attached 2014 NDF).  Consistent with the population and anecdotal information, recent information from the CITES MIKE program (discussed in paragraph 11) also suggested widespread population declines in Tanzania due to poaching.

4

**292**

11.     In Tanzania, African elephant deaths occur as a result of several factors, including: 1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching.  In order to evaluate whether offtake from trophy hunting is sustainable, all losses to the country's African elephant population, including poaching, must be considered.  Based on the MIKE report presented to CoP16, information from multiple sites in Tanzania indicate that the level of illegal annual offtake is likely to be higher than the annual natural birth rate, indicating that the elephant populations are very likely to be in net decline (CoP16 Doc. 53.1).  In other words, the illegal offtake is unsustainable at these sites.  Therefore, any additional take, even if legal, would be considered unsustainable.

12.     In order to inform hunters of our finding, we posted a press release and a set of Questions and Answers (Q&As) on the FWS website on April 4, 2014, at approximately 4:30 p.m.  Subsequently, the press release and Q&As were also specifically posted on the FWS Office of Law Enforcement homepage, and the Office of Law Enforcement issued a public bulletin, as is standard practice for the announcement of provisions that will impact importers of wildlife.  In addition, the press release was distributed to 346 reporters (313 of whom received it) via CisionPoint, which is a web-based software to distribute press releases and manage other communications-related activities.  In addition, Director Dan Ashe placed personal phone calls on April 3, 2014, the day prior to the announcement, to Craig Kauffman, President, Safari Club International; Jeff Crane, President, Congressional Sportsman's Foundation; Ben F. Carter, Executive Director, Dallas Safari Club; and John J. Jackson, III, President, Conservation Force, to inform them of the FWS's decisions.

13.     On April 28, 2014, at the 27th Meeting of the CITES Animals Committee in Veracruz, Mexico, DSA Branch Chief, Pamela Scruggs provided Dennis Ikanda, an official of the Tanzania Wildlife Research Institute, with a written copy of the DSA's 2014 NDF for Tanzania. Most of the referenced documents cited in the NDF are readily available through journal publications or the internet. Since eight of the NDF references, however, were not readily available, on May 6, 2014, Ms. Scruggs sent copies of those eight references to Mr. Ikanda by email correspondence. All the NDF references are relevant because they informed our NDF and substantiated the conclusions that we drew.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Arlington, Virginia, on this ___13___ day of May 2014.

*Rosemarie S. Gnam*

Rosemarie S. Gnam
Chief, Division of Scientific Authority
U.S. Fish and Wildlife Service
Department of the Interior

6

**294**



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240



**MEMORANDUM**

JUL 1 1 2008

To:        Chief, Division of Management Authority

From:      Chief, Division of Scientific Authority   *R. Gnam*

Subject:   General Advice on Import of Sport-hunted Trophies of African Elephant from
           Tanzania for the Calendar Year 2008

---

This responds to your request for a CITES finding on various applications for the import of sport-hunted trophies of African elephants (*Loxodonta africana*) from Tanzania for calendar year 2008.

**Please be advised that, with the information available, we are able to find that the import of sport-hunted trophies of African elephants from Tanzania will be for purposes that are not detrimental to the survival of the species.** This General Advice applies only to African elephant sport-hunted trophies lawfully taken in Tanzania during calendar year 2008 (i.e., January 1, 2008, through December 31, 2008), provided that they are to be imported by the persons who hunted them for personal use or display.

If new information becomes available during 2008 that suggests that this General Advice is no longer valid, said Advice would be suspended and reconsidered by the Division of Scientific Authority (DSA). If, after reconsideration, DSA believes that the General Advice is no longer valid, we will issue a new General Advice or require that subsequent permit applications be considered on a case-by-case basis.

If it is not rescinded beforehand, this General Advice will be reviewed at the beginning of calendar year 2009, and a new finding issued for that calendar year.

BASIS FOR ADVICE:

1. Tanzania has a 2008 export quota of 400 tusks (200 elephants), which is double the 2007 quota. However, Tanzania has not exported its stated quota in trophies or tusks between 2002 and 2006 (most recent net export trade data available on the UNEP-WCMC CITES Trade Database, http://www.unep-wcmc.org/citestrade/report.cfm). The new quota represents 0.15% of Tanzania's elephant population based on data from the *African Elephant Status Report* (Blanc et al. 2007).

2. The trophy quota is distributed among 145 hunting blocks with the number of trophy permits allotted to each determined by survey information (Ministry of Natural Resources and Tourism,



295

2005).

3. Tanzania has participated in the MIKE program (Monitoring of Illegal Killing of Elephants) since 2000. This includes annual surveys of the geographic areas of Rungwa Ruaha, Selous Mikumi, Rukwa Katavi, and Tarangire Manyara (SC55 Doc. 10.2).

4. The Elephant Trade Information System (ETIS) reports that Tanzania has had a large number of high-volume ivory seizures relative to other ivory producing/consuming nations. Despite a fairly high perception of corruption (based on the Corruption Perception Index used by ETIS), there is a fairly good law enforcement effort ratio, which demonstrates a high level of interdiction. However, 11 of the 49 highest volume seizures reported to ETIS implicate Tanzania as a transit country for illegal ivory due to its ports of Dar es Salaam and Tanga. There is almost no internal ivory market (CoP14 Doc. 53.2).

5. The *African Elephant Status Report* (Blanc et al. 2007) indicates that the Tanzanian elephant population increased 19.8% (Definite and Probable categories combined) since the 2002 report (Blanc et al. 2003). The population has increased from 109,684 to 136,753 elephants between 2002 and 2006 using comparable survey methodologies. The Tanzania Wildlife Research Institute conducted surveys between August and November 2006. One third of the country remains unassessed. Thus, the annual export quota of 200 tusks (100 elephants) from sport hunting represents 0.07% of the population.

6. Elephants are found throughout 48% of Tanzania. Of the range area, 37% lies in protected areas (Blanc et al. 2007). Compared to other African elephant range countries, 37% protected range is high.

7. From 1991 to 2007, we found that:

(a) There is good-quality, current information about African elephant populations in Tanzania, and there is acceptable information indicating that the elephant population in Tanzania had increased in recent years.

(b) Tanzania has increased penalties and improved law enforcement and public awareness to reduce illegal hunting of elephants. Tanzania is a Party to CITES in good standing, has submitted annual elephant trophy export quotas to the CITES Secretariat, and is issuing appropriate export permits.

(d) Tanzania has established game management areas with substantial and important habitats for elephants, and directed considerable resources toward elephant conservation. Tanzania also has reliable population surveys, adequate habitat, sufficient enforcement capability, and adequate management infrastructure to manage and protect elephants.

(e) Revenues from sport hunting of elephants are used directly and indirectly for anti-poaching activities.

2

8. Tanzania's 2001 revised elephant management plan states that Tanzania has the resources to support a maximum of 100,600 elephants (Kayera in litt., 2005).

9. The Conservation Information and Monitoring Unit (CIMU, formerly Tanzania Wildlife Conservation Monitoring Unit) surveys wildlife on a regular basis. There were 21 elephant survey zones in Tanzania in 1999, and all but two of these zones had been surveyed by TWCM since 1994 (Barnes et al. 1999). By 2006, 29 sites had been surveyed (Blanc et al. 2007). Blanc et al. (2003) note that, unlike areas managed by Tanzania National Parks, areas managed by the Wildlife Division, which includes most of the hunting blocks, are not subject to population monitoring. However, the U.S. Division of Management Authority received information that the survey data includes national parks, game reserves, game controlled areas, Ngorongoro Conservation Area, forest reserves, and open areas with wildlife (Kayera in litt., 2005). Indeed the *African Elephant Status Report* (Blanc et al. 2007) includes elephant surveys in hunting blocks.

10. Elephant populations in Tanzania have expanded their range in recent years. Since 1989, 13 new game reserves have been established and three national parks have been expanded. This has resulted in 22,148 sq. km of new elephant range being created (Ministry of Natural Resources and Tourism, 2005).

11. The U.S. Fish and Wildlife Service Division of International Conservation has received information from the field that there has been a dramatic increase in unreported elephant poaching in southern and western Tanzania. This may be due to collusion of poorly paid Wildlife Department rangers and police, lack of ranger capacitation, the influx of refugees from neighboring countries, and the increase of human-elephant conflict along the borders of protected areas. In response to these concerns, the Service gave a letter on June 2007 to the Director General of Tanzania Wildlife Research Institute, Tanzania's CITES Management Authority. The letter requested additional information about the conservation status and management of the country's elephant population. Although we did not receive a response to the letter[1], there have been no published reports or popular press articles on the African Elephant Listserve managed by Save the Elephant in 2007 regarding elephant concerns in Tanzania.

12. We continue to believe that the status of African elephant populations in Tanzania (stable or increasing) and management efforts (e.g., law enforcement and anti-poaching efforts, monitoring and protection of elephants and their habitats) are adequate to ensure that the sport hunting of African elephants as administered by the Government of Tanzania does not adversely affect the status of the species in that country.

13. Thus, for calendar year 2008, we find that the import of sport-hunted trophies of African elephants taken in Tanzania will be for purposes that are not detrimental to the survival of the

---

[1] Note: On July 1, 2008, Tanzania confirmed responding to the Service's letter, but DSA had not received their response. Upon DSA's request, Tanzania transmitted their response to DSA via email, and we are currently reviewing the information. If this information or any other information received suggests the current finding is no longer valid or needs to be revised, we will take action as stated on page 1 of this advice.

3

species.

References

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. African Elephant Status Report 2007: An Update from the African Elephant Database. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. http://www.iucn.org/themes/ssc/sgs/afesg/aed/aesr2007.html

Barnes, R.F.W., G.C. Craig, H.T. Dublin, G. Overton, W. Simons, and C.R. Thouless. 1999. African Elephant Database 1998. Occasional Paper of the IUCN Species Survival Commission No. 22. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Pp. 104-109.

Blanc, J.J., C.R. Thouless, J.A. Hart, H.T. Dublin, I. Douglas-Hamilton, C.G. Craig, and R.F.W. Barnes. 2003. African Elephant Status Report 2002: An Update from the African Elephant Database. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Pp. 112-116.

Kayera, J. 2005. Letter to Dr. Peter O. Thomas, U.S. Division of Management Authority. July 13, 2005.

Ministry of Natural Resources and Tourism 2005. African Elephant Conservation in Tanzania. Wildlife Division.

4




# United States Department of the Interior

### FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

JUL 2 3 2009

**MEMORANDUM**

To:        Chief, Division of Management Authority

From:      Chief, Division of Scientific Authority   *R. Hʌ̃ram*

Subject:   General Advice on Import of Sport-hunted Trophies of African Elephant from
           Tanzania for the Calendar Year 2009

---

This responds to your request for a CITES finding on various applications for the import of sport-hunted trophies of African elephants (*Loxodonta africana*) from Tanzania for calendar year 2009.

**Please be advised that, with the information available, we are able to find that the import of sport-hunted trophies of African elephants from Tanzania will be for purposes that are not detrimental to the survival of the species.** This General Advice applies only to African elephant sport-hunted trophies lawfully taken in Tanzania during calendar year 2009 (i.e., January 1, 2009, through December 31, 2009), provided that they are to be imported by the persons who hunted them for personal use or personal display.

If new information becomes available during 2009 that suggests that this General Advice is no longer valid, said Advice would be suspended and reconsidered by the Division of Scientific Authority (DSA). If, after reconsideration, DSA believes that the General Advice is no longer valid, we will issue a new General Advice or require that subsequent permit applications be considered on a case-by-case basis.

If it is not rescinded beforehand, this General Advice will be reviewed at the beginning of calendar year 2010, and a new finding issued for that calendar year.

BASIS FOR ADVICE:

1. Tanzania has a 2009 export quota of 400 tusks (200 elephants), which remains unchanged from the 2008 quota. However, Tanzania has not exported its stated quota in trophies or tusks between 2002 and 2007 (most recent net export trade data available on the UNEP-WCMC CITES Trade Database, http://www.unep-wcmc.org/citestrade/report.cfm). The quota represents approximately 0.15% of Tanzania's elephant population based on data from the *African Elephant Status Report* (Blanc et al. 2007).

2. The trophy quota is distributed among approximately 150 hunting concessions/blocks (Ministry



of Natural Resources and Tourism (Tanzania) in litt., 2008) with the number of trophy permits allotted to each concession determined by survey information (Ministry of Natural Resources and Tourism (Tanzania) in litt., 2005).

3. According to Tanzania's Ministry of Natural Resources and Tourism (in litt., 2008), 25% of the revenue accrued from the sport hunting of elephants goes to the conservation and protection of elephants and other wildlife species through the Tanzania Wildlife Protection Fund (TWPF). In addition, 25% of the game fees received from hunters is given to the local communities in the areas where the sport hunting took place. Apart from being the source of revenue to local communities, sport hunting plays an important role in creating employment for the members of the local communities, as trackers, skinners, tent and mess attendants, and guards (Ministry of Natural Resources and Tourism (Tanzania) in litt., 2008). The Tanzanian Ministry of Natural Resources and Tourism (in litt., 2008) also reports that the sport hunting program assists in curbing illegal harvesting, developing infrastructure such as roads, hospitals, and schools, as well as creating a market for local artwork.

4. Tanzania has participated in the MIKE program (Monitoring of Illegal Killing of Elephants) since 2000. This includes annual surveys of the geographic areas of Rungwa Ruaha, Selous Mikumi, Rukwa Katavi, and Tarangire Manyara (CITES Secretariat 2007).

5. The Elephant Trade Information System (ETIS) reports that Tanzania has had a large number of high-volume ivory seizures relative to other ivory producing/consuming nations. Despite a fairly high perception of corruption (based on the Corruption Perception Index used by ETIS), there is a fairly good law enforcement effort ratio, which demonstrates a high level of interdiction. However, 11 of the 49 highest volume seizures reported to ETIS implicate Tanzania as a transit country for illegal ivory due to its ports of Dar es Salaam and Tanga. There is almost no internal ivory market (TRAFFIC 2007).

6. Tanzania's Ministry of Natural Resources and Tourism (in litt., 2008) reports that a minimum of 37 elephants are lost annually through illegal killing (which is about 0.03% of the elephant population in Tanzania). According to the Tanzanian Ministry of Natural Resources and Tourism (in litt., 2008), Tanzania has recently intensified anti-poaching patrols, especially in the elephant stronghold areas of Selous and Rungwa Game Reserves. With the help of Global Positioning System (GPS) coupled with topographical maps, as well as a significant fleet of vehicles, Tanzania has been able to address previous problems they had with unavailable or limited equipment, such as helicopters, ensuring a wider area of coverage per person. These efforts, along with the concept of community conservation, particularly around protected areas, have significantly reduced incidences of poaching (Ministry of Natural Resources and Tourism (Tanzania) in litt., 2008).

7. The *African Elephant Status Report* (Blanc et al. 2007) indicates that the Tanzanian elephant population increased by approximately 24.7% (Definite and Probable categories combined) since the 2002 report. The population increased from 109,684 to 136,753 elephants between 2002 and 2006 using comparable survey methodologies. The Tanzania Wildlife Research Institute conducted surveys between August and November 2006. Although over 60% of Tanzania's estimated

2

elephant range had been covered by good quality counts, one third of the estimated range remains unassessed (Blanc et al. 2007). According to the Tanzanian Ministry of Natural Resources and Tourism (in litt., 2008), Tanzania has a standardized process for conducting population censuses. The census is usually conducted every 2-3 years, depending on "the need and availabilities of both human and financial resources," in ecosystems where African elephants occur (including all of the hunting concessions within these ecosystems). Currently, the range of elephants in Tanzania cover seven ecosystems: Serengeti, Kilimanjaro-Amboseli, Tarangire-Manyara, Selous, Greater Ruaha, Ugalla-Katavi, Mkomazi (within the Tsavo ecosystem), and coastal (comprised of smaller ranges within Saadani National Park). Although the movement of elephants across international borders can have a significant impact on population numbers throughout the year, the Tanzanian Ministry of Natural Resources and Tourism (in litt., 2008) states that the impact is not very significant in Tanzania. This is due to the small number of elephants present in the transboundary populations, accounting for only about 0.96% of the total population of African elephants in Tanzania. In addition, as applicable, joint censuses are usually conducted in order to take into account the movement of these transboundary populations.

8. Tanzania holds 80% of the East African regional population of elephants (UNEP-WCMC 2009) with the main stronghold in the Selous ecosystem (Blanc et al. 2007).

9. African elephants are widely distributed throughout Tanzania occurring in 49% of the country (Ministry of Natural Resources and Tourism (Tanzania) in litt., 2008). They are found in 12 of the 14 National Parks, 31 (of the 34) game reserves, and in the Ngorongoro Conservation Area, as well as in some Game Controlled Areas, Forest Reserves, and village lands (Ministry of Natural Resources and Tourism (Tanzania) in litt., 2008). Of the range area, 37% lies in protected areas (Blanc et al. 2007). Compared to other African elephant range countries, 37% protected range is high.

10. The Conservation Information and Monitoring Unit (CIMU, formerly Tanzania Wildlife Conservation Monitoring Unit (TWCM)) surveys wildlife on a regular basis. There were 21 elephant survey zones in Tanzania in 1999, and all but two of these zones had been surveyed by TWCM since 1995 (Barnes et al. 1999). By 2006, 29 sites had been surveyed (Blanc et al. 2007). Blanc et al. (2003) note that, unlike areas managed by Tanzania National Parks, areas managed by the Wildlife Division, which includes most of the hunting blocks, are not subject to population monitoring. However, the U.S. Division of Management Authority received information that the survey data includes National Parks, Game Reserves, Game Controlled Areas, Ngorongoro Conservation Area, Forest Reserves, and open areas with wildlife (Kayera in litt., 2005). Indeed the *African Elephant Status Report* (Blanc et al. 2007) includes elephant surveys in hunting concessions.

11. Tanzania's 2001 revised elephant management plan states that Tanzania has the resources to support a maximum of 100,600 elephants (Department of Wildlife 2001).

12. Elephant populations in Tanzania have expanded their range in recent years. Since 1989, 13 new game reserves have been established and three national parks have been expanded. This has

3

resulted in 22,148 square kilometers of new elephant range being created (Ministry of Natural Resources and Tourism (Tanzania) in litt., 2005).

13.  The U.S. Fish and Wildlife Service's Division of International Conservation received information from the field that there has been a dramatic increase in unreported elephant poaching in southern and western Tanzania.  This may be due to collusion of poorly paid Wildlife Department rangers and police, lack of ranger capacitation, the influx of refugees from neighboring countries, and the increase of human-elephant conflict along the borders of protected areas.  In response to these concerns, the Service sent a letter in March 2007 to the Director General of the Tanzania Wildlife Research Institute, Tanzania's CITES Management Authority.  The letter requested additional information about the conservation status and management of the country's elephant population.  On July 1, 2008, the Division of Scientific Authority received Tanzania's response via email.  We have reviewed the information they provided and have incorporated the information into this finding, where appropriate.

14.  We are aware that Tanzania continues to be regularly challenged by the illicit trade in ivory (TRAFFIC 2007).  For example, according to press articles, there have already been four large seizures of elephant ivory from Tanzania this year; one in the Philippines, one in Vietnam, one in Kenya, and one at the Julius Nyerere International Airport in Dar es Salaam, Tanzania, prior to departure to China (Kimaro 2009; ThisDay 2009a; ThisDay 2009b; ThisDay 2009c).  However, as reported at CoP14 (TRAFFIC 2007), Tanzania "by and large exhibits good law enforcement capabilities and are interdicting ivory far more often then it appears to elude them."

15.  As a signatory to the Lusaka Agreement on Cooperative Enforcement Operations Directed at Illegal Trade in Wild Fauna and Flora, Tanzania is required to take appropriate measures to investigate and prosecute cases of illegal trade (Article 4, paragraph 1, of the Lusaka Agreement).  On July 21, 2009, six Tanzanian businessmen were charged with smuggling 11 tons of elephant ivory to the Philippines and Vietnam over the last six months (AFP 2009).  In addition, the individuals were charged with 11 counts of conspiracy, unlawful hunting, exporting concealed and undeclared items, as well as making false documents.  According to the Dar es Salaam magistrate court before which they were charged, the individuals committed the offense between October 2008 and March 2009.  AFP (2009) reports that the individuals run several export and cargo clearing firms in Dar es Salaam, Tanzania.

16.  In an effort to connect a seized shipment with its source, new DNA forensic methods have been developed to determine where elephant poaching is most concentrated in Africa (Wasser et al. 2009).  DNA analysis of three large seizures (of about 1,500 tusks) made in 2006 showed that the tusks came from an area centered in the Selous ecosystem in Tanzania and its neighboring Niassa Game Reserve in northern Mozambique.  Based upon the 2006 ivory seizures, Wasser et al. (2009) estimate that more than 8 percent of the total African elephant population is being killed annually.

17.  It is reported that the new DNA analysis developed by Wasser et al. will be used to trace the origins of the ivory seized in Vietnam and the Philippines this year (McKie 2009).

4

18. The *Action Plan for the Control of Trade in Elephant Ivory*, adopted at CoP14, required the Secretariat to distribute to all Parties and non-Parties identified in the CoP14 ETIS report as being affected by illicit trade in ivory, a questionnaire relating to the control of trade in ivory. At SC58 in July 2009, the CITES Secretariat (2009) reported that they shared the completed questionnaires with TRAFFIC's East/Southern Africa Regional Office, which is responsible for the maintenance of the ETIS database, but an analysis of the information has yet to be conducted[1].

19. We are very concerned about the illicit trade in ivory from Tanzania, especially in light of the number of recent seizures of elephant ivory from Tanzania. We are not sure what impact this seemingly large amount of illegal trade in ivory is having on the African elephant population in Tanzania and whether or not additional take of the species, such as through sport-hunting, is putting the species further at risk. As a result, the Service will send a letter to the Director General of the Tanzania Wildlife Research Institute, Tanzania's CITES Management Authority, to notify him of our concerns and to request information regarding the impacts that trade in illegal ivory is having on the Tanzanian elephant population. Based upon the response received from Tanzania, we may need to take action regarding this finding as detailed on page 1 of this advice. If we do not receive a response from Tanzania, we may not have adequate information to be able to find that the import of sport-hunted trophies of African elephants from Tanzania for calendar year 2010 will be for purposes that are not detrimental to the survival of the species in the wild.

20. Although we are very concerned about the illicit trade in ivory from Tanzania and its potential impact on the species, we are not aware of any information to indicate that trade in legally taken sport-hunted trophies stimulates additional illegal trade in ivory or take of elephants from Tanzania. At this time, we do not feel that the additional take of elephants for sport hunting (a maximum of 0.15% of the total elephant population in Tanzania, based upon the export quota), is putting the species further at risk. However, we will continue to monitor this issue, and if new information becomes available that suggests the current finding is no longer valid or needs to be revised, we will take action as stated on page 1 of this advice.

21. With the information currently available, we believe that the status of African elephant populations in Tanzania (stable or increasing) and management efforts (e.g., law enforcement and anti-poaching efforts, monitoring and protection of elephants and their habitats) are adequate to ensure that the sport hunting of African elephants as administered by the Government of Tanzania does not adversely affect the status of the species in Tanzania.

22. Thus, for calendar year 2009, we find that the import of sport-hunted trophies of African elephants taken in Tanzania will be for purposes that are not detrimental to the survival of the species.

---

[1] We will review the analysis of the compiled information once it has been completed. If this information suggests the current finding is no longer valid or needs to be revised, we will take action as stated on page 1 of this advice.

5

## References

AFP. 2009. Tanzania charges six for 11-ton ivory smuggle. *AFP* (July 22, 2009).

Barnes, R.F.W., G.C. Craig, H.T. Dublin, G. Overton, W. Simons, and C.R. Thouless. 1999. *African Elephant Database 1998*. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aed1998.pdf.

Blanc, J.J., C.R. Thouless, J.A. Hart, H.T. Dublin, I. Douglas-Hamilton, C.G. Craig, and R.F.W. Barnes. 2003. *African Elephant Status Report 2002: An Update from the African Elephant Database*. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2002.pdf.

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. *African Elephant Status Report 2007: An Update from the African Elephant Database*. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

CITES Secretariat. 2007. MIKE Baseline Information (SC55 Doc. 10.2 (Rev. 1)). Document submitted at SC55. Available online at: http://www.cites.org/eng/com/SC/55/E55-10-2.pdf.

CITES Secretariat. 2009. Control of Trade in Elephant Ivory (SC58 Doc. 36.2). Document submitted at SC58. Available online at: http://www.cites.org/eng/com/SC/58/E58-36-2.pdf.

Department of Wildlife. 2001. Management Plan for the African Elephants, *Loxodonta africana* in Tanzania. Dar es Salaam, Tanzania.

Kayera, J. 2005. Letter from Juma Kayera, for Director of Wildlife, Wildlife Division, Ministry of Natural Resources and Tourism, Dar es Salaam, Tanzania (July 13, 2005).

Kimaro, S. 2009. Woman nabbed at airport trying to smuggle ivory out to China. *ThisDay* (July 13, 2009).

McKie, R. 2009. Map of elephant DNA reveals trial of ivory smugglers. *The Observer* (June 28, 2009).

Ministry of Natural Resources and Tourism (Tanzania). in litt. 2005. African Elephant Conservation in Tanzania.

Ministry of Natural Resources and Tourism (Tanzania). in litt. 2008. Questionaire from US Fish and Wildlife Service on Elephants Conservation in Tanzania.

ThisDay. 2009a. Kenya seizes massive ivory haul: Some of the tusks and rhino horns suspected to have come from Tanzania. *ThisDay* (July 16, 2009).

ThisDay. 2009b. Philippines authorities seize more elephant tusks smuggled from Dar. *ThisDay* (May 22, 2009).

ThisDay. 2009c. Smuggled elephant tusks: Six TRA officials nabbed. *ThisDay* (June 5, 2009).

TRAFFIC. 2007. Monitoring of Illegal Trade in Ivory and Other Elephant Specimens (CoP14 Doc. 53.2). Document submitted at CoP14. Available online at: http://www.cites.org/eng/cop/14/doc/E14-53-2.pdf.

UNEP-WCMC. 2009. Conservation Status of and Trade in Elephants (SC58 Doc. 36.1, Annex 2). Document submitted at SC58. Available online at: http://www.cites.org/eng/com/SC/58/E58-36-1A2.pdf.

Wasser, S.K., B. Clark, and C. Laurie. 2009. Forensic Tools Battle Ivory Poachers. *Scientific American*: July 2009. Available online at: http://www.scientificamerican.com/article.cfm?id=forensic-tools-battle-ivory-poachers.

7





# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

JUL 23 2010

**MEMORANDUM**

To:        Chief, Division of Management Authority

From:    *for* Chief, Division of Scientific Authority *Pamela F. Hall*

Subject:  General Advice on Import of Sport-hunted Trophies of African Elephant from
          Tanzania for the Calendar Year 2010

---

This responds to your request for a CITES finding on various applications for the import of sport-hunted trophies of African elephants (*Loxodonta africana*) from Tanzania for calendar year 2010.

**Please be advised that, with the information available, we are able to find that the import of sport-hunted trophies of African elephants from Tanzania will be for purposes that are not detrimental to the survival of the species. This General Advice applies only to African elephant sport-hunted trophies lawfully taken in Tanzania during calendar year 2010 (i.e., January 1, 2010, through December 31, 2010), provided that they are to be imported by the persons who hunted them for personal use or personal display.**

If new information becomes available during 2010 that suggests that this General Advice is no longer valid, said Advice would be suspended and reconsidered by the Division of Scientific Authority (DSA). If, after reconsideration, DSA believes that the General Advice is no longer valid, we will issue a new General Advice or require that subsequent permit applications be considered on a case-by-case basis. If it is not rescinded beforehand, this General Advice will be reviewed at the beginning of calendar year 2011, and a new finding issued for that calendar year.

Please be advised that since issuance of our 2009 General Advice, a significant amount of new information relevant to this General Advice was made available at the Fifteenth Meeting of the CITES Conference of the Parties (CoP15), including Tanzania's proposal to transfer its population of African elephants from Appendix I to Appendix II (CoP15 Prop. 4 (Rev. 1)), in addition to the Report of the Panel of Experts on Tanzania's proposal (CoP15 Doc. 68, Annex 6a). Much of the information used in making the current finding was derived from these sources, as noted below.

BASIS FOR ADVICE:

Conservation and Management

1. African elephants are widely distributed throughout Tanzania, covering 49% of the country's



land area.  About 37% of the elephant's range in Tanzania is in protected areas (PA).  This proportion of protected range is relatively high compared to other African elephant range countries (Blanc *et al.* 2007).  These protected areas comprise 26% of the country's land area within 6 ecosystems throughout the country, including Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa, and Moyowosi-Kigosi.  The network of PAs includes 15 National Parks (NP) (4%), Ngorongoro Conservation Area (1%), 28 Game Reserves (GR) (14%), and 33 Game Controlled Areas (GCA) and/or Wildlife Management Areas (WMA) (5%).  Some of these areas have been designated as recently as 2005 (CoP15 Doc. 68, Annex 6a).

2.  In Tanzania, the only consumptive use of elephants is sport hunting (CoP15 Prop. 4 (Rev. 1)), which is covered by the Wildlife Conservation (Tourist Hunting) Regulations, 2000.  These regulations control hunting by concession area, season, minimum trophy sizes (15 kg and 150 cm per tusk), annual quotas, post-hunt reporting, trophy registration, marking, and export requirements (CoP15 Doc. 68 Annex 6a).

3.  The trophy quota is distributed among approximately 150 hunting concessions/blocks (Ministry of Natural Resources and Tourism (Tanzania) in litt., 2008) with the number of trophy permits allotted to each concession determined by survey information (Ministry of Natural Resources and Tourism (Tanzania) in litt., 2005).

4.  According to Tanzania's Ministry of Natural Resources and Tourism (in litt., 2008), 25% of the revenue accrued from the sport hunting of elephants goes to the conservation and protection of elephants and other wildlife species through the Tanzania Wildlife Protection Fund (TWPF).  In addition, 25% of the game fees received from hunters is given to the local communities in the areas where the sport hunting took place.  Apart from being the source of revenue to local communities, sport hunting plays an important role in creating employment for the members of the local communities, as trackers, skinners, tent and mess attendants, and guards (Ministry of Natural Resources and Tourism (Tanzania) in litt., 2008).  The Tanzanian Ministry of Natural Resources and Tourism (in litt., 2008) also reports that the sport hunting program assists in curbing illegal harvesting, developing infrastructure such as roads, hospitals, and schools, as well as creating a market for local artwork.

5.  The 1998 Wildlife Policy of Tanzania, revised in 2007, provided guidelines for the management of elephants through the development, review, and updating of specific management plans (CoP15 Doc. 68, Annex 6a).

6.  The "Management Plan for the African Elephant *Loxodonta africana* in Tanzania" (2001) provides a plan for managing elephants in protected areas, population trends and goals, community involvement in elephant conservation, utilization, law enforcement and control of ivory, international obligations, and monitoring and research.  Objectives of the plan are outlined, and five strategies are provided to meet those objectives, including protection of elephants, sustainable utilization, minimizing human-elephant conflict, enabling communities to benefit from elephant conservation, and enhancement of management through research and monitoring.  The plan calls for an upper limit of 100,600 elephants, reduced from the previous policy 120,000 elephants, due to the

2

increasing incidence of human-elephant conflict which calls for a reduced preferred elephant density in some of the ecosystems (Department of Wildlife 2001).

7. According to the Panel of Experts, the Tanzania Elephant Management Plan project (TEMP) is in the process of developing a revised management plan through a series of country-wide stakeholder consultations and population status assessments, as well as a national workshop scheduled in 2010 (CoP15 Doc. 68, Annex 6a).

Population Status and Trends

8. In 2006, the Tanzania Wildlife Research Institute (TAWIRI 2007, as cited in CoP15 Doc. 68, Annex 6a) estimated Tanzania's elephant population at 139,915±12,338 (SE) animals from census surveys covering 227,328 km$^2$ conducted using both total and sample counts. According to the Panel of Experts, this estimate is not significantly different from that of 111,475±18,728 (95%CL) elephants estimated in 2000-2003. The Panel of Experts noted that the 2006 estimate does not include 2,873 additional elephants from areas not formally surveyed, which provides a country-wide "best estimate" of 142,788 ±12,405 (SE) elephants in 2006 (CoP15 Doc. 68, Annex 6a). According to the African Elephant Status Report (Blanc *et al.*, 2007), in 2006, the definite category estimate is 108,816 elephants, in addition to 27,937 probable, 29,350 possible, and 900 speculative category estimates.

9. In 2009, a similar survey covering 229,318 km$^2$ across the same six ecosystems produced a total population estimate of 105,439±6,080 (SE) elephants (TAWIRI 2010a, as cited in CoP15 Doc. 68, Annex 6a). A "best estimate," which includes an additional 3,583 elephants provides a country-wide estimate of 109,022 ±6,135 (SE) elephants in 2009. The Panel of Experts noted that these results suggest a significant decline compared to the 2006 estimate of 142,788 elephants and that the decline can be attributed largely to a downward trend recorded in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a).

10. Demographic parameters were collected during 2009 from 1,817 elephants from five major elephant populations in Tarangire, Ruaha-Rungwa, Selous-Mikumi, Katavi-Rukwa, and Ugalla River (TEMP 2010, as cited in CoP15 Doc. 68, Annex 6a). This demographic survey revealed that the proportion of the population <5 years of age varied from 41% in Tarangire NP to 25% in Ugalla River GR, with values above 30% (Tarangire, Ruaha-Rungwa, and Selous GR), which are indicative of good to high growth rates. The Panel of Experts, citing Foley and Faust (2010), further pointed out that Tarangire has a growth rate of >6%, one of the highest growth rates ever recorded for an African elephant population. It was noted that those populations with the proportion of their herds <5 years of age below 30% (Katavi NP and Ugalla GR), which is indicative of low recruitment and growth rates, suggests one or more population stressors, such as higher infant mortality and increased stress associated with human-elephant conflict and/or illegal activity (i.e., poaching) (CoP15 Doc. 68, Annex 6a).

11. The Panel of Experts concluded that while recent estimates suggest that the Tanzanian elephant population is stable or possibly decreasing, it still remains large (>100,000) and is demographically

3

healthy. The Panel noted that the population is widespread across the country in diverse ecosystems, and a high proportion of the population (>80%) is in protected areas. In the opinion of the Panel of Experts, the overall population is currently viable (CoP15 Doc. 68, Annex 6a).

12. The Panel of Experts, however, raised concerns about the future mobility of the elephant population. The Panel noted that human settlements are increasing around protected areas, accompanied by increasing human-elephant conflict which are probably the most important factors limiting the elephants' mobility and range. It is the opinion of the Panel of Experts that at the current rates of habitat change and land conversion, the 31 corridors that still remain in Tanzania will disappear in less than five years (CoP15 Doc. 68, Annex 6a).

13. According to Jones et al. (2009, as cited in CoP15 Doc. 68, Annex 6a), Tanzania is working to minimize risks to elephants, other wildlife, people, and property through improvements in spatial planning involving the identification, maintenance, and restoration of wildlife corridors.

Sustainability of Off-Take

14. In Tanzania, elephant deaths occur as a result of 1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching. In order to evaluate whether off-take from trophy hunting is sustainable, all losses to the population must be considered.

*Legal Off-Take*

15. Tanzania's annual CITES export quota has been 400 tusks (sport-hunting quota of 200 male elephants) since 2007 and remains the same for 2010. However, Tanzania has not exported its full quota in trophies or tusks between 2004 and 2008 (most recent data available from the UNEP-WCMC CITES Trade Database, http://www.unep-wcmc.org/citestrade) and has exported less than 50% of its quota since 2007.

16. The Panel of Experts assessed the sustainability of legal off-take from the elephant population in Tanzania. Records on natural mortality for the entire country or on the killing of problem elephants were not available, but the Panel was able to estimate the level of such off-take by analyzing the data from Tanzania's ivory store databases. Based on 21 years of data, an average of 231 elephants die from natural mortality, and 287 die from elephant control annually in Tanzania (CoP15 Doc. 68, Annex 6a).

17. Based on the sport hunting quota (200 elephants), as well as the above estimates of natural mortality and problem animal control, the Panel of Experts estimated that the overall legal off-take of elephants from the population is about 718 annually, which is 0.7% of the 2009 elephant population estimate (109,022). Even if the natural mortalities were to be considerably higher due to the low carcass detection rates in general, the Panel believes that the legal off-take is still within the population growth rate (3 to 5% annually) and is, therefore, sustainable (CoP15 Doc. 68, Annex 6a).

18. The Panel of Experts also assessed whether the hunting of trophy quality males in Tanzania is sustainable. Based on the population information available, the Panel estimated that nationwide,

4

there is a potential off-take of 325 trophy quality males, which is 0.3% of the total population (CoP15 Doc. 68, Annex 6a). The Panel noted that this is less than 0.5-1% of total elephant numbers, which is considered the limit to sustainable hunting of trophy quality males in a healthy population based on Martin's (1986) analysis.

*Illegal Off-Take*

19. According to the Panel of Experts, official poaching statistics provided by Tanzania's Wildlife Division show 258 incidents of poaching between 2005 and 2009, including 82 carcasses in 2009, the highest number poached during that time period. The Panel noted, however, that these poaching estimates are likely underestimated given the low carcass detection rates (CoP15 Doc. 68, Annex 6a).

20. The Panel of Experts noted that the 30,000 plus elephant decline between 2006 and 2009, primarily accounted for in the Selous-Mikumi ecosystem, is a cause for concern regarding the sustainability of off-take levels. In reviewing the potential explanations for this population decline, the Panel concluded that poaching is the predominant cause of the decline based on various factors (CoP15 Doc. 68, Annex 6a). The Panel reported:

> *a) PIKE values collected at the Selous-Mikumi MIKE site have progressively increased between 2003 and 2009 (CITES Secretariat, 2010).*

> *b) Joint Wildlife Division/Selous Rhino Project aerial observations and foot patrols recorded more than a threefold increase in encounter rates of recently dead elephant carcasses between 2007 and 2008 (TAWIRI, 2010c).*

> *c) Tourism operators operating in the northern Selous reported to the Panel an increase in elephant (and other wildlife) poaching since 2007/8, including several incidents close to tourist camps.*

> *d) A significant proportion of the large seizures of ivory made in Asia in 2006 have been traced by forensic DNA work to elephants killed in the Selous-Niassa area (Wasser et al., 2009).*

21. The Panel of Experts also pointed to evidence that the Selous-Mikumi ecosystem is a "hotspot" for elephant poaching. The Panel observed that all ivory collected by Udzungwa National Park was from confiscations, which according to wildlife enforcement officials, was the result of illegally-sourced ivory coming out of nearby Kilombero GCA in the Selous-Mikumi ecosystem. In addition, the highest number of tusks confiscated by field-based Wildlife Division offices originated from Morogoro and Lindi, which are adjacent to Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a).

22. Given the factors discussed above, the Panel of Experts concluded that the current level of off-take is not sustainable in the Selous-Mikumi ecosystem, which represents about 40% of the total

5

elephant population in Tanzania. The Panel noted that legal and illegal off-take appears to be sustainable in the other 5 elephant ecosystems where the population is stable or increasing. Expressing concern about the potential for off-take levels in the Selous-Mikumi ecosystem to have a future negative impact on the elephant population as a whole, the Panel stated, "Whilst not unequivocally substantiated, the Selous-Mikumi situation described above could affect long-term population sustainability (CoP15 Doc. 68, Annex 6a)".

23. Another concern the Panel of Experts raised, which relates to Tanzania's commitment to combat poaching, is the financial mechanism by which the Wildlife Division is funded. The Wildlife Division's revenue share is paid directly to the central Treasury, and the Treasury is then supposed to distribute the budgeted monies to the Wildlife Division. The Panel of Experts raised the concern that over the course of the past three years (2007-2009), the Wildlife Division has only received 63% (USD 2,634,975 per year) of its approved budget from the central Treasury. The Panel noted that given these funding limitations, the Wildlife Division would not be able to meet its conservation, management, and protection needs and obligations. However, the Panel noted that between 2005 and 2009, the TWPF contributed an average of USD 12,894,564 annually to the Wildlife Division. According to the Panel, these funds, combined with the Treasury allocations should have put the Wildlife Division in a "strong position" to meet its enforcement and protection obligations, including containment of threats to elephants in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a).

24. The Panel of Experts noted that Tanzania National Parks and the Ngorongoro Conservation Area Authority are adequately funded because they retain 100% of their revenues generated (CoP15 Doc. 68, Annex 6a).

25. Although the Panel of Experts raised concerns over the illegal killing of elephants in the Selous-Mikumi ecosystem, the Panel also acknowledged recent efforts by Tanzanian authorities to combat the increases in poaching. For example, in July 2009, a series of planning meetings led to joint cooperative anti-poaching patrols involving rangers and scouts from the Selous Game Reserve, the Udzungwa Mountains National Park, and the Mikumi National Park. In December 2009, the commander of special police operations led an anti-poaching operation in the Selous Game Reserve, code-named 'Operation Butterfly.' Noting these, as well as other anti-poaching efforts by Tanzanian authorities, the Panel of Experts stated, "There is a clear indication of concern by the authorities to minimize poaching of elephant and other wildlife species. The various efforts to deploy staff and execute special anti-poaching operations in various parts of the country, particularly in the vast Selous Game Reserve, are noteworthy (CoP15 Doc. 68, Annex 6a)."

26. In addition, Tanzania's Director of Wildlife informed the Panel of Experts that regulations are being finalized to implement the new Wildlife Conservation Act of 2009, which will reportedly increase revenue retention, increase penalties up to 30 years, and provide additional powers to law enforcement personnel (CoP15 Doc. 68, Annex 6a).

27. With the information currently available, we believe that the status of the African elephant population in Tanzania and management efforts are adequate to ensure that the sport hunting of

African elephants as administered by the Government of Tanzania does not adversely affect the status of the species in Tanzania.

28.  Therefore, for calendar year 2010, we find that the import of sport-hunted trophies of African elephants taken in Tanzania will be for purposes that are not detrimental to the survival of the species.


CONCERNS:

Although we are able to make the current non-detriment finding, we have several concerns about the future sustainability of the total levels of off-take from the elephant population.  These are concerns that were also noted by the Panel of Experts (CoP15 Doc. 68, Annex 6a).

1.  We acknowledge the recent increased efforts that Tanzanian authorities have made to combat poaching in the Selous-Mikumi ecosystem; however, given methodologies for disbursing funds to the Wildlife Division and the historical short-falls in disbursing budgeted funds, we are concerned about Tanzania's commitment to the future sustainable management of its elephant population.  In particular, we are concerned about the availability of future resources to combat poaching in Tanzania, especially in the Selous-Mikumi ecosystem.  In this regard, we will continue to monitor Tanzania's anti-poaching capabilities and effectiveness throughout the upcoming year and will re-evaluate this issue when considering our finding for 2011.  We also intend to request from Tanzania a copy of the new Wildlife Conservation Act of 2009 and implementing regulations, and we will consider these new management tools in our finding for 2011.

2.  We note that 31 corridors are currently available, which allows elephant movement throughout Tanzania and transboundary populations; however we are concerned about the threats to the corridors and the consequent risks to the elephant population in the future as a result of human-elephant conflict in and around these areas.  In this regard, we will continue to monitor Tanzania's efforts to maintain appropriate corridors for elephant movements throughout Tanzania and transboundary populations.  We intend to request a copy of Tanzania's revised Elephant Management Plan (2010), and we will consider its objectives and strategies for addressing this issue when making our finding for 2011.


REFERENCES:

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. *African Elephant Status Report 2007: An Update from the African Elephant Database.* IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

CITES Secretariat. 2010. *Monitoring of Illegal hunting in elephant range States.* Document CoP15 Doc. 44.2 presented at the 15th meeting of the Conference of the Parties to CITES.

CoP15 Doc. 68 Annex 6a). 2010.  Report of the Panel regarding the proposal of the United Republic of Tanzania. Available online at: http://www.cites.org/eng/cop/15/doc/E15-68A06a).pdf.

CoP15 Prop. 4 (Rev. 1). 2010. Transfer the population of the United Republic of Tanzania from Appendix I to Appendix II with an annotation. Available online at: http://www.cites.org/eng/cop/15/prop/E-15-Prop-04.pdf.

Department of Wildlife. 2001. Management Plan for the African Elephants, *Loxodonta africana* in Tanzania. Dar es Salaam, Tanzania.

Foley, C.A.H. and Faust, L.J. 2010. Rapid population growth in an elephant *Loxodonta africana* population recovering from poaching in Tarangire National Park, Tanzania. *Oryx* in press.

Jones, T., Caro, T. and Davenport, T.R.B. (Eds). 2009. Wildlife Corridors in Tanzania. Unpublished Report. Tanzania Wildlife Research Institute (TAWARI), Arusha.

Martin, R.B. 1986. *Establishment of African ivory export quotas and associated control procedures*. Report to CITES Secretariat.

Ministry of Natural Resources and Tourism (Tanzania). in litt. 2005. African Elephant Conservation in Tanzania.

Ministry of Natural Resources and Tourism (Tanzania). in litt. 2008. Questionaire from US Fish and Wildlife Service on Elephants Conservation in Tanzania.

TAWIRI. 2007. *Elephant population estimates: Dry season 2006*. Tanzania Wildlife Research Institute in collaboration with NCAA, TANAPA and Wildlife Division. Commissioned by Wildlife Division. TAWARI, Arusha.

TAWIRI. 2010a. *Elephant population estimates: Dry season 2009*. Tanzania Wildlife Research Institute in collaboration with NCAA, TANAPA and Wildlife Division. Commissioned by Wildlife Division. TAWARI, Arusha.

TAWIRI. 2010c. *Status of the Major Elephant Populations of Tanzania 2009-2010*. TAWIRI Preliminary Report, 2010. Tanzania Elephant Management Plan Project. TAWIRI, Arusha.

TEMP. 2010. *Status of the major elephant populations of Tanzania 2009-2010*. Preliminary report January 2010, Tanzania Elephant Management Plan Project. TAWIRI, Arusha.

Wasser, S.K., Clark, B. and Laurie, C. (2009). The Ivory Trail. *Scientific American*, July 2009 (68-76).

8



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240



**MEMORANDUM**

APR    1 2011

To:         Chief, Division of Management Authority

From:       Chief, Division of Scientific Authority *Rosemarie Gnam*

Subject:    General Advice on Importation of Sport-hunted Trophies of African Elephants
            from Tanzania for the Calendar Year 2011

This responds to your request for a finding as required under the Convention on International
Trade in Endangered Species of Wild Fauna and Flora (CITES) on various applications for the
importation of sport-hunted trophies of African elephants (*Loxodonta africana*) from the United
Republic of Tanzania for calendar year 2011.

**Please be advised that, with the information currently available, we are able to find that the
importation of sport-hunted trophies of African elephants from the United Republic of
Tanzania will be for purposes that are not detrimental to the survival of the species. This
General Advice applies only to sport-hunted trophies of African elephants that were
lawfully taken in the United Republic of Tanzania during calendar year 2011 (i.e., January
1, 2011, through December 31, 2011), provided that they are to be imported by the persons
who hunted them for personal use or personal display.**

If new information becomes available during 2011 that suggests that this General Advice is no
longer valid, said General Advice would be suspended and reconsidered by the Division of
Scientific Authority. If, after reconsideration, the Division of Scientific Authority believes that
the General Advice is no longer valid, we will issue a new General Advice or require that
subsequent permit applications be considered on a case-by-case basis. If it is not rescinded
beforehand, this General Advice will be reviewed at the beginning of calendar year 2012, and a
new finding will be issued for that calendar year.

Please be advised that since the issuance of our 2009 and 2010 General Advices, a significant
amount of new information relevant to this issue has become available, including:

- Tanzania National Elephant Management Plan 2010-2015 (Government of the United
  Republic of Tanzania 2010a)
- The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania
  2009a)
- The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009;
  Government of the United Republic of Tanzania 2009b)
- The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation
  Supplement No. 25; 2nd July, 2010; Government of the United Republic of Tanzania



314

2010b)
- Third African Elephant Meeting (1-3 November 2010;  Gigiri, Kenya;  various documents)

Much of the information used in making the current finding was derived from these sources, as noted below, as well as previously cited information (see AOSA106;  dated July 23, 2010; [Division of Scientific Authority 2010]).

In addition to the new published information that the US Fish and Wildlife Service (Service) had received during late 2010, we also had the opportunity to meet personally with several officials of the Government of the United Republic of Tanzania and to discuss several issues related to the conservation status of the African elephant in that country.  On behalf of the Government of the United Republic of Tanzania, the February 17, 2011, meeting at Service headquarters in Washington, DC, was attended by three officials: Mr. Erasmus Tarimo (Director of Wildlife, Ministry of Natural Resources and Tourism), Mr. Simon Mduma (Director General, Tanzania Wildlife Research Institute), and Mr. Emmanul Severre (Head of the College;  previous Director of Wildlife).  On behalf of the Service, Ms. Teiko Saito (Assistant Director, International Affairs) led the meeting and was accompanied by seven other Service representatives from the Divisions of International Conservation, Management Authority, and Scientific Authority.  Mr. John J. Jackson, III (Conservation Force) also attended the meeting at the request of Tanzanian officials.  Dr. Mary Cogliano is compiling the meeting notes on behalf of the Service (Mary Cogliano, in litt., 2011).

The main topic of this meeting was the recently completed Tanzania National Elephant Management Plan 2010-2015 (Government of the United Republic of Tanzania 2010a), as well as the previously-mentioned legislation and regulations (discussed below).  Mr. Tarimo went over the key aspects of the plan and summarized the proposed work schedule to implement the plan.  Another key point was a clarification regarding the total population size of African elephants in the Selous region.  Earlier information had suggested a recent population decline of approximately 30,000 elephants over the past few years.  Mr. Mduma explained that human error apparently had led to an inflated estimate during the 2006 survey and that later counts were more accurate (approximately 50,000 individuals in 2009 [Government of the United Republic of Tanzania 2010a]).  He also suggested that about 7,000 elephants counted earlier at the Selous had migrated to the nearby Niassa Game Reserve and had not been killed as had been feared by some.  Additional surveys, according to Messrs. Tarimo and Mduma, will be conducted shortly to confirm African elephant population sizes in that country.

BASIS FOR ADVICE:

> *Note:  As in the past for matters associated with the African elephant, the Conference of the Parties in 2010 for CoP15 created a Panel of Experts to review, in accordance with Resolution Conf. 10.9, the proposals of the United Republic of Tanzania and Zambia to transfer their populations of African elephants from Appendix I to II subject to certain conditions.  The findings of the*

*Panel of Experts, based in large measure on a preliminary report called "Status of the major elephant populations of Tanzania 2009-2010" (TEMP 2010), were transmitted to the Conference of the Parties as documents CoP15 Doc. 68, Annex 6, Annex 6a (Tanzania), and Annex 6b (Zambia), and formed the basis of our 2010 General Advice (Division of Scientific Authority 2010).*

Conservation and Management

1.     African elephants are widely distributed throughout the United Republic of Tanzania, covering 49% of the country's land area.  About 37% of the elephant's range in that country is in protected areas (PA).  This proportion of protected range is relatively high compared to other African elephant range countries (Blanc *et al.* 2007).  These protected areas comprise 26% of the country's land area within six ecosystems throughout the country, including: Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa, and Moyowosi-Kigosi.  The network of PAs includes 15 National Parks (NP) (4% of the country's land surface), Ngorongoro Conservation Area (1%), 28 Game Reserves (GR) (14%), and 33 Game Controlled Areas (GCA) and/or Wildlife Management Areas (WMA) (5%).  Some of these areas were designated as recently as 2005 (CoP15 Doc. 68, Annex 6a [page 1]).

2.     In the United Republic of Tanzania, the only consumptive use of African elephants is sport hunting [CoP15 Prop. 4 (Rev. 1)], which is covered by The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Government of the United Republic of Tanzania 2010b).  These regulations control hunting by concession area, season, minimum trophy sizes (18 kg and 160 cm per tusk), annual quotas, post-hunt reporting, trophy registration, marking, and export requirements [CoP15 Doc. 68 Annex 6a [page 11]; Part V, Regulation 24.-(5)(b)].

3.     The trophy quota for African elephants is distributed among approximately 150 hunting concessions/blocks [Ministry of Natural Resources and Tourism (United Republic of Tanzania), in litt., 2008] with the number of trophy permits allotted to each concession determined by elephant survey information (Ministry of Natural Resources and Tourism, in litt., 2005).

4.     According to the Ministry of Natural Resources and Tourism (in litt., 2008), 25% of the revenue accrued from the sport hunting of elephants goes to the conservation and protection of African elephants and other wildlife species through the Tanzania Wildlife Protection Fund (TWPF).  In addition, 25% of the game fees received from hunters is given to the local communities in the areas where the sport hunting took place.  Apart from being the source of revenue to local communities, sport hunting plays an important role in creating employment for the members of the local communities, for example, as trackers, skinners, tent and mess attendants, and guards (Ministry of Natural Resources and Tourism, in litt., 2008).  The Ministry of Natural Resources and Tourism (in litt., 2008) also reported that the sport hunting program assisted in curbing illegal harvesting and developing infrastructure such as roads, hospitals, and schools, as well as creating a market for local artwork.

5.     The 1998 Wildlife Policy of the United Republic of Tanzania was revised in 2007 and provides guidelines for the management of African elephants through the development, review, and updating of specific management plans (CoP15 Doc. 68, Annex 6a [page 4]).

6.     The "Management Plan for the African Elephant *Loxodonta africana* in the United Republic of Tanzania" (2001) provided a plan for managing African elephants in protected areas, population trends and goals, community involvement in elephant conservation, utilization, law enforcement and control of ivory, international obligations, and monitoring and research until 2010. The plan called for an upper limit of 100,600 African elephants, reduced from the previous policy of 120,000 elephants (Department of Wildlife 2001). This decrease was mandated due to the increasing incidence of human-elephant conflict and will result in a reduced preferred elephant density in some of the ecosystems. In 2010, a revised plan, the Tanzania National Elephant Management Plan 2010-2015, was prepared by the Government of the United Republic of Tanzania (Government of the United Republic of Tanzania 2010a).

7.     A copy of the Tanzania National Elephant Management Plan 2010-2015 was received at the February 2011 meeting (Government of the United Republic of Tanzania 2010a). This plan provided updated information on several biological and ecological topics, including: distribution and range, abundance, population trends and demography, elephant corridors, and human-elephant conflicts. Some of that information has been incorporated into this General Advice.

8.     The Tanzania National Elephant Management Plan 2010-2015 identified several general strategic objectives, as well as numerous specific objectives and their associated targets, actions, timelines, actors, and indicators (Government of the United Republic of Tanzania 2010a). The general strategic objectives consisted of the following items: Human-Elephant Conflict, Corridors, Law Enforcement, Benefits and Sustainable Utilization, Ivory Stockpile and Management System, Research and Monitoring, Elephant Health and Welfare, Cross-border Cooperation, and Elephant Information System. While these objectives provide an impressive logical framework upon which to construct a national elephant management plan, some of the timelines and indicators are general or non-specific. Furthermore, specific actions, completion dates, and measures of success that would be used to evaluate plan implementation are absent. It appears that additional work to define and implement specific tasks would be necessary to implement the plan and successfully promote the conservation of the African elephant in Tanzania.

Population Status and Trends

9.     In 2006, the Tanzania Wildlife Research Institute [TAWIRI 2007 (cited in CoP15 Doc. 68, Annex 6a [page 1])] estimated the African elephant populations of the United Republic of Tanzania at $139,915 \pm 12,338$ (SE) animals based on census surveys covering $227,328 \text{ km}^2$ conducted using both total and sample counts. According to the Panel of Experts, this estimate was not significantly different from that of $111,475 \pm 18,728$ (95% CL) elephants estimated in 2000-2003. The Panel of Experts noted that the 2006 estimate did not include 2,873 additional

elephants from areas not formally surveyed, which provided a country-wide "best estimate" of 142,788 ± 12,405 (SE) elephants in 2006 (CoP15 Doc. 68, Annex 6a [page 1]). In 2006, according to the African Elephant Status Report (Blanc *et al.*, 2007), the "definite" category estimate was 108,816 elephants, in addition to 27,937 "probable," 29,350 "possible," and 900 "speculative" category estimates.

10.     In 2009, a similar survey covering 229,318 km$^2$ across the same six ecosystems produced a total population estimate of 105,439 ± 6,080 (SE) African elephants [TAWIRI 2010a (cited in CoP15 Doc. 68, Annex 6a)]. A "best estimate," which included an additional 3,583 elephants, provided a country-wide estimate of 109,022 ± 6,135 (SE) elephants in 2009. The Panel of Experts noted that these results suggested a significant decline compared to the 2006 estimate of 142,788 elephants and that the decline could be attributed largely to a downward population trend recorded in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a [page 1]). At the February 2011 meeting, however, and as noted earlier, Mr. Mduma suggested that human error had led some to believe that a substantial elephant population decline had occurred.

11.     Demographic parameters were calculated during 2009 from 1,817 African elephants from five major elephant populations in Tarangire, Ruaha-Rungwa, Selous-Mikumi, Katavi-Rukwa, and Ugalla River (Government of the United Republic of Tanzania 2010a). This demographic survey of African elephants revealed that the proportion of the population < 5 years of age varied from 41% in Tarangire National Park to 25% in Ugalla River Game Reserve, with values above 30% (Tarangire, Ruaha-Rungwa, and Selous Game Reserves). These results were indicative of good to high growth rates. The Panel of Experts, citing Foley and Faust (2010), further pointed out that Tarangire had a growth rate of > 6% and was one of the highest growth rates ever recorded for an African elephant population. It was noted that those populations with the proportion of their herds < 5 years of age below 30% (Katavi NP and Ugalla Game Reserves), which is indicative of low recruitment and growth rates, suggested one or more population stressors, such as higher infant mortality or increased stress associated with human-elephant conflict or illegal activity (i.e., poaching) (CoP15 Doc. 68, Annex 6a [pages 1-2]).

12.     The Panel of Experts concluded that while recent estimates suggested that the Tanzanian African elephant populations were stable or possibly decreasing, elephant populations still remained large (> 100,000 individuals) and were demographically healthy. The Panel of Experts noted that the populations of African elephants were geographically widespread across the country and occupied diverse ecosystems, and that a high proportion of the populations (> 80% individuals) occupied protected areas. In the overall opinion of the Panel of Experts, the African elephant populations in the United Republic of Tanzania were currently viable (CoP15 Doc. 68, Annex 6a [page 2]).

13.     The Panel of Experts, however, raised concerns about the future mobility of the African elephant populations in the United Republic of Tanzania. They noted, for example, that associated human settlements were increasing in size and number around protected areas and were accompanied by increasing human-elephant conflicts. These settlements and the associated

conflicts were probably the most important factors limiting the elephants' mobility and range. It was the opinion of the Panel of Experts that -- at the current rates of habitat change and land conversion -- the 31 corridors that still remained in the United Republic of Tanzania would be converted to unsuitable habitat in less than 5 years (CoP15 Doc. 68, Annex 6a [page 4]).

14.    According to Jones et al. (2009), the United Republic of Tanzania was working to minimize risks to African elephants, other wildlife, people, and property through improvements in spatial planning involving the identification, maintenance, and restoration of wildlife corridors.

Sustainability of Off-Take

15.    In the United Republic of Tanzania, African elephant deaths occur as a result of several factors, including: 1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching. In order to evaluate whether off-take from trophy hunting was sustainable, all losses to the African elephant population must be considered.

*Legal Off-Take*

16.    Since 2007, the annual CITES Export Quota for the United Republic of Tanzania has been 400 tusks (sport-hunting quota of 200 male elephants; CITES Secretariat 2011, page 29). During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals. The United Republic of Tanzania, however, typically has not exported its full quota allotment in sport-hunted trophies or African elephant tusks. During 1997-2009, for example, annual tusk exports typically were about 40-45% of the allowed quantities and never exceeded the approved annual quota (UNEP-WCMC CITES Trade Database; available on the internet at: http://www.unep-wcmc.org/citestrade; accessed on 8 March 2010).

> *Note: The Panel of Experts suggested that the annual sport hunted quota for elephants was currently 200 **males (emphasis added**; export of 400 tusks; CoP15 Doc. 68 Annex 6a) – p. 5 [item 32]). The published CITES National Export Quotas for 2011 (CITES Secretariat 2011, page 29), however, do not specify that tusks must originate from males. According to Nowak (1999:993 & 998), for the African elephant both sexes exhibit tusks, while for the Asian elephant (Elephas maximus) the tusk is usually absent in females. Based on a review of the materials provided by Tanzanian officials, as well as sport-hunting advertisements available on the internet, it does not appear that Tanzanian officials differentiate between male and female African elephants when permitting CITES exports under the CITES National Export Quota program.*

17.    The Panel of Experts also assessed the sustainability of legal off-take from African elephant populations in the United Republic of Tanzania. Complete records on natural mortality

for the entire country or on the killing of problem elephants were not available, but the Panel of Experts was able to estimate the level of such off-take by analyzing the data from the ivory store databases of the United Republic of Tanzania. Based on 21 years of data for that country, an average of 231 elephants died annually from natural mortality, while another 287 individuals died annually from elephant control measures (CoP15 Doc. 68, Annex 6a [page 5]).

18.     Based on the current sport-hunting quota (200 African elephants), as well as the estimates cited earlier for natural mortality and problem animal control in the United Republic of Tanzania, the Panel of Experts estimated that the overall legal off-take of African elephants from the several populations in that country was about 718 annually, which was 0.7% of the 2009 elephant population estimate of 109,022 individuals. Even if natural mortalities were considerably higher due, for example, to low carcass detection rates by observers in difficult terrain, the Panel of Experts believed that the legal off-take was still less than the annual population growth rate of 3-5% and, therefore, was sustainable (CoP15 Doc. 68, Annex 6a [page 14]).

19.     The Panel of Experts also assessed whether the hunting of trophy-quality males in the United Republic of Tanzania was sustainable. According to an earlier analysis by Martin (1986), an annual harvest rate of 0.5-1.0% of the total African elephant population was sustainable. Based on the available population information, the Panel of Experts estimated that nationwide there was a potential off-take of 325 trophy-quality African elephant males (0.3% of the total population; CoP15 Doc. 68, Annex 6a [page 14]). The Panel of Experts noted that this value of 0.3% was less than the value of 0.5-1% of total African elephant numbers and concluded that the hunting was sustainable.

*Illegal Off-Take*

20.     According to the Panel of Experts, official poaching statistics provided by the Wildlife Division of the United Republic of Tanzania indicated 258 reported poaching incidents that were detected during 2005-2009, including 82 poaching incidents in 2009, the highest number poached annually during that time period. The Panel of Exports noted, however, that the total number of poaching incidents was likely underestimated given low African elephant carcass detection rates (CoP15 Doc. 68, Annex 6a [page 5]).

21.     The Panel of Experts also noted that the 30,000 plus African elephant decline between 2006 and 2009, primarily accounted for by losses in the Selous-Mikumi ecosystem, was a cause for concern regarding the sustainability of off-take levels. In reviewing the potential explanations for this population decline, the Panel of Experts concluded -- based on various factors -- that poaching was the predominant cause of the decline (CoP15 Doc. 68, Annex 6a [page 5]). According to the Panel of Experts:

> *a) PIKE values collected at the Selous-Mikumi MIKE site have progressively increased between 2003 and 2009 (CITES Secretariat, 2010).*

> *b) Joint Wildlife Division/Selous Rhino Project aerial observations and foot patrols recorded more than a threefold increase in encounter rates of recently dead elephant carcasses between 2007 and 2008 (TAWIRI, 2010c).*
>
> *c) Tourism operators operating in the northern Selous reported to the Panel an increase in elephant (and other wildlife) poaching since 2007/8, including several incidents close to tourist camps.*
>
> *d) A significant proportion of the large seizures of ivory made in Asia in 2006 have been traced by forensic DNA work to elephants killed in the Selous-Niassa area (Wasser et al., 2009).*
>
> Note: PIKE = Proportion of illegally killed elephants

22.     The Panel of Experts also pointed to evidence that the Selous-Mikumi ecosystem was a "hotspot" for African elephant poaching. They observed that the ivory that had been collected by wildlife enforcement officials at Udzungwa National Park was from confiscations. According to these officials, the confiscations consisted of illegally-sourced ivory coming out of nearby Kilombero Game Controlled Area in the Selous-Mikumi ecosystem. In addition, the highest number of tusks confiscated by field-based Wildlife Division offices originated from Morogoro and Lindi, which are adjacent to the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a [page 5]).

23.     Given the factors discussed above, the Panel of Experts concluded that the current level of off-take was not sustainable in the Selous-Mikumi ecosystem, which represents about 40% of the total African elephant population in the United Republic of Tanzania. They also noted, however, that legal and illegal off-take appeared to be sustainable in the five other elephant ecosystems where the populations were stable or increasing. Expressing concern about the potential for off-take levels in the Selous-Mikumi ecosystem to have a future negative impact on the African elephant population as a whole, the Panel of Experts stated:

> *"Whilst not unequivocally substantiated, the Selous-Mikumi situation described above could affect long-term population sustainability."*
> (CoP15 Doc. 68, Annex 6a [page 3])"

24.     Another concern that the Panel of Experts raised, which relates to the commitment by the United Republic of Tanzania to combat poaching, was the financial mechanism by which the Wildlife Division was funded. The Wildlife Division's revenue share is paid directly to the central Treasury, and the Treasury is then supposed to distribute the budgeted monies to the Wildlife Division. The Panel of Experts raised the concern that over the course of the past 3 years (2007-2009), the Wildlife Division had received only 63% (USD 2,634,975 per year) of its approved budget from the central Treasury. The Panel noted that given these funding

limitations, the Wildlife Division would not be able to meet its needs and obligations regarding the conservation, management, and protection of African elephants. The Panel of Experts also noted, however, that between 2005 and 2009, the Tanzania Wildlife Protection Fund contributed on average a total of USD 12,894,564 annually to the Wildlife Division. According to the Panel of Experts, these funds, when combined with the Treasury allocations, should have put the Wildlife Division in a "strong position" to meet its enforcement obligations, including containment of threats to elephants in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a [page 3]). Recent African elephant poaching levels in the Selous-Mikumi ecosystem, however, suggest that enforcement may have been inadequate.

25.     The Panel of Experts also noted that the National Parks and the Ngorongoro Conservation Area Authorities of the United Republic of Tanzania were adequately funded because they generated and retained 100% of their revenue share through park and conservation area fees (CoP15 Doc. 68, Annex 6a [page 3]).

26.     Although the Panel of Experts raised concerns over the illegal killing of elephants in the Selous-Mikumi ecosystem, they also acknowledged recent efforts by authorities of the United Republic of Tanzania to combat the increases in poaching. For example, in July 2009, a series of planning meetings led to anti-poaching patrols that were joint and cooperative, and involved rangers and scouts from the Selous Game Reserve, the Udzungwa Mountains National Park, and the Mikumi National Park. In December 2009, for example, the commander of special police operations led an anti-poaching operation, code-named "Operation Butterfly," in the Selous Game Reserve. Noting these, as well as other anti-poaching efforts by the United Republic of Tanzanian authorities, the Panel of Experts stated:

> *"There is a clear indication of concern by the authorities to minimize poaching of elephant and other wildlife species. The various efforts to deploy staff and execute special anti-poaching operations in various parts of the country, particularly in the vast Selous Game Reserve, are noteworthy."*
> (CoP15 Doc. 68, Annex 6a [page 14]).

27.     The Director of Wildlife of the United Republic of Tanzania informed the Panel of Experts that regulations were being finalized to implement The Wildlife Conservation Act, 2009, which will reportedly increase revenue retention, increase penalties up to 30 years, and provide additional powers to law enforcement personnel (CoP15 Doc. 68, Annex 6a [page 11]). As was indicated earlier, copies of those laws and regulations were provided to the Service at the February 2011 meeting with Tanzanian officials.

28.     The Tanzania National Elephant Management Plan 2010-2015 is based on several new wildlife laws and implementing regulations (Government of the United Republic of Tanzania 2010a): The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania 2009a); The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009; Government of the United Republic of Tanzania 2009b); The Wildlife Conservation (Tourist

Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010; Government of the United Republic of Tanzania 2010b). During the February 2011 meeting, the Service received copies of these measures, but it was not clear when they would be fully implemented. For example, the Subsidiary Legislation (Supplement No. 25; 2nd July, 2010) of The Wildlife Conservation (Tourist Hunting) Regulations, 2010, in Part V, 24.-(5)(b), directs that no person shall hunt an elephant with tusks weighing below 18 kg per tusk or measuring not less that 160 cm per tusk (Government of the United Republic of Tanzania 2010b). In another example, the Act Supplement (No. 5; 20th March, 2009) of The Wildlife Conservation Act, 2009, in Part IV, calls for the protection of wildlife corridors, dispersal areas, buffer zones, and migratory routes (Government of the United Republic of Tanzania 2009b). Both of these measures are critically important to the conservation of the African elephant, but it is not clear when they will become operational and backed by the force of law in the United Republic of Tanzania. Until the plan and new laws are fully implemented, these African elephant conservation and management measures, while improving, are still in a transitional phase.

29.     The Tanzania National Elephant Management Plan 2010-2015 makes only generic references to strengthening the financial base of the Wildlife Division and to undertaking anti-poaching measures, and apparently does not clearly identify any specific measures to combat poaching in the Selous-Mikumi ecosystem (Government of the United Republic of Tanzania 2010a).

Conclusion

30.     With the information currently available, we believe that the status of the African elephant population in the United Republic of Tanzania and ongoing management efforts in that country are adequate to ensure that the sport hunting of African elephants, as administered by the Government of the United Republic of Tanzania, does not adversely affect the status of the species in the United Republic of Tanzania.

31.     Therefore, for calendar year 2011, we find that the import of sport-hunted trophies of African elephants taken in the United Republic of Tanzania will be for purposes that are not detrimental to the survival of the species.

CONCERNS:

Although we are able to make the current non-detriment finding, we still have concerns about the future sustainability of the total levels of off-take from the African elephant populations in the United Republic of Tanzania. These concerns – in part -- were also noted by the Panel of Experts (CoP15 Doc. 68, Annex 6a [pages 13-16]):

A.      Efforts have been made by the United Republic of Tanzania to combat poaching in the Selous-Mikumi ecosystem. We also acknowledge that additional resources are now available to promote the conservation status of the African elephant in that country,

including: Tanzania National Elephant Management Plan 2010-2015 (Government of the United Republic of Tanzania 2010a); The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania 2009a); The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009; Government of the United Republic of Tanzania 2009b); and The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010; Government of the United Republic of Tanzania 2010b). As indicated above, these measures are in a transitional phase, and we remain concerned, as noted in the General Advice for 2010, about the overall level of commitment by the United Republic of Tanzania to the future sustainable management of its African elephant population. In particular and in the absence of any specific new measures that suggest specific activities whose effectiveness could be quantified by species and enforcement experts, we remain concerned about the availability of future resources to combat poaching in the United Republic of Tanzania, especially in the Selous-Mikumi ecosystem. In this regard, we will continue to monitor anti-poaching capabilities in the United Republic of Tanzania and the effectiveness of those actions throughout the upcoming year. We will re-evaluate this issue when considering our finding for 2012.

B.  We note that 31 wildlife corridors of appropriate habitat are currently available to African elephants in the United Republic of Tanzania and facilitate elephant movements throughout the country as well as into adjacent trans-boundary regions. While we recognize that additional laws and regulations are now available to protect these corridors in the United Republic of Tanzania, we remain concerned about the ongoing threats to these wildlife corridors and the consequent risks to the associated African elephant populations in the future as a result of human-elephant conflict in and around these areas. In this regard and taking into account the Tanzania National Elephant Management Plan 2010-2015 (Government of the United Republic of Tanzania 2010a), we will continue to monitor efforts by the United Republic of Tanzania to develop and maintain appropriate wildlife corridors for African elephants. We will also re-evaluate this issue when considering our finding for 2012.

C.  Based on recent information obtained through the National Website of the United Republic of Tanzania, we understand that new procedures have been implemented regarding the allocation of tourist hunting blocks [see: Invitation For Applications For Tourist Hunting Blocks Allocation For The Period 2013 – 2018; (Made under Section 9 (2) of the Wildlife Conservation Act, Cap.283 (Tourist Hunting Regulations of 2010); http://www.tanzania.go.tz/ministriesf.html; accessed on March 9, 2011); Government of the United Republic of Tanzania 2011]. We understand that these changes deal primarily with the hunting block fees that will be charged by the government. We are unclear how these changes may affect wildlife harvest quotas or off-take levels associated with the corresponding hunting blocks, especially for the African elephant. Given the recent uncertainty about the total population sizes and trends of African elephant populations in the United Republic of Tanzania, especially in the Selous-Mikumi ecosystem, we will

continue to monitor African elephant population survey results, as well as overall harvest quotas and off-take levels for this species in the United Republic of Tanzania. The forthcoming survey information discussed by Messrs. Tarimo and Mduma at the February 2011 meeting will be especially helpful in this regard. We ask Tanzania to provide us with further information about these regulations and will evaluate this issue when considering our finding for 2012.

\*     \*     \*     \*     \*

## REFERENCES

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. *African Elephant Status Report 2007: An Update from the African Elephant Database*. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

CITES Secretariat. 2010. *Monitoring of Illegal hunting in elephant range States.* Document CoP15 Doc. 44.2 presented at the 15th meeting of the Conference of the Parties to CITES.

CITES Secretariat. 2011. CITES National Export Quotas for 2011. Available on the internet at: http://www.cites.org/common/quotas/2011/ExportQuotas2011.pdf; accessed on March 9, 2011.

CoP15 Doc. 68 Annex 6a). 2010. Report of the Panel of Experts ... Appendix II (Tanzania). Available online at: http://www.cites.org/eng/cop/15/doc/E15-68A06a).pdf.

CoP15 Doc. 68 Annex 6b). 2010. Report of the Panel of Experts ... Appendix II (Zambia). Available online at: http://www.cites.org/eng/cop/15/doc/E15-68A06b).pdf.

CoP15 Prop. 4 (Rev. 1). 2010. Transfer the population of the United Republic of Tanzania from Appendix I to Appendix II with an annotation. Available online at: http://www.cites.org/eng/cop/15/prop/E-15-Prop-04.pdf.

Department of Wildlife. 2001. Management Plan for the African Elephants, *Loxodonta africana* in Tanzania. Dar es Salaam, Tanzania.

Division of Scientific Authority. 2010. General advice on import of sport-hunted trophies of African elephant from Tanzania for the calendar year 2010. US Fish and Wildlife Service, Arlington, Virginia. 8 pp. [Reference: AOSA 106]

Foley, C.A.H., and Faust, L.J. 2010. Rapid population growth in an elephant *Loxodonta africana* population recovering from poaching in Tarangire National Park, Tanzania. *Oryx* in press.

Government of the United Republic of Tanzania. 2009a. The Wildlife Conservation Act, 2009. Available online at: http://faolex.fao.org/docs/pdf/tan97858.pdf; accessed on March 9, 2011.

Government of the United Republic of Tanzania. 2009b. The Wildlife Conservation Act, 2009

(Act Supplement No. 5; 20th March, 2009).  Gazette of the United Republic of Tanzania (No. 12;  Vol. 90):165—256.

Government of the United Republic of Tanzania.  2010a.  Tanzania National Elephant Management Plan 2010-2015.  Ministry of Natural Resources and Tourism, Dar es Salaam.  129 pp.

Government of the United Republic of Tanzania.  2010b.  The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25;  2nd July, 2010).  Gazette of the United Republic of Tanzania (No. 27;  Vol. 91):1—35.

Government of the United Republic of Tanzania.  2011.  Applications for tourist hunting blocks.  Written by Tulizo Kilaga; dated February 10, 2011; available on the internet at:  http://www.tanzania.go.tz/ministriesf.html;  accessed on March 9, 2011.

Jones, T., Caro, T. and Davenport, T.R.B. (eds.).  2009.  Wildlife Corridors in Tanzania.  Unpublished Report. Tanzania Wildlife Research Institute (TAWARI), Arusha.

Martin, R.B.  1986.  *Establishment of African ivory export quotas and associated control procedures.* Report to CITES Secretariat.

Ministry of Natural Resources and Tourism (Tanzania).  2005.  African Elephant Conservation in Tanzania.  in litt.

Ministry of Natural Resources and Tourism (Tanzania).  2008.  Questionnaire from US Fish and Wildlife Service on Elephants Conservation in Tanzania.  in litt.

Nowak, R.M.  1999.  Walker's mammals of the world.  Sixth edition.  Volume II.  The Johns Hopkins University Press, Baltimore.

TAWIRI.  2007.  *Elephant population estimates: Dry season 2006.*  Tanzania Wildlife Research Institute in collaboration with NCAA, TANAPA and Wildlife Division. Commissioned by Wildlife Division. TAWARI, Arusha.

TAWIRI.  2010a.  *Elephant population estimates: Dry season 2009.*  Tanzania Wildlife Research Institute in collaboration with NCAA, TANAPA and Wildlife Division.  Commissioned by Wildlife Division. TAWARI, Arusha.

TAWIRI.  2010c.  *Status of the Major Elephant Populations of Tanzania 2009-2010.*  TAWIRI Preliminary Report, 2010.  Tanzania Elephant Management Plan Project. TAWIRI, Arusha.

TEMP (Tanzania Elephant Management Plan). 2010. *Status of the major elephant populations of Tanzania 2009-2010*. Preliminary report January 2010, Tanzania Elephant Management Plan Project. TAWIRI, Arusha.

Wasser, S.K., Clark, B. and Laurie, C. 2009. The Ivory Trail. *Scientific American*, July 2009 (68-76).



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

AUG 1 4 2012

**MEMORANDUM**

To:         Chief, Division of Management Authority

From:       Chief, Division of Scientific Authority *Rosemarie Gnam*

Subject:    General Advice on Importation of Sport-hunted Trophies of African Elephants
            from Tanzania for the Calendar Year 2012

---

This responds to your request for a finding as required under the Convention on International
Trade in Endangered Species of Wild Fauna and Flora (CITES) on various applications for the
importation of sport-hunted trophies of African elephants (*Loxodonta africana*) from the United
Republic of Tanzania (Tanzania) for calendar year 2012.

**Please be advised that, with the information currently available, we are able to find that the
importation of sport-hunted trophies of African elephants from Tanzania will be for
purposes that are not detrimental to the survival of the species. This General Advice
applies only to sport-hunted trophies of African elephants that were lawfully taken in
Tanzania during calendar year 2012 (i.e., January 1, 2012, through December 31, 2012),
provided that they are to be imported by the persons who hunted them for personal use or
personal display.**

If new information becomes available during 2012 that suggests that this General Advice is no
longer valid, it will be suspended and reconsidered by the Division of Scientific Authority. If,
after reconsideration, the Division of Scientific Authority believes that the General Advice is no
longer valid, we will issue a new General Advice or require that subsequent permit applications
be considered on a case-by-case basis.

BASIS FOR ADVICE:

A significant amount of information relevant to this General Advice was made available at the
Fifteenth Meeting of the CITES Conference of the Parties (CoP15), including Tanzania's
proposal to transfer its population of African elephants from Appendix I to Appendix II (CoP15
Prop. 4 (Rev. 1)), in addition to the Report of the Panel of Experts on Tanzania's proposal
(CoP15 Doc. 68, Annex 6a). Much of the information used in making the current finding was
derived from these sources, as noted below.

In addition, since CoP15, a significant amount of new information relevant to this issue has
become available, including:



329

- Tanzania National Elephant Management Plan 2010-2015 (TAWIRI 2012);
- The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania 2009a);
- The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009; Government of the United Republic of Tanzania 2009b);
- The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25;  2nd July, 2010;  Government of the United Republic of Tanzania 2010);
- Third African Elephant Meeting (1-3 November 2010; Gigiri, Kenya; various documents); and
- Documents from the 62nd Meeting of the CITES Standing Committee (Geneva 2012).

Much of the information used in making the current finding was derived from these sources, as noted below, as well as previously cited information (see AOSA106; dated July 23, 2010; [Division of Scientific Authority 2010]).

Conservation and Management

1. African elephants are widely distributed throughout Tanzania, covering 49% of the country's land area.  About 37% of the elephant's range in that country is in protected areas (PA).  This proportion of protected range is relatively high compared to other African elephant range countries (Blanc *et al.* 2007).  These protected areas comprise 26% of the country's land area within six ecosystems throughout the country, including:  Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa, and Moyowosi-Kigosi.  The network of PAs includes 15 National Parks (NP) (4% of the country's land surface), Ngorongoro Conservation Area (1%), 28 Game Reserves (GR) (14%), and 33 Game Controlled Areas (GCA) and/or Wildlife Management Areas (WMA) (5%).  Some of these areas were designated as recently as 2005 (CoP15 Doc. 68, Annex 6a [page 1]).

2. In Tanzania, the only consumptive use of African elephants is sport hunting [CoP15 Prop. 4 (Rev. 1)], which is covered by The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Government of the United Republic of Tanzania 2010).  These regulations control hunting by concession area, season, minimum trophy sizes (18 kg and 160 cm per tusk), annual quotas, post-hunt reporting, trophy registration, marking, and export requirements [CoP15 Doc. 68 Annex 6a [page 11];  Part V, Regulation 24.-(5)(b)].

3. The trophy quota for African elephants is distributed among approximately 150 hunting concessions/blocks [Ministry of Natural Resources and Tourism (United Republic of Tanzania), in litt., 2008] with the number of trophy permits allotted to each concession determined by elephant survey information (Ministry of Natural Resources and Tourism, in litt., 2005).

4. According to the Ministry of Natural Resources and Tourism (in litt., 2008), 25% of the revenue accrued from the sport hunting of elephants goes to the conservation and protection of

2

African elephants and other wildlife species through the Tanzania Wildlife Protection Fund (TWPF). In addition, 25% of the game fees received from hunters is given to the local communities in the areas where the sport hunting took place. Apart from being the source of revenue to local communities, sport hunting plays an important role in creating employment for the members of the local communities, for example, as trackers, skinners, tent and mess attendants, and guards (Ministry of Natural Resources and Tourism, in litt., 2008). The Ministry of Natural Resources and Tourism (in litt., 2008) also reported that the sport hunting program assisted in curbing illegal harvesting and developing infrastructure such as roads, hospitals, and schools, as well as creating a market for local artwork.

5. The 1998 Wildlife Policy of the United Republic of Tanzania was revised in 2007 and provides guidelines for the management of African elephants through the development, review, and updating of specific management plans (CoP15 Doc. 68, Annex 6a [page 4]).

6. This past year, Tanzania published its country-level strategy and action plan, the "Tanzania National Elephant Management Plan 2010-2015." This plan provides updated information on several biological and ecological topics, including: distribution and range, abundance, population trends and demography, elephant corridors, and human-elephant conflicts. It identifies nine different strategic objectives, as well as numerous specific objectives and their associated targets, actions, timelines, actors, and indicators. The strategic objectives include: Human-Elephant Conflict, Elephant Corridors, Law Enforcement, Benefits and Sustainable Utilization, Ivory Stockpile and Management System, Research and Monitoring, Elephant Health and Welfare, Cross-border Cooperation, and Elephant Information Management (TAWIRI 2012).

Population Status and Trends

7. In 2006, the Tanzania Wildlife Research Institute [TAWIRI 2007 (cited in CoP15 Doc. 68, Annex 6a [page 1])] estimated the African elephant populations of Tanzania at $139,915 \pm 12,338$ (SE) animals based on census surveys covering $227,328$ km$^2$ conducted using both total and sample counts. According to the Panel of Experts, this estimate was not significantly different from that of $111,475 \pm 18,728$ (95% CL) elephants estimated in 2000-2003. The Panel of Experts noted that the 2006 estimate did not include 2,873 additional elephants from areas not formally surveyed, which provided a country-wide "best estimate" of $142,788 \pm 12,405$ (SE) elephants in 2006 (CoP15 Doc. 68, Annex 6a [page 1]). In 2006, according to the African Elephant Status Report (Blanc *et al.*, 2007), the "definite" category estimate was 108,816 elephants, in addition to 27,937 "probable," 29,350 "possible," and 900 "speculative" category estimates.

8. In 2009, a similar survey covering $229,318$ km$^2$ across the same six ecosystems produced a total population estimate of $105,439 \pm 6,080$ (SE) African elephants [TAWIRI 2010a (cited in CoP15 Doc. 68, Annex 6a)]. A "best estimate," which included an additional 3,583 elephants, provided a country-wide estimate of $109,022 \pm 6,135$ (SE) elephants in 2009. The Panel of

3

Experts noted that these results suggested a significant decline compared to the 2006 estimate of 142,788 elephants and that the decline could be attributed largely to a downward population trend recorded in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a [page 1]); however, Tanzania later clarified that methodological issues during the 2006 survey is believed to have resulted in an overestimate, and therefore, the two years' results cannot be compared due to different study techniques. Although a survey was also conducted in 2011, the final survey report is not yet available (SC62 Inf. 1).

9. Demographic parameters were calculated between 2009 — 2010 from 2,182 African elephants from six major elephant populations in Tarangire, Serengeti, Ruaha-Rungwa, Selous, Katavi-Rukwa, and Ugalla (TAWIRI 2012). This demographic survey of African elephants revealed that the proportion of the population < 5 years of age varied from 41% in Tarangire to 25% in Ugalla River Game Reserve, with values above 30% (Tarangire, Selous, Serengeti, and Ruaha-Rungwa). These results were indicative of good to high growth rates. The Panel of Experts, citing Foley and Faust (2010), further pointed out that Tarangire had a growth rate of > 6% and was one of the highest growth rates ever recorded for an African elephant population. It was noted that those populations with the proportion of their herds < 5 years of age below 30% (Katavi and Ugalla Game Reserve), which is indicative of low recruitment and growth rates, suggested one or more population stressors, such as higher infant mortality or increased stress associated with human-elephant conflict or illegal activity (i.e., poaching) (CoP15 Doc. 68, Annex 6a [pages 1-2]).

10. The Panel of Experts concluded that while estimates at that time suggested that the Tanzanian African elephant populations were stable or possibly decreasing, elephant populations still remained large (> 100,000 individuals) and were demographically healthy. The Panel of Experts noted that the populations of African elephants were geographically widespread across the country and occupied diverse ecosystems, and that a high proportion of the populations (> 80% individuals) occupied protected areas. In the overall opinion of the Panel of Experts, the African elephant populations in Tanzania were viable at the time of the analysis (CoP15 Doc. 68, Annex 6a [page 2]).

11. The Panel of Experts, however, raised concerns about the future mobility of the African elephant populations in Tanzania. They noted, for example, that associated human settlements were increasing in size and number around protected areas and were accompanied by increasing human-elephant conflicts. These settlements and the associated conflicts were probably the most important factors limiting the elephants' mobility and range. It was the opinion of the Panel of Experts that -- at the rates of habitat change and land conversion at the time -- the corridors that still remained in Tanzania would be converted to unsuitable habitat in less than 5 years (CoP15 Doc. 68, Annex 6a [page 4]).

12. According to Jones et al. (2009), Tanzania was working to minimize risks to African elephants, other wildlife, people, and property through improvements in spatial planning involving the identification, maintenance, and restoration of wildlife corridors. The "Tanzania

4

National Elephant Management Plan 2010-2015" lays out a strategic objective to restore lost corridors and to increase protection for corridors that are identified to still be in use (TAWIRI 2012).

Sustainability of Off-Take

13. In Tanzania, African elephant deaths occur as a result of several factors, including: 1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching. In order to evaluate whether off-take from trophy hunting was sustainable, all losses to the African elephant population must be considered.

*Legal Off-Take*

14. Since 2007, the annual CITES Export Quota for the United Republic of Tanzania has been 400 tusks (sport-hunting quota of 200 elephants). During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals. Tanzania, however, typically has not exported its full quota allotment in sport-hunted trophies or African elephant tusks. During 1997-2009, for example, annual tusk exports typically were about 40-45% of the allowed quantities and never exceeded the approved annual quota (UNEP-WCMC CITES Trade Database; available on the internet at: http://www.unep-wcmc.org/citestrade; accessed on 8 March 2010).

15. The Panel of Experts also assessed the sustainability of legal off-take from African elephant populations in Tanzania. Complete records on natural mortality for the entire country or on the killing of problem elephants were not available, but the Panel of Experts was able to estimate the level of such off-take by analyzing the data from the ivory store databases of Tanzania. Based on 21 years of data for that country, an average of 231 elephants died annually from natural mortality, while another 287 individuals died annually from elephant control measures (CoP15 Doc. 68, Annex 6a [page 5]).

16. Based a sport-hunting quota of 200 African elephants, as well as the estimates cited earlier for natural mortality and problem animal control in Tanzania, the Panel of Experts estimated that the overall legal off-take of African elephants from the several populations in that country was about 718 annually, which was 0.7% of the 2009 elephant population estimate of 109,022 individuals. Even if natural mortalities were considerably higher due, for example, to low carcass detection rates by observers in difficult terrain, the Panel of Experts believed that the legal off-take was still less than the annual population growth rate of 3-5% and, therefore, was sustainable (CoP15 Doc. 68, Annex 6a [page 14]).

17. The Panel of Experts also assessed whether the hunting of trophy-quality males in Tanzania was sustainable. According to an earlier analysis by Martin (1986), an annual harvest rate of 0.5-1.0% of the total African elephant population was sustainable. Based on the available population information, the Panel of Experts estimated that nationwide there was a potential off-take of 325 trophy-quality African elephant males (0.3% of the total population; CoP15 Doc. 68,

5

Annex 6a [page 14]). The Panel of Experts noted that this value of 0.3% was less than the value of 0.5-1% of total African elephant numbers and concluded that the hunting was sustainable.

*Illegal Off-Take*

18. According to the Panel of Experts, official poaching statistics provided by the Wildlife Division of Tanzania indicated 258 reported poaching incidents that were detected during 2005-2009, including 82 poaching incidents in 2009, the highest number poached annually during that time period. The Panel of Exports noted, however, that the total number of poaching incidents was likely underestimated given low African elephant carcass detection rates (CoP15 Doc. 68, Annex 6a [page 5]).

19. The Panel of Experts cited the following evidence that poaching has led to elephant population declines in the Selous-Mikumi ecosystem:

> *a) PIKE values collected at the Selous-Mikumi MIKE site have progressively increased between 2003 and 2009 (CITES Secretariat, 2010).*
>
> *b) Joint Wildlife Division/Selous Rhino Project aerial observations and foot patrols recorded more than a threefold increase in encounter rates of recently dead elephant carcasses between 2007 and 2008 (TAWIRI, 2010b).*
>
> *c) Tourism operators operating in the northern Selous reported to the Panel an increase in elephant (and other wildlife) poaching since 2007/8, including several incidents close to tourist camps.*
>
> *d) A significant proportion of the large seizures of ivory made in Asia in 2006 have been traced by forensic DNA work to elephants killed in the Selous-Niassa area (Wasser et al., 2009).*
>
> Note: PIKE = Proportion of illegally killed elephants

20. The Panel of Experts also pointed to evidence that the Selous-Mikumi ecosystem was a "hotspot" for African elephant poaching. They observed that the ivory that had been collected by wildlife enforcement officials at Udzungwa National Park was from confiscations. According to these officials, the confiscations consisted of illegally-sourced ivory coming out of nearby Kilombero Game Controlled Area in the Selous-Mikumi ecosystem. In addition, the highest number of tusks confiscated by field-based Wildlife Division offices originated from Morogoro and Lindi, which are adjacent to the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a [page 5]).

21. Given the factors discussed above, the Panel of Experts concluded that the level of off-take at that time was not sustainable in the Selous-Mikumi ecosystem, which represents about 40% of the total African elephant population in Tanzania. They also noted, however, that legal and

6

illegal off-take appeared to be sustainable in the five other elephant ecosystems where the populations were stable or increasing. Expressing concern about the potential for off-take levels in the Selous-Mikumi ecosystem to have a future negative impact on the African elephant population as a whole, the Panel of Experts stated:

> *"Whilst not unequivocally substantiated, the Selous-Mikumi situation described above could affect long-term population sustainability."*
> (CoP15 Doc. 68, Annex 6a [page 3])"

22. Based on a more recent analysis of MIKE data, the levels of illegal killing across the African elephants' range are of serious and increasing concern. Between 2009 and 2011, PIKE values remained high at the Selous-Mikumi MIKE site (SC62 Inf. 1). Moreover, a March 2012 IUCN African Elephant Specialist Group survey indicated that poaching over the last 12 months had increased in sites in Tanzania (SC62 Doc. 46.1 (Rev. 1).

23. Another concern that the Panel of Experts raised, which relates to the commitment by the Tanzania to combat poaching, was the financial mechanism by which the Wildlife Division was funded. The Wildlife Division's revenue share is paid directly to the central Treasury, and the Treasury is then supposed to distribute the budgeted monies to the Wildlife Division. The Panel of Experts raised the concern that over a 3-year period (2007-2009), the Wildlife Division had received only 63% (USD 2,634,975 per year) of its approved budget from the central Treasury. The Panel noted that given these funding limitations, the Wildlife Division would not be able to meet its needs and obligations regarding the conservation, management, and protection of African elephants. The Panel of Experts also noted, however, that between 2005 and 2009, the Tanzania Wildlife Protection Fund contributed on average a total of USD 12,894,564 annually to the Wildlife Division. According to the Panel of Experts, these funds, when combined with the Treasury allocations, should have put the Wildlife Division in a "strong position" to meet its enforcement obligations, including containment of threats to elephants in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a [page 3]). Recent African elephant poaching levels in the Selous-Mikumi ecosystem, however, suggest that enforcement may have been inadequate.

24. The Panel of Experts also noted that the National Parks and the Ngorongoro Conservation Area Authorities of Tanzania were adequately funded because they generated and retained 100% of their revenue share through park and conservation area fees (CoP15 Doc. 68, Annex 6a [page 3]).

25. Although the Panel of Experts raised concerns over the illegal killing of elephants in the Selous-Mikumi ecosystem, they also acknowledged the efforts by authorities of Tanzania to combat the increases in poaching. For example, in July 2009, a series of planning meetings led to anti-poaching patrols that were joint and cooperative, and involved rangers and scouts from the Selous Game Reserve, the Udzungwa Mountains National Park, and the Mikumi National Park. In December 2009, for example, the commander of special police operations led an anti-poaching operation, code-named "Operation Butterfly," in the Selous Game Reserve. This operation led to the arrest of 70 poachers and the recovery of elephant and hippopotamus ivory

7

(Midala 2010, *as cited in* TAWIRI 2012). Noting these, as well as other anti-poaching efforts by the Tanzanian authorities, the Panel of Experts stated:

> *"There is a clear indication of concern by the authorities to minimize poaching of elephant and other wildlife species. The various efforts to deploy staff and execute special anti-poaching operations in various parts of the country, particularly in the vast Selous Game Reserve, are noteworthy."*
> (CoP15 Doc. 68, Annex 6a [page 14]).

26. The Director of Wildlife of Tanzania informed the Panel of Experts that regulations were being finalized to implement The Wildlife Conservation Act, 2009, which would reportedly increase revenue retention, increase penalties up to 30 years, and provide additional powers to law enforcement personnel (CoP15 Doc. 68, Annex 6a [page 11]). Copies of those laws and regulations were provided to the U.S. Fish and Wildlife Service (Service) at a February 17, 2011, meeting with Tanzanian officials.

27. The "Tanzania National Elephant Management Plan 2010-2015" is based on several new wildlife laws and implementing regulations (TAWIRI 2012): The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania 2009a); The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009; Government of the United Republic of Tanzania 2009b); and The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010; Government of the United Republic of Tanzania 2010). During the February 2011, meeting, the Service received copies of these measures, but it was not clear when they would be fully implemented. For example, the Subsidiary Legislation (Supplement No. 25; 2nd July, 2010) of The Wildlife Conservation (Tourist Hunting) Regulations, 2010, in Part V, 24.-(5)(b), directs that no person shall hunt an elephant with tusks weighing below 18 kg per tusk or measuring not less that 160 cm per tusk (Government of the United Republic of Tanzania 2010). In another example, the Act Supplement (No. 5; 20th March, 2009) of The Wildlife Conservation Act, 2009, in Part IV, calls for the protection of wildlife corridors, dispersal areas, buffer zones, and migratory routes (Government of the United Republic of Tanzania 2009b). Both of these measures are critically important to the conservation of the African elephant, but it is not clear when they will become operational and backed by the force of law in Tanzania. Until the new laws are fully implemented, these African elephant conservation and management measures, while improving, are still in a transitional phase.

Conclusion

28. With the information currently available, we believe that the status of the African elephant population in Tanzania and ongoing management efforts in that country are adequate to ensure that the sport hunting of African elephants, as administered by the Government of the United Republic of Tanzania, does not adversely affect the status of the species in Tanzania.

8

29. Therefore, for calendar year 2012, we find that the import of sport-hunted trophies of African elephants taken in Tanzania will be for purposes that are not detrimental to the survival of the species.

CONCERNS:

Although we are able to make the current non-detriment finding, we still have concerns about the future sustainability of the total levels of off-take from the African elephant populations in Tanzania. These concerns – in part -- were also noted by the Panel of Experts (CoP15 Doc. 68, Annex 6a [pages 13-16]):

A.    Efforts have been made by Tanzania to combat poaching in the Selous-Mikumi ecosystem. We also acknowledge that additional resources are now available to promote the conservation status of the African elephant in that country, including: "Tanzania National Elephant Management Plan 2010-2015" (TAWIRI 2012); The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania 2009a); The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009; Government of the United Republic of Tanzania 2009b); and The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010; Government of the United Republic of Tanzania 2010). The Service is interested in receiving an update on whether the management and regulatory measures mentioned above have been fully implemented, and if not, the targeted time period for full implementation of these measures. In particular, we remain concerned about the availability of future resources to combat poaching in Tanzania, especially in the Selous-Mikumi ecosystem. In this regard, we are interested in receiving updated information on recent initiatives and their effectiveness in combating poaching in Tanzania, particularly in the Selous-Mikumi ecosystem.

B.    It is our understanding that the elephant population in the Selous ecosystem in Tanzania was surveyed in 2011 but that the results have not yet been available. We are interested in receiving these results as soon as they are available.

C.    We note that most of the 23 known elephant corridors in Tanzania are in poor condition (TAWIRI 2012). We recognize that the "Tanzania National Elephant Management Plan 2010-2015" includes a strategic framework for increasing protection for these corridors and for restoring lost corridors and that laws and regulations are available to protect these corridors. Given the importance of protecting these corridors from ongoing threats and the risks to the African elephant populations in the future as a result of human-elephant conflict in and around these areas, we are interested in receiving updated information on Tanzania's success to date in achieving its objectives related to the protection of African elephant corridors, as laid out in the "Tanzania National Elephant Management Plan 2010-2015" (TAWIRI 2012).

9

D.      Based on recent information obtained through the National Website of Tanzania, we understand that new procedures have been implemented regarding the allocation of tourist hunting blocks [see: Invitation For Applications For Tourist Hunting Blocks Allocation For The Period 2013 – 2018; (Made under Section 9 (2) of the Wildlife Conservation Act, Cap.283 (Tourist Hunting Regulations of 2010); http://www.tanzania.go.tz/ministriesf.html; accessed on March 9, 2011);  Government of the United Republic of Tanzania 2011]. These changes deal primarily with the hunting block fees that will be charged by the government. We are interested in receiving information about these changes and how they could affect African elephant harvest quotas or off-take levels associated with the corresponding hunting blocks. Given the recent uncertainty about the total population sizes and trends of African elephant populations in the United Republic of Tanzania, especially in the Selous-Mikumi ecosystem, we will continue to monitor African elephant population survey results, as well as overall harvest quotas and off-take levels for this species in the United Republic of Tanzania.

REFERENCES

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. *African Elephant Status Report 2007: An Update from the African Elephant Database*. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

CITES Secretariat. 2010. *Monitoring of Illegal hunting in elephant range States*. Document CoP15 Doc. 44.2 presented at the 15th meeting of the Conference of the Parties to CITES.

CITES Secretariat. 2011. CITES National Export Quotas for 2011. Available on the internet at: http://www.cites.org/common/quotas/2011/ExportQuotas2011.pdf; accessed on March 9, 2011.

CoP15 Doc. 68 Annex 6a). 2010. Report of the Panel of Experts ... Appendix II (Tanzania). Available online at: http://www.cites.org/eng/cop/15/doc/E15-68A06a).pdf.

CoP15 Doc. 68 Annex 6b). 2010. Report of the Panel of Experts ... Appendix II (Zambia). Available online at: http://www.cites.org/eng/cop/15/doc/E15-68A06b).pdf.

CoP15 Prop. 4 (Rev. 1). 2010. Transfer the population of the United Republic of Tanzania from Appendix I to Appendix II with an annotation. Available online at: http://www.cites.org/eng/cop/15/prop/E-15-Prop-04.pdf.

Department of Wildlife. 2001. Management Plan for the African Elephants, *Loxodonta africana* in Tanzania. Dar es Salaam, Tanzania.

10

Division of Scientific Authority. 2010. General advice on import of sport-hunted trophies of African elephant from Tanzania for the calendar year 2010. U.S. Fish and Wildlife Service, Arlington, Virginia. 8 pp. [Reference: AOSA 106]

Foley, C.A.H., and Faust, L.J. 2010. Rapid population growth in an elephant *Loxodonta africana* population recovering from poaching in Tarangire National Park, Tanzania. *Oryx* 44(2):205–212.

Government of the United Republic of Tanzania. 2009a. The Wildlife Conservation Act, 2009. Available online at: http://faolex.fao.org/docs/pdf/tan97858.pdf; accessed on March 9, 2011.

Government of the United Republic of Tanzania. 2009b. The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009). Gazette of the United Republic of Tanzania (No. 12; Vol. 90):165—256.

Government of the United Republic of Tanzania. 2010. The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010). Gazette of the United Republic of Tanzania (No. 27; Vol. 91):1—35.

Government of the United Republic of Tanzania. 2011. Applications for tourist hunting blocks. Written by Tulizo Kilaga; dated February 10, 2011; available on the internet at: http://www.tanzania.go.tz/ministriesf.html; accessed on March 9, 2011.

Jones, T., Caro, T. and Davenport, T.R.B. (eds.). 2009. Wildlife Corridors in Tanzania. Unpublished Report. Tanzania Wildlife Research Institute (TAWIRI), Arusha.

Martin, R.B. 1986. *Establishment of African ivory export quotas and associated control procedures*. Report to CITES Secretariat.

Ministry of Natural Resources and Tourism (Tanzania). 2005. African Elephant Conservation in Tanzania. in litt.

Ministry of Natural Resources and Tourism (Tanzania). 2008. Questionnaire from US Fish and Wildlife Service on Elephants Conservation in Tanzania. in litt.

Nowak, R.M. 1999. Walker's mammals of the world. Sixth edition. Volume II. The Johns Hopkins University Press, Baltimore.

SC62 Doc. 46.1 (Rev. 1). 2012. Elephant Conservation, Illegal Killing, and Ivory Trade. Available online at: http://www.cites.org/eng/com/SC/62/E62-46-01.pdf.

11

SC62 Inf. 1. 2012. Supplementary information on document SC62 Doc. 46.1. Available online at: http://www.cites.org/eng/com/SC/62/Inf/E62i-01.pdf.

TAWIRI. 2007. *Elephant population estimates: Dry season 2006*. Tanzania Wildlife Research Institute in collaboration with NCAA, TANAPA and Wildlife Division. Commissioned by Wildlife Division. TAWIRI, Arusha.

TAWIRI. 2010a. *Elephant population estimates: Dry season 2009*. Tanzania Wildlife Research Institute in collaboration with NCAA, TANAPA and Wildlife Division. Commissioned by Wildlife Division. TAWIRI, Arusha.

TAWIRI. 2010b. *Status of the Major Elephant Populations of Tanzania 2009-2010*. TAWIRI Preliminary Report, 2010. Tanzania Elephant Management Plan Project. TAWIRI, Arusha.

TAWIRI. 2012. Tanzania Elephant Management Plan 2010-2015. TAWIRI, Arusha. Available online at: www.tawiri.or.tz/images/Conference/elephant_plan.pdf.

TEMP (Tanzania Elephant Management Plan). 2010. *Status of the major elephant populations of Tanzania 2009-2010*. Preliminary report January 2010, Tanzania Elephant Management Plan Project. TAWIRI, Arusha.

Wasser, S.K., Clark, B. and Laurie, C. 2009. The Ivory Trail. *Scientific American*, July 2009 (68-76).

12



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240



FEB 2 6 2013

**MEMORANDUM**

To:        Chief, Division of Management Authority

From:      Chief, Division of Scientific Authority   *Rosemarie Gnam*

Subject:   General Advice on Importation of Sport-hunted Trophies and Articles for
           Personal Use or Display that Were Made from Sport-hunted Trophies of African
           Elephants from Tanzania, for the Calendar Year 2013

---

This General Advice responds to your request for a finding as required under the Convention on
International Trade in Endangered Species of Wild Fauna and Flora (CITES) on various
applications for the importation of sport-hunted trophies of African elephants (*Loxodonta
africana*) from the United Republic of Tanzania (Tanzania) for calendar year 2013. This
General Advice also includes our finding on applications for the import of articles for personal
use or display that were made from sport-hunted trophies of African elephants (*Loxodonta
africana*) taken in Tanzania during calendar year 2013.

**Please be advised that, with the information currently available, we are able to find that the
importation of sport-hunted trophies of African elephants from Tanzania will be for
purposes that are not detrimental to the survival of the species. This General Advice
applies only to sport-hunted trophies of African elephants that were lawfully taken in the
Tanzania during calendar year 2013 (i.e., January 1, 2013, through December 31, 2013),
provided that they are to be imported by the persons who hunted them for personal use or
personal display.**

**Also, please be advised that the importation of articles made from sport-hunted trophies of
African elephants from Tanzania, for personal use or display, will not be detrimental to the
survival of the species provided the following conditions are met:**

1. The article(s) being imported must be from a sport-hunted trophy that the applicant hunted
   him/herself during calendar year 2013 (i.e., January 1, 2013, through December 31, 2013).

2. Import is for personal use or display (not for commercial purposes).

3. An appropriate amount of time has elapsed since the hunting of the trophy to allow for
   drying, curing, processing, and/or working/manufacturing of the article(s).

If the application **does not** meet the above criteria, it should then be referred to the Division of Scientific Authority for further review and a determination on whether this General Advice may be used or a specific advice is required.

If new information becomes available during 2013 that suggests that this General Advice is no longer valid, it will be suspended and reconsidered by the Division of Scientific Authority. If, after reconsideration, the Division of Scientific Authority believes that the General Advice is no longer valid, we will issue a new General Advice or require that subsequent permit applications be considered on a case-by-case basis.

BASIS FOR ADVICE:

A significant amount of updated information relevant to this General Advice was made available by Tanzania's proposal to transfer its population of African elephants from Appendix I to Appendix II (CoP16 Prop. 11), which was submitted to the Sixteenth Meeting of the Conference of the Parties to CITES (CoP16). Although Tanzania withdrew its proposal prior to CoP16 (http://www.cites.org/eng/news/sundry/2012/20121226_TZ_withdrawal.php), we used information from this proposal for the current finding, as noted below, because it represents the best available information. Since Tanzania withdrew its proposal prior to CoP16, a Panel of Experts was not convened. Therefore, as in our previous findings on this issue and as noted below, we have used relevant information from the Report on the Panel of Experts (CoP15 Doc. 68, Annex 6a) on Tanzania's proposal (CoP15 Prop. 4 (Rev.1)) that was submitted at the Fifteenth Meeting of the Conference of the Parties to CITES (CoP15).

In addition, since CoP15, a significant amount of new information relevant to this issue has become available, including:

- Documents from the 62nd Meeting of the CITES Standing Committee (Geneva 2012);
- Tanzania National Elephant Management Plan 2010-2015 (TAWIRI 2012);
- The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania 2009a);
- The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009; Government of the United Republic of Tanzania 2009b);
- The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010; Government of the United Republic of Tanzania 2010); and
- Third African Elephant Meeting (1-3 November 2010; Gigiri, Kenya; various documents).

Much of the information used in making the current finding was derived from these sources, as noted below, as well as previously cited information (see AOSA106; dated July 23, 2010; Division of Scientific Authority 2010).

Conservation and Management

1. African elephants are widely distributed throughout Tanzania, covering approximately 39% of the country's total land surface area, an area of about 370,000 square kilometers ($km^2$) (TAWIRI 2010, *as cited in* CoP16 Prop. 11). About 50% of the elephant's range in that country is in protected areas (PA) (CoP16 Prop. 11). This proportion of protected range is relatively high compared to other African elephant range countries (Blanc *et al.* 2007). These protected areas comprise about 28% of the country's land area, and elephants receive full protection in 19% of Tanzania's total land surface area (CoP16 Prop. 11). Elephants occur within six ecosystems throughout the country, including: Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa, and Moyowosi-Kigosi (CoP15 Doc. 68, Annex 6a). The network of PAs includes national parks (NP), Ngorongoro Conservation Area, game reserves (GR), game controlled areas (GCA), and wildlife management areas (WMA) in village lands. Tanzania has recently put into place Wildlife Management Area Regulations (2012), a legal mechanism aimed at promoting the establishment of wildlife conservation areas outside of PAs administered by the central government. These regulations allow local communities to establish wildlife management areas in village lands that offer conservation potential for wildlife. This legal mechanism has enabled local communities to contribute to wildlife conservation and to benefit from conservation activities on their land. This strategy has increased Tanzania's PA network by 29,000 $km^2$ and is expected to continue to add more land for wildlife conservation. In Tanzania, elephants occur in 13 of the 15 national parks, in 24 of the 28 game reserves, in the Ngorongoro Conservation Area, and in some game controlled areas, forest reserves, wildlife management areas, and village lands (CoP16 Prop. 11).

2. In addition, there are transboundary elephant populations in the Kilimanjaro-Amboseli, the Serengeti-Mara, and Tsavo-Mkomazi ecosystems along the Tanzania-Kenya border, and elephants move between the Selous in Tanzania and the Niassa in Mozambique (Blanc *et. al.* 2003, *as cited in* CoP16 Prop. 11) and between Kimisi-Ibanda in Tanzania and Akagera in Rwanda. Tanzania cooperates with transboundary countries, especially Kenya and Mozambique, in cross-border law enforcement efforts (CoP16 Prop. 11).

3. In Tanzania, the only consumptive use of African elephants is sport hunting (CoP16 Prop. 11), which is covered by The Wildlife Conservation (Tourist Hunting) Regulations, 2010 – (Government of the United Republic of Tanzania 2010). These regulations control hunting by concession area, season, minimum trophy sizes (18 kg and 160 cm per tusk), annual quotas, post-hunt reporting, trophy registration, marking, and export requirements (CoP15 Doc. 68 Annex 6a; Part V, Regulation 24.-(5)(b)).

4. The trophy quota for African elephants is distributed among approximately 150 hunting concessions/blocks (Ministry of Natural Resources and Tourism (United Republic of Tanzania), *in litt.*, 2008) with the number of trophy permits allotted to each concession determined by elephant survey information (Ministry of Natural Resources and Tourism, *in litt.*, 2005).

5. According to the Ministry of Natural Resources and Tourism (*in litt.*, 2008), 25% of the revenue accrued from the sport hunting of elephants goes to the conservation and protection of African elephants and other wildlife species through the Tanzania Wildlife Protection Fund, and 25% of the game fees received from hunters is given to the local communities in the areas where the sport hunting took place.  More than 90% of the revenue of the Tanzania Wildlife Protection Fund is generated from fees associated with sport-hunting activities.  Law enforcement for wildlife and wildlife products, including ivory, is primarily undertaken by a special anti-poaching unit, which is largely subsidized by the Tanzania Wildlife Protection Fund (CoP16 Prop. 11).

6. In addition to providing a source of revenue to local communities, sport hunting plays an important role in creating employment for the local community members, e.g., as trackers, skinners, tent and mess attendants, and guards (Ministry of Natural Resources and Tourism, *in litt.*, 2008).  The Ministry of Natural Resources and Tourism (*in litt.*, 2008) also reported that the sport-hunting program assisted in curbing illegal harvesting and developing infrastructure such as roads, hospitals, and schools, as well as creating a market for local artwork.

7. According to Tanzania's proposal submitted (and later withdrawn) to CoP16 (CoP16 Prop. 11), 100% of the revenue from resident hunting is provided to District Councils to support community development projects, and conservation activities at the District level has improved conservation efforts by local authorities.

8. The 1998 Wildlife Policy of the United Republic of Tanzania was revised in 2007 and provides guidelines for the management of African elephants through the development, review, and updating of specific management plans (CoP15 Doc. 68, Annex 6a).

9. In the year 2012, Tanzania published its country-level strategy and action plan, the "Tanzania National Elephant Management Plan 2010-2015."  This plan provides updated information on several biological and ecological topics, including:  distribution and range, abundance, population trends and demography, elephant corridors, and human-elephant conflicts.  It identifies nine different strategic objectives, as well as numerous specific objectives and their associated targets, actions, timelines, actors, and indicators.  The strategic objectives include: Human-Elephant Conflict, Elephant Corridors, Law Enforcement, Benefits and Sustainable Utilization, Ivory Stockpile and Management System, Research and Monitoring, Elephant Health and Welfare, Cross-border Cooperation, and Elephant Information Management (TAWIRI 2012).

Population Status and Trends

10. In 2006, the Tanzania Wildlife Research Institute (TAWIRI 2007, *as cited in* CoP15 Doc. 68, Annex 6a) estimated the African elephant populations of Tanzania at $139,915 \pm 12,338$ (SE) animals based on census surveys covering $227,328$ km$^2$ conducted using both total and sample counts.  According to the Panel of Experts, this estimate was not significantly different from that

of 111,475 ± 18,728 (95% CL) elephants estimated in 2000-2003.  The Panel of Experts noted that the 2006 estimate did not include 2,873 additional elephants from areas not formally surveyed, which provided a country-wide "best estimate" of 142,788 ± 12,405 (SE) elephants in 2006 (CoP15 Doc. 68, Annex 6a).  In 2006, according to the African Elephant Status Report (Blanc *et al.*, 2007), the "definite" category estimate was 108,816 elephants, in addition to 27,937 "probable," 29,350 "possible," and 900 "speculative" category estimates.

11.  In 2009, a similar survey covering 229,318 km$^2$ across the same six ecosystems produced a total population estimate of 105,439 ± 6,080 (SE) African elephants (TAWIRI 2010a, *as cited in* CoP15 Doc. 68, Annex 6a).  A "best estimate," which included an additional 3,583 elephants, provided a country-wide estimate of 109,022 ± 6,135 (SE) elephants in 2009.  The Panel of Experts noted that these results suggested a significant decline compared to the 2006 estimate of 142,788 elephants and that the decline could be attributed largely to a downward population trend recorded in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a); however, Tanzania later clarified that the methodological issues during the 2006 survey is believed to have resulted in an overestimate, and therefore, the two years' results cannot be compared due to different study techniques.  Although surveys were conducted in 2011 in the Selous-Mikumi and Ruaha-Rungwa ecosystems and 2012 in the Katavi-Rukwa, Burigi Biharamuro and Moyowosi-Kigosi ecosystems), the final survey results have not yet been made available (CoP16 Prop. 11).

12.  Demographic parameters were calculated between 2009 — 2010 from 2,182 African elephants from six major elephant populations in Tarangire, Serengeti, Ruaha-Rungwa, Selous, Katavi-Rukwa, and Ugalla (TAWIRI 2012).  This demographic survey of African elephants revealed that the proportion of the population < 5 years of age varied from 41% in Tarangire to 25% in Ugalla River Game Reserve, with values above 30% (Tarangire, Selous, Serengeti, and Ruaha-Rungwa).  These results were indicative of good to high growth rates.  The Panel of Experts, citing Foley and Faust (2010), further pointed out that Tarangire had a growth rate of > 6% and was one of the highest growth rates ever recorded for an African elephant population.  It was noted that those populations with the proportion of their herds < 5 years of age below 30% (Katavi and Ugalla Game Reserve), which is indicative of low recruitment and growth rates, suggested one or more population stressors, such as higher infant mortality or increased stress associated with human-elephant conflict or illegal activity (i.e., poaching) (CoP15 Doc. 68, Annex 6a).

13.  The Panel of Experts concluded that while estimates at that time suggested that the Tanzanian African elephant populations were stable or possibly decreasing, elephant populations still remained large (> 100,000 individuals) and were demographically healthy.  The Panel of Experts noted that the populations of African elephants were geographically widespread across the country and occupied diverse ecosystems, and that a high proportion of the populations (> 80% individuals) occupied protected areas.  In the overall opinion of the Panel of Experts, the African elephant populations in Tanzania were currently viable at the time of the analysis (CoP15 Doc. 68, Annex 6a).

14. The Panel of Experts, however, raised concerns about the future mobility of the African elephant populations in Tanzania. They noted, for example, that associated human settlements were increasing in size and number around protected areas and were accompanied by increasing human-elephant conflicts. These settlements and the associated conflicts were probably the most important factors limiting the elephants' mobility and range. It was the opinion of the Panel of Experts that -- at the rates of habitat change and land conversion at the time -- the corridors that still remained in Tanzania would be converted to unsuitable habitat in less than 5 years (CoP15 Doc. 68, Annex 6a).

15. According to Jones *et al.* (2009), Tanzania was working to minimize risks to African elephants, other wildlife, people, and property through improvements in spatial planning involving the identification, maintenance, and restoration of wildlife corridors. The "Tanzania National Elephant Management Plan 2010-2015" lays out a strategic objective to restore lost corridors and to increase protection for corridors that are still in use (TAWIRI 2012).

Sustainability of Off-Take

16. In Tanzania, African elephant deaths occur as a result of several factors, including: 1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching. In order to evaluate whether off-take from trophy hunting is sustainable, all losses to the African elephant population must be considered.

*Legal Off-Take*

17. Since 2007, the annual CITES Export Quota for Tanzania has been 400 tusks (sport-hunting quota of 200 elephants). During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals. Tanzania, however, typically has not exported its full quota allotment in sport-hunted trophies or African elephant tusks. During 1997-2009, for example, annual tusk exports typically were about 40-45% of the allowed quantities and never exceeded the approved annual quota (UNEP-WCMC CITES Trade Database; available on the internet at: http://www.unep-wcmc.org/citestrade; accessed on 8 March 2010).

18. The Panel of Experts also assessed the sustainability of legal off-take from African elephant populations in Tanzania. Complete records on natural mortality for the entire country or on the killing of problem elephants were not available, but the Panel of Experts was able to estimate the level of such off-take by analyzing the data from the ivory store databases of Tanzania. Based on 21 years of data for that country, an average of 231 elephants died annually from natural mortality, while another 287 individuals died annually from elephant control measures (CoP15 Doc. 68, Annex 6a).

19. Based on a sport-hunting quota of 200 African elephants, as well as the estimates cited earlier for natural mortality and problem animal control in Tanzania, the Panel of Experts

estimated that the overall legal off-take of African elephants from the several populations in that country was about 718 annually, which was 0.7% of the 2009 elephant population estimate of 109,022 individuals.  Even if natural mortalities were considerably higher due, for example, to low carcass detection rates by observers in difficult terrain, the Panel of Experts believed that the legal off-take was still less than the annual population growth rate of 3-5% and, therefore, was sustainable (CoP15 Doc. 68, Annex 6a).

20.  The Panel of Experts also assessed whether the hunting of trophy-quality males in Tanzania was sustainable.  According to an earlier analysis by Martin (1986), an annual harvest rate of 0.5-1.0% of the total African elephant population was sustainable.  Based on the available population information, the Panel of Experts estimated that nationwide there was a potential off-take of 325 trophy-quality African elephant males (0.3% of the total population; CoP15 Doc. 68, Annex 6a).  The Panel of Experts noted that this value of 0.3% was less than the value of 0.5-1% of total African elephant numbers and concluded that the hunting was sustainable.

*Illegal Off-Take*

21.  According to the Panel of Experts, official poaching statistics provided by the Wildlife Division of Tanzania indicated 258 reported poaching incidents that were detected during 2005-2009, including 82 poaching incidents in 2009, the highest number poached annually during that time period.  The Panel of Exports noted, however, that the total number of poaching incidents was likely underestimated given low African elephant carcass detection rates (CoP15 Doc. 68, Annex 6a).

22.  The Panel of Experts cited the following evidence that poaching has led to elephant population declines in the Selous-Mikumi ecosystem:

> *a) PIKE values collected at the Selous-Mikumi MIKE site have progressively increased between 2003 and 2009 (CITES Secretariat, 2010).*

> *b) Joint Wildlife Division/Selous Rhino Project aerial observations and foot patrols recorded more than a threefold increase in encounter rates of recently dead elephant carcasses between 2007 and 2008 (TAWIRI, 2010b).*

> *c) Tourism operators operating in the northern Selous reported to the Panel an increase in elephant (and other wildlife) poaching since 2007/8, including several incidents close to tourist camps.*

> *d) A significant proportion of the large seizures of ivory made in Asia in 2006 have been traced by forensic DNA work to elephants killed in the Selous-Niassa area (Wasser et al., 2009).*

Note:  PIKE = Proportion of illegally killed elephants

23.  The Panel of Experts also pointed to evidence that the Selous-Mikumi ecosystem was a "hotspot" for African elephant poaching.  They observed that the ivory that had been collected by wildlife enforcement officials at Udzungwa National Park was from confiscations.  According to these officials, the confiscations consisted of illegally-sourced ivory coming out of nearby Kilombero Game Controlled Area in the Selous-Mikumi ecosystem.  In addition, the highest number of tusks confiscated by field-based Wildlife Division offices originated from Morogoro and Lindi, which are adjacent to the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a).

24.  Given the factors discussed above, the Panel of Experts concluded that the level of off-take at that time was not sustainable in the Selous-Mikumi ecosystem, which represents about 40% of the total African elephant population in Tanzania.  They also noted, however, that legal and illegal off-take appeared to be sustainable in the five other elephant ecosystems where the populations were stable or increasing.  Expressing concern about the potential for off-take levels in the Selous-Mikumi ecosystem to have a future negative impact on the African elephant population as a whole, the Panel of Experts stated:

> *"Whilst not unequivocally substantiated, the Selous-Mikumi situation described above could affect long-term population sustainability."*
> (CoP15 Doc. 68, Annex 6a)"

25.  Based on a more recent analysis of MIKE data, the levels of illegal killing across the African elephants' range are of serious and increasing concern.  Between 2009 and 2011, PIKE values remained high at the Selous-Mikumi MIKE site (SC62 Inf. 1).  Moreover, a March 2012 IUCN African Elephant Specialist Group survey indicated that poaching over the previous 12 months had increased in sites in Tanzania (SC62 Doc. 46.1 (Rev. 1)).

26.  Another concern of the Panel of Experts, which relates to the commitment by Tanzania to combat poaching, was the financial mechanism by which the Wildlife Division was funded.  The Wildlife Division's revenue share is paid directly to the central Treasury, and the Treasury is then supposed to distribute the budgeted monies to the Wildlife Division. The Panel of Experts raised the concern that over a 3-year period (2007-2009), the Wildlife Division had received only 63% (USD 2,634,975 per year) of its approved budget from the central Treasury.  The Panel noted that given these funding limitations, the Wildlife Division would not be able to meet its needs and obligations regarding the conservation, management, and protection of African elephants.  The Panel of Experts also noted, however, that between 2005 and 2009, the Tanzania Wildlife Protection Fund contributed on average a total of USD 12,894,564 annually to the Wildlife Division.  According to the Panel of Experts, these funds, when combined with the Treasury allocations, should have put the Wildlife Division in a "strong position" to meet its enforcement obligations, including containment of threats to elephants in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a).  Reported elephant poaching levels in the Selous-Mikumi ecosystem, however, suggest that enforcement may have been inadequate.

27.  The Panel of Experts also noted that the national parks and the Ngorongoro Conservation Area Authorities of Tanzania were adequately funded because they generated and retained 100% of their revenue share through park and conservation area fees (CoP15 Doc. 68, Annex 6a).

28.  Although the Panel of Experts raised concerns over the illegal killing of elephants in the Selous-Mikumi ecosystem, they also acknowledged the efforts by authorities of Tanzania to combat the increases in poaching.  For example, in July 2009, a series of planning meetings led to anti-poaching patrols that were joint and cooperative, and involved rangers and scouts from the Selous Game Reserve, the Udzungwa Mountains National Park, and the Mikumi National Park.  In December 2009, for example, the commander of special police operations led an anti-poaching operation, code-named "Operation Butterfly," in the Selous Game Reserve.  This operation led to the arrest of 70 poachers and the recovery of elephant and hippopotamus ivory (Midala 2010, *as cited in* TAWIRI 2012).  Noting these, as well as other anti-poaching efforts by the Tanzanian authorities, the Panel of Experts stated:

> *"There is a clear indication of concern by the authorities to minimize poaching of elephant and other wildlife species.  The various efforts to deploy staff and execute special anti-poaching operations in various parts of the country, particularly in the vast Selous Game Reserve, are noteworthy."*
> (CoP15 Doc. 68, Annex 6a).

29.  The Director of Wildlife of Tanzania informed the Panel of Experts that regulations were being finalized to implement The Wildlife Conservation Act, 2009, which would reportedly increase revenue retention, increase penalties up to 30 years, and provide additional powers to law enforcement personnel (CoP15 Doc. 68, Annex 6a).  Copies of those laws and regulations were provided to the U.S. Fish and Wildlife Service (Service) at a February 17, 2011, meeting with Tanzanian officials.

30.  The "Tanzania National Elephant Management Plan 2010-2015" is based on several new wildlife laws and implementing regulations (TAWIRI 2012):  The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania 2009a);  The Wildlife Conservation Act, 2009 (Act Supplement No. 5;  20th March, 2009;  Government of the United Republic of Tanzania 2009b);  and The Wildlife Conservation (Tourist Hunting) Regulations, 2010    – (Subsidiary Legislation Supplement No. 25;  2nd July, 2010;  Government of the United Republic of Tanzania 2010).  During the February 2011 meeting, the Service received copies of these measures, but it was not clear when they would be fully implemented.  For example, the Subsidiary Legislation (Supplement No. 25;  2nd July, 2010) of The Wildlife Conservation (Tourist Hunting) Regulations, 2010, in Part V, 24.-(5)(b), directs that no person shall hunt an elephant with tusks weighing below 18 kg per tusk or measuring not less than 160 cm per tusk (Government of the United Republic of Tanzania 2010).  In another example, the Act Supplement (No. 5; 20th March, 2009) of The Wildlife Conservation Act, 2009, in Part IV, calls for the protection of wildlife corridors, dispersal areas, buffer zones, and migratory routes (Government of the United Republic of Tanzania 2009b).  Both of these measures are critically

important to the conservation of the African elephant, but it is not clear when they will become operational and backed by the force of law in Tanzania. Until the new laws are fully implemented, these African elephant conservation and management measures, while improving, are still in a transitional phase.

Conclusion

31. With the information currently available, we believe that the status of the African elephant population in Tanzania and ongoing management efforts in that country are adequate to ensure that the sport hunting of African elephants, as administered by the Government of the United Republic of Tanzania, does not adversely affect the status of the species in Tanzania.

32. Therefore, for calendar year 2013, we find that the import of sport-hunted trophies of African elephants taken in Tanzania will be for purposes that are not detrimental to the survival of the species.

33. We acknowledge that applicants sometimes request authorization to import various articles that have been made from their sport-hunted trophies taken in Tanzania, yet the articles do not fall under the Service's current definition of "sport-hunted trophy" according to the Service's regulations at 50 CFR 23.74 (see AOSA 96, *General Advice on Import of Articles Made from Sport-hunted Trophies of African Elephant from Botswana, Namibia, South Africa, and Zimbabwe, for Personal Use or Display*).

34. Such articles, when made from the applicant's personally sport-hunted trophy and are to be imported for the applicant's personal use, are not expected to negatively affect the conservation status of this species in the wild or stimulate additional trade in wild-taken specimens.

35. Therefore, since we have found that the import of sport-hunted trophies of African elephants taken in Tanzania will be for purposes that are not detrimental to the survival of the species, we also find that the importation of articles made from sport-hunted trophies of African elephants from Tanzania, for personal use or display, will not be detrimental to the survival of the species provided the following conditions are met:

1. The article(s) being imported must be from a sport-hunted trophy that the applicant hunted him/herself during calendar year 2013 (i.e., January 1, 2013, through December 31, 2013).

2. Import is for personal use or display (not for commercial purposes).

3. An appropriate amount of time has elapsed since the hunting of the trophy to allow for drying, curing, processing, and/or working/manufacturing of the article(s).

CONCERNS:

Although we are able to make the current non-detriment finding, we still have concerns about the future sustainability of the total levels of off-take from the African elephant populations in Tanzania. These concerns – in part -- were also noted by the Panel of Experts (CoP15 Doc. 68, Annex 6a):

A.  Efforts have been made by Tanzania to combat poaching in the Selous-Mikumi ecosystem. We also acknowledge that additional resources are available to promote the conservation status of the African elephant in that country, including: "Tanzania National Elephant Management Plan 2010-2015" (TAWIRI 2012); The Wildlife Conservation Act, 2009 (Government of the United Republic of Tanzania 2009a); The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009; Government of the United Republic of Tanzania 2009b); and The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010; Government of the United Republic of Tanzania 2010). The Service is interested in receiving an update on whether the management and regulatory measures mentioned above have been fully implemented, and if not, the targeted time period for full implementation of these measures. In particular, we remain concerned about the availability of future resources to combat poaching in Tanzania, especially in the Selous-Mikumi ecosystem. In this regard, we are interested in receiving updated information on recent initiatives and their effectiveness in combating poaching in Tanzania, particularly in the Selous-Mikumi ecosystem.

B.  It is our understanding that elephant population surveys were conducted in Tanzania during 2011 and 2012, but the results have not yet been made available. We are interested in receiving these results as soon as they become available.

C.  We note that most of the 23 known elephant corridors in Tanzania are in poor condition (TAWIRI 2012). We recognize that the "Tanzania National Elephant Management Plan 2010-2015" includes a strategic framework for increasing protection for these corridors and for restoring lost corridors and that laws and regulations are available to protect these corridors. Given the importance of protecting these corridors from ongoing threats and the risks to the African elephant populations in the future as a result of human-elephant conflict in and around these areas, we are interested in receiving updated information on Taznania's success to date in achieving its objectives related to the protection of African elephant corridors, as laid out in the "Tanzania National Elephant Management Plan 2010-2015" (TAWIRI 2012).

D.  Given the uncertainty about the current population size and trends of African elephants in Tanzania, especially in the Selous-Mikumi ecosystem, we will continue to monitor African elephant population survey results, as well as overall harvest quotas and off-take levels for this species in Tanzania.

*General Advice on Import of Sport-hunted Trophies of African Elephants from Tanzania for the Calendar Year 2013*

REFERENCES:

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. *African Elephant Status Report 2007: An Update from the African Elephant Database*. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

CITES Secretariat. 2010. *Monitoring of Illegal hunting in elephant range States*. Document CoP15 Doc. 44.2 presented at the 15th meeting of the Conference of the Parties to CITES.

CoP15 Doc. 68 Annex 6a). 2010. Report of the Panel of Experts ... Appendix II (Tanzania). Available online at: http://www.cites.org/eng/cop/15/doc/E15-68A06a).pdf.

CoP15 Doc. 68 Annex 6b). 2010. Report of the Panel of Experts ... Appendix II (Zambia). Available online at: http://www.cites.org/eng/cop/15/doc/E15-68A06b).pdf.

CoP15 Prop. 4 (Rev. 1). 2010. Transfer the population of the United Republic of Tanzania from Appendix I to Appendix II with an annotation. Available online at: http://www.cites.org/eng/cop/15/prop/E-15-Prop-04.pdf.

CoP16 Prop. 11. 2012. Transfer the population of the African elephant, *Loxodonta africana*, of the United Republic of Tanzania from Appendix I to Appendix II (with an annotation) (Note: proposal withdrawn). Available online at: http://www.cites.org/eng/cop/16/prop/E-CoP16-Prop-11.pdf.

Department of Wildlife. 2001. Management Plan for the African Elephants, *Loxodonta africana* in Tanzania. Dar es Salaam, Tanzania.

Division of Scientific Authority. 2009. General advice on import of articles made from sport-hunted trophies of African elephant for personal use or display. U.S. Fish and Wildlife Service, Arlington, Virginia. [Reference: AOSA 96]

Division of Scientific Authority. 2010. General advice on import of sport-hunted trophies of African elephant from Tanzania for the calendar year 2010. U.S. Fish and Wildlife Service, Arlington, Virginia. [Reference: AOSA 106]

Foley, C.A.H., and Faust, L.J. 2010. Rapid population growth in an elephant *Loxodonta africana* population recovering from poaching in Tarangire National Park, Tanzania. *Oryx* 44(2):205–212.

Government of the United Republic of Tanzania. 2009a. The Wildlife Conservation Act, 2009. Available online: http://faolex.fao.org/docs/pdf/tan97858.pdf; accessed March 9, 2011.

Government of the United Republic of Tanzania.  2009b. The Wildlife Conservation Act, 2009 (Act Supplement No. 5; 20th March, 2009).  Gazette of the United Republic of Tanzania (No. 12; Vol. 90):165—256.

Government of the United Republic of Tanzania.  2010.  The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010). Gazette of the United Republic of Tanzania (No. 27; Vol. 91):1—35.

Jones, T., Caro, T. and Davenport, T.R.B. (eds.).  2009.  Wildlife Corridors in Tanzania. Unpublished Report. Tanzania Wildlife Research Institute (TAWARI), Arusha.

Martin, R.B.  1986.  *Establishment of African ivory export quotas and associated control procedures*. Report to CITES Secretariat.

Ministry of Natural Resources and Tourism (Tanzania).  2005.  African Elephant Conservation in Tanzania.  *in litt.*

Ministry of Natural Resources and Tourism (Tanzania).  2008.  Questionnaire from US Fish and Wildlife Service on Elephants Conservation in Tanzania.  *in litt.*

Nowak, R.M.  1999.  Walker's mammals of the world.  Sixth edition.  Volume II.  The Johns Hopkins University Press, Baltimore.

SC62 Doc. 46.1 (Rev. 1). 2012. Elephant Conservation, Illegal Killing, and Ivory Trade. Available online at:  http://www.cites.org/eng/com/SC/62/E62-46-01.pdf.

SC62 Inf. 1. 2012. Supplementary information on document SC62 Doc. 46.1. Available online at:  http://www.cites.org/eng/com/SC/62/Inf/E62i-01.pdf.

TAWIRI.  2007.  *Elephant population estimates:  Dry season 2006*.  Tanzania Wildlife Research Institute in collaboration with NCAA, TANAPA and Wildlife Division. Commissioned by Wildlife Division. TAWARI, Arusha.

TAWIRI.  2010a.  *Elephant population estimates:  Dry season 2009*.  Tanzania Wildlife Research Institute in collaboration with NCAA, TANAPA and Wildlife Division. Commissioned by Wildlife Division. TAWARI, Arusha.

TAWIRI.  2010b.  *Status of the Major Elephant Populations of Tanzania 2009-2010*.  TAWIRI Preliminary Report, 2010.  Tanzania Elephant Management Plan Project. TAWIRI, Arusha.

TAWIRI.  2012. Tanzania Elephant Management Plan 2010-2015. TAWIRI, Arusha. Available online at:  www.tawiri.or.tz/images/Conference/elephant_plan.pdf.

TEMP (Tanzania Elephant Management Plan).  2010.  *Status of the major elephant populations of Tanzania 2009-2010*.  Preliminary report January 2010, Tanzania Elephant Management Plan Project.  TAWIRI, Arusha.

Wasser, S.K., Clark, B. and Laurie, C.  2009.  The Ivory Trail.  *Scientific American*, July 2009 (68-76).



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

FEB 2 1 2014

## MEMORANDUM

To:          Chief, Division of Management Authority

From:       Chief, Division of Scientific Authority *Rosemarie Gnam*

Subject:   General Advice on Importation of Sport-hunted Trophies of African Elephants
             taken in Tanzania in the Calendar Year 2014

---

This General Advice represents our CITES finding for permit applications that you might receive
for the import of sport-hunted trophies of African elephants (*Loxodonta africana*) taken in the
United Republic of Tanzania (Tanzania) in calendar year 2014.

Please be advised that, based on the available information, we are **unable** to determine that the
importation of sport-hunted trophies of African elephants taken in Tanzania during calendar year
2014 will be for purposes that are not detrimental to the survival of the species.

If permit applications are received that include new or additional information showing that
elephant management practices by the Government of Tanzania have led to the sustainability of
its elephant population on a nation-wide basis, these applications should be referred to the
Division of Scientific Authority for consideration on a case-by-case basis.

BASIS FOR ADVICE:

Since our analysis for the General Advice issued for calendar year 2013, several sources of
information have become available indicating a significant decline in Tanzania's elephant
population primarily due to poaching for ivory, including:

- *Aerial census of large animals in the Selous-Mikumi ecosystem, population status of
  African elephant* (TAWIRI 2013a);
- *Aerial census of large animals in the Ruaha-Rungwa ecosystem, population status of
  African elephant* (TAWIRI 2013b);
- A written report, *Recognition and tackling of the current elephant poaching crisis in
  Tanzania* (TEPS 2013a) and PowerPoint presentation, *Tackling the elephant poaching
  crisis in Tanzania* (TEPS 2013b), by the Tanzania Elephant Protection Society (TEPS)
  Task Force presented to the Parliamentary Committee of Land, Natural Resources and
  Environment, April, 2013;

- A report to the African Elephant Summit (Botswana, 2013), *Status of African elephant populations and levels of illegal killing and the illegal trade in ivory: A report to the African elephant summit* (CITES Secretariat *et al.* 2013);
- A report to the 16th Meeting of the CITES Conference of the Parties (CoP16 - Bangkok, Thailand, 2013), providing an update on Monitoring the Illegal Killing of Elephants (MIKE) (CoP16 Doc. 53.1), posted 11/30/2012, with an Addendum posted 2/19/2013; and
- A report to CoP16 (Bangkok, Thailand, 2013), providing an update on monitoring of illegal trade in ivory and other elephant specimens (CoP16 Doc. 53.2.2 (Rev. 1)), originally posted 12/12/2012, with a revision of the document posted 2/8/2013.

The new information provided by these sources is discussed below as it relates to our finding for the 2014 calendar year.

Conservation and Management

1. As recently as a few years ago, African elephants were considered to be widely distributed throughout Tanzania. As of 2009, they covered about 39% of the country's total land surface area (~370,000 square kilometers (km$^2$) (TAWIRI 2010) within six ecosystems, including: Tarangire-Manyara, Serengeti, Selous-Mikumi, Ruaha-Rungwa, Katavi-Rukwa, and Moyowosi-Kigosi (CoP15 Doc. 68, Annex 6a). The Selous-Mikumi ecosystem represented about 40% of the total elephant population in Tanzania (CoP15 Doc. 68, Annex 6a). At 31,040 square miles, the Selous-Mikumi ecosystem is Africa's largest protected area, and historically held East Africa's largest elephant population, followed by Ruaha-Rungwa (13,384 square miles) (Jones and Nowak 2013).

2. According to the Government of Tanzania, about 50% of the elephant's range in that country is in protected areas (PA) (CoP16 Prop. 11). This proportion of protected range is relatively high compared to other African elephant range countries (Blanc *et al.* 2007). These protected areas comprise about 28% of the country's land area, and elephants receive full protection in 19% of Tanzania's total land surface area (CoP16 Prop. 11). The network of PAs includes national parks (NP), Ngorongoro Conservation Area, game reserves (GR), game controlled areas (GCA), and wildlife management areas (WMA) in village lands. In the year 2012, Tanzania put into place Wildlife Management Area Regulations (2012), which provided a legal mechanism to promote the establishment of wildlife conservation areas outside of PAs administered by the central government. These regulations allow local communities to establish wildlife management areas in village lands that offer conservation potential for wildlife. This legal mechanism has the potential to enable local communities to contribute to wildlife conservation and to benefit from conservation activities on their land (CoP16 Prop. 11). Concerns have been raised, however, that WMAs have not effectively contributed to conservation (TEPS 2013a). The legal process developed by the Wildlife Department has been criticized as being complicated, overregulated, and lengthy, resulting in high transaction costs and making

compliance difficult. It is suggested that in order to make the WMA approach successful, it will need to be simplified (Baldus and Hahn 2009).

3. Historically, there have been transboundary elephant populations in the Kilimanjaro-Amboseli, the Serengeti-Mara, and Tsavo-Mkomazi ecosystems along the Tanzania-Kenya border (Blanc *et. al.* 2003), and elephants have moved between the Selous in Tanzania and the Niassa in Mozambique (Mpanduji *et al.* 2002). Tanzania also shares elephant populations with Rwanda – the Burigi Game Reserve in Tanzania and Akagera National Park in Rwanda (TAWIRI 2010). Tanzania cooperates with transboundary countries, especially Kenya and Mozambique, in cross-border law enforcement efforts (CoP16 Prop. 11); however, concern has been raised over the lack of effectiveness of cross-border cooperation in anti-poaching efforts (Baldus and Hahn 2009).

4. According to the Government of Tanzania (Tarimo, Severre, and Mduma, *in litt.* 2011), the following legal instruments govern wildlife conservation in Tanzania:
- Wildlife Policy, 2007, which provides guidelines for the management of African elephants through the development, review, and updating of specific management plans (CoP15 Doc. 68, Annex 6a);
- Wildlife Conservation Act No. 5 of 2009;
- Tanzania National Parks Act CAP. 282 (RE 2002); and
- Ngorongoro Conservation Area Act CAP. 284 (RE 2002).

5. Four different institutions have authority for management of wildlife in Tanzania:
- Tanzania National Parks (TANAPA), a Parastatal organization that manages 15 national parks (total area of 50,872 km$^2$);
- Ngorongoro Conservation Area Authority (NCAA), a Parastatal organization that manages the Ngorongoro Conservation Area (NCA) (total area of 8,300 km$^2$);
- Wildlife Division, an institution that manages 28 game reserves with an area of 112,564 km$^2$, about 38 game controlled areas with an area of about 161,521 km$^2$, and RAMSAR sites covering 249,856 km$^2$; and
- District Councils, local government institutions that collaborate with the Wildlife Division on wildlife conservation issues and facilitate the establishment and management of WMAs on village land (Tarimo, Severre, and Mduma, *in litt.* 2011).

6. Tanzania developed its country-level strategy and action plan, the "Tanzania National Elephant Management Plan 2010-2015" in 2010, and the plan was endorsed by the Minister for Natural Resources and Tourism on January 15, 2011. This plan provides updated information on several biological and ecological topics, including: distribution and range, abundance, population trends and demography, elephant corridors, and human-elephant conflicts. It identifies nine different strategic objectives, as well as numerous specific objectives and their associated targets, actions, timelines, actors, and indicators. The strategic objectives include: Human-Elephant Conflict, Elephant Corridors, Law Enforcement, Benefits and Sustainable Utilization, Ivory Stockpile and Management System, Research and Monitoring, Elephant Health

and Welfare, Cross-border Cooperation, and Elephant Information Management (TAWIRI 2010). It is unclear whether or to what extent the National Elephant Management Plan has been implemented to date.

7. The Tanzania National Elephant Management Plan 2010-2015 (TAWIRI 2010) identified that a substantial decrease in funding is an important factor that has influenced the protection of the elephant population in the Selous ecosystem. Prior to 2005, a Revenue Retention Scheme was being implemented in which 100% of the revenue from photographic tourism and 50% from hunting operations was retained for management of the Game Reserve (TAWIRI 2010). By 2003, the revenue had risen to USD 2,800,000, but following national budget reductions in 2004, the amount retained by the Reserve had dropped to about USD 800,000 by 2008 (UNEP 2008, as cited in TAWIRI 2010). The timing of the decrease in funding coincides with increased poaching in the Reserve, suggesting that anti-poaching operations are greatly under-funded (TAWIRI 2010). It has been reported that the Tanzanian Government terminated the Selous Revenue Retention Scheme following the end of the Tanzanian-German Selous Conservation Program in 2003 (Baldus and Hahn 2009).

8. In addition to concerns about the implementation of Strategic Objective 3, Law Enforcement, we are concerned about implementation of Strategic Objective 8, Elephant Utilization, which includes as an action item to, "Set realistic hunting quotas." Since 2007, the annual CITES export quota for Tanzania has been 400 tusks (sport-hunting quota of 200 elephants). During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals (http://www.cites.org/eng/resources/quotas/index.php). Based on the available information, Tanzania's elephant population is now less than 70,000 elephants nation-wide (see paragraph 16), and according to the population trends shown in the Tanzania National Elephant Management Plan 2010-2015 (p. 10), the population has not been this low since the 1990's. According to the graph, the population in 1999 was estimated at about 75,000 elephants (TAWIRI 2010). During this time period, the quota was 100 tusks from 50 individuals, and the population appeared to be showing an increasing population trend. Despite the ongoing population decline and current estimated population figure, Tanzania has not adjusted its national export quota downward in response.

9. In Tanzania, the only consumptive use of African elephants is sport hunting (CoP16 Prop. 11), which is covered by The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Government of the United Republic of Tanzania 2010). These regulations control hunting by concession area, season, minimum trophy sizes (18 kg and 160 cm per tusk), annual quotas, post-hunt reporting, trophy registration, marking, and export requirements (CoP15 Doc. 68 Annex 6a; Part V, Regulation 24.-(5)(b)). According to the Government of Tanzania, sport hunting quota determinations for different areas take into account the density of elephants in those ecosystems (CoP16 Prop. 11).

10. According to Tanzania's proposal submitted (and later withdrawn) to CoP16 (CoP16 Prop. 11), 25% of the revenue accrued from the sport hunting and 100% of the revenue from resident

hunting goes to District Councils to support community development projects and conservation activities. In addition, 65% of the revenue from photographic tourism and 75% of the block fee in WMAs is given back to local communities. More than 90% of the revenue of the Tanzania Wildlife Protection Fund is generated from fees associated with sport-hunting and the sale of trophies. Law enforcement activities for wildlife and wildlife products, including ivory, are largely subsidized by the Tanzania Wildlife Protection Fund (CoP16 Prop. 11).

11.  Despite the legal and management tools available to Tanzania for managing its elephant populations, population trends and data collected under the CITES program known as Monitoring the Illegal Killing of Elephants (MIKE) show, as discussed below, that elephant populations throughout Tanzania are declining, primarily due to rampant poaching. This ongoing crisis raises questions about the effectiveness of Tanzania's management and governance to protect elephants, particularly with respect to Strategic Objective 3, Law Enforcement, in the National Elephant Management Plan. In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II (Note: the proposal was rejected), the Panel of Experts questioned the commitment by Tanzania to combat poaching, raising concerns over the financial mechanism by which the Wildlife Division was funded. The Wildlife Division's revenue share is paid directly to the central Treasury, and the Treasury is then supposed to distribute the budgeted monies to the Wildlife Division. The Panel of Experts raised the concern that over a 3-year period (2007-2009), the Wildlife Division had received only 63% (USD 2,634,975 per year) of its approved budget from the central Treasury. The Panel noted that given these funding limitations, the Wildlife Division would not be able to meet its needs and obligations regarding the conservation, management, and protection of African elephants. The Panel of Experts also noted, however, that between 2005 and 2009, the Tanzania Wildlife Protection Fund contributed on average a total of USD 12,894,564 annually to the Wildlife Division. According to the Panel of Experts, these funds, when combined with the Treasury allocations, should have put the Wildlife Division in a "strong position" to meet its enforcement obligations, including containment of threats to elephants in the Selous-Mikumi ecosystem (CoP15 Doc. 68, Annex 6a). Reported elephant poaching levels in the Selous-Mikumi ecosystem, however, suggest that enforcement was inadequate.

12. Tanzania's high Proportion of Illegally Killed Elephants (PIKE) values indicate high poaching rates, which suggests weak governance in Tanzania (see paragraph 16 for PIKE values). Repeated analyses under the CITES MIKE program have identified that at the national level, governance, as measured by Transparency International's Corruption Perceptions Index (CPI), is the factor most strongly correlated with PIKE. Poaching levels are higher in countries where governance is weaker, and vice versa. It is suggested that poor governance likely facilitates the illegal killing of elephants and movement of illegal ivory by ineffective law enforcement and/or "active aiding and abetting by unscrupulous officials" (CITES Secretariat *et al.* 2013).

13.  The MIKE analyses are consistent with information available from the Elephant Trade Information System (ETIS), a global illegal elephant trade tracking system operated by

TRAFFIC on behalf of the CITES Parties. According to an analysis of data from the ETIS presented at CITES CoP16, Tanzania was implicated as a significant player in the illegal ivory trade. In the ETIS analysis presented at CoP15, Tanzania was already identified as a country of concern with respect to large consignments of illicit ivory leaving the African continent. In the intervening three years, the ETIS data show that both Kenya and Tanzania continued to be the primary conduits for large shipments of ivory exported to Asia, together accounting for nearly half of the 34 large-scale ivory seizures by number and 58% of the associated weight of such seizures during the period 2009-2011(CoP16 Doc. 53.2.2 (Rev. 1). A recent TRAFFIC news article, drawing on ETIS data, reports that since 2009 Tanzania has made or been implicated in 18 large-scale ivory seizures (i.e., seizures that involved 500 kg or more in a single shipment). Of these seizures, Tanzania only made five, while the other 13 seizures were made outside of the country. In total, these seizures represented nearly 43 tons of ivory, representing the death of about 4,000 elephants (http://www.traffic.org/home/2014/1/27/tanzania-reshuffled-cabinet-should-address-poaching-urgently.html). Such large-scale transactions of ivory represent higher-level criminal activity, and the ETIS report to CoP16 suggests that governance issues could be responsible for Tanzania's low seizure and reporting rates (CoP16 Doc. 53.2.2 (Rev. 1)).

Population Distribution, Status and Trends

14. New census information was made publicly available in early 2014. The results of back-to-back aerial surveys of the Selous-Mikumi and Ruaha-Rungwa ecosystems in October through November of 2013 show significant population declines (TAWIRI 2013a and 2013b) in both of these ecosystems. The Selous-Mikumi survey revealed an estimate of 13,084 (±1,816 SE) elephants, the lowest figure reported in this area since surveys began in 1976 (TAWIRI 2013a). This figure is down from an estimated 38,975 (± 2,644 SE) elephants in 2009 (TAWIRI 2009, *as cited in* TAWIRI 2013a), a decline of about 66%, which is significant ($d$-test = 8.07, $p$>0.05) (TAWIRI 2013a). The Ruaha-Rungwa survey revealed an estimate of 20,090 (±3,282 SE) elephants (TAWIRI 2013b), down from an estimated 31,625 (±2,890 SE) elephants in 2009 (TAWIRI 2010, *as cited in* TAWIRI 2013b), a decline of about 36.5%, which is significant ($d$-test = 2.6, $p$>0.05) (TAWIRI 2013b).

15. The latest update to Tanzania's population information in the African Elephant Database (http://www.elephantdatabase.org/preview_report/2013_africa/Loxodonta_africana/2012/Africa/Eastern_Africa/Tanzania) provides a best estimate for the year 2012, but does not reflect the new survey information discussed above from 2013. According to the 2012 estimate, the "definite" category estimate was 95,351 elephants, in addition to 10,278 "probable," 10,927 "possible," and 900 "speculative" category estimates. The new survey information would reduce the population estimate by about 37,426 individuals. Additional information below suggests that an updated population estimate would be revised downward even further.

16. Other information that indicates elephant populations are declining throughout Tanzania, includes:

a) Demographic surveys of the Katavi-Rukwa and Ugalla populations in 2009-2010 suggested that these populations were in distress. Survey results revealed that in each of these populations, the proportion of the herd less than 5 years of age was below 30% (TAWIRI 2010). These results are indicative of low recruitment and growth rates, suggesting one or more population stressors, such as higher infant mortality or increased stress associated with human-elephant conflict or illegal activity (i.e., poaching) (CoP15 Doc. 68, Annex 6a).

b) Anecdotal reports presented at a stakeholders meeting[1] held in Dar es Salaam (January 2013) to address elephant and other wildlife poaching issues in Tanzania (TEPS 2013a and 2013b) indicate that:
   o the Moyowosi population in northwest Tanzania may have been extirpated;
   o the population in the Ugalla ecosystem in western Tanzania is becoming unviable, with less than 500 elephants left;
   o the Katavi-Rungwa-Ruaha population in central Tanzania has been decimated by poachers;
   o elephants are almost absent from the Matambwe photo-tourism sector of the Selous Game Reserve and from the Kilombero Valley in southern Tanzania;
   o elephants in the southern Selous Game Reserve and Selous-Niassa corridor are being decimated by poachers;
   o Tanzania has lost 50% of its elephant population since 2007; and
   o the national population estimate is <70,000[2] elephants (*versus* 109,000 elephants in 2009 (TAWIRI 2010) and that if this rate of poaching continues, it is estimated that elephants will be extirpated from Tanzania within seven years.

c) Although Tarangire National Park in northeast Tanzania was cited in 2010 as having one of the highest growth rates (6%) ever recorded for an African elephant population (Foley and Faust 2010), it has been reported that since December 2011, there has been ongoing massive organized poaching within the park that has resulted in the illegal killing of at least 30 elephants in the year 2012 alone (Kideghesho *et al.* 2013). Demographic surveys of elephants from the Serengeti ecosystem during 2009-2010 were also indicative of good growth rates; however, the January 24, 2014, seizure of six pieces of elephant tusks in the Tarime District bordering the northern part of Serengeti National Park is an indication that not even the Serengeti ecosystem is free from poachers (http://allafrica.com/stories/201402070291.html).

d) Consistent with the population and anecdotal information available, recent information from the CITES MIKE program also suggests widespread population declines in

---

[1] This meeting was convened by the Tanzanian Elephant Protection Society (TEPS) and was attended by representatives from the Tanzania Ministry of Natural Resources and Tourism (Wildlife Division, Tunduru District Council, Morogoro Region), Tanzania National Parks (NP) (Udzungwa Mountains NP, Ruaha NP, and Mikumi NP), Wildlife Management Areas (WMA), photographic safari operators, hunting safari operators, researchers, NGOs, foreign donors, the press, and other interested individuals (TEPS 2013a).

[2] Note: this estimate was suggested prior to receipt of new information resulting from the 2013 aerial surveys of the Selous-Mikumi and Ruaha-Rungwa ecosystems.

Tanzania due to poaching.  MIKE collects data at representative sites throughout Asia and Africa in order to measure trends in the levels of illegal killing of elephants and identifies factors associated with those trends.  MIKE evaluates relative poaching levels based on the Proportion of Illegally Killed Elephants (PIKE), which is calculated as the number of illegally killed elephants found divided by the total number of elephant carcasses encountered by patrols or through other means, aggregated by year for each site (CITES Secretariat *et al.* 2013).  A PIKE level of 0.5 or higher translates to a level of illegal annual offtake that is likely to be higher than the annual natural birth rate and, therefore, indicates that the elephant population is very likely to be in net decline (CoP16 Doc. 53.1).  Within Tanzania, PIKE values suggest widespread population declines due to poaching.  At the Selous-Mikumi MIKE site, Tanzania's sole World Heritage site, the 2011 PIKE was 0.64 (based on 224 carcasses), a nearly 27% increase over the 2002-2010 average of 0.50.  At the Ruaha- Rungwa MIKE site, the 2011 PIKE was 0.94 (based on 34 carcasses), the highest ever recorded for that site.  The PIKE was 0.86 (based on 29 carcasses) at the Katavi-Rukwa MIKE site (CoP16 Doc. 53.1).

17.  Aside from concerns about population numbers, we are also concerned about the mobility of the African elephant populations in Tanzania.  The Panel of Experts noted, for example, that associated human settlements were increasing in size and number around protected areas and were accompanied by increasing human-elephant conflicts.  These settlements and the associated conflicts were probably the most important factors limiting the elephants' mobility and range.  It was the opinion of the Panel of Experts that -- at the rates of habitat change and land conversion at the time -- the corridors that still remained in Tanzania would be converted to unsuitable habitat in less than 5 years (CoP15 Doc. 68, Annex 6a).

18.  According to Jones *et al.* (2009), Tanzania was working to minimize risks to African elephants, other wildlife, people, and property through improvements in spatial planning involving the identification, maintenance, and restoration of wildlife corridors.  The Tanzania National Elephant Management Plan lays out a strategic objective to restore lost corridors and to increase protection for corridors that are still in use (TAWIRI 2010).  We do not have updated information on the status of the implementation of this strategic objective, but based on the information available we are particularly concerned about the viability of the Selous (Tanzania)- Niassa (Mozambique) corridor.  According to the 2013 survey of the Selous ecosystem only 32 elephants were counted within the Selous portion of the corridor, resulting in an estimate of 1,006 ± 810 (SE) elephants (TAWIRI 2013a).  In addition, poaching in the Niassa Reserve has reached crisis levels, as evidenced by high carcass ratios (18%; population of 12,000 elephants) observed during October 2011 aerial surveys (WCS Mozambique *in litt.* 2014) (see paragraph 24 for an explanation of carcass ratios).

Sustainability of Offtake

19.  In Tanzania, African elephant deaths occur as a result of several factors, including: 1) natural mortality; 2) trophy hunting; 3) problem animal control; and 4) poaching.  In order to

evaluate whether offtake from trophy hunting is sustainable, all losses to the African elephant population must be considered.

Legal Offtake

20. Since 2007, the annual CITES export quota for Tanzania has been 400 tusks (sport-hunting quota of 200 elephants). During 2003-2006, the quota was 200 tusks from 100 individuals, while during 1997-2002 the quota was 100 tusks from 50 individuals. Tanzania, however, typically has not exported its full quota allotment in sport-hunted trophies or African elephant tusks. This may be an indication that the quota is set too high.

21. Although complete records on natural mortality for the entire country or on the killing of problem elephants were not available, the Panel of Experts were able to estimate the level of such offtake by analyzing the data from the ivory store databases of Tanzania. Based on 21 years of data for that country, an average of 231 elephants died annually from natural mortality, while another 287 individuals died annually from elephant control measures (CoP15 Doc. 68, Annex 6a). These annual mortality rates continue to be the best estimates available for Tanzania and are cited and used by the Government of Tanzania (TAWIRI 2010).

22. Based on a sport-hunting quota of 200 African elephants, as well as the estimates cited earlier for natural mortality and problem animal control in Tanzania, the overall legal offtake of African elephants in Tanzania is about 718 elephants annually. Considering the current population estimate to be 70,000 elephants, which we believe is a significant over-estimate because it did not consider the most recent survey figures, the legal annual offtake would be estimated at about 1% of the population. This figure is less than the annual population growth rate of 3-5% (CoP15 Doc. 68, Annex 6a) and in itself would be considered sustainable; however, sustainability is measured against total offtake, including illegal offtake, discussed below.

Illegal Offtake

23. Based on the MIKE report presented to CoP16 (Bangkok, Thailand, 2013), the levels of illegal killing across the African elephants' range are of serious and increasing concern. There has been an ongoing increase in the levels of illegal killing of elephants in Africa since 2006, with 2011 showing the highest levels of poaching since MIKE records began in 2002. The increase in poaching between 2010 and 2011 is statistically significant. As highlighted in paragraph 16, within Tanzania, PIKE values suggest widespread population declines due to illegal offtake. At the Selous-Mikumi MIKE site, Tanzania's sole World Heritage site, the 2011 PIKE was 0.64 (based on 224 carcasses), a nearly 27% increase over the 2002-2010 average of 0.50. At the Ruaha- Rungwa MIKE site, the 2011 PIKE was 0.94 (based on 34 carcasses), the highest ever recorded for that site. The PIKE was 0.86 (based on 29 carcasses) at the Katavi-Rukwa MIKE site (CoP16 Doc. 53.1). A PIKE level of 0.5 or higher translates to a level of illegal annual offtake that is likely to be higher than the annual natural birth rate, indicating that the elephant populations are very likely to be in net decline (CoP16 Doc. 53.1). In other words,

the illegal offtake is unsustainable at these sites. Recent information presented at the African Elephant Summit (Botswana, 2013) indicates that in 2012 and the first six months of 2013, the trend in PIKE levels for Eastern Africa stabilized at levels close to those of 2011(CITES Secretariat *et al.* 2013), indicating that unsustainable illegal offtake levels are continuing.

24. Carcass analyses resulting from the 2013 Selous-Mikumi and Ruaha-Rungwa aerial surveys are consistent with MIKE data. Based on the surveys, there were an estimated 6,516 (± 534 SE) elephant carcasses in the Selous-Mikumi, spanning three years. Carcass analyses indicate that more than two thirds (67%) of these elephants were killed 18 to 30 months prior, with much fewer elephants being killed within the last 18 months (<5%). The carcass ratio for the Selous-Mikumi was calculated at 30%, which indicates unnaturally high mortality (TAWIRI 2013a). Natural mortality is represented by a ratio of about 7-8% (Douglas-Hamilton and Burrill 1991, *as cited in* TAWIRI 2013a). In the Ruaha-Rungwa ecosystem, there were an estimated 3,496 (±342 SE) elephant carcasses, spanning over a ten-year period. Carcass analyses indicate that relatively fewer elephants were killed in the last 12 months (<13%). The carcass ratio for the Ruaha-Rungwa was calculated at 14.6%, which indicates unnaturally high mortality (TAWIRI 2013b).

25. It is expected that data showing high levels of poaching would be concurrent with data showing high levels of illegal trade, and this is the case with Tanzania. As noted in paragraph 16, a recent TRAFFIC news article reports that since 2009 Tanzania has made or been implicated in 18 large-scale ivory seizures (i.e., seizures that involved 500 kg or more in a single shipment). Of these seizures, Tanzania only made five of these seizures, while the other 13 seizures were made outside of the country. In total, these seizures represented nearly 43 tons of ivory, representing the death of about 4,000 elephants (http://www.traffic.org/home/2014/1/27/tanzania-reshuffled-cabinet-should-address-poaching-urgently.html). Although information on the origin of ivory from these seizures is not yet available, a significant proportion of the large seizures of ivory made in Asia in 2006 have been traced by forensic DNA work to elephants killed in the Selous-Niassa ecosystem (Wasser *et al.* 2009).

Sustainability of All Offtake

26. In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II (Note: the proposal was rejected), the Panel of Experts noted that illegal hunting can reduce the sustainability of legal offtakes, potentially negatively impacting the population as a whole. The Panel raised concerns that the poaching in the Selous-Mikumi ecosystem, which was happening at that time, could affect the long-term population sustainability. While the Panel concluded that the level of offtake in the Selous-Mikumi ecosystem was not sustainable at the time, the Panel asserted that legal and illegal offtake appeared to be sustainable for other elephant ecosystems where populations were stable or increasing, namely the Tarangire-Manyara, Ruaha-Rungwa, Katavi-Rukwa, Moyowosi-Kigosi and Serengeti (CoP15 Doc. 68, Annex 6a). In recent years our findings have been made under the supposition that the populations mentioned above were stable or increasing, rendering the

overall Tanzania elephant population to be sustainable. New information, however, indicates that the population decline is no longer restricted to the Selous-Mikumi ecosystem, but is occurring throughout Tanzania. Estimates are that Tanzania is losing about 30 elephants per day to poaching, a rate far greater than replacement through natural reproduction (TEPS 2013a and 2013b). This loss rate has recently been cited by TANAPA's Director General, Allan Kijazi (http://allafrica.com/stories/201402041257.html).

Conclusion

27. Although Tanzania has put into place legal instruments, wildlife management authorities, and a National Elephant Management Plan, the national elephant population has plummeted, primarily due to the ongoing illegal killing of elephants. Indications are that management resources have not been fully utilized and that governance in Tanzania is weak. In its findings on Tanzania's CoP15 (2010) proposal to down-list its elephant population from CITES Appendix I to Appendix II, the Panel of Experts raised concerns about the mechanism Tanzania used for funding the conservation, management, and protection of African elephants; however, after reviewing the actual allocations to the Wildlife Division between 2005 and 2009, the Panel concluded that sufficient funding was available for Tanzania to meet its enforcement obligations during that time period. The Panel of Experts also raised concern that the levels of offtake in the Selous-Mikumi ecosystem due to poaching was not sustainable at the time and could potentially affect long-term population sustainability. At the time, the Panel asserted that legal and illegal offtake appeared to be sustainable for other ecosystems where elephant populations were stable or increasing, namely the Tarangire-Manyara, Ruaha-Rungwa, Katavi-Rukwa, Moyowosi-Kigosi and Serengeti.

28. Our recent non-detriment findings followed the rationale laid out by the Panel of Experts and concluded that the import of sport-hunted trophies from Tanzania would be for purposes that are not detrimental to the survival of the species. However, now new information indicates that the elephant declines in Tanzania are no longer restricted to the Selous-Mikumi ecosystem, but are occurring throughout the country. MIKE analyses showing high levels of poaching at sites throughout Tanzania and ETIS data showing rampant, large-scale illegal ivory trade involving Tanzania, point to weak governance.

29. We recognize that sport-hunting, as part of a sound management program, can provide benefits to wildlife conservation and that sport-hunting of elephants is not the primary cause of the decline of elephant populations in Tanzania. However, given the significant decline in the elephant population due to uncontrolled poaching and questionable management and governance, we are concerned that additional killing of elephants, even if legal, is not sustainable and will not support effective elephant population recovery efforts in Tanzania.

30. Therefore, we are **unable** to find that the importation of sport-hunted trophies of African elephants taken in Tanzania during calendar year 2014 will be for purposes that are not detrimental to the survival of the species.

REFERENCES:

Baldus, R.D. and R. Hahn. 2009. The Selous – Niassa Wildlife Corridor in Tanzania: Biodiversity Conservation from the Grassroots. Practical Experiences and Lessons from Integrating Local Communities into Trans-boundary Natural Resources Management. Joint publication of FAO and CIC. Budapest. 48 pp. Available online at: http://www.wildlife-baldus.com/download/transboundary.pdf.

Blanc, J.J., R.F.W. Barnes, G.C. Craig, H.T. Dublin, C.R. Thouless, I. Douglas-Hamilton, and J.A. Hart. 2007. African Elephant Status Report 2007: An Update from the African Elephant Database. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. Available online at: http://www.african-elephant.org/aed/pdfs/aesr2007.pdf.

Blanc, J.J., C.R. Thouless., J.A. Hart., H.T. Dublin., I. Douglas-Hamilton., C.G. Craig and R.F.W. Barnes. 2003. African Elephant Status Report-2002: An update from the African Elephant Database. IUCN/SSCAfrican Elephant Specialist Group, Tanzania, 112 -117, IUCN, Gland, Switzerland and Cambridge, UK. Available online at: http://african-elephant.org/aed/aesr2002.html.

CITES Secretariat, IUCN/SSC African Elephant Specialist Group, and TRAFFIC. 2013. Status of African elephant populations and levels of illegal killing and the illegal trade in ivory: A report to the African elephant summit, December 2013. 19pp. Available online at: https://cmsdata.iucn.org/downloads/african_elephant_summit_background_document_2013_en.pdf.

CoP15 Doc. 68 Annex 6a). 2010. Report of the Panel regarding the proposal of the United Republic of Tanzania. 19 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/15/doc/E15-68A06a_.pdf.

CoP16 Doc. 53.1. 2012. Monitoring the Illegal Killing of Elephants (MIKE). Sixteenth meeting of the Conference of the Parties, Bangkok (Thailand), 3-14 March 2013, 15 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-01.pdf.

CoP16 Doc. 53.2.2 (Rev. 1). 2013. ETIS Report of TRAFFIC. Sixteenth meeting of the Conference of the Parties, Bangkok (Thailand), 3-14 March 2013, 30 pp. Available online at: http://www.cites.org/sites/default/files/eng/cop/16/doc/E-CoP16-53-02-02.pdf.

CoP16 Prop. 11. 2012. Transfer the population of the African elephant, *Loxodonta africana*, of the United Republic of Tanzania from Appendix I to Appendix II (with an annotation) (Note: proposal withdrawn). Available online at: http://www.cites.org/sites/default/files/eng/cop/16/prop/E-CoP16-Prop-11.pdf.

Foley, C.A.H. and L.J. Faust. 2010. Rapid population growth in an elephant *Loxodonta africana* population recovering from poaching in Tarangire National Park, Tanzania. *Oryx* 44(2):205—212.

Government of the United Republic of Tanzania. 2010. The Wildlife Conservation (Tourist Hunting) Regulations, 2010 (Subsidiary Legislation Supplement No. 25; 2nd July, 2010). Gazette of the United Republic of Tanzania (No. 27; Vol. 91):1—35.

Jones, T., T. Caro and T.R.B. Davenport (eds.). 2009. Wildlife Corridors in Tanzania. Unpublished Report. Tanzania Wildlife Research Institute (TAWARI), Arusha. Available online at: http://www.tzwildlifecorridors.org/TzWildlifeCorridors.pdf.

Jones, T. and K. Nowak. 2013. Elephant declines vastly underestimated. *A Voice for Elephants.* December 16, 2013. National Geographic Society. Available online at: http://newswatch.nationalgeographic.com/2013/12/16/elephant-declines-a-view-from-the-field/.

Kideghesho, J.R., A.A. Rija, K.A. Mwamende and I.S. Selemani. 2013. Emerging issues and challenges in conservation of biodiversity in the rangelands of Tanzania. *Nature Conservation* 6:1-29.

Mpanduji, D.G., H. Hofer, T.B. Hilderbrandt, F. Goeritz, M.L.East. 2002. Movement of elephants in the Selous-Niassa wildlife corridor, southern Tanzania. *Pachyderm* 33:18-31.

Tarimo, E.E., E.L.M. Severre, and S. Mduma. 2011. *in litt.* Elephant Management Plan and Law Enforcement in Tanzania: A report presented at the meeting between Ministry of Natural Resources and the Department of Interior, Fish and Wildlife Service, Washington, D.C., 17 February 2011. 16 pp.

TAWIRI. 2013a. Aerial census of large animals in the Selous-Mikumi ecosystem, dry season 2013, population status of African elephant. Arusha, Tanzania, 11pp.

TAWIRI. 2013b. Aerial census of large animals in the Ruaha-Rungwa ecosystem, dry season 2013, population status of African elephant. Arusha, Tanzania, 12pp.

TAWIRI. 2010. Tanzania Elephant Management Plan 2010-2015. TAWIRI, Arusha, Tanzania, 95 pp. Available online at: www.tawiri.or.tz/images/Conference/elephant_plan.pdf.

TEPS. 2013a. Recognition and tackling of the current elephant poaching crisis in Tanzania. Report by Tanzania Elephant Protection Society (TEPS) Task Force to the Parliamentary Committee of Land, Natural Resources and Environment. April 2013. Dar es Salaam, Tanzania, 18pp. Available online at:

http://www.tanzaniaelephantprotectionsociety.org/images/PDFs/TEPS_Elephant_Crisis_Report_BUNGE1_April_2013.pdf.

TEPS. 2013b. Tackling the elephant poaching crisis in Tanzania. Presentation to the Parliamentary Committee of Land, Natural Resources and Environment. 23rd April 2013. Task Force, Tanzania Elephant Protection Society. Dar es Salaam, Tanzania, 28pp.

Wasser, S.K., B. Clark and C. Laurie. 2009. The Ivory Trail. *Scientific American*, July 2009. Pp. 68-76.

WCS Mozambique. 2014. *in litt.* Niassa Reserve expanded elephant protection program. USFWS WWB-AECF FY14 grant proposal (F13AS00357).



| Form No. | Estimated number of respondents | Estimated number of responses | Frequency of response | Average hours per response | Total estimated burden |
|---|---|---|---|---|---|
| HUD–52670–A Part 3 ........................................ | ................ | ........................ | ........................ | 0.125 | |
| HUD–52670–A Part 4 ........................................ | ................ | ........................ | ........................ | 0.125 | |
| HUD–52670–A Part 5 ........................................ | ................ | ........................ | ........................ | 0.125 | |
| HUD–52670–A Part 6 ........................................ | ................ | ........................ | ........................ | 0.125 | |
| Total HUD–Form 52670 ........................................ | 22,731 | 272,772 | Monthly ........... | 1.125 | 306,869 |
| HUD–52671–A ........................................ | 321 | 3,852 | Monthly ........... | 1.33 | 5,123 |
| HUD–52671–B ........................................ | 11 | 132 | Monthly ........... | 1.33 | 176 |
| HUD–52671–C ........................................ | 2,742 | 44,904 | Monthly ........... | 1.33 | 59,722 |
| HUD–52670–D ........................................ | 38 | 456 | Monthly ........... | 1.33 | 607 |
| HUD–92742 ........................................ | 12 | 12 | Annually ........... | .50 | 6 |
| HUD–92743a ........................................ | 12 | 12 | Annually ........... | .25 | 3 |
| Total ........................................ | 25,867 | 322,140 | ........................ | ........................ | 372,506 |

**B. Solicitation of Public Comment**

This notice is soliciting comments from members of the public and affected parties concerning the collection of information described in Section A on the following:

(1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) The accuracy of the agency's estimate of the burden of the proposed collection of information;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Ways to minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

HUD encourages interested parties to submit comment in response to these questions.

**Authority:** Section 3507 of the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35.

Dated: May 6, 2014.

**Colette Pollard,**

*Departmental Reports Manager.*

[FR Doc. 2014–10868 Filed 5–9–14; 8:45 am]

**BILLING CODE 4210–67–P**

---

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

**[FWS–HQ–IA–2014–N086; FXIA16710900000–145–FF09A30000]**

## Interim Suspension of Imports of Elephant Trophies From Zimbabwe

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of Interim Suspension on Importation of Zimbabwean Elephant Trophies.

**SUMMARY:** On April 4, 2014, the U.S. Fish and Wildlife Service (Service) announced an interim suspension on importation of sport-hunted African elephant trophies taken in Zimbabwe during the 2014 season (on April 17, 2014, the Service revised this finding, primarily to clarify that the suspension applied only to elephants hunted on or after April 4, 2014). The decision to suspend importation of African elephant trophies taken in Zimbabwe was due primarily to the Service having insufficient information on the status of elephants in Zimbabwe and the current management program in Zimbabwe to determine that the killing of the animal whose trophy is intended for import into the United States would enhance the survival of the species.

**DATES:** The temporary suspension described in this document went into effect April 4, 2014, and will remain in effect until we provide further notice.

**ADDRESSES:** Timothy J. Van Norman, Chief, Branch of Permits, Division of Management Authority, U.S. Fish and Wildlife Service, 4401 North Fairfax Drive, Room 212, Arlington, VA 22203; fax (703) 358–2280; or email *DMAFR@fws.gov*.

**FOR FURTHER INFORMATION CONTACT:** Timothy J. Van Norman, (703) 358–2104 (telephone); (703) 358–2280 (fax); *DMAFR@fws.gov* (email).

**SUPPLEMENTARY INFORMATION:**

**Background**

The African Elephant (*Loxodonta africana*) is listed as threatened under the Endangered Species Act (ESA), 16 U.S.C. 1531 *et seq.*, and is regulated under a special rule found at 50 CFR 17.40(e). The special rule includes specific requirements for the import of sport-hunted trophies, including marking requirements for ivory. Under § 17.40(e)(3)(iii)(C), in order for the U.S. Fish and Wildlife Service (Service) to authorize the import of a sport-hunted

elephant trophy, the Service must find that the killing of the animal whose trophy is intended for import into the United States would enhance the survival of the species.

Zimbabwe has had an active elephant hunting program for more than 20 years and imports of elephant trophies into the United States have occurred at least since 1997, when the Zimbabwe elephant population, along with populations in Botswana and Namibia, was downlisted to Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). When the population was downlisted, the Service published a **Federal Register** notice that acknowledged that, as these elephants were classified as an Appendix II population, no U.S. import permit would be required to import trophies. However, we did state that in accordance with the special rule under the ESA, the requirement for an enhancement finding would continue to apply (62 FR 44627, 44633, August 22, 1997). In that **Federal Register** notice, we stated that in making the required enhancement finding for import of sport-hunted trophies, the Service would review the status of the elephant population and the total management program for elephants in each country to ensure the program was promoting the conservation of the species. The notice also stated that the Service would make such findings on a periodic basis upon receipt of new information on the species' population or management. If, based on new information, the conditions of the special rule are no longer met, the Service explained that it would publish a notice in the **Federal Register** of any change.

**Need for Current Data**

Although African elephant conservation issues have received significant attention within CITES over the last 10 or more years, the Service

has limited information on elephant management programs, efforts to control poaching, and the effects of legal hunting in Zimbabwe. While the Service is aware of a 1997 national elephant management plan, we are not aware of any updates to the plan, or whether an adaptive management approach has been taken in implementing the plan. In 2007, the Service sent a letter to the Parks and Wildlife Management Authority of Zimbabwe requesting additional information. While we did receive some information at that time, we have not received any additional updates directly from government officials since that time. Service representatives have met in person with Zimbabwean representatives at various times in the past 6 years, but again, little new or additional information has been obtained. As stated, with African elephants being a prominent species within CITES discussions, the Service has received information through documents produced in association with CITES activities. However, this information has focused more on the ivory trade and poaching, with less about regulatory mechanisms in place that would allow for appropriate management of elephants, sustainable utilization of elephants, and how elephant management is integrated into human communities to reduce human–elephant conflicts and support elephant populations.

According to the International Union for Conservation of Nature *(IUCN) Species Survival Commission, African Elephant Database report ''2013Africa''*, the elephant population in Zimbabwe in 2007 was 84,416, but as of 2013, that population had been reduced to 47,366. However, until very recently, the Government continued to provide population estimates exceeding 100,000 elephants. The summary in the IUCN report indicates that, of recent surveys, only about 1% of the country has been covered by more reliable aerial or ground surveys for population estimates, while about 50% was covered by less accurate sample counts or dung counts. For a substantial portion of the country, no recent surveys have occurred, and most estimates are based on 2001 figures. Even problem areas such as Hwange National Park where poaching appears to have significantly reduced the numbers of elephants do not appear to have been surveyed since 2001.

Several areas that were covered in the current surveys (2006–2010) indicate a substantial decline in the population; whether this decline is related to habitat degradation or poaching is unknown. Figures presented at the 16th Meeting of the Conference of the Parties to CITES in Bangkok, Thailand, March 3–14, 2013, indicates that, from 2002–2011, the number of elephants illegally killed annually increased significantly. While the numbers for 2012 and 2013 are not yet available, the trend would indicate a higher percentage of illegal killings and a population in decline. However, without further information, the Service is unable to determine the reliability of these numbers and what influence such a decline, if accurate, is having on the elephant population and its habitat in Zimbabwe.

The Service recognizes that Zimbabwe has established the Parks and Wild Life Act, as well as other laws and regulations, which provide a strong legal basis for regulating utilization and management of elephants within the country. However, with the limited information available to the Service at the time the decision to suspend imports occurred, it is not clear if resources and governance are adequate to successfully implement and enforce the established regulations. Based on available information, it appears that the Zimbabwe Parks and Wildlife Department receives no funding from the central Zimbabwean Government and must rely primarily on hunting revenues. A 2013 CITES Panel of Experts raised concerns as to the status of the Zimbabwe Parks and Wildlife Department relating to its weak financial base, lack of management skills, inadequate and old equipment, and poor infrastructure. However, the Service has little information as to funding levels or the available financial base, management skills, equipment, or infrastructure.

Without current data on population numbers and trends, government efforts to manage elephant populations, government efforts to address human-elephant conflicts and poaching, and the state of the hunting program within the country, the Service is currently unable to make a finding that sport-hunting in Zimbabwe is enhancing the survival of the species and that imports of trophies from that sport hunting would meet the criteria established under the ESA for African elephants. However, we recognize that our inability to make a finding is based primarily on a lack of information, not on specific information that shows that Zimbabwe's management is not enhancing the survival of the species. Therefore, the Service is actively pursuing additional information from the Government of Zimbabwe, as well as other sources, in an effort to make a final determination on whether African elephant sport-hunted trophies taken in 2014 could be imported into the United States.

**Recent Action**

Until sufficient additional information can be obtained, the Service has established an interim suspension on imports of elephant trophies taken from Zimbabwe on or after April 4, 2014, the date the suspension was announced through a press release and posting on the Service's Web page. Until the Service is able to issue a finding that the sport hunting of African elephants in Zimbabwe enhances the survival of the species, U.S. hunters are on notice that, while no ESA permit is currently required for the import of sport-hunted trophies, such imports cannot occur at this time. The current enhancement finding has been posted at *http://www.fws.gov/international/pdf/enhancement-finding-2014-elephant-Zimbabwe.PDF*. In addition, the press release announcing the interim suspension and frequently asked questions is available on the Service's Web page (*www.fws.gov/international*).

The Service has requested the information necessary to make a final decision from the Government of Zimbabwe. After the Service has an opportunity to review new information and obtain additional information, if necessary, we will make a final decision. If the Service finds that sport hunting of African elephants in Zimbabwe enhances the survival of the species, the suspension will be lifted. If, after reviewing the new information, the Service finds that sport hunting of African elephants in Zimbabwe does not enhance the survival of the species, the suspension will continue until the Service receives new information in the future that would allow it to make a positive enhancement finding. Either way, the final finding will be published in the **Federal Register** and made available on the Service's Web page.

**Interim Suspension**

This suspension does not prohibit U.S. hunters from traveling to Zimbabwe and participating in an elephant hunt. The ESA special rule for African elephants does not prohibit take (e.g., hunting) outside the United States, but it does prohibit import of sport-hunted trophies unless all requirements have been met. Therefore, it is possible that a hunter who hunted in Zimbabwe and took an elephant after April 4 could import his or her trophy at a later date if the Service can determine in the final finding that imports meet the criteria under the ESA. Nonetheless, the Service cannot ensure that such imports will ever be authorized in the future.

Further, this suspension on imports does not affect elephant taken in Zimbabwe prior to April 4, 2014. Elephants hunted in previous hunting seasons are still eligible to be imported, provided all CITES and other import requirements are met.

Dated: May 7, 2014.

**Timothy J. Van Norman,**

*Chief, Branch of Permits, Division of Management Authority, U.S. Fish and Wildlife Service.*

[FR Doc. 2014–10890 Filed 5–9–14; 8:45 am]

**BILLING CODE 4310–55–P**

---

## DEPARTMENT OF THE INTERIOR

**Bureau of Land Management**

[LLCON06000–L16100000.DQ0000]

**Notice of Resource Advisory Council Meeting for the Dominguez-Escalante National Conservation Area Advisory Council**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of Public Meeting.

**SUMMARY:** In accordance with the Federal Land Policy and Management Act of 1976 and the Federal Advisory Committee Act of 1972, the U.S. Department of the Interior, Bureau of Land Management (BLM) Dominguez-Escalante National Conservation Area (NCA) Advisory Council (Council) will meet as indicated below.

**DATES:** The meeting will be held on Wednesday, July 23, 2014, from 3 p.m. to approximately 6 p.m. Any adjustments to this meeting will be posted on the Dominguez-Escalante NCA Resource Management Plan (RMP) Web site: *http://www.blm.gov/co/st/en/nca/denca_rmp.html.*

**ADDRESSES:** The meeting will be held in Conference Room 40 at the Mesa County Central Services Building, 200 S. Spruce Street, Grand Junction, CO 81501.

**FOR FURTHER INFORMATION CONTACT:** Collin Ewing, Advisory Council Designated Federal Official, 2815 H Road, Grand Junction, CO 81506. Phone: (970) 244–3049. Email: *cewing@blm.gov.* Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 to contact the above individual during normal business hours. The FIRS is available 24 hours a day, seven days a week, to leave a message or question with the above individual. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** The 10-member Council advises the Secretary of the Interior, through the BLM, on a variety of planning and management issues associated with the RMP process for the Dominguez-Escalante NCA and Dominguez Canyon Wilderness.

Topics of discussion during the meeting may include informational presentations from various resource specialists working on the RMP as well as Council reports on the following topics: recreation, fire management, land-use planning process, invasive species management, travel management, wilderness, land exchange criteria, cultural resource management and other resource management topics of interest to the Council that were raised during the planning process.

These meetings are anticipated to occur quarterly and may occur as frequently as every two weeks during intensive phases of the planning process. Dates, times and agendas for additional meetings may be determined at future Council meetings and will be published in the **Federal Register**, announced through local media and on the BLM's Web site for the Dominguez-Escalante planning effort, *www.blm.gov/co/st/en/nca/denca_rmp.html.*

These meetings are open to the public. The public may present written comments to the Council. Each formal Council meeting will have time allocated at the middle and end of each meeting to hear public comments. Depending on the number of persons wishing to comment and time available, the time for individual oral comments may be limited at the discretion of the chair.

**Ruth Welch,**

*BLM Colorado Acting State Director.*

[FR Doc. 2014–10786 Filed 5–9–14; 8:45 am]

**BILLING CODE 4310–JB–P**

---

## DEPARTMENT OF THE INTERIOR

**Bureau of Land Management**

[LLNVC02000 L57000000.BX0000; 241A; MO# 4500063716]

**Temporary Closures of Public Land in Washoe County, NV**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice.

**SUMMARY:** As authorized under the provisions of the Federal Land Policy and Management Act of 1976, certain public land near Stead, Nevada, will be temporarily closed to all public use to provide for public safety during the 2014 Reno Air Racing Association Pylon Racing Seminar and the Reno National Championship Air Races.

**DATES:** The temporary closure periods are June 11 through June 14, 2014, and September 6 through September 14, 2014.

**FOR FURTHER INFORMATION CONTACT:** Leon Thomas, 775–885–6000, email: *l70thoma@blm.gov.* Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 to contact Mr. Thomas during normal business hours. The FIRS is available 24 hours a day, 7 days a week, to leave a message or question for Mr. Thomas. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** This closure applies to all public use, including pedestrian use and vehicles. The public lands affected by this closure are described as follows:

**Mount Diablo Meridian**

T. 21 N., R. 19 E.,
  Sec. 8, E½E½, NW¼NE¼;
  Sec. 16, SW¼SW¼NE¼, NW¼, W½SE¼.

The area described contains 450 acres, more or less, in Washoe County, Nevada.

The closure notice and map of the closure area will be posted at the BLM Carson City District Office, 5665 Morgan Mill Road, Carson City, Nevada and on the BLM Web site: *http://www.blm.gov/nv/st/en/fo/carsoncity_field.html.* Roads leading into the public lands under the closure will be posted to notify the public of the closure. Under the authority of Section 303(a) of the Federal Lands Policy and Management Act of 1976 (43 U.S.C. 1733(a)), 43 CFR 8360.9–7 and 43 CFR 8364.1, the Bureau of Land Management will enforce the following rules in the area described above: All public use, whether motorized, on foot, or otherwise, is prohibited.

*Exceptions:* Closure restrictions do not apply to event officials, medical and rescue personnel, law enforcement, and agency personnel monitoring the events.

*Penalties:* Any person who fails to comply with the closure orders is subject to arrest and, upon conviction, may be fined not more than $1,000 and/or imprisonment for not more than 12 months under 43 CFR 8360.0–7. Violations may also be subject to the provisions of Title 18, U.S.C. 3571 and 3581.

**Authority:** 43 CFR 8360.0–7 and 8364.1.

**James W. Schroeder,**

*Acting Field Office Manager, Sierra Front Field Office.*

[FR Doc. 2014–10834 Filed 5–9–14; 8:45 am]

**BILLING CODE 4310–HC–P**



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer To:
FWS/AIA/OMA

Memorandum

**MAY   6 1997**

To:        The File

From:    Chief, Branch of Permits

Subject:   Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in
            Tanzania

The African elephant (<u>Loxodonta africana</u>) is listed as threatened under the U.S. Endangered
Species Act with a special rule at 50 CFR 17.40(e). The special rule sets forth requirements for
the import of sport-hunted trophies, including marking requirements for ivory. Under paragraph
17.40(e)(3)(iii)(C), the Service must make a finding that the killing of the elephant whose trophy
is intended for import would enhance the survival of the species.

Based on available information, the OMA believes that Tanzania is effectively conserving and
managing the elephant population throughout the country and finds that the import of sport-
hunted elephant trophies from Tanzania enhances the survival of the species. This finding applies
to all African elephant trophies lawfully taken in Tanzania, provided they are imported by the
person who hunted them for personal use.

<u>Basis for Enhancement Finding</u>:

**Population Status**: Aerial surveys of elephant populations have been undertaken by the
Tanzania Wildlife Conservation Monitoring (TWCM) unit at two- to three-year intervals to
monitor population trends, distribution, and recovery. Ground survey techniques have also
been incorporated. They involve scientists and field staff undertaking routine monitoring
duties during law enforcement patrols to determine population trends, distribution, and age
and sex ratios of key populations.

Tanzania has the largest elephant population of any range state. In the early 1970's, the
population was estimated at 365,000 elephants. By 1991, a population survey conducted by
TWCM showed the population had dropped to approximately 57,334 elephants. This drop
was primarily a result of extensive poaching which occurred during the 1970's and 1980's. A
secondary factor was a reduction in habitat due to expanding human populations. The
current estimates available indicate the population in Tanzania ranges from a low of 87,842
to a high of about 100,000 elephants.

***Management Program***: In 1974, Tanzania passed the Wildlife Conservation Act which allowed the government to establish protected areas for elephants. These areas were established as National Parks, Game Reserves, and Game Controlled Areas. The management plan outlined by Tanzania encourages the recovery of the elephant population and its management on a scientific basis. It provides for total protection of Tanzania's elephants within certain protected areas and their utilization through tourist game viewing. It also provides for controlled utilization of elephants through limited sport hunting in protected areas where appropriate. It encourages reductions in human-elephant conflicts by promoting enhanced community-based conservation programs and by the control of problem elephants.

In all National Parks and in the Ngorongoro Conservation Area, elephants are fully protected. Their habitats are managed to encourage  recovery in terms of numbers and age structure, to preferred management densities for each habitat. Utilization of elephants in these areas is limited to tourist game viewing. In Game Reserves, elephants are protected and their habitats managed in the same manner as National Parks. However, utilization of elephants in these areas is comprised of limited sport-hunting and tourist game viewing.

In Game Controlled Areas and in Open Areas, the protection and recovery of elephants poses the greatest challenge due to increased human-elephant conflicts. As elephant populations recover they expand into areas surrounding unsettled protected areas. The increase in human population has led to a decrease in elephant habitat. In these areas, methods of utilization are incorporated which enhance the economic value of elephants to local communities. These methods include tourist game viewing, limited sport-hunting, and the sale to sport-hunters of problem animals. A policy of community-based conservation provides an economic incentive and return to local communities while encouraging tolerance for the elephant and sustainable use of natural resources.

***Regulations/Enforcement***: In Tanzania, all natural resources come under the jurisdiction of the Ministry of Tourism, Natural Resources and Environment. Within the Ministry is the Wildlife Department (WD) which is responsible for wildlife in Game Reserves, Game Controlled Areas and Open Areas. Under the Wildlife Conservation Act, elephants may only be hunted or utilized under a license issued by the Director of Wildlife. Elephants also need to meet requirements relating to tusks size and weight to be legally harvested. The only exception is elephants killed in defense of human life and property.

In 1989, "Operation Uhai" was undertaken by the WD in an effort to address the rampant poaching problem in Tanzania. The operation involved 200 men from WD and 1,000 each from the army and police at a cost of $4,210,000. It resulted in the recovery of 3,044 illegally taken tusks and the arrest and conviction of 2,607 poachers. The operation was credited with curtailing poaching activities in Tanzania. In addition, sentences for ivory poachers and dealers were increased from a few months jail sentence or fine to 30 years imprisonment. As of 1991, the WD employed 260 staff members in the anti-poaching unit. The Tanzania government has allowed the WD to retain 50 percent of the revenues from

sport-hunting of elephants to provide continued funding for law enforcement, anti-poaching activities, management and conservation programs.

*Sustainable Use*: The CITES Secretariat has provided documentation that Tanzania has established a quota of 50 elephants (100 tusks) for the 1997 hunting season. These quotas are established each year by the Ministry based upon measurements of trophy size and numbers shot in each area, from data on trends in population size, and age and sex structure.

Total levels of current and projected offtake from the Tanzania elephant population are sustainable. Each year problem animal control results in an estimated 500 to 1,000 elephants being taken annually due to human-elephant conflicts. The illegal hunting of elephants has been effectively curtailed as a result of increased anti-poaching efforts begun in 1989 by the WD.

The principle forms of utilization of the elephant in Tanzania involve tourist game viewing in National Parks, the Ngorongoro Conservation Area, and in certain areas of Game Reserves. The elephant is also utilized through limited sport-hunting inside designated areas of Game Reserves. Since the 1991 hunting season, hunters have been allowed to shoot only male elephants with tusks heavier than 25 kilograms or longer than 1.75 meters per tusk. Each hunting group is accompanied by an official from the WD. Tanzania's regulated sport-hunting industry has contributed to the reduction of illegally taken elephants and those killed through problem animal control.

In late 1994, three male elephants were shot by foreign sport hunters in Tanzania that had purportedly migrated over the border from Amboseli National Park, Kenya, into the Longido area of Tanzania. These elephants were believed to be part of a long-term research project in Kenya. In May of 1995, the Service received information from the Director of Wildlife, Tanzanian Ministry of Tourism, Natural Resources and Environment, indicating that hunting had been banned in the Longido area (except for the removal of problem elephants) to protect elephants, especially the old bulls, involved in long-term research and possibly migrating from Amboseli National Park, Kenya. The documents also indicated that the Governments of Tanzania and Kenya would be developing conservation strategies for cross-border populations of elephants shared by the two countries. Further information received in May of 1996 from the Director of Wildlife in Tanzania indicated that the hunting ban in the Longido area was still in effect. There have been no reports of any further problems occurring in this area. The ban includes all cross-border elephant populations in Tanzania. The following condition will be placed on all import permits for sport hunted elephants taken in Tanzania: "Elephants must not have been taken from any moratorium area including Longido Controlled Hunting Area (CHA)."

*CITES Implementation*: Under the Wildlife Conservation Act, elephants may be hunted or otherwise utilized under a license issued by the Director of Wildlife. All exports of sport-hunted elephant trophies from Tanzania will be in accordance with CITES and the Wildlife Conservation Act.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 18th day of July 2014, a true and correct copy of the Appendix for the Safari Club International and National Rifle Association of America's Appeal of the Denial of Motion for a Preliminary Injunction was electronically filed through the CM/ECF system, which caused all parties to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

/s/ Anna M. Seidman
Anna M. Seidman

*Counsel for Appellants,*
*Safari Club International*