No. 14-5152
ORAL ARGUMENT SCHEDULED OCT. 3, 2014

---

IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT

---

SAFARI CLUB INTERNATIONAL; NATIONAL RIFLE ASSOCIATION OF AMERICA,
PLAINTIFFS-APPELLANTS,

v.

S.M.R. JEWELL, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE
INTERIOR; DEPARTMENT OF THE INTERIOR, AN AGENCY OF THE UNITED
STATES; DANIEL M. ASH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE
U.S. FISH & WILDLIFE SERVICE; U.S. FISH & WILDLIFE SERVICE, AN
AGENCY OF THE UNITED STATES,
DEFENDANTS–APPELLEES,

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF COLUMBIA (HON. AMY BERMAN JACKSON)

---

**FEDERAL DEFENDANTS-APPELLEES' ANSWERING BRIEF**

---

SAM HIRSCH
  Acting Assistant Attorney General

Of Counsel:
HOLLY WHEELER
RUSSELL HUSEN
  U.S. Dep't of the Interior
  Office of the Solicitor
  Washington, D.C.

MATTHEW LITTLETON
MEREDITH L. FLAX
ANDREA GELATT
NICHOLAS A. DIMASCIO
  Attorneys, U.S. Dep't of Justice
  Env't & Natural Resources Div.
  999 18th St., Suite 370
  Denver, CO  80202
  (303) 844-1384
  nicholas.dimascio@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A) **Parties and Amici**. All parties, intervenors, and amici appearing before the district court and in this court are listed in Plaintiffs-Appellants' opening brief.

(B) **Rulings under Review**. References to the rulings at issue appear in Plaintiffs-Appellants' opening brief.

(C) **Related Cases**. This case has not been before this Court previously. Undersigned counsel is unaware of any other case that is related to this appeal within the meaning of D.C. Circuit Rule 28(a)(1)(B).

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF ISSUES ..................................................................... 1

STATEMENT OF THE CASE .................................................................. 2

LEGAL BACKGROUND ........................................................................ 4

    I.    Non-detriment Findings Under CITES ............................... 4

    II.   Enhancement Findings Under the ESA ............................... 7

STATEMENT OF FACTS AND PROCEDURAL HISTORY .................... 9

    I.    The Service's Actions Concerning Sport-Hunted
        African Elephant Trophies from Tanzania & Zimbabwe ....... 9

    II.   Safari Club's Suit and Allegations of Harm ...................... 12

    III.  The District Court's Denial of Preliminary Relief ............ 14

    IV.  The Service's New Enhancement Finding for Zimbabwe ..... 17

STANDARD OF REVIEW ..................................................................... 20

SUMMARY OF ARGUMENT ................................................................ 21

ARGUMENT ..................................................................................... 24

    I.    Safari Club's Preliminary Injunction Appeal Does Not
        Present an Article III Case or Controversy ....................... 25

        A.   Safari Club's Preliminary Injunction Motion is Moot
             With Respect to the Service's Superseded April 4
             Enhancement Finding for Zimbabwe ............................. 27

        B.   Safari Club Lacks Standing to Seek a Preliminary
             Injunction with Respect to Tanzania ............................. 35

II.    THE DISTRICT COURT CORRECTLY HELD THAT SAFARI CLUB
       DID NOT DEMONSTRATE IRREPARABLE HARM .............................. 46

       A.    Safari Club Has Not Shown that the Hunters Will
             Suffer Any Irreparable Harm During this Suit .............. 47

       B.    None of Safari Club's Other Alleged Injuries Qualify
             as Irreparable Harm ......................................................... 54

             1.    Any harm to conservation interests is neither
                   certain nor imminent enough to warrant
                   preliminary relief ..................................................... 55

             2.    Any economic harm is not certain or great
                   enough to warrant preliminary relief ...................... 61

CONCLUSION ....................................................................................... 68

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[1]

## **Federal Cases**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ........................................................ 27

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.,*
    840 F. Supp. 2d 327 (D.D.C. 2012) ............................... 63, 67

*\*Albuquerque Indian Rights v. Lujan,*
    930 F.2d 49 (D.C. Cir. 1991) .......................... 36–38, 41–42

*Aluminum Co. of Am. v. Bonneville Power Admin.,*
    56 F.3d 1075 (9th Cir. 1995) ........................................... 30

*Am. Rivers v. Nat'l Marine Fisheries Serv.,*
    126 F.3d 1118 (9th Cir.1997) .......................................... 30

*Animal Legal Def. Fund v. Shalala,*
    53 F.3d 363 (D.C. Cir. 1995) ...................................... 27–28

*Arizonans for Official English v. Arizona,*
    520 U.S. 43 (1997) ........................................................... 17

*Boucher v. Sch. Bd. of Greenfield,*
    134 F.3d 821 (7th Cir. 1998) ........................................... 50

*Bova v. City of Medford,*
    564 F.3d 1093 (9th Cir. 2009) .................................... 43–44

*Cardinal Health, Inc. v. Holder,*
    846 F. Supp. 2d 203 (D.D.C. 2012) ............... 62–63, 65, 67

*Castlewood Prods., L.L.C. v. Norton,*
    365 F.3d 1076 (D.C. Cir. 2004) ......................................... 6

---

[1] Authorities upon which the Service chiefly relies are marked with asterisks.

*Cent. & S. Motor Freight Tariff Ass'n v. United States,*
757 F.2d 301 (D.C. Cir. 1985) .......................................... 65

*Ctr. for Auto Safety v. Dole,*
595 F. Supp. 98 (D.D.C. 1984) ................................. 29, 32

*Ctr. for Sci. in the Pub. Interest v. Regan,*
727 F.2d 1161 (D.C. Cir. 1984) ............................... 30, 32

*\*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) .............. 25, 31, 46–47, 50–51, 58, 63

*Connecticut v. Massachusetts,*
282 U.S. 660 (1931) ........................................................ 60

*Cnty. of L.A. v. Shalala,*
192 F.3d 1005 (D.C. Cir. 1999) ..................................... 48

*Crete Carrier Corp. v. EPA,*
363 F.3d 490 (D.C. Cir. 2004) ....................................... 57

*Davis v. Pension Benefit Guar. Corp.,*
571 F.3d 1288 (D.C. Cir. 2009) ........................... 20, 61, 68

*Dist. of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................ 38

*Fed. Exp. Corp. v. Air Line Pilots Ass'n,*
67 F.3d 961 (D.C. Cir. 1995) .......................................... 20

*Fla. Audubon Soc'y v. Bentsen,*
94 F.3d 658 (D.C. Cir. 1996) (*en banc*) ..................... 43, 57

*Fla. Power & Light Co. v. Lorion,*
470 U.S. 729 (1985) ........................................................ 48

*\*Fund for Animals, Inc. v. Hogan,*
428 F.3d 1059 (D.C. Cir. 2005) ................................. 29–30

*Gulf Oil Corp. v. Dept. of Energy,*
514 F.Supp. 1019 (D.D.C. 1981) ................................... 63

*Hightower v. City of Boston*,
    693 F.3d 61 (1st Cir. 2012) ............................................................ 38

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ....................................................................... 36

*In re Reporters Comm. for Freedom of the Press*,
    773 F.2d 1325 (D.C. Cir. 1985) ..................................................... 34

*Jackson-Bey v. Hanslmaier*,
    115 F.3d 1091 (2d Cir. 1997)................................................... 38, 41

*Lemon v. Geren*,
    514 F.3d 1312 (D.C. Cir. 2008) ..................................................... 32

*Lewis v. Cont'l Bank Corp.*,
    494 U.S. 472 (1990) ....................................................................... 26

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ......................................................................... 26

*Madsen v. Boise State Univ.*,
    976 F.2d 1219 (9th Cir. 1992) ................................................. 38, 41

*Marcum v. Salazar*,
    694 F.3d 123 (D.C. Cir. 2012) ................................................. 44–45

*Medellin v. Texas*,
    552 U.S. 491 (2008) ......................................................................... 6

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ....................................................................... 48

*Moose Lodge No. 107 v. Irvis*,
    407 U.S. 163 (1972) ....................................................................... 37

*Morris v. United States*,
    392 F.3d 1372 (Fed. Cir. 2004) ..................................................... 45

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) ......................................... 62, 65, 67

*Nat'l Mining Ass'n v. McCarthy,*
     ___ F.3d ___, 2014 WL 3377245 (D.C. Cir. July 11, 2014) ..... 25, 44

*\*Nat'l Ass'n of Clean Water Agencies v. EPA,*
     734 F.3d 1115 (D.C. Cir. 2013) ................................................ 17, 24

*Nat'l Ass'n of Mortgage Brokers v. Bd. of Governors,*
     773 F. Supp. 2d 151 (D.D.C. 2011) .................................................. 67

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
     538 U.S. 803 (2003) .......................................................................... 52

*\*Nat'l Treasury Employees Union v. United States,*
     927 F.2d 1253 (D.C. Cir. 1991) ...................................................... 49

*Nat'l Treasury Employees Union v. United States,*
     101 F.3d 1423 (D.C. Cir. 1996) ...................................................... 43

*Nat'l Wildlife Fed'n v. Burford,*
     835 F.2d 305 (D.C. Cir. 1987) ........................................................ 20

*New York v. U.S. EPA,*
     413 F.3d 3 (D.C. Cir. 2005) ...................................................... 63–64

*Newdow v. Roberts,*
     603 F.3d 1002 (D.C. Cir. 2010) ...................................................... 34

*Park Lake Res. Ltd. Liab. Co. v. U.S. Dep't of Agric.,*
     197 F.3d 448 (10th Cir. 1999) ........................................................ 45

*Parker v. Dist. of Columbia,*
     478 F.3d 370 (D.C. Cir. 2007) ........................................................ 38

*Pennsylvania v. New Jersey,*
     426 U.S. 660 (1976) .................................................................. 16, 53

*People for Ethical Treatment of Animals, Inc. v. Gittens,*
     396 F.3d 416 (D.C. Cir. 2005) ........................................................ 28

*Phillip v. Fairfield Univ.,*
     118 F.3d 131 (2d Cir. 1997) ............................................................ 50

*Pub. Utils. Comm'n of Cal. v. FERC*,
    236 F.3d 708 (D.C. Cir. 2001) ........................................ 33

*Schalk v. Teledyne, Inc.*,
    751 F. Supp. 1261 (W.D. Mich. 1990) ........................... 51

*Schalk v. Teledyne, Inc.*,
    948 F.2d 1290 (6th Cir. 1991) (table case) ................... 51

*Sea Containers Ltd. v. Stena AB*,
    890 F.2d 1205 (D.C. Cir. 1989) ...................................... 46

*Second City Music, Inc. v. City of Chi., Ill.*,
    333 F.3d 846 (7th Cir. 2003) .................................... 53–54

*Serono Labs., Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) ...................................... 20

*Sherley v. Sebelius*,
    610 F.3d 69 (D.C. Cir. 2010) ......................................... 31

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ...................................................... 26

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007) .......................................... 17, 24–25

*Southern Co. Servs., Inc. v. FERC*,
    416 F.3d 39 (D.C. Cir. 2005) ........................................ 34

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,
    695 F.3d 676 (7th Cir. 2012) ........................................ 54

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................ 36, 43

*Tesoro Ref. & Mktg. Co. v. FERC*,
    552 F.3d 868 (D.C. Cir. 2009) ...................................... 41

*Texas v. United States*,
    523 U.S. 296 (1998) ................................................ 43–44

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir. 2006) ........................................ 26

*United States v. Decastro,*
  682 F.3d 160 (2d Cir. 2012) ..................................... 38, 41

*United States v. Koczuk,*
  252 F.3d 91 (2d Cir. 2001) ........................................ 5

*United States v. Western Elec. Co., Inc.,*
  777 F.2d 23 (D.C. Cir. 1985) ........................................ 53

*United Transp. Union v. Interstate Commerce Comm'n,*
  891 F.2d 908 (D.C. Cir. 1989) ........................................ 57

*\*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981) ........................................ 27, 47, 49

*Utah Shared Access Alliance v. Carpenter,*
  463 F.3d 1125 (10th Cir. 2006) ........................................ 30, 33, 34

*Valley Forge Christian Coll. v. Ams. United for Separation of Church
  & State, Inc.,*
  454 U.S. 464 (1982) ........................................ 26, 36, 37, 42

*Warth v. Seldin,*
  422 U.S. 490 (1975) ........................................ 36

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................ 55

*\*Wisc. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) .................... 46–47, 57, 59–62, 65–66

*Worth v. Jackson,*
  451 F.3d 854 (D.C. Cir. 2006) ........................................ 26

*Wyoming v. U.S. Dep't of Interior,*
  587 F.3d 1245, 1253 (10th Cir. 2009) ........................................ 30

## STATUTES

Administrative Procedure Act ("APA"):

    5 U.S.C. § 704 ......................................................................... 25

    5 U.S.C. §§ 551-559, 701–706 ............................................... 12

Endangered Species Act of 1973 ("ESA"):

    16 U.S.C. § 1533(d) .................................................................. 7

    16 U.S.C. § 1537a .................................................................... 6

    16 U.S.C. § 1538(a)(1)(A) ....................................................... 7

    16 U.S.C. § 1538(c)(1) ............................................................ 6

    16 U.S.C. § 1539(g) ............................................................... 41

    16 U.S.C. § 1540(f) ................................................................. 6

28 U.S.C. § 1292(a)(1) ................................................................ 1

28 U.S.C. § 1331 ......................................................................... 1

## RULES AND REGULATIONS

50 C.F.R. § 17.9 .......................................................................... 9

50 C.F.R. § 17.11(h) .................................................................... 8

50 C.F.R. § 17.31(a) .................................................................... 7

50 C.F.R. § 17.31(c) .................................................................... 7

50 C.F.R. § 17.40(e) .................................................................... 8

50 C.F.R. § 17.40(e)(3)(iii)(B) .................................................... 8

50 C.F.R. § 17.40(e)(3)(iii)(C) .................................................... 8

50 C.F.R. § 23.6.............................................................. 7, 9

50 C.F.R. § 23.7(b) ............................................................ 7

50 C.F.R. § 23.20(e) ....................................................... 6, 39

50 C.F.R. § 23.33(a)(1) ....................................................... 9

50 C.F.R. § 23.33(b) ........................................................... 7

50 C.F.R. § 23.35(b) ....................................................... 6, 39

50 C.F.R. § 23.35(c) ........................................................... 7

50 C.F.R. § 23.61(c) ...................................................... 7, 41

50 C.F.R. § 23.61(e) ........................................................... 7

Fed. R. Civ. P. 12(b)(1) .................................................... 17

Fed. R. Civ. P. 12(b)(6) ............................................... 17, 25

## **MISCELLEANOUS**

U.S. Constitution art. III § 2 ....................... 1, 20–22, 26, 43, 45

Convention on International Trade in Endangered Species of Wild
    Fauna and Flora (Mar. 3, 1973) ("CITES") ...................... 4

    CITES preamble ....................................................... 4

    CITES art. I(a) ........................................................ 5

    CITES art. II ....................................................... 4–5

    CITES art. III, ¶ 2 .................................................. 6

    CITES art. III, ¶ 3 ................................................ 6–7

    CITES art. IV, ¶ 2 .................................................. 6

    CITES art. IV, ¶ 4 .................................................. 6

CITES art. XIV, ¶ 1(a) ....................................................... 8

Listing of the African Elephant as a Threatened Species, 43 Fed. Reg.
     20,499 (May 12, 1978) ...................................................... 8

Endangered and Threatened Wildlife and Plants; Retention of
     Threatened Status for the Continental Population of the
     African Elephant, 57 Fed. Reg. 35,473 (Aug. 10, 1992)................... 8

Changes in List of Species in Appendices to CITES, 62 Fed. Reg.
     44,627 (Aug. 22, 1997)................................................... 8–9

Notice of Suspension of Imports of Zimbabwe Elephant Trophies
     Taken in 2014 on or After April 4, 2014, 79 Fed. Reg. 44,459
     (July 31, 2014) ....................................................... 18, 35

Sport-Hunted Trophies, U.S. Fish & Wildlife Service,
     http://www.fws.gov/ international/permits/by-activity/
     sport-hunted-trophies.html................................................ 10, 17–18

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CITES | Convention on International Trade in Endangered Species of Wild Fauna and Flora |
| ESA | Endangered Species Act |

# JURISDICTIONAL STATEMENT

Plaintiffs-Appellants (collectively "Safari Club") invoked the district court's original jurisdiction under 28 U.S.C. § 1331. Without determining whether it had subject matter jurisdiction over Safari Club's claims, the district court denied Safari Club's motion for a preliminary injunction on June 6, 2014, because Safari Club had not demonstrated irreparable harm. (App. 45.) Safari Club timely filed a notice of appeal on June 17, 2014. (App. 56.) This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). However, as explained below, the U.S. Fish & Wildlife Service contends that this Court lacks subject matter jurisdiction under Article III of the U.S. Constitution.

# STATEMENT OF ISSUES

1. Whether Safari Club's preliminary injunction appeal presents a case or controversy under Article III of the U.S. Constitution where,

    A. the Service has issued a new enhancement finding for Zimbabwe that supersedes the April 4, 2014, finding at issue in Safari Club's preliminary injunction motion; and

    B. Safari Club did not show that any of its members had applied for or been denied an import permit for a sport-hunted African elephant trophy from Tanzania.

2. Whether the district court properly denied Safari Club's motion because Safari Club did not show that its members would suffer any irreparable harm during the pendency of the suit.

## STATEMENT OF THE CASE

This is an appeal from the district court's denial of Safari Club's motion to preliminarily enjoin the U.S. Fish & Wildlife Service from suspending the import of sport-hunted African elephant trophies from Tanzania and Zimbabwe. After analyzing the available evidence, the Service concluded that, given the threats to African elephant populations in Tanzania and Zimbabwe, it could not make the findings necessary to permit the import of sport-hunted elephant trophies from those countries. The Service therefore announced that it was suspending imports of sport-hunted African elephant trophies from Tanzania and Zimbabwe for the remainder of 2014 unless it received additional information allowing it to make the necessary findings.

Safari Club filed suit in district court and moved to preliminarily enjoin the Service from restricting the import of sport-hunted elephant trophies from Tanzania and Zimbabwe. Safari Club argued that a number of its members would be harmed because they had plans to hunt, or had U.S. clients who planned to hunt, African elephants in Tanzania and Zimbabwe in 2014. The district court denied Safari Club's

motion because Safari Club had not demonstrated any irreparable harm. Safari Club appealed.

This Court lacks subject matter jurisdiction over this preliminary injunction appeal. Safari Club's motion is moot with respect to the Service's April 4, 2014, enhancement finding for Zimbabwe because that finding has been superseded. Safari Club also lacks standing to seek an injunction with respect to Tanzania because it did not show that any of its members had applied for or been denied a permit to import a sport-hunted elephant trophy from that country. Accordingly, this Court should vacate the district court's order and instruct it to dismiss Safari Club's motion for lack of subject matter jurisdiction.

Alternatively, this Court may affirm the district court's order on the nonmerits ground that Safari Club did not demonstrate irreparable harm. Nothing the Service did prevents Safari Club's members from hunting African elephants in Tanzania or Zimbabwe while their suit is pending. The hunters simply can place any trophies they garner in storage and seek appropriate relief if they win their suit on the merits. Safari Club's allegations of harm to elephant conservation are speculative and remote, and the economic harms Safari Club alleged

are insufficient to justify preliminary relief. The district court therefore correctly concluded that Safari Club did not allege any harm that was certain, great, imminent, or irreparable, and thus did not meet the high standard for preliminary injunctive relief.

## LEGAL BACKGROUND[2]

### I.    NON-DETRIMENT FINDINGS UNDER CITES

The Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087 ("CITES" or "Convention"), is a multilateral treaty to which the United States is a party, *id.* at 1089. The parties to the Convention recognized that "international cooperation is essential for the protection of certain species of wild fauna and flora against over-exploitation through international trade." CITES preamble, *id.* at 1090. The Convention thus aims to regulate international trade in wildlife and plants that are listed in its appendices to ensure that such trade does not threaten the survival of those species in the wild.

The degree of regulation depends upon the particular appendix in which a species is listed. *See* CITES art. II, *id.* at 1092. Species listed in

---

[2] All applicable authorities are included in the addendum to Safari Club's opening brief or the separately-filed addendum to this brief.

Appendix I are "threatened with extinction" and thus trade in such species is "subject to particularly strict regulation in order not to endanger further their survival." *Id.* Appendix II includes species that are not necessarily threatened with extinction at present but "may become so unless trade in specimens of such species is subject to strict regulation." *Id.* Appendix III contains those species that a party to the treaty has identified as "subject to regulation within its jurisdiction for the purpose of preventing or restricting exploitation, and as needing the cooperation of other parties in the control of trade." *Id.*

A given species may be listed in different appendices for different countries. *See* CITES art. I(a), *id.* at 1090 (defining "species" to include any "geographically separate population"). This case concerns African elephants (*Loxodonta africana*), which appear in Appendix I for Tanzania and Appendix II for Zimbabwe.[3]

Because the Convention is not self-executing, *see United States v. Koczuk*, 252 F.3d 91, 93 (2d Cir. 2001), it did not automatically have effect as domestic law upon ratification by the United States, *see*

_____

[3] The current CITES appendices are available at http://www.cites.org/eng/app/appendices.php (last visited Aug. 18, 2014).

*generally Medellin v. Texas*, 552 U.S. 491, 504–05 (2008). "Congress implemented the Convention into U.S. law in the Endangered Species Act of 1973 ['ESA'], Pub. L. No. 93-205, 87 Stat. 884 (codified as amended at 16 U.S.C. §§ 1531–44 (2000)). The ESA makes it unlawful to 'engage in any trade in any specimens contrary to the provisions of the Convention.' 16 U.S.C. § 1538(c)(1)." *Castlewood Prods., L.L.C. v. Norton*, 365 F.3d 1076, 1079 (D.C. Cir. 2004).

Congress directed the Service to effectuate the Convention, 16 U.S.C. § 1537a, and the Service used its rulemaking authority under the ESA, *id.* § 1540(f), to promulgate regulations implementing the Convention. 50 C.F.R. §§ 23.1–23.92. Under those regulations, an individual seeking to import a specimen of an Appendix I species generally must obtain an import permit. *Id.* §§ 23.20(e), 23.35(b). An import permit is not required for Appendix II species. *See id.*; *see also* CITES art. III ¶ 3, 27 U.S.T. at 1093; CITES art. IV ¶ 4, *id.* at 1096.[4]

When applying for an import permit for an Appendix I species, the applicant "must provide sufficient information for [the Service] to find that . . . [t]he proposed import would be for purposes that are not

---

[4] An export permit from the country of origin also is required for all listed species. *See* CITES art. III, ¶ 2, art. IV ¶ 2, *id.* at 1093, 1095.

detrimental to the survival of the species." *Id.* § 23.35(c)(1); *see also*

CITES art III, ¶ 3(a), 27 U.S.T. at 1093. The regulations summarize the

types of information that applicants should submit to enable the Service

to make such a "non-detriment finding." *Id.* § 23.61(c), (e). For example,

the Service will consider whether removal of the animal from the wild

was part of "a biologically based sustainable-use management plan that

is designed to eliminate over-utilization of the species." *Id.* § 23.61(c)(2).

The Service's Division of Scientific Authority is in charge of making

non-detriment findings. *See* 50 C.F.R. §§ 23.6, 23.7(b), 23.33(b).

## II.    ENHANCEMENT FINDINGS UNDER THE ENDANGERED SPECIES ACT

Independent of the Convention, the ESA itself also generally

prohibits the import of species listed as endangered, 16 U.S.C.

§ 1538(a)(1)(A), and permits the Service to extend that prohibition to

species listed as threatened, *id.* § 1533(d). The Service has generally

extended the import prohibition to all species listed as threatened by

the Service. 50 C.F.R. § 17.31(a). However, where the Service has

promulgated a "special rule" for a particular threatened species, the

special rule "contain[s] all the applicable prohibitions and exceptions."

*Id.* § 17.31(c). The Service has listed the African elephant as threatened,

*id.* § 17.11(h),[5] and has promulgated a special rule allowing importation of sport-hunted African elephant trophies only under certain conditions, *id.* § 17.40(e).[6]

One condition under the special rule is that the Service must determine that "the killing of the animal whose trophy is intended for import would enhance survival of the species." *Id.* § 17.40(e)(3)(iii)(C). This requirement, commonly known as an "enhancement finding," applies in addition to any CITES permitting or other wildlife import requirements. *Id.* § 17.40(e)(3)(iii)(B).[7] The Service makes enhancement findings on a periodic basis for each country that permits exportation of sport-hunted African elephant trophies. *See* Changes in List of Species in Appendices to CITES, 62 Fed. Reg. 44,627, 44,633 (Aug. 22, 1997). In making enhancement findings, the Service "reviews the status of the population and the total management program for the elephant in each

_____

[5] *See also* Listing of the African Elephant as a Threatened Species, 43 Fed. Reg. 20,499 (May 12, 1978).

[6] *See also* Endangered and Threatened Wildlife and Plants; Retention of Threatened Status for the Continental Population of the African Elephant, 57 Fed. Reg. 35,473, 35,485 (Aug. 10, 1992).

[7] The Convention does not "affect the right of the Parties to adopt . . . stricter domestic measures" regarding species listed in the appendices. CITES art. XIV, ¶ 1(a), 27 U.S.T. at 1108.

country to ensure the program is promoting the conservation of the species." *Id.* The Service's Division of Management Authority, Branch of Permits, is in charge of making enhancement findings. 50 C.F.R. §§ 17.9, 23.6, 23.33(a)(1).

In sum, as relevant to this case, to import a sport-hunted African elephant trophy from Tanzania, where such elephants are listed in CITES Appendix I, the importer must apply for an import permit and the Service must make both a positive non-detriment and a positive enhancement finding before issuing the permit. To import a sport-hunted African elephant trophy from Zimbabwe, where such elephants are listed in CITES Appendix II, the importer need not apply for an import permit, but the Service must have made a positive enhancement finding for Zimbabwe before importation can occur.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

## I. THE SERVICE'S ACTIONS CONCERNING SPORT-HUNTED AFRICAN ELEPHANT TROPHIES FROM TANZANIA AND ZIMBABWE

On April 4, 2014, the Service issued a press release announcing a "suspension on imports of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014." (App. 58.) The Service explained that "[q]uestionable management practices, a lack of

effective law enforcement and weak governance" had harmed African elephant populations in Tanzania. (App. 58.) Although the Service had more "limited" data for Zimbabwe, the available data also indicated "a significant decline in the elephant population" in that country. (App. 58.) The Service thus announced that it "is unable to make positive findings required under the [Convention] and the [ESA] to allow import of elephant trophies from these countries." (App. 58.) The Service stated that it would reevaluate the "suspension for calendar year 2015 <u>or</u> upon receipt of new information that demonstrates an improved situation for elephants in these countries." (App. 59 (emphasis supplied).)[8]

The press release directed the public to the Service's website for more information. (App. 59.)[9] On the website, the Service posted the negative enhancement findings made by the Division of Management Authority for Tanzania and Zimbabwe and the negative non-detriment

---

[8] To avoid retroactivity concerns, the Service later "revised the suspension" to allow the import of sport-hunted elephant trophies from Zimbabwe if the elephant was taken prior to April 4, 2014. (App. 60.) A similar revision for Tanzania was not necessary because the hunting season in Tanzania did not open until after April 4, 2014. (App. 60.)

[9] *See* Sport-Hunted Trophies, U.S. Fish & Wildlife Service, http://www.fws.gov/international/permits/by-activity/sport-hunted-trophies.html (last visited Aug. 18, 2014).

finding made by the Division of Scientific Authority for Tanzania. (App. 63–68, 109–22, 123–36.) Those findings thoroughly analyzed the available evidence concerning African elephants in Tanzania and Zimbabwe and explained the Service's conclusions. The Division of Scientific Authority's finding for Tanzania, however, explained that "[i]f permit applications are received that include new or additional information showing that elephant management practices by the Government of Tanzania have led to the sustainability of its elephant population on a nation-wide basis, these applications should be referred to the Division of Scientific Authority for consideration on a case-by-case basis." (App. 109.) The Service thus made clear that, despite its general announcement of a suspension on imports, it still was accepting and could grant import permit applications for Tanzania that contained new or additional information allowing the Service to make the required findings.

The Service also concurrently sent a letter to the Government of Zimbabwe requesting more information about its elephant population and conservation efforts. (App. 69–70.) Zimbabwe later sent additional information to the Service. (App. 73–106.) In a May 12, 2014, notice

published in the Federal Register, the Service explained that it had requested additional information from Zimbabwe and would make a new enhancement finding for that country after reviewing the information received. (App. 370–71.)

## II. SAFARI CLUB'S SUIT AND ALLEGATIONS OF HARM

Safari Club filed suit alleging that the suspension on imports violated the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706. (App. 32–40.) Safari Club then moved for a preliminary injunction (App. 43) and attached declarations from a number of its members (App. 137–256) alleging various injuries from the suspension. Most of the declarations are from Safari Club members who have plans to hunt African elephants in Tanzania or Zimbabwe in 2014.

The hunters describe their belief that sport hunting benefits elephant conservation, explain the importance they place on elephant trophies, and express indecision about whether to cancel their hunts. (*See, e.g.*, App. 144–46, 152–56, 159–64, 168–79, 186–93, 200–03, 207–10.) A number of the hunters state that they will proceed with their scheduled hunts despite the Service's actions. (*See, e.g.*, App. 143, 149,

181, 196, 206.) Only two of the hunters actually canceled their hunts, and both of those individuals rebooked hunts for other species with the same outfitter. (App. 157, 185.) Two other hunters state that they successfully killed African elephants after April 4, 2014, and that the trophies are in storage in Zimbabwe. (App. 166, 198.) Those hunters do not provide any cost figures for storing their trophies. None of the hunters with plans to hunt in Tanzania state that they have applied for, or have been denied, an import permit. (App. 187, 238, 241, 244, 247.)

Safari Club also submitted declarations from several of its members who are hunting outfitters in Tanzania or Zimbabwe. The outfitters espouse a belief that sport hunting benefits elephant conservation, express concerns that hunters from the United States may cancel their hunts, and describe potential economic losses if any canceled hunts cannot be resold to hunters from other countries. (*See, e.g.*, App. 212–37.) Only three of the outfitters report a small number of actual cancellations by U.S. hunters. (App. 220 ("several" cancellations), 223 (three cancellations), 236 (one cancellation).)[10] None of the

_____

[10] Safari Club cites another declaration that purportedly describes cancellations. (Opening Br. 26 (citing App. 229).) That outfitter, however, did not describe any cancellations, but rather merely stated

outfitters state that they have been unable to sell hunts to U.S. hunters since April 4, 2014.

## III.  THE DISTRICT COURT'S DENIAL OF PRELIMINARY RELIEF

After Safari Club filed its motion, the district court issued an order directing the parties to "address only the issues of irreparable harm and subject matter jurisdiction." (App. 4 (minute order of 05/02/2014).) The Service argued that Safari Club had not demonstrated irreparable harm.[11] The Service also moved to dismiss Safari Club's claims for lack of subject matter jurisdiction. The Service contended that Safari Club lacked standing to seek an injunction with respect to Tanzania because Safari Club did not show that any of its members had applied for or been denied an import permit. The Service further asserted that Safari Club's claims were not ripe with respect to Zimbabwe because the Service planned to make a new enhancement finding for that country based on the new information it had received.

After full briefing on those issues, the district court denied Safari Club's motion because it fell "well short of the legal standard for

_____

that it would have "five elephant hunts on my hands that U.S. hunters will not want." (App. 229.)

[11] To comply with the district court's briefing order, we did not brief the other preliminary injunction factors.

preliminary relief[,]" particularly because Safari Club had not shown that its members would suffer "grave, imminent, and certain harm" without an injunction. (App. 47.) The district court correctly observed that because the Service "did not prohibit anyone from hunting African elephants in Zimbabwe or Tanzania" (App. 47), U.S. hunters "may still enjoy the recreational benefits of participating in hunts" (App. 50). And because "a hunter must successfully shoot an elephant in order to garner a trophy worth importing[,]" the district court was not certain that "*any* Safari Club member other than the declarants with elephants already in storage" would be affected. (App. 50.) The court noted that any harm to the two hunters with trophies in storage was not necessarily "irreparable" because those hunters might be able to import their trophies at a later date if the suspension was lifted. (App. 48 n.6.)

The district court acknowledged that some hunters' enjoyment "may be diminished" by the possibility that they may not be able to import a trophy, but held that any such diminishment did not rise to the level of "irreparable harm" because the hunters still could engage in the "core recreational activity of hunting." (App. 50.) The court further observed that "since most of the hunter declarants are still considering

15

whether to cancel or change their trips or not, it is uncertain whether any harm will come to their recreational interests at all." (App. 51.) The court found that any harm to the two hunters who canceled their trips was "self-inflicted and, therefore, not the irreparable harm that supports injunctive relief." (App. 51 (citing *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).)

The district court also concluded that Safari Club's allegation of harm to it and its members' interests in elephant conservation was "indirect and speculative" because any such harm depended upon multiple intervening contingencies, including whether U.S. hunters choose to cancel their trips. (App. 51–52.) The court similarly found that Safari Club's allegation of economic harm to its outfitter members was "speculative" because the outfitters "do not even know if their clients will cancel or if they will be replaced." (App. 54.) Further, because the outfitters had not demonstrated that "any threatened economic losses are serious in terms of their effect on these business," any such loss did not rise to the level of irreparable harm. (App. 53.)

The district court thus denied Safari Club's motion and noted that it was taking the Service's motion to dismiss Safari Club's claims for

lack of subject matter jurisdiction under advisement. (App. 45 n.3.) *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1160 (D.C. Cir. 2013) (court need not address jurisdiction if it can "dispose of [a motion] on another threshold ground that does not require [the court] to reach the merits" (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007)). Briefing on the Service's motions to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) presently is ongoing in district court.

## IV.  THE SERVICE'S NEW ENHANCEMENT FINDING FOR ZIMBABWE

"It is the duty of counsel to bring to the federal tribunal's attention, '*without delay*,' facts that may raise a question of mootness." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.23 (1997). On July 22, 2014, after the district court denied Safari Club's motion, the Service issued a new enhancement finding for Zimbabwe that supersedes the April 4, 2014, enhancement finding. *See* Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe in 2014, U.S. Fish & Wildlife Service (July 22, 2014) at 1, *available at* http://www.fws.gov/international/permits/by-activity/sport-

hunted-trophies.html (last visited Aug. 18, 2014).[12] The Service

announced the new enhancement finding for Zimbabwe in the Federal

Register on July 31, 2014. *See* Notice of Suspension of Imports of

Zimbabwe Elephant Trophies Taken in 2014 on or After April 4, 2014,

79 Fed. Reg. 44,459 (July 31, 2014).

The Service had received additional information from Zimbabwe

and other sources after making its April 4 enhancement finding for that

country. The Service thus explained that its new enhancement finding

"is the result of an analysis of this more recent information from

Zimbabwe and other sources." (July 22 Finding at 3–12.) The Service

found that Zimbabwe's strategy for implementing its elephant

management plan was unclear, that Zimbabwe did not have "adequate

information on current elephant populations to establish scientifically

defensible hunting quotas," and that Zimbabwe was not enforcing its

laws or allocating most hunting revenues to elephant conservation and

management. (July 22 Finding at 12–13.) And although there were

"bright spots" of elephant conservation efforts scattered around

---

[12] The Service first issued the finding on July 17, 2014, and then made
minor technical revisions on July 22, 2014. For ease of citation, this
brief refers to the finding as the "July 22 finding."

Zimbabwe, the Service concluded that "there are not enough of these 'bright spots' to overcome problems currently facing Zimbabwe elephant populations and to support a finding that sport hunting is enhancing survival of the species." (July 22 Finding at 13.)

Because the Service could not make a positive enhancement finding for Zimbabwe, the Service announced that "trophies, parts or products, of elephants taken in Zimbabwe after April 4, 2014, will not be allowed to be imported into the United States." (July 22 Finding at 1.) The Service stated that it would reevaluate the finding in December 2014 to determine whether to allow imports of trophies from Zimbabwe taken starting in 2015. (July 22 Finding at 1.)

Safari Club subsequently moved to amend its complaint. (*See* Pls.' Mot. to Amend, *Safari Club Int'l v. Jewell*, No. 14-cv-670, Doc. # 34 (D.D.C. Aug. 1, 2014).) Safari Club's proposed amended complaint purports to challenge both the April 4, 2014, enhancement finding for Zimbabwe and the superseding enhancement finding issued on July 22, 2014. (Proposed Second Am. Compl., Doc. # 34-1 at 1–3, 27–34.) The Service does not oppose Safari Club's motion to amend its complaint to add claims concerning the merits of the July 22 finding. (Defs.' Opp'n,

Doc. # 37 at 8 n.5.) The Service has, however, moved to dismiss Safari Club's claims concerning the April 4 finding as moot and has opposed Safari Club's amendment motion to the extent that it seeks to retain those moot claims. (Mot. to Dismiss, Doc. # 36 at 7–13; Defs.' Opp'n at 7–13.)

## STANDARD OF REVIEW

This Court reviews de novo whether a suit involves a case or controversy over which the Court has subject matter jurisdiction under Article III of the U.S. Constitution. *Fed. Exp. Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 964 (D.C. Cir. 1995). This Court reviews a district court's "weighing of the four preliminary injunction factors and its ultimate decision to issue or deny such relief for abuse of discretion[,]" but reviews legal questions de novo, "including whether the movant has established irreparable harm." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). This Court reviews the district court's "findings of fact under the 'clearly erroneous' standard." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998) (quoting *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 319 (D.C. Cir. 1987)).

# SUMMARY OF ARGUMENT

1.      Safari Club's preliminary injunction appeal does not present a case or controversy under Article III of the U.S. Constitution. After the district court denied Safari Club's motion, the Service issued a new enhancement finding for Zimbabwe that supersedes the April 4, 2014, enhancement finding at issue in Safari Club's motion. Because the April 4 finding no longer has any effect, Safari Club does not have any legally cognizable interest in whether the district court properly denied its motion to enjoin the Service from applying that finding. This appeal therefore is moot with respect to the Service's superseded enhancement finding for Zimbabwe.

Safari Club also lacks standing to request relief with respect to Tanzania. The Service made clear that it still would consider import permit applications that contained new or additional information about Tanzania on a case-by-case basis. Despite professing to have such additional information, none of Safari Club's declarant members state that they have applied for or been denied an import permit for an elephant trophy from Tanzania. Safari Club therefore has not shown that any of its members have been concretely injured by the Tanzania

import restrictions about which it is complaining.

Put differently, Safari Club's Tanzania claims are constitutionally unripe. If one of Safari Club's members were to apply for an import permit, that members' claim would not be ripe before completion of the permit process because the information submitted might convince the Service to grant the permit. Safari Club cannot obtain premature review of its claims by entirely avoiding the permit process. Accordingly, this Court lacks Article III jurisdiction over Safari Club's appeal, should vacate the district court's order, and should remand with instructions to dismiss the motion for lack of subject matter jurisdiction.

2.	Alternatively, this Court may affirm on the nonmerits ground that Safari Club did not show that its members would suffer any irreparable harm during the pendency of the suit. Safari Club's hunter members will not suffer any such harm because they can go on their planned hunts and place any trophies they garner in storage. If Safari Club prevails on the merits, it can seek appropriate relief at that time. The only uncertainty the hunters face is that their legal position is wrong and thus they properly cannot import their trophies. Safari Club therefore did not show that the preliminary relief it seeks is necessary

to prevent any irreparable harm to the hunters.

Safari Club also has not shown any certain or imminent harm to it or its members' interests in elephant conservation. Safari Club's own declarations show that most hunters with plans to hunt in Tanzania and Zimbabwe in 2014 have not cancelled their trips and outfitters can and will tap non-U.S. markets to replace any decline in U.S. hunters. Thus, Safari Club has not shown that the Service's actions will cause elephant hunting to decline so greatly that conservation efforts, and thus elephant populations, will suffer at all, much less this season.

Nor has Safari Club identified any economic harm to its members that would independently justify preliminary relief. Safari Club argues only that its alleged economic harms are significant when combined with its other alleged harms; Safari Club does not argue that the economic harms warrant relief on their own. Any argument that the alleged economic harms independently qualify as irreparable therefore is waived, and Safari Club's argument about the combined harms fails. As explained above, Safari Club's alleged recreational and conservation harms do not qualify as irreparable, and Safari Club cannot meet the high standard for preliminary relief by combining multiple insignificant

harms. In any case, Safari Club's alleged economic harms are too speculative and modest to merit preliminary injunctive relief.

Because the district court correctly held that Safari Club did not show any irreparable harm, and because that conclusion was fatal to Safari Club's preliminary injunction motion, this Court should affirm.

## ARGUMENT

This Court may dispose of this preliminary injunction appeal in either of two ways. The first option is to vacate the district court's order and remand with instructions to dismiss for lack of subject matter jurisdiction. The second option is to affirm the district court's order denying Safari Club's preliminary injunction motion without addressing subject matter jurisdiction.

The district court did not address the issue of subject matter jurisdiction. Instead, the court took the Service's motion to dismiss under advisement and denied Safari Club's motion because Safari Club had not demonstrated irreparable harm. The district court's approach was proper because it disposed of the motion on a "threshold ground that [did] not require [it] to reach the merits." *Nat'l Ass'n of Clean Water Agencies*, 734 F.3d at 1160 (citing *Sinochem*, 549 U.S. at 431); *see*

*also Sinochem*, 549 U.S. at 431 ("[J]urisdiction is vital only if the court proposes to issue a judgment on the merits."). The district court correctly held that Safari Club did not demonstrate irreparable harm, and that conclusion alone was sufficient to deny the motion. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

This brief will first address subject matter jurisdiction because that topic typically precedes other issues. The Service, however, agrees with the district court that Safari Club clearly failed to demonstrate irreparable harm. This Court therefore may follow the district court's mode of analysis and affirm the denial of Safari Club's preliminary injunction motion without addressing subject matter jurisdiction.

## I.   SAFARI CLUB'S PRELIMINARY INJUNCTION APPEAL DOES NOT PRESENT AN ARTICLE III CASE OR CONTROVERSY.

To challenge an administrative agency's final action in federal court,[13] a plaintiff's suit must present a live case or controversy under

_____

[13] In our Rule 12(b)(6) motion to dismiss currently pending in district court, we argue that some of Safari Club's claims should be dismissed because Safari Club does not challenge a "final agency action" under the APA, 5 U.S.C. § 704. *See generally Nat'l Mining Ass'n v. McCarthy*, ___ F.3d ___, 2014 WL 3377245 at *5–8 (D.C. Cir. July 11, 2014). We do not raise that issue here only because this Court has held that the final

Article III § 2 of the U.S. Constitution. "Three inter-related judicial doctrines—standing, mootness, and ripeness—ensure that federal courts assert jurisdiction only over 'Cases' and 'Controversies.'" *Worth v. Jackson*, 451 F.3d 854, 855 (D.C. Cir. 2006).

Standing doctrine limits judicial review to those litigants who "have a direct stake in the outcome" because they can show "'injury in fact' resulting from the action which they seek to have the court adjudicate." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972)). Mootness doctrine ensures that the parties "continue to have a 'personal stake in the outcome' of the lawsuit." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 478 (1990) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)). And ripeness doctrine prevents courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and it protects agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a

agency action requirement is not jurisdictional, *see Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006), and the district court has not yet considered our nonjurisdictional arguments (*see* App. 4 (minute order of 05/02/2014)).

concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387

U.S. 136, 148–49 (1967).

As explained below, Safari Club's preliminary injunction motion is

moot with respect to the Service's April 4, 2014, enhancement finding

for Zimbabwe, and Safari Club lacks standing to seek a preliminary

injunction with respect to Tanzania.

A.  **Safari Club's preliminary injunction motion is moot with respect to the Service's April 4 enhancement finding for Zimbabwe, which has been superseded by the Service's July 22 enhancement finding for that country.**

Because this is an appeal from the denial of a preliminary

injunction, "[t]he only issue presently before [this Court] [is] the

correctness of the decision to [deny] a preliminary injunction[.]" *Univ. of*

*Tex. v. Camenisch*, 451 U.S. 390, 394 (1981). Thus, even if some dispute

on the merits remains live in district court, if the preliminary injunctive

aspects of this case have become moot, this Court should vacate the

district court's order and instruct it to dismiss the motion as moot. *Id.*

at 395–98. An appeal from the denial of a preliminary injunction is

moot when the "parties no longer have a legally cognizable interest in

the determination of whether the preliminary injunction was properly

denied." *Animal Legal Def. Fund v. Shalala*, 53 F.3d 363, 366 (D.C. Cir.

1995); *see also People for Ethical Treatment of Animals, Inc. v. Gittens,* 396 F.3d 416, 421 (D.C. Cir. 2005) ("An appeal from an order granting a preliminary injunction becomes moot when, because of the defendant's compliance or some other change in circumstances, nothing remains to be enjoined through a permanent injunction." (internal quotation marks omitted)).

In district court, Safari Club asserted a number of claims referring to the Service's April 4, 2014, enhancement finding for Zimbabwe and, based on those claims, moved for a preliminary injunction to prevent the Service from suspending imports from Zimbabwe. (App. 32–37, 43.) Safari Club no longer has any cognizable interest in whether the district court properly denied that motion because the April 4 enhancement finding no longer is operative. That finding has been superseded by the July 22, 2014, enhancement finding for Zimbabwe, which did not exist and therefore was not at issue when Safari Club filed its complaint and motion. (July 22 Finding at 1.)

Although the July 22 finding results in maintaining the suspension on imports from Zimbabwe going back to April 4, 2014, Safari Club's motion nevertheless is moot with respect to the April 4

finding. The Service predicated its July 22 finding on a different factual record than the April 4 finding. (July 22 Finding at 3–12.) Safari Club must bring any challenge to the July 22 finding and its distinct administrative record in district court. *See Ctr. for Auto Safety v. Dole*, 595 F. Supp. 98, 99–100 (D.D.C. 1984) (dismissing challenge to superseded regulations and refusing to entertain challenge to new regulations because they were based on "a different administrative record" that was not before the court). Safari Club has moved to amend its complaint to do just that, and the Service has not opposed Safari Club's motion to the extent that it seeks to add claims concerning the merits of the July 22 finding. (Case No. 14-cv-670 (D.D.C.), Doc. ## 34, 37 at 8 n.5.)

Under this Court's precedent, a challenge to an agency decision that has been "superceded in full" by a new agency decision is moot, even where the outcome of the new decision is largely the same as the original decision. *Fund for Animals, Inc. v. Hogan*, 428 F.3d 1059, 1064 (D.C. Cir. 2005). In *Fund for Animals*, the plaintiff sought to challenge two agency decisions: (1) a letter sent by the Service denying the plaintiff's emergency listing petition under the ESA; and (2) a 2001

environmental assessment. *Id.* at 1061–63. Both of those decisions, however, had been superseded by new decisions issued by the Service. Although the outcome of the new decisions was virtually the same as the decisions challenged by the plaintiff, the agency's new decisions contained more complete analysis, *id.* at 1061–62, and were based on different records, *id.* at 1063. This Court held that the plaintiff's challenges to the original decisions were moot and the plaintiff could simply challenge the new decisions in district court. *Id.* at 1063–65; *see also Ctr. for Sci. in the Pub. Interest v. Regan*, 727 F.2d 1161, 1164 (D.C. Cir. 1984) (new rule rendered challenge to superseded rule moot).

The Ninth and Tenth Circuits have similarly held that a superseding agency decision moots a challenge to the original decision, especially where the new decision rests on a different factual record. *See, e.g.*, *Wyoming v. U.S. Dep't of Interior*, 587 F.3d 1245, 1253 (10th Cir. 2009); *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1134–35 (10th Cir. 2006); *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir.1997); *Aluminum Co. of Am. v. Bonneville Power Admin.*, 56 F.3d 1075, 1078 (9th Cir. 1995). Here, the Service's July 22 enhancement finding for Zimbabwe supersedes the April 4

enhancement finding for Zimbabwe and includes the Service's analysis of new information concerning African elephants in Zimbabwe. (July 22 Finding at 1, 3–12.) Safari Club's preliminary injunction motion therefore is moot with respect to the April 4, 2014, enhancement finding for Zimbabwe.

This Court cannot afford Safari Club any preliminary relief with respect to the superseded April 4 finding. Even if, contrary to the district court's analysis, Safari Club did establish irreparable harm, this Court merely would remand for the district court to consider the other preliminary injunction factors, including likelihood of success on the merits. *See Sherley v. Sebelius*, 610 F.3d 69, 75 (D.C. Cir. 2010) ("[I]t is not the usual practice of this court to grant a motion for a preliminary injunction that the district court denied without having considered its merits."); *Chaplaincy*, 454 F.3d at 305. Recognizing that rule, Safari Club requests that this Court "remand the matter to the court below to evaluate the remaining elements necessary for [Safari Club's] entitlement to preliminary injunctive relief." (Opening Br. 1; *see also id.* at 51.)

If this Court were to remand, the district court would consider Safari Club's likelihood of succeeding on the merits of its challenge to the July 22 finding, not the superseded April 4 finding. It does not matter that Safari Club asserts some of the same legal theories concerning the July 22 finding that it asserted concerning the April 4 finding. *See Ctr. for Auto Safety*, 595 F. Supp. at 100 ("[T]he mere possibility that the interim and final regulations may share some of the same general shortcomings does not keep the controversy as to the interim regulations alive." (citing *Ctr. for Sci.*, 727 F.2d at 1166)). Safari Club's preliminary injunction motion still is moot with respect to the April 4 finding because that finding no longer has any effect and therefore cannot be enjoined, preliminarily or permanently. Neither this Court nor the district court can afford Safari Club any relief with respect to the April 4 enhancement finding for Zimbabwe. Safari Club's preliminary injunction motion therefore is moot with respect to that finding. *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) ("A case becomes moot when intervening events make it impossible to grant the prevailing party effective relief." (internal quotation marks omitted)).

Nor does this appeal implicate the exception to mootness for cases that are capable of repetition yet evading review. A dispute is not capable of repetition unless there is a "reasonable expectation if not a demonstrated probability that petitioners will be subject to the same action." *Pub. Utils. Comm'n of Cal. v. FERC*, 236 F.3d 708, 714 (D.C. Cir. 2001) (internal quotation marks omitted). "[C]ourts have interpreted 'same action' to refer to particular agency policies, regulations, guidelines, or recurrent identical agency actions." *Id.* (collecting cases). This case is not capable of repetition because the Service will not issue another enhancement finding for Zimbabwe identical to the April 4 finding. In reaching the July 22 enhancement finding for Zimbabwe, the Service received and analyzed additional information concerning elephants and management programs in Zimbabwe. Any future enhancement finding for Zimbabwe also will necessarily account for that additional information in the context of a different administrative record.

But even assuming that this case is capable of repetition, Safari Club's claims will not evade review because Safari Club has challenged the July 22 finding in district court. *See Utah Shared Access Alliance*,

463 F.3d at 1135 (citing *Am. Rivers*, 126 F.3d at 1124)). The July 22

finding is effective until the end of calendar year 2014. (July 22 Finding

at 1.) Safari Club therefore has sufficient time to seek preliminary relief

with respect to that finding and, if such relief is not granted, appeal to

this Court. *See Newdow v. Roberts*, 603 F.3d 1002, 1009 (D.C. Cir. 2010)

("[A] plaintiff [must] make a full attempt to prevent his case from

becoming moot, an obligation that includes filing for preliminary

injunctions and appealing denials of preliminary injunctions."). If Safari

Club promptly follows that course of action, its claims will not evade

review.

Moreover, "[t]his court has emphasized that, when reliance on the

mootness exception is based on the short duration of an order, the

question is whether such a short duration is 'typical' of the controversy."

*Southern Co. Servs., Inc. v. FERC*, 416 F.3d 39, 43 (D.C. Cir. 2005)

(citing *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325,

1329 (D.C. Cir. 1985)). Although the Service's April 4 and July 22

enhancement findings for Zimbabwe were limited to calendar year

2014, that duration is not typical. The Service's previous enhancement

finding for Zimbabwe went into effect in 1997 and was not limited to

any particular time period. (*See* App. 372–74.) Rather, that finding was in effect until the April 4, 2014, finding replaced it. *See* 79 Fed. Reg. at 44,459 to 44,460. Thus, any Zimbabwe enhancement finding the Service issues at the beginning of 2015 may return to the more typical, open-ended timeframe, leaving Safari Club ample opportunity to challenge that finding if it is adverse to Safari Club's interests.

Safari Club's preliminary injunction motion is moot with respect to the April 4, 2014, enhancement finding for Zimbabwe. This Court therefore should vacate the district court's order with respect to that finding and instruct the district court to dismiss that portion of Safari Club's motion as moot.[14]

## B. Safari Club lacks standing to seek a preliminary injunction with respect to Tanzania because it did not show that any of its members had applied for or been denied an import permit.

To have standing to "seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural

---

[14] The Zimbabwe claims in Safari Club's complaint (App. 32–37 (Counts I to III)) are moot for all the same reasons. This Court therefore also could instruct the district court to dismiss those underlying claims for lack of subject matter jurisdiction.

or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Those requirements ensure that the plaintiff has "'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). The standing inquiry thus aims to prevent the judicial process from becoming "a vehicle for the vindication of the value interests of concerned bystanders." *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 56 (D.C. Cir. 1991) (quoting *Valley Forge*, 454 U.S. at 473).

Where, as here, an organization asserts standing on behalf of its members, it must demonstrate, among other things, that "its members would otherwise have standing to sue in their own right." *Albuquerque Indian Rights*, 930 F.2d at 53 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). In applying that standard in *Albuquerque Indian Rights*, this Court denied standing to an organization because none of its members had "actually applied for" the

benefit that the organization was suing over. *Id.* at 55–57 (discussing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67 (1972)).

The plaintiff organization in *Albuquerque Indian Rights* sought to challenge an agency's refusal to apply an Indian hiring preference to certain employment positions. *Id.* at 52. None of the organization's members, however, had applied for any position with the agency. *Id.* at 52, 55–57. Although the members submitted affidavits stating that they were "interested" and "would have applied" for the positions if they had been advertised with the Indian hiring preference, *id.* at 55–56, this Court held such allegations insufficient to demonstrate standing. "Unadorned statements that [an organization's] members were 'interested' in positions or 'would have applied' for positions . . . do not satisfy the burden of showing that any of plaintiff's members '*personally* . . . suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendants.'" *Id.* at 57 (quoting *Valley Forge*, 454 U.S. at 472 (alteration omitted)).

As the Ninth Circuit has succinctly summarized, "[t]here is a long line of cases . . . that hold that a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually

applying for the desired benefit." *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220 (9th Cir. 1992) (citing, among other authority, *Albuquerque Indian Rights*). "The formal application requirement—as our caselaw establishes—presents a bright line separating those who have suffered from the challenged policy and those who have not." *Id.* at 1222; *see also Jackson-Bey v. Hanslmaier,* 115 F.3d 1091, 1096 (2d Cir. 1997) ("As a general matter, to establish standing to challenge an allegedly [illegal] policy, a plaintiff must submit to the challenged policy.").

Under the same rationale, an individual lacks standing to challenge a law or rule prohibiting certain conduct where the individual has not applied for or been denied a permit that would allow the conduct in question. *See, e.g., Parker v. Dist. of Columbia*, 478 F.3d 370, 373–74, 375–76 (D.C. Cir. 2007) (four individuals wished to possess handguns, but only the one who had "applied for and been denied a registration certificate to own a handgun" had standing), *aff'd sub nom. Dist. of Columbia v. Heller*, 554 U.S. 570 (2008); *see also United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) (plaintiff lacked standing because he "failed to apply for a gun license"); *Hightower v. City of Boston*, 693 F.3d 61, 70 (1st Cir. 2012) (no standing because plaintiff

had "never applied for [a Class B] license, been denied one, or had such a license revoked").

Under that authority, Safari Club lacks standing to seek a preliminary injunction with respect to Tanzania because it did not show that any of its members had applied for or been denied an import permit. As explained above, a person wishing to import a sport-hunted African elephant trophy from Tanzania must apply for an import permit. *See* 50 C.F.R. §§ 23.20(e), 23.35(b). And although the Service generally announced a suspension on such imports, the Service clarified that it still was processing permit applications for Tanzania and would consider any such applications that contained "new or additional information" on a "case-by-case basis." (App. 109; *see also* App. 59 (explaining that the Service would reevaluate the suspension "upon receipt of new information"). In fact, several non-plaintiffs have applied for import permits for Tanzanian elephant trophies and the Service has denied those applications because they contained no new or additional information. (App. 281.)

According to their own declarations, Safari Club's members claim special knowledge and experience concerning elephant conservation in

Africa. The hunters disagree with the Service's conclusions and predict dire effects if trophies from Tanzania cannot be imported. (*See, e.g.*, App. 157–58, 163–64, 172–73, 189–90, 195, 199, 200–01, 207–08, 210, 238–39, 241–42, 244, 246, 254–55.) Yet none of the hunters with trips planned to Tanzania state that they submitted permit applications containing additional information for the Service to consider. (App. 187, 238, 241, 244, 247.) Nor did any of the Tanzanian outfitters state that any of their customers had applied for or been denied a permit. (App. 218, 222, 248, 251.) Safari Club therefore lacks standing to seek injunctive relief with respect to Tanzania.

In district court, Safari Club argued that the burden of having to submit additional information was sufficient injury to provide standing. That argument fails for the same reasons just discussed. Safari Club's declarant members purport to have additional information relevant to the Service's decisions, but none of those members actually submitted that information to the Service. Safari Club therefore did not show that any of its members are injured by the informational burden allegedly created by the Service's actions. Further, the actions that Safari Club challenged did not create any such informational burden. Import permit

applicants have always had the burden to supply information sufficient for the Service to make the necessary findings. *See* 50 C.F.R. § 23.61(c); *see also* 16 U.S.C. § 1539(g).

Because Safari Club did not show that any of its members had applied for an import permit, Safari Club had to show that applying for such a permit would have been futile. Safari Club cannot demonstrate futility merely by contending that the Service's actions "discouraged" the hunters from applying. *Albuquerque Indian Rights*, 930 F.2d at 57. Rather, as this Court has explained in the context of administrative exhaustion, the futility exception applies only where resort to the agency would be "clearly useless" because of "*certainty* of an adverse decision." *Tesoro Ref. & Mktg. Co. v. FERC*, 552 F.3d 868, 874 (D.C. Cir. 2009) (internal quotation marks and citations omitted). Safari Club therefore must make a "substantial showing" of futility by citing to "evidence" that the agency would have summarily rejected any permit application. *Decastro*, 682 F.3d at 164 (quoting *Jackson-Bey*, 115 F.3d at 1096); *see also Madsen*, 976 F.2d at 1222.

Safari Club cannot meet that standard. As explained above, Safari Club's members claim to have better information than the Service

regarding elephant conservation in Tanzania and Zimbabwe, and Safari Club has not shown that the Service would disregard that information if the hunters submitted it. The Service's statements are to the contrary: "Despite the suspension and permit denials, individual permit applications under both CITES and the ESA to import sport-hunted elephant trophies from Tanzania will be considered on a case-by-case basis for 2014 and permits will be granted if the applicants can provide evidence that the findings under both laws can be made." (App. 283; *see also* App. 59, 109.)

Because Safari Club did not show that any of its members had applied for or been denied an import permit for Tanzania, Safari Club is nothing more than a "concerned bystander[]" seeking to vindicate its own "value interests." *Albuquerque Indian Rights*, 930 F.2d at 56 (quoting *Valley Forge*, 454 U.S. at 473). Regardless of the Service's actions, Safari Club's members may never have ended up applying for an import permit. They may have been unsuccessful in killing any elephants. As the district court correctly noted (App. 50), none of the hunters are guaranteed to kill an elephant. (See App. 145 (hunter successful on only two of six trips), 176 (hunter not successful on either

of two trips).) Or the hunters may have had to cancel their trips for reasons unrelated to the Service's actions. Thus, it is entirely possible that Safari Club's members never will be injured by the Tanzania import restrictions about which Safari Club is complaining.[15] Under such circumstances, Safari Club lacks standing to request a preliminary injunction with respect to Tanzania.

The issue can also be framed as one of constitutional ripeness. "Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending." *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). A claim that "rests upon contingent future events" is not ripe for review, *Texas v. United States*, 523 U.S. 296, 300 (1998), because "if the contingent events do not occur, the plaintiff will not have suffered an injury that is concrete and particularized enough" for standing, *Bova v. City of*

---

[15] The mere fact that some of Safari Club's claims are procedural does not relieve Safari Club of the burden to demonstrate that its members are concretely injured by the challenged actions. "[A] procedural right *in vacuo* . . . is insufficient to create Article III standing." *Summers*, 555 U.S. at 496; *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) ("[T]he plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff.").

*Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009). "In this way, ripeness and standing are intertwined." *Id.*

Safari Club's claim rests on at least two contingent future events: first, that one of its members will apply for an import permit for Tanzania; and second, that the member's permit application will be denied. As explained above, Safari Club's members may never apply for an import permit, and if they do apply the information they submit may convince the Service that the findings necessary to grant the permit application can be made. Safari Club's injury thus may "not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300. Accordingly, Safari Club's motion for a preliminary injunction with respect to Tanzania is constitutionally unripe. *Cf. Nat'l Mining Ass'n*, ___ F.3d ___, 2014 WL 3377245 at *7 (no final agency action where "applicants ultimately may be able to obtain permits" even though "the writing [was] on the wall about what [would] be needed to obtain a permit").

This Court has held a challenge to the denial of an import permit unripe where the applicant's administrative appeal remained pending with the agency. *Marcum v. Salazar*, 694 F.3d 123, 129–30 (D.C. Cir.

2012). Safari Club's claim is even less ripe than the claim at issue in *Marcum* because Safari Club's declarant members have not applied for, much less been denied, an import permit. Under *Marcum*, if one of Safari Club's members had participated in the permit process, that member's claim would not be ripe before completion of the process. Safari Club cannot obtain premature federal court review of its claims by entirely avoiding the permit process. *See Park Lake Res. Ltd. Liab. Co. v. U.S. Dep't of Agric.*, 197 F.3d 448, 449–50, 452–53 (10th Cir. 1999) (mining association's injunction request unripe because agency had not yet acted on association's application for motorized access); *Morris v. United States*, 392 F.3d 1372, 1376 (Fed. Cir. 2004) ("[W]hen an agency provides procedures for obtaining a final decision, a takings claim is unlikely to be ripe until the property owner complies with those procedures.").

This Court lacks Article III jurisdiction over Safari Club's preliminary injunction appeal with respect to Tanzania because Safari Club has not shown that any of its members have applied for or been denied an import permit. This Court therefore should vacate the district court's order with respect to the Tanzania claims and instruct the

district court to dismiss that portion of Safari Club's motion for lack of subject matter jurisdiction.[16] If, as urged in the previous section, this Court also holds that Safari Club's preliminary injunction motion is moot with respect to the April 4, 2014, enhancement finding for Zimbabwe, this Court should vacate the district court's order in its entirety and instruct the court to dismiss the entire motion for lack of subject matter jurisdiction.

## II. THE DISTRICT COURT CORRECTLY HELD THAT SAFARI CLUB DID NOT DEMONSTRATE IRREPARABLE HARM.

"A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy*, 454 F.3d at 297 (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210–11 (D.C. Cir. 1989)). To meet this Court's "high standard" for irreparable harm, the harm "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The harm must be "of such *imminence*

---

[16] Safari Club lacks standing to assert the Tanzania claims in its complaint (App. 37–40 (Counts IV to VI)) for all the same reasons. This Court therefore also could instruct the district court to dismiss those underlying claims for lack of subject matter jurisdiction.

that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* And, perhaps most importantly, because the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held[,]" *Camenisch*, 451 U.S. at 395, the harm that plaintiff asserts must be "beyond remediation." *Chaplaincy*, 454 F.3d at 297. The possibility that "adequate compensatory or other corrective relief" will be available in the ordinary course of litigation weighs "heavily" against finding irreparable harm. *Id.* at 297–98 (quoting *Wisc. Gas Co.*, 758 F.2d at 297–98).

The district court here correctly held that Safari Club did not meet its burden to show irreparable harm.

## A. Safari Club Has Not Shown that the Hunters Will Suffer Any Irreparable Harm During this Suit.

Safari Club did not demonstrate that its hunter members would suffer irreparable harm during the pendency of its suit. As the district court correctly observed, the Service "did not prohibit anyone from hunting African elephants in Zimbabwe or Tanzania." (App. 47.) The Service only suspended the importation of sport-hunted African elephant trophies from Zimbabwe and Tanzania unless it received

additional information demonstrating that the necessary findings could be made. Safari Club's members therefore are free to carry out their hunting plans while the district court considers the merits of their claims.

Safari Club nevertheless complains that the hunters are injured by their inability to import any trophies they garner. (Opening Br. 38–42.) Safari Club appears to seek an injunction permitting the hunters to import their trophies. (*See* App. 41.) Such an injunction would not be proper, even in the unlikely event that Safari Club were to prevail on the merits. Where a court finds an agency action arbitrary or capricious, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, (1985); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 159 (2010) (district court abused its discretion in ordering agency to partially deregulate market because "it was for the agency to decide whether and to what extent it would pursue a partial deregulation"); *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1011, 1023 (D.C. Cir. 1999) (district court erred in specifying a "specific remedy for the Secretary to follow"). Safari Club cannot obtain as

preliminary relief an injunction that it would not be entitled to even if it prevailed on the merits.

However, even assuming, for purposes of argument, that an injunction permitting the hunters to import their trophies could be obtained, Safari Club has not shown why it cannot wait until the district court renders judgment to request such relief. If the hunters are successful in killing any elephants, they simply can place the trophies in storage until the district court renders judgment. Two of the hunters already have followed that path. (App. 166, 198.) If, on the other hand, the Service prevails on the merits, then the hunters "were never entitled to [the trophies] in the first place." *Nat'l Treasury Employees Union v. United States*, 927 F.2d 1253, 1256 (D.C. Cir. 1991) (Thomas, C.J.) (finding lack of irreparable harm where government employees could place earnings into escrow during pendency of suit).

Safari Club essentially wants this Court to override the Service's decision and allow the hunters to import their trophies now, but such relief would not "preserve the relative positions of the parties[.]" *Camenisch*, 451 U.S. at 395. Rather, granting that relief would provide Safari Club with substantially all the relief it would request if it

ultimately prevails on the merits. And if the trophies are imported, it is difficult to imagine that they could be exported back to their origins. Where issuance of an injunction "would provide the movant with substantially all the relief he or she seeks and where the relief could not then be undone, even if the non-moving party later prevails at trial," courts have required the movant to show that "extreme or very serious damage will result from a denial of the injunction." *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997); *see also Boucher v. Sch. Bd. of Greenfield*, 134 F.3d 821, 826 n.6 (7th Cir. 1998). Safari Club has not met the ordinary standard for irreparable harm, much less the heightened showing just described.

To obtain the "extraordinary remedy" of preliminary injunctive relief, Safari Club must demonstrate that waiting until the end of the suit to seek relief somehow irreparably harms the hunters' interests. *Chaplaincy*, 454 F.3d at 297. Safari Club's brief on appeal does not identify any such harm. Safari Club contends that the hunters' recreational enjoyment of killing elephants will be lessened if they cannot import the trophies. (Opening Br. 38–42.) But as just explained, the hunters can place any trophies they garner in storage and seek

appropriate relief if they prevail on the merits. The possibility of relief in the ordinary course of litigation weighs "heavily" against a finding of irreparable harm. *Id.*

At best, Safari Club complains that the Service's actions make the hunters' "decision-making more difficult and uncertain." (Opening Br. 39 n.14.) Safari Club asserts that "[e]motional turmoil caused when a defendant creates uncertainty can itself qualify as irreparable harm." (Opening Br. 39 n.14.) For that proposition, Safari Club cites only a case from the Western District of Michigan, *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261, 1268 (1990), which this Court obviously need not follow.[17] In any event, *Schalk* plainly is distinguishable. In *Schalk*, a number of retirees living on small fixed incomes brought suit against their former employer when it terminated their health insurance policies. *Id.* at 1263, 1267–68. Due to their limited financial means and the cancellation of their policies, the retirees potentially had to forego health care and endure the attendant worry over their health while their suit was pending. *Id.* The hunters here need not forego their

---

[17] *Schalk* was affirmed by the Sixth Circuit in an unpublished, per curiam decision. *Schalk v. Teledyne, Inc.*, 948 F.2d 1290 (6th Cir. 1991) (table case).

hunting plans; they simply need to store any trophies they garner and seek appropriate relief if the district court renders judgment in their favor.

The only uncertainty the hunters truly face is that their legal position is wrong and thus they properly cannot import their trophies. If that type of uncertainty were sufficient to obtain a preliminary injunction, the irreparable harm requirement would be meaningless. *Cf. Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 (2003) (explaining that if "mere uncertainty as to the validity of a legal rule constitute[d] a hardship for purposes of the ripeness analysis" courts would "soon be overwhelmed with requests for what essentially would be advisory opinions").

Put simply, Safari Club's hunter members need only have the courage of their own convictions. If the hunters truly believe that the Service's decision is misguided and illegal, they should follow through with their hunting plans and seek relief when they win their suit. Any diminishment in enjoyment that the hunters experience merely due to the possibility that they lose their suit cannot justify preliminary relief. And to the extent that any hunters decide that the risk of losing the suit

is too great and thus cancel their hunting plans, the district court correctly observed that they "[do] so of their own volition" and thus their harm is "self-inflicted." (App. 50–51 (citing *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).)

Safari Club argues that the harm to the hunters is not self-inflicted because the Service's decision forces the hunters "to choose between multiple undesirable options (cancellation of hunt v. proceed with hunt without importation ability)." (Opening Br. 44.) But that is not the choice that the hunters face. The hunters' choice is to proceed with their hunts and wait for a judgment on the merits to seek relief, or cancel their hunts because they may lose on the merits, in which case they could not properly import their trophies anyway.

Apart from the need to place any trophies they garner in storage, the hunters will suffer no detriment during the pendency of the suit by following through with their hunts. "[C]ost and delay associated with litigation does not serve to establish irreparable harm." *United States v. Western Elec. Co., Inc.*, 777 F.2d 23, 30 (D.C. Cir. 1985). Accordingly, if any hunters cancel their hunts, their injuries are self-inflicted and do not warrant preliminary relief. *Compare Second City Music, Inc. v. City*

*of Chi., Ill.*, 333 F.3d 846, 849–50 (7th Cir. 2003) (harm was "self-inflicted" because movant "would incur no detriment" other than minor fee by applying for challenged license during suit), *with Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (harm was not self-inflicted because complying with challenged policy during suit would cause a "loss of good will and reputation" that could not be fully recouped after trial). In any case, the hunters supplied no evidence concerning the costs to store their trophies, and no declarant has suggested that any harm will befall the trophies themselves before the district court renders judgment. (*See* App. 166 ("I have not determined the cost of storing [my trophy]."), 198 (no mention of storage costs).)

The district court properly denied Safari Club's motion because it merely sought to overturn the Service's suspension on imports from Tanzania and Zimbabwe, not to prevent any "irreparable" harm to the hunters during the pendency of the suit.

## B. None of Safari Club's Other Alleged Injuries Qualify as Irreparable Harm.

Safari Club asserts two other types of harm: harm to it and its members' interests in elephant conservation; and economic harm to its members. Safari Club has not shown that those harms are so certain,

great, imminent, and irreparable that they necessitate preliminary relief in advance of the district court's judgment.

1. **Any harm to conservation interests is neither certain nor imminent enough to warrant preliminary relief.**

Safari Club has a policy disagreement with the Service about what is beneficial for elephants in Tanzania and Zimbabwe. The Service analyzed the available evidence and concluded that, given the threats to African elephant populations in Tanzania and Zimbabwe, it could not make the findings necessary to permit the import of sport-hunted elephant trophies from those countries. (App. 63–68, 109–22, 123–36.) Thus, in the Service's expert judgment, continuing to permit the import of elephant trophies from those countries would be inconsistent with CITES and the ESA's fundamental objective of ensuring survival of the species in the wild.

To obtain a preliminary injunction overriding that decision, Safari Club had to make a "clear showing" of irreparable harm; a mere "possibility of irreparable harm" was not sufficient. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In contrast to the Service's thorough review of the available evidence, most of Safari Club's declarations merely expressed a belief that sport hunting is beneficial to

elephant conservation (*see, e.g.*, App. 151, 157, 177, 189) and offered anecdotes and hearsay about elephant populations and anti-poaching efforts (*see, e.g.*, App. 148, 163, 176, 189, 200). None of Safari Club's declarants are wildlife scientists or claim any formal training in wildlife management. Safari Club ultimately offered no evidence that suspending trophy imports would harm its interests by causing increased poaching or otherwise reducing elephant populations, much less during this hunting season.

As the district court correctly observed (App. 51–52), Safari Club's theory involves multiple speculative links: inability to import a trophy would have to cause substantial numbers of U.S. hunters to decide not to hunt elephants in Tanzania and Zimbabwe; hunting outfitters then would have to be unable to fill those slots with other hunters; fewer hunters would have to result in fewer hunting trips taking place (as opposed to the same number of hunting trips with fewer participants); fewer hunts would have to cause reductions in anti-poaching activities and revenues to support conservation efforts; and those declines would have to lead to an uptick in poaching or otherwise cause elephant populations to suffer during the pendency of Safari Club's suit. No link

in that chain is sufficiently certain or imminent to establish irreparable harm.[18]

In the standing context, this Court frequently rejects alleged injuries that depend upon a great number of speculative links and the independent actions of third parties. *See, e.g.*, *Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc); *United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 911–13 (D.C. Cir. 1989). Similarly here, any injury to Safari Club's alleged conservation interests is not sufficiently "certain" to constitute irreparable harm. *See, e.g.*, *Wisc. Gas*, 758 F.2d at 674–75 (no irreparable harm where petitioner's injury depended upon a "purely hypothetical chain of events").

Although the Service hopes that its actions will spur U.S. hunters to reconsider the impacts of their activities on elephants in Tanzania and Zimbabwe, it is far from certain that U.S. hunters will stop

---

[18] The Service's analysis does show that African elephant populations in Tanzania and Zimbabwe are suffering from poor management and poaching. Safari Club, however, must show that the challenged actions of the Service will cause elephant populations to suffer this season, not merely that elephant populations are suffering.

elephant hunting in those countries. Of the approximately thirty hunters who submitted declarations for Safari Club, only two actually cancelled their hunting plans (App. 157, 185), and several others stated that they would not cancel their plans (App. 143, 149, 181, 196, 206). Again, nothing the Service did prevents the hunters from going on hunts to support what they perceive as elephant conservation. A hunter who nevertheless chooses to cancel a trip has prioritized the trophy over his or her purported interest in elephant conservation, suggesting that the harm to that particular hunter's conservation interest is not sufficiently "great" to warrant preliminary relief. *Chaplaincy*, 454 F.3d at 297.[19]

Similarly, only three of the outfitters reported a small number of cancellations. (App. 220 ("several" cancellations), 223 (three cancellations), 236 (one cancellation).) And none of the outfitters state that they actually have been unable to sell hunts to U.S. hunters; they only speculate that they may not be able to sell to U.S. hunters. (*See,*

---

[19] Further, as explained in Section II.A., any hunter who cancels his or her trip does so voluntarily, and thus any resulting harm to that hunter is self-inflicted.

*e.g.*, App. 229 (outfitter stating that it would have "five elephant hunts on my hands that U.S. hunters will not want").)

Safari Club therefore did not provide evidence that U.S. hunters are quitting or will quit the Tanzanian and Zimbabwean elephant hunting markets in such numbers to jeopardize what Safari Club perceives as elephant conservation. (*See* App. 224 (anti-poaching efforts will be harmed if "hundreds of U.S. hunters" cancel their trips).) Safari Club cannot obtain preliminary relief based merely on what it believes is likely to occur. "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wisc. Gas*, 758 F.2d at 674. Safari Club had the burden to supply "proof" that the alleged harms to elephant conservation were "certain to occur in the near future." *Id.* It did not do so.

Even if some U.S. hunters do forego hunting in Tanzania and Zimbabwe, Safari Club's own declarations make clear that outfitters can and will seek to sell the open slots to hunters from other countries. (*See, e.g.*, App. 213, 220, 229, 236.) Thus, any reduction in U.S. hunters would not necessarily translate into fewer hunts, and even if it did, Safari Club provides no evidence that the number of hunts will dwindle

so low that hunting outfitters will reduce or eliminate their anti-poaching activities. (*See* App. 220 (explaining that because outfitters "can and will" sell to hunters from other countries "the same number of elephants will be available for hunting in Zimbabwe and Tanzania").) Although the outfitters predict prices to drop, they supply no evidence that prices have in fact dropped. And because the Service concluded that Tanzania and Zimbabwe already are not properly allocating hunting revenues to elephant conservation (App. 66–67, 113, 130–31), any decline in U.S. hunters will not necessarily translate into a decline in support for elephant conservation. It is more likely that the Service's actions will spur the governments of those countries to better support conservation efforts, consistent with CITES and the ESA's goals.

Setting aside the speculative nature of any harm to conservation efforts, Safari Club also does not argue—much less cite any evidence—that the Service's actions will cause imminent elephant declines before the district court renders judgment. "Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time[.]'" *Wisc. Gas*, 758 F.2d at 674 (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)). The harm must be "of such

*imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (internal quotation marks omitted).

Safari Club's declarations do not demonstrate that the Service's actions will cause an uptick in poaching or other threats to elephants this season. Many U.S. hunters plan their trips well in advance, sometimes years before a hunt is to take place. (*See, e.g.*, App. 166, 173, 193.) And again, only two out of thirty hunters identified by Safari Club actually canceled their trips. If, as Safari Club's own declarations suggest, substantial numbers of U.S. hunters carry out their scheduled hunts this season, then Safari Club's theoretical decline in revenues, anti-poaching activities, and other conservation efforts will not occur this season. The preliminary relief that Safari Club seeks is not necessary to avert any imminent harm to Safari Club's purported elephant conservation interests.

### 2. Any economic harm is not certain or great enough to warrant preliminary relief.

The "general rule" in this Circuit is that "economic harm does not constitute irreparable injury." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009); *see also Wisc. Gas*, 758 F.2d at 674 ("It is also well settled that economic loss does not, in and of itself,

constitute irreparable harm."). The exceptions to that general rule are limited. For example, irreparable harm may occur where a monetary loss, although ultimately recoverable, presently "threatens the very existence of a movant's business." *Wisc. Gas*, 758 F.2d at 674. And unrecoverable economic loss may qualify as irreparable if it is "serious in terms of its effect on the plaintiff." *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000) (internal quotation marks omitted); *see also Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 211–213 (D.D.C. 2012) (unrecoverable economic loss must be so "great, certain and imminent" that it will be "serious in terms of its effects" on the movant).

Safari Club does not contend that the economic losses it has alleged meet any of those standards. Safari Club instead argues—without citation to authority—that those standards "apply only where the plaintiffs assert nothing other than economic harm in support of their request for preliminary injunctive relief." (Opening Br. 47.) Safari Club clarifies that its members' economic losses qualify only "as components" of their irreparable harm because Safari Club asserts those losses "in conjunction with their recreational and conservation

injuries[.]" (Opening Br. 47.) Safari Club thus admits that its members' alleged economic losses do not independently qualify as irreparable harm. And as already explained, Safari Club's alleged recreational and conservation injuries also do not qualify as irreparable harm.

Safari Club cannot obtain preliminary relief merely by stringing together a series of insignificant harms. This Court has set a "high standard" for an injury to qualify as irreparable: "the injury 'must be both certain and <u>great</u>[.]'" *Chaplaincy*, 454 F.3d at 297 (emphasis supplied). An economic loss with no serious effect on the movant is not a "great" harm. *See Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335–36 (D.D.C. 2012) (rejecting argument that any unrecoverable economic loss, "however slight," qualifies as irreparable (quoting *Gulf Oil Corp. v. Dept. of Energy*, 514 F.Supp. 1019, 1026 (D.D.C.1981)); *Cardinal Health*, 846 F. Supp. 2d at 211. It would be inconsistent with this Court's high standard for irreparable harm to permit Safari Club to convert a minor economic loss into a "great" harm merely by mixing it with other inconsequential harms.

Safari Club has waived any argument that its members' economic losses independently qualify as irreparable harm. *See New York v. U.S.*

*EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005) (argument not made in opening brief is waived). This Court therefore need not and should not address whether the economic harms Safari Club alleged independently meet the above-described standards for irreparable harm. Out of an abundance of caution, however, this brief will demonstrate why Safari Club's allegations of economic losses do not qualify as irreparable harm.

Safari Club has not shown that its members will suffer certain and great economic losses during the pendency of this suit. Only three outfitters report a small number of cancellations (App. 220, 223, 236), and any outfitters who do receive cancellations may refuse to offer refunds. Safari Club's declarations state that refunds are not available (App. 143, 149, 181, 187, 193, 198, 247, 255) or are uncertain (App. 153, 156, 160, 173, 179, 193, 208, 217). If the outfitters do not provide refunds, they will not suffer any economic losses from cancellations.

The outfitters also only predict that they will not be able to sell to U.S. hunters; they do not report actual sales declines. (*See* App. 213 ("My company will potentially lose the income from nine elephant safaris this year due to the trophy importation ban."), 229 ("I will have five elephant hunts on my hands that U.S. hunters will not want.").)

Without evidence of sales declines, any serious harm to the outfitters this season is speculative. *See Wisc. Gas*, 758 F.2d at 675 (movant did not show that its customers "have reduced their [purchases] to such an extent" that any harm was "presently a real possibility"). The outfitters also say that they will attempt to sell any available hunts to hunters from other countries. (*See, e.g.*, App. 213, 220, 229, 239.) Revenues and customers that "can be regained through competition are not irreparable[.]" *Cent. & S. Motor Freight Tariff Ass'n v. United States*, 757 F.2d 301, 309 (D.C. Cir. 1985); *see also Wisc. Gas*, 758 F.2d at 675 (movant did not show "that it ha[d] unsuccessfully attempted to find other purchasers to alleviate the possible [economic harm]"). And the declarations provide no evidence of actual price declines this season.

Even if the outfitters do sustain some economic losses, Safari Club has not demonstrated that those losses will have a serious effect on their businesses before the district court renders judgment. *See Cardinal Health*, 846 F. Supp. 2d at 213 (citing *Mylan Pharms.*, 81 F. Supp. 2d at 42). There is no evidence that any of the outfitters face an imminent threat of going out of business. One outfitter states that he "believe[s] the bans will ultimately destroy my business if not revoked"

(App. 233), but that statement is insufficient to obtain preliminary relief. The "movant must provide . . . proof indicating that the harm is certain to occur in the near future." *Wisc. Gas*, 758 F.2d at 674. Safari Club cannot meet that standard with a single outfitter's unsubstantiated statement that suspending trophy imports might one day cause his business to fail.

Nor has Safari Club demonstrated any other serious effect on the outfitters this hunting season. The outfitters do not provide specific details concerning their expected sales losses or the impact to their overall profitability or operations this season. Where they provide any figures at all, they simply recite the total revenue they could expect to garner if they were to sell all of the available hunts to U.S. hunters. (*See, e.g.*, App. 213, 233, 236.) Those declarations fail to establish that the outfitters would be able to sell all of the hunts even if trophies could be imported. The declarations do not quantify how much revenue the outfitters might recover by selling to non-U.S. hunters, as the outfitters admit they will attempt to do. And the declarations do not provide sufficient information about the outfitters' operational costs or profitability to determine whether any revenue losses this season will

be significant. Safari Club therefore has not made a "strong showing" that any economic losses "would significantly damage its [members'] business[es]." *Mylan Pharms.*, 81 F. Supp. 2d at 43; *see also Nat'l Ass'n of Mortgage Brokers v. Bd. of Governors*, 773 F. Supp. 2d 151, 181 (D.D.C. 2011) (movant "failed to adequately describe and quantify the level of [economic] harm its members face"); *Air Transp. Ass'n of Am.*, 840 F. Supp. 2d at 338 (same).

Safari Club also incorrectly asserts that its hunter members will suffer economic losses. (Opening Br. 23–26, 45.) Because the hunters are not prohibited from hunting elephants in Tanzania and Zimbabwe, the deposits and fees that they have paid are not lost. Only those hunters who cancel their hunts will sustain such losses. Of the two hunters who have canceled, both were able to rebook hunts for other animals with the same outfitter. (App. 157, 185.) Neither hunter states specifically how much, if any, money he lost by switching from one type of hunt to another. Whatever that difference, those hunters do not explain why any money they lost is "serious in terms of its effects" given their financial situations. *Cardinal Health*, 846 F. Supp. 2d at 213.

Moreover, as explained in Section II.A., any harm to hunters who cancel their plans is self-inflicted and thus cannot serve as the basis for preliminary relief. The hunters can proceed with their hunts, place any trophies they garner in storage, and request appropriate relief if they win their suit on the merits. Safari Club complains that hunters will have to pay fees to store their trophies (Opening Br. 45), but again does not point to evidence quantifying any such fees or demonstrating that such fees will have a serious impact on the hunters. (*See* App. 166, 198.)

Safari Club's declarations do not justify any departure from the general rule that "economic harm does not constitute irreparable injury." *Davis*, 571 F.3d at 1295. And none of the other harms Safari Club alleged qualifies as irreparable. This Court therefore should affirm the district court's denial of Safari Club's preliminary injunction motion.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's order and instruct it to dismiss Safari Club's motion for lack of subject matter jurisdiction, or this Court should affirm the district

court's order because Safari Club did not demonstrate that it would

suffer any irreparable harm in the absence of preliminary relief.

Respectfully submitted,

SAM HIRSCH
 Acting Assistant Attorney General

 */s/ Nicholas A. DiMascio*
 NICHOLAS A. DIMASCIO
 U.S. Department of Justice
 Environment & Natural Res. Div.
 999 18th St., Suite 370
Aug. 18, 2014                Denver, CO  80202
90-8-6-07698                (303) 844-1384

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME
LIMITATION**

This brief complies with the type volume limitations set forth in

Federal Rule of Appellate Procedure 32(a)(7)(B). Excepting the portions

described in Rule 32(a)(7)(B)(iii), the brief contains 13,939 words.

_/s/ Nicholas A. DiMascio_
NICHOLAS A. DIMASCIO
U.S. Department of Justice
Environment & Natural Res. Div.
999 18th St., Suite 370
Denver, CO  80202
(303) 844-1384

## CERTIFICATE OF SERVICE

On August 18, 2014, I electronically filed the foregoing document

with the Clerk of the Court for the United States Court of Appeals for

the District of Columbia Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF

users and that service will be accomplished by the appellate CM/ECF

system.

/s/ Nicholas A. DiMascio
NICHOLAS A. DIMASCIO
U.S. Department of Justice
Environment & Natural Res. Div.
999 18th St., Suite 370
Denver, CO 80202
(303) 844-1384
nicholas.dimascio@usdoj.gov