No. 14-5152
ORAL ARGUMENT SCHEDULED OCT. 3, 2014

---

IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT

---

SAFARI CLUB INTERNATIONAL; NATIONAL RIFLE ASSOCIATION OF AMERICA,
PLAINTIFFS-APPELLANTS,

v.

S.M.R. JEWELL, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE
INTERIOR; DEPARTMENT OF THE INTERIOR, AN AGENCY OF THE UNITED
STATES; DANIEL M. ASH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE
U.S. FISH & WILDLIFE SERVICE; U.S. FISH & WILDLIFE SERVICE, AN
AGENCY OF THE UNITED STATES,
DEFENDANTS–APPELLEES,

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF COLUMBIA (HON. AMY BERMAN JACKSON)

---

**STATUTORY ADDENDUM TO FEDERAL DEFENDANTS' ANSWERING BRIEF**

---

SAM HIRSCH
  Acting Assistant Attorney General

Of Counsel:
HOLLY WHEELER
RUSSELL HUSEN
  U.S. Dep't of the Interior
  Office of the Solicitor
  Washington, D.C.

MATTHEW LITTLETON
MEREDITH L. FLAX
ANDREA GELATT
NICHOLAS A. DIMASCIO
  Attorneys, U.S. Dep't of Justice
  Env't & Natural Resources Div.
  999 18th St., Suite 370
  Denver, CO  80202
  (303) 844-1384
  nicholas.dimascio@usdoj.gov

# TABLE OF CONTENTS

Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087 (excerpted) ........... 1

16 U.S.C. § 1533(d) ................................................................. 12

16 U.S.C. § 1537a ................................................................. 13

16 U.S.C. § 1538 ................................................................... 14

50 C.F.R. § 17.31 ................................................................. 16

50 C.F.R. § 23.6 ................................................................... 17

50 C.F.R. § 23.7 ................................................................... 18

50 C.F.R. § 23.20 ................................................................. 20

50 C.F.R. § 23.33 ................................................................. 23

50 C.F.R. § 23.35 ................................................................. 24

50 C.F.R. § 23.61 ................................................................. 26

# MULTILATERAL

## International Trade in Endangered Species of Wild Fauna and Flora

*Convention done at Washington March 3, 1973,*
*Ratification advised by the Senate of the United States of America*
*August 3, 1973,*
*Ratified by the President of the United States of America*
*September 13, 1973,*
*Ratification of the United States of America deposited with the*
*Government of the Swiss Confederation January 14, 1974,*
*Proclaimed by the President of the United States of America*
*May 12, 1975,*
*Entered into force July 1, 1975.*
*With procès-verbal correcting inconsistencies in text.*

Add. 1

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

# A PROCLAMATION

CONSIDERING THAT:

The Convention on International Trade in Endangered Species of Wild Fauna and Flora was open for signature at Washington from March 3, 1973 to April 30, 1973, and thereafter at Bern until December 31, 1974, and was signed on behalf of the United States of America on March 3, 1973, a certified copy of which Convention in the Chinese, English, French, Russian and Spanish languages, is hereto annexed;

The Senate of the United States of America by its resolution of August 3, 1973, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Convention;

The President of the United States of America on September 13, 1973, ratified the Convention, in pursuance of the advice and consent of the Senate, and the United States of America deposited its instrument of ratification with the Government of the Swiss Confederation on January 14, 1974;

Pursuant to the provisions of Article XXIII of the Convention, the Convention will enter into force on July 1, 1975;

Now, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Convention, to the end that it shall be observed and fulfilled with good faith on and after July 1, 1975, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this twelfth day of May in the year of our Lord one thousand nine hundred seventy-

[SEAL]     five and of the Independence of the United States of America the one hundred ninety-ninth.

GERALD R. FORD

By the President:
HENRY A. KISSINGER
*Secretary of State*

TIAS 8249

CONVENTION ON INTERNATIONAL TRADE IN ENDANGERED SPECIES
OF WILD FAUNA AND FLORA

The Contracting States,

RECOGNIZING that wild fauna and flora in their many beautiful and
varied forms are an irreplaceable part of the natural systems of the earth
which must be protected for this and the generations to come;

CONSCIOUS of the ever-growing value of wild fauna and flora from
aesthetic, scientific, cultural, recreational and economic points of view;

RECOGNIZING that peoples and States are and should be the best
protectors of their own wild fauna and flora;

RECOGNIZING, in addition, that international cooperation is essential
for the protection of certain species of wild fauna and flora against
over-exploitation through international trade;

CONVINCED of the urgency of taking appropriate measures to this end;

HAVE AGREED as follows:

ARTICLE I

Definitions

For the purpose of the present Convention, unless the context otherwise
requires:

(a) "Species" means  any species, subspecies, or geographically
separate population thereof;

(b) "Specimen" means:

(i)   any animal or plant, whether alive or dead;

(ii)  in the case of an animal. for species included in
Appendices I and II, any readily recognizable part or

Add. 3

derivative thereof; and for species included in Appendix
III,[1] any readily recognizable part or derivative thereof
specified in Appendix III in relation to the species; and

(iii)  in the case of a plant: for species included in Appendix
I, any readily recognizable part or derivative thereof;
and for species included in Appendices II and III, any
readily recognizaole part or derivative thereof
specified in Appendices II and III in relation to the
species;

(c)  "Trade" means export, re-export, import and introduction from
the sea;

(d)  "Re-export" means export of any specimen that has previously
been imported;

(e)  "Introduction from the sea" means transportation into a State
of specimens of any species which were taken in the marine environment not
under the jurisdiction of any State;

(f)  "Scientific Authority" means a national scientific authority
designated in accordance with Article IX;

(g)  "Management Authority" means a national management authority
aesignated in accordance with Article IX,

(h)  "Party" means a State for which the present Convention has
entered into force.

---

[1] See Articles V and XVI. As Appendix III is to be composed of species identified
by any party to the Convention rather than by agreement of the parties as is the
case for the other Appendices, the Conference which produced the Convention
concluded that Appendix III could only be established after the Convention had
entered into force and the "parties" were identified and even then it would be
subject to nearly continuous revision. As of this printing the Secretariat has not
promulgated an Appendix III. [Footnote added by the Department of State.]

ARTICLE II

## Fundamental Principles

1. Appendix I shall include all species threatened with extinction which are or may be affected by trade. Trade in specimens of these species must be subject to particularly strict regulation in order not to endanger further their survival and must only be authorized in exceptional circumstances.

2. Appendix II shall include:

(a) all species which although not necessarily now threatened with extinction may become so unless trade in specimens of such species is subject to strict regulation in order to avoid utilization incompatible with their survival, and

(b) other species which must be subject to regulation in order that trade in specimens of certain species referred to in sub-paragraph (a) of this paragraph may be brought under effective control.

3. Appendix III shall include all species which any Party identifies as being subject to regulation within its jurisdiction for the purpose of preventing or restricting exploitation, and as needing the cooperation of other parties in the control of trade.

4. The Parties shall not allow trade in specimens of species included in Appendices I, II and III except in accordance with the provisions of the present Convention.

Add. 5

ARTICLE III

Regulation of Trade in Specimens
of Species included in Appendix I

1. All trade in specimens of species included in Appendix I shall be in accordance with the provisions of this Article.

2. The export of any specimen of a species included in Appendix I shall require the prior grant and presentation of an export permit. An export permit shall only be granted when the following conditions have been met

    (a) a Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species;

    (b) a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora;

    (c) a Management Authority of the State of export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment; and

    (d) a Management Authority of the State of export is satisfied that an import permit has been granted for the specimen.

3. The import of any specimen of a species included in Appendix I shall require the prior grant and presentation of an import permit and either an export permit or a re-export certificate. An import permit shall only be granted when the following conditions have been met.

    (a) a Scientific Authority of the State of import has advised that the import will be for purposes which are not detrimental to the survival of the species involved;

    (b) a Scientific Authority of the State of import is satisfied that the proposed recipient of a living specimen is suitably equipped to house

Add. 6

and care for it; and

(c) a Management Authority of the State of import is satisfied that the specimen is not to be used for primarily commercial purposes.

4. The re-export of any specimen of a species included in Appendix I shall require the prior grant and presentation of a re-export certificate. A re-export certificate shall only be granted when the following conditions have been met:

(a) a Management Authority of the State of re-export is satisfied that the specimen was imported into that State in accordance with the provisions of the present Convention;

(b) a Management Authority of the State of re-export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment; and

(c) a Management Authority of the State of re-export is satisfied that an import permit has been granted for any living specimen.

5. The introduction from the sea of any specimen of a species included in Appendix I shall require the prior grant of a certificate from a Management Authority of the State of introduction. A certificate shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of introduction advises that the introduction will not be detrimental to the survival of the species involved;

(b) a Management Authority of the State of introduction is satisfied that the proposed recipient of a living specimen is suitably equipped to house and care for it; and

Add. 7

(c) a Management Authority of the State of introduction is satisfied that the specimen is not to be used for primarily commercial purposes.

## ARTICLE IV

### Regulation of Trade in Specimens of Species included in Appendix II

1. All trade in specimens of species included in Appendix II shall be in accordance with the provisions of this Article.

2. The export of any specimen of a species included in Appendix II shall require the prior grant and presentation of an export permit. An export permit shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species;

(b) a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora; and

(c) a Management Authority of the State of export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment.

3. A Scientific Authority in each Party shall monitor both the export permits granted by that State for specimens of species included in Appendix II and the actual exports of such specimens. Whenever a Scientific Authority determines that the export of specimens of any such species should be limited in order to maintain that species throughout its range at a level consistent with its role in the ecosystems in which it occurs and well above the level at which that species might become eligible for inclusion in Appendix I, the Scientific Authority shall advise the

Add. 8

appropriate Management Authority of suitable measures to be taken to limit the grant of export permits for specimens of that species.

4.  The import of any specimen of a species included in Appendix II shall require the prior presentation of either an export permit or a re-export certificate.

5.  The re-export of any specimen of a species included in Appendix II shall require the prior grant and presentation of a re-export certificate.  A re-export certificate shall only be granted when the following conditions have been met:

    (a)  a Management Authority of the State of re-export is satisfied that the specimen was imported into that State in accordance with the provisions of the present Convention; and

    (b)  a Management Authority of the State of re-export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment.

6.  The introduction from the sea of any specimen of a species included in Appendix II shall require the prior grant of a certificate from a Management Authority of the State of introduction.  A certificate shall only be granted when the following conditions have been met.

    (a)  a Scientific Authority of the State of introduction advises that the introduction will not be detrimental to the survival of the species involved; and

    (b)  a Management Authority of the State of introduction is satisfied that any living specimen will be so handled as to minimize the risk of injury, damage to health or cruel treatment.

Add. 9

7   Certificates referred to in paragraph 6 of this Article may be granted
on the advice of a Scientific Authority, in consultation with other
national scientific authorities or, when appropriate, international
scientific authorities, in respect of periods not exceeding one year for
total numbers of specimens to be introduced in such periods.

ARTICLE V

Regulation of Trade in Specimens
of Species included in Appendix III

1.  All trade in specimens of species included in Appendix III shall be in
accordance with the provisions of this Article.

2.  The export of any specimen of a species included in Appendix III from
any State which has included that species in Appendix III shall require
the prior grant and presentation of an export permit.   An export permit
shall only be granted when the following conditions have been met:

    (a)  a Management Authority of the State of export is satisfied that
the specimen was not obtained in contravention of the laws of that State
for the protection of fauna and flora; and

    (b)  a Management Authority of the State of export is satisfied that
any living specimen will be so prepared and shipped as to minimize the
risk of injury, damage to health or cruel treatment.

3.  The import of any specimen of a species included in Appendix III shall
require, except in circumstances to which paragraph 4 of this Article
applies, the prior presentation of a certificate of origin and, where the
import is from a State which has included that species in Appendix III,
an export permit.

TIAS 8249

ARTICLE XIV

Effect on Domestic Legislation and International Conventions

1. The provisions of the present Convention shall in no way affect the
right of Parties to adopt:

(a) stricter domestic measures regarding the conditions for trade,
taking possession or transport of specimens of species included in
Appendices I, II and III, or the complete prohibition thereof; or

(b) domestic measures restricting or prohibiting trade, taking
possession, or transport of species not included in Appendices I, II or
III.

2. The provisions of the present Convention shall in no way affect the
provisions of any domestic measures or the obligations of Parties deriving
from any treaty, convention, or international agreement relating to other
aspects of trade, taking, possession, or transport of specimens which is
in force or subsequently may enter into force for any Party including any
measure pertaining to the Customs, public health, veterinary or plant
quarantine fields.

3. The provisions of the present Convention shall in no way affect the
provisions of, or the obligations deriving from, any treaty, convention
or international agreement concluded or which may be concluded between
States creating a union or regional trade agreement establishing or main-
taining a common external customs control and removing customs control
between the parties thereto insofar as they relate to trade among the
States members of that union or agreement.

4. A State party to the present Convention, which is also a party to any
other treaty, convention or international agreement which is in force at
the time of the coming into force of the present Convention and under the

TIAS 8249

Add. 11

threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b) of this section.

(2) The Secretary shall—

(A) conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

(B) determine on the basis of such review whether any such species should—

(i) be removed from such list;

(ii) be changed in status from an endangered species to a threatened species; or

(iii) be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b) of this section.

**(d) Protective regulations**

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

**(e) Similarity of appearance cases**

The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to section 1533 if he finds that—

(A) such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

(B) the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

(C) such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

**(f) Recovery plans**

(1) The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable—

(A) give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

(B) incorporate in each plan—

(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

(iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

(2) The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act.

(3) The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the status of all species for which such plans have been developed.

(4) The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.

(5) Each Federal agency shall, prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period under paragraph (4).

**(g) Monitoring**

(1) The Secretary shall implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which, in accordance with the provisions of this section, have been removed from either of the lists published under subsection (c) of this section.

(2) The Secretary shall make prompt use of the authority under paragraph 7[2] of subsection (b) of this section to prevent a significant risk to the well being of any such recovered species.

**(h) Agency guidelines; publication in Federal Register; scope; proposals and amendments: notice and opportunity for comments**

The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to—

---

[2] So in original. Probably should be paragraph "(7)".

Add. 12

national Trade in Endangered Species of Wild Fauna and Flora the Secretary of the Interior be designated as the Management Authority and established the Endangered Species Scientific Authority as the Scientific Authority, with the Secretary of the Interior designated to act on behalf of the United States in all regards as required by the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere, was revoked by Ex. Ord. No. 12608, Sept. 9, 1987, 52 F.R. 34617.

DELEGATION OF AUTHORITY REGARDING CERTIFICATION OF COUNTRIES EXPORTING SHRIMP TO UNITED STATES

Memorandum of the President of the United States, Dec. 19, 1990, 56 F.R. 357, provided:

Memorandum for the Secretary of State

By virtue of the authority vested in me by the Constitution and laws of the United States of America, including section 609 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990 (Public Law 101–162) [set out above], and section 301 of title 3 of the United States Code, I hereby delegate to the Secretary of State the functions vested in me by section 609(b) of that Act. The authority delegated by this memorandum may be further redelegated within the Department of State.

The Secretary of State is authorized and directed to publish this memorandum in the Federal Register.

GEORGE BUSH.

## § 1537a. Convention implementation

### (a) Management Authority and Scientific Authority

The Secretary of the Interior (hereinafter in this section referred to as the "Secretary") is designated as the Management Authority and the Scientific Authority for purposes of the Convention and the respective functions of each such Authority shall be carried out through the United States Fish and Wildlife Service.

### (b) Management Authority functions

The Secretary shall do all things necessary and appropriate to carry out the functions of the Management Authority under the Convention.

### (c) Scientific Authority functions; determinations

(1) The Secretary shall do all things necessary and appropriate to carry out the functions of the Scientific Authority under the Convention.

(2) The Secretary shall base the determinations and advice given by him under Article IV of the Convention with respect to wildlife upon the best available biological information derived from professionally accepted wildlife management practices; but is not required to make, or require any State to make, estimates of population size in making such determinations or giving such advice.

### (d) Reservations by the United States under Convention

If the United States votes against including any species in Appendix I or II of the Convention and does not enter a reservation pursuant to paragraph (3) of Article XV of the Convention with respect to that species, the Secretary of State, before the 90th day after the last day on which such a reservation could be entered, shall submit to the Committee on Merchant Marine and Fisheries of the House of Representatives, and to the Committee on the Environment and Public Works of the Senate, a written report setting forth the reasons why such a reservation was not entered.

### (e) Wildlife preservation in Western Hemisphere

(1) The Secretary of the Interior (hereinafter in this subsection referred to as the "Secretary"), in cooperation with the Secretary of State, shall act on behalf of, and represent, the United States in all regards as required by the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere (56 Stat. 1354, T.S. 982, hereinafter in this subsection referred to as the "Western Convention"). In the discharge of these responsibilities, the Secretary and the Secretary of State shall consult with the Secretary of Agriculture, the Secretary of Commerce, and the heads of other agencies with respect to matters relating to or affecting their areas of responsibility.

(2) The Secretary and the Secretary of State shall, in cooperation with the contracting parties to the Western Convention and, to the extent feasible and appropriate, with the participation of State agencies, take such steps as are necessary to implement the Western Convention. Such steps shall include, but not be limited to—

(A) cooperation with contracting parties and international organizations for the purpose of developing personnel resources and programs that will facilitate implementation of the Western Convention;

(B) identification of those species of birds that migrate between the United States and other contracting parties, and the habitats upon which those species depend, and the implementation of cooperative measures to ensure that such species will not become endangered or threatened; and

(C) identification of measures that are necessary and appropriate to implement those provisions of the Western Convention which address the protection of wild plants.

(3) No later than September 30, 1985, the Secretary and the Secretary of State shall submit a report to Congress describing those steps taken in accordance with the requirements of this subsection and identifying the principal remaining actions yet necessary for comprehensive and effective implementation of the Western Convention.

(4) The provisions of this subsection shall not be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate resident fish or wildlife under State law or regulations.

(Pub. L. 93–205, §8A, as added Pub. L. 96–159, §6(a)(1), Dec. 28, 1979, 93 Stat. 1228; amended Pub. L. 97–304, §5[(a)], Oct. 13, 1983, 96 Stat. 1421.)

AMENDMENTS

1982—Subsec. (c). Pub. L. 97–304, §5[(a)](1), designated existing provisions as par. (1) and added par. (2).

Subsec. (d). Pub. L. 97–304, §5[(a)](2), substituted provisions relating to reservations by the United States under the Convention for provisions which had established an International Convention Advisory Commission and had provided for its membership, staffing, and operation.

Subsec. (e). Pub. L. 97–304, §5[(a)](3), substituted provisions implementing the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere for provisions which had provided that the President shall designate those agencies of the Federal

Government that shall act on behalf of, and represent, the United States in all regards as required by the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere.

EFFECTIVE DATE OF 1982 AMENDMENT

Pub. L. 97–304, §5(b), Oct. 13, 1982, 96 Stat. 1422, provided that: "The amendment made by paragraph (1) of subsection (a) [amending this section] shall take effect January 1, 1981."

ABOLITION OF HOUSE COMMITTEE ON MERCHANT MARINE AND FISHERIES

Committee on Merchant Marine and Fisheries of House of Representatives abolished and its jurisdiction transferred by House Resolution No. 6, One Hundred Fourth Congress, Jan. 4, 1995. Committee on Merchant Marine and Fisheries of House of Representatives treated as referring to Committee on Resources of House of Representatives in case of provisions relating to fisheries, wildlife, international fishing agreements, marine affairs (including coastal zone management) except for measures relating to oil and other pollution of navigable waters, or oceanography by section 1(b)(3) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress. Committee on Resources of House of Representatives changed to Committee on Natural Resources of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007.

ENDANGERED SPECIES SCIENTIFIC AUTHORITY; INTERIM PERFORMANCE OF FUNCTIONS OF COMMISSION

Pub. L. 96–159, §6(b), Dec. 28, 1979, 93 Stat. 1230, provided that until such time as the Chairman, Members, and Executive Secretary of the International Convention Advisory Commission are appointed, but not later than 90 days after Dec. 28, 1979, the functions of the Commission be carried out by the Endangered Species Scientific Authority as established by Ex. Ord. No. 11911, formerly set out as a note under section 1537 of this title, with staff and administrative support being provided by the Secretary of the Interior as set forth in that Executive Order.

## § 1538. Prohibited acts

### (a) Generally

(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—

(A) import any such species into, or export any such species from the United States;

(B) take any such species within the United States or the territorial sea of the United States;

(C) take any such species upon the high seas;

(D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);

(E) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(F) sell or offer for sale in interstate or foreign commerce any such species; or

(G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

(2) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of plants listed pursuant to section 1533 of this title, it is unlawful for any person subject to the jurisdiction of the United States to—

(A) import any such species into, or export any such species from, the United States;

(B) remove and reduce to possession any such species from areas under Federal jurisdiction; maliciously damage or destroy any such species on any such area; or remove, cut, dig up, or damage or destroy any such species on any other area in knowing violation of any law or regulation of any State or in the course of any violation of a State criminal trespass law;

(C) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(D) sell or offer for sale in interstate or foreign commerce any such species; or

(E) violate any regulation pertaining to such species or to any threatened species of plants listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

### (b) Species held in captivity or controlled environment

(1) The provisions of subsections (a)(1)(A) and (a)(1)(G) of this section shall not apply to any fish or wildlife which was held in captivity or in a controlled environment on (A) December 28, 1973, or (B) the date of the publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 1533 of this title: *Provided,* That such holding and any subsequent holding or use of the fish or wildlife was not in the course of a commercial activity. With respect to any act prohibited by subsections (a)(1)(A) and (a)(1)(G) of this section which occurs after a period of 180 days from (i) December 28, 1973, or (ii) the date of publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 1533 of this title, there shall be a rebuttable presumption that the fish or wildlife involved in such act is not entitled to the exemption contained in this subsection.

(2)(A) The provisions of subsection (a)(1) of this section shall not apply to—

(i) any raptor legally held in captivity or in a controlled environment on November 10, 1978; or

(ii) any progeny of any raptor described in clause (i);

until such time as any such raptor or progeny is intentionally returned to a wild state.

(B) Any person holding any raptor or progeny described in subparagraph (A) must be able to demonstrate that the raptor or progeny does, in fact, qualify under the provisions of this paragraph, and shall maintain and submit to the Secretary, on request, such inventories, documentation, and records as the Secretary may by regulation require as being reasonably appropriate to carry out the purposes of this paragraph. Such requirements shall not unnecessarily duplicate the requirements of other rules and regulations promulgated by the Secretary.

#### (c) Violation of Convention

(1) It is unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of the Convention, or to possess any specimens traded contrary to the provisions of the Convention, including the definitions of terms in article I thereof.

(2) Any importation into the United States of fish or wildlife shall, if—

(A) such fish or wildlife is not an endangered species listed pursuant to section 1533 of this title but is listed in Appendix II to the Convention,

(B) the taking and exportation of such fish or wildlife is not contrary to the provisions of the Convention and all other applicable requirements of the Convention have been satisfied,

(C) the applicable requirements of subsections (d), (e), and (f) of this section have been satisfied, and

(D) such importation is not made in the course of a commercial activity,

be presumed to be an importation not in violation of any provision of this chapter or any regulation issued pursuant to this chapter.

#### (d) Imports and exports

##### (1) In general

It is unlawful for any person, without first having obtained permission from the Secretary, to engage in business—

(A) as an importer or exporter of fish or wildlife (other than shellfish and fishery products which (i) are not listed pursuant to section 1533 of this title as endangered species or threatened species, and (ii) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants; or

(B) as an importer or exporter of any amount of raw or worked African elephant ivory.

##### (2) Requirements

Any person required to obtain permission under paragraph (1) of this subsection shall—

(A) keep such records as will fully and correctly disclose each importation or exportation of fish, wildlife, plants, or African elephant ivory made by him and the subsequent disposition made by him with respect to such fish, wildlife, plants, or ivory;

(B) at all reasonable times upon notice by a duly authorized representative of the Secretary, afford such representative access to his place of business, an opportunity to examine his inventory of imported fish, wildlife, plants, or African elephant ivory and the records required to be kept under subparagraph (A) of this paragraph, and to copy such records; and

(C) file such reports as the Secretary may require.

##### (3) Regulations

The Secretary shall prescribe such regulations as are necessary and appropriate to carry out the purposes of this subsection.

#### (4) Restriction on consideration of value or amount of African elephant ivory imported or exported

In granting permission under this subsection for importation or exportation of African elephant ivory, the Secretary shall not vary the requirements for obtaining such permission on the basis of the value or amount of ivory imported or exported under such permission.

#### (e) Reports

It is unlawful for any person importing or exporting fish or wildlife (other than shellfish and fishery products which (1) are not listed pursuant to section 1533 of this title as endangered or threatened species, and (2) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants to fail to file any declaration or report as the Secretary deems necessary to facilitate enforcement of this chapter or to meet the obligations of the Convention.

#### (f) Designation of ports

(1) It is unlawful for any person subject to the jurisdiction of the United States to import into or export from the United States any fish or wildlife (other than shellfish and fishery products which (A) are not listed pursuant to section 1533 of this title as endangered species or threatened species, and (B) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants, except at a port or ports designated by the Secretary of the Interior. For the purpose of facilitating enforcement of this chapter and reducing the costs thereof, the Secretary of the Interior, with approval of the Secretary of the Treasury and after notice and opportunity for public hearing, may, by regulation, designate ports and change such designations. The Secretary of the Interior, under such terms and conditions as he may prescribe, may permit the importation or exportation at nondesignated ports in the interest of the health or safety of the fish or wildlife or plants, or for other reasons, if, in his discretion, he deems it appropriate and consistent with the purpose of this subsection.

(2) Any port designated by the Secretary of the Interior under the authority of section 668cc–4(d)[1] of this title, shall, if such designation is in effect on December 27, 1973, be deemed to be a port designated by the Secretary under paragraph (1) of this subsection until such time as the Secretary otherwise provides.

#### (g) Violations

It is unlawful for any person subject to the jurisdiction of the United States to attempt to commit, solicit another to commit, or cause to be committed, any offense defined in this section.

(Pub. L. 93–205, §9, Dec. 28, 1973, 87 Stat. 893; Pub. L. 95–632, §4, Nov. 10, 1978, 92 Stat. 3760; Pub. L. 97–304, §9(b), Oct. 13, 1982, 96 Stat. 1426; Pub. L. 100–478, title I, §1006, title II, §2301, Oct. 7, 1988,

---

[1] See References in Text note below.

(3) The economic, legal, subsistence, or other alternatives or relief available to the applicant;

(4) The amount of evidence that the applicant was in fact party to a contract or other binding legal obligation which;

(i) Deals specifically with the wildlife sought to be covered by the permit; and

(ii) Became binding prior to the date when the notice of a review of the status of the species or the notice of proposed rulemaking proposing to list such wildlife as endangered was published in the FEDERAL REGISTER, whichever is earlier.

(5) The severity of economic hardship which the contract or other binding legal obligation referred to in paragraph (b)(4) of this section would cause if the permit were denied;

(6) Where applicable, the portion of the applicant's income which would be lost if the permit were denied, and the relationship of that portion to the balance of his income;

(7) Where applicable, the nature and extent of subsistence taking generally by the applicant; and

(8) The likelihood that applicant can reasonably carry out his desired activity within one year from the date a notice is published in the FEDERAL REGISTER to review status of such wildlife, or to list such wildlife as endangered, whichever is earlier.

(c) *Permit conditions.* In addition to the general conditions set forth in part 13 of this subchapter, every permit issued under this section shall be subject to the following special conditions:

(1) In addition to any reporting requirements contained in the permit itself, the permittee shall also submit to the Director a written report of his activities pursuant to the permit. Such report must be postmarked or actually delivered no later than 10 days after completion of the activity.

(2) The death or escape of all living wildlife covered by the permit shall be immediately reported to the Service's office designated in the permit.

(d) Duration of permits issued under this section shall be designated on the face of the permit. No permit issued under this section, however, shall be valid for more than one year from the date a notice is published in the FEDERAL REGISTER to review status of such wildlife, or to list such wildlife as endangered, whichever is earlier.

[40 FR 44415, Sept. 26, 1975, as amended at 40 FR 53400, Nov. 18, 1975; 40 FR 58307, Dec. 16, 1975; 50 FR 39688, Sept. 30, 1985]

## Subpart D—Threatened Wildlife

### § 17.31 Prohibitions.

(a) Except as provided in subpart A of this part, or in a permit issued under this subpart, all of the provisions in § 17.21 shall apply to threatened wildlife, except § 17.21(c)(5).

(b) In addition to any other provisions of this part 17, any employee or agent of the Service, of the National Marine Fisheries Service, or of a State conservation agency which is operating a conservation program pursuant to the terms of a Cooperative Agreement with the Service in accordance with section 6(c) of the Act, who is designated by his agency for such purposes, may, when acting in the course of his official duties, take those threatened species of wildlife which are covered by an approved cooperative agreement to carry out conservation programs.

(c) Whenever a special rule in §§ 17.40 to 17.48 applies to a threatened species, none of the provisions of paragraphs (a) and (b) of this section will apply. The special rule will contain all the applicable prohibitions and exceptions.

[43 FR 18181, Apr. 28, 1978, as amended at 44 FR 31580, May 31, 1979; 70 FR 10503, Mar. 4, 2005]

### § 17.32 Permits—general.

Upon receipt of a complete application the Director may issue a permit for any activity otherwise prohibited with regard to threatened wildlife. Such permit shall be governed by the provisions of this section unless a special rule applicable to the wildlife, appearing in §§ 17.40 to 17.48, of this part provides otherwise. Permits issued under this section must be for one of the following purposes: Scientific purposes, or the enhancement of propagation or survival, or economic hardship, or zoological exhibition, or educational

*Primarily commercial purposes* means an activity whose noncommercial aspects do not clearly predominate (see §23.62).

*Propagule* means a structure, such as a cutting, seed, or spore, which is capable of propagating a plant.

*Readily recognizable* means any specimen that appears from a visual, physical, scientific, or forensic examination or test; an accompanying document, packaging, mark, or label; or any other circumstances to be a part, product, or derivative of any CITES wildlife or plant, unless such part, product, or derivative is specifically exempt from the provisions of CITES or this part.

*Re-export* means to send, ship, or carry out of a country any specimen previously imported into that country, whether or not the specimen has been altered since import.

*Reservation* means the action taken by a Party to inform the Secretariat that it is not bound by the effect of a specific listing (see §23.21).

*Scientific Authority* means a governmental or independent scientific institution or entity officially designated by either a Party to implement CITES, or a non-Party to serve the role of a Scientific Authority, including making scientific findings.

*Secretariat* means the entity designated by the Treaty to perform certain administrative functions (see §23.84).

*Shipment* means any CITES specimen in international trade whether for commercial or noncommercial use, including any personal item.

*Species* means any species, subspecies, hybrid, variety, cultivar, color or morphological variant, or geographically separate population of that species.

*Specimen* means any wildlife or plant, whether live or dead. This term includes any readily recognizable part, product, or derivative unless otherwise annotated in the Appendices.

*Sustainable use* means the use of a species in a manner and at a level that maintains wild populations at biologically viable levels for the long term. Such use involves a determination of the productive capacity of the species and its ecosystem to ensure that utilization does not exceed those capacities or the ability of the population to reproduce, maintain itself, and perform its role or function in its ecosystem.

*Trade* means the same as international trade.

*Transit* see the definition for *in-transit shipment.*

*Traveling exhibition* means a display of live or dead wildlife or plants for entertainment, educational, cultural, or other display purposes that is temporarily moving internationally.

## §23.6 What are the roles of the Management and Scientific Authorities?

Under Article IX of the Treaty, each Party must designate a Management and Scientific Authority to implement CITES for that country. If a non-Party wants to trade with a Party, it must also designate such Authorities. The names and addresses of these offices must be sent to the Secretariat to be included in the Directory. In the United States, different offices within the FWS have been designated the Scientific Authority and Management Authority, which for purposes of this section includes FWS Law Enforcement. When offices share activities, the Management Authority is responsible for dealing primarily with management and regulatory issues and the Scientific Authority is responsible for dealing primarily with scientific issues. The offices do the following:

| Roles | U.S. Scientific Authority | U.S. Management Authority |
|---|---|---|
| (a) Provide scientific advice and recommendations, including advice on biological findings for applications for certain CITES documents, registrations, and export program approvals. Evaluate the conservation status of species to determine if a species listing or change in a listing is warranted. Interpret listings and review nomenclatural issues. | x | |

Add. 17

| Roles | U.S. Sci-entific Author-ity | U.S. Man-age-ment Author-ity |
|---|---|---|
| (b) Review applications for CITES documents and issue or deny them based on findings required by CITES. | | x |
| (c) Communicate with the Secretariat and other countries on scientific, administrative, and enforcement issues. | x | x |
| (d) Ensure that export of Appendix-II specimens is at a level that maintains a species throughout its range at a level consistent with its role in the ecosystems in which it occurs and well above the level at which it might become eligible for inclusion in Appendix I. | x | |
| (e) Monitor trade in all CITES species and produce annual reports on CITES trade. | | x |
| (f) Collect the cancelled foreign export permit or re-export certificate and any corresponding import permit presented for import of any CITES specimen. Collect a copy of the validated U.S. export permit or re-export certificate presented for export or re-export of any CITES specimen. | | x |
| (g) Produce biennial reports on legislative, regulatory, and administrative measures taken by the United States to enforce the provisions of CITES. | | x |
| (h) Coordinate with State and tribal governments and other Federal agencies on CITES issues, such as the status of native species, development of policies, negotiating positions, and law enforcement activities. | x | x |
| (i) Communicate with the scientific community, the public, and media about CITES issues. Conduct public meetings and publish notices to gather input from the public on the administration of CITES and the conservation and trade status of domestic and foreign species traded internationally. | x | x |
| (j) Represent the United States at the meetings of the CoP, on committees (see subpart G of this part), and on CITES working groups. Consult with other countries on CITES issues and the conservation status of species. Prepare discussion papers and proposals for new or amended resolutions and species listings for consideration at the CoP. | x | x |
| (k) Provide assistance to APHIS and CBP for the enforcement of CITES. Cooperate with enforcement officials to facilitate the exchange of information between enforcement bodies and for training purposes. | x | x |
| (l) Provide financial and technical assistance to other governmental agencies and CITES officials of other countries. | x | x |

## § 23.7   What office do I contact for CITES information?

Contact the following offices to receive information about CITES:

| Type of information | Office to contact |
|---|---|
| (a) *CITES administrative and management issues*: (1) CITES documents, including application forms and procedures; lists of registered scientific institutions and operations breeding Appendix-I wildlife for commercial purposes; and reservations (2) Information on the CoP (3) List of CITES species (4) Names and addresses of other countries' Management and Scientific Authority offices (5) Notifications, resolutions, and decisions (6) Standing Committee documents and issues (7) State and tribal export programs | U.S. Management Authority U.S. Fish and Wildlife Service 4401 North Fairfax Drive, Room 700 Arlington, Virginia 22203 Toll Free: (800) 358-2104/permit questions Tel: (703) 358-2095/other questions Fax: (703) 358-2281/permits Fax: (703) 358-2298/other issues E-mail: *managementauthority@fws.gov* Website:    *http://www.fws.gov/international*    and    *http://www.fws.gov/permits* |
| (b) *Scientific issues*: (1) Animals and Plants Committees documents and issues (2) Findings of non-detriment and suitability of facilities, and other scientific findings (3) Listing of species in the Appendices and relevant resolutions (4) Names and addresses of other countries' Scientific Authority offices and scientists involved with CITES-related issues (5) Nomenclatural issues | U.S. Scientific Authority U.S. Fish and Wildlife Service 4401 North Fairfax Drive, Room 750 Arlington, Virginia 22203 Tel: (703) 358-1708 Fax: (703) 358-2276 E-mail: *scientificauthority@fws.gov* Website: *http://www.fws.gov/international* |

Add. 18

| Type of information | Office to contact |
|---|---|
| (c) *Wildlife clearance procedures:*<br>(1) CITES replacement tags<br>(2) Information about wildlife port office locations<br>(3) Information bulletins<br>(4) Inspection and clearance of wildlife shipments involving import, introduction from the sea, export, and re-export, and filing a Declaration of Importation or Exportation of Fish or Wildlife (Form 3–177)<br>(5) Validation, certification, or cancellation of CITES wildlife documents | Law Enforcement<br>U.S. Fish and Wildlife Service<br>4401 North Fairfax Drive, Mail Stop LE–3000<br>Arlington, Virginia 22203<br>Tel: (703) 358-1949<br>Fax: (703) 358-2271<br>Website: http://www.fws.gov/le |
| (d) *APHIS plant clearance procedures:*<br>(1) Information about plant port office locations<br>(2) Inspection and clearance of plant shipments involving:<br>(i) Import and introduction from the sea of living plants<br>(ii) Export and re-export of living and non-living plants<br>(3) Validation or cancellation of CITES plant documents for the type of shipments listed in paragraph (d)(2) of this section | U.S. Department of Agriculture APHIS/PPQ<br>4700 River Road<br>Riverdale, Maryland 20737–1236<br>Toll Free: (877) 770-5990/permit questions<br>Tel: (301) 734-8891/other CITES issues<br>Fax: (301) 734-5786/permit questions<br>Fax: (301) 734-5276/other CITES issues<br>Website: http://www.aphis.usda.gov/plant   health |
| (e) *CBP plant clearance procedures:*<br>(1) Inspection and clearance of plant shipments involving:<br>(i) Import and introduction from the sea of nonliving plants<br>(ii) Import of living plants from Canada at designated border ports (7 CFR 319.37–14(b) and 50 CFR 24.12(d))<br>(2) Cancellation of CITES plant documents for the type of shipments listed in paragraph (e)(1) of this section | Department of Homeland Security<br>U.S. Customs and Border Protection<br>Office of Field Operations<br>Agriculture Programs and Liaison<br>1300 Pennsylvania Avenue, NW, Room 2.5 B<br>Washington, DC 20229<br>Tel: (202) 344-3298<br>Fax: (202) 344-1442 |
| (f) *General information on CITES:*<br>(1) CITES export quota information<br>(2) CITES'*Guidelines for transport and preparation for shipment of live wild animals and plants*<br>(3) Information about the Secretariat<br>(4) Names and addresses of other countries' Management and Scientific Authority offices<br>(5) Official documents, including resolutions, decisions, notifications, CoP documents, and committee documents<br>(6) Official list of CITES species and species database<br>(7) Text of the Convention | CITES Secretariat<br>Website: http://www.cites.org |

## § 23.8  What are the information collection requirements?

The Office of Management and Budget approved the information collection requirements for application forms and reports contained in this part and assigned OMB Control Numbers 1018–0093 and 1018–0137. We cannot collect or sponsor a collection of information and you are not required to provide information unless it displays a currently valid OMB control number.

## Subpart B—Prohibitions, Exemptions, and Requirements

### § 23.13  What is prohibited?

Except as provided in § 23.92, it is unlawful for any person subject to the jurisdiction of the United States to conduct any of the following activities unless they meet the requirements of this part:

(a) Import, export, re-export, or engage in international trade with any specimen of a species listed in Appendix I, II, or III of CITES.

(b) Introduce from the sea any specimen of a species listed in Appendix I or II of CITES.

(c) Possess any specimen of a species listed in Appendix I, II, or III of CITES imported, exported, re-exported, introduced from the sea, or traded contrary to the provisions of CITES, the ESA, or this part.

(d) Attempt to commit, solicit another to commit, or cause to be committed any of the activities described

163

Add. 19

## Decision Tree for Export of Appendix-I Plants



[1] Cultivated specimens (see § 23.5) that do not meet the criteria as artificially propagated are treated as wild.

B

### § 23.20 What CITES documents are required for international trade?

(a) *Purpose.* Articles III, IV, and V of the Treaty give the types of standard CITES documents that must accompany an Appendix-I, -II, or -III specimen in international trade. Articles

Add. 20

VII and XIV recognize some exemptions and provide that a CITES document must accompany most exempt specimens.

(b) *Stricter national measures.* Before importing, introducing from the sea, exporting, or re-exporting a specimen, check with the Management Authorities of all countries concerned to obtain any documentation required under stricter national measures.

(c) *CITES documents.* Except as provided in the regulations in this part, you must have a valid CITES document to engage in international trade in any CITES specimen.

(d) *CITES exemption documents.* The following table lists the CITES exemption document that you must obtain before conducting a proposed activity with an exempt specimen (other than specimens exempted under § 23.92). If one of the exemptions does not apply to the specimen, you must obtain a CITES document as provided in paragraph (e) of this section. The first column in the following table alphabetically lists the type of specimen or activity that may qualify for a CITES exemption document. The last column indicates the section of this part that contains information on the application procedures, provisions, criteria, and conditions specific to each CITES exemption document, as follows:

| Type of specimen or activity | Appendix | CITES exemption document | Section |
|---|---|---|---|
| (1) Artificially propagated plant (see paragraph (d)(4) of this section for an Appendix-I plant propagated for commercial purposes) | I, II, or III | CITES document with source code "A"[1] | 23.40 |
| (2) Artificially propagated plant from a country that has provided copies of the certificates, stamps, and seals to the Secretariat | II or III | Phytosanitary certificate with CITES statement [1] | 23.23(f) |
| (3) Bred-in-captivity wildlife (see paragraph (d)(5) of this section for Appendix-I wildlife bred in captivity for commercial purposes) | I, II, or III | CITES document with source code "C"[1] | 23.41 |
| (4) Commercially propagated Appendix-I plant | I | CITES document with source code "D"[1] | 23.47 |
| (5) Commercially bred Appendix-I wildlife from a breeding operation registered with the CITES Secretariat | I | CITES document with source code "D"[1] | 23.46 |
| (6) Export of certain marine specimens protected under a pre-existing treaty, convention, or international agreement for that species | II | CITES document indicating that the specimen was taken in accordance with provisions of the applicable treaty, convention, or international agreement | 23.36(e) 23.39(e) |
| (7) Hybrid plants | I, II, or III | CITES document unless the specimen qualifies as an exempt plant hybrid | 23.42 |
| (8) Hybrid wildlife | I, II, or III | CITES document unless the specimen qualifies as an exempt wildlife hybrid | 23.43 |
| (9) In-transit shipment (see paragraph (d)(14) of this section for sample collections covered by an ATA carnet) | I, II, or III | CITES document designating importer and country of final destination | 23.22 |
| (10) Introduction from the sea under a pre-existing treaty, convention, or international agreement for that species | II | Document required by applicable treaty, convention, or international agreement, if appropriate | 23.39(d) |
| (11) Noncommercial loan, donation, or exchange of specimens between scientific institutions registered with the CITES Secretariat | I, II, or III | A label indicating CITES and the registration codes of both institutions and, in the United States, a CITES certificate of scientific exchange that registers the institution [3] | 23.48 |

| Type of specimen or activity | Appendix | CITES exemption document | Section |
|---|---|---|---|
| (12) Personally owned live wildlife for multiple cross-border movements | I, II, or III | CITES certificate of ownership[2] | 23.44 |
| (13) Pre-Convention specimen | I, II, or III | CITES document indicating pre-Convention status [1] | 23.45 |
| (14) Sample collection covered by an ATA carnet | I [4], II, or III | CITES document indicating sample collection [2] | 23.50 |
| (15) Traveling exhibition | I, II, or III | CITES document indicating specimens qualify as pre-Convention, bred in captivity, or artificially propagated [2] | 23.49 |

[1] Issued by the Management Authority in the exporting or re-exporting country.
[2] Issued by the Management Authority in the owner's country of usual residence.
[3] Registration codes assigned by the Management Authorities in both exporting and importing countries.
[4] Appendix-I species bred in captivity or artificially propagated for commercial purposes (see §§ 23.46 and 23.47).

(e) *Import permits, export permits, re-export certificates, and certificates of origin.* Unless one of the exemptions under paragraph (d) of this section or § 23.92 applies, you must obtain the following CITES documents before conducting the proposed activity:

| Appendix | Type of CITES document(s) required |
|---|---|
| I | Import permit (§ 23.35) and either an export permit (§ 23.36) or re-export certificate (§ 23.37) |
| II | Export permit (§ 23.36) or re-export certificate (§ 23.37) |
| III | Export permit (§ 23.36) if the specimen originated in a country that listed the species; certificate of origin (§ 23.38) if the specimen originated in a country other than the listing country, unless the listing annotation indicates otherwise; or re-export certificate for all re-exports (§ 23.37) |

(f) *Introduction-from-the-sea certificates.* For introduction from the sea of Appendix-I or Appendix-II specimens, you must obtain an introduction-from-the-sea certificate before conducting the proposed activity, unless the exemption in paragraph (d)(10) of this section applies (see § 23.39). The export of a specimen that was previously introduced from the sea will be treated as an export (see § 23.36 for export, § 23.36(e) and § 23.39(e) for export of exempt specimens, or § 23.37 for re-export). Although an Appendix-III specimen does not require a CITES document to be introduced from the sea, the subsequent international trade of the specimen would be considered an export. For export of an Appendix-III specimen that was introduced from the sea you must obtain an export permit (§ 23.36) if the export is from the country that listed the species in Appendix III, a certificate of origin (§ 23.38) if the export is from a country other than the listing country, or a re-export certificate for all re-exports (§ 23.37).

### § 23.21 What happens if a country enters a reservation for a species?

(a) *Purpose.* CITES is not subject to general reservations. Articles XV, XVI, and XXIII of the Treaty allow a Party to enter a specific reservation on a species listed in Appendix I, II, or III, or on parts, products, or derivatives of a species listed in Appendix III.

(b) *General provision.* A Party can enter a reservation in one of the following ways:

(1) A Party must provide written notification to the Depositary Government (Switzerland) on a specific new or amended listing in the Appendices within 90 days after the CoP that adopted the listing, or at any time for Appendix-III species.

(2) A country must provide written notification on a specific species listing when the country ratifies, accepts, approves, or accedes to CITES.

(c) *Requesting the United States take a reservation.* You may submit information relevant to the issue of whether the United States should take a reservation on a species listing to the U.S.

Add. 22

apply and what type of CITES document you need.

(2) If we need additional information, we will contact you. If you do not provide the information within 45 calendar days, we will abandon your application. If your application is abandoned and you wish to apply for a permit at a later time, you must submit a new application.

### § 23.33 How is the decision made to issue or deny a request for a U.S. CITES document?

(a) Upon receiving a complete application, we will decide whether to issue a CITES document by considering:

(1) The general criteria in § 13.21(b) of this subchapter and, if the species is protected under a separate law or treaty, criteria in any other applicable parts.

(2) The CITES issuance criteria provided in this subpart (see subpart D of this part for factors we consider in making certain findings).

(b) As needed, the U.S. Management Authority, including FWS Law Enforcement, will forward a copy of the application to the U.S. Scientific Authority; State, tribal, or other Federal government agencies; or other applicable experts. We may also query the Secretariat and foreign Management and Scientific Authorities for information to use in making the required findings.

(c) You must provide sufficient information to satisfy us that all criteria specific to the proposed activity are met before we can issue a CITES document.

(d) We will base our decision on whether to issue or deny the application on the best available information.

### § 23.34 What kinds of records may I use to show the origin of a specimen when I apply for a U.S. CITES document?

(a) When you apply for a U.S. CITES document, you will be asked to provide information on the origin of the specimen that will be covered by the CITES document.

(1) You need to provide sufficient information for us to determine if the issuance criteria in this part are met (see the sections in this subpart for each type of CITES document).

(2) We require less detailed information when the import, introduction from the sea, export, or re-export poses a low risk to a species in the wild and more detailed information when the proposed activity poses greater risk to a species in the wild (see Subpart D of this part for factors we consider in making certain findings).

(b) Information you may want to provide in a permit application includes, but is not limited to, the following:

| Source of specimen | Types of records |
| --- | --- |
| (1) Captive-bred or cultivated [1] | (i) Records that identify the breeder or propagator of the specimens that have been identified by birth, hatch, or propagation date and for wildlife by sex, size, band number, or other mark, or for plants by size or other identifying feature: |
| |     (A) Signed and dated statement by the breeder or propagator that the specimen was bred or propagated under controlled conditions. |
| |     (B) Name and address of the breeder or propagator as shown by documents such as an International Species Information System (ISIS) record, veterinary certificate, or plant nursery license. |
| | (ii) Records that document the breeding or propagating of specimens at the facility: |
| |     (A) Number of wildlife (by sex and age- or size-class) or plants at the facility. |
| |     (B) How long the facility has been breeding or propagating the species. |
| |     (C) Annual production and mortalities. |
| |     (D) Number of specimens sold or transferred annually. |
| |     (E) Number of specimens added from other sources annually. |
| |     (F) Transaction records with the date, species, quantity of specimens, and name and address of seller. |
| |     (G) Marking system, if applicable. |
| |     (H) Photographs or video of facility, including for wildlife any activities during nesting and production and rearing of young, and for plants, different stages of growth. |

Add. 23

| Source of specimen | Types of records |
|---|---|
| (2) Confiscated or seized | Copy of remission decision, legal settlement, or disposal action after forfeiture or abandonment, which demonstrates the applicant's legal possession. |
| (3) Exempt plant material | Records that document how you obtained the exempt plant material, including the name and address of the person from whom you received the plant material. |
| (4) Imported previously | (i) A copy of the cancelled CITES document that accompanied the shipment into the United States.<br>(ii) For wildlife, copies of cleared Declarations for Importation or Exportation of Fish or Wildlife (Form 3–177) associated with each specimen. |
| (5) Pre-Convention | Records that show the specimen was acquired before the date the provisions of the Convention first applied to it, such as:<br>(i) Receipt or invoice.<br>(ii) Catalog, inventory list, photograph, or art book.<br>(iii) Statement from a qualified appraiser attesting to the age of a manufactured product.<br>(iv) CBP (formerly U.S. Customs Service) import documents.<br>(v) Phytosanitary certificate.<br>(vi) Veterinary document or breeding or propagation logs. |
| (6) Sequential ownership or purchase | (i) Records that specifically identify the specimen, give the name and address of the owner, and show the specimen's origin (pre-Convention, previously imported, wild-collected, or born or propagated in a controlled environment in the United States).<br>(ii) Records that document the history of all transfers in ownership (generally not required for pre-Convention specimens). |
| (7) Unknown origin, for noncommercial purposes | A complete description of the circumstances under which the specimen was acquired (where, when, and from whom the specimen was acquired), including efforts made to obtain information on the origin of the specimen. |
| (8) Wild-collected | Records, such as permits, licenses, and tags, that demonstrate the specimen or the parental stock was legally removed from the wild under relevant foreign, Federal, tribal, State, or local wildlife or plant conservation laws or regulations:<br>(i) If taken on private or tribal land, permission of the landowner if required under applicable law.<br>(ii) If taken in a national, State, or local park, refuge, or other protected area, permission from the applicable agency, if required. |

¹ If the wildlife was born in captivity from an egg collected from the wild or from parents that mated or exchanged genetic material in the wild, or the plant was propagated from a non-exempt propagule collected from a wild plant, see paragraph (b)(8) of this section.

(c) If you intend to engage in international trade with a CITES specimen in the future, you should keep sufficient records to establish your eligibility for a CITES document for as long as you possess the specimen, and if you sell, donate, or transfer ownership of the specimen, you should provide such records on the origin of the specimen to the new owner.

**§ 23.35 What are the requirements for an import permit?**

(a) *Purpose.* Article III(3) of the Treaty sets out the conditions under which a Management Authority can issue an import permit.

(b) *U.S. application forms.* Complete the appropriate form for the proposed activity and submit it to the U.S. Management Authority:

| Type of application for an import permit for an Appendix-I specimen | Form no. |
|---|---|
| (1) CITES: | |
| Southern African Leopard, African Elephant, and Namibian Southern White Rhinoceros Sport-hunted Trophies | 3–200–19 |
| Appendix-I Plants | 3–200–35 |
| Appendix-I Wildlife | 3–200–37 |
| Appendix-I Biological Samples | 3–200–29 |

Add. 24

| Type of application for an import permit for an Appendix-I specimen | Form no. |
| --- | --- |
| (2) Endangered Species Act and CITES: | |
|     ESA Plants | 3–200–36 |
|     ESA Sport-hunted Trophies | 3–200–20 |
|     ESA Wildlife | 3–200–37 |
| (3) Marine Mammal Protection Act and CITES: | |
|     Marine Mammals | 3–200–43 |
| (4) Wild Bird Conservation Act and CITES: | |
|     Personal Pet Bird | 3–200–46 |
|     Under an Approved Cooperative Breeding Program | 3–200–48 |
|     Scientific Research or Zoological Breeding/Display | 3–200–47 |

(c) *Criteria.* The criteria in this paragraph (c) apply to the issuance and acceptance of U.S. and foreign import permits. When applying for a U.S. import permit, you must provide sufficient information for us to find that your proposed activity meets all of the following criteria:

| Criteria for an import permit for an Appendix-I specimen | Section |
| --- | --- |
| (1) The proposed import would be for purposes that are not detrimental to the survival of the species. | 23.61 |
| (2) The specimen will not be used for primarily commercial purposes. | 23.62 |
| (3) The recipients are suitably equipped to house and care for any live wildlife or plant to be imported. | 23.65 |
| (4) The scientific name of the species is the standard nomenclature in the CITES Appendices or the references adopted by the CoP. | 23.23 |

(d) *U.S. standard conditions.* You must meet all of the provisions on use after import in § 23.55 and the standard conditions in § 23.56.

(e) *Prior issuance of an import permit.* For Appendix-I specimens, the Management Authority of the exporting country may:

(1) Issue an export permit for live or dead specimens or a re-export certificate for live specimens only after the Management Authority of the importing country has either issued an import permit or confirmed in writing that an import permit will be issued.

(2) Accept oral confirmation from the Management Authority of the importing country that an import permit will be issued in an emergency situation where the life or health of the specimen is threatened and no means of written communication is possible.

(3) Issue a re-export certificate for a dead specimen without confirmation that the import permit has been issued.

## § 23.36  What are the requirements for an export permit?

(a) *Purposes.* Articles III, IV, and V of the Treaty set out the conditions under which a Management Authority may issue an export permit for an Appendix-I, -II, or -III specimen. Article XIV sets out the conditions under which a Management Authority may issue a document for export of certain Appendix-II marine specimens protected under a pre-existing treaty, convention, or international agreement.

(b) *U.S. application forms.* Complete the appropriate form for the proposed activity and submit it to the U.S. Management Authority. Form 3–200–26 may also be submitted to FWS Law Enforcement at certain ports or regional offices:

(10) *Genetic status of the specimen*: From a purebred species to a hybrid.

(e) *Captive-bred wildlife or a cultivated plant*. For a specimen that is captive-bred or cultivated, we may consider whether the parental stock was legally acquired.

(f) *Confiscated specimen*. For a confiscated Appendix-II or -III specimen, we consider whether information shows that the transfer of the confiscated specimen or its offspring met the conditions of the remission decision, legal settlement, or disposal action after forfeiture or abandonment.

(g) *Donated specimen of unknown origin*. For an unsolicited specimen of unknown origin donated to a public institution (see § 10.12 of this subchapter), we consider whether:

(1) The public institution follows standard recordkeeping practices and has made reasonable efforts to obtain supporting information on the origin of the specimen.

(2) The public institution provides sufficient information to show it made a reasonable effort to find a suitable recipient in the United States.

(3) The export will provide a conservation benefit to the species.

(4) No persuasive information exists on illegal transactions involving the specimen.

(5) The export is noncommercial, with no money or barter exchanged except for shipping costs.

(6) The institution has no history of receiving a series of rare and valuable specimens or a large quantity of wildlife or plants of unknown origin.

(h) *Imported previously*. For a specimen that was previously imported into the United States, we consider any reliable, relevant information we receive concerning the validity of a CITES document, regardless of whether the shipment was cleared by FWS, APHIS, or CBP.

(i) *Personal use*. For a wildlife or plant specimen that is being exported or re-exported for personal use by the applicant, we consider whether:

(1) The specimen was acquired in the United States and possessed for strictly personal use.

(2) The number of specimens is reasonably appropriate for the nature of your export or re-export as personal use.

(3) No persuasive evidence exists on illegal transactions involving the specimen.

(j) *Sequential ownership*. For a specimen that was previously possessed by someone other than the applicant, we may consider the history of ownership for a specimen and its parental stock, breeding stock, or cultivated parental stock.

(k) *Wild-collected in the United States*. For a specimen collected from the wild in the United States, we consider the site where the specimen was collected, whether the species is known to occur at that site, the abundance of the species at that site, and, if necessary, whether permission of the appropriate management agency or landowner was obtained to collect the specimen.

## § 23.61 What factors are considered in making a non-detriment finding?

(a) *Purpose*. Articles III and IV of the Treaty require that, before we issue a CITES document, we find that a proposed export or introduction from the sea of Appendix-I or -II specimens is not detrimental to the survival of the species and that a proposed import of an Appendix-I specimen is for purposes that would not be detrimental to the survival of the species.

(b) *Types of detriment*. Detrimental activities, depending on the species, could include, among other things, unsustainable use and any activities that would pose a net harm to the status of the species in the wild. For Appendix-I species, it also includes use or removal from the wild that results in habitat loss or destruction, interference with recovery efforts for a species, or stimulation of further trade.

(c) *General factors*. The applicant must provide sufficient information for us to make a finding of non-detriment. In addition to factors in paragraphs (d) and (e) of this section, we will consider whether:

(1) Biological and management information demonstrates that the proposed activity represents sustainable use.

Add. 26

(2) The removal of the animal or plant from the wild is part of a biologically based sustainable-use management plan that is designed to eliminate over-utilization of the species.

(3) If no sustainable-use management plan has been established, the removal of the animal or plant from the wild would not contribute to the over-utilization of the species, considering both domestic and international uses.

(4) The proposed activity, including the methods used to acquire the specimen, would pose no net harm to the status of the species in the wild.

(5) The proposed activity would not lead to long-term declines that would place the viability of the affected population in question.

(6) The proposed activity would not lead to significant habitat or range loss or restriction.

(d) *Additional factor for Appendix-II species.* In addition to the general factors in paragraph (c) of this section, we will consider whether the intended export of an Appendix-II species would cause a significant risk that the species would qualify for inclusion in Appendix I.

(e) *Additional factors for Appendix-I species.* In addition to the general factors in paragraph (c) of this section, we will consider whether the proposed activity:

(1) Would not cause an increased risk of extinction for either the species as a whole or the population from which the specimen was obtained.

(2) Would not interfere with the recovery of the species.

(3) Would not stimulate additional trade in the species. If the proposed activity does stimulate trade, we will consider whether the anticipated increase in trade would lead to the decline of the species.

(f) *How we make our findings.* We base the non-detriment finding on the best available biological information. We also consider trade information, including trade demand, and other scientific management information. We make a non-detriment finding in the following way:

(1) We consult with the States, Tribes, other Federal agencies, scientists, other experts, and the range countries of the species.

(2) We consult with the Secretariat and other Parties to monitor the level of trade that is occurring in the species.

(3) Based on the factors in paragraphs (c) through (e) of this section, we evaluate the biological impact of the proposed activity.

(4) In cases where insufficient information is available or the factors above are not satisfactorily addressed, we take precautionary measures and would be unable to make the required finding of non-detriment.

(g) *Risk assessment.* We review the status of the species in the wild and the degree of risk the proposed activity poses to the species to determine the level of scrutiny needed to make a finding. We give greater scrutiny and require more detailed information for activities that pose a greater risk to a species in the wild. We consider the cumulative risks, recognizing that each aspect of international trade has a continuum of risk (from high to low) associated with it as follows:

(1) *Status of the species:* From Appendix I to Appendix II.

(2) *Origin of the specimen:* From wild-collected to born or propagated in a controlled environment to bred in captivity or artificially propagated.

(3) *Source of the propagule used to grow the plant:* From documentation that the plant was grown from a non-exempt seed or seedling to documentation that the plant was grown from an exempt seed or seedling.

(4) *Origin of the species:* From native species to nonnative species.

(5) *Volume of legal trade:* From high to low occurrence of legal trade.

(6) *Volume of illegal trade:* From high to low occurrence of illegal trade.

(7) *Type of trade:* From commercial to noncommercial.

(8) *Genetic status of the specimen:* From a purebred species to a hybrid.

(9) *Risk of disease transmission:* From high to limited risk of disease transmission.

(10) *Basis for listing:* From listed under Article II(1) or II(2)(a) of the Treaty to listed under Article II(2)(b).

(h) *Quotas for Appendix-I species.* When an export quota has been set by the CoP for an Appendix-I species, we

will consider the scientific and management basis of the quota together with the best available biological information when we make our non-detriment finding. We will contact the Scientific and Management Authorities of the exporting country for further information if needed.

### § 23.62 What factors are considered in making a finding of not for primarily commercial purposes?

(a) *Purpose.* Under Article III(3(c)) and (5(c)) of the Treaty, an import permit or an introduction-from-the-sea certificate for Appendix-I species can be issued only if the Management Authority is satisfied that the specimen is not to be used for primarily commercial purposes. Trade in Appendix-I species must be subject to particularly strict regulation and authorized only in exceptional circumstances.

(b) *How we make our findings.* We must find that the intended use of the Appendix-I specimen is not for primarily commercial purposes before we can issue a CITES document.

(1) We will make this decision on a case-by-case basis considering all available information.

(2) The applicant must provide sufficient information to satisfy us that the intended use is not for primarily commercial purposes.

(3) The definitions of "commercial" and "primarily commercial purposes" in § 23.5 apply.

(4) We will look at all aspects of the intended use of the specimen. If the noncommercial aspects do not clearly predominate, we will consider the import or introduction from the sea to be for primarily commercial purposes.

(5) While the nature of the transaction between the owner in the country of export and the recipient in the country of import or introduction from the sea may have some commercial aspects, such as the exchange of money to cover the costs of shipment and care of specimens during transport, it is the intended use of the specimen, including the purpose of the export, that must not be for primarily commercial purposes.

(6) We will conduct an assessment of factors listed in paragraph (d) of this section. For activities involving an an-

ticipated measurable increase in revenue and other economic value associated with the intended use, we will conduct an analysis as described in paragraph (e) of this section.

(7) All net profits generated in the United States from activities associated with the import of an Appendix-I species must be used for conservation of that species.

(c) *Examples.* The following are examples of types of transactions in which the noncommercial aspects of the intended use of the specimen may predominate depending on the facts of each situation. The discussions of each example provide further guidance in assessing the actual degree of commerciality on a case-by-case basis. These examples outline circumstances commonly encountered and do not cover all situations where import or introduction from the sea could be found to be not for primarily commercial purposes.

(1) *Personal use.* Import or introduction from the sea of an Appendix-I specimen for personal use generally is considered to be not for primarily commercial purposes. An example is the import of a personal sport-hunted trophy by the person who hunted the wildlife for display in his or her own home.

(2) *Scientific purposes.* The import or introduction from the sea of an Appendix-I specimen by a scientist or scientific institution may be permitted in situations where resale, commercial exchange, or exhibit of the specimen for economic benefit is not the primary intended use.

(3) *Conservation, education, or training.* Generally an Appendix-I specimen may be imported or introduced from the sea by government agencies or nonprofit institutions for purposes of conservation, education, or training. For example, a specimen could be imported or introduced from the sea primarily to train customs staff in effective CITES control, such as for identification of certain types of specimens.

(4) *Biomedical industry.* Import or introduction from the sea of an Appendix-I specimen by an institution or company in the biomedical industry is initially presumed to be commercial since specimens are typically imported or introduced from the sea to develop

Add. 28

# CERTIFICATE OF SERVICE

On August 18, 2014, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

> */s/ Nicholas A. DiMascio*
> NICHOLAS A. DIMASCIO
> U.S. Department of Justice
> Environment & Natural Res. Div.
> 999 18th St., Suite 370
> Denver, CO  80202
> (303) 844-1384
> nicholas.dimascio@usdoj.gov