# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

SAFARI CLUB INTERNATIONAL and NATIONAL RIFLE ASSOCIATION
OF AMERICA, Plaintiffs-Appellants,

v.

SALLY M. R. JEWELL, in her official capacity as
United States Secretary of the Interior, *et al.*,
Defendants-Appellees
_____

On Appeal from the United States District Court for the District of Columbia
(No. 14-00670-ABJ)
_____

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS SAFARI CLUB
## INTERNATIONAL AND NATIONAL RIFLE ASSOCIATION OF
## AMERICA

Anna M. Seidman
Douglas S. Burdin
Safari Club International
501 2nd Street NE
Washington, D.C. 20002
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
*Counsel for Safari Club International*

Christopher A. Conte
National Rifle Association of
America/ILA
11250 Waples Mill Rd., 5N
Fairfax, Virginia 22030
Tel: 703-267-1166
Fax: 703-267-1164
cconte@nrahq.org
*Counsel for National Rifle
Association of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

GLOSSARY ....................................................................................................... v

I.   SUMMARY OF ARGUMENT ..................................................................... 1

II.  ARGUMENT ............................................................................................... 3

    A.    SCI/NRA's Challenges to the April 4, 2014 Zimbabwe Elephant
           Importation Ban Remain Viable ........................................................ 3

    B.    This Court Has Jurisdiction to Review SCI/NRA's Challenges
           to the Tanzania Importation Ban ..................................................... 10

           1.    SCI/NRA Members Who Have Lost the Ability to Import
                   Elephants Do Not Need to Be Denied Import Permits to
                   Demonstrate Standing ........................................................... 11

           2.    SCI/NRA Members' Harms Go Beyond the Inability to
                   Import an Elephant ................................................................ 14

           3.    SCI/NRA's Standing Relies on the Injuries of Individuals
                   Other Than Those Who Want to Import Sport-Hunted
                   Elephants ................................................................................ 16

           4.    Resort to the Permit Application Process Would
                   Prove Futile .......................................................................... 17

    C.    SCI/NRA Have Sustained Irreparable Harm ..................................... 21

           1.    SCI/NRA Sufficiently Demonstrated Irreparable Harm ........... 21

           2.    SCI/NRA Demonstrated Concrete, Non-Speculative
                   Harms .................................................................................... 26

            3.    SCI/NRA Members' Economic Harm, Together With
                   Their Other Injuries, Qualifies As Irreparable Harm ............... 28

III. CONCLUSION ........................................................................................... 29

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION ..... 32

CERTIFICATE OF SERVICE ......................................................................... 33

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

Albuquerque Indian Rights v. Lujan, 930 F.2d 49 (D.C. Cir. 1991) ...................... 12

Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531 (1987) .......................... 24

Arkema Inc. v. EPA, 618 F.3d 1 (D.C. Cir. 2010) ..................................... 4

Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988) ....................................... 4

Carrillo v. Schneider Logistics, 2012 WL 556309 (C.D.CA.) ............................... 29

Carlson v. Schlesinger, 511 F.2d 1327 (D.C. Cir. 1975) ........................................ 9

Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290
  (D.C. Cir. 2006) ..................................................................... 11

Chevron Natural Gas v. FERC, 199 F. App'x. 2 (D.C. Cir. 2006) ................... 11-12

Christian Knights of Ku Klux Klan Invisible Empire v. Dist. of Columbia,
  972 F.2d 365 (D.C. Cir. 1992) ................................................................ 8

Del Monte Fresh Produce Co. v. U.S., 570 F.3d 316 (D.C. Cir. 2009) .................... 8

Elrod v. Burns, 427 U.S. 347 (1976) ...................................................... 27

Friends for All Children v. Lockheed Aircraft Corp., 746 F.2d 816
  (D.C. Cir. 1984) ..................................................................... 25

*Fund for Animals Inc. v. Norton, 322 F.3d 728 (D.C. Cir. 2003) .. 11, 14, 15, 17, 28

Fund for Animals v. Clark, 27 F.Supp.2d 8 (D.D.C. 1998) .................................. 21

Fund for Animals v. Espy, 814 F. Supp. 142 (D.D.C. 1993) ............................ 21-22

Hightower v. City of Boston, 693 F.3d 61 (1st Cir. 2012) .................................... 13

James v. U.S. Dep't of Health and Human Servs., 824 F.2d 1132
  (D.C. Cir. 1987) ..................................................................... 18

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ........................................ 11

Madsen v. Boise State Univ., 976 F.2d 1219 (9th Cir. 1992) ................................ 12

Marcum v. Salazar, 694 F.3d 123 (D.C. Cir. 2012) ........................................ 19, 20

Moose Lodge No. 107 v. Irvis, 407 U.S. 163 (1972) ............................................ 12

Morris v. United States, 392 F.3d 1372 (Fed. Cir. 2004) .................................... 20

Nat'l Wildlife Fed. v. Burford, 835 F.2d 305 (D.C. Cir. 1987) ............................. 24

National Mining Ass'n v. McCarthy, 2014 WL 3377245 (D.C. Cir.).....................19

Park Lake Res. Ltd. Liab. Co. v. U.S. Dep't of Agric., 197 F.3d 448
  (10th Cir. 1999)...........................................................................................19

Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007) ..............................13

Shell Offshore Inc., v. Greenpeace Inc., 864 F.Supp.2d 839 (D. Ak. 2012)...........29

Super Tire Eng'g Co. v. McCorkle, 416 U.S. 115 (1974)......................................10

Tesoro Ref. & Mktg. Co. v. FERC, 552 F.3d 868 (D.C. Cir. 2009) ................ 17-18

United States v. Students Challenging Regulatory Agency Procedures,
  412 U.S. 669 (1973)...................................................................................12

Young v. Crofts, 64 F. App'x 24 (9th Cir. 2003).....................................................13

**Statutes**

5 U.S.C. §551(4) ........................................................................................5

16 U.S.C. §1533(d) .....................................................................................5

**Regulations**

50 C.F.R. §17.40(e)(3)(iii)(c) ......................................................................5

*62 Fed. Reg. 44627 (Aug. 22, 1997) ............................................... 4, 8, 10

66 Fed. Reg. 27601 (May 18, 2001) ............................................................10

*Authorities Principally Relied On

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| App. | Appendix |
| April Finding | Federal Appellees' April 4, 2014 Enhancement Finding for Zimbabwe |
| CITES | Convention on the International Trade of Endangered Species of Fauna and Flora |
| Dkt. | Docket |
| ESA | Endangered Species Act |
| Fed. Br. | Federal Appellees' Answering Brief |
| Federal Appellees | Defendant-Appellees Sally M. R. Jewell *et al*. |
| Service | U.S. Fish and Wildlife Service |
| July Finding | Federal Appellees' July 31, 2014 Enhancement Finding for Zimbabwe |
| NRD | Natural Resources Department of the Ministry of Nature and Environment of Mongolia |
| SCI/NRA | Safari Club International and the National Rifle Association of America |
| ZimParks | Zimbabwe Parks and Wildlife Management Authority |

# I. SUMMARY OF ARGUMENT

On April 4, 2014 Defendant-Appellees Sally M. R. Jewell *et al*. ("Federal Appellees"), without warning or public input, abruptly terminated the importation of sport-hunted elephants from Tanzania and Zimbabwe. Plaintiffs-Appellants Safari Club International and the National Rifle Association of America ("SCI/NRA") challenged those actions and moved for a preliminary injunction. The Court below denied that motion, ruling that SCI/NRA failed to demonstrate sufficient irreparable harm. SCI/NRA appealed that ruling.

Weeks after implementing the April 4 importation bans, Federal Appellees announced that their decision for Zimbabwe was only temporary and that they would make a final decision in mid-July. On July 31, 2014, after SCI/NRA filed their opening brief in this appeal, Federal Appellees confirmed their original decision. Federal Appellees now rely on this new decision to assert jurisdictional challenges. They incorrectly argue that because the new decision supersedes its predecessor, SCI/NRA's claims are no longer ripe and SCI/NRA lack standing to challenge the original decision. These jurisdictional challenges fail because Federal Appellees lack authority to make decisions with retroactive effect and because the initial decision still governs the importation of elephants that were hunted while that decision was in effect.

Federal Appellees' answering brief also includes jurisdictional attacks on SCI/NRA's challenges to the Tanzania importation ban. Federal Appellees erroneously argue that SCI/NRA cannot challenge the Tanzania ban until SCI/NRA members fail in attempts to obtain permits to import elephants from Tanzania. Federal Appellees' argument fails because SCI/NRA's harms do not all rely on the ability of individual members to obtain permits to import elephants and because Federal Appellees have imposed impossible standards that make resort to the permit application process futile.

In addressing the issues on appeal, Federal Appellees support the District Court's erroneous decision that rejected the sufficiency of SCI/NRA's demonstration of irreparable harm. The Court should reverse that ruling and to view the inability to import legally sport-hunted elephants from the hunters' perspective. This Court should find that the loss of the ability to import a successfully-hunted elephant constitutes sufficiently significant irreparable harm regardless of whether SCI/NRA members can still participate in hunts in Zimbabwe and Tanzania. In addition, because Federal Appellees implemented the bans with the express goal of persuading U.S. hunters to cancel their hunts in the two countries, SCI/NRA members who cancelled their hunts did not self-inflict their injuries. The concrete facts presented by SCI/NRA exhibit the loss of hunter generated conservation revenue resulting from the bans and sufficient proof of

certain, great, imminent and irreparable harm to elephant conservation and SCI/NRA's interests. Finally, SCI/NRA ask this Court to evaluate the economic harms they have suffered in conjunction with their recreational and conservation harms, and not by the standards applicable to economic injuries that are the exclusive harms sustained by the injured party. This Court should find that SCI/NRA's harms collectively demonstrate sufficient injury to qualify as irreparable harm and to justify preliminary injunctive relief.

SCI/NRA ask this Court to reject Federal Appellees' jurisdictional challenges, reverse the lower court's ruling and direct the District Court to fully consider SCI/NRA's motion to enjoin the harms that the importation bans have caused and continue to cause.

## II. ARGUMENT

### A. SCI/NRA's Challenges to the April 4, 2014 Zimbabwe Elephant Importation Ban Remain Viable

Federal Appellees' July 31, 2014 enhancement finding for Zimbabwe ("July Finding") does not moot SCI/NRA's challenges to Federal Appellees' April 4, 2014 decision to ban the importation of elephants legally hunted in Zimbabwe ("April Finding").[1] Contrary to Federal Appellees' arguments, the April Finding

---

[1] The July Finding was not published in the Federal Register until July 31, 2014. According to the commitment Federal Appellees published in 1997, the pre-existing finding would "remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has

3

remains operative.  The fact that Federal Appellees announced that the July

Finding superseded the earlier decision does not automatically give the July

Finding retroactive impact.

> Retroactivity is not favored in the law. Thus, congressional
> enactments and administrative rules will not be construed to have
> retroactive effect unless their language requires this result. (*Citations
> omitted.*)  By the same principle, a statutory grant of legislative
> rulemaking authority will not, as a general matter, be understood to
> encompass the power to promulgate retroactive rules unless that
> power is conveyed by Congress in express terms. (*Citations omitted.*)
> Even where some substantial justification for retroactive rulemaking
> is presented, courts should be reluctant to find such authority absent
> an express statutory grant.

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988); *See also Arkema

Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010).

The July Finding cannot apply to the importation of elephants hunted prior

to July 31, 2014 because Federal Appellees lack legal authority to make such

retroactive determinations.  Because the July Finding applies only to elephants

legally hunted in Zimbabwe from July 31, 2014 forward, SCI/NRA's claims

challenging the April Finding are not moot.  Setting aside the April Finding will

allow the importation of elephants hunted before July 31, and will redress the harm

suffered by SCI members who hunted elephants during the period between April 4

and July 31.

---

published a notice of any change in the Federal Register."  62 Fed. Reg. 44627,
44633 (Aug. 22, 1997).

Other laws and agency actions confirm that the July Finding lacks retroactive effect. The Administrative Procedure Act ("APA") explains that Congress intends agency rulemaking to regulate future conduct:

> (4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . .;

5 U.S.C. §551(4).[2] Federal Appellees regulate the importation of threatened species under authority of 16 U.S.C. §1533(d) of the Endangered Species Act ("ESA"). That provision authorizes the Secretary of the Interior to issue regulations deemed necessary and advisable for the conservation of species but does not expressly grant authority to promulgate retroactive regulations. The language of the rule that the Secretary issued for African elephants confirms the prospective nature of the Secretary's authority. The rule states that sport-hunted elephants may be imported when "a determination is made that the killing of the animal whose trophy is intended for import *would* enhance survival of the species;" 50 C.F.R. §17.40(e)(3)(iii)(c) (emphasis added). The Secretary is to base the decision on whether the take of the animal intended for import *would* enhance the survival of the species, looking towards the future, and not whether the take "did" enhance the survival at some time in the past. Nothing in the wording of the

---

[2] In their Complaint (Dkt.1, ¶¶87, 92), Amended Complaint (Dkt. 13,¶¶94, 99) and Proposed Second Amended Complaint (Dkt. 34-2,¶¶108, 114), SCI/NRA contend that the April 4, 2014 importation bans qualify as APA rulemaking.

regulation suggests that the Secretary has authority to make such determinations retroactive.

In their briefing in this appeal, and in their conduct subsequent to April 4, 2014, Federal Appellees belatedly acknowledged their "concerns" about their authority to retroactively ban the importation of Zimbabwe's elephants. The April 4 ban initially applied retroactively to elephants hunted after December 31, 2013. On April 17, 2014, Federal Appellees revised that determination to ban only the importation of elephants hunted *on or after* April 4. In the brief that they filed in this appeal, Federal Appellees admitted that they changed their April 4 ban to prospective application in order to "avoid retroactivity concerns." Federal Appellees' Answering Brief ("Fed. Br.") at 10 n.8.

For all practical purposes, this Court need not consider whether SCI/NRA's claims concerning the April Finding are moot. This appeal does not address the merits of SCI/NRA's claims. It concerns only whether SCI/NRA have suffered irreparable harm from the importation bans. As Federal Appellees correctly informed this Court, SCI/NRA have already moved to file a Second Amended and Supplemented Complaint. Dkt. 34. That proposed pleading includes challenges to the July Finding that Federal Appellees have stated they do "not oppose." Fed. Br. at 19. The harms that SCI/NRA asserted in their preliminary injunction motion

that are the subject of this appeal are the same harms that continue as a result of the July Finding.

Whether Federal Appellees "predicated [the] July 22 finding on a different factual record than the April 4 finding" (Fed. Br. at 29) has no bearing on the issue of irreparable harm. While the discrepancies in the factual records relating to the two decisions may impact the District Court's ruling on SCI/NRA's ability to succeed on the *merits* of its claims, that issue has not yet been addressed by the Court below and is not before this Court. SCI/NRA have asked this Court to review the only finding that the District Court made – on the question of irreparable harm. If this Court reverses the lower court's determination on irreparable harm and remands the preliminary injunction determination to the District Court, that court can address the merits issue based on the pleadings before it at that time.

Finally, even if this Court finds that SCI/NRA's challenges to the April Finding have been mooted by the July Finding, this Court should not dismiss SCI/NRA's challenge to the earlier finding. Contrary to Federal Appellee's protestations, the illegal, yet allegedly short-lived April Finding qualifies as "capable of repetition yet evading review." To assert that mootness exception, a party must demonstrate that 1) the duration of the conduct being challenged is too short to allow for full litigation and 2) there is a reasonable expectation that the

party will be subject to the same conduct again.  *Del Monte Fresh Produce Co. v. U.S.*, 570 F.3d 316, 322 (D.C. Cir. 2009).  "Full litigation" requires the time necessary for Supreme Court review.  *Christian Knights of Ku Klux Klan Invisible Empire v. Dist. of Columbia*, 972 F.2d 365, 369 (D.C. Cir. 1992).  Conduct with a duration of less than two years qualifies if the duration of the challenged action is "typical" for that type of agency conduct.  *Del Monte*, 570 F.3d at 322.

Federal Appellees characterize the three month duration of the April Finding as atypical, contrasting that decision with the last finding that Federal Appellees made for Zimbabwe in 1997.  Since Federal Appellees have made only one previous finding for Zimbabwe, that single example cannot demonstrate typical or atypical behavior.  In 1997, Federal Appellees explained that they would make such findings on a "periodic basis," giving no indication of any typical duration between decisions.  62 Fed. Reg. at 44633.  Federal Appellees have established a new "typical" by making three findings for Zimbabwe in the past fifteen weeks:  1) the April 4 finding; 2) the April 17 finding revising the effective date of the importation ban; and 3) the July 31 finding.  In addition, Federal Appellees have already announced that they intend to make yet another finding in December 2014.  Consequently, what is currently "typical" is for Federal Appellees to make findings of very short durations.

Federal Appellees also argue that if the April Finding is capable of repetition, it will not evade review because SCI/NRA have challenged the July Finding in district court. Fed. Br. at 33. Because SCI/NRA's challenges to the April and July Findings are not identical, SCI/NRA cannot rely on their litigation of the July Finding to resolve all the illegalities involved with the April Finding.

Without a judicial ruling enjoining such conduct, SCI/NRA face a real probability that their members will be subjected to the same type of arbitrary and capricious decision-making that resulted in the April Finding. Whether or not Federal Appellees will continue to rely on a lack of information, rather than new information, in their upcoming December 2014 decision,[3] nothing prevents Federal Appellees from applying the same conduct for future decisions concerning Namibia and South Africa elephant importation.[4] Prior to April 4, 2014, SCI/NRA members had no reason to expect that Federal Appellees had any intention of changing their long-standing positive enhancement finding for elephants in Zimbabwe. Similarly, Federal Appellees did not even give Zimbabwe notice of their plans until after imposing the ban. Despite their commitment 1) to base any

---

[3] SCI/NRA disagree with Federal Appellees that the July Finding was based on "new information." While it may have been based on more information than the April Finding, the July Finding continues to be based on a lack of information.

[4] To qualify for the capable of repetition yet evading review exception, the injured party can challenge a repeated incidence of the illegal conduct even if the circumstances involving the application of the conduct are not identical to the original action. *Carlson v. Schlesinger*, 511 F.2d 1327, 1334 n.9 (D.C. Cir. 1975).

change in their position on new information and 2) to publish any such change in

position in the Federal Register, Federal Appellees did neither. 62 Fed. Reg. at

44633. Federal Appellees have made the exact same commitments for South

Africa and Namibia.

> The enhancement findings for importation of sport-hunted elephant
> trophies from Botswana, Namibia, and Zimbabwe … remain in effect
> until the Service finds, based on new information, that the conditions
> of the special rule are no longer met and has published a notice of any
> change in the Federal Register.

*Id*.; 66 Fed. Reg. 27601, 27609 (May 18, 2001) (South Africa). SCI/NRA's

inability to fully litigate their challenges to the April Finding within two years and

Federal Appellee's ability to abruptly and without warning use the exact same

approach to terminate elephant importation from Namibia and South Africa

qualifies Federal Appellees' actions in implementing the April 4, 2014 importation

ban as "capable of repetition yet evading review." *See Super Tire Eng'g Co. v.*

*McCorkle*, 416 U.S. 115, 122 (1974) (petitioners' challenges were not moot

because "the challenged governmental activity . . . has not evaporated or

disappeared, and by its continuing and brooding presence, casts what may well be

a substantial adverse effect on the interests of the petitioning parties.").

B.    **This Court Has Jurisdiction to Review SCI/NRA's Challenges to
      the Tanzania Importation Ban**

Federal Appellees erroneously argue that SCI/NRA cannot demonstrate

standing or ripeness unless an SCI or NRA member unsuccessfully applies for a

permit to import an elephant from Tanzania.  Federal Appellees fail to acknowledge four salient facts: 1) those who invested in and planned Tanzania elephant hunts do not need permits to demonstrate interest in importing elephants or harm from the importation ban; 2) those who wish to hunt and import Tanzania elephants have sustained harms other than the inability to import their elephants; 3) SCI/NRA members without plans to hunt and import Tanzania elephants are also harmed by the importation ban; and 4) participation in the application process for an import permit would have proven futile.

> **1.    SCI/NRA Members Who Have Lost the Ability to Import Elephants Do Not Need to Be Denied Import Permits to Demonstrate Standing**

A plaintiff seeking to establish Article III standing must demonstrate 1) injury-in-fact; 2) causation; and 3) redressability.  *Fund for Animals Inc. v. Norton*, 322 F.3d 728, 732-33 (D.C. Cir. 2003), *citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  The burden to prove injury-in-fact is significantly less for standing than for obtaining preliminary injunctive relief.  While this Circuit may require a showing of "certain and great" injury to demonstrate irreparable harm, (*Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006)), for standing, SCI/NRA need only show that their members have sustained an "identifiable trifle" of harm.  *Chevron Natural Gas v. FERC,* 199 F.

App'x 2, 4 (D.C. Cir. 2006), *quoting United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n.14 (1973).

SCI/NRA members who seek to import their successfully hunted elephants from Tanzania are nothing like the "concerned bystanders" who are the focus of many of the cases cited by Federal Appellees. Fed. Br. at 36. For example, the plaintiffs in *Albuquerque Indian Rights v. Lujan,* 930 F.2d 49, 56 (D.C. Cir. 1991) had not taken any concrete steps to demonstrate their interest in the jobs from which they claimed they had been discriminatorily excluded.[5] In contrast, SCI/NRA members have booked hunts, made plans, spent money and otherwise heavily invested emotionally and financially in the hunting and intended importation of elephants. *See* Tarpley Decl., App. 238, ¶ 6; Petty Decl., App. 241, 242, ¶¶ 12, 15; Johnson Decl., App. 244, ¶ 11(members have already paid deposits and purchased plane tickets).

In contrast to the circumstances in *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1222 (9th Cir. 1992), SCI/NRA's claims and injuries are not too nebulous and Federal Appellees do not need to receive permit applications from SCI/NRA

---

[5] In *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 168 (1972), referenced by the *Albuquerque Indian Rights* court, the Supreme Court held that the plaintiff had standing to challenge the lodge's discriminatory policies towards guests, even though he had not applied to be a member.

members to understand the harms caused by the importation bans.[6]  In fact, Federal

Appellees acknowledged their awareness of at least some of those harms in a Q&A

page they posted on the Service website:

> **I have already purchased a hunt in Tanzania or Zimbabwe. How do I get my money back?**
> We encourage you to contact your hunting outfitter to discuss options. While you can still participate in a hunt in 2014, ***you currently are not able to import the trophy***. In addition, given the current conservation concerns for elephants in Tanzania and Zimbabwe, we strongly advise that you reconsider taking part in an elephant hunt in either of these countries at this time

App. 61 (emphasis added).

Two cases cited by Federal Appellees undermine their arguments.  In

*Parker v. District of Columbia,* 478 F.3d 370, 376 (D.C. Cir. 2007), the court

indicated that applying for and being denied a firearm registration certificate

provided standing but was not the only way a plaintiff could have established

standing to challenge the laws.  In *Hightower v. City of Boston*, 693 F.3d 61, 70

(1st Cir. 2012), the court found that the plaintiff had standing to challenge the law

preventing her from obtaining some types of firearms licenses because although

she had not applied for any types of firearms licenses, she had standing concerning

a type of license that she had previously held and that had been revoked in the past.

---

[6] The Ninth Circuit in *Young v. Crofts*, 64 F. App'x 24, 26-27 (9th Cir. 2003) distinguished *Madsen* and ruled that students that failed to apply for permits could still have standing if the defendants had engaged in conduct that made it appear that applying for permits would be futile.

## 2. SCI/NRA Members' Harms Go Beyond the Inability to Import an Elephant

SCI/NRA members who booked elephant hunts in Tanzania have sustained many injuries other than the inability to import their successfully hunted elephants. Those who decide to proceed with their hunts face uncertainty and inevitable delay in their ability to import their elephants – factors that significantly lessen the enjoyment of their long awaited, highly valued, and costly hunts. Even the Court below acknowledged that SCI/NRA members are suffering recreational harms, stating that it "does not find that the suspensions will have no effect on their overall hunting experience" (App. 50) and noting that the "'full enjoyment of the hunt' may be diminished" by the inability to import the legally sport-hunted elephants. *Id*.

Whether or not they choose to go forward with their elephant hunts in Tanzania, SCI/NRA members have a "personal stake in the outcome of this litigation" and are suffering injuries-in-fact to their interests in elephant conservation. *See, e.g.*, Johnson Declaration, App. 243-45. This is not the first time that this Circuit has considered the standing of parties who suffer such harms as a result of a ban on the importation of sport-hunted animals. In 2003, the D.C. Circuit acknowledged standing based on the harms that an importation ban posed to interests in the conservation of wildlife. In *Fund for Animals v. Norton*, the D.C. Circuit reversed a District Court's decision to deny intervention to the Natural

Resources Department of the Ministry of Nature and Environment of Mongolia

("NRD") in a suit challenging the Service's decision to permit the importation of

sport-hunted argali sheep from Mongolia, Tajikistan and Kyrgyzstan. 322 F.3d at

730.[7] NRD explained that:

> fees paid by sport hunters are the primary source of funding for its
> argali conservation program. If the [plaintiff] succeeds in barring
> American hunters from bringing their trophies home, some hunters
> will not travel to Mongolia to hunt the argali, and the revenues that
> support the conservation program will decline.

*Id*. at 733. The Court recognized that "[t]he threatened loss of tourist dollars, and

the consequent reduction in funding for Mongolia's conservation program,

constitute a concrete and imminent injury." *Id*.

As in *Fund for Animals*, SCI/NRA base their Article III standing on both

their inability to import sport-hunted elephants and the harm to their interests in

elephant conservation resulting from fewer hunters traveling to Tanzania and less

revenue being generated for wildlife conservation. Just as the D.C. Circuit

acknowledged these harms as a basis for SCI and NRD's standing in *Fund for*

---

[7] The District Court had already granted intervention to SCI and other hunting
organizations based on recreational, economic and conservation injuries created by
the risk that plaintiff's success would make it impossible for SCI's members to
import their argali into the United States. The appellate court took note of and
expressed no questions as to the intervention of SCI, based at least in part on the
declarations of hunters who stated they would not travel to Mongolia to hunt if
they could not import their argali sheep. 322 F.3d at 734. After acknowledging
that applicants for intervention must demonstrate Article III standing, the Court
expressly noted that SCI's standing was based in part upon their conservation
interests in the argali sheep. *Id.* at 732, 737.

*Animals*, this Court should recognize these harms for the purpose of standing here. Whether or not individual SCI/NRA members submitted applications for import permits has no bearing on this Court's recognition of SCI/NRA's standing based on these conservation injuries.

> ### 3. SCI/NRA's Standing Relies on the Injuries of Individuals Other Than Those Who Want to Import Sport-Hunted Elephants

In asserting that SCI/NRA members must apply for importation permits, Federal Appellees ignore the harms suffered by SCI/NRA members who do not have an interest in importing elephants into the U.S. For example, professional hunter Derek Hurt submitted a declaration describing his interests and involvement in Tanzania elephant conservation and anti-poaching efforts. App. 248, ¶5. Mr. Hurt explained how the importation ban is "removing the hunter and the money he brings into Tanzania" and "reduces our financial ability to patrol and manage these areas." App. 249, ¶11. He explained that "[f]ewer clients means less revenue to be used to help curtail poaching, community tolerance and overall management for all species." App. 249-50, ¶12. "We could lose our wildlife in a short period of five years." App. 250, ¶13.

The harm to Mr. Hurt's conservation interests arises not from an inability to import elephants, but from Federal Appellees' purposeful efforts to persuade U.S. hunters to cancel their Tanzania elephant hunts. These injuries are no less

concrete, imminent or causally connected to the importation ban than those that established the standing of NRD and SCI in *Fund for Animals*.

### 4. Resort to the Permit Application Process Would Prove Futile

Finally, because of the futility of submitting an import permit application, SCI/NRA members can establish their standing and the ripeness of their claims without submitting such applications. Regardless of the number of applications submitted or the amount of currently available information provided, Federal Appellees' alleged case-by-case review of those applications will not result in the issuance of an importation permit for an elephant hunted in Tanzania in 2014. Federal Appellees do not seek "additional" information about whether the importation of elephants is detrimental to the survival of the species or whether the take of elephants enhances species survival. Instead, Federal Appellees seek very specific information that does not presently exist and will not exist until Tanzania modifies its elephant management practices and/or conducts very lengthy surveys and studies that reveal very specific results. Resort to the permit application process is and will remain futile until Tanzania takes actions that are completely outside of SCI/NRA's control.

Federal Appellees argue that the futility exception applies only where resort to administrative processes would be "clearly useless" because of "certainty of an adverse decision." *Tesoro Ref. & Mktg. Co. v. FERC*, 552 F.3d 868, 874 (D.C.

Cir. 2009). This Circuit considers an adverse decision certain where the agency "has evidenced a strong position on the issue together with an unwillingness to reconsider." *James v. U.S. Dep't of Health and Human Servs.*, 824 F.2d 1132, 1139 (D.C. Cir. 1987) (citation omitted). Federal Appellees' conduct fulfills these criteria.

On April 4, 2014, Bryan Arroyo, Assistant Director of the U.S. Fish and Wildlife Service for International Affairs, sent a letter to Tanzania's Minister of Natural Resources and Tourism explaining Federal Appellees' decision to ban importation of Tanzania elephants. After expressing grave concern about the escalation of elephant poaching throughout Tanzania, Mr. Arroyo issued Federal Appellees' ultimatum:

> In order to allow elephant trophies to be imported in the future, documented total offtake from the elephant population (i.e. all sources of elephant deaths, including poaching, sport-hunting, problem animal control and natural mortality) would need to be below the elephant's annual population growth rate, requiring the poaching rate to be significantly reduced.

Supplement to the Appendix at 375-76. Mr. Arroyo's letter revealed that Federal Appellees are not simply seeking additional information, but are instead essentially requiring Tanzania to modify its management approach to reduce the number of elephants poached.

The importation ban that SCI/NRA challenge in this litigation currently applies only to elephants hunted in 2014.[8]  Individuals who have hunted and have plans to hunt elephants in 2014 will not be able to provide the information demanded by Federal Appellees until Tanzania satisfies Federal Appellees' arbitrary requirements concerning elephant management.  If the required information does not exist for elephants taken in 2014, then engaging in the permit process without such information is futile.

Federal Appellees rely on distinguishable cases to support their ripeness challenge.  For example, in contrast to the circumstances in *National Mining Ass'n v. McCarthy*, Federal Appellees have not suggested that the importation bans are not "legally or practically binding" or that the "permitting authorities [Service] and permit applicants may ignore" the importation bans.  2014 WL 3377245 *6-7 (D.C. Cir.).  Another case is distinguishable because the plaintiffs had not shown any harm resulting from the actions they challenged.  *Park Lake Res. LLC v. U.S. Dep't of Agric.*, 197 F.3d 448, 449-50, 452-53 (10th Cir. 1999)

Although the circumstances in *Marcum v. Salazar,* 694 F.3d 123 (D.C. Cir. 2012) appear similar to the instant matter, many differences separate the two cases. Both cases involve the importation of elephant populations listed as threatened and

---

[8] For Tanzania, Federal Appellees make their findings on an annual basis.  Even if in 2015Tanzania produces population data demonstrating a different ratio of elephant mortality to elephant population growth, this would not change the futility of applying for a permit for individuals who hunted elephants in 2014.

classified as Appendix I species.  The similarities end there.  For Tanzania, Federal

Appellees reversed a consistent, two decade-long position that the importation of

elephants is not detrimental to the survival of the species and that the take of those

elephants enhances their survival.  In contrast, in *Marcum*, Federal Appellees had

not previously made such determinations or allowed importation of Zambia's

elephants.  Consequently, the plaintiffs in *Marcum* had no importation history or

past practice upon which to base their expectation of importing their elephants and

suffered no reversal of opportunities from Service's refusal to allow importation.

Moreover, nothing in the *Marcum* case suggests that the Service had made the

permit process futile by communicating an absolute refusal to allow importation

until Zambia changed its management practices.[9]  In fact, the Service was still

awaiting a response to their request for additional information from Zambia when

the *Marcum* plaintiffs filed suit.  694 F.3d at 125. Thus, their applications might

have been granted.

　　　As the denial of an importation permit in this case does not encompass the

full complement of harms suffered by SCI/NRA's members and as resort to the

administrative process would be pointless, SCI/NRA have standing to assert their

---

[9] The actual futility of effort caused by Federal Appellees' mandate to Tanzania
also distinguishes *Morris v. United States*, 392 F.3d 1372, 1376 (Fed. Cir. 2004).

claims concerning the Tanzania importation ban and those claims are ripe for review.

### C. SCI/NRA Have Sustained Irreparable Harm

#### 1. SCI/NRA Sufficiently Demonstrated Irreparable Harm

The court below incorrectly determined that, although SCI/NRA had indeed suffered as a result of the importation bans, their losses were insufficient for preliminary injunctive relief. The court decided that because SCI/NRA members can continue to hunt elephants in Zimbabwe and Tanzania, their inability to import elephants, while injurious, lacks sufficient significance to justify injunctive relief. Fed. Br. at 47-48. In effect, the court substituted its own value judgment for what qualifies as "great" harm to hunters.

The court below made little attempt to view SCI/NRA's harms from the hunter's perspective. Recreational and aesthetic harms are extremely subjective in nature. What qualifies as a loss to one group of individuals may seem insignificant to another, and what is desirable to one may be repugnant to another. SCI/NRA ask this Court to evaluate harm based on its significance to the injured party.

Courts in this circuit have granted preliminary injunctions against hunts and management actions based on animal rights groups' allegations that seeing or even contemplating the killing of animals would cause them irreparable aesthetic injury. *Fund for Animals v. Clark*, 27 F.Supp.2d 8, 14 (D.D.C. 1998); *Fund for Animals v.*

*Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993). If courts can recognize irreparable harm based on the subjective sensibilities of those who oppose hunting, courts should apply the same standards when reviewing harms alleged by those who support it.

Despite possible differences of opinion on the significance of the inability to import a legally hunted elephant, all parties to this litigation share a concern for elephant conservation in Zimbabwe and Tanzania. For this reason alone, this Court can find that SCI/NRA have suffered irreparable injury in the form of harm to elephant conservation.

SCI/NRA offered concrete proof that elephant conservation efforts will suffer due to the importation bans. First, SCI/NRA demonstrated that, less than a month after the importation ban's announcement, several hunters had already cancelled their hunts (*e.g.,* Booking agent Ivan Carter "lost several hunts booked in Zimbabwe and Tanzania for elephant" App. 220, ¶19; Outfitter John Barth had three cancellations, App. 223, ¶13). Federal Appellees expressly encouraged U.S. hunters to cancel their elephant hunts in both countries: "[W]e ***strongly advise*** that you reconsider taking part in an elephant hunt in either of these countries at this time." App. 61 (emphasis added). Second, SCI/NRA proved that hunting revenues provide the primary, if not the only, source of funding for Zimbabwe's wildlife management authority. "[O]nly revenues generated through sport-hunting

conducted on state and private lands are used to finance ZimParks and to our

knowledge, no other government funding is provided." App. 66-67.  Third,

SCI/NRA established that the majority of elephant hunts are purchased by U.S.

hunters (outfitter Alistair Pole sells 90% of elephant hunts to U.S. hunters, App.

213-214; U.S. residents booked 106 of 167 elephant hunts for 2014 on

CAMPFIRE concessions, App. 263, ¶11).  Fourth, SCI/NRA demonstrated that

private hunting operations play a major role in anti-poaching efforts.  For example,

a hunting business financed the apprehension of poachers responsible for the

incident featured in Federal Appellees' announcement of the importation bans (De

Vries Declaration, App. 235, ¶¶10, 11).  These pieces of information alone – not to

mention all the additional statements from hunters and outfitters who presented

personal knowledge of how U.S. hunters provide revenue for elephant

conservation, habitat improvement and anti-poaching efforts[10] – demonstrate

SCI/NRA's harm.  The facts show that U.S. hunters, who provide significant

revenue for elephant conservation, are cancelling their hunts and depriving the

management authorities and hunting businesses of money needed for anti-poaching

efforts and elephant conservation.

---

[10] E.g. Petty Declaration (hunters and hunting revenues combat poaching in
Tanzania) App. 241, ¶13; Duckworth Decl., (hunting operation helps combat
poaching and improves social tolerance in Zimbabwe) App. 232, ¶¶9, 13.

SCI/NRA provided concrete evidence that elephant conservation in the two countries will be harmed as a result of the importation bans. The loss to elephant conservation is an environmental injury. The U.S. Supreme Court has stated that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).

Federal Appellees argue that SCI/NRA need to show an increase in poaching to demonstrate that the loss of hunter revenue has already caused irreparable harm. Fed. Br. at 56. This approach directly conflicts with this circuit's ruling that "[a] preliminary injunction is designed to prevent irreparable injury; its value would be totally eviscerated if the plaintiff had to show that the harm had already occurred before the court could issue the injunction." *Nat'l Wildlife Fed. v. Burford*, 835 F.2d 305, 325 (D.C. Cir. 1987).

Instead of focusing on SCI/NRA's irreparable harm, Federal Appellees digress with a discussion of the type of relief that SCI/NRA seek. Contrary to Federal Appellees' characterization, SCI/NRA do not seek a preliminary injunction that directs Federal Appellees to permit hunters to import their elephants. On April 3, 2014 SCI/NRA members could legally import elephants hunted in 2014. On April 4, 2014, they could not. SCI/NRA asked the District Court to enjoin the illegal importation bans for the duration of this litigation to restore the status quo

that was in effect on April 3, 2014. Even injunctive relief that provided SCI/NRA with complete relief from the harms caused by the importation bans would not, as Federal Appellees erroneously argue, trigger a heightened standard of irreparable harm. That standard is not applied in this jurisdiction. *Friends for All Children v. Lockheed Aircraft Corp*., 746 F.2d 816, 834 n.31 (D.C. Cir. 1984) (Court noted no court in this Circuit had ever required the heightened showing).

Federal Appellees suggest that SCI/NRA should be satisfied with placing sport-hunted elephants in storage until SCI/NRA succeed in this litigation, comparing the storage of sport-hunted elephants with the escrow of money. This inapt comparison equates sport-hunted animals with cash and fails to recognize the aesthetic and recreational pride and enjoyment that a hunter experiences from owning, displaying and viewing the animal he or she successfully hunted. In addition, the elephants that benefit from the revenues brought into Zimbabwe and Tanzania by sport-hunters, that are at risk from poachers and other harms, cannot be put into escrow while the parties litigate this case.

SCI/NRA members' injuries cannot be deemed self-inflicted because it was Federal Appellees who advised hunters to cancel their hunts and who intended the bans to reduce the overall take of elephants. Ignoring this fact, Federal Appellees argue that unless they proceed with their hunts, SCI/NRA members are inflicting their own harms. Federal Appellees appear to be advising SCI/NRA that they

should proceed with their hunts and store their elephants for the duration of the litigation. In doing so, Federal Appellees directly contradict their own (questionable) goals. Federal Appellees cannot have it both ways. Reasonably, many hunters have heeded the Service's advice in response to absolute importation bans. SCI/NRA members and elephants are suffering as a result; injunctive relief will remedy those irreparable harms.

## 2. SCI/NRA Demonstrated Concrete, Non-Speculative Harms

Federal Appellees appear to ask this Court to measure irreparable harm based on Federal Appellees' assessment of whether sport-hunting and importation enhance the survival of Zimbabwe's and Tanzania's elephants. Fed. Br. at 55. The Court cannot adopt this approach because 1) SCI/NRA are challenging its legality and 2) the assessment does not address whether the loss of hunter revenues will harm species conservation. Federal Appellees have in fact determined that sport-hunting benefits the conservation of elephants in Zimbabwe and Tanzania. For example:

> U.S. hunters are the primary recipients of licenses in Tanzania. It is the belief of these hunters, as well as the [Division of Management Authority], that the funds generated from these licenses are being used for conservation purposes.

Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Tanzania, 2014, App. 130-31. Similarly, for Zimbabwe, Federal Appellees acknowledged the conservation benefits provided by sport-hunting:

There are clearly "bright spots" of elephant conservation efforts, carried out by non-governmental entities, scattered around Zimbabwe that are providing a benefit to elephants.

Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies in Zimbabwe 2014, July 22, 2014, 13, *available at* http://www.fws.gov/international/pdf/enhancement-finding-July-2014-elephant-Zimbabwe.PDF (last visited Aug. 25, 2014). If hunting provides conservation benefits, the loss of hunting and hunter-generated revenues deprives Zimbabwe and Tanzania of conservation resources and results in harm to elephant conservation efforts.

SCI/NRA do not need to produce scientific evidence to demonstrate that a loss of significant conservation resources causes a loss to conservation. Because uncontroverted declarations[11] filed in support of a motion for a preliminary injunction may be taken as true, the first-hand evidentiary statements included in SCI/NRA's declarations are more than sufficient to establish that harm. *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).

Federal Appellees mistakenly suggest that the logical conclusions that SCI/NRA have drawn concerning the risks to elephant conservation would not pass Article III standing causal connection requirements. Fed. Br. at 57. In fact, as discussed earlier in this Reply, this Court has already acknowledged the standing

---

[11] Neither of the two declarations submitted by Federal Appellees in support of their Motion to Dismiss addresses the impact of U.S. hunters and U.S. hunting revenues on the conservation of elephants in Zimbabwe and Tanzania and therefore do not "controvert" the declarations submitted by SCI/NRA.

of those asserting that an importation ban would harm the conservation of sport-hunted wildlife due to a loss of revenues used for conservation purposes resulting from hunters cancelling their hunts. *Fund for Animals v. Norton*, 322 F.3d at 734. For the same reasons this Court found nothing conjectural about the harm to conservation of Mongolia's argali sheep, this Court should find nothing speculative about the harm to elephant conservation caused by the removal of a recognized and major source of elephant conservation funding.

Federal Appellees considered the risk to elephants in Zimbabwe and Tanzania so dire that they took immediate action without advance notice to the countries involved or the public. Despite the ostensible severity of the situation, Federal Appellees argue that the consequences of a decrease in funding undeniably used to combat elephant poaching are speculative. Instead, Federal Appellees ask this Court to believe their own speculative prediction – "that the [Service's] actions will spur the governments of those countries to better support conservation efforts, consistent with CITES and the ESA's goals." Fed. Br. at 60. But where will the money for these efforts come from, if not from the hunters who have been the major if not sole support for elephant conservation for decades?

### 3. SCI/NRA Members' Economic Harm, Together With Their Other Injuries, Qualifies As Irreparable Harm

As SCI/NRA explained in their opening brief, they do not rely on economic loss "in and of itself" to demonstrate irreparable harm. SCI/NRA Opening Br. at

47.  Federal Appellees do not challenge the fact that SCI/NRA members, both

hunters and professional hunters, have sustained economic losses as a result of the

importation bans.  They simply argue that SCI/NRA cannot show that these

economic losses threaten the very existence of their businesses.  SCI/NRA have no

need to do so.  The economic losses experienced by SCI/NRA members are a

component of the numerous harms they suffer and add to the recreational and/or

conservation losses they have and continue to experience.  Other courts have

expressly addressed the ability of a petitioner to combine economic and non-

economic losses to meet the irreparable harm standard required for preliminary

injunctive relief.  *See e.g.*, *Carrillo v. Schneider Logistics*, 2012 WL 556309 *7

(C.D.CA.) *aff'd,* 501 F. App'x 713 (9th Cir. 2012)("When combined with the

irreparable economic injuries plaintiffs face, these threatened harms leave no doubt

that the "irreparable harm" element is met."); *Shell Offshore Inc., v. Greenpeace

Inc.*, 864 F.Supp.2d 839, 851 (D. Ak. 2012)(Court combined economic and non-

economic losses for finding of irreparable harm sufficient to enjoin activities

against offshore drilling vessels).  This Court should reject Federal Appellees'

attempts to impose an inapplicable burden on SCI/NRA's economic harm

allegations.

## III.    CONCLUSION

SCI/NRA's challenges to Federal Appellees' April 4, 2014 Zimbabwe

elephant importation ban are not moot because that action continues to apply to elephants hunted between April 4 and July 31. SCI/NRA do not need a permit denial for standing to challenge the Tanzania importation ban. Consequently, this Court has jurisdiction to consider SCI/NRA's appeal of the denial of their preliminary injunction motion.

SCI/NRA have demonstrated facts that show that the importation bans have resulted in a decrease in a major source of funding for elephant conservation. This, as well as the other imminent recreational, conservation and economic harms suffered by SCI/NRA, meets the standards for irreparable harm. SCI/NRA request that this Court reverse the ruling of the court below and remand this matter to the District Court for consideration of the remaining factors necessary for preliminary injunctive relief.

Dated: August 25, 2014

Respectfully submitted,

/s/Anna M. Seidman
Anna M. Seidman
Douglas Burdin
501 2nd Street NE
Washington, D.C.
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org

*Counsel for Plaintiff*
*Safari Club International*

Christopher A. Conte
National Rifle Association of
America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org

*Counsel for Plaintiff*
*National Rifle Association of America*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> [X] this brief contains 6,988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

> [ ] this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> [X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font, or

> [ ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated:  August 25, 2014                    Respectfully submitted,

                                           /s/Anna M. Seidman

                                           *Counsel for Plaintiff/Appellant*
                                           *Safari Club International*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 25th day of August 2014, a true and correct copy of the Reply Brief of Appellants Safari Club International and National Rifle Association of America was electronically filed through the CM/ECF system, which caused all parties to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

/s/ Anna M. Seidman
Anna M. Seidman

*Counsel for Appellants,*
*Safari Club International*

# ADDENDUM

Except for the following, all applicable statutes and regulations are contained in the Brief of Plaintiffs-Appellants Safari Club International and National Rifle Association of America.

## TABLE OF CONTENTS

5 U.S.C. § 551(4)..........................................................................REPLY ADD 1



expenses in the same manner as the payment of final judgments as provided in this Act [probably should be "this title", see Short Title note above] would be effective only to the extent and in such amounts as are provided in advance in appropriation Acts, was repealed by Pub. L. 99–80, §4, Aug. 5, 1985, 99 Stat. 186.

## SUBCHAPTER II—ADMINISTRATIVE PROCEDURE

### SHORT TITLE

The provisions of this subchapter and chapter 7 of this title were originally enacted by act June 11, 1946, ch. 324, 60 Stat. 237, popularly known as the "Administrative Procedure Act". That Act was repealed as part of the general revision of this title by Pub. L. 89–554 and its provisions incorporated into this subchapter and chapter 7 hereof.

## § 551. Definitions

For the purpose of this subchapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

or except as to the requirements of section 552 of this title—

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;

(2) "person" includes an individual, partnership, corporation, association, or public or private organization other than an agency;

(3) "party" includes a person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes;

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

(6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7) "adjudication" means agency process for the formulation of an order;

(8) "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

(9) "licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

(10) "sanction" includes the whole or a part of an agency—

(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;

(B) withholding of relief;

(C) imposition of penalty or fine;

(D) destruction, taking, seizure, or withholding of property;

(E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;

(F) requirement, revocation, or suspension of a license; or

(G) taking other compulsory or restrictive action;

(11) "relief" includes the whole or a part of an agency—

(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

(B) recognition of a claim, right, immunity, privilege, exemption, or exception; or

(C) taking of other action on the application or petition of, and beneficial to, a person;

(12) "agency proceeding" means an agency process as defined by paragraphs (5), (7), and (9) of this section;

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

(14) "ex parte communication" means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 381; Pub. L. 94–409, §4(b), Sept. 13, 1976, 90 Stat. 1247; Pub. L. 103–272, §5(a), July 5, 1994, 108 Stat. 1373; Pub. L. 111–350, §5(a)(2), Jan. 4, 2011, 124 Stat. 3841.)

### HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (1) .............. | 5 U.S.C. 1001(a). | June 11, 1946, ch. 324, §2(a), 60 Stat. 237. <br> Aug. 8, 1946, ch. 870, §302, 60 Stat. 918. <br> Aug. 10, 1946, ch. 951, §601, 60 Stat. 993. <br> Mar. 31, 1947, ch. 30, §6(a), 61 Stat. 37. <br> June 30, 1947, ch. 163, §210, 61 Stat. 201. |